UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

FRIENDS OF HAMILTON GRANGE and
DR. JOHN CARDWELL,

**08 CV 5220**

Plaintiffs,                    08 Civ. _____

-against-

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

DIRK KEMPTHORNE, Secretary of the Interior;
U.S. DEPARTMENT OF THE INTERIOR,
MARY A. BOMAR, Director of the National Park
Service; NATIONAL PARK SERVICE; and
MARIA BURKS, Commissioner of National Parks
of New York Harbor and Superintendent of Manhattan
Sites,

Defendants.

RECEIVED
JUN 0 6 2008
U.S.D.C. S.D. N.Y.
CASHIERS

-------------------------------------------------------------x

Plaintiffs, Friends of Hamilton Grange ("Friends") and Dr. John Cardwell, by

their attorneys Emery Celli Brinckerhoff & Abady LLP, for their complaint, alleges as follows:

## INTRODUCTION

1.      This case is about the relocation and restoration of the home of Alexander

Hamilton, a founder of our Nation. Hamilton's home, the Hamilton Grange, located in the

Hamilton Heights neighborhood in northern Manhattan, is a National Memorial and a National

Historic Monument under the care and control of defendant National Park Service.

2.      The Grange currently rests on a transportation platform in the middle of

Convent Avenue in advance of its imminent journey a few short blocks to St. Nicholas Park

where it will be repaired and restored in a setting more closely reminiscent of its historical past.

3.     Plaintiffs do not contest the relocation and restoration of the Grange. Indeed, plaintiffs have been instrumental in bringing about this important undertaking through their steadfast advocacy over the course of more than twenty years. Plaintiffs instead challenge the recent decision by the Park Service to undermine those decades of hard work and dedication by turning the Grange one-hundred and eighty degrees from its historically accurate and previously agreed upon southerly orientation. This is no small matter.

4.     Pursuant to the Park Service's own Final General Management Plan and Environmental Impact Statement, it was decided, after a long and arduous process, that the Grange would be oriented in its original direction facing southwest. As described in the summary, the "dining room and parlor would be fully restored, and the mirrored folding doors that once separated them and reflected the sylvan setting of the house would be re-created." The single most important room in the house, from an architectural and historical perspective, is the dining room, which originally faced to the southeast, with the view down the ridge to the Harlem Plain displayed through a large bay of floor to ceiling windows. The doors and panels making up the back three walls of the octagonal room were mirrored, to amplify the eastern light and reflect the foliage and view out the bay window.

5.     In a single stroke, without input from the parties to the Final GMP, including plaintiff Friends of Hamilton Grange (the entity the Parks Service itself designated for consulting on such matters), or the community or public at large, defendants have now decided to reposition the all important dining room so it will face *the rear wall* of a large building instead of out into the leafy glade of St. Nicholas Park.

6.      Defendants illegal, irresponsible and unilateral decision to reverse the orientation also places Hamilton's study – originally located on the south corner of the house, with its bright, all day natural light and panoramic view from the East River to the Hudson – so that it will now face north, into the into the same wall as the dining room through one window and onto the urban traffic of West 141st Street through the other.

7.      Defendants' ill-considered decision to reverse the orientation of the house is a disaster.  It, along with the decision to abandon the interpretive and community center that it committed to fill the void caused by the move, is exactly the result that plaintiffs, the community and many other interested parties worked tirelessly (and successfully) to prevent during the process that culminated with the Final GMP.

8.      The only substantive justification offered thus far by the Park Service is that spinning the Grange will make compliance with the Americans with Disabilities Act less costly and more elegant, combined with the general notion that the front of a house should invitingly face the street (which defendants intimate, apropos of nothing, most modern urban homes currently do).  Needless to say, these are woefully inadequate justifications for destroying a National Historic Landmark that is more than 200 years old, the home of a founding father, and one of only forty-four National Memorials in the entire United States.

9.      The Park Service's decision abrogates the Final GMP was without consultation with plaintiffs and others as mandated by the National Historic Preservation Act (the "NHPA" or the "Act").  Had defendants complied with their obligations, plaintiffs would have been afforded a meaningful opportunity to be heard concerning the decision.  Moreover, the

decision itself directly violates the Act's command that defendants must "minimize harm" to the historical authenticity of the Hamilton Grange "to the maximum extent possible."

## JURISDICTION AND VENUE

10.    This action arises under the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, and its implementing regulations, the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

11.    The jurisdiction of this Court is predicated upon 28 U.S.C. § 1331.

12.    The acts complained of occurred in the Southern District of New York. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(e).

## PARTIES

13.    Plaintiff Friends of Hamilton Grange ("Friends") is an unincorporated association created in 1994 at the behest of defendant National Park Service (the "Park Service" or "NPS"), as an umbrella organization for the community groups, property owners, professional preservationists and other interested parties who consulted extensively with the Park Service throughout the process that led to the 1995 Final General Management Plan and Environmental Impact Statement (the "Final GMP"). The Final GMP provided for the physical relocation and restoration of the house of Alexander Hamilton and the building of an interpretive and community center at its current location. During the period leading to the Final GMP, Friends consulted with the Park Service, raised funds, provided historical expertise and documentation, and mediated community controversy over the proposed moving of the house. As set forth in the Final GMP, the Park Service committed that Friends "would be actively involved . . . in the

future restoration of Hamilton Grange and in the mitigation of any concers that might arise,
especially those that arise from moving the Grange from its current site." Final GMP at 7.

14.     Plaintiff Dr. John Cardwell is chairperson of the Friends of Hamilton
Grange. He has lived in the Hamilton Heights neighborhood since 1980. He served as President
of the Hamilton Heights Homeowner's Association ("HHHA") from 1991 to 2001, which is also
a member of Friends. As Chairperson of Friends, and in his individual capacity as a long time
resident of the community tied to Hamilton Grange with a keen interest in historical preservation
issues, Dr. Cardwell has suffered from defendants failure to comply with sections 106 and 110 of
the National Historic Preservation Act (the "Act" or "NHPA" (codified at 16 U.S.C. § 470 *et
seq.*)) and will continue to suffer absent the declaratory and injunctive relief sought by this
action.

15.     Defendant Department of the Interior ("Interior") is a department of the
United States. The Mission of Interior is to protect and provide access to our Nation's natural
and cultural heritage. Interior is responsible for implementing the NHPA and overseeing the
National Park Service.

16.     Defendant Dirk Kempthorne is Secretary of the Interior. As Secretary,
defendant Kempthorne has primary responsibility for implementing the National Historic
Preservation Act and ultimate authority over the National Park Service. Defendant Kempthorne
is sued in his official capacity.

17.     Defendant National Park Service ("NPS" or "Park Service") is an agency
within the Department of the Interior. The mission of the Park Service is to preserve unimpaired
the natural and cultural resources and values of the national park system and in cooperation with

partners to extend the benefits of natural and cultural resource conservation throughout this country and the world. The Park Service administers the Hamilton Grange National Memorial, which is a National Historic Landmark and the subject of this action.

18. · Defendant Mary A. Bomar is Director of the Park Service, an agency within the Department of the Interior. As Director, defendant Bomar is responsible for ensuring that the Park Service complies with the mandate of the National Historic Preservation Act. Defendant Bomar is sued in her official capacity.

19. Defendant Maria Burks is the Commissioner of National Parks of New York Harbor and Superintendent of Manhattan Sites. As Commissioner, and as Superintendent, defendant Burks is responsible for all aspects of Hamilton Grange, one of the Manhattan sites. Defendant Burks is sued in her official capacity.

### FACTS

**A.    History of Hamilton Grange**

20. The Hamilton Grange was built in 1802 by Alexander Hamilton, one of our nation's founders. It was originally located on a 32 acre estate in the then rural northern end of Manhattan. The Hamilton Grange was designed by John McComb, Jr., who, together with Joseph Mangin, also designed New York's City Hall.

21. This Federal style wood framed house was located on the ridge of Harlem Heights on a site offering wide views to the Hudson Palisades and east over the Harlem Plains to the East River. Essentially square in plan, the southwesterly oriented front facade was close to symmetrical with the northeast-facing rear elevation. Between the large side porches and the central public rooms, the alignment of the design was essentially lateral.

-6-

22.    The most important public room of the house, from an architectural and historical perspective, was the dining room, facing to the southeast, with the view down the ridge to the Harlem Plain displayed through a large bay of floor to ceiling windows. The doors and panels making up the back three walls of the octagonal room were mirrored, to amplify the eastern light and reflect the foliage and view out the bay window.

23.    Additionally, Hamilton's study, where he spent most of his day while he was there, was on the southern corner of the house, with a window to the south east and a window to the south west, making the most of the natural lighting of a southerly exposure.

24.    In 1887, the Hamilton Grange was moved from its original location in 1887 when Hamilton's estate was subdivided into city lots to form the neighborhood that is now Convent Avenue between approximately 140th street and 148th street. The Grange was moved onto one of the subdivided row house lots. It was stripped of its front and back porches and sandwiched sideways between a church and an apartment building. There it has remained, obscured, underutilized, and largely neglected.

25.    The Hamilton Grange was declared a National Historic Landmark in 1960.

26.    As a National Historic Landmark, Hamilton Grange is also automatically listed on the National Register of Historic Places.

27.    In 1962, Congress designated the Hamilton Grange as a National Memorial. It is currently one of only forty-four national memorials in the United States.

28.    The area in which the Hamilton Grange is located, the Hamilton Heights Historic District, also known as "Sugar Hill", has played an important role at the pinnacle of

-7-

Harlem society, culture, economy and politics. The Hamilton Heights Historic District ("HH

Historic District") is also listed on the National Register of Historic Places.

**B.      Hamilton Grange Restoration**

29.     Hamilton Heights features a vigorous community leadership active in

many block associations, prestigious churches, civic associations and Community Board 9

("CB9").

30.     Beginning in the mid-1980s, the Hamilton Heights Homeowners

Association ("HHHA"), a not-for-profit corporation and member of plaintiff Friends of Hamilton

Grange, undertook to persuade the Park Service to fully restore the Hamilton Grange.

31.     In 1987, as part of the bi-centennial celebration of the U. S. Constitution,

the HHHA planted a sweet gum tree in front of the Grange, and others around the neighborhood,

reminiscent of the thirteen sweet gum trees planted by Hamilton to symbolize the original

thirteen colonies.

32.     The HHHA then commenced a campaign to win the Park Service's

agreement to a restoration. Through its annual Hamilton Heights House and Garden tours, the

HHHA raised $8,500 to contribute to the restoration of the Hamilton Grange. The HHHA

conducted outreach with local schools and involved school children in caring for the sweet gum

trees, as part of an effort to educate the community about the Hamilton Grange.

33.     On November 8, 1990, defendant Park Service entered into a

Memorandum of Agreement with the HHHA, in which the HHHA agreed to raise funds, and

contribute historic materials, and the Park Service agreed to "administer and develop the

Hamilton Grange National Memorial according to plans developed through a documented

process of public participation, commensurate with available funds." The Park Service also committed itself to support the efforts of HHHA to provide facilities for its meetings at the Grange, as well as for other community programs.

34.    On or about December, 1990, the HHHA made a donation of $8,500 to the Park Service.

## C.    Legitimate Hamilton Grange Restoration Review Process

35.    In the early 1990s, the Park Service commenced a process of consultation and public participation in evaluating the adverse effects of various restoration proposals.

36.    This process resulted in a draft General Management Plan and Environmental Impact Statement "Draft GMP" in 1993. The 1993 Draft GMP proposed the removal of Hamilton Grange from its current location to near by St. Nicholas Park. The Draft GMP proposed that the front of the house would be oriented facing northeast onto the street instead of southwest onto open park land with trees and grass as it had been in Hamilton's time.

37.    Initial proposals to move the Grange to the more open St. Nicholas Park were met with significant community opposition. The Hamilton Grange Community Taskforce to Prevent the Removal of the Grange led by St. Luke's Episcopal Church gathered 538 signatures on a petition opposing relocation of the Grange. Convent Avenue Baptist Church obtained another 74 signatures.

38.    One concern articulated by community opponents of the move was that the proposed pocket park on the lot vacated by a relocated Grange would attract crime. Concerns were also expressed that the Park Service would not follow through on commitments to adequately secure, maintain and operate the Grange.

39.    More important, however, was an underlying distrust of the National Park Service in the Hamilton Heights community.  The community regarded the Park Service as outsiders threatening to deprive the community of control over and access to its own historical resources.  The Hamilton Heights community felt a strong sense of ownership over the Grange. Members of the surrounding community volunteered their time to support the Grange.  The community used the Grange for meetings and events, and actively promoted and supported the restoration of the Grange for years when the Park Service appeared to be neglecting it.

40.    The community concerns that the Grange would be taken away were not unfounded.  On information and belief, in the early 1980s, when it was assumed white tourists would not venture into Harlem to see the Grange, the Park Service proposed removing the Hamilton Grange from Harlem altogether and placing it next to Grant's Tomb on Morningside Heights, a largely white neighborhood.   This proposal was defeated by vocal Hamilton Heights community opposition.

41.    From 1992 to 1995, preservationists interested in the Hamilton Grange, including author Michael Henry Adams, and the HHHA led an effort in which members of the community, as well as Community Board 9 worked with the Park Service to address community concerns about a proposed move to St. Nicholas Park.  These organizations and individuals, together with other block associations and preservationists were convened in 1994 by the Park Service into a single consulting party, the Friends of the Hamilton Grange.  They met formally as a group on two occasions in 1994.

42.    As a result of the outreach and mediation performed by members of the Friends of Hamilton Grange, a consensus was reached to support a plan for moving the Grange to

St. Nicholas park because that option would maximize historic the authenticity of setting and appearance, and because it would also include the building of a brand new interpretive and community center on the Convent Avenue site from which the Grange was to be removed.

43.     In 1994, Community Board 9 approved the plan to move the Grange to St. Nicholas Park, specifying a "full architectural restoration of the Grange in its interior and exterior appearance during Hamilton's residency and landscaping of a setting more reflective of its original rural placement" and to "construct upon the present Convent Avenue site a compatible structure housing a Ranger residence, exhibition space, and a reception room for community use."

**D.     The 1995 Final General Management Plan**

44.     The twin aims of (1) restoring Hamilton Grange in an historically authentic setting and (2) enhancing community use by building an interpretive and community center at the Convent Avenue site were incorporated into the1995 Final General Management Plan and Environmental Impact Statement (the "Final GMP").

45.     In the Final GMP, the Park Service represented that it had "and would continue to comply with all applicable laws, regulations, and executive orders, including . . . Section 106 of the National Historic Preservation Act." Final GMP at 70-73.

46.     The Final GMP cited historic authenticity as the rationale for the move to St. Nicholas Park. The Park Service proposed to recreate a setting most nearly like the original. The review process had brought about a number of changes and modifications. For plaintiffs, the most significant change won in the review process was the restoration of the house to its original southernly orientation.

-11-

47.     Under the Final GMP, the Park Service recommended that the house be oriented in its originally designed direction, with the front door towards the southwest and the important dining room looking out to the southeast, down the hill into the park, and with Hamilton's study on the southern corner to receive southeastern morning light and southwestern afternoon light. As described in the summary, the "dining room and parlor would be fully restored, and the mirrored folding doors that once separated them and reflected the sylvan setting of the house would be re-created." *Id.* at v. In front of the southwest front door there was to be a lawn, intended to be used for community and ceremonial events.

48.     The GMP also proposed to build a new two story interpretive and community center at the vacated site at 287 Convent Avenue. *Id.*

**E.     Friends of Hamilton Grange – A Consulting Party**

49.     The Friends of the Hamilton Grange was identified by the Park Service in the Final GMP as a present and future stakeholder and consultant in all issues concerning the restoration of the Grange. Most of the member organizations or individual members of Friends of the Hamilton Grange had been included in the circulation of the 1993 Draft GMP, and many, including the Hamilton Heights Homeowners Association, submitted comments in response.

50.     In the 1995 Final General Management Plan, the Park Service committed itself to "work with" the Friends of Hamilton Grange, and that the Friends of Hamilton Grange would be "actively involved" in "the future restoration of Hamilton Grange and in mitigation of any concerns that might arise, especially those that arise from moving the Grange from its current site." *Id.* at 7. The Service distributed the Final GMP to members of Friends of Hamilton Grange under cover addressed to "Friends of Hamilton Grange."

-12-

51.　　Included in the Final GMP were the communications received from various individuals, organizations and government agencies with interest in the project and responses from the Park Service. *See id.* at 75-187 ("Consultation and Coordination").

52.　　The National Trust for Historic Preservation explained that it was "aware that there are issues related to the siting of the structure in St. Nicholas Park" and commented that it trusted "that the National Park Service will involve local organizations, neighborhood groups and the New York Landmarks Preservation Commission in these decisions." In response the Park Service asserted that it had "involved and would continue to involve all interested parties in the development and implementation" of the move to St. Nicholas Park. The Park service agreed that the "Friends of Hamilton Grange group . . . would be involved with the National Park Service in relocating the Grange" and that "[r]epresentatives of the different groups and interests in the community would be invited to join the group." *Id.* at 157-58.

53.　　The Municipal Art Society of New York commented that in "restoring Hamilton Grange on its new site, every effort should be made to restore its original orientation and to allow visitors to enter through its original front door" because "[o]rientation both with regard to topography and to the sun, has always been an important aspect of architecture, and nowhere more so than in the design of classic villas." The Society presciently cautioned that the "opportunity to restore Hamilton Grange to its full architectural and scenic splendor will not come again." *Id.* at 155-56.

54.　　The Hamilton Heights Homeowners Association commented that it "would like to be represented on any group established to monitor the Grange development." The Park Service responded that Friends of Hamilton Grange would be involved and that

representatives "of the different groups and interests in the community would be invited to join the group. *Id.* at 149-50.

55.    In response to a 1993 comment of the New York City Landmarks Preservation Commission, the Park Service expressly committed to consult with the Friends of Hamilton Grange in the event of any possible alteration to the location or orientation of the house.  The Park Service stated, "…based on site topography, the location of the 141st Street, and the location of Steinman Hall, the most appropriate orientation of the house (within the acreage acquired) might be changed during the design process *in consultation with the Friends of the Hamilton Grange group.*" *Id.* at 93-95 (emphasis supplied).

56.    The comments of Community Board included a resolution that called "for the institution of a community-based organization, Friends of the Hamilton Grange, to be allowed an active support and oversight role toward the Grange – in guarantee of the community interest in this long-treasured National Memorial, the foremost historic and architectural endowment within our boundaries of responsibility."  In response, the Parks Service reiterated that the "Friends of Hamilton Grange" would serve that role. *Id.* at 99-100.

**F.    Delay**

57.    From 1995 to 2001, while the Park Service obtained an easement to the land in St. Nicholas Park, and from 2001 to 2006, while waiting for funding to be secured, the Friends of Hamilton Grange did not meet formally, but its members, all active in local community affairs, kept in contact and frequently discussed the Hamilton Grange.

58.    On information and belief, Members of Friends of the Hamilton Grange inquired of the Park Service by phone with then Superintendent of Manhattan Sites Joseph

-14-

Avery, concerning the status of the project. Superintendent Avery repeatedly told them there was nothing to consult about until the easement to the St. Nicholas receiving site was secured, and then that there was nothing to consult about until funding was secured.

59.     In 2000, the Hamilton Heights West Harlem Community Preservation Organization, concerned at the lack of progress, wrote to the Park Service Northeast Regional Director protesting the lack of movement on the project, and asking for information regarding the project status. Superintendent Avery wrote back explaining that the transfer of an easement would require review under New York City's Uniform Land Use Review Procedure ("ULURP"), but that "planning related to the project, including for the facility which will replace the Grange on Convent Avenue, will begin soon." However, when the Hamilton Heights West Harlem Community Preservation Organization called to follow up that year, and on at least two occasions between 2001 and 2004, they were told each time that no further planning was under way, and that there would be nothing to consult about, until funding was obtained.

60.     In 2001 the Park Service applied for review of the land easement transfer in St. Nicholas Park, as provided under New York City's Uniform Land Use Review Process. The Park Service's application was approved by Community Board 9 on June 21, 2001.

61.     Members of the Friends of Hamilton Grange who are also members of Community Board 9 and were present at that meeting have stated that the issue of orientation of the Grange in the new location was never so much as mentioned during the meeting, much less presented for approval. No site plan of the Grange in its relocation site was provided.

62.     On information and belief, in September 2005, Park Service Superintendent of Manhattan Sites James Pepper appeared at the meeting of Community Board 9

and announced that the Park Service would not be funding the interpretive and community center on Convent Avenue. The Park Service's decision directly contravenes its commitment as set forth in the Final GMP. Community approval would not have been obtained in 1995 had it been known that the Parks Service would renege on this commitment.

63.    On information and belief, members of the Community Board 9 objected, including members of the Friends of Hamilton Grange. They were told by Pepper that funding for the interpretive and community center could be sought separately. Pepper warned that contesting the agency's determination to provide only partial funding would delay further, and possibly jeopardize funding for the entire project. The Park Service ultimately obtained partial funding for the GMP for fiscal year 2007.

**F.    The Sham/Non-Existent Hamilton Grange Restoration Review Process**

64.    On March 24, 2006, more than eleven years after the Final GMP and five years after negotiations with New York City for an easement on the site in St. Nicholas were concluded, the Park Service entered into a secret Programmatic Agreement, ostensibly pursuant to 36 C.F.R. § 100.14. The other parties to the agreement were the New York State Office of Historic Preservation, the New York City Department of Parks and Recreation, and the New York City Landmarks Preservation Commission.

65.    The Programmatic Agreement did not include the Friends of Hamilton Grange, a party with whom the Service, in the 1995 General Management Plan, had made explicit commitments to consult. The Programmatic Agreement also excluded other consulting parties from the pre-1995 process, such as Community Planning Board 9.

-16-

66.    The Programmatic Agreement specified the interpretive and community center at the vacated Convent Avenue site would be treated as a separate action, outside the scope of the Programmatic Agreement.

67.    Neither the Friends of Hamilton Grange and its members, nor Community Board 9, nor the public, was given notice of the Park Service's proposal of such a Programmatic Agreement.

68.    Neither the Friends of Hamilton Grange and its members, nor Community Board 9, nor any member of the public, was consulted in the development of the Programmatic Agreement.

69.    Neither the Friends of Hamilton Grange and its members, nor Community Board 9, nor the public, was given notice of the Park Service's execution of a Programmatic Agreement.

70.    Indeed, the existence of the Programmatic Agreement was not discovered by Community Board 9 until late March, 2008 and even then it was not obtained from the Parks Service.

71.    The Park Service made no effort to contact the Friends of Hamilton Grange and/or its members, or Community Board 9, or the public, until late 2006.

72.    On information and belief, in late November 2006 Superintendent Pepper notified Carolyn Kent, co-chair of the Community Board 9 Parks and Landmarks Committee, that the Park Service's plan to move Hamilton Grange would be unveiled on December 21, 2006. The unveiling was not open to the public; it was invitation only.  Ms. Kent objected to holding

-17-

the meeting so near the holidays, but yielded to Superintendent Pepper's insistence that he was under pressure to have the meeting before the end of the year.

73.     On information and belief, at the meeting of December 21, 2006, during discussion of some new findings made by Park Service architect Stephen Spaulding, a passing reference was made to the reversal of the orientation from that specified in the Final GMP.

74.     On information and belief, members of the Community Board 9 Parks and Landmarks Committee (the "CB9 Committee"), including Michael Henry Adams and Yuien Chin, who, along with others, were also members of the Friends of Hamilton Grange, vigorously challenged the proposed re-orientation as a significant degradation of historic preservation values, and a breach of agreements, including the commitment to consult with the Friends of Hamilton Grange *prior* to considering any changes to the Final GMP.

75.     Defendants' sudden ill-considered decision to reverse the orientation of the house was (and unfortunately remains) a disaster.  It was exactly the result the community and many other interested parties worked tirelessly (and successfully) to prevent when they participated in the process preceding the Final GMP.

76.     In one fell swoop, without input from the parties to the Final GMP, including the Friends of Hamilton Grange (the entity designated by defendants for the express purpose of consulting on such matters), or the community or public at large, defendants had repositioned the elegant dining room with its mirrored panels so it faces *the rear wall* of City College of New York's Steinman Hall instead of out into the leafy glade of St. Nicholas Park.

77.     Defendants illegal, irresponsible and unilateral decision to reverse the orientation also placed Hamilton's study – originally located on the south corner of the house,

-18-

with its bright, all day natural light and panoramic view from the East River to the Hudson – so that it would face north, into the into the back of Steinman Hall through one window and onto the urban traffic of West 141st Street through the other.

78.    On information and belief, in February, 2007, defendant Park Service Commissioner Maria Burks appointed herself as Superintendent of Manhattan Sites, replacing James Pepper.

79.    On information and belief, thereafter, defendant Burks attended a special meeting of the CB9 Committee on April 9, 2007.  Members of the CB9 Committee, including Michael Adams and other members of the Friends of the Hamilton Grange, objected to the proposed reorientation on grounds of loss of historical authenticity, relation to setting, destruction of views and lighting to the important dining room and study, the violation of the prior agreement, and the Park Service's failure to consult.

80.    On information and belief, at the meeting of April 9, 2007, members of CB9, including members of the Friends of Hamilton Grange, asked whether, to reduce expense and delay, the house could not be rotated on the designed foundation, since it was symmetrical in form.  Park Service Architect Spaulding responded that such a solution was feasible, with only small changes, minor expense and delay.

81.    On April 30, 2007, Carolyn Kent, co-chair of the CB9 Committee met with defendant Burks.  On information and belief, when presented with a copy of the 1995 GMP, defendant Burks expressed surprise, explaining that she "never seen this before."

82.    On information and belief, in late November the Park Service called Community Board 9 to ask for help in publicizing a proposed meeting with the community it had

planned for December 13, 2007 in order to announce its plan for moving the Hamilton Grange. At the insistence of CB9 chair Jordi Reyez-Montblanc, defendant Burks attended the regularly scheduled meeting of the CB9 Parks and Landmarks Committee on December 10, 2007. At that meeting members of Community Board 9 were first informed that the Park Service had entered into contract for the moving and re-siting of the Grange. A large attendance, including members of the Friends of the Hamilton Grange, protested the reorientation and the failure of the Park Service to consult with Community Board 9 prior to entering into contract. The Park Service did not respond.

83.    On December 13, 2007, the Park Service held a public meeting announcing the move of the Grange. At the meeting, members of the Friends of the Hamilton Grange and others contested the change of orientation and the cancellation of the interpretive and community center. The Park Service did not respond.

84.    On January 8, 2008, the Park Service distributed a flyer in the Hamilton Heights neighborhood, announcing that the Grange would be moved in March 2008. The flier used a rendering of the Hamilton Grange in its new site taken directly from the 1995 GMP, showing the house oriented to the southwest.

85.    Since the beginning of the year, various community based organizations have engaged in a letter writing campaign to Congressman Charles Rangel with the hope that he could mediate the dispute between the community and defendant Burks. Letters were sent to Congressman Rangel by: Community Board 9 Chair Reyez-Montblanc; the Hamilton Heights West Harlem Community Preservation Organization; Friends of Hamilton Grange members, the 141st Street and 142nd Street Block Associations; the Hamilton Terrace Block Association;

Friends of the Hamilton Grange member the Hamilton Heights Homeowners Association; the West 144th Street Land Mark Block Association; and the Morningside Heights Historic District Committee. All of the letters protested the damaging and historically inaccurate orientation of the Grange facing northeast onto a city street.

86.    On March 6, 2008, Friends member, HHHA, frustrated at the failure of the Park Service to offer a reasonable basis for orienting the house to the northeast, wrote the Park Service seeking information under the Freedom of Information Act.

87.    On information and belief, in late March, 2008, CB9 Committee co-chair Kent managed to obtain a copy of the March 24, 2006 Programmatic Agreement between the Park Service, the New York State Office of Historic Preservation, the New York City Parks Department, and the New York City Landmarks Commission. Defendants had concealed the existence of the Programmatic Agreement from anyone connected with Community Board 9 or the Friends of Hamilton Grange or the Hamilton Heights community for over two years.

88.    On March 20, 2008, Community Board 9 voted 27 to 3 to protest the Park service's wilful violation of its commitments to the community in the 1995 GMP, including its commitment to preserve the historic orientation of the house.

89.    On April 8, 2008, defendant Burks wrote to Patricia Jones, the new chair of CB9, acknowledging the ongoing, "unresolved distress" the Park Service's proposed action was causing, but declaring that the decision of the Park Service as to orientation was final. Defendant Burks explained in the letter that the basis for her decision was to accommodate the 1993 comment of the New York City Land Marks Preservation Commission that the building should be oriented to fit the topography of the site. To date, the only justification ever offered by

defendant Burks to justify her decision has been the undesirable impact on the landscape from handicap access path around to the south of the building, and the need to present the front facade to visitors approaching from West 141ˢᵗ Street.

90.    On information and belief, in late April 2008 the Park Service produced records in response to HHHA's Freedom of Information Law request. The documents provided did not disclose when, by whom, and on what basis, or by what process the decision was made to reorient the grange towards the northeast or to abandon the Convent Avenue interpretive and community center. The disclosure did, however, contain an April 13, 2008 letter of defendant Burks to the New York City Art Commission that cited "Community Board 9 approval for the relocation and reorientation of Alexander Hamilton's home" at the CB9 meeting of June 21, 2001. This is false. No such approval was ever granted.

91.    The Park Service's disclosures revealed that the approval of the New York State Historic Preservation Office, the New York City Department of Parks and New York City Land Marks Preservation Commission under the Programmatic Agreement had each been made by staff, without public notice or proceedings.

92.    On May 13, 2008, Friends sent a letter of appeal to the Park Service alleging that its use of a Programmatic Agreement violated NHPA and its implementing regulations, and that the further undertaking of reorienting the Hamilton Grange to the northeast was not in accordance with law.

93.    On May 15, defendant Burks and architect Spaulding met with members of the Friends of Hamilton Grange and CB9 at the request of HHHA. Burks stated that the question of orientation was now irreversible, and that the purpose of the meeting from her

-22-

perspective was for her to explain why and how she made her decision. Architect Spaulding quickly ran through a display of plan drawings, explaining alleged obstructions to the site caused by handicap access ramps, retaining walls and railings if the house were restored to its original orientation to the southwest. The Friends of Hamilton Grange then presented an architect, Paul Sheehan, who explained that there were many ways to achieve ADA compliance than just the three drawings presented by the Park Service. Superintendent Burks did not reply, or listen to any alternative proposal. She abruptly ended the meeting after thirty minutes.

94.    As of last week, the Grange was lifted off its Convent Avenue foundation and moved onto a platform erected on the street itself.

95.    There is sufficient space in St. Nicholas Park between the foundation and West 141st Street to leave the house temporarily on its transport platform pending the resolution of this action.

## FIRST CAUSE OF ACTION
(National Historic Preservation Act § 110)

96.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

97.    Section 110(f) of the National Historic Preservation Act ("NHPA" or the "Act") (codified at 16 U.S.C. § 470h-2) provides that: "Prior to approval for any federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking." NHPA § 110(f) (codified at 16 U.S.C. § 470h-29f)).

98.     Plaintiffs assert this claim directly under Section 110 of the Act and its implementing regulations and also via the Administrative Procedure Act, codified at 5 U.S.C. § 701, *et seq.*

99.     Hamilton Grange was designated as a National Historic Landmark in 1960 and a National Memorial in 1962.

100.     The relocation and restoration of the Grange is an undertaking within the meaning of the Act which will directly and adversely affect the Grange.

101.     Defendants did not implement the planning and actions necessary to minimize harm to the Grange. Indeed, defendants bypassed the normal section 106 planning and actions required even for historic properties that are listed on the National Register, but not designated as National Historic Landmarks, as the Grange is.

102.     Defendants' decision to reorient the Grange one hundred and eighty degrees from its intended orientation facing southwest as required by the Final GMP will cause harm to important historical and architectural elements of the Grange, thus degrading its status as a National Historic Landmark.

103.     Defendants' decision to reorient the Grange one hundred and eighty degrees from its intended orientation facing southwest as required by the Final GMP does not "minimize harm" to the Grange "to the maximum extent possible" in violation of the NHPA.

104.     The regulations promulgated by the Advisory Council on Historic Preservation (the "Council") pursuant to the Act provide: "Special Requirements for protecting National Historic Landmarks." 36 C.F.R. § 800.10.

105.    The special requirements direct that: (1) "the agency official shall notify the Secretary [of the Interior] of any consultation involving a National Historic Landmark and invite the Secretary to participate in the consultation where there may be an adverse effect"; (2) "the agency official shall request the Council to participate in any consultation to resolve adverse effects on National Historic Landmarks conducted under § 800.6'" (3) "When the Council participates in consultation under this section, it shall report the outcome of the section 106 process, providing its written comments or any memoranda of agreement to which it is a signatory, to the Secretary" and agency head; and (4) "the Council shall use the process set forth in §§ 800.6 through 800.7 and give special consideration to protecting National Historic Landmarks as specified in this section." 36 C.F.R. § 800.10.

106.    On information and belief, no notice was ever provided to Secretary Kempthorne pursuant to 36 C.F.R. § 800.10(c).

107.    On information and belief, defendants never invited the Council to participate in the consultation, notwithstanding the regulation that requires an invitation when either (1) the "undertaking has an adverse effect upon a National Historic Landmark," or (2) when a "programmatic agreement under § 800.14 will be prepared." 800.6(a)(1).

108.    While the regulations allow agency officials to bypass the Section 106 Process provided for in Subpart B of 36 C.F.R. Part 800 and instead utilize a program alternative such as a Programmatic Agreement under Subpart C of 36 C.F.R. Part 800, the bypass procedure is not permitted in actions governed, as this one, by Section 110 of the Act.

109.    In bypassing the normal Section 106 procedures that are mandatory under 36 C.F.R. § 800.10, defendants violated Section 110 of the Act and its implementing regulations.

110.    Defendants' actions were contrary to law, unreasonable, arbitrary and capricious.

111.    Plaintiffs have suffered and will continue to suffer immediate irreparable harm absent an order enjoining defendants from taking any action that will interfere with a final judgment that the Grange be permanently oriented facing southwest as provided in the Final GMP and directing defendants to comply with their obligations under Section 110 of the Act.

### SECOND CAUSE OF ACTION
(National Historic Preservation Act § 106)

112.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

113.    Section 106 of the National Historic Preservation Act (codified at 16 U.S.C. § 470f) provides that the "head of any Federal agency having direct or indirect jurisdiction over a proposed . . . undertaking shall . . . take into account the effect of the undertaking on any district, site, building or structure that is included . . . in the National Register."

114.    Plaintiffs assert this claim directly under Section 106 of the Act and its implementing regulations and also via the Administrative Procedure Act, codified at 5 U.S.C. § 701, *et seq.*

115.    As a National Historic Landmark, Hamilton Grange is automatically included in the National Register.  The Hamilton Heights Historic District is also included in the National Register.  The Grange has been located in the Hamilton Heights Historic District for many years.

-26-

116.    Defendants violated Section 106 of the Act by failing to meet the consultation and public participation requirements of 36 C.F.R. §800.3-12, and by implementing an alternative procedure without notice of intent to enter into such agreement, of entry into such agreement, or of implementation of such agreement, or provision for public participation pursuant to 36 C.F.R. § 800.14.

117.    Defendants violated the regulations by entering an undertaking in violation of its obligation to consult under 36 C.F.R. 800.2 § (a) (4).  Members of the Friends of the Hamilton Grange demonstrated interest, including financial participation and neighboring property rights, as well as demonstrated concern for the undertaking's effect on historic properties.  The Park Service represented in the 1995 GMP that the Friends of the Hamilton Grange was a consulting party pursuant to § 800.2 (c)(5).  The Friends of Hamilton Grange was designated by the Park Service to represent member organizations, including the Hamilton Heights Homeowner's Association.

118.    Defendants violated the regulations by entering an undertaking without seeking and considering the views of the public, pursuant to § 800.2(d)(1).  Defendants failed to give notice to provide the public with information about an undertaking and its effects on historic properties, pursuant to § 800.2(d)(2).

119.    Defendants' new plan to reorient the house to the northeast represents a new and distinct set of adverse impacts on the historic resource, destroying the natural lighting scheme and view from the dining room and Hamilton's study, two of the most important rooms in the house, facing the former onto the back of CUNY's Steinman hall, and the former onto an

urban street scape. Defendants violated the stated purpose of the prior undertaking to move the house to St. Nicholas Park which was to recreate the original rural setting of the house.

120.    Defendants entered a new undertaking without assessing its adverse effects, altering the characteristics of a historic property as enumerated in § 800.5, including changing the character of the property's setting that contribute to its historic significance, pursuant to 36 C.F.R. 800. 5 (a) (2) (iv) and introducing visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features, pursuant to § 800. 5 (a) (2) (iv).

121.    Defendants failed to consult with consulting parties to develop and evaluate alternatives to the new undertaking pursuant to § 800.6 and § 800.6 (2).

122.    Defendants failed to involve the public by making information available pursuant to § 800.6 (4). The Hamilton Heights Homeowners Association had to resort to the lengthy and cumbersome process of a Freedom of Information Act request just to find the basis for the Park Services's decision to orient the house towards the northeast, or disclosing the agency's procedures in reaching such a position, and its request remains unanswered to date.

123.    Defendants also failed to provide opportunity to members of the public to express their views on resolving adverse effects of the undertaking, pursuant to 36 C.F.R. 800.6 (4).

124.    Alternatively, insofar as defendants' latest plan to reorient the house towards the northeast onto the urban street scape represents a further modification of an unfinished Section 106 Process, pursuant to Sub Part B of the regulations, defendants failed to either terminate its consultation with the Friends of Hamilton Grange pursuant to 36 C.F.R.

800.7 (a), resolve adverse effects pursuant to § 800.7 (b), or produce a modified memorandum of agreement pursuant to § 800.7 (c).

125.    Defendants failed to ensure that the determination, finding or agreement to orient the house towards the northeast is supported by sufficient documentation to enable reviewing parties to understand its basis, as required by § 800.11.

126.    Defendants failed to give notice of its development of an alternative procedure in connection with the Hamilton Grange National Memorial pursuant to § 800.14 (a) (1)  Defendants did not give notice of the availability of alternative procedures in connection with the Hamilton Grange to the Friends of Hamilton Grange, to any member of the Friends of Hamilton Grange, to Community Board 9, or to any member of Community Board 9, or to the public at large.  Defendants did not publish such notice in the Federal Register, pursuant to § 800.14 (a) 3.  Defendants thereby denied the Friends of Hamilton Grange an opportunity to comment, or request inclusion in such Programmatic Agreement.

127.    Defendants acted without legal authority in entering into a Programmatic Agreement.  The land transfer had been accomplished in 2001, five years prior to the Programmatic Agreement.  The project therefore no longer represented a complex project situation or multiple undertaking.  There were no non-federal parties delegated major decision making responsibilities, and no other circumstance has been offered by the Park Service to warrant departure from the normal section 106 process under 36 C. F. R. 800.14 (b) (1).

128.    Defendants failed to consult with members of the public concerning the development of a Programmatic Agreement for the Hamilton Grange National Memorial pursuant to § 800.14 (b) (2) (i).

129.    Defendants failed to arrange for public participation appropriate to the subject matter and scope of the program pursuant to § 800.14 (b) (2) (ii).  Defendants also did not provide adequate opportunities for public involvement consistent with Subpart B of the regulations, in violation of § 800.2 (d) (3).

130.    Defendants failed to give notice of the execution of a Programmatic Agreement, or to give notice before it takes effect pursuant to § 800.14 (b) 2 (iv).  Defendants did not give notice to the Friends of Hamilton Grange, to any member of the Friends of Hamilton Grange, to Community Board 9, or to any member of Community Board 9, or to the public at large, and it did not publish such notice in the Federal Register.  Defendants thereby denied and delayed the Friends of Hamilton Grange the opportunity to pursue administrative or judicial processes for review of defendants' unlawful conduct until this late date.

131.    Defendants also failed to make any internal agency procedures implementing the agreement readily available, as required under § 800.14 (b) 2 (iv).

132.    Defendants' actions were contrary to law, unreasonable, arbitrary and capricious.

133.    Plaintiffs have suffered and will continue to suffer immediate irreparable harm absent an order enjoining defendants from taking any action that will interfere with a final judgment that the Grange be permanently oriented facing the southwest as provided in the Final GMP and directing defendants to comply with their obligations under Section 106 of the Act.


## **RELIEF**

WHEREFORE, plaintiffs request the following relief:


-30-

1.    A judgment declaring that defendants have committed the violations of law
      alleged in this action;

2.    A judgment declaring the Programmatic Agreement null and void;

3.    A preliminary and permanent order:

    a.    Enjoining defendants from situating Alexander Hamilton's house on its
      new foundation with the front of the house facing in any direction other
      than that provided in the Final General Management Plan for Hamilton
      Grange;

    b.    Directing defendants to comply with their obligations under the National
      Historic Preservation Act, including their obligation to consult with and
      obtain the consent of Friends of Hamilton Grange prior to any undertaking
      in connection with the relocation, orientation, restoration, landscaping, or
      operation of the Hamilton Grange National Monument.

4.    An order awarding disbursements, costs, and attorneys' fees pursuant to 16 U.S.C.
      § 470w–4; and

5.    Such other and further relief that may be just and proper.

Dated: June 5, 2008
      New York, New York

                  EMERY CELLI BRINCKERHOFF
                    & ABADY LLP

By: _____
                  Matthew D. Brinckerhoff (3552)

                  75 Rockefeller Plaza - 20th Floor
                  New York, New York 10019
                  (212) 763-5000

                  *Attorneys for Plaintiffs*