MICHAEL J. GARCIA
United States Attorney
Southern District of New York
Attorney for Defendants
By: LAWRENCE H. FOGELMAN
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2719
Email: Lawrence.Fogelman@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
FRIENDS OF HAMILTON GRANGE and
DR. JOHN CARDWELL,

      Plaintiffs,     08 Civ. 5220 (DLC) (FM)

 v.

DIRK KEMPTHORNE, Secretary of the Interior;
U.S. DEPARTMENT OF THE INTERIOR;
MARY A. BOMAR, Director of the National
Park Service; NATIONAL PARK SERVICE; and
MARIA BURKS, Commissioner of National Parks
of New York Harbor and Superintendent of
Manhattan Sites,

      Defendants.
------------------------------------x

## DECLARATION OF JOHN S. HAGEN JR.

John S. Hagen Jr., pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

1. I am an Architect/Project Specialist with the Design and Construction division of the National Park Service (NPS) Denver Service Center. I started working for NPS in 1993 and have served as an architect during my entire employment with NPS. Prior to my present employment, I worked as an intern design architect and construction administrator for private

1

architecture firms from 1990 to 1993. As an Architect/Project Supervisor from 1993 through 2004, I designed and also supervised the construction on-site of NPS projects. In my current position as Architect/Project Specialist, I act as the point of contact for NPS with contractors and provide technical assistance regarding the design and construction of NPS projects, including assisting the Project Manager and Contracting Officer with oversight of the work of Architectural and Engineering firms hired by NPS to provide design services. My work also includes assisting in contract procurement, and providing oversight and monitoring of construction to ensure compliance with contract requirements.

2.      In early February of 2008, I became the Contracting Officer's Representative on the project to restore of the Hamilton Grange National Memorial (the "Grange"). In that role I provide technical oversight for the project Contracting Officer and Project Manager in order to ensure that construction meets the contract requirements and follows the plans and specifications of the project design. I regularly review the design drawings and written specifications (known together as construction documents), which are a part of NPS's construction contract with the contractor. I monitor daily construction activities and along with the Project Manager ensure critical concerns such as unforeseen issues in the field are resolved.

3.      I have first-hand knowledge of the construction of the Grange project to date. I review daily and weekly reports from the contractor, participate in weekly project progress meetings, review and approve material submissions for the project work, and review photographs of construction progress of the Grange project. I speak with NPS's construction management team of engineers and on-site inspectors on a daily basis. From June 5-7, 2008, I was present at the Grange foundation construction site and inspected all of the completed work.

4. The Grange is currently supported by wooden columns composed of wood blocking (called "cribbing"), along with steel beams located atop steel plating on a compacted earthen pad in St. Nicholas Park. NPS plans to place the Grange over the permanent foundation no earlier than June 19, 2008, and plans to secure the Grange to the permanent foundation currently under construction in the following weeks. This permanent foundation is now approximately 70% complete.

5. I have reviewed the declaration of Paul Sheehan dated June 5, 2008. In his declaration, Mr. Sheehan expresses the view that it is feasible for the Grange to be rotated 180 degrees from the intended northeast orientation and placed in a southwest orientation on the nearly completed permanent foundation. Based on my knowledge of the project and review of the construction documents, I disagree with Mr. Sheehan's conclusions.

6. The Grange cannot be oriented to the southwest on a foundation designed and built for a northeast orientation of the building. If the Grange had to be oriented to the southwest, the required foundation to support this orientation of the Grange would need to be situated at least 15 feet from the foundation's present location in order to enable NPS to comply with the Americans with Disabilities Act ("ADA") and comply with construction permits provided by the New York City Department of Parks and Recreation ("NYCDPR"). In order to accomplish this relocation of the foundation, the work already done on the foundation would have to be completely demolished and reconstructed (as described in ¶¶ 7-10 below). Even if NPS did not have to comply with the ADA and NYCDPR requirements, and could use the present location of the foundation to convert it to a southwest orientation, the reorientation would require substantial alteration of the interior layout out the foundation. Specifically, NPS

3

would need to substantially demolish and reconstruct much of the interior construction of the foundation already completed in order to properly support the Grange and align the interior foundation walls with the rotated Grange interior layout (as described in ¶¶ 11-17). Either reorientation scenario would require that the Grange remain on temporary support for a significant amount of time while the foundation is reconstructed. The longer the Grange remains on temporary support, the greater the risk of damage to the Grange.

### I.   THE FOUNDATION WOULD NEED TO BE MOVED 15 FEET TO ACCOMMODATE A SOUTHWEST ORIENTATION

7.  In order to provide an ADA-accessible southwest orientation and comply with NYCDPR permits, the Grange foundation would need to be moved at least 15 feet closer to 141st Street than the current location of the nearly completed foundation. This move would require complete demolition of the permanent foundation and reconstruction of a new foundation in a new location. While this work is undertaken, the Grange would need to be moved off-site to a new temporary location in order to create room for the demolition and reconstruction work.

8.  NPS is required to comply with the ADA to ensure access for all members of the public to Alexander Hamilton's historic home. NPS plans to ensure accessibility to the Grange by constructing a wheelchair lift under the front porch of the Grange, which will provide access to the first floor of the historic building. The Grange's original historic front and rear porches were removed when the Grange was moved from its original location to its previous location on Convent Avenue. After the Grange is placed on its permanent foundation, NPS intends to reconstruct these porches to match their historic appearance. NPS chose to place the lift under

4

the front porch because it could accommodate the lift and equipment without altering the historic size and appearance of the building's facade.

9. Mr. Sheehan suggests in his declaration that NPS construct the lift on the rear porch instead of the front porch. NPS cannot use the rear porch for the lift because it is too small, and enlarging the rear porch would adversely affect the historic appearance of the porch and the Grange as a whole. Similarly, placing the lift next to the restored rear porch would adversely affect the historic appearance of the Grange.

10. Therefore, the front porch must be made accessible to individuals with disabilities regardless of the Grange's orientation. It is not feasible, however, to orient the Grange towards the southwest on the current foundation and also make the front porch accessible to individuals with disabilities. Because the front porch is larger than the rear porch and reorientation to the southwest would require the creation of accessible pathways to the front porch, reorienting the building would require additional construction in the sloped ground southwest of the Grange foundation. This construction would entail the removal of a large specimen Oak tree. However, NPS cannot remove the specimen tree pursuant to the permits it has received from the NYCDPR. The Grange foundation would therefore need to be moved 15 feet to comply with NYCDPR permits and protect the specimen tree.

## II. SUBSTANTIAL DEMOLITION AND RECONSTRUCTION WOULD BE REQUIRED TO MAINTAIN THE PRESENT LOCATION OF THE FOUNDATION AND REORIENT THE GRANGE TO THE SOUTHWEST

11. Even if NPS could remove the large specimen tree, re-orienting the house onto the presently constructed foundation is not possible without substantial demolition of, and alterations to, the foundation. It is certainly not, as Mr. Sheenan suggests, "eminently feasible."

5

12. The nearly complete permanent foundation system contains two floors: a cellar and ground floor (sometimes referred to as the sub-basement and basement, respectively). Construction of the cellar, the lower of the two floors, is nearly complete. Construction of the ground floor is 25-35% complete.

13. In order to reorient the Grange to the southwest on this foundation, considerable architectural and engineering redesign efforts would be necessary, and a major demolition and reconstruction of the already constructed cellar and ground floor would be required. This would be necessary in order to reconstruct the cellar and ground floor to accommodate the structure of the rotated Grange above. The foundation was built anticipating the need to support the layout of the Grange oriented towards the northeast. Rotating the Grange would require that structural and historical elements, such as load-bearing walls and steel beams, and a flight of historic stairs, be relocated to accommodate the new orientation. For example, the ground floor of the foundation had been designed to accommodate a historic staircase leading to the first floor. Rotating the building 180 degrees would place the staircase landing on the first floor of the Grange over a part of the foundation that was not designed to accommodate stairs. Much of the ground floor masonry wall construction would have to be demolished and rebuilt in order to preserve the historic location of the staircase. Similarly, the masonry walls for the restroom on the ground floor that are currently under construction would have to be demolished and rebuilt in a new location.

14. Constructions documents showing the layout of the first floor and ground floor are included as Exhibit 1 and are labeled USA3 and USA 4. The stairs are clearly visible in the bottom left corner of each drawing. Attached as Exhibit 2 are several renderings of the cellar

floor and ground floor, labeled SK-1 and SK-2, respectively. The first drawing on both SK-1 and SK-2 are renderings of the current floor plan. Drawing 2 is that same rendering on top of which green squares indicate which areas would need to be demolished in order to accommodate a new orientation of the Grange. The third drawing shows in red the new construction required if the design layout were rotated 180 degrees to accommodate the reoriented Grange.

15. Reorienting the Grange to the southwest would also require that all of the plumbing drainage systems below the building would need to be reinstalled. In order to install the plumbing piping, much of the floor of the cellar, a twelve inch thick, steel-reinforced concrete slab, as well waterproofing and supportive "mud" slab below the 12" thick slab, would need to be demolished and then reconstructed after plumbing work is reinstalled.

16. Reorienting the Grange to the southwest would further require the relocation of the heating and ventilating air conditioning ("HVAC") mechanical system in the cellar, and the construction of two new areaways, which are concrete structures outside the building foundation that provide ventilation for the HVAC system. This work would require excavation, installing floor drain piping, building the concrete structures, creating new areaway openings in foundation walls, covering the already constructed areaway openings, and at least partial demolition already constructed areaways.

17. In light of the substantial work that would need to be done to accommodate a southwest orientation on the existing permanent foundation, the Grange would need to be moved off-site to allow room for the demolition work and reconstruction.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Denver, CO
June 12, 2008

_____
JOHN S. HAGEN JR.

**Exhibit 1**





USA 4

**Exhibit 2**

# CELLAR FLOOR PLAN



1. EXISTING CELLAR PLAN





2. DEMOLITION CELLAR PLAN








3. NEW CONSTRUCTION PLAN

- EXISTING CONSTRUCTION
- EXISTING CONSTRUCTION DEMOLITION REQUIRED
- DESIGN LAYOUT ROTATED 180 DEGREES NEW CONSTRUCTION REQUIRED



SCALE OF FEET



SK-1

# GROUND FLOOR PLAN



**1** EXISTING GROUND FLOOR PLAN



**2** DEMOLITION GROUND FLOOR PLAN

**3** NEW CONSTRUCTION GROUND FLOOR PLAN





- ▮ EXISTING CONSTRUCTION
- ▯ EXISTING CONSTRUCTION DEMOLITION REQUIRED
- ▮ (red) DESIGN LAYOUT ROTATED 180 DEGREES NEW CONSTRUCTION REQUIRED



SCALE OF FEET
4 0 4 8



**SK-2**