UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FRIENDS OF HAMILTON GRANGE and       :
DR. JOHN CARDWELL,                    :
                                      :
                    Plaintiffs,       :        08 Civ. 5220 (DLC) (FM)
                                      :
        v.                            :
                                      :
DIRK KEMPTHORNE, Secretary of the Interior;  :
U.S. DEPARTMENT OF THE INTERIOR;      :
MARY A. BOMAR, Director of the National      :
Park Service; NATIONAL PARK SERVICE; and  :
MARIA BURKS, Commissioner of National Parks  :
of New York Harbor and Superintendent of   :
Manhattan Sites,                      :
                                      :
                    Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007

LAWRENCE H. FOGELMAN
Assistant United States Attorney
    Of Counsel

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    The Hamilton Grange Relocation Project Is Almost Complete . . . . . . . . . . . . . . . 3

B.    There Are Serious Risks of Damage to the Grange if it is Not Affixed to Its
      Permanent Foundation As Soon As Possible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C.    Plaintiffs Had Ample Notice of NPS's Decision to Reorient the Grange
      By No Later Than April 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.    The Grange Cannot Simply Be Reoriented On a Nearly Complete Permanent
      Foundation in Saint Nicholas Park, and Constructing a New Foundation Would
      Require Significant Delay and Expense, and Risks Harm to the Grange . . . . . . 12

E.    Overview of Statutory and Regulatory Requirements of the National Historic
      Preservation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1.    Statutory Background of the NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      2.    NPS Compliance With NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

THIS COURT SHOULD DENY PLAINTIFFS' REQUEST FOR A PRELIMINARY
INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.    Standards for a Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.    Standard of Review under the Administrative Procedure Act . . . . . . . . . . . . . . . 21

C.    Plaintiffs Cannot Demonstrate Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . 22

      1.    Plaintiffs' Delay in Bringing This Action Belies Their Claim of
            Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      2.    Plaintiffs Cannot Demonstrate Irreparable Harm From The Alleged
            Absence of NHPA Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

D.    Plaintiffs Cannot Establish A Likelihood of Success on the Merits . . . . . . . . . . 28

        1.    Plaintiffs Cannot Establish that the NPS Acted Arbitrarily and
              Capriciously When Plaintiffs Received Actual Notice That the Grange
              Would Be Reoriented, Were Afforded An Opportunity to Voice Their
              Concerns, And the NPS Reconsidered Its Decision To Take Their
              Concerns Into Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        2.    Section 110 Does Not Mandate the Substantive Relief Plaintiffs Seek . . 31

E.    The Balance Of Interests Weighs Against an Injunction Because Any Further
       Delay Will Harm the Historic and Structural Integrity of the Grange . . . . . . . . . 33

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## PRELIMINARY STATEMENT

Defendants Dirk Kempthorne, Secretary of the Department of the Interior, the United

States Department of the Interior, Mary Bomar, Director of the National Parks Service ("NPS"),

the National Parks Service, and Maria Burks, Commissioner of National Parks of New York

Harbor and Superintendent of Manhattan Sites (collectively, the "Government" or "NPS"), by

their attorney Michael J. Garcia, United States Attorney for the Southern District of New York,

respectfully submit this memorandum of law in opposition to the Plaintiffs' motion for a

preliminary injunction.

Plaintiffs seek to prevent the Government from completing a long-standing project to

move Alexander Hamilton's home, the Hamilton Grange National Memorial (the "Grange"),

from its recent location on Convent Avenue in Hamilton Heights to St. Nicholas Park, where the

Grange will be affixed to a new foundation. Plaintiffs claim that the Government failed to

comply with the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq.,

specifically, that the Government's determination to orient the Grange to face the northeast

violated the NHPA because the public allegedly did not have an appropriate opportunity to

comment on this orientation.

Plaintiffs seek a preliminary injunction (1) enjoining the Government from "situating

Alexander Hamilton's house on its new foundation with the front of the house facing in any

direction other than" southwest; and (2) directing the Government to "comply with their

obligations under the National Historic Preservation Act, including their obligation to consult

with and obtain the consent of Friends of Hamilton Grange prior to any undertaking in

connection with the relocation, orientation, restoration, landscaping, or operation of the Hamilton

1

Grange National Monument." Complaint at 31. This Court should deny Plaintiffs' request.

Plaintiffs fail to meet the rigorous standards required to obtain a preliminary injunction. First, Plaintiffs cannot demonstrate the required element of irreparable harm. Plaintiffs had ample notice of the Government's decision to orient the Grange to face northeast for at least one year prior to the commencement of any construction work on the foundation in St. Nicholas Park, and before the Government had expended millions of taxpayer dollars on the project. However, Plaintiffs failed to file this request for preliminary injunctive relief until June 6, 2008 – a mere 24 hours before the Grange was moved to its new site at St. Nicholas Park, after the Grange had been lifted off of its prior permanent foundation, and while the building is supported only by a temporary foundation. Having slept on their rights, Plaintiffs cannot now establish irreparable harm. Further, there is no irreparable harm because federal officials have complied with NHPA's requirements by providing an opportunity for Plaintiffs to present their views on the proper orientation of the Grange, and considering their position. NPS has fully considered the impact of the orientation of the Grange to face the northeast, evaluated three alternative southwest orientations, and ultimately concluded that it was appropriate to orient the Grange to the northeast.

Second, Plaintiffs cannot demonstrate a likelihood of success on the merits. NPS has fully considered the impact of orienting the Grange to the northeast, and considered the views of the local community, including Plaintiffs, who support a southwest orientation. There is simply no requirement under the NHPA that NPS obtain the Plaintiffs' consent regarding the orientation of the Grange. Moreover, the Court lacks jurisdiction to order the NPS to orient the Grange towards the southwest – or any other substantive relief – because of Plaintiffs' expressed

preference. The Second Circuit has explained that the NHPA is a procedural statute that does not require a particular outcome, but rather ensures that the relevant federal agency will, before an undertaking, consider the potential impact of that undertaking on surrounding historical places. Courts have thus referred to the NHPA as a "stop, look, and listen" provision. Because NPS fully considered the potential impact of its decision to orient the Grange to face the northeast, and Plaintiffs had ample opportunity to express their concerns to NPS regarding the Grange's orientation, Plaintiffs cannot demonstrate a likelihood of success in establishing that NPS acted arbitrarily and capriciously in determining to orient the Grange to face the northeast.

Finally, the balance of interests weighs against the issuance of a preliminary injunction. Any delay in placing the Grange on a permanent foundation will cause irreparable harm to the Grange itself. The Grange must be placed on a permanent foundation as quickly as possible to protect its structural and historic integrity. In addition, any delay will result in the needless expenditure of additional taxpayer dollars.

At heart, Plaintiffs simply disagree with the decision rendered by NPS regarding the orientation of the Grange. But they are not entitled to the substantive relief they seek. Accordingly, this Court should deny Plaintiffs' motion for a preliminary injunction.

## STATEMENT OF FACTS

### A.    The Hamilton Grange Relocation Project Is Almost Complete

Built in 1802, the Hamilton Grange (the "Grange") is the only home ever owned by Alexander Hamilton, one of our nation's founding fathers. See Declaration of Maria Burks, dated June 12, 2008 ( "Burks Decl.") ¶ 2. In 1962, the United States Congress designated the Grange as a National Memorial with the requirement that the house be relocated from its

3

previous location on Convent Avenue between 141st Street and 142nd Street.[1]  Id. ¶ 2-3; id. Exh.

1.  NPS engaged in the planning process for the relocation and renovation of the Grange

beginning in the early 1990s.  See Burks Decl. ¶ 4, 6, 9, 14; infra, Section C.  Construction for

relocation of the Grange commenced in December of 2007.  See Declaration of Jodie Petersen,

dated June 12, 2008 ("Petersen Decl.") ¶ 3.  Specifically, on December 21, 2007,  construction

fencing was erected at Convent Avenue and at St. Nicholas Park.  Id.  On January 24, 2008,

excavation for the new foundation at St. Nicholas Park commenced.  Id.  The Government has

devoted substantial work and expended significant amounts of taxpayer dollars to design and

construct the new foundation for the Grange in St. Nicholas Park, see id. ¶ 13, and that

foundation is now nearly 70% complete.  Id. ¶ 12; Declaration of John S. Hagen Jr. ("Hagen

Decl.") ¶ 4.

        In its Convent Avenue location, the Grange had been sandwiched between a church and

an apartment complex.  See Petersen Decl. ¶ 4.  Extracting the Grange from that location without

damaging the adjacent church or the Grange itself required extraordinary care and planning.  Id.

Specifically, NPS had to raise the Grange from its foundation to move the building via roller

beams over the loggia of the adjacent church and into the roadway of Convent Avenue.  Id.  The

Grange was lifted off its foundation on May 1, 2008.  Id.  Photographs depicting the move from

its previous location to the roadway of Convent Avenue are attached as Exhibit 1 to the Petersen

Declaration.

        On May 27, 2008, the Grange was placed in the roadway of Convent Avenue.  Id.  NPS

---

        [1]      The Grange had been moved from its original location to Convent Avenue in 1889.
See Burks Decl. ¶ 2.

                                                4

obtained project permits from New York City to allow the Grange to be temporarily located in Convent Avenue. Id. ¶ 5. Street access for vehicles and pedestrians was closed or limited to accommodate the temporary presence of the Grange in Covenant Avenue. Id. NPS began the procedure to obtain these permits on November 19, 2007, and did not complete the process until May 16, 2008. Id.

Concerns for public safety have been the highest priority of the NPS during the relocation of the Grange. Id. ¶ 6. NPS worked closely with the New York City Department of Parks & Recreation ("NYCDPR"), the New York Police Department ("NYPD"), the Fire Department of New York ("FDNY"), the City College of New York ("CCNY"), the New York City Department of Transportation, the local neighborhood community and others, to ensure that all safety precautions have been employed and disruptions are minimized during the moving process. Id.

On Saturday, June 7, 2008, the Grange was transported along Convent Avenue and into St. Nicholas Park. Id. ¶ 8. The Grange is currently sitting on a temporary foundation atop an earthen/gravel pad adjacent to the permanent foundation currently under construction. Id.; Declaration of Stephen Spaudling dated June 13, 2008 ("Spaulding Decl.") ¶ 4, Exh. 1 (photograph of Grange as currently situated).

On approximately June 21, 2008, but possibly as early as June 19, 2008, the Grange will be relocated within St. Nicholas Park to rest on the permanent foundation. See Petersen Decl. ¶ 10. During the following two weeks, the last stage of the permanent concrete foundation will be completed, the temporary foundation structures removed, and the Grange will be affixed to the permanent foundation. Id.

5

**B.    There Are Serious Risks of Damage to the Grange if it is Not
Affixed to Its Permanent Foundation As Soon As Possible**

While the Grange remains in St. Nicholas Park but unattached to the permanent

foundation, it will be supported by a temporary foundation atop a gravel platform.  See Spaulding

Decl. ¶ 5.  Until the Grange is moved to its permanent foundation, the building is exposed to a

variety of risks including ongoing expansion of cracks in the plaster walls of the Grange,

exposure to the elements, vandalism, and a lack of security and fire suppression systems.  Id. ¶

6-22.

Unlike a permanent foundation, which provides continuous support to the building, the

temporary foundation provides only point loading, or support at intermittent locations of the

structure.  Id. ¶¶ 5-6; id. Ex. 2 (photograph showing point loading support); Declaration of David

A. Aitken ("Aitken Decl.") ¶ 7.  This temporary foundation poses risks to the Grange the longer

the building remains on the structure.  See Aitken Decl. ¶ 7.  In addition, the platform on which

the Grange is sitting was intended to be a temporary transition point.  See Spaulding Decl. ¶ 10.

As such, it lacks adequate drainage to ensure stable support of the building for very long.  Id.;

Aitken Decl. ¶ 11-14.  The lack of continuous, uniform support exposes the Grange to the risk of

settling unevenly on the temporary foundation (known as "settlement"), twisting of the building

(known as "wracking"), and the bending of the wooden structure of the building between the

point load supports (known as "deflection").  See Aitken Decl. ¶¶ 7-10.  Cracks in the plaster

have formed and grown while the Grange has been on its temporary point loaded foundation as a

result of uneven support.  See Spaulding Decl ¶¶ 7-9; Ex. 3 (photographs of cracks); Aitken

Decl. ¶¶ 5-6; 8.  These cracks have damaged the original, historical architectural material put into

6

the house by Alexander Hamilton during the building's construction (known as the "historic fabric") of the Grange. Spaulding Decl., ¶¶ 3, 11. The longer the Grange remains on the temporary foundation, the more damage to the historic fabric, both clearly visible and not, will occur. Id. ¶ 11. For this reason, NPS made every effort to minimize the amount of time the Grange would remain on a temporary foundation structure. See Petersen Decl. ¶ 11.

While the Grange remains on its temporary foundation, the entire historic structure is exposed to the elements. See Spaulding Decl. ¶¶ 12-13; Aitken Decl. ¶¶ 15-17. Water damage poses a threat to the Grange's historic fabric, including the wooden frame. Id. Moreover, while the Grange remains on its temporary foundation, it cannot be properly secured from physical intrusion by vandals and animals, and lacks adequate fire suppression systems. See Spaulding Dec. ¶¶ 14-16.

## C.    Plaintiffs Had Ample Notice of NPS's Decision to Reorient the Grange By No Later Than April 2007

NPS engaged in a lengthy process of environmental and historical review regarding the relocation project, which included much contact with the public, as well as federal, state and local government officials.

In 1995, NPS issued a General Management Plan/Environmental Impact Statement ("GMP/EIS") regarding the relocation of the Grange to St. Nicholas Park, which contemplated orienting the Grange to the southwest. See Burks Decl. ¶¶ 5-6, Exh. 2. The City of New York Landmarks Preservation Commission expressed its comment before the finalization of the GMP/EIS that the "decision on the proper orientation of the house should consider not only the historic orientation, with the front door facing south, but also that the orientation must make

7

sense on the proposed site, which has a north facing street frontage; and that any fence placed around the site be as far removed from the mansion as possible and that the distance between the house and the high retaining wall at the edge of the park be increased, if possible, so that the mansion can read as a free-standing country retreat in the middle of a landscape." Burks Decl., Exh. 2 at 94.

In 1995, NPS issued a record of decision regarding the relocation of the Grange. Burks Decl., ¶ 6, Exh. 3. The preferred alternative to relocate the house to nearby Saint Nicholas Park, a park run by New York City Department of Parks and Recreation ("NYCDPR"), was adopted. Id. The decision included a description of the placement of the house on its new site. See id. The intention of the relocation project was to recapture, to the greatest extent possible, the appearance and general characteristics of the house within the landscape. See id. The characteristics of the St. Nicholas Park site are dramatically different from the Grange's original site in numerous ways, including the presence of one large building abutting the site, and another large building on the top of the hill towards the southwest of the site. Id. ¶ 7. In addition, the entire site slopes, such that a level area had to be developed to accommodate the Grange. Id. Finally, whereas the original site of the Grange was on top of a hill, the new site slopes downward only in one direction from the level area where the Grange will sit. Id.

In 2000, during the New York City Department of Parks and Recreation ("NYCDPR") mandatory compliance review of the conveyance of an easement on St. Nicholas Park to NPS, pursuant to the New York State Uniform Land Use Review Process ("ULURP"), the planned orientation of the Grange was changed to face northeast, and the documents prepared at that time reflected this change both in graphics and text. Id. ¶¶ 9-10, Ex. 5, Appendix D. Individuals and

8

groups participated in the ULURP process, including a member of Community Board 9, a local government unit representing the Hamilton Heights community, who was sent documents showing the altered plans. Id. ¶¶ 10-11, Ex. 5, Appendix D.

In May 2004, during a Value Analysis that NPS undertook to evaluate various aspects of the move, the maps and drawings used in connection with the Value Analysis process again depicted the orientation of the Grange to the northeast. Id. ¶ 14, Ex. 9. Bernice Cummings-Ubiles, the executive director of a local community group, the Hamilton Heights Preservation Association, attended this Value Analysis workshop. Id. ¶ 14.

Even if Plaintiffs dispute their awareness of the plans to reorient the Grange in 2000-2004, it is not in dispute that in December 2006, one year prior to the commencement of construction, NPS conducted public informational meetings to provide details regarding the Grange project to city government, city regulatory bodies and the community. Id. ¶ 15. At these December meetings, NPS expressly discussed the changed orientation of the house with Michael Henry Adams, a purported member of Plaintiff the Friends of Hamilton Grange, and other members of Community Board 9, who attended and raised concerns about the northeast orientation. Id.; Complaint ¶¶ 73-74.

Subsequently, on April 9, 2007, Maria Burks, the Commissioner of the National Parks of New York Harbor of the NPS, who assumed supervisory responsibility for the Grange in February 2007, along with Stephen Spaulding, Chief of the Architectural Preservation Division for the Northeast Region of NPS, attended a meeting of the Parks and Landmarks Subcommittee of Community Board 9 regarding the Grange project. See Burks Decl. ¶ 16; Complaint ¶¶ 79-80. During the course of this meeting, several community board members expressed disagreement

9

with the decision to reorient the building. Id. As a result of this meeting, Burks indicated that she would revisit the issue of the orientation of the Grange and instructed her staff to prepare detailed documents pertaining to the possible orientation of the Grange on the site, and to conduct a site visit. See Burks Decl. ¶ 16. She ordered her staff to prepare scale drawings, a table top scale model, and to stake out the footprint of the house on the new site. Id.

On April 12, 2007, NPS conducted a site visit in St. Nicholas Park which was attended by, among others, Burks and Spaulding from NPS and several community representatives, including Michael Henry Adams, Ron Melichar, Jeff Alama and Brad Taylor. Id. ¶ 17. During the site visit, NPS presented documents to those in attendance demonstrating three possible designs for the reorientation of the Grange to the southwest and everyone asked questions, exchanged opinions, walked around the site, and reviewed the siting details, such as where retaining walls would be needed under each alternative and what trees would have to be removed. Id. At the conclusion of the meeting, Burks indicated that she would review the matter and respond as quickly as possible to the community members' concerns. Id.

On April 16, 2007, after evaluating possible orientations, Burks concluded that the northeast orientation was the best option because the northeast orientation had several substantial benefits that the possible southwest orientations lacked, and that the three possible southwest orientations each had several drawbacks that were obviated by orienting the Grange to the northeast. Id. ¶¶ 18-19. The northeast orientation allowed the Grange to be viewed and experienced as a free-standing country retreat in the middle of a landscape, thus better approximating its historic setting and best reestablishing an approaching visitor's view as Alexander Hamilton's guests would have seen his home, approaching from below while viewing

10

the historically unique decorative front door and tripartite window design. Id. ¶ 19. In contrast, each of the southwest orientations essentially placed the front door of the Grange facing a hillside and the wall of a CCNY building, which would have required visitors to view the front door gazing down from a steep hillside or from a CCNY building. Id. ¶ 20.

In addition, each of the southwest orientations would have required that NPS remove three of the historic front steps of the Grange, thus altering the façade. Id. ¶ 21. Two of the three southwest orientations would have required construction of a wall approximately 5 feet from the front door to retain the nearby hill. Id. ¶ 22. The third southwest option, while requiring fewer retaining walls, would have required adding a 4-foot tall railing across a portion of the front façade at the front of the building. Id. ¶ 23. In addition, this third southwest option would have required forcing visitors with disabilities to enter the house through the back door, while other members of the public could enter through the front door. In contrast, the northeast orientation required no retaining walls or railings across the front façade of the house, and it allowed all visitors, including visitors with disabilities, to enter through the front door. Id. ¶ 25.

Burks also considered that although the views reflected in the mirrors in the dining room with a northeast orientation might not be as wooded as the views reflected by orienting the Grange to the southwest, this could be mitigated. Id. ¶ 26. Specifically, NPS planned to plant 13 sweet gum trees (to replicate the 13 sweet gum trees that Hamilton himself planted on the original site of the Grange) between the house and neighboring Steinman Hall of CCNY. Id. Thus, the view from the mirrored doors in the dining room would, as closely as possible, replicate the original view, given all other constraints. Id.

Burks sent letters to community members, including Carolyn Kent and Michael Adams,

11

regarding this determination on or around April 17-19, 2007. Id. ¶ 27; Burks Decl. Exh. 17.

NPS held another public meeting on December 13, 2007, to address the schedule for the physical move. See Complaint ¶ 83; Burks Decl. ¶ 28. Several opponents of the northeast orientation of the Grange were present at this meeting, including Michael Henry Adams. See Burks Decl. ¶ 28.

NPS maintains a publicly accessible website that contains detailed information and photographs regarding the move, and that provided advance notice that the move would commence. Id.; See

Http://www.nps.gov/hagr/parkmgmt/hamilton-grange-national-memorial-move-updates.htm. Moreover, beginning in December 2007, members of the public could observe firsthand the construction as it began to take place. See Petersen Decl. ¶ 4.

## D.   The Grange Cannot Simply Be Reoriented on a Nearly Complete Permanent Foundation in Saint Nicholas Park, and Constructing a New Foundation Would Require Significant Delay and Expense and Risks Serious Harm to the Grange

The Grange cannot be oriented to the southwest on a foundation designed and built for a northeast orientation. See Hagen Decl. ¶¶ 6-16; Spaulding Decl. ¶¶ 17-22. If the Grange had to be oriented to the southwest, the foundation would need to be situated at least 15 feet from the foundation's present location in order for NPS to comply with the Americans with Disabilities Act ("ADA") and comply with construction permits provided by the New York City Department of Parks and Recreation ("NYCDPR"). See Hagen Decl. ¶¶ 7-10; Spaulding Decl. ¶¶ 18-20. Even if NPS did not have to comply with the ADA and NYCDPR requirements, and could convert the present location of the foundation to a southwest orientation, the reorientation would require substantial demolition and reconstruction of the already constructed interior layout of the

12

foundation.  See Hagen Decl. ¶¶ 11-16; Spaulding Decl. ¶¶ 22.  For example, in order to preserve

the historically accurate location of the interior stairs leading from the ground floor to the second

floor of the Grange, the layout of the ground floor of the foundation would need to be

reconstructed.  See Spaulding Decl. ¶ 21; Hagen Decl. ¶ 21.  Support structures in the current

foundation would also need to be demolished and relocated to provide adequate support to the

new rotated layout of the Grange on the foundation.  Id.

    A new orientation in either scenario will result in significant delay and expenses

stemming from, among many other considerations, halting a project that is substantially

underway, obtaining architectural and engineering redesign of the foundation and site, securing

approval letters from various regulatory entities, and conducting all necessary compliance efforts.

 See Petersen Decl. ¶ 15.  NPS estimates that reorienting the Grange would require

approximately 240 days and the expenditure of millions of additional taxpayer dollars.  Id. ¶¶ 17-

19.  These costs would be in addition to the budgeted expense of completing the project after the

Grange is placed on its permanent foundation.  Id. ¶¶ 19.  Additional costs would include, among

others, fees resulting from the redesign effort; the cost of demolition and rebuilding of the

foundation; security for the temporary location of the Grange; costs of renewed compliance

efforts; and possibly contract termination fees if the delays stemming  from the reorientation

necessitate termination of the current construction contract.  Id. ¶ 19.  These estimated additional

costs would exceed the amount that has been budgeted for this project.  Id. ¶ 20.  Accordingly,

Congressional authorization would be required in order to expend these additional sums.  Id.  For

all these reasons, reorienting the Grange to the southwest would involve substantial work and

delay, the substantial expenditure of taxpayer dollars, and could jeopardize NPS's ability to

complete the project. Id.

Additionally, during this delay, the Grange would remain on temporary support while the permanent foundation is constructed. See Hagen Decl. ¶ 17; Spaulding Decl. ¶ 22. The longer the Grange is on temporary support, the more damage will occur to the historic fabric and structural integrity of the home. See Spaulding Decl. ¶ 22.

## E.    Overview of Statutory and Regulatory
Requirements of the National Historic Preservation Act

### 1.    Statutory Background of the NHPA

The NHPA was enacted in 1966, and reflected the Congressional determination that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people." 16 U.S.C. § 470(b)(2). The NHPA authorized the Secretary of the Interior to "expand and maintain a National Register of Historic Places, composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." 16 U.S.C. § 470a(a)(1)(A). By enacting the NHPA, Congress directed federal agencies to: (1) consider the impact of federal undertakings on historic resources of national significance; and (2) assume responsibility for the preservation of historic resources that they own or control.

The core of a federal agency's responsibilities under the NHPA with regard to federal agency actions can be found in Section 106 of the NHPA, 16 U.S.C. § 470f, which sets forth the responsibilities of a federal agency having direct or indirect jurisdiction over a proposed federal or federally assisted "undertaking":

> The head of any federal agency having direct or indirect jurisdiction over a proposed federal or federally assisted undertaking in any State . . . shall, prior to

14

the approval of the expenditure of any federal funds on the undertaking . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.

Further, the Advisory Council on Historic Preservation ("ACHP") shall have "a reasonable opportunity to comment with regard to such undertaking." Id.

The Second Circuit has explained that the NHPA is "primarily procedural . . . . It does not require a particular outcome, but rather ensures that the relevant federal agency will [before an undertaking], consider the potential impact of that undertaking on surrounding historical places. As such, courts have sometimes referred to Section 106 as a 'stop, look, and listen' provision." Business and Residents Alliance of East Harlem v. Jackson, 430 F.3d 584, 591 (2d Cir. 2005); Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 164, 166 (1st Cir. 2003) (same). "NHPA imposes purely procedural requirements. It requires an agency to 'take into account' the effect of any 'undertaking' on historical sites. 16 U.S.C. § 470f." City of Oxford v. FAA, 428 F.3d 1346 (11th Cir. 2005) (rejecting claimed NHPA violation based on alleged failure to properly involve consulting parties). See also National Mining Assoc. V. Fowler, 324 F.3d 752, 755 (D.C. Cir. 2003) (stating that the NHPA is an essentially procedural statute and that Section 106 of the NHPA "imposes no substantive standards on agencies").

The express goal of the NHPA is for the agency to pause to consider the possible historical consequences before acting. It does not create any substantive rights requiring that any specific historic quality or historic place is preserved. See City of Alexandria v. Slater, 198 F.3d 862, 871 (D.C. Cir. 1999) (explaining that to comply with the NHPA, the agency is only required to "consult with state historic preservation officers to ensure that historic properties in the project area are thoroughly identified and the effects that the project will have on them fully assessed.").

15

As no particular outcome is mandated by the NHPA, as long as the spirit of law is honored by pausing to make an informed decision concerning an historic place, procedural "agency missteps" may be "disregarded where it is clear that a remand would accomplish nothing beyond further expense and delay." Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61-62 (1st Cir. 2001); see also Abenaki Nation v. Hughes, 805 F. Supp. 234, 250-51 (D. Vt. 1992) (technical violation of NHPA by Army Corps' failure to prepare memorandum of agreement was "not fatal" and did not warrant injunctive relief).

Section 110(f) of the NHPA provides:

> Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal Agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

16 U.S.C. §470h-2(f). Courts have repeatedly held that Section 110 does not impose any substantive requirements on a federal agency. The mandates contained in Section 110, as well as the broad discretion granted to federal agencies in that provision, cannot be the basis of the type of substantive claim urged by Plaintiffs. See, e.g., Nat'l Trust for Historic Preservation v. Blanck, 938 F. Supp. 908 (D.D.C. 1996) (legislative history clarifies that Section 110 is merely intended to flesh out requirements of Section 106), aff'd, 203 F.3d 53 (D.C. Cir. 1999) (table); see also New Mexico ex rel. Richardson v. BLM, 459 F. Supp. 2d 1102, 1128-29 (D. N.M. 2006) (same); Coalition of 9/11 Families, Inc. v. Rampe, 2005 WL 323747, at *3 (S.D.N.Y. Feb. 8, 2005) (noting that Section 110 of the NHPA did not add new substantive requirements).

16

### 2.    NPS Compliance With NHPA

NPS complied with the statutory and regulatory requirements of the NHPA throughout the relocation of the Grange from Convent Avenue to St. Nicholas Park.[2] Specifically, NPS appropriately (1) prepared a GMP/EIS in 1995 regarding the relocation project as a whole; (2) entered into a Programmatic Agreement with the New York State Historic Preservation Office ("SHPO"), New York City Department of Parks and Recreation ("NYCDPR"), and the New York City Landmarks Preservation Commission ("Landmarks Commission"), and consulted with these entities regarding the project; (3) offered the ACHP the opportunity to consult on the project; (4) reached out to the Secretary of the Interior; and (5) repeatedly involved the public in the process of determining the appropriate orientation of the Grange.[3]

Pursuant to 36 C.F.R. § 800.14(b), NPS entered into a Programmatic Agreement in 2006 with the SHPO, NYCDPR and the Landmarks Commission. See Declaration of David Uschold, dated June 12, 2007 ("Uschold Decl."), Ex. 1. Such programmatic agreements are authorized under numerous circumstances, including, for example, "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking" or "[w]here other circumstances warrant a departure from the normal section 106 process." Federal agencies have entered into programmatic agreements in cases in which Section 110 is at issue. See, e.g., Coalition of 9/11 Families, Inc, 2005 WL 323747, at *1 (noting that the LMDC entered into a programmatic

---

[2]    Notably, Plaintiffs do not contend that NPS failed to comply with NHPA for any aspect of the relocation project other than the reorientation of the Grange.

[3]    The NHPA regulations state that "[w]here consistent with the procedures in this subpart, the agency official may use information developed for other reviews under Federal, State, or tribal law to meet the requirements of section 106." 36 C.F.R. § 800.3(b).

17

agreement for an undertaking partially funded by the Federal Transit Administration with the

SHPO and the ACHP and noting that "[i]f defendants have complied with their obligations under

Section 106 through the Programmatic Agreement, they have also complied with Section

110(b)"). Moreover, consulting parties are not required to be parties to a programmatic

agreement. See id. (finding that consulting party that was not a party to a programmatic

agreement had no standing to enforce the programmatic agreement).[4]

Throughout the historical and environmental review process, beginning in 1993, NPS

repeatedly reached out to the ACHP. Declaration of David Uschold, dated June 12, 2008

("Uschold Decl."), ¶¶ 1-7. NPS provided ACHP with all relevant design and construction

documents regarding the relocation project, including after the orientation had changed. Id. ¶¶ 5-

6. By letter dated May 28, 2008, ACHP confirmed that it had reviewed NPS's compliance with

NHPA specifically regarding the reorientation of the Grange, and declined to ask NPS to revisit

any issues, in light of NPS's multiple meetings with the public. Id. ¶ 7, Exh. 6. In addition, on

---

[4] Although Plaintiff "Friends of Hamilton Grange" purport to be a consulting party, this is false. Indeed, notwithstanding Plaintiff's assertions, it is not at all clear that "Friends of Hamilton Grange" even existed from 1995 through the present, much less acted as a "consulting party" as defined by 36 C.F.R. 800.2(c). First, there is no reference to the "Friends of the Grange" in the NPS database of Friends groups, see Burks Decl. ¶ 35. Second, the 1995 GMP/EIS contains a list of agencies and organizations who received or reviewed the draft plan or submitted written comments, and the "Friends" group is entirely absent from this listing. See Burks Decl. Ex. 2, at 78-86. Third, the only letter submitted to NPS from the "Friends of the Grange" was a letter raising the same issues in this complaint in May 2008. See Burks Decl. ¶ 34, Ex. 22. Fourth, Plaintiffs admit that the "Friends" group did not meet from 1995 through 2006. See Complaint ¶ 57. Accordingly, although the GMP/EIS itself mentions the "Friends of Hamilton Grange," and Plaintiffs have introduced a letter from NPS to the "Friends of Hamilton Grange" from 1995 (albeit without any address on the letter), see Declaration of John Cardwell, Ex. 5, there is no evidence that the "Friends of Hamilton Grange" existed after the GMP/EIS process concluded in 1995 until just before the institution of this lawsuit.

18

or about June 22, 2005, NPS consulted with the designee of the Secretary of the Interior, who

stated that the Secretary did not wish to participate in consultations for the project. Id. ¶ 9.

NPS further complied with the requirements of consulting with the public regarding the

orientation of the Grange as explained above in Section C. A federal agency has broad discretion

to determine the appropriate scope of consultation with the public. Specifically, the regulations

provide that "The agency official should plan consultations appropriate to the scale of the

undertaking, and the scope of Federal involvement and coordinated with other requirements of

other statutes, as applicable . . . ." 36 C.F.R. § 800.2(a)(4) (emphasis added). Regarding the

scope of public participation, "The agency official shall seek and consider the views of the public

in a manner that reflects the nature and complexity of the undertaking and its effects on historic

properties, the likely interest of the public in the effects on historic properties, confidentiality

concerns of private individuals and businesses, and the relationship of the Federal involvement to

the undertaking." 36 C.F.R. § 800.2(d) (emphasis added).

**ARGUMENT**

**THIS COURT SHOULD DENY PLAINTIFFS' REQUEST
FOR A PRELIMINARY INJUNCTION**

**A.    Standards for a Preliminary Injunction**

A preliminary injunction is an "an extraordinary and drastic remedy, one that should not

be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v.

Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original) (citation omitted); see also Medical

Soc'y of the State of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977) (stating that a

preliminary injunction is an "extraordinary and drastic remedy which should not be routinely

19

granted"); see also Alvarez v. City of New York, 2 F. Supp. 2d 509, 513 (S.D.N.Y. 1998)

("Injunctions are 'the most intrusive sort of judicial relief'") (quoting Tribune Co. v. Abiola, 66

F.3d 12, 16 (2d Cir. 1995)).

      Plaintiffs misstate the preliminary injunction standard applicable in this case.  It is true

that, in the ordinary case, the standard cited by Plaintiffs applies, requiring a showing of:

(1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) a serious

question on the merits to make them a fair ground for trial, with a balance of hardships tipping

decidedly in plaintiff's favor.  See Pls.' Br. at 20.

      Where, as here, however, the movant seeks a preliminary injunction "that will affect

government action taken in the public interest pursuant to a statutory or regulatory scheme, the

injunction should be granted only if the moving party meets the more rigorous

likelihood-of-success standard."  No Spray Coalition, Inc. v. City of New York, 252 F.3d 148,

150 (2d Cir. 2001) (quotations omitted); Wright v. Guiliani, 230 F.3d 543, 547 (2d Cir. 2000)

(same); see also Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 424 (2d Cir. 2004) (because

"government action[s] taken in furtherance of a regulatory or statutory scheme [are] presumed to

be in the public interest[,] in such situations, a plaintiff must meet a 'more rigorous likelihood-of-

success standard'" to obtain preliminary injunctive relief) (internal citation omitted).  Plaintiffs

here challenge government action taken pursuant to the NHPA, as well as the 1962 legislation

authorizing the relocation of the Grange  – in other words, "government action taken in the

public interest pursuant to a statutory or regulatory scheme."  No Spray Coalition, 252 F.3d at

20

150. Accordingly, they must meet the heightened standard for a preliminary injunction.[5]

As a final consideration, "[w]henever a request for a preliminary injunction implicates the public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." Time Warner Cable of New York City v. Bloomberg L.P., 118 F.3d 917, 929 (2d Cir. 1997).

## B.    Standard of Review under the Administrative Procedure Act

Agency compliance with NHPA is reviewed under the "arbitrary and capricious" standard set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). See City of Oxford v. FAA, 428 F.3d 1346, 1351 (11th Cir. 2005); San Carlos Apache Tribe v. United States, 417 F.3d 1091 (9th Cir. 2005).[6] This standard of review is "particularly deferential." Envtl. Def. v. U.S. E.P.A., 369 F.3d 193, 201 (2d Cir. 2004); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (although the Court's "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one"). Reversal of the agency's decision is justified only where there has been a "clear error of judgment." Overton

---

[5]  Plaintiffs' reliance on the Second Circuit's holding in Time Warner Cable of New York City v. Bloomberg L.P., 118 F.3d 917 (2d Cir. 1997), is misplaced. The Time Warner court held that the lesser standard may apply where the governmental action is "akin to the sort of proprietary action in a federally regulated field that, if undertaken by a state, has sometimes been said to waive the defense of sovereign immunity," not where, as here, the injunction seeks to "prevent the exercise of governmental regulatory authority." Time Warner, 118 F.3d at 923-24. Polymer Tech. Corp. v. Mimram, 37 F.3d 74, 77-78 (2d Cir. 1994), is inapposite, as it did not involve a government defendant.

[6]  Although the Second Circuit has not yet addressed this issue, see Business and Residents Alliance of East Harlem, 430 F.3d at 590 & n.7, the Court noted that the Ninth Circuit had recently held that only APA review is available (citing San Carlos Apache Tribe, 417 F.3d 1091).

Park, 401 U.S. at 416. As the Second Circuit has explained:

> [A] court . . . is not empowered to make a de novo determination concerning the
> advisability of the proposed [action]. Neither is it permitted to fly speck [decision
> documents] or to use the applicable statutes as a crutch for chronic faultfinding.
> Its duty, instead, is to see that the officials and agencies involved have properly
> considered the relevant factors and that the administrative decision was not
> arbitrary, capricious or a clear abuse of discretion.

Monroe County Conservation Council, Inc. v. Adams, 566 F.2d 419, 426 (2d Cir. 1977)

(citations and internal quotation marks omitted).

## C.    Plaintiffs Cannot Demonstrate Irreparable Harm

### 1.    Plaintiffs' Delay in Bringing
This Action Belies Their Claim of Irreparable Harm

It is well settled in this Circuit that irreparable harm is "the single most important

prerequisite for the issuance of a preliminary injunction," Rodriguez v. DeBuono, 175 F.3d 227,

233-34 (2d Cir. 1999), and that "[a] showing of irreparable harm is essential to the issuance of a

preliminary injunction." Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995). "To

establish irreparable harm, the movant must demonstrate an injury that is neither remote nor

speculative, but actual and imminent and that cannot be remedied by an award of monetary

damages." Id. (quotations omitted); see also Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir.

2002) (same); Forest City, 175 F.3d at 153 (same). Vague, theoretical, and conclusory harms,

however, cannot form the basis for granting the "extraordinary and drastic" remedy afforded by a

preliminary injunction. See, e.g., Jayaraj v. Scappini, 66 F.3d 36, 40 (2d Cir. 1995) (evidence of

"speculative and attenuated injuries" insufficient for preliminary injunction); Nat'l Football

League Players Ass'n v. Nat'l Football League Properties, Inc., No. 90 Civ. 4244 (MJL), 1991

WL 79325, at *4 (S.D.N.Y. May 7, 1991) ("[P]laintiff's conclusory statements of [irreparable

22

harm] will not make it so without more to support the claim."). Rather, a plaintiff "is required to establish not a mere possibility of irreparable harm, but that it is 'likely to suffer irreparable harm if equitable relief is denied.' Likelihood sets, of course, a higher standard than 'possibility.'" Aim Int'l Trading, L.L.C. v. Valcucine S.P.A., No. 02 Civ. 1363 (PKL), 2002 WL 1285557, at *4 (S.D.N.Y. June 11, 2002) (quoting Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) (emphasis in original). Accordingly, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990).

Plaintiffs' considerable delay in bringing this action seriously undermines any notion of urgency and irreparable harm. See Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) ("[A]ny such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."). The Second Circuit has held that "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985); see also Rodriguez, 175 F.3d at 235 (2d Cir. 1999) (per curiam) (where movant exhibits delay in seeking preliminary injunctive relief, "the irreparable harm he or she faces may not ordinarily be deemed 'imminent' as required to sustain a preliminary injunction"). Indeed, "delay alone may justify denial of a preliminary injunction." Citibank, 756 F.2d at 276.

Delay weighs particularly heavily against the moving party where, as here, it was aware of the underlying facts of the case well before seeking relief. See Cunningham v. English,

23

__U.S.__, 78 S. Ct. 3, 4 (1957) (denying preliminary relief where challengers waited until ten days before the event to bring suit, since "[m]any of the allegations in the papers are based on events known by petitioners to have occurred months and years ago" and thus a preliminary injunction "at this late date would call for an extraordinary exercise of judicial power that only the most compelling considerations could warrant").

Plaintiffs had actual notice of the NPS's plan to reorient the Grange long before construction work commenced on the permanent foundation and long before the Grange was placed on the temporary foundation structure on which it now sits. Nevertheless, they waited to seek relief until construction of the new foundation was 70% complete and the Grange had been removed from its prior permanent foundation and placed on a temporary foundation structure.

As early as 2001, NPS made public the planned reorientation of the Grange. See Burks Decl. ¶ 10. Regardless of any dispute as to Plaintiffs' knowledge prior to 2006, there can be no dispute that they were aware of the NPS's plan to reorient the Grange in December 2006, when they complained about the reorientation at a public meeting; see Burks Decl. ¶ 15, Complaint ¶¶ 72-73; on April 9, 2007, when they complained about the orientation during a meeting with Community Board 9; see Burks Decl. ¶ 16, Complaint ¶¶ 79-80; and on April 12, 2007, when they attended a site visit with NPS, were shown drawings and a model and discussed the possible orientations of the house; see Burks Decl. ¶ 17; and when, on April 17-19, 2007, they were sent letters from Maria Burks stating that the decision was final. See Burks Decl. ¶ 27, Ex. 16.

Plaintiffs had actual notice of the construction work as well. NPS placed construction fencing on Convent Avenue and St. Nicholas Park beginning in December 2007, began excavation for the foundation in January 2008, and started the process of lifting the Grange from

24

its foundation on Convent Avenue on May 1, 2008. <u>See</u> Peterson Decl. ¶¶ 3-4. Thus, the

Plaintiffs were no doubt aware of the commencement and progress of the project to relocate the

Grange.

By waiting until after the new foundation for the Grange was 70% complete, and the

Grange was already placed onto a temporary foundation structure before filing this case, despite

the actual notice that the Plaintiffs had, Plaintiffs unduly delayed filing suit, demonstrating a lack

of irreparable harm. In <u>East 63rd Street Association</u>, the Court held that:

> The importance of delay as an argument against injunctive relief is enhanced
> when the over-all project, of which only a piece is questioned, has progressed so
> far and been so largely set along irreversible lines that a temporary injunction
> could not realistically be expected to "serve the public interest and the purposes of
> (NEPA)." This is quite clearly a case where, in the period of plaintiffs' delay,
> "construction . . . (has) gone so far that for economic (and overriding
> environmental) reasons it would be impracticable or impossible to alter much of
> the basic plan."

414 F. Supp. at 1330 (citations omitted). <u>See also Riverdale Environmental Action Committee</u>

<u>Along the Hudson v. Metropolitan Trans. Authority</u>, 638 F. Supp. 99, 103 (S.D.N.Y.), <u>aff'd</u> 797

F.2d 110 (2d Cir. 1986) ("The Second Circuit test is whether the plaintiff's delay in bringing the

suit has resulted in construction proceeding 'to a point where any significant environmental

damage has already been done' and whether, in the alternative, 'construction may have gone so

far that for economic reasons it would be impracticable to alter much of the basic plan.'"); <u>Stow</u>

<u>v. U.S. on Behalf of Soil Conservation Service of U.,S. Dept. of Agriculture</u>, 696 F. Supp. 857,

863 (W.D.N.Y. 1988) (finding laches applied and noting, <u>inter alia</u>, that the "projects at issue

here are in advance stages of construction."); <u>Citizens for the Scenic Severn River Bridge, Inc. v.</u>

<u>Skinner</u>, 802 F. Supp. 1325, 1342 (D. Md. 1991), <u>aff'd</u> 972 F.2d 338 (4th Cir. 1992)  (finding

laches barred the plaintiffs' claims where the delay in bringing the lawsuit left the parties "on the eve of the awarding of the construction contract" and prejudiced defendants).

> 2. Plaintiffs Cannot Demonstrate
> Irreparable Harm From The Alleged Absence of NHPA Review

There is no irreparable harm for the further reason that the ultimate goal of NHPA review – a determination of the effect an undertaking may have on historic properties – has already been achieved. In addition, NPS has already heard the views of Plaintiffs in opposition to the northeast orientation, and considered whether alternative orientations were feasible. Specifically, in early 2007, Maria Burks ordered her staff to prepare scale drawings showing alternative orientations of the Grange, specifically three potential southwest orientations, a table top scale model, and to stake out the footprint of the house on the new site. Burks Decl. ¶¶ 16-17, Exs. 12-14. In response, NPS prepared such drawings, which NPS considered in good faith. See id. ¶ 17. NPS also conducted a site visit, during which time members of the public, including members of Plaintiff were present to discuss the matter. Having consulted with the public and having considered multiple orientations of the house, the NPS rendered a determination that (i) the northeast orientation best preserves the historic integrity of the Grange, including the historic fabric; (ii) three southwest orientations should be rejected, because they did not as fully as the northeast orientation preserve the historic integrity of the house, and they raised additional issues regarding access to people with disabilities, and preservation of specimen trees in St. Nicholas Park. See Burks Decl. ¶¶ 19-26.

In Save Our Heritage, Inc. v. Federal Aviation Administration, 269 F.3d 49 (1st Cir. 2001), the Court refused to remand for further NEPA and NHPA review where the agency had

26

already taken into account particular concerns, found them to be without merit, and disclosed the

results to interested parties:

> We will assume that an environmental assessment and finding of no significant
> impact might look somewhat different in form and follow somewhat more
> complicated procedures than the study and findings by the FAA in this case . . .
> Ultimately, the entire NEPA process is designed to make certain that significant
> negative effects are taken into account. Remanding for a differently named
> assessment, where the project's negative consequences have already been
> analyzed and found to be absent and the findings have been disclosed to interested
> parties, is a waste of time.

Id. at 62. In discussing the NHPA, the Court reiterated this point: "The consultative process

under NHPA, like the process of creating an EIS or environmental assessment under NEPA, is

intended in the end to identify and measure the adverse effects of a proposed action on a

protected interest (historic properties for NHPA, the environment for NEPA) so that those effects

can be considered by the responsible agency." Id. at 63. Here, there can be no doubt that the

agency considered the potential adverse effects of the reorientation of the Grange.

Notably, numerous other entities have agreed with the NPS's decision, and/or determined

that no further review is necessary. For example, the SHPO concluded in June 2007 that the

construction documents were "appropriate" for the "proposed plan" to move and rehabilitate the

Grange. See Burks Decl., Ex. 20. The Art Commission of the City of New York approved the

project in April 2007, see Burks Decl., Ex. 19, and the Landmarks Commission found on April

10, 2007 that the orientation of the Grange to the northeast "relates to its original siting as a

mansion on a promontory." See Burks Decl., Ex. 18. Moreover, the ACHP, which issued the

regulations under the NHPA, declined to intervene on the issue of the orientation of the Grange

in response to requests by certain community groups, and found the NPS's consideration of the

27

orientation, as well as its consultation with the public, sufficient. See Uschold Decl., Ex. 6.

Plaintiffs have thus not suffered irreparable harm because NHPA's procedural

requirements that NPS consider any potential adverse effects on the Grange due to the

reorientation have been met. Plaintiffs have mustered no evidence to contradict this conclusion.

In sum, NPS's consideration of the orientation of the Grange, its inclusion of the public in

that process, and its ultimate determination that the Grange should be oriented to face the

northeast, coupled with the Plaintiffs' delay in bringing this lawsuit and the near completion of

the northeast-facing foundation, demonstrate that Plaintiffs cannot establish the requisite element

of irreparable harm in seeking a preliminary injunction.

**D.      Plaintiffs Cannot Establish A**
        **Likelihood of Success on the Merits**

      **1.      Plaintiffs Cannot Establish that the NPS Acted Arbitrarily and Capriciously**
        **When Plaintiffs Received Actual Notice That the Grange Would Be**
        **Reoriented, Were Afforded An Opportunity to Voice Their Concerns, And**
        **the NPS Reconsidered Its Decision To Take Their Concerns Into Account**

The crux of Plaintiffs' complaint is that NPS violated the NHPA by failing to accept

Plaintiffs' judgment that the Grange should be oriented to the southwest rather than the northeast.

Neither the APA nor the NHPA, however, permits this Court to substitute Plaintiffs' judgment

for the Government's. To the contrary, the only question for this Court is whether NPS acted

arbitrarily and capriciously in determining to reorient the Grange to the northeast. NHPA is

"primarily procedural," it "does not require a particular outcome," and essentially functions as a

"'stop, look, and listen' provision." Business and Residents Alliance, 430 F.3d at 591 (2d Cir.

2005); see also National Mining Assoc., 324 F.3d at 755 (D.C. Cir. 2003) (finding Section 106 of

NHPA "imposes no substantive standards on agencies"). Accordingly, Plaintiffs' request that

this Court order NPS to obtain the "consent" of the "Friends of Hamilton Grange prior to any undertaking" relating to the Grange is completely without legal support. Complaint at p. 31. NPS met any obligation it had to Plaintiffs by properly considering their concerns regarding the proper orientation of the Grange.

The Eleventh Circuit recently rejected a claim that the FAA violated the procedural requirements of NHPA by "failing properly to involve consulting parties in the NHPA process." City of Oxford, 428 F.3d at 1357. As here, the petitioner contended that the agency did not inform it of the subject matter of a meeting, "prematurely cut off the consultation process," and "failed to provide it with documentation of the finding of no adverse effect." Id. In that case, however, there was no dispute that the petitioner was a "consulting party." The court rejected the petitioner's claims, stating that the NHPA regulations "do not speak to the form and content of written invitations to meetings with consulting parties." Id. The court also rejected claims that the FAA failed to hold an additional meeting at the petitioner's request, noting that after revising its analysis in response to concerns raised by the SHPO and other consulting parties, the "FAA properly exercised its discretion in concluding that no further meetings were useful." Id.

The court likewise rejected the petitioner's claims that the FAA had violated NHPA by "failing to provide it with documentation of its finding of no adverse effect." Id. The court explained, "Petitioner seems to operate under the erroneous view that the FAA was required to provide it with all significant written correspondences between the FAA and the SHPO or the ACHP." Id. The court noted that the NHPA regulations required only notification of consulting parties after its findings of no adverse effect. Id.

Finally, this Court should reject Plaintiffs' attack on NPS's substantive determinations

29

regarding the appropriate orientation of the Grange, its ability to simply rotate the building on the

foundation in St. Nicholas Park, and the risks of harm to the Grange if it were left on the

temporary foundation, just as the court in City of Oxford rejected the petitioner's attack on the

technical conclusions and methodology employed in rendering the FAA's findings. Id. at 1358.

The Eleventh Circuit stated, "The methodology used to make technical determinations . . . is a

matter of agency expertise. This court's role is simply to ensure that the agency utilized legally

adequate procedures in applying its expertise." Id.

There is no likelihood that Plaintiffs will succeed in establishing that NPS's

determination to orient the Grange to the northeast instead of the southwest was arbitrary and

capricious. Even assuming arguendo that Plaintiffs did not receive notice that the Grange would

be oriented to the northeast until December 2006, see Complaint ¶¶ 73-74, it cannot be disputed

that after community members "vigorously challenged" (Complaint ¶ 74) the northeast

orientation, NPS took steps to evaluate Plaintiffs' concerns before commencing construction.

Specifically, Burks and Spaulding of NPS attended a meeting at Community Board 9 regarding

the Grange, and heard concerns expressed by community members regarding how reorienting the

Grange to the northeast would negatively affect the light in the dining room and the reflection of

the sylvan setting in the dining room mirrors. See Burks Decl. ¶ 16. In response, Burks took

action to evaluate Plaintiffs' concerns and revisit the orientation of the Grange by having her

staff prepare scale drawings, a table-top scale model and stake out the footprint of the house on

the new site in advance of a site visit on April 12, 2007. See id. ¶¶ 16-17. During the site visit,

Plaintiffs and NPS discussed and reviewed three possible southwest alternatives to orienting the

Grange to the northeast. See id. ¶ 17. Following these meetings, and after evaluating the

30

negatives and positives of the various possible orientations, Burks reached a reasoned conclusion that the northeast orientation represented the best of the possible alternatives that was supported by the evidence. See id. ¶¶ 19-26. NPS also has taken steps to mitigate Plaintiffs' concern regarding the view from the dining room by planning to plant 13 sugar gum trees that will enhance the view reflected through the mirrors in the dining room and recapture the view from Alexander Hamilton's time. See id. ¶ 26. Accordingly, for all these reasons, Plaintiffs' are not likely to succeed on the merits in attempting to demonstrate that NPS's orientation determination was arbitrary and capricious.[7]

## 2.    Section 110 Does Not Mandate the Substantive Relief Plaintiffs Seek

Contrary to Plaintiffs' assertions, courts have repeatedly held that Section 110 does not impose substantive requirements on a federal agency. The mandates contained in Section 110, as well as the broad discretion granted to federal agencies in that provision, cannot be the basis of the type of substantive claim urged by Plaintiffs. See, e.g., Nat'l Trust for Historic Preservation v. Blanck, 938 F. Supp. 908 (D.D.C. 1996) (legislative history clarifies that Section 110 is merely intended to flesh out requirements of Section 106), aff'd, 203 F.3d 53 (D.C. Cir. 1999) (table); see also New Mexico ex rel. Richardson v. BLM, 459 F. Supp. 2d 1102, 1128-29 (D. N.M. 2006) (same); Coalition of 9/11 Families, 2005 WL 323747, at *3 (noting that Section 110 of the NHPA did not add new substantive requirements).

---

[7] Nor are Plaintiffs likely to succeed in their claims that NPS failed to properly consult with the ACHP and the Secretary of the Department of the Interior, which are alleged "on information and belief," but without any personal knowledge. See Complaint ¶¶ 106-107. In fact, NPS consulted with both ACHP and the Secretary. See Uschold Decl. ¶¶ 1-9. Moreover, the ACHP has determined that NPS adequately addressed the reorientation of the Grange, and declined to intervene on the issue; the Secretary did not wish to participate in consultations for the project. Id.

31

"Section 110 is to be read in conjunction with Section 106 which constitutes the main thrust of the NHPA," and "embod[ies] the requirement that agencies thoroughly consider preservationist goals in all aspects of agency decisionmaking," but "does not itself affirmatively mandate the preservation of historic buildings or other resources." Blanck, 938 F. Supp. at 925. "Section 110 of the NHPA was [originally] added to the NHPA in 1980 to 'clarif[y] and codif[y] the minimum responsibilities expected of Federal agencies in carrying out the purposes of th[e] Act.' Although the language of the section is broad, it was not 'intended to change the preservation responsibilities of Federal agencies as required by any other laws, executive orders or regulations . . . .'" 938 F. Supp. at 916 (quoting Lee v. Thornburgh, 877 F.2d 1053, 1057 (D.C. Cir. 1989) (quoting H.R. Rep. No. 1457, 96th Cong., 2d Sess. 36 (1980), reprinted in 1980 U.S. Code Cong. & Admin. News 6378, 6399); see also Oglala Sioux Tribe v. U.S. Army Corps of Engineers, 537 F. Supp. 2d 161, 173 (D.D.C. 2008) (rejecting request for mandamus under Section 110, reaffirming Blanck's holding that "Section 110 does not affirmatively mandate the preservation of historic buildings or other resources" and only requires an agency "to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process and with its own Historic Preservation Plan") (emphasis in original).

Therefore, Section 110 does not require a federal agency "to undertake any preservation beyond what was necessary to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process." Id. See also Coalition of 9/11 Families, 2005 WL 323747, at *3 (noting that Section 110 of the NHPA did not add new substantive requirements and that "[i]f defendants have complied with their obligations under Section 106 through the Programmatic Agreement, they have also complied with Section 110(b)"); Oglala Sioux Tribe, 537 F. Supp. 2d

at 173 (rejecting argument that <u>Blanck</u>'s holding was limited to any subsection of 110).[8]

## E.    The Balance Of Interests Weighs Against an Injunction Because Any Further Delay Will Harm the Historic and Structural Integrity of the Grange

Even if Plaintiffs were able to demonstrate the requisite irreparable harm, the balance of

the equities would nevertheless militate against awarding them injunctive relief. The Second

Circuit has warned against granting preliminary injunctions that would "needlessly . . . injure[]

the public interest." <u>Brody v. Village of Port Chester</u>, 261 F.3d 288, 290 (2d Cir. 2001) (citation

omitted). "Whenever a request for a preliminary injunction implicates public interests, a court

should give some consideration to the balance of such interests" in deciding whether to award

injunctive relief. <u>Id.</u> (citation omitted). Here, the remedy sought by Plaintiffs – to preclude the

Government from placing the Grange on its permanent foundation – would result in serious

---

[8]    The cases cited by Plaintiffs are not to the contrary (Br. at 21-22). <u>See</u> <u>Okinawa Dugong v. Gates</u>, 543 F. Supp. 2d 1082, 1095 & n.4 (N.D. Cal. 2008) (acknowledging that the "NHPA itself does not require a particular outcome and it neither forbids destruction of a protected property no commands its preservation," but stating in <u>dicta</u> that Section 110 imposes an affirmative duty to minimize harm); <u>Coliseum Square Ass'n v. Jackson</u>, 465 F.3d 215, 225 (5th Cir. 2006) (stating in <u>dicta</u> that Section 110 imposes substantive duties, yet holding only that the government did not act arbitrarily and capriciously in relying on NPS to support its conclusion that a project would have no adverse impact). Moreover, even if Section 110 imposed a substantive duty – which it does not – Section 110 itself acknowledges that the agency can only minimize harm "to the maximum extent possible," leaving discretion in the agency as to how to accomplish that goal. 16 U.S.C. § 470h-2(f). In any event, NPS has unquestionably made every possible effort to minimize harm to the Grange – and indeed to preserve its historic integrity – to the "maximum extent possible." Although Plaintiffs focus on a single aspect of the Grange – its orientation – NPS has considered and taken into account multiple aspects of the Grange's historic integrity, including its historic façade, the historic fabric, the building's structure, the stairs, its security, and other features. The goal of the NPS has been to minimize harm, to the maximum extent possible, to all aspects of the Grange – not simply the one feature that Plaintiffs have singled out. Indeed, NPS determined that the requested reorientation would have caused significant harms to the historic integrity of the structure and the historic fabric, and the remedy that Plaintiffs request – further delay in placing the  Grange on its permanent foundation – risk even greater harms.

harm to the Grange itself.

Specifically, there is a strong public interest against allowing Plaintiffs' proposed last-minute change and in favor of allowing NPS to place the Grange on the permanent foundation that is now 70% complete, the culmination of a project that has taken many years of design, planning and consultation, as well as many months of construction. The longer the Grange remains on a temporary foundation, the greater the risk of harm to the Grange, including harm from settling, bowing, cracking plaster, vandalism, fire, movement of the earthen pad, animals, water damage and other harms. It would not serve the public interest to delay placement of the Grange onto its permanent foundation at this late date, when to do so could threaten the historic and structural integrity of the Grange, would require the needless expenditure of taxpayer dollars, and could compromise the entire relocation project.

**CONCLUSION**

For the reasons stated above, the relief sought by Plaintiffs should be denied.

Dated:   New York, New York
         June 13, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the Government

By:      ____/s/_____
         LAWRENCE H. FOGELMAN
         Assistant United States Attorney
         86 Chambers Street, 3rd Floor
         New York, New York  10007
         Tel:  (212) 637-2719
         Fax: (212) 637-2730
         Email: lawrence.fogelman@usdoj.gov

34
