MICHAEL J. GARCIA
United States Attorney
Southern District of New York
Attorney for Defendants
By: LAWRENCE H. FOGELMAN
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2719
Email: Lawrence.Fogelman@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRIENDS OF HAMILTON GRANGE and      :
DR. JOHN CARDWELL,                  :
                                    :
                    Plaintiffs,     :       08 Civ 5220 (DLC) (FM)
            v.                      :
                                    :
DIRK KEMPTHORNE, Secretary of the Interior; :
U.S. DEPARTMENT OF THE INTERIOR;    :
MARY A. BOMAR, Director of the National :
Park Service; NATIONAL PARK SERVICE; and :
MARIA BURKS, Commissioner of National Parks :
of New York Harbor and Superintendent of :
Manhattan Sites,                    :
                                    :
                    Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF STEPHEN SPAULDING

Stephen Spaulding, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

1.    I am the Chief of the Architectural Preservation Division for the Northeast Region

of the Nation Parks Service ("NPS").  In that position I provide technical advice, support and

oversight for the restoration, preservation, rehabilitation and maintenance of the historic structures

in the northeast region. I have worked for the National Park Service for 25 years, serving as a

1

Preservation Craftsman, Restoration Specialist (responsible for executing restoration treatments on a historic structure), and a Project Manager. I have held my current position, although the title has changed, since 1989.

2.    Because structural stability is integral to historic preservation and restoration, understanding architectural and engineering practices is an essential part of my job. I oversee a staff of architects, project managers, historic architects, architectural conservators, preservation craftsmen, construction managers, and work with mechanical engineers, electrical engineers, and civil engineers and architectural and engineering firms hired by NPS.

3.    The goal of the Hamilton Grange project is, to the fullest extent possible, to preserve the original, historical architectural material put into the house by Alexander Hamilton during the building's construction (known as the "historic fabric") and restore the Grange to its appearance when it was constructed in 1802. NPS has done its best to ensure that there is as little damage as possible to the historic fabric during the investigation and planning, leading to relocation and restoration of the Grange. This process requires careful and often creative planning. For example, NPS does its best to ensure that the installation of mechanical, electrical, and alarm systems do not visually alter the historic appearance of the Grange or harm the historic fabric of the building.

4.    My work with the Hamilton Grange Project began in 1990. At that time, I was involved in design and installation of security and smoke detection systems and ongoing structural repairs to the building in its location on Convent Avenue. In 2003, at the direction of the Regional Director, I became the Northeast Region Technical Lead to James Pepper, the Park Superintendent, and to the Denver Service Center on the Hamilton Grange restoration project. In

that position, I work as part of the design team to create methodology to achieve the NPS goals of preservation and restoration of the Grange. As Technical Lead, I have worked closely with the Architectural and Engineering firm hired by the National Park Service on a number of issues including the safety of the Grange, ensuring accessibility to the Grange for people with disabilities, design and installation of mechanical systems, and plans for the restoration of the interior and exterior of the Grange.

5.    The Grange is currently located on a temporary support in St. Nicholas Park while the permanent foundation is completed. A photograph attached as Exhibit 1 and labeled USA 25 shows the Grange in St. Nicholas Park as it is currently situated. Unlike a permanent foundation, which provides continuous support to building sills load bearing walls, the temporary support provides only point loading, or support with blocking at intermittent locations of the structure. This blocking is in turn supported by wooden towers (called "cribbing") which support steel beams and the wood blocking. A photograph attached as Exhibit 2 and labeled USA 41 clearly shows the current point loading support. The Grange is currently situated on top of a 70 foot by 70 flat table of compacted gravel fill covered with one inch steel plates. These plates can be seen in the photograph attached here as Exhibit 1. The gravel mound upon which the Grange is currently located can be seen in Exhibit 2.

6.    Until the Grange is moved to its permanent foundation, the building is exposed to a variety of risks including ongoing expansion of cracks in the plaster walls of the Grange, exposure to the elements, vandalism, and a lack of security and fire suppression systems. The longer the Grange remains on its temporary foundation, the greater the risk to the structural integrity of the Grange and the historic fabric in the building.

3

## I.     CRACKS AND DAMAGE TO THE GRANGE

7.     Cracks have formed in the plaster walls of the Grange.  These cracks have formed and grown in response to the movement of the house from a uniform, continuously supportive foundation to point loading of its temporary foundation, first on Convent Avenue and currently in St. Nicholas Park.  I have personally observed newly formed cracks along nearly every interior wall on the first floor of the Grange.  On May 31, 2008, I personally inspected the Grange and had markings made to document the length of various cracks.  On June 5, 2008, I again inspected the Grange and found the cracks in the plaster had grown considerably.  Attached to this declaration as Exhibit 3 and labeled USA 47-53 are photographs taken during this June 5, 2008 visit.  In each of these photographs, the cracks extended beyond the lines drawn on May 31, 2008, which indicated the termination of the crack on that date.  Photographs labeled USA 51 and USA 52 show that the cracks are forming and growing in multiple directions.  These cracks were first identified while the Grange was sitting on its temporary support on the road bed of Convent Avenue, a more stable location than the gravel platform where it is currently located.

8.     I also personally inspected the Grange on June 11, 2008, subsequent to its relocation to St. Nicholas Park.  I found that the cracks had continued to grow.  Additionally, I discovered that a panel of plaster wall has bowed out from the wall.

9.     These cracks and bowing are caused by the Grange's current position on point loaded blocking and the amount of deteriorated and compromised components of the wooden framing of the building which has resulted in the cracking and crushing of the plaster, wooden trim, and other aspects of the historic fabric in the Grange.

10.     Moreover, the gravel platform on which the Grange is currently sitting was

intended to be a temporary turning table and transition point for the Grange onto the permanent foundation. As such, it lacks adequate drainage to ensure stable support of the building for very long. As the soil becomes wet from rain or underground springs running through the site, areas of soil will settle differently, creating uneven support for the Grange.

11.    Cracks and bowing have damaged the historic fabric of the Grange and indicate that settlement is putting stress on the building. Cracks radiating in multiple directions indicate that the building is settling unevenly in a variety of directions. These cracks indicate threats to parts of the Grange that are more difficult to access visually, including the structural integrity of the building's wooden frame. The longer the Grange remains on the temporary foundation, the more damage to the historic fabric, both clearly visible and not, will occur. The only way to ensure the damage to the historic fabric ceases is to place the Grange on the uniform support of its permanent foundation.

## II.    RISKS TO THE GRANGE CAUSED BY EXPOSURE TO WEATHER

12.    The Grange is also at risk because there is a significant amount of rot and decay damage to the wooden structure of the house, including the sills (wooden beams that support the frame of the house) and joists (horizontal wooden supports attached to the sills). Photographs attached as Exhibit 4 and bearing labels USA 26-28; 31; 34; 37-38 show several locations of damage to these wooden supports. The photograph labeled USA 29 shows undamaged sill and joist connections. The other photographs show varying degrees of damage to the wooden supports. In some locations, such as the one shown in USA 31, the sill has split completely. It is no longer providing adequate support to the structure above. While the Grange remains on its temporary foundation, these beams are exposed to the elements, exacerbating the damage and

decay. The Grange must be moved onto its permanent foundation so that repairs can be made to these damaged wooden structures and adequate support provided to the historic fabric above.

13.     While the Grange remains on its temporary foundation, the entire historic structure is exposed to the elements.   The front door of the Grange was removed for the move, as were roofs on either side of the house. These roofs previously extended to cover more than a quarter of the building's most weather affected windows that are most exposed to the elements. Currently, the NPS has done its best to protect the Grange from rain with temporary coverings for these locations, but the building is in danger of water intrusion from storms and heavy rain. Water is a threat to the historic fabric of the Grange because water in the building can cause rotting, mold, and damage to the plaster and wood finishes. When the Grange is placed on its permanent foundation, the door and roofs can be restored and replaced, protecting the Grange from the elements.

III.    **RISKS TO THE SAFETY AND SECURITY OF THE GRANGE**

14.     While the Grange remains on its temporary foundation, it cannot be properly secured from physical intrusion. The bottom of the building-- what will become the ceiling of the ground floor-- is open in places. On June 11, 2008,  a squirrel had climbed into the building prior to my visit to the building.  Until the Grange is secured to its permanent foundation, the Grange will be accessible to animals, which can damage the historic fabric within the home.

15.     Additionally, while the Grange remains on its temporary foundation, it lacks adequate security and fire suppression systems. Although there is security at the site, as situated, the Grange presents an attractive nuisance to potential vandals. When the Grange is placed on its permanent foundation, access will be limited to doors and windows, and the building will be

6

protected by an alarm system wired to the windows and doors and motion detection within the building. While the Grange is on its temporary foundation, the building cannot be confidently secured in this fashion because of the lack of electrical supply and the multiple points of entry. Vandals entering the building can damage the historic fabric of the home or dislodge temporary bracing within the home, threatening the entire structure. To confront this threat, NPS has hired security to protect the Grange when the contractor is not at the work site. This historic building will only be securely protected when it can be placed on its permanent foundation.

16.     Moreover, while on its temporary foundation, the Grange cannot be adequately protected from fire. The building currently lacks any fire suppression system, such as sprinklers, because there is no plumbing available in the temporary foundation. NPS has installed fire detection in the building, but because the Grange is exposed to moving air, it would likely delay the activation of an alarm system. The Grange is constructed of wood and would be difficult to save if a fire went undetected for even a short length of time. Fire detection cannot be installed on the exposed underside of the Grange or supporting wood cribbing. A fire in this location would most assuredly consume the Grange. When the Grange is placed on its permanent foundation it will be protected by smoke detectors which will transmit alarms directly to the fire department. Additionally, fire suppression systems will be installed on both the interior and exterior of the building. Until it is secured to its permanent foundation, the Grange will not be as securely protected from fire as possible.

## IV.     THE GRANGE CANNOT BE REORIENTED ON THE EXISTING FOUNDATION

17.     The Grange cannot be reoriented in a different direction on the already constructed foundation for numerous reasons.

18.    NPS has designed the Grange to be accessible to people with disabilities via a wheelchair lift under the front porch which provides access to the first floor of the Grange. The lift is located under the front porch because there is adequate room for the lift and to conceal its presence, so that the lift does not visually alter the historic appearance of the home, and because the front porch is to be reconstructed and as such the lift will not cause damage to original architectural materials.

19.    The lift cannot be moved to the Grange's rear porch for several reasons. The rear porch is too small to accommodate a lift without enlarging the structure or placing the lift along side of the porch. Either of those options alters the way the home would have appeared when it was built. Moreover, if the wheelchair lift were on the rear porch, the access for people with disabilities to the impressive visual presentation of the front of the Grange would be limited. Historic maps and historical accounts of the Grange indicate that visitors were meant to approach the front facade of the building, which is distinguished by its use of windows and siding, unlike the other sides of the building. NPS has designed access to the Grange so that all members of the public could have access to this aspect of the historic building. Construction documents showing architectural depictions of the front and rear of the home are attached as Exhibit 5. The front of the home is labeled USA 1 and the rear of the home is labeled USA 2.

20.    In order to situate the Grange on its present foundation in a southwest orientation, among other things, additional construction required by the wheelchair lift and access paths to the front of the home would necessitate removal of a 50 inch diameter Oak tree near the Grange. The New York City Department of Parks and Recreation ("NYCDPR") has told NPS not to remove this tree. Thus the foundation of the Grange would need to be relocated at least fifteen feet away

from its present location.  This move would require that the foundation currently under

construction be demolished and a new foundation built.

21.    Even if NYCDPR would consent to removal of the specimen tree, the Grange

cannot be placed on the existing foundation in a different orientation than intended.  Significant

demolition and reconstruction would need to occur to accommodate the new layout of the Grange

on the foundation.  In order to preserve the historically accurate location and configuration of the

interior stairs leading from the ground to the second floor of the Grange, the layout of the ground

floor of the foundation would need to be reconstructed.  Support structures in the cellar and

ground floor of the foundation would also need to be demolished and relocated to provide

adequate support to the new rotated layout of the Grange on the foundation.  Additional

construction would be necessary to reinstall plumbing below the foundation and ventilation

passageways on either side of the building.

22.    If NPS were required to make any changes to its plan to complete the existing

foundation, the Grange would have to remain on a temporary support system during that time, or

be relocated to another site to allow room for demolition and construction of a new foundation.

The longer the Grange is on temporary support, the more damage will occur to the historic fabric

and structural integrity of the home.

## V.     RESPONSE TO DR. CARDWELL'S DECLARATION

23.     In paragraph 62 of his declaration, dated June 5, 2008, Dr. John Cardwell states that I told members of the Friends of Hamilton Grange that the house could be rotated on the designed foundation "with only small changes, minor expense and delay." I met with members of the public on April 9, 2007, and discussed with them the orientation of the Grange. I informed them that if NPS decided to reorient the Grange at that time, i.e. in April 2007, before construction began, that all four floors of the Grange, including the foundation, could be reoriented. I did not suggest that the top two floors of the Grange could be reoriented on a foundation constructed in a different orientation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:       Lowell, MA
             June 13, 2008

                                                STEPHEN SPAULDING



USA 25





USA 47



USA 48



USA 49



USA 50



USA 51







USA 26







USA 29





USA 34





USA 38



USA 1



REAR ELEVATION

NEW

HAMILTON GRANGE NATIONAL MEMORIAL
ST. NICHOLAS PARK, NEW YORK CITY

A2.03

USA 2