MICHAEL J. GARCIA
United States Attorney
Southern District of New York
Attorney for Defendants
By: LAWRENCE H. FOGELMAN
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2719
Email: Lawrence.Fogelman@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRIENDS OF HAMILTON GRANGE and  :
DR. JOHN CARDWELL,              :
                               :
            Plaintiffs,         :        08 Civ. 5220 (DLC) (FM)
    v.                          :
                               :
DIRK KEMPTHORNE, Secretary of the Interior; :
U.S. DEPARTMENT OF THE INTERIOR; :
MARY A. BOMAR, Director of the National :
Park Service; NATIONAL PARK SERVICE; and :
MARIA BURKS, Commissioner of National Parks :
of New York Harbor and Superintendent of :
Manhattan Sites,                :
                               :
            Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF MARIA BURKS

          MARIA BURKS, pursuant to the provisions of 28 U.S.C. § 1746, declares as
follows:

          1.     I am Maria Burks, Commissioner of the National Parks of New York Harbor, of

the National Park Service ("NPS"), of the United States Department of the Interior.  I have held

this position since June 2005.  The National Parks of New York Harbor comprise approximately

27,000 acres including multiple historic sites.  As Commissioner, I have supervisory

responsibilities over the superintendent of 6 sites, collectively referred to by NPS as the

Manhattan Sites, which include Federal Hall National Memorial ("NM"), Theodore Roosevelt

Birthplace National Historic Site ("NHS"), General Grant NM, Saint Paul's Church NHS, Castle

Clinton National Monument and Hamilton Grange NM.  I also have supervisory responsibility

over the superintendents at Governor's Island National Monument and the African Burial

Ground National Monument.  I further coordinate the work of these superintendents, as well as

the superintendents of the Statue of Liberty National Monument and Ellis Island, and Gateway

National Recreational Area in the areas of business, philanthropy, inter-park transportation and

partner organizations.  In addition, in February 2007, I assumed the direct responsibility of

serving as superintendent for the Manhattan Sites.  I am a member of the Senior Executive

Service.

      2.    Hamilton Grange National Memorial (the "Grange") is the only home ever owned

by Alexander Hamilton, one of our nation's founding fathers.  Built in 1802, it represented the

culmination of Hamilton's ambition to demonstrate his accomplishments and rise from humble

beginnings to become one of our nation's leaders.  When built, it occupied a high point on the

spine of Manhattan in an area that was completely rural with beautiful 360-degree views.  In

1889, the street grid of Manhattan reached the location of the Grange.  Because the grid would

have cut through the property, the house was moved to a new location to prevent its destruction.

Saint Luke's Episcopal Church purchased it and moved it to Convent Avenue between 141st

street and 142nd street.  The Grange was squeezed into the site to fit behind the church. Its front

door and steps were relocated to one of the side piazzas, the interior front hallway and stairs

were reconfigured to meet the new door, and its back porch was removed entirely.  It remained

there in private hands until 1962. First used as a rectory by the church, in 1924 it was converted

to a museum by the American Scenic and Historic Preservation Society.

3.    In 1962, in recognition of the profound significance of the building's relationship to Alexander Hamilton, the United States Congress designated it a National Memorial with the requirement that the house be relocated.  See Exhibit 1.

4.    In 1993 through 1995, pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq., NPS initiated a general management planning process, and prepared an environmental impact statement (GMP/EIS) regarding the consideration of alternative relocation options for the Grange.  During the draft GMP/EIS process, extensive public comment was solicited and received.   At the conclusion of this process, NPS issued a final GMP/EIS.  See Exhibit 2.  As part of this process, NPS complied with the requirements of NHPA, and included a section in the GMP/EIS explaining measures taken to comply with NHPA, including the involvement of the State Historic Preservation Officer ("SHPO") and the Advisory Council on Historic Preservation ("ACHP"), as well as additional steps that would be taken to preserve, as much as possible, the historic integrity of the Grange.  See Exhibit 2 at 71-72.

5.    During the GMP/EIS process, NPS contemplated orienting the Grange towards the southwest, the orientation of the Grange in its original location.  See id.  The City of New York Landmarks Preservation Commission expressed its comment before the finalization of the GMP/EIS that the "decision on the proper orientation of the house should consider not only the historic orientation, with the front door facing south, but also that the orientation must make sense on the proposed site, which has a north facing street frontage; and that any fence placed around the site be as far removed from the mansion as possible and that the distance between the

3

house and the high retaining wall at the edge of the park be increased, if possible, so that the mansion can read as a free-standing country retreat in the middle of a landscape." <u>See id.</u> at 94.

6.      In 1995, NPS issued a record of decision regarding the relocation of the Grange. <u>See</u> Exhibit 3.  The preferred alternative to relocate the house to nearby Saint Nicholas Park, a park run by New York City Department of Parks and Recreation ("NYCDPR"), was adopted. The decision included a description of the placement of the house on its new site.  <u>See id.</u>  The intention of the relocation project was to recapture, to the greatest extent possible, the appearance and general characteristics of the house within the landscape.  <u>See id.</u>

7.      The characteristics of the Saint Nicholas Park site are dramatically different from the Grange's original site in numerous ways, including the presence of one large building abutting the site, and another large building on the top of the hill towards the southwest of the site.  In addition, the entire site slopes, such that a level area had to be developed to accommodate the Grange.  Finally, whereas the original site of the Grange was on top of a hill, the new site slopes downward in one direction only from the level area where the Grange will sit.

8.      From 1995-2000, NPS made efforts to obtain Congressional funding to relocate the Grange.

9.      In 2000, the NYCDPR initiated a mandatory compliance review of the conveyance of an easement on Saint Nicholas Park to NPS, pursuant to New York Uniform Land Use Review Process ("ULURP").  This process required NYCDPR to prepare an environmental assessment statement (EAS).  The purpose of the ULURP was to consider whether NYCDPR should grant an easement to NPS for the portion of Saint Nicholas Park to which the Grange was to be relocated.  Preparation of the ULURP EAS began in 2000.  NYCDPR completed Part I in

4

October, 2000, see Exhibit 4; Part II in December, 2000, see Exhibit 5; and Part III in February, 2001, see Exhibit 6.

10.     During the ULURP process, the planned orientation of the Grange changed from southwest to northeast, as revealed in attachments to Part II of the ULURP EAS.  See Exhibit 5, Appendix D.  Appendix D of this document shows both in text and in graphics that the orientation of the house on its new site had been altered to the northeast.  Appendix D, addressing the "Relocation of Hamilton Grange – Assessment of Feasibility and Associated Impacts," described the building move and explained that the Grange will have its "front facade facing northeast in its proposed setting in the park."  See Exhibit 5, Appendix D at 4.  The document further states that the "building front will face due east, at an approximate 20 degree angle to West 141st Street."  See id., Appendix D at 5; see also id., Appendix C, Letter dated October 23, 2000 from NYCDPR to Landmarks Preservation Committee at 3 (same).  Attached diagrams further reflect the northeast orientation of the Grange.  See id., Appendix D, Diagrams.

11.     The records demonstrate that Lawrence McClean, Manager, Community Board 9, was sent copies of these documents at the time each was completed.  See Exhibits 4-6. Community Board 9 includes Saint Nicholas Park and the surrounding neighborhood.

12.     Community Board 9 voted by clear majority on June 21, 2001 to support the granting of the easement.  See Exhibit 7.

13.     New York City subsequently conveyed the easement to NPS on April 24, 2002. See Exhibit 8.

14.     Between 2001 and 2005, NPS undertook preliminary planning for the project including cost estimates, structural studies, and detailed landscape reviews.  NPS records

demonstrate that a Value Analysis workshop took place from May 4 through May 6, 2004, and participants included NPS representatives, architects, engineers, and Bernice Cummings-Ubiles, the Executive Director of the Hamilton Heights Preservation Association, Inc.  See Exhibit 9 at 6-7.  NPS, through Kirk Associates, LLC prepared a Value Analysis Final Report reflecting recommendations for value enhancement of the Grange stemming from the workshop.  See Exhibit 9.  The workshop focused on "review of the building relocation, stabilization & restoration."  See id. at 3.  Documents used in connection with the Value Analysis process clearly show the revised (northeasterly) orientation of the house.  See id. at 47, 53.

15.     Congress provided funding for the project in the Fiscal Year 2007 NPS appropriation.  NPS's records demonstrate that then-superintendent of Manhattan Sites, Jim Pepper, conducted three public informational meetings in December 2006 to inform city government, city regulatory bodies and the community that the project would begin shortly and about the details of the project.  Specifically, attendance sheets from those meetings demonstrate that attendees included members of the Hamilton Heights Homeowners Association and Community Board 9.  See Exhibit 10.  Representatives of Community Board 9 expressed surprise at the changed orientation of the house and strongly objected, as reflected in notes taken of the meeting.  See Exhibit 11.

16.     I assumed responsibility for Manhattan Sites in February of 2007.  On April 9, 2007, Stephen Spaulding, the Chief of the Architectural Preservation Division, and I attended a Community Board 9 meeting regarding the Grange.  During the course of this meeting, I became aware of the serious disagreement that several Community Board members had with NPS' decision to reorient the Grange.  In particular, I was concerned about comments made by

6

Community Board members who argued that reorienting the Grange would negatively affect the natural light in the Grange. They also argued that the mirrored doors in the dining room that originally reflected the sylvan setting of the house would be impacted, because the dining room would instead face the wall of a building. As a result of this meeting, I indicated to those present at the meeting that I would revisit the issue of the orientation of the Grange, and instructed my staff to prepare detailed documents, and to conduct a site visit with representatives of NPS and members of the community. Specifically, I ordered NPS staff to prepare scale drawings, a table-top scale model, and to stake out the footprint of the house on the new site.

17.      On April 12, 2007, NPS conducted the site visit. Present were Stephen Spaulding, Steve Laise, Chief of Cultural Resources for the Manhattan Sites, Shirley McKinney, the Deputy Superintendent of Manhattan Sites, and myself of the National Park Service. Community representatives and members of the public included Michael Henry Adams, Ron Melichar, Jeff Alama and Brad Taylor. During the site visit, NPS presented documents to those in attendance demonstrating three possible designs for the reorientation of the Grange to the southwest. See Exhibits 12-14. Steve Spaulding also displayed a table-top size scale model of the site. During the site visit, everyone asked questions, exchanged opinions, walked around the site, and reviewed the siting details, such as where retaining walls would be needed under each alternative and what trees would have to be removed. We actively discussed the pros and cons of the northeast and three possible southwest orientations. A typed copy of contemporaneous notes made by Laise and McKinney describing this site visit are attached hereto as Exhibit 15. At the conclusion of the meeting, I indicated I would review the matter and respond as quickly as possible to the community members' concerns regarding reorientation of the Grange.

7

18.     On April 16, 2007, I determined that the northeast orientation was the best option for the orientation of the Grange.  I arrived at this decision after carefully considering:  (1) the views of the community members who were dissatisfied with the NPS's decision to orient the house to the northeast; (2) Steve Spaulding's three scale drawings and scale model showing potential ways to orient the Grange to the southwest as well as the staked house footprint showing the orientation to the northeast; (3) a consideration of the pros and cons of each of the siting options prepared by Steve Spaulding with respect to the historical integrity of the house and other factors; (4) discussions with individuals at NPS who had considered the orientation of the Grange; and (5) my observations during the site visit.

19.     In concluding that the Grange should be oriented to the northeast, I determined that the northeast orientation had several substantial benefits that the possible southwest orientations lacked, and that the three possible southwest orientations each had several drawbacks that were obviated by orienting the Grange to the northeast.  In its original setting, Alexander Hamilton's guests would have seen his home on a promontory approached from below.  The northeast orientation best reestablished a visitor's view of approaching the house from below, as one could walk uphill on 141st street and approach the Grange from below while viewing the historically unique decorative front door and tripartite window design.  This orientation allowed the Grange to be viewed and experienced as a free-standing country retreat in the middle of a landscape, thus better approximating its historic setting.  This orientation also specifically accounted for the concern raised by New York City Landmarks Preservation Committee in its comments to the GMP/EIS.  See Exhibit 2 at 94-95.

20.     In contrast, each of the southwest orientations essentially placed the front door of

the Grange facing a hillside and the wall of a CCNY building, without significant space between the front door and the hillside.  A visitor to the Grange could only approach from the rear of the Grange and would have to walk around the building to approach the front.  The requirement of standing on a hillside in order to look down on the front of the Grange never existed during Hamilton's lifetime.  Accordingly, the northeast orientation better preserved the historical approach to the Grange as more of an open vista, in contrast to the southwest orientation that would have required visitors to view the front door gazing down from a steep hillside or from a CCNY building.

21.    In addition, each of the southwest orientations would have required NPS to remove three of the historic front steps of the Grange, thus altering the façade.  The alteration would have been required as a result of space constraints caused by the nearby hill and NYCDPR's need for a path or roadway between the Grange and the edge of the slope to allow NYCDPR access to that area of the park for maintenance purposes.  This would have further detracted from attempts to accurately restore the front steps of the Grange.

22.    Two of the three southwest orientations that we considered would have required construction of a tall retaining wall and fence approximately 5 feet from the front door to retain the nearby hill.  These items would obstruct the view of the Grange and detract from its historic appearance.  The New York City Landmarks Preservation Committee specifically raised the concern in the 1995 GMP/EIS process that "any fence placed around the site be as far removed from the mansion as possible and that the distance between the house and the high retaining wall at the edge of the park be increased, if possible, so that the mansion can read as a free-standing country retreat in the middle of a landscape."  See Exhibit 2 at 94-95.  Accordingly, these

9

southwest orientations created serious drawbacks to presenting the Grange in its historic setting as a free-standing country retreat in the middle of a landscape.

23.     The third southwest option, while requiring fewer retaining walls, would have required adding a four foot tall railing across a portion of the front façade at the front of the building.  In addition, due to the topography of the site, this third southwest option would have required forcing visitors with disabilities to enter the house through the back door, past the public restrooms, while other members of the public could enter through the front door.  We were concerned that this could potentially violate the Americans with Disabilities Act, and thus did not believe it was a viable option.

24.     The southwest orientations would additionally have required that NPS carve deeper into the hillside to create space for the foundation.  This would have required removing at least one "specimen" tree, in other words, a tree of significant size and age that NYCDPR has marked as significant in the landscape, that should be protected.  Moreover, due to the topography of the site, all three southwest orientations would have resulted in an uneven foundation height around the Grange to keep the floor of the building level.  At various points, for example, the visible foundation might six feet high, whereas in other portions of the Grange the visible foundation would appear to be four feet high.  In contrast, the northeast orientation allowed for a uniform foundation around the Grange, as it existed in Hamilton's lifetime.

25.     In contrast to the drawbacks described above, the northeast orientation required no retaining walls or railings across the façade of the house.  It allowed for all visitors, including visitors with disabilities, to enter through the front door as Hamilton's guests would have.  It allowed retention of at least one specimen tree that the southwest alternatives would have

removed.  The northwest orientation also presented a view of the house to approaching visitors

that came closer to replicating the first view guests would have had of the home on its original

site, including a clear view from below of  the historically unique decorative front door and

tripartite window design, the first of its kind, and the accurate restoration of the front steps.

26.    I also considered that although the views reflected in the mirrors with a northeast

orientation might not be as wooded as the views reflected by orienting the Grange to the

southwest, this could be mitigated.  Specifically, NPS planned to plant 13 sweet gum trees (to

replicate the 13 sweet gum trees that Hamilton himself planted on the original site of the Grange)

between the house and neighboring Steinman Hall of CCNY to the west, and by considering the

planting of ivy to further screen Steinman Hall.  Thus, the view from the mirrored doors in the

dining room would, as closely as possible, replicate the original view, given all other constraints.

27.    I communicated my decision in writing to everyone who had attended the April

12, 2007, site visit and to several others, including Carolyn Kent, in letters dated April 17-19,

2007.  See Exhibit 16.

28.    On December 13, 2007, NPS held a public meeting at CCNY that specifically

addressed the schedule of the physical move of the Grange.  See Exhibit 17.  Several opponents

of the determination to orient the Grange to the northeast were present at this meeting, including

Michael Henry Adams.

29.    NPS also maintains a publicly accessible website with detailed information and

photographs regarding the move.  The website also provided advance notice of the move.  See

Http://www.nps.gov/hagr/parkmgmt/hamilton-grange-national-memorial-move-updates.htm.

30.    NPS has acquired numerous approvals for the reorientation of the Grange from

11

the southwest to the northeast from several regulatory bodies. In 1993, the New York City Landmarks Preservation Committee approved the relocation of the Grange to Saint Nicholas Park. On April 10, 2007, the New York City Landmarks Preservation Commission issued a finding incorporating the revised orientation design of the Grange into its previous 1993 approval. Specifically, in 2007 the Landmarks Commission noted that in granting its prior approval in 1993, it had "made its determination subject to the condition that the house be sited so that the mansion can read as a free-standing country retreat in the middle of a landscape and contingent upon final documents and drawings." See Exhibit 18. As part of the final 2007 approval process, NPS provided the Landmarks Commission revised documentation reflecting the reorientation of the Grange to the northeast. The Landmarks Commission explicitly noted in its approval letter that the "orientation of the house has been revised so that the primary entrance faces West 141st Street." After reviewing these materials, the Landmarks Commission "found that the orientation of the house relates to its original siting as a mansion on a promontory." See id.

31.    On April 16, 2007, the Art Commission of the City of New York (the "Art Commission") held a public hearing. The Art Commission is a regulatory group of New York City with responsibility for approving any changes or additions to statues or other structures in city public spaces. City rules require that the Art Commission notify the local Community Board in advance of such hearings. Stephen Spaulding and I were present on behalf of the National Park Service at the public hearing. Mr. Spaulding presented the project in full, including the concern that had been raised about the orientation of the house. No one from Community Board 9 attended the hearing and no one present objected to the new orientation.

12

The Art Commission unanimously approved the project as presented.  See Exhibit 19.

32.    Also in the spring of 2007, NPS contacted the New York State Historic

Preservation Office ("SHPO") to determine whether or not they remained in concurrence with

the National Park Service's planning regarding the move and rehabilitation of the Grange.  The

SHPO sent me a letter dated June 21, 2007, stating that the SHPO had "received and reviewed

the 100% draft Construction Documents for the proposed plan to Move and Rehabilitation

Hamilton Grange National Memorial," and had "reviewed the submission in accordance with

section 106 of the National Historic Preservation [Act] of 1966."  The SHPO stated, "we concur

that that [sic] 100% draft Construction Documents are appropriate."  See Exhibit 20.

33.    To become an official "Friends Group" of any unit of the National Park Service a

group must have an agreement with the NPS detailing the nature of the relationship.  For simple

short-term or very minor relationships, such as a one-time activity or a small work program, an

oral arrangement may suffice.  For anything more serious or longer lasting, such as fundraising,

participating as a group in planning processes, assisting in developing interpretive program

content or the like, a general agreement, a volunteer agreement, a cooperative agreement and/or

a fundraising agreement is required between the friends group and NPS.

34.    A search for documents in this regard revealed only an unexecuted 1984

document regarding a "Friends of Hamilton Grange" group that by its terms would "[t]erminate

within 3 years."  See Exhibit 21.   The only correspondence NPS could locate from the "Friends

of Hamilton Grange" is a letter dated May 13, 2008, raising allegations similar to those raised by

plaintiffs in this action.  See Exhibit 22.

35.    NPS records do not show that Friends ever submitted a letter or other request to

13

become a consulting party on the relocation of the Grange.  Further, my review of the National

Park Service's Friends Group Directory demonstrates no reference to a group entitled "Friends

of Hamilton Grange" or any group referencing Hamilton Grange National Memorial.  <u>See</u>

http://home.nps.gov/applications/partnerships/friends_groups_directory.cfm.


      I declare under penalty of perjury that the foregoing is true and correct.



Dated:      June 12, 2008

MARIA BURKS

14

APPENDIX A: LEGISLATION

## 8. Hamilton Grange National Memorial Project

Page

Establishment authorized_____Joint Resolution of April 27, 1962   382

---

**Joint Resolution Providing for the establishing of the former dwelling house of Alexander Hamilton as a national memorial, approved April 27, 1962 (76 Stat. 57)**

**Alexander Hamilton national memorial. Establishment.**

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior is authorized and directed to take such action as may be necessary to provide for the establishment of the former dwelling house of Alexander Hamilton (commonly known as The Grange), situated in New York, New York, as a national memorial. However, the Secretary shall not establish the national memorial until he has satisfied himself that the lands which have been donated are sufficient to assure the relocation of The Grange and administration and interpretation of the national memorial.

**Designation as Hamilton Grange National Memorial.**

SEC. 2. (a) The national memorial established by the Secretary of the Interior pursuant to this joint resolution shall be designated as the Hamilton Grange National Memorial and shall be set aside as a public national memorial to commemorate the historic role played by Alexander Hamilton in the establishment of this Nation.

(b) The National Park Service, under the direction of the Secretary of the Interior, shall administer, protect, and develop such memorial, subject to the provisions of the Act entitled "An Act to establish a National Park Service, and for other purposes", approved August 25, 1916, as amended and supplemented, and the Act entitled "An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes", approved August 21, 1935, as amended.

**39 Stat. 535. 16 U.S.C. 1–4.**

**49 Stat. 666. 16 U.S.C. 461–467.**

**Appropriation.**

SEC. 3. There are hereby authorized to be appropriated such sums, but not more than $460,000, as may be necessary to carry out the provisions of section 1 of this joint resolution.

United States Department of the Interior
National Park Service

**RECORD OF DECISION**

General Management Plan
Hamilton Grange National Memorial
New York County, New York

### INTRODUCTION

A 1962 act of Congress authorized the establishment of a Hamilton Grange
National Memorial to commemorate the historic role played by Alexander Hamilton
in the establishment of our nation. The act further directed that the house
eventually be relocated for its proper administration and interpretation as a national
memorial. The site proposed at that time by a National Park Service planning effort
was about 10 blocks from the present location on Convent Avenue near 141st
Street. The house was not moved, and because of a congressional funding ceiling,
only minor rehabilitation projects were undertaken over the next decade.

New legislation was passed in 1988 (Public Law 100-701) amending the earlier
legislation by establishing a boundary, authorizing the acquisition of the land on
which the house sits, and authorizing the expenditure of up to $2.5 million for
development. This legislation also required that a general management plan be
completed to "identify appropriate facilities for proper interpretation of the site for
visitors."

Long-range planning for the Grange was begun in 1991. The planning process
was complete in March 1995 when the *Final General Management
Plan/Environmental Impact Statement (FEIS) for Hamilton Grange National
Memorial* was released to the public. Pursuant to the National Environmental
Policy Act of 1969 and the regulations promulgated by the Council on
Environmental Quality at 40 CFR 1505.2, the Department of Interior/National Park
Service has prepared this Record of Decision to document the outcome of this
planning process. This Record of Decision (ROD) is a concise statement of what
decisions were made, the criteria used to make this decision, alternatives that
were considered, and the mitigating measures developed to avoid or minimize
environmental and social impacts.

## DECISION

The National Park Service will implement the preferred alternative (alternative 4 ) - Relocation and Restoration - as described in the *Final General Management Plan/Environmental Impact Statement* dated January 1995 and filed with the Environmental Protection Agency in March 1995.

## SUMMARY OF ALTERNATIVES

### Preferred Alternative

The original woodframe first and second floors and attic of the Grange will be relocated across the street to a portion of St. Nicholas Park, a park owned and administered by the City of New York Department of Parks and Recreation. Approximately 0.91 acres on the northern edge of the park will be transferred to the National Park Service for the relocation. The concept has been reviewed and generally approved by the city. Specific issues will be addressed in future negotiations. Landscaping around the Grange will be evocative of Hamilton's period and will include thirteen sweet gums commemorating the original colonies.

In its new location, the Grange will be fully restored in accordance with the approved *Historic Structure Report* and NPS *Management Policies* and new information learned during the move. The Grange's exterior will be restored as closely as possible to its historic appearance, with all doors, windows, and porches in their original places. The main door will be relocated to its original position, and the entrance porch will be reconstructed. The house will oriented to the southwest, and visitors will approach the house from the northeast as Hamilton's guests would have done. Most visitors will enter the house through a new, fully accessible doorway on the northeast to an orientation center on the ground floor level. However, a curving walk will lead from 141st Street around the house to its formal front entrance. Groups and guests attending ceremonies and special commemorative occasions will enter through the restored front door.

A new masonry and stone subbasement and ground floor will be constructed at the new site to complement the original building in size, scale, and material. However, these additions will be clearly differentiated from the original Grange so as not to create a false historical appearance. A concealed steel framing system will be inserted to stabilize the building and provide adequate load-bearing capacity. An elevator in the northwest corner will provide access to all floors.

Visitor contact will be in the ground level floor, which will have a lobby, a theater, an information desk and book sales area, staff space, and fully accessible public restrooms. Exhibits and other interpretive media will orient visitors to all the major

2

themes of Alexander Hamilton and the Grange, as well as the house's historic setting and the changes it has undergone. Four rooms on the first floor will be refurnished, as will the front entry hall, to the reflect the house as it appeared during Hamilton's occupancy. The dining room and parlor will be fully restored, as will the room off the entry hall as Hamilton's library. Because less is known about the five private rooms on the second floor, these will be developed as interpretive space with exhibits about the military, political, and professional accomplishments of Hamilton.

Security for the site will be provided by NPS rangers. Rangers will be on duty at the Grange 24 hours a day and will live in the housing provided at the new structure on Convent Avenue (see below). A security and fire alarm and suppression systems will be installed at both sites. A decorative iron security fence will be installed around the perimeter of the new site, and appropriate walk and security lighting and decorative house lighting will be installed. The historic shutters will be used to secure the house from unauthorized entry when the site is closed.

The plan for Convent Avenue, the current location of the Grange, is to construct a new structure for public and NPS uses. The new building, no more than two stories and built on the 1889 Grange foundation, will emphasize heritage education and community involvement. A multipurpose meeting room will occupy the main floor, where educational programs and community meetings may be held. Space will also be provided for exhibits to depict the growth and development of Harlem, the role of the Grange in the community, the role of St. Luke's parish in preserving the Grange, and broader community preservation efforts. The lower levels will be developed as apartments for housing NPS law enforcement rangers and for site storage needs and maintenance operations.

## Other Alternatives

The National Environmental Policy Act requires that a range of alternatives be evaluated for proposed federal actions, including a no-action alternative. The *FEIS* for Hamilton Grange analyzes the selected plan above as well as three additional alternatives. The three remaining alternatives as documented in the *FEIS* include the following.

Alternative 1 ( no action) would continue existing management trends. The structure would be stabilized in place by reinforcing failed wooden structural members. Structural capacity of the second floor would remain that of a typical wood-frame house - not meant for visitors. Public access would be only to the basement and first floor. Interior finishes would be partially restored, but the basic configuration and use of space within the Grange would not be changed.

3

SENT BY:                    2-20-90 ; 14:20 ;          NI 3 DSC TCL          JITZZUJU11 - J.10

Alternative 2 would maintain the same building configuration as alternative 1, but the house would be structurally reinforced with a new interior steel framing system to allow full public use of the basement and the first and second floors. The steel framing would not be hidden. An exterior elevator at the back side of the house and a wheelchair lift at the front would allow full visitor circulation to all floors. Three open floors (basement, first and second floors) and a partially restored interior would provide more space and opportunities for an enhance interpretive program.

Alternative 3 would alter the setting of the current site by reorienting the visitor entrance to a more impressive, but less historically accurate four-story facade. More space would be made available by lowering the existing subbasement/garden level floor and opening a new entryway into this level from the east (Hamilton Terrace) side of the Grange (see page 14, *FEIS*). The garden level and basement would provide space for visitor information and needs, a theater, community and school-group meetings, and staff, storage, and utilities. The first floor would be restored and partially refurnished; the second floor would be available for interpretive exhibits. Interest in St. Luke's property behind or east of the Grange would have to be acquired to implement this alternative.

### Environmentally Preferable Alternative

Alternative 4, while being the preferred alternative, is also considered to be the environmentally preferable alternative with the implementation of the proposed mitigation (outlined in the alternative description and under the mitigation section below). Environmentally preferable is defined as "the alternative that will promote the national environmental policy as expressed in NEPA's Section 101" (46 FR 18026, as amended, 51 FR 15618). This generally means the the alternative that causes the least damage to the biological and physical environment, but also includes the alternative which best protects, preserves, and enhances historic, cultural, and natural resources. The goal of any agency in selecting an alternative, as is the National Park Service's charge, is to carefully balance the different possible actions in order to best "fulfill the responsibilities of each generation as trustee of the environment."

The description of the alternative, the rationale for the decision, and the mitigation provide the data and rationale which support alternative 4.

### RATIONALE FOR DECISION

#### Decision Criteria

Criteria were developed to guide the generation and selection of the alternative most appropriate for the management of the Grange. These criteria evolved

4

throughout the planning process from site legislation, public input, visitor use and community needs, and cultural and natural resource concerns.  The more significant criterla used In the decislon-making process included the following (the order does not imply a greater slgnlficance):

- Will the location of the Grange ensure its proper administration and interpretation as a national memorial, as requirod by the legislation?

- Will the Grange be structurally stable?

- Will the Grange be fully restored with the porches returned to their original locations?

- Will the Grange be situated within the bounds of Alexander Hamilton's original tract of land?

- Will space and resources be available for enhanced interpretative, educational, and community activities?  Will visitor experience be improved?

- Will the Grange location allow for its traditional association with the Harlem community?

Alternative 4 best meets these criteria from the standpoint of the National Park Service.  Implementation of this alternative will accomplish what Congress intended - restoration of the Grange within an appropriate setting while keeping it within the context of its present-day community and on Hamilton's original tract of land.  It also allows for full interpretation of the site for visitors.

As described in the summary, the house will be restored and fully stabilized with a concealed steel framing system in this new location. All porches, doors, and windows will be in their original locations and all four rooms on the first floor will be refurnished. Although outside the current boundaries of the Hamilton Heights Historic District in which the Grange currently resides, the Grange will be very close to its current location.  As shown in the FEIS (pg.20), the new location is just across 141st Street to the south of St. Luke's  and Hamilton Terrace and is within the boundary of the original Hamilton Estate (shown on page 6 of the FEIS). The loss of the Grange from the historic District will not affect or compromise the historical and architectural basis for which the district was established, nor will it affect the Grange's status as a national historic landmark. Although public concern was expressed regarding the potential Impacts to St. Nicholas Park, the site of the proposed relocation, it was determined in consultation with the St. historic preservation officer that St. Nicholas Park is not eligible for listing on the national register and that the relocation of the Grange would not adversely affect the park.

5

The selected alternative will also significantly enhance interpretive and educational opportunities about Hamilton and his life, his relationship to contemporary times, and the relationship between the Grange and the local community because of the increase in available space (the new Convent Avenue building and the Grange) for such activities. The provision of NPS housing at the Convent Avenue site and 24-hour security at the Grange will also increase security at the new location, and possibly provide a greater sense of overall community security because of the 24-hour ranger presence.

The decision criteria which the National Park Service feels is met, but which has been most highly debated by the local community, is whether the traditional association of the Grange with St. Luke's Episcopal Church and the local Harlem Community will remain if the Grange is moved. As expressed throughout the planning and public involvement phases for Hamilton Grange, many individuals in the local neighborhood feel their traditional association will be lost in the proposed location for a variety of reasons (FEIS, page 53). They favor maintaining and stabilizing the Grange in its current location to honor its relationship with the church and community.

Other concerns with the move, which are interwoven in the community, include feelings that unrealistic cost figures for the move and restoration have been presented and anticipation that funding may not be available to fund the move, the restoration and the construction of the new building on Convent Avenue, resulting in an empty lot on Convent Avenue and a moved, but unrestored Grange for an extended period of time.

### Mitigation

To mitigate these and other concerns, actions were added to the selected alternative prior to the release of the *FEIS*. These are listed below. All practicable means to avoid or minimize environmental or social harm from the selected alternative have been adopted.

To address community concerns that, upon moving the Grange to St. Nicholas Park, a vacant, untended lot would remain in its original location, a new structure for public and NPS uses will be built. The characteristics and purposes of this building were described under the preferred alternativec.

To further address community concerns and to assist the National Park Service in better understanding the traditional associations the community has with the Grange, a Friends of Hamilton Grange group is being formed. The group will be composed of representatives from the Harlem community and other city-wide groups and organizations. They will provide input into a variety of issues involved

6

with the relocation including the planning of the new building on Convent Avenue and the development of the new site in St. Nicholas Park, particularly landscape design.    The group will also help promote the site and programs related to the Grange for the visitor and the community.

The new building will be designed to be compatible with the qualities for which the Hamilton Heights Historic District was established.  Additionally, the design of the landscape surrounding the restored Grange will be fully developed as an appropriate setting for the memorial, as well as to replace trees removed for the relocation, to soften the intrusion of the adjacent Steinman Hall, and to respect the original design intent of St. Nicholas Park.  Discussions will also be held with the City regarding NPS involvement in maintenance of the surrounding parklands.

Structural and noise concerns regarding blasting of bedrock for the Grange's new foundation will be addressed during the design phase.  Geotechnical factors will be assessed and considered in determining the foundation design.  The results of this study will influence the type of foundation and extent of the basement on the new site.  Vibrations from excavation of bedrock will be limited through the use of modern excavation techniques to avoid damage to nearby structures and minimize disturbance to nearby residents and businesses.

Funding concerns will also be addressed by carefully phasing the project.  Prior to moving the Grange, construction planning funds will be acquired which will be used to develop construction drawings and more specific cost estimates for the relocation and restoration of the Grange and the development of the Convent Avenue building.  Following the move of the Grange to the new site in St. Nicholas Park, development of the building and the restoration of the Grange will proceed simultaneously.

## COMPLIANCE

Consultation with the New York State Office of Parks, Recreation and Historic Preservation will continue.  Proper procedures for the review of the move of a National Register listed property will be implemented with this office prior to moving the Grange.

All new interpretive media will conform with the September 1991 guidelines outlined in the plan.

7

SENT BY·                          Z-ZU-UU ·  IT·ZU ·          IN U DUU ·LL          -- ------ -

## CONCLUSION

A notice of availability for the *Final Environmental Impact Statement* was published In the *Federal Register* by the National Park Service on March 15, 1995 and by the Environmental Protection Agency on March 17, 1995.  The 30-day no-action period ended on April 16, 1995.

The above factors and considerations justify the selection of alternative 4, as summarized above and described in the *FEIS*, as the final general management for Hamilton Grange National Memorial.

APPROVED: _____  DATE: 7/19/95
                 Marie Rust, Regional Director
                 National Park Service

8



City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

Jane P. Cleaver
Chief of Parklands

October 23, 2000

Alessandra Sumowicz
Director
Office of Environmental Coordination
100 Gold St.
NY, NY 10038

**RE: Part I -- Environmental Assessment Statement for Proposed Relocation of Hamilton Grange**

ULURP #    NO10061MEM
CEQR#      00DPR001M

*alessandra*

Dear Ms. Sumowicz:

In conformance with the requirements in the Environmental Assessment Statement guidelines, please find the attached Part I for the proposed relocation of Hamilton Grange, located in Community Board #9 in Manhattan. The Part I Environmental Assessment Statement addresses the granting of a permanent easement to the United States National Parks Service and the associated map change for this relocation. The Grange will be relocated from its current site at 287 Convent Avenue to a .093 acre section of St Nicholas Park, and will be permanently located within the park at the corner of 141st Street and Hamilton Terrace. Please call Kate Slevin at (212)-360-3421 with any questions.

Sincerely,

Jane P. Cleaver
Chief of Parklands

## ULURP #: N010061MEM
## CEQR #: 00DPR001M
## PROPOSED RELOCATION OF HAMILTON GRANGE
## CEQR ENVIRONMENTAL ASSESSMENT STATEMENT
## SERVICE LIST

October 23, 2000

Alessandra Sumowicz
Director
Office of Environmental Coordination
100 Gold St., 2ⁿᵈ Floor, Room 244
New York, NY 10038

Beverly Reith
Director, Environmental Review
HPD   Division of Architecture and Engineering
100 Gold St.
New York, NY 10038

Mr. Randal Fong
Assistant Commissioner
DCAS Division of Real Estate Services
1 Centre St., 19N
New York, NY 10007

Marie Dooley
Department of Environmental Protection
Bureau of Legal Affairs
59-17 Junction Blvd., 11ᵗʰ Floor
Corona, NY 11368

Mr. Ralph Palmer
Chief of Fire Protection
New York City Fire Department
250 Livingston St.
Brooklyn, NY 11201

Bob Gochfeld
Director of Technical Review
Department of City Planning
22 Reade St.
New York, NY 10007

Naim Rasheed
Department of Transportation
Environmental Review Unit
40 Worth St.
New York, NY 10013

John J. Strauss
Department of Sanitation
Bureau of Legal Affairs
125 Worth St., Room 710
New York, NY 10013

Mr. Charles DeQuillfeldt
Hunters Point Plaza
Department of Environmental
Conservation
47-40  21ˢᵗ St.
Long Island City, NY 11101

Mr. Maurice Spreiregen
Director of Central Intake
Department of City Planning
22 Reade St., 2E
New York, NY 10007

Mr. David Carlson
Director of Landscape Architecture
Olmsted Center
Flushing Meadow Corona Park
Corona, NY 11368

Gina Santucci
Director of Environmental Review
Landmarks Preservation Committee
100 Old Slip
New York, NY 10005

Adrien Benepe
Manhattan Borough Commissioner
Arsenal West
16 W. 61st St., Floor 16
New York, NY 10023

C. Virginia Fields
Manhattan Borough President
Municipal Building, Executive
Division
1 Centre St.
Municipal Building, 19th Floor South
New York, NY 10007

Ms. Maritta Dunn, Chair
Manhattan Community Board #9
565 West 125th St.
New York, NY 10027

Mr. Lawrence McClean, District
Manager
Manhattan Community Board #9
565 West 125th St.
New York, NY 10027

Ms. Kathy Howe
Historic Preservation Specialist
NYS Office of Parks, Recreation and Historic
Preservation
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189
Waterford, NY 12188-0189

The Honorable Charles Rangel
2354 Rayburn HOB
Washington, DC 20515-3215

Mr. Eric Cardwell, P.E.
Consulting Engineer
Manhattan Borough President's Office
1 Centre St., 19th Floor
New York, NY 10007

Mr. Tim Butz
Verizon Communications
5030 Broadway
Room 503
New York, NY 10034

**ENVIRONMENTAL ASSESSMENT STATEMENT**
**Part I**
**Proposed Relocation of the Hamilton Grange National Memorial**
**St. Nicholas Park**
**Manhattan, New York**

**Lead Agency:**

City of New York, Parks and Recreation
The Arsenal, Central Park
New York, New York 10021

**Prepared for:**

City of New York, Parks and Recreation
The Arsenal, Central Park
New York, New York 10021

United States National Park Service
Northeast Regional Development Office
26 Wall Street
New York, New York

**Prepared by:**

TRC Environmental Corporation
1200 Wall Street West
Lyndhurst, NJ 07071

**October, 2000**

## 1.0   PROJECT INTRODUCTION

The proposed action addressed in this Environmental Assessment Statement is the granting of a permanent easement to the United States National Park Service (NPS) and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial (Hamilton Grange or Grange). Presently located at 287 Convent Avenue, the Grange will be relocated by the National Park Service to a 0.93-acre portion of St. Nicholas Park (see Figures 1 and 2). St. Nicholas Park is owned and administered by the City of New York, Parks and Recreation. The Grange, built in 1802-03 was the only home Alexander Hamilton ever owned and has architectural significance as a house of the Federal period.

The current site of the Hamilton Grange is not the structure's original site. The home was moved in 1889 by a real estate developer and donated to St. Lukes Episcopal Church (see Figure 3). In 1924, the American Scenic and Historic Preservation Society acquired the Grange and opened it as a museum in 1933. The National Park Service assumed administration of the site in 1962 by an Act of Congress under Joint Resolution of April 27, 1962. In 1967, the City of New York Landmarks Preservation Commission designated the house as a landmark.

The 1962 act of Congress that established Hamilton Grange National Memorial directed that the house eventually be relocated and "preserved in a fitting setting" for its proper administration and interpretation as a national memorial. The granting of an easement by the City of New York, Parks and Recreation and the proposed relocation to St Nicholas Park, which is located south of 141st Street in the immediate vicinity of the current Hamilton Grange site, will allow for the development of enhanced interpretive programs and provide a setting for the Hamilton Grange which is reminiscent of the structures original location as intended by the 1962 Act of Congress.

1

## 1.1    Background and Purpose

The relocation of the Hamilton Grange is proposed as part of the *General Management Plan* for Hamilton Grange National Memorial. The *General Management Plan* was the subject of a detailed and comprehensive environmental review prepared by the NPS in accordance with the National Environmental Policy Act (NEPA). As part of the NEPA Environmental Review, a *Draft General Management Plan/Environmental Impact Statement* (DEIS) was prepared and published in April 1993. That document was subject to a public review period of approximately 11 months. At the close of the comment period agency and public review comments were considered and the draft management plan and DEIS were reviewed in light of the comments received. In January 1995, the *Final General Management Plan Environmental Impact Statement* (FEIS) was published by the National Park Service. The FEIS addressed changes to the proposed management plan developed in consideration of public comments received and included information regarding additional public meetings as well as responses to comments received on the DEIS. Following publication of the FEIS, a NEPA Record of Decision was issued in July 1995. The Record of Decision is attached as Appendix A of this EAS. No changes have occurred to the Final General Management Plan since issuance of the NEPA Record of Decision.

This Environmental Assessment Statement (EAS) is submitted in accordance with the New York City Environmental Quality Review (CEQR) to address the grant of a permanent easement to the United States National Park Service and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial. As provided by the CEQR regulations, materials prepared for other purposes, specifically, the *Draft General Management Plan/Environmental Impact Statement, Final General Management Plan Environmental Impact Statement,* and NEPA Record of Decision, will be evaluated to satisfy expanded analyses portion of Part II of the EAS document. The NEPA Record of Decision is attached as Appendix A of this document. The *Draft General Management Plan/Environmental Impact Statement* and *Final*

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

*General Management Plan Environmental Impact Statement* are herein incorporated by reference
and can be reviewed at the following locations:

> City of New York, Parks and Recreation
> The Arsenal, Central Park
> New York, New York  10021
>
> United States National Park Service
> Northeast Regional Development Office
> 26 Wall Street
> New York, New York 10005
>
> New York City Department of City Planning
> Environmental Assessment and Review Division
> 22 Reade Street, 4E
> New York, New York  10007
>
> Manhattan Community Board #9
> 565 West 125ᵗʰ Street
> New York, New York  10027

No changes have occurred to the Final General Management Plan for the Hamilton Grange since
issuance of the July 1995 NEPA Record of Decision.  However, to ensure the "hard look" at
potential impacts required by CEQR, in June 2000 the National Park Service reassessed the *Final
General Management Plan Environmental Impact Statement* prepared for the proposed Hamilton
Grange Relocation, dated January 1995, and the July 1995 Record of Decision.  Where
appropriate, text contained within the FEIS has been revised to reflect recent changes in the
affected environment or the assessment of potential impacts.  These revisions are identified in the
FEIS addendum attached to this EAS document as Appendix B.  The re-evaluation of the FEIS
document established that there have been no substantive or significant changes in the affected
environment or the assessment of impacts contained within the FEIS and reaffirmed the validity
of the Record of Decision for the *Final General Management Plan*.

3

In addition, in July 2000, the NPS undertook an assessment of alternative moving techniques and associated construction-related impacts for the relocation of the Hamilton Grange. The findings of this analysis will be incorporated into Part II of this EAS.

## 2.0   SUMMARY OF THE HAMILTON GRANGE GENERAL MANAGEMENT PLAN

The following discussion provides a summary of the Hamilton Grange General Management Plan.

The general management plan for Hamilton Grange National Memorial would be to relocate and restore the original woodframe first and second floors and attic of the Grange across 141st Street to St. Nicholas Park (see previous Figure 2). The restoration would recreate the appearance of the Grange during Hamilton's residency in accordance with the approved *Historic Structure Report* and NPS *Management Policies* and any new information learned during the move (see Alternative 4 - The Grange on the New Site). Implementation of this plan would accomplish what Congress intended in establishment of the memorial - restoration of the Grange within an appropriate setting while keeping it within the context of its present-day community and on Hamilton's original tract of land.

To relocate and create an appropriate setting for the Grange and to provide better security for the memorial, the NPS has requested an easement on an approximate 0.93-acre parcel on the northern edge of St. Nicholas Park from the City of New York, Parks and Recreation. Discussions with the City of New York, Parks and Recreation have begun, and they have indicated that it is in the public interest to move the Grange and that they approve of the basic concepts in the management plan.

The Grange's status as a national historic landmark would not be affected by relocation. Removing the Grange from the Hamilton Heights Historic District would not affect or compromise the historical and architectural basis for which the district was established. In consultation with the state historic preservation officer, the National Park Service prepared a determination of eligibility to the National Register of Historic Places for St. Nicholas Park. It

5

was determined that St. Nicholas Park is not eligible for listing on the national register and that the relocation of the Grange would not adversely affect the park. However, the effects of relocating the Grange into the park would be mitigated through documentation and appropriate design.

Based on research, in its new location the Grange's exterior would be restored as closely as possible to its historic appearance, with all doors, windows, and porches in their original places. The main door would be relocated to its original position and the entrance porch would be reconstructed. The house would be oriented to the southwest, and visitors would approach the house from the northeast as Hamilton's guests would have done. Visitors would enter the house through a new, fully accessible doorway on the northeast to an orientation center on the ground floor level (described below). Here they would be greeted by an NPS ranger and introduced to the Grange and the Alexander Hamilton story. A curving walk would lead from 141st Street around the house to its formal front entrance. Groups who have been oriented at the Convent Avenue site and guests attending ceremonies and special commemorative occasions would enter through the restored front door.

A new masonry and stone subbasement (for housing mechanical equipment, maintenance and space for staff use) and ground floor, which would be developed as a visitor contact area, would be constructed at the new site to complement the original building in size, scale, and material. However, these additions would be clearly differentiated from the original Grange so as not to create a false historical appearance. During the design phase, geotechnical factors would be assessed and considered in determining the foundation design. The results of this study would influence the type of foundation and extent of the basement on the new site. Vibrations from excavation of bedrock, as measured by peak particle velocity, would be limited through the use of modern excavation techniques to avoid damage to nearby structures and minimize disturbances to nearby residents and businesses.

A concealed steel framing system would be inserted to stabilize the building and provide adequate load-bearing capacity. An elevator would provide access to all floors.

Visitor contact would necessarily be in the ground level floor, which would have a lobby, a theater, an information desk and book sales area, staff space, and fully accessible public restrooms. Exhibits and other interpretive media would orient visitors to all the major themes of Alexander Hamilton and the Grange, as well as the house's historic setting and the various changes it has undergone. Four rooms on the first floor would be refurnished to reflect the house as it appeared during Hamilton's occupancy. Efforts would be made to acquire (through purchase, donation, or loan) original Hamilton or period furniture from public and private sources or to make reproductions. The front entry hall would be refurnished and would include the bust of Hamilton in the niche opposite the front door. The dining room and parlor would be fully restored, and the mirrored folding doors that once separated them and reflected the sylvan setting of the house would be re-created. The room off the entry hall would be restored as Hamilton's library.

Less is known about the five private rooms on the second floor than about the first floor. Because so little is known about these rooms, they would be developed as interpretive space with exhibits about the military, political, and professional accomplishments of Hamilton. There might be other uses for the second floor rooms, such as a furnished bedroom, a Hamilton reference library, curatorial work space, collections, storage, etc. Contemporary exhibits in at least one room could feature the family furniture that is in the park collection but comes from a time after Hamilton's death.

About 3,827 square feet, including the community use space at the Convent Avenue site, would be available for visitor use and interpretation and community use.

A museum-quality climate control system would be installed to protect cultural resources and enhance visitor and staff comfort. Artifacts not on display would be stored on site. With additional and upgraded exhibits/refurnishings, guided tours or stationed personnel would be needed for security purposes

The new site in St. Nicholas Park would be fully developed as an appropriate setting for the memorial. Landscaping that is evocative of Hamilton's period would be done. Thirteen sweet gum trees commemorating the original colonies and perhaps propagated from the trees at Mount Vernon, would be planted near the house in a grove as Hamilton had planted them. About 22 mature trees would have to be removed. 14 street trees located along the moving route and eight trees within St. Nicholas Park, to allow for the house relocation, but additional trees would be planted to ensure that the trees lost are replaced. During the design process, landscaping plans would be developed to soften the intrusion of Steinman Hall, part of City College of New York, a nine-story structure adjacent to the new Grange site.

Parking for visitors would continue to be predominately on the street. The National Park Service would work with the City College of New York to identify existing parking spaces that would be available for visitor use. Promotional efforts for the Grange would also encourage the use of public transit, particularly the subway.

Security for the site would be provided by NPS rangers. Security and fire alarm and suppression systems would be installed at the site. A decorative iron security fence would be installed around the perimeter of the new site, and appropriate walk and security lighting and decorative house lighting would be installed. The historic shutters would be used to secure the house from unauthorized entry when the site is closed.

The National Park Service would work with the City of New York, Parks and Recreation to provide information about the outstanding public collection of historic house museums within

the New York City parks system and draw parallels between these houses and Hamilton Grange. The National Park Service will also actively cooperate with community organizations to promote public awareness and appreciation of the rich cultural heritages of West Harlem, to which the Hamilton Grange contributes. With the dramatic restoration, it could be expected that the number of visitors would increase significantly. NPS would also work with the City of New York, Parks and Recreation on upgrading and maintaining St. Nicholas Park to preserve and protect the remaining elements of the park's original design.

Archeological investigations and evaluation would be done before construction work or ground-disturbing activities. Trained personnel would be onsite to monitor construction activities. Thus, any disturbance to archeological resources would be fully mitigated. Actions would also be taken to prevent soil erosion and runoff during construction.

The plan for the Convent Avenue site would be to construct a new structure for public and NPS uses. The new building, no more than two stories, built on the 1889 Grange foundation, would emphasize heritage education and community involvement. A multipurpose meeting room would occupy the main floor, where educational programs and community meetings could be held. Space would also be provided for exhibits to depict the growth, and development of Harlem; the role of the Grange in the community; the role of St. Luke's parish in preserving the Grange; and broader community preservation efforts. Large groups could also be oriented to the Grange here before visiting the house. The structure will include apartment(s) for housing NPS law enforcement rangers and for site storage needs and maintenance operations. The new structure proposed for the Convent Avenue site would be designed to be compatible with the qualities for which the Hamilton Heights Historic District was established.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## 4.0    CEQR ENVIRONMENTAL ASSESSMENT STATEMENT

The main body of Part I of the CEQR Environmental Assessment Statement, including and II, is
included on the following pages.

## CEQR ENVIRONMENTAL ASSESSMENT STATEMENT

## PART I

## APPLICANT INFORMATION & ACTION SUMMARY

### A.   LEAD AGENCY

**Agency:**       City of New York Parks and Recreation

**Contact:**      Jane P. Cleaver, Chief of Parklands

**Address:**      The Arsenal, Central Park

                  New York, New York 10021

**Phone:**        (212) 360 - 3401

**FAX:**          (212) 360 - 3461

### B.   PRIVATE OR NON-LEAD AGENCY APPLICANT

**Applicant:**   United States National Park Service

**Contact:**     Tom Dyer, Chief of Planning

**Address:**     26 Wall Street, New York, New York 10005

**Phone:**       (212) 825 - 8950

**FAX:**         (212) 825 - 6874

### C.   APPLICATION IDENTIFICATION

**Project:** Proposed Relocation of the Hamilton Grange

**CEQR #:** (agency initials followed by year and number): 00DPR001M

**BSA #:** _____

**ULURP #:** NO10061MEM

**LEGISLATIVE INTRO #:** _____

**CAPA #:** _____

11

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## D. ACTION DESCRIPTION

1. **Provide a Sanborn or other land use map showing the boundaries of the directly affected area.**\*

   See Sanborn map attached as Figure 4.

2. **Describe the location of the directly affected area as follows:**
   **Borough:** Manhattan
   **Community District(s):** #9_____
   **Tax block(s) and lot(s):** Block 1957, Lot 140 (proposed site)
   Block 2050, Lot 4 (existing site)

   **Street address, vanity address and nearest cross streets (minimum of two) to property:**

   Proposed Relocation Site: Block 1957, Lot 140 (portion)

   St. Nicholas Park on St. Nicholas Terrace and West 141st Street. Block 2050, Lot 4

   Existing Site: Block 2050, Lot 4

   287 Convent Avenue at West 141st Street.

   **If the action would apply to the entire City or to areas that are so extensive that site-specific description is not appropriate or practicable, describe the areas likely to be affected by the action:**

   Not Applicable.

3. **Describe the action for which environmental review is being performed and, briefly, what consequences would result from or be generated by the action:**

   Action Description:

   The proposed action addressed in this Environmental Assessment Statement is the granting of a permanent easement to the United States National Park Service and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial. Presently located at 287 Convent Avenue, the Grange will be relocated to a 0.93-acre portion of St. Nicholas Park (see Figures 1 and 2). St. Nicholas Park is owned and administered by the City of New York, Parks and Recreation. The Grange, built

in 1802-03, was the only home Alexander Hamilton owned in his lifetime and has architectural significance as a house of the Federal period.

The current site of the Hamilton Grange is not the structure's original site. The home was moved in 1889 by a real estate developer and donated to St Lukes Episcopal Church. In 1924, the American Scenic and Historic Preservation Society acquired the Grange and opened it as a museum in 1933. The National Park Service assumed administration of the site in 1962 by an Act of Congress under the Joint Resolution of April 27, 1962. In 1967, the City of New York Landmarks Preservation Commission designated the house as a landmark.

The 1962 act of Congress that established Hamilton Grange National Memorial directed that the house eventually be relocated and "preserved in a fitting setting" for its proper administration and interpretation as a national memorial. The granting of a permanent easement by the City of New York, Parks and Recreation and the proposed relocation to St. Nicholas Park, which is located south of 141st Street in the immediate vicinity of the current Hamilton Grange site, will allow for the development of enhanced interpretive programs and provide a setting for the Hamilton Grange which is reminiscent of the structures original location as intended by the 1962 Act of Congress.

The areas directly affected by the proposed action include:

Existing Hamilton Grange Site: Block 2050, Lot 4

287 Convent Avenue at 141st Street.

Proposed Relocation Site: Block 1957, Lot 140 (portion)

St. Nicholas Park on St. Nicholas Terrace and 141st Street.

Environmental Consequences.

The physical relocation of the Hamilton Grange is proposed as part of the *General Management Plan* for Hamilton Grange National Memorial, which was the subject of a detailed and comprehensive environmental review prepared by the NPS in accordance with the National Environmental Policy Act. That review resulted in the issuance of a Record of Decision in July of 1995, which identified mitigation measures to be employed to reduce identified impacts (see Appendix A). As such, the proposed action is not anticipated to result in adverse impacts in any category. Beneficial cultural and historic impacts will be experienced through the restoration of the Hamilton Grange and the development of enhanced interpretive programs at the structures new setting. Temporary construction impacts, including increases in ambient noise levels, excavation within St. Nicholas Park, tree removal, and alterations to existing traffic patterns in the immediate project area, will

be experienced during the physical relocation of the Grange. Additionally, some existing street trees and streetscape elements (i.e. fire hydrants, street lights, pedestrian crossing signal, etc.) along the moving route and trees within St. Nicholas Park will need to be removed to facilitate the relocation of the Grange. Additional mitigation, beyond that identified in the NEPA environmental review, is being evaluated by the NPS in coordination with the City of New York, Parks and Recreation. The intent of this additional mitigation will be to achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit local residents. These measures will be described in greater detail in Part II of the EAS. However, such measures are anticipated to include:

- Replacement/relocation of street trees required to be removed along Convent Avenue and West 141st Street. Significant efforts shall be made to relocate or replant in place as many existing street trees as possible and/or practicable;

- Replacement of street trees currently missing along West 141st Street;

- Inspection and maintenance of existing street trees along the proposed move route;

- Streetlight upgrades along West 141st Street. Fixtures will be period lighting sympathetic to the historic character of the Hamilton Heights Historic District and the Grange itself. The fixtures will not be dissimilar to the traditional "shepend's crook" fixtures currently in place along Covent Avenue;

- Replacement of existing sidewalks along the move route on Convent Avenue and West 141st Street, and

- Siting considerations for the relocated Grange within St. Nicholas Park to minimize required excavations and tree removals.

4.    **Physical dimensions and scale of project (fill in dimensions as appropriate):**

The proposed action will result in the grant of a permanent easement to the United States National Park Service for a 0.93-acre parcel to the NPS to facilitate the relocation of the Hamilton Grange.

**Total contiguous square feet owned or controlled by project sponsor: approx. 4,700 square feet.**

The National Park Service owns and administers the existing Hamilton Grange site located at 287 Convent Avenue. The City of New York, Parks and Recreation currently owns and administers the 0.93-acre proposed Grange relocation site located within St. Nicholas Park.

**Project square feet to be developed: _____ square feet.**

Not Applicable. A 0.93-acre portion of St. Nicholas Park will be dedicated as a permanent NPS easement to accommodate the relocated Grange.

### Gross floor area of project, in square feet:

Not Applicable. The proposed action is the grant of a permanent easement to the United States National Park Service for a 0.93-acre parcel within St. Nicholas Park, which is administered by the City of New York, Parks and Recreation, to the NPS to facilitate the relocation of the Hamilton Grange.

**If the action is an expansion, indicate percent of expansion proposed in the number of units, square feet or other appropriate measure:**

Not Applicable

**Dimensions (in ft.) of largest proposed structure: __height; __width; __length.**

Not Applicable.

### Linear feet of frontage along a public thoroughfare:

The relocated Grange will occupy approximately 90 feet along St. Nicholas Terrace and 240 feet along West 141st Street.

5.  **Construction:**

*   **Will the action result in demolition of or significant physical alteration to any improvements?**

Yes. The proposed action will facilitate the relocation of the Hamilton Grange National Memorial (Hamilton Grange or Grange), presently located at 287 Convent Avenue, to a 0.93-acre portion of St. Nicholas Park. Relocation activities will result in excavation within St. Nicholas Park and the removal of street trees and other streetscape elements (i.e. fire

CEQR Environmental Assessment Statement.
Proposed Relocation of the Hamilton Grange National Memorial

hydrants, street lights, pedestrian crossing signal, etc.) along the selected moving route. These impacts will be described in greater detail in Part II of this EAS.

- **Will the action involve either above ground construction resulting in any ground disturbance or in-ground construction?**

Yes. The proposed action will facilitate the relocation of the original first and second floors of the Hamilton Grange across 141st Street to St. Nicholas Park. Excavation within St. Nicholas Park will be required to construct a new masonry and stone subbasement and ground floor for the Grange at its new location. Once relocated, the Grange will be restored, to the greatest degree possible, to its appearance during Hamilton's residency. The extent of above ground construction and required excavations will be described in greater detail in Part II of this EAS.

- **If single-phase project: Anticipated period of construction _____ months (including demolition)**

To be determined. The final schedule for the proposed relocation has not been developed. However, the proposed relocation and restoration in anticipated to occur in one phase.

- **If multi-phased: Total number of phases anticipated _____ (number)**

Not Applicable.

Describe phases and construction schedule:

Anticipated date of commencement of phase 1 __ month __ year (including demolition)

Approximate completion date of final phase ___ month ___ year

#### E. APPROVALS

1. **Will the action be reviewed pursuant to the Uniform Land Use Review Procedure (ULURP) set forth in section 197-c of the Charter?**

Yes.

2. **Identify below and describe as appropriate all City approvals required for the action, regardless of whether environmental review is required for any individual approval.**

16

CEQR Environmental Assessment Statement.
Proposed Relocation of the Hamilton Grange National Memorial

**LAND USE APPROVALS SOUGHT (For BSA approvals, see following section):**

**Zoning text amendment:** _____

**Zoning map amendment** _____

**City map change:** Yes

    **Street map change:** No.
    **Park map change:**    Yes

The proposed action will result in the grant of a permanent easement to the United States National Park Service for a 0.93-acre parcel within St. Nicholas Park, which is administered by the City of New York, Parks and Recreation, to the NPS to facilitate the relocation of the Hamilton Grange.

**Special permit:** Not Applicable

    **Specify type**
    **Specify section of Zoning Resolution**
    **New or renewal?**
    **Expiration date**
**Site selection for public facility:** Not Applicable

**Acquisition of real property by the City :** Not Applicable
    **\*Public easement**
**Franchise:** Not Applicable
    **\*Type of franchise**
    **\*New or renewal?**
    **\*Expiration date**

**Urban renewal area designation or alteration:** Not Applicable

**Urban renewal plan:** Not Applicable
    **\*New or amended?**

**Concession:** Not Applicable

**Sanitary or waterfront landfill:** Not Applicable

**Revocable consent:** Not Applicable
    *New, modified or renewal?
    *Expiration date

**Charter Section 197-a plan:** Not Applicable

**Disposition of City property:**

Yes. The proposed action will result in the grant of a permanent easement to the United States National Park Service for a 0.93-acre parcel within St. Nicholas Park, which is administered by the City of New York, Parks and Recreation, to the NPS to facilitate the relocation of the Hamilton Grange. The grant of the easement is considered the disposition of city-owned property.

**Other (specify)**

**BOARD OF STANDARDS AND APPEALS APPROVALS SOUGHT:**

**Special permit:** Not Applicable

    *Type of special permit
    *Specify section of Zoning Resolution
    *New or renewal?
    *Expiration date
**Variance:** Not Applicable
    *Type of variance, if known (use or bulk)

**Other (specify)**

**OTHER CITY APPROVALS SOUGHT:**

**Legislation:** Not Applicable

**Rulemaking:** Not Applicable

**Construction of public facilities:** Not Applicable

**Funding of construction:** Not Applicable

**Funding of programs:** Not Applicable



**Policy or plan:** Not Applicable

**Landmarks Preservation Commission approvals (exempt from CEQR):**

Yes. The proposed action will facilitate the relocation of a designated City of New York Landmark, the Hamilton Grange.

**Department of Buildings approvals (exempt from CEQR):** Not Applicable

**Other (specify)**

3. **Specify all State and federal approvals, actions or funding required for the action, regardless of whether environmental review is required for any individual action.**

State or Federal approvals are not required for the proposed grant of a permanent easement to the NPS. However, the proposed relocation of the Hamilton Grange will require review and consultation with the New York State Office of Parks, Recreation and Historic Preservation in accordance with Section 106, the National Historic Preservation Act, and an act of Congress.

## F.    ACTION TYPE

Is the action a Type I action or an unlisted action?  Consult the Type I list in 6 NYCRR Section 617.12(b) and the City list at Section 6-15(a) of Executive Order No. 91 of 1977.  (See attachments 3 and 4).  Type I actions have been determined to be more likely to require preparation of an environmental impact statement than other actions.  Prior to finalizing the EAS, it may be appropriate to reconsider the answer to this question in light of other parts of the EAS or supporting materials.  Check below as appropriate:

Unlisted

Type I _____X_____

*Specify Type I category or categories

In accordance with Section 617.4(b)(9):

An unlisted action which occurs wholly or partially within, or substantially contiguous to, any historic building (Hamilton Grange), structure, facility, site, or district (Hamilton Heights Historic District) listed on the National or State Register of Historic Places.

After completing or receiving Part I, the lead agency must send a copy of it, with any other information it deems necessary, to the Office of Environmental Coordination - 52 Chambers Street, Room 315, New York, NY 10007.  In addition, if any action includes discretionary actions/approvals by City agencies other than the lead agency, the lead agency should provide those involved agencies with notice of its lead agency status and send them Part I of the EAS.



Project Area



Proposed Relocation of the Hamilton Grange
St. Nicholas Park
Manhattan, New York

Figure 1. Site Location
Scale: 1:1000'

Source: USGS Topographical Survey Maps
Central Park N Y - N J Quadrangle, Photorevised 1979





Proposed Relocation of the Hamilton Grange
St. Nicholas Park
Manhattan, New York

Figure 2. Hamilton Grange Relocation:
Concept Plan

Source: National Park Service, 1992



ORIGINAL
HAMILTON ESTATE

HAMILTON HEIGHTS
HISTORIC DISTRICT

North

Proposed Relocation of the Hamilton Grange
St. Nicholas Park
Manhattan, New York

Figure 3  Hamilton Grange:
Location History

Source: National Park Service, 1992

TRC



 · Directly Affected Area

Proposed Relocation of the Hamilton Grange
St. Nicholas Park
Manhattan, New York

Figure 4. Sanborn Map

Source: Sanborn Mapping and Geographic Information Service, 1999



Appendix A
NEPA Record of Decision:
General Management Plan
Hamilton Grange National Memorial

United States Department of the Interior
National Park Service

RECORD OF DECISION

General Management Plan
Hamilton Grange National Memorial
New York County, New York

## INTRODUCTION

A 1962 act of Congress authorized the establishment of a Hamilton Grange
National Memorial to commemorate the historic role played by Alexander Hamilton
in the establishment of our nation. The act further directed that the house
eventually be relocated for its proper administration and interpretation as a national
memorial. The site proposed at that time by a National Park Service planning effort
was about 10 blocks from the present location on Convent Avenue near 141st
Street. The house was not moved, and because of a congressional funding ceiling,
only minor rehabilitation projects were undertaken over the next decade.

New legislation was passed in 1988 (Public Law 100-701) amending the earlier
legislation by establishing a boundary, authorizing the acquisition of the land on
which the house sits, and authorizing the expenditure of up to $2.5 million for
development. This legislation also required that a general management plan be
completed to "identify appropriate facilities for proper interpretation of the site for
visitors."

Long-range planning for the Grange was begun in 1981. The planning process
was complete in March 1995 when the *Final General Management
Plan/Environmental Impact Statement (FEIS) for Hamilton Grange National
Memorial* was released to the public. Pursuant to the National Environmental
Policy Act of 1969 and the regulations promulgated by the Council on
Environmental Quality at 40 CFR 1505.2, the Department of Interior/National Park
Service has prepared this Record of Decision to document the outcome of this
planning process. This Record of Decision (ROD) is a concise statement of what
decisions were made, the criteria used to make this decision, alternatives that
were considered, and the mitigating measures developed to avoid or minimize
environmental and social impacts.

1

## DECISION

The National Park Service will implement the preferred alternative (alternative 4) - Relocation and Restoration - as described in the *Final General Management Plan/Environmental Impact Statement* dated January 1995 and filed with the Environmental Protection Agency in March 1995.

## SUMMARY OF ALTERNATIVES

### Preferred Alternative

The original woodframe first and second floors and attic of the Grange will be relocated across the street to a portion of St. Nicholas Park, a park owned and administered by the City of New York Department of Parks and Recreation. Approximately 0.91 acres on the northern edge of the park will be transferred to the National Park Service for the relocation. The concept has been reviewed and generally approved by the city. Specific issues will be addressed in future negotiations. Landscaping around the Grange will be evocative of Hamilton's period and will include thirteen sweet gums commemorating the original colonies.

In its new location, the Grange will be fully restored in accordance with the approved *Historic Structure Report* and NPS *Management Policies* and new information learned during the move. The Grange's exterior will be restored as closely as possible to its historic appearance, with all doors, windows, and porches in their original places. The main door will be relocated to its original position, and the entrance porch will be reconstructed. The house will be oriented to the southwest, and visitors will approach the house from the northeast as Hamilton's guests would have done. Most visitors will enter the house through a new, fully accessible doorway on the northeast to an orientation center on the ground floor level. However, a curving walk will lead from 141st Street around the house to its formal front entrance. Groups and guests attending ceremonies and special commemorative occasions will enter through the restored front door.

A new masonry and stone subbasement and ground floor will be constructed at the new site to complement the original building in size, scale, and material. However, these additions will be clearly differentiated from the original Grange so as not to create a false historical appearance. A concealed steel framing system will be inserted to stabilize the building and provide adequate load-bearing capacity. An elevator in the northwest corner will provide access to all floors.

Visitor contact will be in the ground level floor, which will have a lobby, a theater, an information desk and book sales area, staff space, and fully accessible public restrooms. Exhibits and other interpretive media will orient visitors to all the major

2

themes of Alexander Hamilton and the Grange, as well as the house's historic setting and the changes it has undergone. Four rooms on the first floor will be refurnished, as will the front entry hall, to the reflect the house as it appeared during Hamilton's occupancy. The dining room and parlor will be fully restored, as will the room off the entry hall as Hamilton's library. Because less is known about the five private rooms on the second floor, these will be developed as interpretive space with exhibits about the military, political, and professional accomplishments of Hamilton.

Security for the site will be provided by NPS rangers. Rangers will be on duty at the Grange 24 hours a day and will live in the housing provided at the new structure on Convent Avenue (see below). A security and fire alarm and suppression systems will be installed at both sites. A decorative iron security fence will be installed around the perimeter of the new site, and appropriate walk and security lighting and decorative house lighting will be installed. The historic shutters will be used to secure the house from unauthorized entry when the site is closed.

The plan for Convent Avenue, the current location of the Grange, is to construct a new structure for public and NPS uses. The new building, no more than two stories and built on the 1889 Grange foundation, will emphasize heritage education and community involvement. A multipurpose meeting room will occupy the main floor, where educational programs and community meetings may be held. Space will also be provided for exhibits to depict the growth and development of Harlem, the role of the Grange in the community, the role of St. Luke's parish in preserving the Grange, and broader community preservation efforts. The lower levels will be developed as apartments for housing NPS law enforcement rangers and for site storage needs and maintenance operations.

**Other Alternatives**

The National Environmental Policy Act requires that a range of alternatives be evaluated for proposed federal actions, including a no-action alternative. The *FEIS* for Hamilton Grange analyzes the selected plan above as well as three additional alternatives. The three remaining alternatives as documented in the *FEIS* include the following.

Alternative 1 ( no action) would continue existing management trends. The structure would be stabilized in place by reinforcing failed wooden structural members. Structural capacity of the second floor would remain that of a typical wood-frame house - not meant for visitors. Public access would be only to the basement and first floor. Interior finishes would be partially restored, but the basic configuration and use of space within the Grange would not be changed.

3

Alternative 2 would maintain the same building configuration as alternative 1, but the house would be structurally reinforced with a new interior steel framing system to allow full public use of the basement and the first and second floors. The steel framing would not be hidden. An exterior elevator at the back side of the house and a wheelchair lift at the front would allow full visitor circulation to all floors. Three open floors (basement, first and second floors) and a partially restored interior would provide more space and opportunities for an enhance interpretive program.

Alternative 3 would alter the setting of the current site by reorienting the visitor entrance to a more impressive, but less historically accurate four-story facade. More space would be made available by lowering the existing subbasement/garden level floor and opening a new entryway into this level from the east (Hamilton Terrace) side of the Grange (see page 14, FEIS). The garden level and basement would provide space for visitor information and needs, a theater, community and school-group meetings, and staff, storage, and utilities. The first floor would be restored and partially refurnished; the second floor would be available for interpretive exhibits. Interest in St. Luke's property behind or east of the Grange would have to be acquired to implement this alternative.

**Environmentally Preferable Alternative**

Alternative 4, while being the preferred alternative, is also considered to be the environmentally preferable alternative with the implementation of the proposed mitigation (outlined in the alternative description and under the mitigation section below). Environmentally preferable is defined as "the alternative that will promote the national environmental policy as expressed in NEPA's Section 101" (46 FR 18026, as amended, 51 FR 15618). This generally means the the alternative that causes the least damage to the biological and physical environment, but also includes the alternative which best protects, preserves, and enhances historic, cultural, and natural resources. The goal of any agency in selecting an alternative, as is the National Park Service's charge, is to carefully balance the different possible actions in order to best "fulfill the responsibilities of each generation as trustee of the environment."

The description of the alternative, the rationale for the decision, and the mitigation provide the data and rationale which support alternative 4.

**RATIONALE FOR DECISION**

**Decision Criteria**

Criteria were developed to guide the generation and selection of the alternative most appropriate for the management of the Grange. These criteria evolved

4

throughout the planning process from site legislation, public input, visitor use and community needs, and cultural and natural resource concerns. The more significant criteria used in the decision-making process included the following (the order does not imply a greater significance):

- Will the location of the Grange ensure its proper administration and interpretation as a national memorial, as required by the legislation?

- Will the Grange be structurally stable?

- Will the Grange be fully restored with the porches returned to their original locations?

- Will the Grange be situated within the bounds of Alexander Hamilton's original tract of land?

- Will space and resources be available for enhanced interpretative, educational, and community activities? Will visitor experience be improved?

- Will the Grange location allow for its traditional association with the Harlem community?

Alternative 4 best meets these criteria from the standpoint of the National Park Service. Implementation of this alternative will accomplish what Congress intended - restoration of the Grange within an appropriate setting while keeping it within the context of its present-day community and on Hamilton's original tract of land. It also allows for full interpretation of the site for visitors.

As described in the summary, the house will be restored and fully stabilized with a concealed steel framing system in this new location. All porches, doors, and windows will be in their original locations and all four rooms on the first floor will be refurnished. Although outside the current boundaries of the Hamilton Heights Historic District in which the Grange currently resides, the Grange will be very close to its current location. As shown in the FEIS (pg.20), the new location is just across 141st Street to the south of St. Luke's and Hamilton Terrace and is within the boundary of the original Hamilton Estate (shown on page 6 of the FEIS). The loss of the Grange from the historic District will not affect or compromise the historical and architectural basis for which the district was established, nor will it affect the Grange's status as a national historic landmark. Although public concern was expressed regarding the potential impacts to St. Nicholas Park, the site of the proposed relocation, it was determined in consultation with the St. historic preservation officer that St. Nicholas Park is not eligible for listing on the national register and that the relocation of the Grange would not adversely affect the park.

5

The selected alternative will also significantly enhance interpretive and educational opportunities about Hamilton and his life, his relationship to contemporary times, and the relationship between the Grange and the local community because of the increase in available space (the new Convent Avenue building and the Grange) for such activities. The provision of NPS housing at the Convent Avenue site and 24-hour security at the Grange will also increase security at the new location, and possibly provide a greater sense of overall community security because of the 24-hour ranger presence.

The decision criteria which the National Park Service feels is met, but which has been most highly debated by the local community, is whether the traditional association of the Grange with St. Luke's Episcopal Church and the local Harlem Community will remain if the Grange is moved. As expressed throughout the planning and public involvement phases for Hamilton Grange, many individuals in the local neighborhood feel their traditional association will be lost in the proposed location for a variety of reasons (FEIS, page 53). They favor maintaining and stabilizing the Grange in its current location to honor its relationship with the church and community.

Other concerns with the move, which are interwoven in the community, include feelings that unrealistic cost figures for the move and restoration have been presented and anticipation that funding may not be available to fund the move, the restoration and the construction of the new building on Convent Avenue, resulting in an empty lot on Convent Avenue and a moved, but unrestored Grange for an extended period of time.


## Mitigation

To mitigate these and other concerns, actions were added to the selected alternative prior to the release of the *FEIS*. These are listed below. All practicable means to avoid or minimize environmental or social harm from the selected alternative have been adopted.

To address community concerns that, upon moving the Grange to St. Nicholas Park, a vacant, untended lot would remain in its original location, a new structure for public and NPS uses will be built. The characteristics and purposes of this building were described under the preferred alternative.

To further address community concerns and to assist the National Park Service in better understanding the traditional associations the community has with the Grange, a Friends of Hamilton Grange group is being formed. The group will be composed of representatives from the Harlem community and other city-wide groups and organizations. They will provide input into a variety of issues involved

6

with the relocation including the planning of the new building on Convent Avenue and the development of the new site in St. Nicholas Park, particularly landscape design.    The group will also help promote the site and programs related to the Grange for the visitor and the community.

The new building will be designed to be compatible with the qualities for which the Hamilton Heights Historic District was established. Additionally, the design of the landscape surrounding the restored Grange will be fully developed as an appropriate setting for the memorial, as well as to replace trees removed for the relocation, to soften the intrusion of the adjacent Steinman Hall, and to respect the original design intent of St. Nicholas Park. Discussions will also be held with the City regarding NPS involvement in maintenance of the surrounding parklands.

Structural and noise concerns regarding blasting of bedrock for the Grange's new foundation will be addressed during the design phase. Geotechnical factors will be assessed and considered in determining the foundation design. The results of this study will influence the type of foundation and extent of the basement on the new site. Vibrations from excavation of bedrock will be limited through the use of modern excavation techniques to avoid damage to nearby structures and minimize disturbance to nearby residents and businesses.

Funding concerns will also be addressed by carefully phasing the project. Prior to moving the Grange, construction planning funds will be acquired which will be used to develop construction drawings and more specific cost estimates for the relocation and restoration of the Grange and the development of the Convent Avenue building. Following the move of the Grange to the new site in St. Nicholas Park, development of the building and the restoration of the Grange will proceed simultaneously.

## COMPLIANCE

Consultation with the New York State Office of Parks, Recreation and Historic Preservation will continue. Proper procedures for the review of the move of a National Register listed property will be implemented with this office prior to moving the Grange.

All new interpretive media will conform with the September 1991 guidelines outlined in the plan.

7

## CONCLUSION

A notice of availability for the *Final Environmental Impact Statement* was published in the *Federal Register* by the National Park Service on March 16, 1995 and by the Environmental Protection Agency on March 17, 1995. The 30-day no-action period ended on April 16, 1995.

The above factors and considerations justify the selection of alternative 4, as summarized above and described in the *FEIS*, as the final general management for Hamilton Grange National Memorial.

APPROVED: _____ DATE: 7/19/95

Marie Rust, Regional Director
National Park Service

8

Appendix B
Addendum to Hamilton Grange Management Plan FEIS

<div align="center">

June 2000

# ADDENDUM

## TO HAMILTON GRANGE FINAL GENERAL MANAGEMENT PLAN FEIS
### DATED JANUARY 1995

</div>

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 5 | 2 | Congress recently passed legislation that allowed the Park Service to acquire the land on which the house is now located and the personal property necessary for interpretation of Hamilton, the Grange, and the United States as a young nation. | In the past, Congress passed legislation that allowed the Park Service to acquire the land on which the house is now located along with personal property necessary for interpretation of Hamilton, the Grange, and the United States as a young nation. |
| 46 | 1[1] | There are no traffic counts available from the New York City Department of Transportation for the Hamilton Grange vicinity. | Traffic counts are not conducted by the New York City Department of Transportation |
| 46 | 4 | Second sentence<br>Recently the Park Service has assisted the city parks in preparing environmental education information related to St. Nicholas Park | In the past, the Park Service has assisted the city parks in preparing environmental education information related to St. Nicholas Park |
| 47 | map | | Add ANCHOR Development Site. |
| 49 | 1 | last sentence<br>Recent capital improvements, including granite curbs, tinted cement, and the tree plantings, were made to Convent Avenue (which runs in front of Hamilton Grange) from West 141st to West 145th Street. | Past capital improvements, including granite curbs, tinted cement, and the tree plantings, were made to Convent Avenue (which runs in front of Hamilton Grange) from West 141st to West 145th Street. |
| 49 | 2 | 4th sentence<br>These avenues are often zoned for mixed use. | The existing site and the proposed site are both within the R7-2 Zone, a residential zone. |
| 49 | 2 | Delete last sentence<br>Examples of businesses on Amsterdam. . | Commercial and retail uses are located on Amsterdam Avenue and St. Nicholas Avenue, the avenues that run parallel to Convent Avenue. Across St. Nicholas Avenue from the park is the New Central Deli and Benta's Funeral Home. |

---

[1]Mr. Binni Bhatta of the New York State Department of Transportation was contacted on April 4, 2000, for traffic count data (data request is attached). We are still waiting for NYSDOT's response.

**June 2000 Addendum to the Hamilton Grange Final General Management Plan FEIS**
**Page 2**

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 49 | 4 | 1ˢᵗ sentence<br>A development, known as the Harlem-on-the-Hudson project, has been proposed in western Harlem on the piers at 125ᵗʰ Street and the Hudson River. | A development, known as the Harlem-on-the-Hudson project, was proposed several years ago in western Harlem on the piers at 125ᵗʰ Street and the Hudson River. |
| 50 | 1 | --- | Add last sentence<br>As of April 2000, the proposal has not been approved and is still in the design phase( Telephone conversation with G. Goodwill of CB9) |
| 50 | 2 | 1ˢᵗ sentence<br>.. "The initial stages..." | "various stages" |
| 50 | 3 | Delete paragraph | The Strivers is the $45 million phase of the project to be located on Frederick Douglas Boulevard between W 134ᵗʰ Street and W 135ᵗʰ Street in the Strivers Historic District. The mixed-use project consists of a 14-story apartment building with 150 units, 20-30 units of two- to four-story duplex units, 30,000 square feet of ground floor commercial space, and 30,000 square feet of parking. Construction was slated to begin at the end of 1999 and the completion date is the Summer of 2001.<br><br>**ANCHOR Development**<br>A proposed ANCHOR Development will be located between Bradhurst Avenue and Frederick Douglas Boulevard between W144th Street and W145th Street. The mixed-use development project consists of 125 condominiums above 54,000 square feet of commercial space. Construction will begin the Summer of 2000. |
| 50 | 4 | Whole paragraph<br>A landscape design...... | Delete both sentences. |

**June 2000 Addendum to the Hamilton Grange Final General Management Plan FEIS**
**Page 3**

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 50 | 5 | **New Developments** **Riverbank State Park.** Dedicated on May 27, 1993, this state park is new to the Harlem community. Built on top of a controversial sewage treatment plant … | **Park Developments** **Riverbank State Park.** This state park was dedicated to the Harlem community on May 27, 1993. Built on top of a the North River Pollution Control Plant, a controversial sewage treatment plant.. |
| 52 | 1 | Paragraph beginning with "The park land surrounding the potential site…… Delete: "Two playgrounds and handball and basketball courts are in the park……TO END OF Paragraph. | New paragraph St. Nicholas Park provides many recreational opportunities, including basketball courts and playgrounds. There is a brick restroom on the northern part of the park. |
| 52 | 2 | Delete "7.3 million" Delete "1.49 million" Delete last sentence. | Insert "7.48 million" Insert "1.52 million" Insert "Hamilton Grange is within the boundaries of Manhattan Community District 9. |
| 52 | 3 | Delete "1993" | Insert "2000" |
| 52 | 4 | Delete first sentence. | Community District 9 is bordered by the following: to the north by West 155" Street; to the west by the Hudson River and the Henry Hudson Parkway; to the east by Morningside Avenue, St. Nicholas Avenue, Bradhurst Avenue, and Edgecombe Avenue; and to the south by Cathedral Parkway. |
| 52 | 4 | Last sentence Industrial and commercial tax lots account for only 9% of the total lots in the district; the remainder are generally residential. | Industrial and commercial tax lots account for only 4% of the total lots in the district; approximately 37% of the district is residential. |

**June 2000 Addendum to the Hamilton Grange Final General Management Plan FEIS**
**Page 4**

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 54 | 2 | Delete 2nd Paragraph, sentences 3 and 4. | Dated July 1, 1999, this data indicates that emissions in Manhattan are within the national ambient air quality standards (NAAQS) for O3 is in severe non-attainment, and PM-10 is in moderate non-attainment. Lead is not designated, and SO2 and NO2 cannot be classified. Currently, the New York City metropolitan area, including New York County, is designated moderate non-attainment for carbon monoxide(CO). However, the New York State Department of Environmental Conservation (NYSDEC) has begun the regulatory process to have the area reclassified as in attainment for CO. Formal approval of the redesignation is expected by September, 2000. |
| 55 221 | 3.4 letter | threatened and endangered species sections | Waiting for response from USFWS and NYSDEC. |

M:yndhest_bd\shared\Margie\grange2\grangeaddendum.wpd

# TRC MEMORANDUM

To:        Tom Dyer, National Park Service
           Joseph Avery, National Park Service
           Richard Southwick, Beyer Blinder Belle
           Ajit Thakore, TRC A&H

From:      Kevin J. Maher, AICP, TRC Environmental

Date:      December 7, 2000

**Subject:    Hamilton Grange: CEQR EAS Part II**

---

Gentlemen,

Enclosed for your files, please find a copy of the final CEQR EAS Part II for the relocation of the Hamilton Grange. At the direction of Jane Cleaver of the City of New York, Parks and Recreation, the document was distributed today (12/7/00) as noted on the service list included within the EAS, Part II. The next step in the EAS process will be the development of a Part III which, if no additional issues arise, will be the equivalent of a SEQRA Negative Declaration or a NEPA "Finding of No Significant Impact".

Please do not hesitate to call should you have any questions or require assistance. I can be reached at 201.933.5541 ext. 108.

Thanks!

**TRC**



**City of New York**
**Parks & Recreation**

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

Jane P. Cleaver
Chief of Parklands

December 6, 2000

Alessandra Sumowicz
Director, Mayor's Office of Environmental Coordination
100 Gold Street, 2nd Floor
NY, NY 10038

**RE: Part II Environmental Assessment Statement for Proposed Relocation of
Hamilton Grange, Manhattan, NY**

ULURP# N010061MEM
CEQR# 00DPR001M
*alexandia*

Dear Ms. Sumowicz:

In conformance with the requirements in the Environmental Assessment Statement
guidelines, please find the attached Part II for the proposed relocation of Hamilton Grange,
located in Community Board #9 in Manhattan. The Part II Environmental Assessment
Statement addresses the granting of a permanent easement to the United States Parks
Service and the associated map change for this relocation. The Grange will be relocated
from its current site at 287 Convent Avenue to a .93 acre section of St. Nicholas Park, and
will be permanently located within the park at the corner of 141st Street and Hamilton
Terrace. Please call Kate Slevin at (212)-360-3421 with any questions regarding this
project.

Sincerely,

Jane P. Cleaver
Chief of Parklands

**ENVIRONMENTAL ASSESSMENT STATEMENT**
**Part II**
**Proposed Relocation of the Hamilton Grange National Memorial**
**St. Nicholas Park**
**Manhattan, New York**

**Lead Agency:**

City of New York, Parks and Recreation
The Arsenal, Central Park
New York, New York 10021

**Prepared for:**

City of New York, Parks and Recreation
The Arsenal, Central Park
New York, New York 10021

United States National Park Service
Northeast Regional Development Office
26 Wall Street
New York, New York

**Prepared by:**

TRC Environmental Corporation
1200 Wall Street West
Lyndhurst, NJ 07071

**December 2000**

ULURP #: N010061MEM
CEQR #: 00DPR001M
PROPOSED RELOCATION OF HAMILTON GRANGE
CEQR ENVIRONMENTAL ASSESSMENT STATEMENT, Part II
SERVICE LIST

December 7, 2000

Alessandra Sumowicz
Director
Office of Environmental Coordination
100 Gold St., 2nd Floor, Room 244
New York, NY 10038

Beverly Reith
Director, Environmental Review
HPD – Division of Architecture and Engineering
100 Gold St.
New York, NY 10038

Mr. Randal Fong
Assistant Commissioner
DCAS Division of Real Estate Services
1 Centre St., 19N
New York, NY 10007

Marie Dooley
Department of Environmental Protection
Bureau of Legal Affairs
59-17 Junction Blvd., 11th Floor
Corona, NY 11368

Mr. Ralph Palmer
Chief of Fire Protection
New York City Fire Department
250 Livingston St.
Brooklyn, NY 11201

Bob Gochfeld
Director of Technical Review
Department of City Planning
22 Reade St.
New York, NY 10007

Naim Rasheed
Department of Transportation
Environmental Review Unit
40 Worth St.
New York, NY 10013

John J. Strauss
Department of Sanitation
Bureau of Legal Affairs
125 Worth St., Room 710
New York, NY 10013

Mr. Charles DeQuillfeldt
Hunters Point Plaza
Department of Environmental
Conservation
47-40 21st St.
Long Island City, NY 11101

Mr. Maurice Spreiregen
Director of Central Intake
Department of City Planning
22 Reade St., 2E
New York, NY 10007

Mr. David Carlson
Director of Landscape Architecture
Olmsted Center
Flushing Meadow Corona Park
Corona, NY 11368

Gina Santucci
Director of Environmental Review
Landmarks Preservation Committee
100 Old Slip
New York, NY 10005

Adrien Benepe
Manhattan Borough Commissioner
Arsenal West
16 W. 61st St., Floor 16
New York, NY 10023

C. Virginia Fields
Manhattan Borough President
Municipal Building, Executive
Division
1 Centre St.
Municipal Building, 19th Floor South
New York, NY 10007

Ms. Maritta Dunn, Chair
Manhattan Community Board #9
565 West 125th St.
New York, NY 10027

Mr. Lawrence McClean, District
Manager
Manhattan Community Board #9
565 West 125th St.
New York, NY 10027

Ms. Kathy Howe
Historic Preservation Specialist
NYS Office of Parks, Recreation and Historic
Preservation
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189
Waterford, NY 12188-0189

The Honorable Charles Rangel
2354 Rayburn HOB
Washington, DC 20515-3215

Mr. Eric Cardwell, P.E.
Consulting Engineer
Manhattan Borough President's Office
1 Centre St., 19th Floor
New York, NY 10007

Mr. Tim Butz
Verizon Communiciations
5030 Broadway
Room 503
New York, NY 10034

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## 1.0    PROJECT INTRODUCTION

The proposed action addressed in this Environmental Assessment Statement (EAS), Part II is the granting of a permanent easement to the United States National Park Service (NPS) and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial (Hamilton Grange or Grange). Presently located at 287 Convent Avenue, the Grange will be relocated by the National Park Service to a 0.93-acre portion of St. Nicholas Park (see Figures 1 and 2). St. Nicholas Park is owned and administered by the City of New York, Parks and Recreation. The Grange, built in 1802-03 was the only home Alexander Hamilton ever owned and has architectural significance as a house of the Federal period. Part I of this EAS was filed with the Office of Environmental Coordination under letter dated October 23, 2000 and distributed to the same service list as this Part II.

The current site of the Hamilton Grange is not the structure's original site. The home was moved in 1889 by a real estate developer and donated to St. Lukes Episcopal Church (see Figure 3). In 1924, the American Scenic and Historic Preservation Society acquired the Grange and opened it as a museum in 1933. The National Park Service assumed administration of the site in 1962 by an Act of Congress under Joint Resolution of April 27, 1962. In 1967, the City of New York Landmarks Preservation Commission designated the house as a landmark.

The 1962 act of Congress that established Hamilton Grange National Memorial directed that the house eventually be relocated and "preserved in a fitting setting" for its proper administration and interpretation as a national memorial. The granting of an easement by the City of New York, Parks and Recreation and the proposed relocation to St. Nicholas Park, which is located south of West 141st Street in the immediate vicinity of the current Hamilton Grange site, will allow for the development of enhanced interpretive programs and provide a setting for the Hamilton Grange which is reminiscent of the structures original location as intended by the 1962 Act of Congress.

2

A detailed description of the General Management Plan for the Hamilton Grange was included in Section 2.0 of Part I of this EAS.

## 1.1    Background and Purpose

The relocation of the Hamilton Grange is proposed as part of the *General Management Plan* for Hamilton Grange National Memorial. The *General Management Plan was* the subject of a detailed and comprehensive environmental review prepared by the NPS in accordance with the National Environmental Policy Act (NEPA). As part of the NEPA Environmental Review, a *Draft General Management Plan/Environmental Impact Statement* (DEIS) was prepared and published in April 1993. That document was subject to a public review period of approximately 11 months. At the close of the comment period agency and public review comments were considered and the draft management plan and DEIS were reviewed in light of the comments received. In January 1995, the *Final General Management Plan Environmental Impact Statement* (FEIS) was published by the National Park Service. The FEIS addressed changes to the proposed management plan developed in consideration of public comments received and included information regarding additional public meetings as well as responses to comments received on the DEIS. Following publication of the FEIS, a NEPA Record of Decision was issued in July 1995. No changes have occurred to the Final General Management Plan since issuance of the NEPA Record of Decision.

This Environmental Assessment Statement, Part II is submitted in accordance with the New York City Environmental Quality Review (CEQR) to address the grant of a permanent easement to the United States National Park Service and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial. Part I of this EAS was filed with the Office of Environmental Coordination under letter dated October 23, 2000 and distributed to the same service list as this Part II.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

As provided by the CEQR regulations, materials prepared for other purposes, specifically, the *Draft General Management Plan/Environmental Impact Statement, Final General Management Plan Environmental Impact Statement,* and NEPA Record of Decision, have been evaluated to satisfy the expanded analyses portion of this Part II. The NEPA Record of Decision is attached as Appendix A of this EAS document. The *Draft General Management Plan/Environmental Impact Statement* and *Final General Management Plan Environmental Impact Statement* are herein incorporated into this Part II by reference and can be reviewed at the following locations:

> City of New York, Parks and Recreation
> The Arsenal, Central Park
> New York, New York 10021

> United States National Park Service
> Northeast Regional Development Office
> 26 Wall Street
> New York, New York 10005

> New York City Department of City Planning
> Environmental Assessment and Review Division
> 22 Reade Street, 4E
> New York, New York 10007

> Manhattan Community Board #9
> 565 West 125th Street
> New York, New York 10027

No substantive changes have occurred to the Final General Management Plan for the Hamilton Grange since issuance of the July 1995 NEPA Record of Decision. However, to ensure the "hard look" at potential impacts required by CEQR, in June 2000 the National Park Service reassessed the *Final General Management Plan Environmental Impact Statement* prepared for the proposed Hamilton Grange Relocation, dated January 1995, and the July 1995 Record of Decision. Where appropriate, text contained within the FEIS has been revised to reflect recent changes in the affected environment or the assessment of potential impacts. These revisions are identified in the

FEIS addendum attached as Appendix B of this EAS.  The re-evaluation of the FEIS document established that there have been no substantive or significant changes in the affected environment or the assessment of impacts contained within the FEIS and reaffirmed the validity of the Record of Decision for the *Final General Management Plan*.

In addition to the reassessment of the NEPA environmental review conducted for the proposed Hamilton Grange General Management Plan, the National Park Service undertook an assessment of the feasibility and associated impacts of the proposed relocation of the Hamilton Grange.  The results of this assessment are summarized in the report, *The Relocation of the Hamilton Grange – Assessment of Feasibility and Associated Impacts*, dated November 8, 2000 and prepared the by architectural consulting firm Beyer Blinder Belle.  The report, outlines the various building move methodologies considered; describes the recommended procedures for relocation; assesses potential construction impacts associated with the building move; and identifies mitigation measures for to ensure amelioration of identified construction impacts.  The report findings are described in greater detail in Section F of this Part II.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## 2.0    CEQR ENVIRONMENTAL ASSESSMENT STATEMENT

The main body of Part II of the CEQR Environmental Assessment Statement is included on the following pages. Part I of this EAS was filed with the Office of Environmental Coordination under letter dated October 23, 2000 and distributed to the same service list as this Part II.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## PART II

## SITE AND ACTION DESCRIPTION

This Part provides a detailed description of the proposed action and addresses the physical and socioeconomic context of the proposed action. Materials prepared for other purposes may be used to satisfy this Part where appropriate. Where appropriate, the action description should include the cumulative effects of related actions. This Part also requires applicants to submit analyses for all applicable categories of environmental impacts.

### A.    CATEGORIZING YOUR ACTION

(1) LOCALIZED ACTIONS include: a) site specific actions which would result in a specific or known development at particular locations; and b) actions involving changes in regulatory controls that affect one or more sites in a well defined localized geographic area and are not associated with specific or known development on each of those sites. Localized actions may be a mix of (a) and (b).

(2) AREAWIDE/PROGRAMMATIC ACTIONS include those actions that would apply to the entire City, or to areas that are so extensive that site-specific description and/or analysis would not be appropriate or practicable.

Check the category of action that is reflective of the actions proposed:

> Category 1: (a)  _X_   and/or (b)
>
> Category 2:

For more information on categorizing your action, consult the introduction to the EAS Guidebook, at pages 8-9.

Subparts B, D, E and F of this Part should be completed for all localized actions. Subpart C, entitled "Project Description," is generally completed only for site specific actions which would result in a specific or known development at particular locations.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

If your action is localized and involves changes in regulatory controls that affect one or more sites not associated with a specific development, then it is generally appropriate to include in subpart E one or more reasonable development scenarios for such sites and, to the extent possible, to provide information about such scenarios(s) similar to that requested in subpart C.

If your action is areawide/programmatic, then you may generally skip subparts B through E of this Part (pages 8-18 of this form), unless completion of those subparts is helpful in describing your action, and proceed directly to subpart F on page 19. If you skip subparts B through E, be sure to attach texts and/or maps that will serve as the action description in lieu of completion of those subparts.

## B.    SITE DESCRIPTION

Except where otherwise indicated, answer the following questions with regard to the directly affected area. (The directly affected area, also called the area directly affected by the action, consists of the project site and the area subject to any change in regulatory controls that the action includes.) Indicate N.A. if not applicable.

1.    MAPS:

In addition to the Sanborn or other land use map requested in Part I, provide a tax map and zoning map showing the boundaries of the directly affected area.

The Sanborn map requested in Part I is attached as Figure 4. Tax maps and a zoning map showing the approximate boundaries of the proposed National Park Service easement and the existing Hamilton Grange site are attached as Figures 5a and b and 6, respectively.

2.    PHYSICAL SETTING (both developed and undeveloped areas):

Total square feet of directly affected area:    approx. 67,300    square feet

The directly affected area includes the existing Grange site located at 287 Convent Avenue (approx. 4,700 sq. ft); the 0.93-acre portion of St. Nicholas Park proposed as a permanent easement to the United States National Park Service for the relocation of the Grange; and the Convent Avenue and West 141st Street right of ways in the immediate project vicinity. (see Figures 1 and 2).

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

    **Current general breakdown of area:**

        **Water surface area:**   0   **square feet**

        **Roads, buildings and other paved surfaces:** approximately 26,800 square feet of buildings, walkways, roadways and other impervious areas (existing Hamilton Grange site and Convent Avenue and West 141st Street right-of-ways).

        **Other:** approx. 40,500 square feet of lawn and landscape area (proposed NPS easement within St. Nicholas Park).

**3.    PRESENT LAND USE:**

    **Residential** Not Applicable

    **Total no. of dwelling units**   0

    **Number of low-to-moderate income units**[*]  N/A

    **Gross floor area**    N/A    **square feet**

    **Number of stories**    N/A

    **Describe type of residential structures:** N/A

    **Commercial** Not Applicable

    **Retail** N/A **Number of buildings and gross floor area of each building (sq. ft.):**

    **Office** N/A **Number of buildings and gross floor area of each building (sq. ft.):**

    **Other** N/A **Number of buildings and gross floor area of each building (sq. ft.):**

    **Specify type(s):**

    **Number of stories and height of each building**

        N/A

---

[*] Low-to-moderate income units are with monthly carrying costs of not more than 30% of the median area monthly income. The Department of Housing Preservation and Development may be contacted for assistance in applying this definition.

**Manufacturing/Industrial**   Not Applicable

**Type of use(s):**    N/A

**Number of buildings and gross floor area of each building (sq. ft):** N/A

**Number of stories and height of each building:** N/A

**Open storage area**   N/A   **square feet**

**If any unenclosed activities, specify:** N/A

**Community facility**

**Number of buildings and gross floor area of each building (sq. ft.):** 0

**Number of stories and height of each building:** N/A

**Type of community facility:**  Parkland

The directly affected area consists of the existing Hamilton Grange site at 287 Convent Avenue, an approximate 0.93-acre portion of St. Nicholas Park, and the Convent Avenue and West 141st Street right of ways in the immediate project vicinity. The portion of St. Nicholas Park considered for the NPS easement is currently used for passive recreation activities and consists of lawn and landscaped areas bisected by a walking path.

**Vacant land**

**Is there any vacant land in the directly affected area?  Describe briefly.**

No.  The directly affected area comprises a 0.93-acre portion of St. Nicholas Park, the existing Hamilton Grange site located at 287 Convent Avenue, and the Convent Avenue and West 141st Street right of ways in the immediate project vicinity.

**Publicly accessible open space**

**Is there any existing publicly accessible open space in the directly affected area? Describe briefly.**

Yes, the directly affected area includes a 0.93-acre portion of St. Nicholas Park, which is owned and administered by the City of New York Department of Parks and Recreation. The existing Hamilton Grange site was open to the public until June of 1992, when it was closed due to the unsafe structural condition of the building.

The proposed action will result in the grant of a permanent easement to the United States National Park Service (NPS) and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial, to a 0.93-acre portion of St. Nicholas Park. The proposed grant of easement will not preclude public access to the directly affected area. The proposed relocation of the Hamilton Grange to St. Nicholas Park will allow for the development of enhanced visitor programs at the relocated memorial and provide a setting for the Hamilton Grange which is reminiscent of the structures original location as intended by the 1962 Act of Congress which designated the Hamilton Grange as a National Memorial.

In addition, temporary construction impacts will be experienced within the directly affected area, including increases in ambient noise levels, excavation within St. Nicholas Park, tree removal, and alterations to existing traffic patterns, during the physical relocation of the Grange. Additionally, some existing street trees and streetscape elements (i.e. fire hydrants, street lights, pedestrian crossing signal, etc.) along the moving route on Convent Avenue and West 141st Street and trees within St. Nicholas Park will need to be removed to facilitate the relocation of the Grange. A number of mitigation measures have been developed by the NPS in coordination with the City of New York, Parks and Recreation to address these temporary construction impacts (see Section C and F of this Part II). The intent of these mitigation measures will be to achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st Street which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit to local residents.

**Does the directly affected area include any mapped City, State or Federal parkland or any mapped or otherwise known wetland?**

Yes, the existing Hamilton Grange site at 287 Convent Avenue is a National Memorial administered by the National Park Service. In addition, a portion of the directly affected area is currently part of St. Nicholas Park which is administered by the City of New York, Parks and Recreation. The proposed action will result in the grant of a permanent easement to the United States National Park Service (NPS) and associated city map change by the City of New York for the proposed relocation of the Hamilton Grange National Memorial.

**Other land use**  Not Applicable
**Gross floor area** _____ sq. ft.
**Number of stories** _____ .
**Type of use:** _____ .

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

4.   **EXISTING PARKING:**

There is no designated on- or off-street parking for visitors to St. Nicholas Park or the existing Hamilton Grange National Memorial site at 287 Convent Avenue.

**Garages:**

**Number of spaces accessible to public:** _0___

**Number of spaces not accessible to public:** _0___

**Attended or non-attended?** __N/A_____

**Operating hours:** __N/A____

**Self-park:** N/A

**Non-self-park (please specify):**

**Lots:**

**Number of spaces accessible to public:** _0_.

**Number of spaces not accessible to public:** 0_.

**Attended or non-attended?** N/A

**Operating hours:** N/A

**Self-park:** N/A

**Non-self-park (please specify)**

**Other** (including street parking) – please specify and provide same data as for lots and garages, as appropriate.

5.   **STORAGE TANKS:**

**Gas or service stations** _0___

**Oil storage facility** _0___

**Other, specify:**

**Size of tanks:** N/A

**Last NYFD inspection date:**

**Location and depth of tanks:** N/A

12

A letter was sent to Mr. Ralph Palmer, Chief of Fire Prevention with the New York City Fire Department on June 26, 2000 to determine if any underground tanks exist within the boundaries of the proposed National Park Service easement within St. Nicholas Park. Correspondence received from the New York City Fire Department indicates that no storage tanks are known to be present within the directly affected area.

In addition, the City of New York Department of Environmental Protection (NYCDEP) was contacted to confirm the presence/absence of known hazardous materials within the directly affected area. Correspondence received from the NYCDEP, dated July 20, 2000, indicates that there are no known occurrences of hazardous materials within the directly affected area.

Copies of the agency correspondence referenced above are attached as Appendix C of this EAS.

6.    **CURRENT USERS:**

**Number of residents:**  0

**Number and type of businesses:**  0

**Number and type of workers by business:**  0

**Number and type of non-residents who are not workers:**  0

The directly affected area includes the existing Hamilton Grange site at 287 Convent Avenue; an approximate 0.93-acre portion of St. Nicholas Park, and the Convent Avenue and West 141st Street right of ways in the immediate project vicinity. St. Nicholas Park, which is owned and administered by the City of New York, Department of Parks and Recreation, is open to the general public. During the period between 1986 and 1991, more than 40,000 visitors per year visited the Hamilton Grange site at 287 Convent Avenue. The site has been closed to visitors since June 1992.

7.    **HISTORIC AND ARCHAEOLOGICAL RESOURCES:**

**Answer the following two questions with regard to the directly affected area, lots abutting that area, lots along the same blockfront or directly across the street from the same blockfront and, where the directly affected area includes a corner lot, lots which front on the same street intersection. (See Section F of the EAS Guidebook).**

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

**Do any of the areas listed above contain an improvement, interior, landscape feature, aggregate of landscape features, or archaeological resource that:**

**(a)    has been designated (or is calendared for consideration as) a New York City Landmark, Interior Landmark or Scenic Landmark;**

**(b)    is within a designated New York City Historic District;**

**(c)    has been listed on, or determined eligible for, the New York State or National Register of Historic Places;**

**(d)    is within a New York State or National Register Historic District; or**

**(e)    has been recommended by the New York State Board for listing on the New York State or National Register of Historic Places?**

**Identify any resource.**

- The Hamilton Grange National Memorial; and
- The Hamilton Heights Historic District.

Hamilton Grange. The Hamilton Grange was designated a national historic landmark in 1960. In 1962 the Grange was authorized as a national memorial within the National Park Service by an Act of Congress under Joint Resolution of April 27, 1962.  In 1967, the City of New York Landmarks Preservation Commission designated the house as a landmark. The current Convent Avenue site of the Hamilton Grange is not the structure's original site.  The home was moved in 1889 by a real estate developer and donated to St. Lukes Episcopal Church (see previous Figure 3). The granting of an easement by the City of New York, Parks and Recreation to facilitate the proposed relocation of the Grange to St. Nicholas Park, which is located south of 141st Street in the immediate vicinity of the current Hamilton Grange site on Convent Avenue, will allow for the development of enhanced interpretive programs and provide a setting for the Grange which is reminiscent of the structures original location as intended by the 1962 Act of Congress.

Hamilton Heights Historic District.  Much of the area surrounding the Grange has been listed on the NPS National Register of Historic Places as the Hamilton Heights Historic District to recognize the various architectural styles and development in the area during the period of 1886 – 1906, with some examples extending to the 1930s.  The district, which has also been designated by the New York City as a landmark district, includes the area roughly between  West 140th and West 145th Streets and Amsterdam and St. Nicholas Avenues.  The Hamilton Grange is a contributing resource to this district (see Figure 3).

**Do any of the areas listed in the introductory paragraph to 7 on page 12 contain any historic or archaeological resource, other than those listed in response to the previous question? Identify any resource.**

No. Significant impacts to the historic resources identified above are not anticipated as a result of the proposed action. Additionally, impacts to unidentified archaeological resources that could be present at the proposed relocation site within St. Nicholas Park are not anticipated. Preliminary site investigations by the National Park Service's architectural consultant for this project, Beyer Blinder Belle, indicate that due to the close proximity of bedrock to the ground surface at the proposed relocation site, it is unlikely that unidentified archaeological artifacts will be encountered during proposed excavations. Prior to project excavation activities, however, the National Park Service will conduct a more detailed investigation of the proposed relocation site to discover any underlying historical data/artifacts.

8.    **WATERFRONT:**

**Is any part of the directly affected area within the City's Waterfront Revitalization Program boundaries? (A map of the boundaries can be obtained at the Department of City Planning bookstore.) If yes, append a map showing the directly affected area as it relates to such boundaries. A map requested in other parts of this form may be used. (See Section K of the EAS Guidebook.)**

No. The directly affected area is not located within any designated coastal zone.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

---

C.    **PROJECT DESCRIPTION**

**This subpart should generally be completed only if your action includes a specific or known development at particular locations.**

The proposed action addressed by this EAS is the grant by the New York City Department of Parks and Recreation of a permanent easement to the United States National Park Service for a 0.93-acre parcel within St. Nicholas Park to facilitate the relocation of the Hamilton Grange. As such, many of the items listed below, are not applicable to the proposed action. However, where appropriate, information on the proposed relocation of the Hamilton Grange has been included to ensure an adequate assessment of potential environmental impacts.

1.    **PROPOSED USES:**

**Residential**  Not Applicable

**Total no. of dwelling units** _0_ .

**Number of low-to-moderate income units** _0_ .

**Gross floor area** _0_ **square feet**

**Number of stories** _0_ .

**Describe type of residential structures:**

**Commercial**  Not Applicable

**Retail** _0_ **Number of buildings and gross floor area of each building (sq. ft.):**

**Office** _0_ **Number of buildings and gross floor area of each building (sq. ft.):**

**Other** _0_ **Number of buildings and gross floor area of each building (sq. ft.):**

**Specify type(s):**

**Number of stories and height of each building**

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

**Manufacturing/Industrial** <u>Not Applicable</u>

**Type of use(s):** N/A

**Number of buildings and gross floor area of each building (sq. ft.):** 0

**Number of stories and height of each building:** 0

**Open storage area:** <u>    0    </u>square feet

**If any unenclosed activities, specify:**

**Community facility**

**Number of buildings and gross floor area of each building (sq. ft.):**

One building (the relocated Hamilton Grange) consisting of 7,222 square feet of floor
area. Floor area includes porches.

**Number of stories and height of each building:**

Three stories, 39.5 feet high

**Type of community facility:**  National Memorial - Historic house open to the public.

The proposed grant of easement and associated City map change by the City of New York
will facilitate the relocation of the Hamilton Grange National Memorial.  The proposed
relocation will ensure that the Grange is "preserved in a fitting setting" for its proper
administration and interpretation as a national memorial and allow for the development of
enhanced interpretive visitor programs and provide a setting for the Hamilton Grange
which is reminiscent of the structures original location as intended by the 1962 Act of
Congress.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

### Vacant land

**Is there any vacant land in the directly affected area?  Describe briefly.**

No.   The directly affected area comprises an approximate 0.93-acre portion of St. Nicholas Park, the existing Grange site at 287 Convent Avenue, and the Convent Avenue and West 141st Street right of ways in the immediate project vicinity.

### Publicly accessible open space

**Any existing publicly accessible open space to be removed or altered?   If yes, describe:**

Yes, the proposed National Park Service easement will be located within St. Nicholas Park. The proposed grant of easement will not preclude public access to this portion of the directly affected area.   This area, however, will be managed by the National Park Service as the Hamilton Grange National Memorial.

In addition, temporary construction impacts, including increases in ambient noise levels, excavation within St. Nicholas Park, tree removal, and alterations to existing traffic patterns in the immediate project area, will be experienced during the physical relocation of the Grange. Additionally, some existing street trees and streetscape elements (i.e. fire hydrants, street lights, pedestrian crossing signal, etc.) along the moving route and trees within St. Nicholas Park will need to be removed to facilitate the relocation of the Grange. Additional mitigation, beyond that identified in the NEPA environmental review, has been developed by the NPS in coordination with the City of New York, Parks and Recreation to address these impacts. The intent of this additional mitigation will be to achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit to local residents. These additional mitigation measures include:

- Replacement/relocation of street trees required to be removed along Convent Avenue and West 141st Street.  Significant efforts shall be made to relocate or replant in place as many existing street trees as possible and/or practicable;

- Replacement of missing street trees on West 141st Street;

- Inspection and maintenance of existing street trees along the proposed move route by a certified arborist;

- Transplantation of Hawthorne Tree in St. Nicholas Park;

- Planting of new trees and landscaping within St. Nicholas Park and within the adjacent neighborhood. The placement of new trees will be in accordance with the City of New York, Parks and Recreation Basil Area Replacement Formula policy. The placement of replacement trees will be coordinated with the City of New York, Parks and Recreation.

- Streetlight upgrades along West 141st Street. Fixtures will be period lighting sympathetic to the historic character of the Hamilton Heights Historic District and the Grange itself. The fixtures will not be dissimilar to the traditional "sheperd's crook" fixtures currently in place along Covent Avenue;

- Replacement of existing sidewalks along the move route on Convent Avenue and West 141st Street; and

- Siting considerations for the relocated Grange within St. Nicholas Park to minimize required excavations and tree removals.

- The NPS, in coordination with the City of New York, Parks and Recreation, will develop a community notification program to inform local residents of upcoming significant project activities. This program shall include, but not be limited to, holding community information meetings and notification via certified U.S. mail of significant project milestones/construction activity at least six months prior to their commencement.

The implementation of these mitigation measures, in addition to those outlined as part of the Hamilton Grange General Management Plan NEPA review, will ensure that construction impacts are minimized to the maximum extent practicable.

**Any publicly accessible open space to be added?  If yes, describe:**

_____**No**

The proposed action will facilitate the relocation of the original first and second floors of the Hamilton Grange across 141st Street to St. Nicholas Park. Once relocated, the Grange will be restored, to the greatest degree possible, to its appearance during Hamilton's residency. In addition, the relocation will allow for the development of enhanced interpretive programs for Grange visitors.

As part of the Grange General Management Plan, a new structure will be constructed by the NPS at the current Hamilton Grange site at 287 Convent Avenue. The new building, to be no more than two stories and built on the 1889 Grange foundation, would emphasize heritage, education and community involvement. A multipurpose meeting

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

room would occupy the main floor, where educational programs and community meetings could be held. Space would also be provided for exhibits to depict the growth, and development of Harlem; the role of the Grange in the community; the role of St. Luke's parish in preserving the Grange; and broader community preservation efforts. This new structure would be designed to be compatible and enhance the qualities for which the Hamilton Heights Historic District was established.

**Other land use**   Not Applicable

**Gross area  0  sq. ft.**

**Number of stories  0**

**Type of use: N/A**

## 2.    PROPOSED PARKING:

As with the existing Grange site, no designated on or off-street parking will be available to visitors at the relocated Grange. However, non-designated, on-street parking, is available on St. Nicholas Avenue and in the immediate project vicinity. The National Park Service has indicated that it will meet with City College to identify existing parking spaces at the College that could be made available to visitors of the Grange.

**Garages:** Not Applicable

**Number of spaces accessible to public: 0   .**

**Number of spaces not accessible to public: 0   .**

**Attended or non-attended?  N/A .**

**Operating hours: N/A .**

**Self-park: N/A .**

**Non-self-park (please specify): N/A .**

**Lots:**  Not Applicable

**Number of spaces accessible to public:** N/A .

**Number of spaces not accessible to public** N/A .

**Attended or non-attended?** N/A .

**Operating hours** N/A .

**Self-park:** N/A .

**Non-self-park (please specify):** N/A .

**Other (including street parking) - please specify and provide same data as for lots and garages, as appropriate.**

Non-designated, on-street parking, is available on St. Nicholas Avenue and in the immediate project vicinity. The National Park Service has indicated that it will meet with City College to identify existing parking spaces at the College that could be made available to visitors of the Grange.

**Number and location of proposed curb cuts:**          0

3.   **PROPOSED STORAGE TANKS:**   Not Applicable

**Gas or service stations:** N/A

**Oil storage facility:** N/A

**Other, specify:** N/A

**Size of tanks:** N/A

**Last NYFD inspection date:**          N/A

**Location and depth of tanks:**          N/A

According to correspondence received from the City of New York Fire Department and Department of Environmental Protection, no storage tanks are known to exist within the directly affected area (see Appendix C).

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

4.    **PROPOSED USERS:**

**Number of residents:**  0

**Number and type of businesses:**  0

**Number and type of workers by business:**  0

**Number and type of non-residents who are not workers:** To be determined.

During the period between 1986 and 1991, the number of visitors to the Hamilton Grange averaged more than 40,000 visitors per year (41,378). The site has been closed to visitors since June 1992. The number of annual visitors may increase, however, as a result of the Grange relocation and enhanced visitor programs.

5.    **HISTORIC AND ARCHAEOLOGICAL RESOURCES:**

**Will the action affect any historic or archaeological resource identified in response to either of the two questions at number 7 on page 14? Describe briefly.**

Yes, the proposed action will affect the Hamilton Grange and the Hamilton Heights Historic District. Beneficial cultural and historic impacts to these resources are anticipated as a result of the restoration of the Hamilton Grange National Memorial and the development of enhanced interpretive programs at the structure's new setting.

In regards to potential historic and archaeological impacts, as part of the recent reassessment of the NEPA environmental review conducted for the Hamilton Grange General Management Plan, the National Park Service, in conjunction with the City of New York, Parks and Recreation, contacted the City of New York Landmarks Preservation Committee (LPC) to request their comments on the proposed relocation of the Hamilton Grange. Correspondence received from the Landmarks Preservation committee on October 24, 2000 indicates that for the proposed relocation "[t]he LPC findings of 1993 and 1995 still apply". The LPC findings of 1993 and 1995 indicate "the Commission found that moving the building from its present non-original site to a new location within St. Nicholas Park would enable the mansion to be fully restored to its original appearance...Based on these findings, the work is found to be appropriate." Project-related correspondence with the LPC is included as Appendix C of this EAS.

Further, impacts to unidentified archaeological resources that could be present at the proposed relocation site within St. Nicholas Park are not anticipated. Preliminary site investigations by the National Park Service's architectural consultants for this project,

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

Beyer Blinder Belle, indicate that due to the close proximity of bedrock to the ground surface at the proposed relocation site, it is unlikely that unidentified archaeological artifacts will be encountered during required site excavations.    Prior to excavation activities, however, the National Park Service will conduct a more detailed investigation of the proposed relocation site to discover any underlying historical data/artifacts.

6.    **DISPLACEMENT:**

**Will the action directly displace specific business or affordable and/or low income residential units?  Describe briefly.  (See Section C of the EAS Guidebook.)**

No displacement will occur as a result of the proposed action.

7.    **CHANGES TO EXISTING COMMUNITY FACILITIES:**

**Will the action directly eliminate, displace or alter public or publicly funded community facilities such as educational facilities, libraries, hospitals and other health care facilities, day care centers, police stations, or fire stations?  (See Section D of the EAS Guidebook.)**

The proposed action will result in the grant of a permanent easement to the United States National Park Service for a 0.93-acre parcel within St. Nicholas Park to facilitate the relocation of the Hamilton Grange. The proposed grant of easement will not preclude public access to the directly affected area.  The directly affected area, however, will be managed by the National Park Service as the Hamilton Grange National Memorial.

D.    **ZONING INFORMATION**

**What is the zoning classification(s) of the directly affected area?**

The directly affected area is located within the R7-2, General Residence, zoning district. (see previous Figure 6).

**What is the maximum amount of floor area that can be developed in the directly affected area under the present zoning? Describe in terms of bulk for each use.**

According to the New York City *Zoning Resolution,* the R7-2 zoning district is subject to a maximum floor area ratio of 5.0. Therefore, considering a proposed National Park Service Easement of 0.93 acres, approximately 198,000 square feet of residential development could be developed within that portion of the directly affected area. Approximately 23,500 square feet of development could occur at the existing Grange site at 287 Convent Avenue.

**What is the proposed zoning of the directly affected area?**

Not Applicable. The directly affected area will not be rezoned as part of the proposed action.

**What is the maximum amount of floor area that could be developed in the directly affected area under the proposed zoning? Describe in terms of bulk for each use.**

Not Applicable. The directly affected area will not be rezoned as part of the proposed action.

**What are the predominant land uses and zoning classifications within a 1/4 mile radius of the proposed action?**

Land Uses: Parkland, residential, educational facilities and commercial uses.

Zoning Districts:    C1 – Local Shopping and Services;
                     C2 – Local Shopping and Services with Residential Uses;
                     R7 – General Residence District; and
                     R8 – General Residence District

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## E.    ADDITIONAL INFORMATION

Attach any additional information as may be needed to describe the action. If your action involves changes in regulatory controls that affect one or more sites not associated with a specific development, it is generally appropriate to include here one or more reasonable development scenarios for such sites and, to the extent possible, to provide information about such scenario(s) similar to that requested in subpart C on pages 15-19 above.

See below.

## F.    ANALYSES

Attach analyses for each of the impact categories listed below (or indicate where an impact category is not applicable). For localized actions, sections B through N of the EAS Guidebook set forth methodologies developed by the City to be used in analyses prepared for the listed categories. Other methodologies developed or approved by the lead agency may also be utilized. If a different methodology is contemplated, it may be advisable to consult with OEC. For areawide/programmatic actions, consult section A of the guidebook. You should also attach any other necessary analyses or information relevant to the determination whether the action may have a significant effect on the environment, including, where appropriate, information on combined or cumulative impacts, as might occur, for example, where actions are interdependent or occur within a discrete geographical area or time frame.

If you believe that a positive declaration is appropriate because the action may have a significant effect on the environment, you may indicate that here and explain briefly. In that case, the analyses otherwise required by this subpart do not have to be submitted (unless the lead agency specifically requests them).

25

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

**Neighborhood character - Section B of the EAS Guidebook**
**Socioeconomic analysis/displacement - Section C of the EAS Guidebook**
**Community facilities - Section D of the EAS Guidebook**
**Open space - Section E of the EAS Guidebook**
**Historic and archaeological resources - Section F of the EAS Guidebook**
**Transportation - Section G of the EAS Guidebook**
**Air quality - Section H of the EAS Guidebook**
**Infrastructure\* and energy impacts - Section I of the EAS Guidebook**
**Natural resources - Section J of the EAS Guidebook**
**Waterfront Revitalization Program - Section K of the EAS Guidebook**
**Hazardous materials - Section L of the EAS Guidebook**
**Noise - Section M of the EAS Guidebook**
**Solid waste - Section N of the EAS Guidebook**

This EAS is submitted in accordance with the New York City Environmental Quality Review to address the grant of a permanent easement to the United States National Park Service and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial. The physical relocation of the Hamilton Grange is proposed as part of the *General Management Plan* for Hamilton Grange National Memorial, which was the subject of a detailed and comprehensive environmental review prepared by the NPS in accordance with the National Environmental Policy Act. That review resulted in the issuance of a Record of Decision in July of 1995 (see Appendix A). Therefore, as provided by the CEQR regulations, materials prepared for other purposes, specifically, the *Draft General Management Plan/Environmental Impact Statement* (DEIS), the *Final General Management Plan Environmental Impact Statement* and NEPA Record of Decision prepared as part of the project's NEPA environmental review, have been used to satisfy Section F, Analyses, of Part II of the EAS document.

---

\* For purposes of this form, infrastructure refers only to the means by which wastewater is discharged and drinking water is supplied.

The NEPA Record of Decision is attached as Appendix A of this EAS. The *Draft General Management Plan/Environmental Impact Statement* (DEIS) and *Final General Management Plan Environmental Impact Statement* are herein incorporated by reference and can be reviewed at the following locations:

> NYC Department of Parks and Recreation
> The Arsenal, Central Park
> New York, New York 10021
>
> United States National Park Service
> Northeast Regional Development Office
> 26 Wall Street
> New York, New York 10005
>
> New York City Department of City Planning
> Environmental Assessment and Review Division
> 22 Reade Street, 4E
> New York, New York 10007
>
> Manhattan Community Board #9
> 565 West 125th Street
> New York, New York 10027

No substantive changes have occurred to the Final General Management Plan for the Hamilton Grange since issuance of the July 1995 NEPA Record of Decision. However, to ensure the "hard look" at potential impacts required by CEQR, in June 2000 the National Park Service has reassessed the *Final General Management Plan Environmental Impact Statement* prepared for the proposed Hamilton Grange Relocation, dated January 1995, and the July 1995 NEPA Record of Decision. Where appropriate, text contained within the FEIS has been revised to reflect recent changes in the affected environment or the assessment of potential impacts. These revisions are identified in the FEIS addendum attached as Appendix B of this Part II. The re-evaluation of the FEIS document established that there have been no significant changes in the affected environment or the assessment of impacts contained within the FEIS and reaffirmed the validity of the Record of Decision for the *Final General Management Plan*.

In addition to the reassessment of the NEPA environmental review conducted for the proposed Hamilton Grange General Management Plan, the National Park Service undertook an assessment of the feasibility and associated impacts of the proposed relocation of the Hamilton Grange. The results of this assessment are summarized in the report, *The Relocation of the Hamilton Grange – Assessment of Feasibility and Associated Impacts*, dated November 8, 2000. The report, attached as Appendix D of this EAS, outlines the various building move methodologies considered; describes the recommended procedures for relocation; assesses potential construction impacts associated with the building move; and identifies mitigation measures for to ensure amelioration of identified construction impacts.

In summary, the report concluded that the relocation of the Grange is very feasible; identifying that the preferred move alternative would relocate the Grange in one piece, separated from the lower two, non-original floors (see Figure 7). A multi-part move was determined to be detrimental to the 200-year old Grange. The preferred move methodology would involve moving the Grange west to Convent Avenue. This would require dismantling the adjacent St. Luke's Parish porch or raising the Grange over the porch. Once rolled to Convent Avenue, the Grange would be rotated counterclockwise 90 degrees to project a slightly narrower profile, and rolled south on self-powered, rubber-tired dollies down Convent Avenue to the intersection of West 141st Street. At West 141st Street the dollies will be adjusted to move in an easterly direction without rotating the house. Additionally, a large construction vehicle will be set at the intersection of Convent Avenue and West 141st Street to act as an anchor to assist in rolling the Grange east along sloping West 141st Street to a position slightly above the receiver site in St. Nicholas Park. At this point the dollies will be realigned and the Grange rolled southward into the park. A preliminary site plan for the relocated Grange is attached as Figure 8.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

During the relocation of the Grange, temporary construction impacts, including increases in ambient noise levels, excavation within St. Nicholas Park, tree removal, and alterations to existing traffic patterns will be experienced within the immediate project area. Additionally, some existing street trees and streetscape elements (i.e. fire hydrants, street lights, pedestrian crossing signal, etc.) along the moving route and trees within St. Nicholas Park will need to be removed to facilitate the relocation of the Grange. Damage to the roadway surface of and utilities within Convent Avenue and West 141st Street will not occur as a result of the relocation. The weight of the Grange will be distributed over multiple rubber-tired dollies. The result of this distribution is that the weight of the Grange will exert no more pressure on the roadway surface than that of a typical car or truck.

To address these impacts the report, *The Relocation of the Hamilton Grange – Assessment of Feasibility and Associated Impacts*, identifies mitigation/improvements proposed by the NPS to ensure that temporary, construction related impacts are minimized to the maximum extent practicable. The measures, which were developed in coordination with the City of New York, Parks and Recreation, are intended to achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st Street which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit to local residents. These additional mitigation measures include:

- Replacement/relocation of street trees required to be removed along Convent Avenue and West 141st Street. Significant efforts shall be made to relocate or replant in place as many existing street trees as possible and/or practicable;
- Replacement of missing street trees on West 141st Street;
- Inspection and maintenance of existing street trees along the proposed move route by a certified arborist;
- Transplantation of Hawthorne Tree in St. Nicholas Park;

- Planting of new trees and landscaping within St. Nicholas Park and within the adjacent neighborhood. The placement of new trees will be in accordance with the City of New York, Parks and Recreation Basil Area Replacement Formula policy. The placement of replacement trees will be coordinated with the City of New York, Parks and Recreation.

- Streetlight upgrades along West 141st Street. Fixtures will be period lighting sympathetic to the historic character of the Hamilton Heights Historic District and the Grange itself. The fixtures will not be dissimilar to the traditional "sheperd's crook" fixtures currently in place along Covent Avenue;

- Replacement of existing sidewalks along the move route on Convent Avenue and West 141st Street; and

- Siting considerations for the relocated Grange within St. Nicholas Park to minimize required excavations and tree removals.

- The NPS, in coordination with the City of New York, Parks and Recreation, will develop a community notification program to inform local residents of upcoming significant project activities. This program shall include, but not be limited to, to holding community information meetings and notification via certified U.S. mail of significant project milestones/construction activity at least six months prior to their commencement.

The implementation of these mitigation measures, in addition to those outlined as part of the Hamilton Grange General Management Plan NEPA review, will ensure that temporary construction impacts are minimized to the maximum extent practicable.

For a more detailed description of the move methodologies considered and construction impacts identified, please see the full report, *The Relocation of the Hamilton Grange – Assessment of Feasibility and Associated Impacts*, dated November 8, 2000 included as Appendix D of this EAS.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## G.    APPLICANT CERTIFICATION

Preparer name:    Kevin J. Maher, TRC Environmental

Preparer signature:

Date:    12/6/00

Principal:    City of New York, Parks and Recreation

Name of principal representative:    Jane Cleaver

Title of principal representative:    Chief of Parklands

Signature of principal representative:

Date:    Dec 6, 2000

NOTE:  Any person who knowingly makes a false statement or who knowingly falsifies
any statement on this form or allows any such statement to be falsified shall be guilty of
an offense punishable by fine or imprisonment or both, pursuant to section 10-154 of the
New York City Administrative Code, and may be liable under other applicable laws.



Project Area



**Proposed Relocation of the Hamilton Grange**
**St. Nicholas Park**
**Manhattan, New York**

Figure 1. Site Location
Scale: 1:1000'

Source: USGS Topographical Survey Maps
        Central Park N.Y. - N.J. Quadrangle, Photorevised 1979





**Proposed Relocation of the Hamilton Grange**
**St. Nicholas Park**
**Manhattan, New York**

Figure 2. Hamilton Grange Relocation:
Concept Plan

Source: National Park Service, 1992





**Proposed Relocation of the Hamilton Grange**
**St. Nicholas Park**
**Manhattan, New York**

Figure 3. Hamilton Grange:
Location History

Source: National Park Service, 1992





287 Convent Avenue:
Existing Location of
Hamilton Grange

Approximate Location of
Proposed NPS Easement for
Relocation of Hamilton Grange

- Directly Affected Area

Proposed Relocation of the Hamilton Grange
St. Nicholas Park
Manhattan, New York

Figure 4. Sanborn Map

Source: Sanborn Mapping and Geographic Information Service,
1999





Approximate Location of Proposed NPS Easement for Relocation of Hamilton Grange

Proposed Relocation of the Hamilton Grange
St. Nicholas Park
Manhattan, New York

Figure 5a. Tax Map:
Proposed Hamilton Grange Relocation Site

Source: City of New York







**Proposed Relocation of the Hamilton Grange**
**St. Nicholas Park**
**Manhattan, New York**

Figure 5b. Tax Map:
287 Convent Avenue - Existing Hamilton Grange Site

Source: City of New York





Zoning Legend:
R7-2: General Residence District

**Proposed Relocation of the Hamilton Grange**
St. Nicholas Park
Manhattan, New York

Figure 6. Zoning Map

Source: New York City *Zoning Resolution*





MOVE ROUTE
HAMILTON GRANGE NATIONAL MEMORIAL
MANHATTAN SITES

0    30'    60'    120'

**Proposed Relocation of the Hamilton Grange**
**St. Nicholas Park**
**Manhattan, New York**

Figure 7.  Moving Plan
Scale: As Shown

Source: Beyer Blinder Belle, October 2000





ST. NICHOLAS PARK RECEIVER SITE
HAMILTON GRANGE NATIONAL MEMORIAL
MANHATTAN SITES



**Proposed Relocation of the Hamilton Grange**
**St. Nicholas Park**
**Manhattan, New York**

Figure 8. Preliminary Site Plan
Scale: As Shown

Source: Beyer Blinder Belle, October 2000

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

**Appendix A:**

**Final General Management Plan Environmental Impact Statement:**

**NEPA Record of Decision**

United States Department of the Interior
National Park Service

RECORD OF DECISION

General Management Plan
Hamilton Grange National Memorial
New York County, New York

## INTRODUCTION

A 1962 act of Congress authorized the establishment of a Hamilton Grange
National Memorial to commemorate the historic role played by Alexander Hamilton
in the establishment of our nation. The act further directed that the house
eventually be relocated for its proper administration and interpretation as a national
memorial. The site proposed at that time by a National Park Service planning effort
was about 10 blocks from the present location on Convent Avenue near 141st
Street. The house was not moved, and because of a congressional funding ceiling,
only minor rehabilitation projects were undertaken over the next decade.

New legislation was passed in 1988 (Public Law 100-701) amending the earlier
legislation by establishing a boundary, authorizing the acquisition of the land on
which the house sits, and authorizing the expenditure of up to $2.5 million for
development. This legislation also required that a general management plan be
completed to "identify appropriate facilities for proper interpretation of the site for
visitors."

Long-range planning for the Grange was begun in 1991. The planning process
was complete in March 1995 when the *Final General Management
Plan/Environmental Impact Statement (FEIS) for Hamilton Grange National
Memorial* was released to the public. Pursuant to the National Environmental
Policy Act of 1969 and the regulations promulgated by the Council on
Environmental Quality at 40 CFR 1505.2, the Department of Interior/National Park
Service has prepared this Record of Decision to document the outcome of this
planning process. This Record of Decision (ROD) is a concise statement of what
decisions were made, the criteria used to make this decision, alternatives that
were considered, and the mitigating measures developed to avoid or minimize
environmental and social impacts.

1

## DECISION

The National Park Service will implement the preferred alternative (alternative 4 ) - Relocation and Restoration - as described in the *Final General Management Plan/Environmental Impact Statement* dated January 1995 and filed with the Environmental Protection Agency in March 1995.

## SUMMARY OF ALTERNATIVES

### Preferred Alternative

The original woodframe first and second floors and attic of the Grange will be relocated across the street to a portion of St. Nicholas Park, a park owned and administered by the City of New York Department of Parks and Recreation. Approximately 0.91 acres on the northern edge of the park will be transferred to the National Park Service for the relocation. The concept has been reviewed and generally approved by the city. Specific issues will be addressed in future negotiations. Landscaping around the Grange will be evocative of Hamilton's period and will include thirteen sweet gums commemorating the original colonies.

In its new location, the Grange will be fully restored in accordance with the approved *Historic Structure Report* and NPS *Management Policies* and new information learned during the move. The Grange's exterior will be restored as closely as possible to its historic appearance, with all doors, windows, and porches in their original places. The main door will be relocated to its original position, and the entrance porch will be reconstructed. The house will oriented to the southwest, and visitors will approach the house from the northeast as Hamilton's guests would have done. Most visitors will enter the house through a new, fully accessible doorway on the northeast to an orientation center on the ground floor level. However, a curving walk will lead from 141st Street around the house to its formal front entrance. Groups and guests attending ceremonies and special commemorative occasions will enter through the restored front door.

A new masonry and stone subbasement and ground floor will be constructed at the new site to complement the original building in size, scale, and material. However, these additions will be clearly differentiated from the original Grange so as not to create a false historical appearance. A concealed steel framing system will be inserted to stabilize the building and provide adequate load-bearing capacity. An elevator in the northwest corner will provide access to all floors.

Visitor contact will be in the ground level floor, which will have a lobby, a theater, an information desk and book sales area, staff space, and fully accessible public restrooms. Exhibits and other interpretive media will orient visitors to all the major

2

themes of Alexander Hamilton and the Grange, as well as the house's historic setting and the changes it has undergone. Four rooms on the first floor will be refurnished, as will the front entry hall, to the reflect the house as it appeared during Hamilton's occupancy. The dining room and parlor will be fully restored, as will the room off the entry hall as Hamilton's library. Because less is known about the five private rooms on the second floor, these will be developed as interpretive space with exhibits about the military, political, and professional accomplishments of Hamilton.

Security for the site will be provided by NPS rangers. Rangers will be on duty at the Grange 24 hours a day and will live in the housing provided at the new structure on Convent Avenue (see below). A security and fire alarm and suppression systems will be installed at both sites. A decorative iron security fence will be installed around the perimeter of the new site, and appropriate walk and security lighting and decorative house lighting will be installed. The historic shutters will be used to secure the house from unauthorized entry when the site is closed.

The plan for Convent Avenue, the current location of the Grange, is to construct a new structure for public and NPS uses. The new building, no more than two stories and built on the 1889 Grange foundation, will emphasize heritage education and community involvement. A multipurpose meeting room will occupy the main floor, where educational programs and community meetings may be held. Space will also be provided for exhibits to depict the growth and development of Harlem, the role of the Grange in the community, the role of St. Luke's parish in preserving the Grange, and broader community preservation efforts. The lower levels will be developed as apartments for housing NPS law enforcement rangers and for site storage needs and maintenance operations.

**Other Alternatives**

The National Environmental Policy Act requires that a range of alternatives be evaluated for proposed federal actions, including a no-action alternative. The *FEIS* for Hamilton Grange analyzes the selected plan above as well as three additional alternatives. The three remaining alternatives as documented in the *FEIS* include the following.

Alternative 1 ( no action) would continue existing management trends. The structure would be stabilized in place by reinforcing failed wooden structural members. Structural capacity of the second floor would remain that of a typical wood-frame house - not meant for visitors. Public access would be only to the basement and first floor. Interior finishes would be partially restored, but the basic configuration and use of space within the Grange would not be changed.

3

Alternative 2 would maintain the same building configuration as alternative 1, but the house would be structurally reinforced with a new interior steel framing system to allow full public use of the basement and the first and second floors. The steel framing would not be hidden. An exterior elevator at the back side of the house and a wheelchair lift at the front would allow full visitor circulation to all floors. Three open floors (basement, first and second floors) and a partially restored interior would provide more space and opportunities for an enhance interpretive program.

Alternative 3 would alter the setting of the current site by reorienting the visitor entrance to a more impressive, but less historically accurate four-story facade. More space would be made available by lowering the existing subbasement/garden level floor and opening a new entryway into this level from the east (Hamilton Terrace) side of the Grange (see page 14, *FEIS*). The garden level and basement would provide space for visitor information and needs, a theater, community and school-group meetings, and staff, storage, and utilities. The first floor would be restored and partially refurnished; the second floor would be available for interpretive exhibits. Interest in St. Luke's property behind or east of the Grange would have to be acquired to implement this alternative.

### Environmentally Preferable Alternative

Alternative 4, while being the preferred alternative, is also considered to be the environmentally preferable alternative with the implementation of the proposed mitigation (outlined in the alternative description and under the mitigation section below). Environmentally preferable is defined as "the alternative that will promote the national environmental policy as expressed in NEPA's Section 101" (46 FR 18026, as amended, 51 FR 15618). This generally means the the alternative that causes the least damage to the biological and physical environment, but also includes the alternative which best protects, preserves, and enhances historic, cultural, and natural resources. The goal of any agency in selecting an alternative, as is the National Park Service's charge, is to carefully balance the different possible actions in order to best "fulfill the responsibilities of each generation as trustee of the environment."

The description of the alternative, the rationale for the decision, and the mitigation provide the data and rationale which support alternative 4.

### RATIONALE FOR DECISION

#### Decision Criteria

Criteria were developed to guide the generation and selection of the alternative most appropriate for the management of the Grange. These criteria evolved

4

throughout the planning process from site legislation, public input, visitor use and community needs, and cultural and natural resource concerns.  The more significant  criteria used in the decision-making process included the following (the order does not imply a greater significance):

>  - Will the location of the Grange ensure its proper administration and interpretation as a national memorial, as required by the legislation?

>  - Will the Grange be structurally stable?

>  - Will the Grange be fully restored with the porches returned to their original locations?

>  - Will the Grange be situated within the bounds of Alexander Hamilton's original tract of land?

>  - Will space and resources be available for enhanced interpretative, educational, and community activities?  Will visitor experience be improved?

>  • Will the Grange location allow for its traditional association with the Harlem community?

Alternative 4 best meets these criteria from the standpoint of the National Park Service.  Implementation of this alternative will accomplish what Congress intended - restoration of the Grange within an appropriate setting while keeping it within the context of its present-day community end on Hamilton's original tract of land.  It also allows for full interpretation of the site for visitors.

As described in the summary, the house will be restored and fully stabilized with a concealed steel framing system in this new location.  All porches, doors, and windows will be in their original locations and all four rooms on the first floor will be refurnished.  Although outside the current boundaries of the Hamilton Heights Historic District in which the Grange currently resides, the Grange will be very close to its current location.  As shown in the FEIS (pg.20), the new location is just across 141st Street to the south of St. Luke's  and Hamilton Terrace and is within the boundary of the original Hamilton Estate (shown on page 6 of the FEIS).  The loss of the Grange from the historic District will not affect or compromise the historical and architectural basis for which the district was established, nor will it affect the Grange's status as a national historic landmark.  Although public concern was expressed regarding the potential impacts to St. Nicholas Park, the site of the proposed relocation, it was determined in consultation with the St. historic preservation officer that St. Nicholas Park is not eligible for listing on the national register and that the relocation of the Grange would not adversely affect the park.

5

The selected alternative will also significantly enhance interpretive and educational opportunities about Hamilton and his life, his relationship to contemporary times, and the relationship between the Grange and the local community because of the increase in available space (the new Convent Avenue building and the Grange) for such activities. The provision of NPS housing at the Convent Avenue site and 24-hour security at the Grange will also increase security at the new location, and possibly provide a greater sense of overall community security because of the 24-hour ranger presence.

The decision criteria which the National Park Service feels is met, but which has been most highly debated by the local community, is whether the traditional association of the Grange with St. Luke's Episcopal Church and the local Harlem Community will remain if the Grange is moved. As expressed throughout the planning and public involvement phases for Hamilton Grange, many individuals in the local neighborhood feel their traditional association will be lost in the proposed location for a variety of reasons (FEIS, page 53). They favor maintaining and stabilizing the Grange in its current location to honor its relationship with the church and community.

Other concerns with the move, which are interwoven in the community, include feelings that unrealistic cost figures for the move and restoration have been presented and anticipation that funding may not be available to fund the move, the restoration and the construction of the new building on Convent Avenue, resulting in an empty lot on Convent Avenue and a moved, but unrestored Grange for an extended period of time.

## Mitigation

To mitigate these and other concerns, actions were added to the selected alternative prior to the release of the *FEIS*. These are listed below. All practicable means to avoid or minimize environmental or social harm from the selected alternative have been adopted.

To address community concerns that, upon moving the Grange to St. Nicholas Park, a vacant, untended lot would remain in its original location, a new structure for public and NPS uses will be built. The characteristics and purposes of this building were described under the preferred alternative.

To further address community concerns and to assist the National Park Service in better understanding the traditional associations the community has with the Grange, a Friends of Hamilton Grange group is being formed. The group will be composed of representatives from the Harlem community and other city-wide groups and organizations. They will provide input into a variety of issues involved

6

with the relocation including the planning of the new building on Convent Avenue and the development of the new site in St. Nicholas Park, particularly landscape design.    The group will also help promote the site and programs related to the Grange for the visitor and the community.

The new building will be designed to be compatible with the qualities for which the Hamilton Heights Historic District was established. Additionally, the design of the landscape surrounding the restored Grange will be fully developed as an appropriate setting for the memorial, as well as to replace trees removed for the relocation, to soften the intrusion of the adjacent Steinman Hall, and to respect the original design intent of St. Nicholas Park. Discussions will also be held with the City regarding NPS involvement in maintenance of the surrounding parklands.

Structural and noise concerns regarding blasting of bedrock for the Grange's new foundation will be addressed during the design phase. Geotechnical factors will be assessed and considered in determining the foundation design. The results of this study will influence the type of foundation and extent of the basement on the new site. Vibrations from excavation of bedrock will be limited through the use of modern excavation techniques to avoid damage to nearby structures and minimize disturbance to nearby residents and businesses.

Funding concerns will also be addressed by carefully phasing the project. Prior to moving the Grange, construction planning funds will be acquired which will be used to develop construction drawings and more specific cost estimates for the relocation and restoration of the Grange and the development of the Convent Avenue building. Following the move of the Grange to the new site in St. Nicholas Park, development of the building and the restoration of the Grange will proceed simultaneously.

## COMPLIANCE

Consultation with the New York State Office of Parks, Recreation and Historic Preservation will continue. Proper procedures for the review of the move of a National Register listed property will be implemented with this office prior to moving the Grange.

All new interpretive media will conform with the September 1991 guidelines outlined in the plan.

7

with the relocation including the planning of the new building on Convent Avenue and the development of the new site in St. Nicholas Park, particularly landscape design.    The group will also help promote the site and programs related to the Grange for the visitor and the community.

The new building will be designed to be compatible with the qualities for which the Hamilton Heights Historic District was established. Additionally, the design of the landscape surrounding the restored Grange will be fully developed as an appropriate setting for the memorial, as well as to replace trees removed for the relocation, to soften the intrusion of the adjacent Steinman Hall, and to respect the original design intent of St. Nicholas Park. Discussions will also be held with the City regarding NPS involvement in maintenance of the surrounding parklands.

Structural and noise concerns regarding blasting of bedrock for the Grange's new foundation will be addressed during the design phase. Geotechnical factors will be assessed and considered in determining the foundation design. The results of this study will influence the type of foundation and extent of the basement on the new site. Vibrations from excavation of bedrock will be limited through the use of modern excavation techniques to avoid damage to nearby structures and minimize disturbance to nearby residents and businesses.

Funding concerns will also be addressed by carefully phasing the project. Prior to moving the Grange, construction planning funds will be acquired which will be used to develop construction drawings and more specific cost estimates for the relocation and restoration of the Grange and the development of the Convent Avenue building. Following the move of the Grange to the new site in St. Nicholas Park, development of the building and the restoration of the Grange will proceed simultaneously.

## COMPLIANCE

Consultation with the New York State Office of Parks, Recreation and Historic Preservation will continue. Proper procedures for the review of the move of a National Register listed property will be implemented with this office prior to moving the Grange.

All new interpretive media will conform with the September 1991 guidelines outlined in the plan.

**CONCLUSION**

A notice of availability for the *Final Environmental Impact Statement* was published in the *Federal Register* by the National Park Service on March 15, 1995 and by the Environmental Protection Agency on March 17, 1995. The 30-day no-action period ended on April 16, 1995.

The above factors and considerations justify the selection of alternative 4, as summarized above and described in the *FEIS*, as the final general management for Hamilton Grange National Memorial.

APPROVED: _____  DATE: 7/19/95
Marie Rust, Regional Director
National Park Service

8

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

**Appendix B:**

**Final General Management Plan Environmental Impact Statement:**

**FEIS Addendum – June 2000**

June 2000

# ADDENDUM

## TO HAMILTON GRANGE FINAL GENERAL MANAGEMENT PLAN FEIS
## DATED JANUARY 1995

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 5 | 2 | Congress recently passed legislation that allowed the Park Service to acquire the land on which the house is now located and the personal property necessary for interpretation of Hamilton, the Grange, and the United States as a young nation. | In the past, Congress passed legislation that allowed the Park Service to acquire the land on which the house is now located along with personal property necessary for interpretation of Hamilton, the Grange, and the United States as a young nation. |
| 46 | 1[1] | There are no traffic counts available from the New York City Department of Transportation for the Hamilton Grange vicinity. | Traffic counts are not conducted by the New York City Department of Transportation. |
| 46 | 4 | Second sentence Recently the Park Service has assisted the city parks in preparing environmental education information related to St. Nicholas Park. | In the past, the Park Service has assisted the city parks in preparing environmental education information related to St. Nicholas Park. |
| 47 | map | | Add ANCHOR Development Site. |
| 49 | 1 | last sentence Recent capital improvements, including granite curbs, tinted cement, and the tree plantings, were made to Convent Avenue (which runs in front of Hamilton Grange) from West 141st to West 145th Street. | Past capital improvements, including granite curbs, tinted cement, and the tree plantings, were made to Convent Avenue (which runs in front of Hamilton Grange) from West 141st to West 145th Street. |
| 49 | 2 | 4th sentence These avenues are often zoned for mixed use. | The existing site and the proposed site are both within the R7-2 Zone, a residential zone. |
| 49 | 2 | Delete last sentence Examples of businesses on Amsterdam... | Commercial and retail uses are located on Amsterdam Avenue and St. Nicholas Avenue, the avenues that run parallel to Convent Avenue. Across St. Nicholas Avenue from the park is the New Central Deli and Benta's Funeral Home. |

[1]Mr. Bimn Bhatta of the New York State Department of Transportation was contacted on April 4, 2000, for traffic count data (data request is attached). We are still waiting for NYSDOT's response.

**June 2000 Addendum to the Hamilton Grange Final General Management Plan FEIS**
**Page 2**

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 49 | 4 | 1st sentence<br>A development, known as the Harlem-on-the-Hudson project, has been proposed in western Harlem on the piers at 125th Street and the Hudson River. | A development, known as the Harlem-on-the-Hudson project, was proposed several years ago in western Harlem on the piers at 125th Street and the Hudson River. |
| 50 | 1 | --- | Add last sentence<br>As of April 2000, the proposal has not been approved and is still in the design phase(Telephone conversation with G. Goodwill of CB9) |
| 50 | 2 | 1st sentence<br>..."the initial stages..." | "various stages". |
| 50 | 3 | Delete paragraph | The Strivers is the $45 million phase of the project to be located on Frederick Douglas Boulevard between W 134th Street and W 135th Street in the Strivers Historic District. The mixed-use project consists of a 14-story apartment building with 150 units, 20-30 units of two- to four-story duplex units, 30,000 square feet of ground floor commercial space, and 30,000 square feet of parking. Construction was slated to begin at the end of 1999 and the completion date is the Summer of 2001..<br><br>**ANCHOR Development**<br>A proposed ANCHOR Development will be located between Bradhurst Avenue and Frederick Douglas Boulevard between W144th Street and W145th Street. The mixed-use development project consists of 125 condominiums above 54,000 square feet of commercial space. Construction will begin the Summer of 2000. |
| 50 | 4 | Whole paragraph<br>A landscape design..... | Delete both sentences. |

**June 2000 Addendum to the Hamilton Grange Final General Management Plan FEIS**
**Page 3**

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 50 | 5 | **New Developments** **Riverbank State Park**. Dedicated on May 27, 1993, this state park is new to the Harlem community. Built on top of a controversial sewage treatment plant..... | **Park Developments** **Riverbank State Park**. This state park was dedicated to the Harlem community on May 27, 1993. Built on top of a the North River Pollution Control Plant, a controversial sewage treatment plant.. |
| 52 | 1 | Paragraph beginning with "The park land surrounding the potential site....... Delete: "Two playgrounds and handball and basketball courts are in the park......TO END OFParagraph. | New paragraph St. Nicholas Park provides many recreational opportunities, including basketball courts and playgrounds. There is a brick restroom on the northern part of the park. |
| 52 | 2 | Delete "7.3 million" Delete "1.49 million" Delete last sentence. | Insert "7.48 million" Insert "1.52 million" Insert "Hamilton Grange is within the boundaries of Manhattan Community District 9. |
| 52 | 3 | Delete "1993" | Insert "2000" |
| 52 | 4 | Delete first sentence. | Community District 9 is bordered by the following: to the north by West 155th Street; to the west by the Hudson River and the Henry Hudson Parkway; to the east by Morningside Avenue, St. Nicholas Avenue, Bradhurst Avenue, and Edgecombe Avenue; and to the south by Cathedral Parkway. |
| 52 | 4 | Last sentence Industrial and commercial tax lots account for only 9% of the total lots in the district; the remainder are generally residential. | Industrial and commercial tax lots account for only 4% of the total lots in the district; approximately 37% of the district is residential. |

**June 2000 Addendum to the Hamilton Grange Final General Management Plan FEIS
Page 4**

| Page Number | Paragraph | Delete | Insert |
|---|---|---|---|
| 54 | 2 | Delete 2nd Paragraph, sentences 3 and 4. | Dated July 1, 1999, this data indicates that emissions in Manhattan are within the national ambient air quality standards (NAAQS) for O3 is in severe non-attainment, and PM-10 is in moderate non-attainment. Lead is not designated, and SO2 and NO2 cannot be classified. Currently, the New York City metropolitan area, including New York County, is designated moderate non-attainment for carbon monoxide(CO). However, the New York State Department of Environmental Conservation (NYSDEC) has begun the regulatory process to have the area reclassified as in attainment for CO. Formal approval of the redesignation is expected by September, 2000. |
| 55 221 | 3,4 letter | threatened and endangered species sections | Waiting for response from USFWS and NYSDEC. |

\\Lyndhrst_bd1\shared\Margie\grange2\grangeaddendum.wpd

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

**Appendix C:**

**Agency Correspondence**

 City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

Jane P. Cleaver
Chief of Parklands

(212) 360-3401
seeker@parklan.ci.nyc.ny.us

June 26, 2000

Ms. Gina Santucci
Director Environmental Review
Landmarks Preservation Committee
100 Old Slip
New York, New York 10005

**RE:    Request for determination of Historic, Architectural and Archaeological Significance
for proposed relocation of Hamilton Grange from Block 2050, Lot 4, to Block 1957,p/o
Lot 140.**

Dear Ms. Santucci:

The Department of Parks and Recreation and National Park Service is currently preparing
an Environmental Assessment Statement for the grant of an easement in perpetuity to the United
States National Park Service and associated city map change, by the City of New York for the
proposed relocation of the Hamilton Grange National Memorial to a 0.91-acre portion of St.
Nicholas Park (see Figures 1 and 2). In conformance with the City Environmental Quality Review
(CEQR), we request your review of the proposed relocation of the Grange, which is presently located
at 287 Convent Avenue within the boundaries of Community Board 9 in Manhattan. A Sanborn map
showing the location of the proposed easement is attached as Figure 3.

The current site of the Hamilton Grange is not the structure's original site. The home was moved
in 1889 by a real estate developer and donated to St. Lukes Episcopal Church (see Figure 4). In
1924, the American Scenic and Historic Preservation Society acquired the Grange and opened it as
a museum in 1933. The National Park Service assumed administration of the site by an Act of
Congress under Joint Resolution of April 27, 1962. In 1967, the City of New York Landmarks
Preservation Commission designated the house as a landmark.

The 1962 act of Congress that established Hamilton Grange National Memorial directed that the house eventually be relocated and "preserved in a fitting setting" for its proper administration and interpretation as a national memorial. The granting of an easement by the City of New York Parks and Recreation Department and the proposed relocation to St. Nicholas Park, which is located south of 141st Street in the immediate vicinity of the current Hamilton Grange site, will allow for the development of enhanced interpretive programs and provide a setting for the Hamilton Grange which is reminiscent of the structures original location as intended by the 1962 Act of Congress.

If you have any questions or comments regarding this request for determination, please call Kate Slevin at (212) 360-3421.

Sincerely,

Jane P. Cleaver
Chief of Parklands
Department of Parks and Recreation

Attachment

cc:     Jane Cleaver, NYC Parks and Recreation
        Tom Dyer, National Park Service
        K. Maher, TRC Environmental
        File

 

## The New York City Landmarks Preservation Commission

100 Old Slip New York NY 10005 TEL: 212-487-6855 FAX: 212-487-6839 TTY: 212-487-6745
http://www.ci.nyc.ny.us/html/lpc/

**Gina Santucci**
**Director of Environmental Review**

To: *Kate Slevin, Parks*

Date: *6/29/00*

Subject: ER/CEQR *relocation Hamilton Grange*

**The above mentioned project(s) need additional information before they can be reviewed.**

(X)   Site plans and description of existing and proposed conditions

(X)   400' radius diagram on Sanborn map

(X)   Original photographs of building facade and/or streetscape

( )   Block and lot numbers

( )   Scaled (1"=20') drawings of existing and proposed conditions in plan and section

( )   Site plan showing locations of soil borings and soil boring logs

( )   Other

A timely response on the part of the applicant will ensure quick processing of the review request. Due to the high volume of projects received by the Environmental Review staff, project analysis may take from two to four weeks. Please take this into account when deciding when to submit the Environmental Review application.

G:\FORMS\reqinfo3.00.wpd



City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

Jane Cleaver
Chief of Parklands

## CERTIFIED MAIL/RETURN RECEIPT REQUESTED

October 23, 2000

Ms. Gina Santucci
Director Environmental Review
Landmarks Preservation Committee
100 Old Slip
New York, New York 10005

**RE:** **Request for determination of Historic, Architectural and Archaeological Significance for proposed relocation of Hamilton Grange from Block 2050, Lot 4, to Block 1957, Lot 140 (portion).**

Dear Ms. Santucci:

As you may be aware the City of New York, Parks and Recreation and the National Park Service is currently preparing an Environmental Assessment Statement for the grant of an permanent easement to the United States National Park Service and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial to a 0.91-acre portion of St. Nicholas Park. Under letter dated June 26, 2000, the City of New York, Parks and Recreation and the National Park Service requested of the Landmarks Preservation Committee a determination of Historic, Architectural and Archaeological Significance for proposed relocation of Hamilton Grange. Under correspondence dated June 29, 2000, additional information was requested by the Landmarks Commission to assist in its review of the project (see attached).

In response to your office's request of June 29, 2000, the City of New York, Parks and Recreation and the National Park Service respectfully submit the following:

- a description of existing and proposed conditions;
- proposed moving plan and conceptual site plan for the relocation of the Hamilton Grange;
- 400' radius diagram on Sanborn Map; and
- original photographs of building façade and/or streetscape.

**Summary of Existing and Proposed Conditions**

The proposed moving plan and conceptual site plan for the relocation of the Hamilton Grange is attached as Figures 1 and 2, respectively. A summary of existing and proposed conditions as prepared by the project's architectural consultant, Beyer Blinder Belle, is included below. Existing conditions in the vicinity of the current Hamilton Grange site and proposed receiver site within St. Nicholas Park are indicated in the attached photographs. The location where each photograph was taken is within the requested 400-foot radius is indicated on Figures 3a and 3b.

The Hamilton Grange, presently located at 287 Convent Avenue, is a small scale, two-story, wood frame residence that had been previously moved in 1889 from its original setting. The proposed relocation site, as well as the present location, is within the boundaries of the original Alexander Hamilton estate (see Figure 4). Currently, the Grange is set on non-original stone-walled basement and cellar levels. As part of the last move campaign, the entrance porch and stairs were relocated to the current west side of the building. The west-facing porch was subsequently truncated to allow for the construction of the adjacent St. Luke's Church. The building is in moderately sound structural condition and several settlement problems have been recently stabilized.

The relocation of the Hamilton Grange will result in the alteration of existing conditions in the northern portion of St. Nicholas Park. Approximately 0.93 acres of parkland directly south of West 141st Street and east of the City College of New York's Steinman Hall will be utilized for the new setting of the Grange. The building is proposed to be sited along the westerly edge of this parcel, set into the hillside above an existing path leading to West 141st Street (see Figure 2 and Photographs Site 1 and Site 2).

St. Nicholas Park, located along the west side of St. Nicholas Avenue, is a linear park stretching from West 128th Street to West 141st Street. Built along one of the rugged escarpments of upper Manhattan, the park's topography drops dramatically from west to

2

east. The park was designed in the early 1900's by Samuel Parsons, Jr. Its picturesque style takes advantage of the many rock outcroppings while accommodating stairs, paths and open lawn areas within this context. Over the years, playgrounds, ball courts and restrooms were added to different areas of the park, compromising Parsons original design intent. In the 1960's the City College of New York constructed the nine-story Steinman Hall at the northwest corner of the park.

The western edge of the park, adjacent to Steinman Hall, contains a path that was part of the original circulation scheme. This path, now unpaved, is lined on both sides with mature pin oaks. The path cuts through a relatively level area of land approximately 60 feet wide (Photograph Site 2). The proposed site for the Grange is on this level area or "bench" of land located behind the easterly row of pin oaks. The building front will face due east, at an approximate 20-degree angle to West 141st Street. Access shall be through a new gate on West 141st Street. This would provide a roughly level approach to the basement level for ADA and service access. A more picturesque and circuitous route would be via an existing stone stairway from the corner of St. Nicholas Avenue and West 141st Street to the clearing in front of the Grange. The building would be set into the slight rise behind the path. A partial cellar and full basement will be excavated, presumably with a quantity of underlying rock removed. Siting the building into the hillside will minimize required rock excavation.

A moderate level of site lighting will be installed to provide pathway illumination and lights on the porches around the house. The lighting will replace two existing light poles and will be period lighting sympathetic to the design of the Grange and not dissimilar to the historic types currently used in many New York City parks.

In addition, the National Park Service and City of New York, Parks and Recreation are currently evaluating measure to address temporary community impacts associated with the relocation of the Grange. The intent of this mitigation will be to achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit local residents. These measures, which will be detailed in Part II of the project's EAS, are anticipated to include:

- Replacement/relocation of street trees required to be removed along Convent Avenue and West 141st Street. Significant efforts shall be made to relocate or replant in place as many existing street trees as possible and/or practicable;

- Replacement of street trees currently missing along West 141st Street;

- Inspection and maintenance of existing street trees along the proposed move route;

- Streetlight upgrades along West 141st Street. Fixtures will be period lighting sympathetic to the historic character of the Hamilton Heights Historic District and the Grange itself. The fixtures will not be dissimilar to the traditional "shepherd 's crook" fixtures currently in place along Covent Avenue;

- Replacement of existing sidewalks along the move route on Convent Avenue and West 141st Street; and

- Siting considerations for the relocated Grange within St. Nicholas Park to minimize required excavations and tree removals.

I hope the attached information satisfies your request and I thank you for your continued interest in this project. Should you have any questions, please call Kate Slevin at (212) 360 – 3421.

Sincerely,

Jane P. Cleaver
Chief of Parklands
City of New York, Parks and Recreation

cc:      Joseph Avery, National Park Service
         Tom Dyer, National Park Service
         Kevin Maher, TRC Environmental

4

Fax:2123603461                    Jul  6 2000 14:45    P.03



The New York City Landmarks Preservation Commission

100 Old Slip New York NY 10005 TEL: 212-487-6855 FAX: 212-487-6839 TTY: 212-487-6745
http://www.ci.nyc.ny.us/html/lpc/



**Gina Santucci**
**Director of Environmental Review**

To: *Kate Slevin, Parks*

Date: *6/29/00*

Subject: ER/CEQR   *relocation Hamilton Grange*

The above mentioned project(s) need additional information before they can be reviewed.

( X )    Site plans and description of existing and proposed conditions

( X )    400' radius diagram on Sanborn map

( X )    Original photographs of building facade and/or streetscape

( )      Block and lot numbers

( )      Scaled (1"=20') drawings of existing and proposed conditions in plan and section

( )      Site plan showing locations of soil borings and soil boring logs

( )      Other

A timely response on the part of the applicant will ensure quick processing of the review request. Due to the high volume of projects received by the Environmental Review staff, project analysis may take from two to four weeks. Please take this into account when deciding when to submit the Environmental Review application.

G:\FORMS\reqinfo3.00.wpd

THE CITY OF NEW YORK LANDMARKS PRESERVATION COMMISSION
100 Old Slip, New York, NY 10005  (212) 487-6800

# ENVIRONMENTAL REVIEW

NYC PARKS/00DPR001M                                      10/24/00
PROJECT NUMBER                                          DATE RECEIVED

**PROJECT**          <u>287  CONVENT AVE</u>:  HAMILTON GRANGE MEMORIAL/NPS/199

      [ ]     No architectural significance

      [ ]     No archaeological significance

      [X]     Designated New York City Landmark or Within Designated Historic District

      [X]     Listed on National Register of Historic Places

      [ ]     Appears to be eligible for National Register Listing and/or New York City Landmark
            Designation

      [X]     May be archaeologically significant;  requesting additional materials

**COMMENTS**         The LPC is in receipt of the EAS of October, 2000. The LPC findings of 1993
and 1995 still apply (see attached). Part II of the EAS is required in order to
complete the review. Also note that plans for new construction on the Hamilton
Hts. historic district site (block 2050, lot 4) should be submitted to the LPC
Preservation Dept. for review and issuance of a permit.

cc: NPS, SHPO

_Gina Santucci_                          11/06/00
SIGNATURE                                 DATE

THE CITY OF NEW YORK LANDMARKS PRESERVATION COMMISSION
100 Old Slip, New York, NY 10005  (212) 487-6800

# ENVIRONMENTAL REVIEW

| NPS/106-M | 03/31/95 |
|---|---|
| PROJECT NUMBER | DATE RECEIVED |

**PROJECT**  <u>287  CONVENT AVE</u>:  HAMILTON GRANGE MEMORIAL/NPS/199

[ ]  No architectural significance

[ ]  No archaeological significance

[X]  Designated New York City Landmark or Within Designated Historic District

[X]  Listed on National Register of Historic Places

[X]  Appears to be eligible for National Register Listing and/or New York City Landmark Designation

[X]  May be archaeologically significant;  requesting additional materials

**COMMENTS**  Test of FEIS, January 1995 is accepted. Please provide the Commission with copies of future plans and studies for cultural resource management prior to their implementation, including the archaeological documentary study. Also please note attached LPC report 94-0003, dated August 3, 1993, regarding this action.

| _signature_ | 07/03/95 |
|---|---|
| SIGNATURE | DATE |



THE CITY OF NEW YORK LANDMARKS PRESERVATION COMMISSION
225 BROADWAY, NEW YORK, NEW YORK 10007 PHONE (212) 553-1100

# R　E　P　O　R　T

| August 3, 1993 | 287 Convent Avenue | Manhattan | 2050 | 4 | 93-3374 |
|---|---|---|---|---|---|
| DATE | ADDRESS | BOROUGH | BLOCK | LOT | DOCKET NUMBER |
| 94-0003 | HAMILTON GRANGE | | | LP-0317 | |
| REPORT NUMBER | HISTORIC DISTRICT/NAME OF BUILDING | | | LP NUMBER | BN/ALT　　F-18 |

HAMILTON HEIGHTS HISTORIC DISTRICT

LANDMARKS PRESERVATION COMMISSION
REPORT

With respect to docket number 93-3374, a schematic proposal to
move Hamilton Grange from its present non-original site at 287
Convent Avenue to St. Nicholas Park and to restore the building
to its original condition, 287 Convent Avenue, LP-0317, Borough
of Manhattan.

CR 94-0003
August 3, 1993

This report is pursuant to Title 25, Chapter 3 of the
Administrative Code of the City of New York, which requires such
a report by the Landmarks Preservation Commission on plans for
the construction, reconstruction, alteration, or demolition of
any improvement or proposed improvement which is owned by a
governmental agency, and is or is to be located on a landmark
site or in a historic district or which contains an interior
landmark.

At the Public Meeting of July 13, 1993, following the Public
Hearing and Public Meeting of June 22, 1993, the Landmarks
Preservation Commission reviewed a schematic proposal to move
Hamilton Grange from its present non-original site to a new site
at St. Nicholas Park, and to restore the building to its original
condition, as shown in the photographs, the Draft Environmental
Impact Statement and in drawings 1 and 2, dated received May 27,
1993, prepared by the National Park Service, submitted as
components of the application, and presented at the Public
Hearing and Public Meetings.

In reviewing this proposal, the Commission noted that Hamilton
Grange is a three-bay, two-story, wood frame, free-standing
symmetrical, Federal style mansion designed by John McComb, Jr.,
and built in 1802-1803 for Alexander Hamilton as a country
retreat;  that the mansion originally featured identical north
and south elevations, with two entry doors on two opposing sides
and broad porches on two opposing sides;  that the original
siting of the mansion on 32 acres of land opened the house to all

August 3, 1993
Hamilton Grange
Page 2

sides, giving distant views in all directions, a concept of the
geometrically perfect villa set in an expansive landscape;  that
in 1879 the property was divided into 300 building lots, and the
rectangular street system was extended north with the grid for
143rd Street proposed to pass through the building;  that in 1889
the mansion was moved 350 feet to the southeast to its present
location at 287 Convent Avenue and acquired by St. Luke's
Episcopal Church;  and that when the mansion was moved and the
adjacent church and apartment buildings were constructed, the
building was turned sideways and the original front and back
porches and entrance door were removed and relocated on the
building.  The Commission further noted  that the interior of the
mansion exhibits mostly original millwork, molding and
plasterwork, showing evidence of Adamesque influence;  that
although the mansion is altered, it is one the few surviving
examples of architect John McComb, Jr.'s domestic architecture;
and that when the building was designated in 1967, the
designation report noted that the National Park Service was
considering moving the building to a more appropriate site and
stated "As the building is now situated, the Grange cannot be
made to reflect either its architect's conception or its
condition when it was Alexander Hamilton's residence."  The
Commission finally noted that presently the mansion is closed to
the public due to severe structural problems including floor
joists that have pulled away from beam pockets, and split and
horizontally cracked beams.

With regard to this proposal, the Commission found that moving
the building from its present non-original site to a new location
within St. Nicholas Park would enable the mansion to be fully
restored to its original appearance with all doors, windows and
porches restored to their original places;  that the new setting
of the mansion within the park would more closely recall the
building's original setting within 32 acres of landscaped
grounds;  and that the restoration of the building in its new
site would allow more comprehensive visitor programs which would
enhance interpretation of this important Federal style mansion as
well as the life of Alexander Hamilton.  Based on these findings,
the work is found to be appropriate.

However, the Commission also found that the existing site, being
within the Hamilton Heights Historic District and associated with
the Grange for over 100 years, is very important, and its
disposition should be dealt with as part of the program for
moving and restoring the Grange;  that the decision on the proper
orientation of the house should consider not only its historic
orientation, with the front door facing south, but also that the
orientation must make sense on the proposed site, which has a
north-facing street frontage;  and that any fence placed around

August 3, 1993
Hamilton Grange
Page 3

the site be as far removed from the mansion as possible and that
the distance between the house and the high retaining wall at the
edge of the park be increased, if possible, so that the mansion
can read as a free-standing country retreat in the middle of a
landscape.

Please note that the issuance of this report pertains to the
schematic stage of this project only and that when final
documents and drawings are completed they will need to be
submitted to the Commission for review.  Direct all inquiries an
correspondence relating to this report to Jennifer Field,
Landmarks Presrvationist.

Very truly yours,

Laurie Beckelman
Chair

LB/JF/wp
cc: National Park Service
    Art Commission
    NYC Department of Parks and Recreation
    SHPO/Advisory Council
    Joan Olshansky
    Alex Herrera
    Laura Alaimo
    City Record
    HDC
    Community Board 9
    Files



City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

Jane P. Cleaver
Chief of Parklands

(212) 360-3401
seeker@parklan.ci.nyc.ny.us

June 26, 2000

Ms. Marie Dooley
DEP Office of Environmental Assessment
59-17 Junction Boulevard
Corona, New York 11368

RE:    **Relocation of the Hamilton Grange from 287 Convent Avenue to St. Nicholas Park.**

Dear Ms. Dooley:

In accordance with the requirements of CEQR, we are requesting information through the Freedom of Information Law about the presence of hazardous materials at the following properties:

$    Block 1957, Lot 140
$    Block 2050, Lot 4

The proposed project involves the granting of an easement in perpetuity to the United States National Park Service (NPS) and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial (Hamilton Grange or Grange), presently located at 287 Convent Avenue, to a 0.91-acre portion of St. Nicholas Park. A Sanborn map and tax map showing the location of the proposed relocation are attached.

Please send your response to this request for any records of hazardous materials being present at the proposed site to:

Kate Slevin
Environmental Review Coordinator
New York City Department of Parks and Recreation
The Arsenal
830 Fifth Avenue
New York, New York 10021

If you have any questions, please call me at (212) 360 - 3421.

Sincerely,

Jane P. Cleaver
Chief of Parklands
Department of Parks and Recreation

Attachment

cc:    Jane Cleaver, NYC Parks and Recreation
       Tom Dyer, National Park Service
       K. Maher, TRC Environmental



THE CITY OF NEW YORK  DEPARTMENT OF ENVIRONMENTAL PROTECTION
JOEL A. MIELE SR., P.E., Commissioner

Mark D. Hoffer
General Counsel

PHONE (718) 595-6555
FAX (718) 595-6543
www.ci.nyc.ny.us/dep

Bureau of
Legal Affairs

June 30, 2000

Ms. Kate Slevin
NYC Parks & Recreation
The Arsenal, Central Park
New York, New York 10021

**RE:** Relocation of the Hamilton Grange from 287 Convent Ave.
to St. Nicholas

Dear Ms. Slevin:

We hereby acknowledge receipt of your **Freedom of Information Law** request
dated June 26, 2000.

Your request is currently being reviewed by our agency, and will be granted or
denied in approximately two weeks.

Very truly yours,

Marie A. Dooley
Assistant Counsel

cm
Log # 964138



THE CITY OF NEW YORK  DEPARTMENT OF ENVIRONMENTAL PROTECTION
JOEL A. MIELE, SR., P.E. Commissioner

**ROBERT C. AVALTRONÍ**
**Deputy Commissioner**

**PHONE (718) 595-4418**
**FAX (718) 595-4422**

**Bureau of**
**Air, Noise, & Hazardous**
**Materials**

July 20, 2000

Jane P. Cleaver
Parks & Recreation
City of New York
The Arsenal
Central Park New York, N.Y 10021

RE:    287 Convent Avenue to St. Nicholas Park, Staten Island

Dear Ms. Cleaver:

The Division of Emergency Response and Technical Assessment has received your
Freedom of Information Law request regarding the above-mentioned location.  We have
searched our files and have not disclosed any information relevant to your request.

If we can be of further assistance, please do not hesitate to contact our office at (718)
595-4784.

                                    Very truly yours,

                              **MOUSTAFA FAWZY**

                             ·Moustafa Fawzy
                              Director
                              Division of Emergency Response
                               And Technical Assessment

Log #964138



City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

Jane P. Cleaver
Chief of Parklands

(212) 360-3401
seeker@parklan.ci.nyc.ny.us

June 26, 2000

Mr. Ralph Palmer
Chief of Fire Prevention
New York City Fire Department
250 Livingston Street
Brooklyn, New York 11201

RE:    **Request for information on the location of underground tanks at 287 Convent Avenue and within St. Nicholas Park.**

Dear Mr. Palmer:

In conformance with the City Environmental Quality Review (CEQR), the National Park Service and the New York City Department of Parks and Recreation request your review of the proposed relocation of the Hamilton Grange, which is presently located at 287 Convent Avenue, to a 0.93-acre parcel within St. Nicholas Park located on St. Nicholas Terrace in Manhattan. Please identify any underground tanks in your records for Block 1957, Lot 140, and Block 2050, Lot 4. A Sanborn map and tax map showing the location of the proposed easement are attached for your convenience . All responses to this request can be sent to:

> Kate Slevin
> Environmental Review Coordinator
> New York City Department of Parks and Recreation
> The Arsenal
> 830 Fifth Avenue
> New York, New York 10021

If you have any questions, please call Kate Slevin at (212) 360 - 3421.

Sincerely,

Jane P. Cleaver
Chief of Parklands
Department of Parks and Recreation

Attachment

cc:     Jane Cleaver, NYC Parks and Recreation
        Tom Dyer, National Park Service
        K. Maher, TRC Environmental

**FIRE DEPARTMENT • CITY OF NEW YORK**          A-95A (5/99)
**BUREAU OF REVENUE MANAGEMENT**
9 MetroTech East
Brooklyn, N.Y. 11201-3857

**RECORD SEARCH REQUEST**
**UNDERGROUND STORAGE TANKS**

MAIL TO: Kate Slevin
NYC Dept of Parks
830 Fifth Ave
New York N.Y. 10021

Search No._____

The undersigned requests the following information re: Premises

287 Convent Ave

| ADDRESS | BOROUGH |

For Buried Motor Vehicle Fuel Tanks Only

1.  No. and Size of tanks                                               FEE  $10.00

2.  No. and Size of sealed and/or removed tanks                         FEE  $10.00

3.  Most recent tank and/or piping test results, including type of test performed   FEE  $10.00

4.  History of leaks                                                    FEE  $10.00

5.  Pending Headquarters Violation Orders                               FEE  $10.00

6.  Other                                                               FEE  $10.00

State Applicants interest in or relation to premises

Signed:_____

Date:_____

DO NOT WRITE BELOW THIS LINE

Gentlemen:

In reply to your request concerning the premises mentioned above, please be advised that as of 9 A.M.,
_____ our records show the following:
(MAKE ADDITIONAL ON REVERSE SIDE)

## No Records Found

Searched by:_____

VIOLATIONS RECORDED ABOVE ARE ONLY THOSE WHICH ARE A MATTER OF RECORD IN HEADQUARTERS OF THE
BUREAU OF FIRE PREVENTION, AND MAY NOT INCLUDE VIOLATIONS ISSUED BY LOCAL UNITS, UNLESS A SUMMONS
FOR "FAILURE TO COMPLY" WAS ISSUED.  ALL REPORTED TANK INFORMATION COMES FROM RECORDS, WHICH EXIST
IN THE FIRE DEPARTMENT DISTRICT OFFICE FOLDERS, OR ON COMPUTER FILES.

**MAXIMUM RESPONSE TIME 20 BUSINESS DAYS**

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## Appendix D:

*The Relocation of the Hamilton Grange – Assessment of Feasibility and Associated Impacts*,

**THE RELOCATION OF HAMILTON GRANGE**
*Assessment of Feasibility & Associated Impacts*

The relocation of the Hamilton Grange National Memorial from its current location on Convent Avenue to a proposed receiver site at the northern end of St. Nicholas Park is physically very feasible. The building is a small scale, two-story residence which had in fact been previously moved in 1887 from its original setting 350' to the northwest. The new site as well as the present location are both within the boundaries of the original Alexander Hamilton estate. This report will outline the various building move methodologies considered and describe the recommended procedures for the relocation. The report will also identify the negative impacts of the proposed move and the positive mitigation strategies to address the temporary disruption of the move along the neighborhood streets and the removal of mature street and park trees.

The Hamilton Grange is a wood frame structure, set on non-original stone-walled basement and cellar levels. As part of the last move campaign, the entrance porch and stairs were relocated to the current west side of the building. The west-facing porch was subsequently truncated to allow for the construction of the adjacent St. Luke's Church. With a footprint of 46' x 49', exclusive of the porches, it is estimated that the house weighs approximately 400 tons. The building is in moderately sound structural condition. Several settlement problems have been recently stabilized.

**Relocation Alternatives**

A number of move methodologies were explored and are identified below. Factors considered is evaluating the move alternatives include:

- The ability to extricate the Grange from the highly constricted site with St. Luke's Church to the south blocking clear passage both east and west, and the apartment building at 289 Convent Avenue abutting the structure to the north.

- The feasibility of maneuvering the Grange down the steep 6-7% grade of West 141st Street to St. Nicholas Park.

- The probability of damage to the Grange, both in terms of maintaining the building's structural integrity and its historic fabric.

- The effect on St. Luke's Church, specifically in dismantling and reconstructing the porch which would allow the Grange to be moved west to Convent Avenue.

- The impact on street trees, utilities, fences and other improvements along the move route.

*Alternative A - Multi-Part Move*: Separate the Grange into three parts, with the building cuts running east-west. This will facilitate removing the building from the site without dismantling the St. Luke's porch to the west or a portion of the transept to the east. This approach is deemed to be detrimental to the 200 year old structure. This would compromise the structural integrity by severing large roof timbers, and floor joists on every level. Aesthetically, the width of the sawcut scar would be visible on the exterior siding, floorboards and decorative details on the interior.

**Hamilton Grange**
BBB Ref. #1688                      -1-                      8 November 2000

**THE RELOCATION OF HAMILTON GRANGE**

*Assessment of Feasibility & Associated Impacts*

*Alternative B – Move East to Hamilton Terrace*: Move the Grange in one piece east to Hamilton Terrace to avoid the steep grade on West 141st Street. The move is not possible without removing a portion of the north transept of St. Luke's Church. Otherwise, the Grange is physically too wide to clear the site out to the street. Additionally, Hamilton Terrace is too narrow from property line to property line (approximately 41') to accommodate the structure, and is lined with a consistent assortment of quality street trees, willow oaks among other species.

*Alternative C – Lift and Carry Over Street Trees*: Two methods were considered to lift the Grange out of its current site and over to St. Nicholas Park. The first, utilizing a large industrial scale dirigible was dismissed due to the weight of the structure which could not be accommodated by the blimp. The second, with one or more large construction cranes, would cause considerable damage to the street trees setting the machines into position and travelling the move route. Most significantly, however, is the great risk of damage to the Hamilton Grange extracting the structure vertically from the site without colliding with its more substantial neighbors and moving this building suspended above the tree line. Any mishap or type of mechanical failure would be catastrophic for this national historic landmark.

The following two alternatives are being considered for the move. Advantages and disadvantages for each are identified.

*Alternative D – Raise Over St. Luke's Porch*: This option involves lifting the Grange approximately twenty feet to clear the St. Luke's porch structure. The building would be severed below the first floor structure and raised along with its temporary steel support frame above the porch roof structure. Once the porch is cleared, the Grange will be lowered on its jacks onto Convent Avenue. This alternative may subject the Grange to the risk of damage if the lifting jacks or supports fail. With this option, the porch at St. Luke's does not require dismantling.

*Alternative E – Convent Avenue Move*: Move the Grange intact west to Convent Avenue, dismantling the Church porch for clearance. To clear the St. Luke's porch, it is recommended that this open-air structure be dismantled for the move and then reassembled. The porch is constructed of red sandstone in a circular colonnade with a series of rounded arch openings on load-bearing stone columns. The roof structure is wood-framed with asphalt shingles. The porch would be fully documented and dimensioned. Each stone will be individually numbered prior to dismantling. Materials to be replaced, e.g. mortar, roofing shingles, copper flashing, would be salvaged for reference in the reconstruction phase. A staging area should be identified in the immediate area, presumably under the portion of the porch to remain, to minimize potential damage due to excessive handling. The reconstruction can occur once the Grange site is vacated. Once the building is on Convent Avenue, move south to West 141st Street, east down West 141st Street, and into St. Nicholas Park.

**Relocation Methodology (Applicable to Alternatives D & E)**

Hamilton Grange should be moved in one piece, separated from the lower two (non-original) floors below the first floor level. A temporary support of steel framing will be inserted under the first floor. The main beams and cross steel will be raised by a series of jacks to allow the existing stone foundation to be dismantled. The jacks will be supported on a cribbing system of 6" x 6" oak timbers, 4' to 8' in length,

**Hamilton Grange**
BBB Ref. #1688                                    -2-                              8 November 2000

**THE RELOCATION OF HAMILTON GRANGE**
*Assessment of Feasibility & Associated Impacts*

stacked underneath the jacks to distribute the load of the building and to equalize any differences in compacted ground surfaces.

Once lifted to an appropriate moving height, a series of self-powered, rubber-tired dollies will be positioned under the support steel. The dollies will have hydraulic jacks connecting the rolling assembly to the steel-framed support plane. The jacks will be controlled by a unified jack machine, providing the ability to adjust the jack throws and maintain a level lift plane regardless of pressure or grade change encountered during the move. The dollies utilize between four and eight tires and axle assemblies, and are 3' tall and up to 6' wide. Axles are spaced 4-1/2' on center. The assembly has a minimum turning radius of 10 feet. The dollies for this project will be equipped with braking mechanisms to better navigate the slope on West 141st Street.

The route path must have a stable and smooth surface. The area in front of the Grange will require a compacted surface, and transitions at curbs will have asphalt ramps installed on which to run the dollies. Depending on the level of compaction with St. Nicholas Park along the existing path, a temporary asphalt travel bed may also need to be installed in the park. The asphalt can be removed and the finish underneath restored immediately following the move over that portion of the route.

<u>Route Preparation</u>

In preparation for the move, a number of tree and street accessory removals are required on both Convent Avenue and West 141st Street. The street dimensions, measured property line to property line, on Convent and West 141st Street are ±60', and ±51', respectively. The minimum clear dimension required for the move is approximately 52' which includes 2' on the east and west sides of the building for the extension of the support frame. On Convent Avenue, west side, one street light, one fire hydrant, a pedestrian crossing signal, and three street trees would be removed. The trees, north to south, are a 10-3/4" caliper green ash in poor condition approximately 60% leafed out, a 5-1/2" honey locust in good condition, and a 11-1/4" Norway maple with a narrow canopy in good condition. The east side of Convent Avenue has a traffic light, two traffic signs, lawn bed fencing and a number of trees. Three of the trees in front of Hamilton Grange would need to be removed. These are a 28" split trunk oak at the north property line, a 6-1/4" cherry, and a 7-1/4" sweetgum. The two significant trees in front of St. Luke's Church possibly can be retained: a 24" Norway maple with a significant, tall canopy and a multiple trunk columnar silver maple at the corner. The Norway maple will require a lower limb to be pruned for clearance. The preparation for the move should take place early in the year, while the trees are dormant. The pruning and pullback of the trees in front of St. Luke's Church will be supervised by a certified arborist.

The clearance on West 141st Street is much tighter and all impediments along the path will need to be removed. On the north side, a fire hydrant, a street light, a 14" and a 12-3/4" willow oak and 4-1/4" honey locust will require removal. The south side has one street light, one pedestrian crossing signal, and four recently planted 3" caliper littleleaf linden trees. Two of the lindens are dead and will be removed by the NYC Parks Department prior to the move.

**THE RELOCATION OF HAMILTON GRANGE**
*Assessment of Feasibility & Associated Impacts*

In summary, a total of 12 street trees will be removed, five of these replanted in place, and 12 new trees will be planted. The new trees will be specified in consultation with the NYC Department of Parks and Recreation.

The east and west porches will be removed from the Grange to minimize its effective width. Foundations do not exist under the porches. The attached flashing between the Grange and 289 Convent Avenue will be dismantled. Repairs such as repointing the flashing reglets and other required remedial work to 289 Convent Avenue will be performed to provide a weathertight wall once the Grange is moved away from the apartment building. All loose furniture and elements will be removed and doors and windows secured.

### The Building Move

The first step in the actual move is to shift the Grange slightly to the south to disengage it from the adjacent apartment building. The structure is rolled out to Convent Avenue and rotated counterclockwise 90 degrees to project a slightly narrower profile to proceed down Convent, and to start a series of maneuvers to position the house correctly in St. Nicholas Park. The Grange is moved south to the intersection at West 141st Street.

At this point the dollies are adjusted to move in an easterly direction. This occurs without rotating the house. A large construction vehicle is set at the top of the hill as an anchor. The Grange is attached via cables to its winch with redundant safety cables also anchored to the vehicle. The structure is slowly lowered down West 141st Street to a position slightly above the receiver site in the park. Again, the dolly wheels are reset to a calculated curve to slightly rotate the building while transversely crossing southward into the park. This route into the park will be a two maneuver S-turn to avoid the elm tree at the northwest corner of the lot and a pin oak northeast of the receiver site. The rotation will align the Grange with its front facade facing northeast in its proposed setting in the park.

The receiver site, in St. Nicholas Park, will require that the site preparation and foundation work be complete prior to the move. The building will be set over the new concrete structure, lowered into position and connected.

### Schedule

The time during which the Grange is physically moving is very short compared to the time required for preparation of the move. Modifications need to be made to the existing structure, the receiver site and along the move route. It is anticipated that preparations will take between six to eight months, including structural calculations and reviews, approvals and coordination with City agencies, the underpinning and installation of the move assemblies at the Grange, the tree and utility removals, and the construction of the new foundations.

The move itself should only take 14 days. The building travels at approximately one mile per hour, therefore the time in actual transit is negligible. The rotation of the structure and the repositioning of the dollies will take a considerable amount of time. The proposed sequence of events is as follows:

**Hamilton Grange**
BBB Ref. #1688                                        -4-                                        8 November 2000

**THE RELOCATION OF HAMILTON GRANGE**

*Assessment of Feasibility & Associated Impacts*

| | | |
|---|---|---|
| A. | Prepare the Grange, the move route and the receiver site, including structural reviews and agency approvals. | 6-8 months |
| B. | Move the Grange west to Convent Avenue and rotate building 90 degrees. | 1 day |
| C. | Move the Grange south to the Convent/West 141st Street intersection, rotate the dollies, and anchor the building. | 2 days |
| D. | Lower the Grange east down West 141st Street. Rotate dollies for move into St. Nicholas Park. | 1 day |
| E. | Move the Grange south into the Park and position above the new foundations. | 10 days |
| F. | Structurally connect the Grange to the new foundation walls. | 10 days |

Once the building has cleared a portion of the move route, traffic signals and lights can be reinstalled and the street opened for traffic. In effect, Convent Avenue will be out of commission for two days, with the exception of the intersection. West 141st Street will also be unavailable for approximately two days. Careful coordination with the NYC Department of Highways is necessary to minimize the downtime, and to reroute traffic, particularly when the intersection is blocked.

## St. Nicholas Park

The relocation of the Hamilton Grange will substantially alter the use and appearance of the northern portion of St. Nicholas Park. Approximately 0.93 acres of parkland directly south of West 141st Street, and east of CCNY-Steinman Hall will be utilized for the new setting of the Grange. The building is proposed to be sited along the westerly edge of this parcel, set into the hillside above an existing path leading to West 141st Street.

St. Nicholas Park, located along the west side of St. Nicholas Avenue, is a linear park stretching from West 128th Street to West 141st Street. Built along one of the rugged escarpments of upper Manhattan, the park's topography drops dramatically from west to east. The park was designed in the early 1900's by Samuel Parsons, Jr. Its picturesque style takes advantage of the many rock outcroppings while accommodating new stairs, paths and open lawn areas within this context. Over the years, playgrounds, ball courts and restrooms were added to different areas of the park, compromising Parson's original design intent. In the 1960's, the City College of New York constructed the nine-story Steinman Hall at the northwest corner of the park.

The western edge of the park, adjacent to Steinman Hall, contains a path that was part of the original circulation scheme. This path, now unpaved, is lined on both sides with mature pin oaks. The path cuts through a relatively level area of land approximately 60' wide. The proposed site for the Grange is on this level area or "bench" of land, located behind the easterly row of pin oaks. The building front will face due east, at an approximate 20 degree angle to West 141st Street. Access shall be through a new gate on West 141st Street. This would provide a roughly level approach to the basement level for ADA and service access. A more picturesque and circuitous route would be via the existing stone stair from the corner of St. Nicholas Avenue and West 141st Street to the clearing in front of the Grange. The building

**Hamilton Grange**
BBB Ref. #1688                                    -5-                                    8 November 2000

**THE RELOCATION OF HAMILTON GRANGE**
*Assessment of Feasibility & Associated Impacts*

would be set into the slight rise behind the path. A partial cellar and full basement will be excavated, presumably with a quantity of underlying rock to be removed. Site borings will help to determine the extent of rock removal necessary. The advantage of siting the building into the hillside is to minimize the rock excavation. Large-scale pneumatic rams will be utilized for the rock removal.

The first floor is approximately 6 feet above grade, therefore the full basement to the front of the house will be 4 feet below grade, while at the rear, the excavation will total approximately 9 feet due to the slope of the hill. The front of the building will have a partial cellar necessitating an additional 9 feet of excavation for a total of approximately 13 feet at the lowest part of the building footprint. The exposed rock outcroppings to the east of the proposed house site will remain undisturbed.

The plan calls for 12 trees to be removed, primarily black locust trees west of the original path and pin oaks up the hill and closer to Steinman Hall. Six of these trees are small caliper Hawthorne trees. These will be transplanted within St. Nicholas Park at locations to be coordinated with the NYC Parks Department. Additional undergrowth is minimal and would be removed and relandscaped as part of the proposed site plan. The existing stone stairway would not be impacted by this development. However, both the stair and the existing north-south path would converge at a point approaching the south porch of the Grange.

It is unlikely that archeological resources will be uncovered during the proposed excavation due to the close proximity of the bedrock to the ground surface. Prior to excavation, however, research and analysis of the site will be undertaken to discover any underlying historical data. If any archeological artifacts are found, a licensed archeologist will be called-in to identify and evaluate the objects. If determined to be significant, the objects will be preserved and catalogued according to National Park Service standards.

Additional excavation will be required for utility trenches from the Grange, north to West 141st Street. Water, electrical and sanitary laterals will be connected to the lines serving the residences on the north side of the street.

A moderate level of site lighting will be installed to provide pathway illumination and lights on the porches and around the house. The lighting on the paths will range from 3 – 5 footcandles and at the house 15 – 20 footcandles. This lighting will replace the two existing lightpoles on the west side of the path. Fixtures will be period lighting sympathetic to the design of the Grange and not dissimilar to the historic types currently used in many New York City parks.

<u>**Mitigation Strategies**</u>

A series of positive mitigation strategies are proposed to compensate for the temporary disruption of the neighborhood along the move route and the permanent effect of removing a number of mature street trees. Recommended improvements include:

- Sidewalk Replacements - Convent Avenue and West 141st Street
- Streetlight Upgrades on West 141st Street
- Replacement of Trees to be Removed on Convent Avenue and West 141st Street

**Hamilton Grange**
BBB Ref. #1688                    -6-                    8 November 2000

**THE RELOCATION OF HAMILTON GRANGE**

*Assessment of Feasibility & Associated Impacts*

- Replacement of Missing Trees on West 141st Street
- Inspection and Maintenance for Existing Trees
- Transplantation of Hawthorne Trees in St. Nicholas Park
- Planting of New Trees and Landscaping in St. Nicholas Park
- Conformance to NYC Department of Parks and Recreation Basal Area Replacement Formula policy

These proposed mitigations are further described below. The planting of the street trees and park landscaping work shall be done in consultation with NYC Parks and Recreation. A tree inventory is attached to this report, and includes the basal area replacement formula calculations. A total of 450 trees will be planted within the neighborhood, at locations as determined by the NYC Parks and Recreation.

A summary of the existing and proposed tree counts along the affected streets and in the immediate vicinity of the relocated Grange is as follows:

|  | Convent Avenue | West 141st Street | St. Nicholas Park | Totals |
|---|---|---|---|---|
| Existing trees | 8 | 10 | 25 | 43 |
| Existing trees to remain | 2 | 2 | 13 | 17 |
| Trees to be removed | 4 | 3 | 6 | 13 |
| Trees to be removed and replanted in place | 2 | 3 | 0 | 5 |
| Trees to be transplanted within park | 0 | 0 | 6 | 6 |
| Proposed new trees | 4 | 8 | 13 | 25 |
| Proposed - Tree Total | 8 | 13 | 26 | 47 |

The restoration of the street utilities on Convent Avenue and West 141st Street such as streetlights, traffic control signals and fire hydrant will be coordinated with the NYC Department of Highways. The elements can be reinstalled and energized immediately after the move. The concrete sidewalks along Convent Avenue and West 141st Street are proposed to be replaced in kind on both sides of the streets. It is recommended that the West 141st Street streetlights be replaced with traditional "shepherd's crook" fixtures to match those already on Convent Avenue.

The street trees felled for the move will also be replaced, within the existing tree pits on the west side of Convent Avenue and within the lawn panels on the east side. Two trees will be replaced on each side of Convent Avenue and one on each side will be replanted in place. Two trees will be lost on the north side of West 141st Street; three trees will be replanted including replacing a recently lost tree in an existing tree pit, and one will be replanted in place. On the south side, five new trees will be planted to replace the one to be removed and to replant the four previously lost. Two lindens will be replanted in place. The street trees will be selected from the NYC Department of Parks and Recreation's recommended list, and in accordance with the NYC Department of Highways approved details.

Caliper and species shall be determined in consultation with the NYC Parks up to 4" in caliper size. The most recent plantings on West 141st Street are 3" littleleaf linden trees. In addition the existing trees along the access corridors to the new Grange site, on Hamilton Terrace, West 141st Street and Convent

**THE RELOCATION OF HAMILTON GRANGE**
*Assessment of Feasibility & Associated Impacts*

Avenue, will be inspected and pruned. All work will be supervised by a certified arborist. New tree plantings will be contracted with a one-year maintenance program.

Within St. Nicholas Park, the intent is to site the building with a minimum of tree loss. A total of 12 trees will be removed, ranging from 3-1/2" to 29" in caliper. Those removed will be primarily in the area between the Grange and the Steinman Hall retaining wall of those removed, six are young, small caliper (4" - 5") Hawthorne trees which are proposed to be transplanted within St. Nicholas Park. A new landscaping plan will enhance the site, and be evocative of the parklike setting of the Grange during the time of Alexander Hamilton's residency. The new landscape design will help to stabilize soils on the hilly site.

A series of 13 sweetgum trees will also be planted on site. Commemorative of the original 13 colonies, an identical number of sweetgums were planted at the original Grange site. The intent is to propagate cuttings from the Mt. Vernon sweetgum trees, in the manner of the original gifts from George Washington to Alexander Hamilton.

## HAMILTON GRANGE RELOCATION
### *Manhattan Sites*

## TREE INVENTORY & DISPOSITION

| Tree ID | DBH (in.) | Species | Action | # of Replacement Trees* |
|---|---|---|---|---|
| St. Nicholas Park | | | | |
| A | 6-1/2" | Black Locust | Remove | 5 |
| B | 21-1/2" | Black Locust | Remove | 52 |
| C | 31-1/4" | Black Locust | Remove | 108 |
| D | 16-1/4" | Black Locust | Remove | 29 |
| E | 4-1/2" | Hawthorne | Transplant - 50" root ball | N/A |
| F | 4-1/2" | Hawthorne | Transplant - 50" root ball | N/A |
| G | 4-1/2" | Hawthorne | Transplant - 50" root ball | N/A |
| H | 29 | Pin Oak | Remove | 93 |
| I | 3-1/2" | Hawthorne | Transplant - 35" root ball | N/A |
| J | 27-1/2" | Pin Oak | Remove | 84 |
| K | 3-3/4" | Hawthorne | Transplant - 40" root ball | N/A |
| L | 4-1/2" | Hawthorne | Transplant - 45" root ball | N/A |
| West 141st Street - South | | | | |
| M | 7" | Scholar Tree | Remove | 7 |
| N | 3" | Littleleaf Linden | Dead - NYC Parks to Remove | N/A |
| O | 3" | Littleleaf Linden | Dead - NYC Parks to Remove | N/A |
| P | 3" | Littleleaf Linden | Transplant - 30" root ball | N/A |
| Q | 3" | Littleleaf Linden | Transplant - 30" root ball | N/A |
| West 141st Street - North | | | | |
| R | 14 | Willow Oak | Remove | 22 |
| S | 4-1/4" | Honey Locust | Transplant - 45" root ball | N/A |
| T | 12-3/4" | Willow Oak | Remove | 18 |
| Convent Avenue - East | | | | |
| U | 12" | Silver Maple | Tie Back for Move | N/A |
| V | 24" | Norway Maple | Prune Lower Branch | N/A |
| W | 7-1/4" | Sweetgum | Transplant - 75" root ball | N/A |
| X | 6-1/4" | Cherry | Remove | 5 |
| Y | 28" | Oak | Tie Back for Move | N/A |
| Convent Avenue - West | | | | |
| Z | 11-1/4" | Norway Maple | Remove | 14 |
| AA | 5-1/2" | Honey Locust | Transplant - 55" root ball | N/A |
| BB | 10-3/4" | Green Ash | Remove | 13 |
| Total Trees Removed: | 12 | | Total Replacement Trees: | 450 |

\* Total Replacement Trees: NYC Parks Department policy is based on the Basal Area Replacement Formula, Replacement Trees are 2-1/2" - 3" caliper and are valued at $500 each

|  | $500 |
|---|---|
|  | 450 |
| Total Replacement Value | $225,000 |

**Hamilton Grange**
BBB Ref. #1688                                                25 October 2000



**MOVE ROUTE**
HAMILTON GRANGE NATIONAL MEMORIAL
MANHATTAN SITES

WEST 141st STREET

⊠ M

⊠ C    ⊠ A

⊠ D

⊠ E

⊠ F

⊠ G

⊠ B

82'

98'

STEINMAN HALL
CITY COLLEGE OF NEW YORK

I ⊠    ⊠ H

23'

⊠ K

L ⊠

ST. NICHOLAS
PARK

LINE OF N.P.S.
EASEMENT

ST. NICHOLAS TERRACE

⊠ TREE TO BE
   REMOVED

Beyer
Blinder
Belle

**ST. NICHOLAS PARK RECEIVER SITE**
HAMILTON GRANGE NATIONAL MEMORIAL
MANHATTAN SITES

0    20'    40'    80'



## SECTION THROUGH CONVENT AVENUE
## LOOKING SOUTH - DURING MOVE



## SECTION THROUGH CONVENT AVENUE
## LOOKING SOUTH - POST MOVE



## CONVENT AVENUE SECTIONS
### HAMILTON GRANGE NATIONAL MEMORIAL
### MANHATTAN SITES



City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

Jane P. Cleaver
Chief of Parklands

(212) 360-3401
seeker@parks.nyc.gov

February 9, 2001

Alessandra Sumowicz
Director
Office of Environmental Coordination
100 Gold Street, 2nd Floor
NY, NY 10038

**Hamilton Grange, Bronx**
**ULURP #      NO10061MEM**
**CEQR#        00DPR001M**

Alexandra —
Dear Ms. Sumowicz:

In conformance with the requirements in the Environmental Assessment Statement guidelines, please find the attached Part III, Negative Declaration for the proposed relocation of Hamilton Grange, located in Community Board #9 in Manhattan. The Part III Environmental Assessment Statement addresses the granting of a permanent easement to the United States National Parks Service and the associated map change for this relocation. The Grange will be relocated from its current site at 287 Convent Avenue to a .093 acre section of St Nicholas Park, and will be permanently located within the park at the corner of 141st Street and Hamilton Terrace. Please call Kate Slevin at (212)-360-3421 with any questions.

Sincerely,

Jane P. Cleaver
Chief of Parklands

www. nyc. gov/parks

**ENVIRONMENTAL ASSESSMENT STATEMENT**
**Part III**
**Proposed Relocation of the Hamilton Grange National Memorial**
**St. Nicholas Park**
**Manhattan, New York**


**Lead Agency:**

City of New York, Parks and Recreation
The Arsenal, Central Park
New York, New York 10021


**Prepared for:**

City of New York, Parks and Recreation
The Arsenal, Central Park
New York, New York 10021

United States National Park Service
Northeast Regional Development Office
26 Wall Street
New York, New York


**Prepared by:**

TRC Environmental Corporation
1200 Wall Street West
Lyndhurst, NJ 07071


**February, 2000**

## ULURP #: N010061MEM
## CEQR #: 00DPR001M
## PROPOSED RELOCATION OF HAMILTON GRANGE
## CEQR ENVIRONMENTAL ASSESSMENT STATEMENT, Part III
## SERVICE LIST

### February 12, 2001

Alessandra Sumowicz
Director
Office of Environmental Coordination
100 Gold St., 2nd Floor, Room 244
New York, NY 10038

Beverly Reith
Director, Environmental Review
HPD – Division of Architecture and Engineering
100 Gold St.
New York, NY 10038

Mr. Randal Fong
Assistant Commissioner
DCAS Division of Real Estate Services
1 Centre St., 19N
New York, NY 10007

Marie Dooley
Department of Environmental Protection
Bureau of Legal Affairs
59-17 Junction Blvd., 11th Floor
Corona, NY 11368

Mr. Ralph Palmer
Chief of Fire Protection
New York City Fire Department
250 Livingston St.
Brooklyn, NY 11201

Bob Gochfeld
Director of Technical Review
Department of City Planning
22 Reade St.
New York, NY 10007

Naim Rasheed
Department of Transportation
Environmental Review Unit
40 Worth St.
New York, NY 10013

John J. Strauss
Department of Sanitation
Bureau of Legal Affairs
125 Worth St., Room 710
New York, NY 10013

Mr. Charles DeQuillfeldt
Hunters Point Plaza
Department of Environmental
Conservation
47-40 21st St.
Long Island City, NY 11101

Mr. Maurice Spreiregen
Director of Central Intake
Department of City Planning
22 Reade St., 2E
New York, NY 10007

Mr. David Carlson
Director of Landscape Architecture
Olmsted Center
Flushing Meadow Corona Park
Corona, NY 11368

Gina Santucci
Director of Environmental Review
Landmarks Preservation Committee
100 Old Slip
New York, NY 10005

Adrien Benepe
Manhattan Borough Commissioner
Arsenal West
16 W. 61st St., Floor 16
New York, NY 10023

C. Virginia Fields
Manhattan Borough President
Municipal Building, Executive
Division
1 Centre St.
Municipal Building, 19th Floor South
New York, NY 10007

Ms. Maritta Dunn, Chair
Manhattan Community Board #9
565 West 125th St.
New York, NY 10027

Mr. Lawrence McClean, District
Manager
Manhattan Community Board #9
565 West 125th St.
New York, NY 10027

Ms. Kathy Howe
Historic Preservation Specialist
NYS Office of Parks, Recreation and Historic
Preservation
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189
Waterford, NY 12188-0189

The Honorable Charles Rangel
2354 Rayburn HOB
Washington, DC 20515-3215

Mr. Eric Cardwell, P.E.
Consulting Engineer
Manhattan Borough President's Office
1 Centre St., 19th Floor
New York, NY 10007

Mr Tim Butz
Verizon Communications
5030 Broadway
Room 503
New York, NY 10034

## 1.0   PROJECT INTRODUCTION

The proposed action addressed in this Environmental Assessment Statement, Part III is the granting of a permanent easement to the United States National Park Service (NPS) and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial (Hamilton Grange or Grange). Presently located at 287 Convent Avenue, the Grange will be relocated by the National Park Service to a 0.93-acre portion of St. Nicholas Park. St. Nicholas Park is owned and administered by the City of New York, Parks and Recreation. The Grange, built in 1802-03 was the only home Alexander Hamilton ever owned and has architectural significance as a house of the Federal period. Part I and II of this EAS was filed with the Office of Environmental Coordination under letters dated October 23, 2000 and December 6, 2000, respectively. Parts I and II were distributed to the same service list as this Part III.

As described in Parts I and II of this EAS, the current site of the Hamilton Grange is not the structure's original site. The home was moved in 1889 by a real estate developer and donated to St. Lukes Episcopal Church. In 1924, the American Scenic and Historic Preservation Society acquired the Grange and opened it as a museum in 1933. The National Park Service assumed administration of the site in 1962 by an Act of Congress under Joint Resolution of April 27, 1962. In 1967, the City of New York Landmarks Preservation Commission designated the house as a landmark.

The 1962 act of Congress that established Hamilton Grange National Memorial directed that the house eventually be relocated and "preserved in a fitting setting" for its proper administration and interpretation as a national memorial. The granting of an easement by the City of New York, Parks and Recreation and the proposed relocation to St. Nicholas Park, which is located south of 141st Street in the immediate vicinity of the current Hamilton Grange site, will allow for the development of enhanced interpretive programs and provide a setting for the Hamilton Grange which is reminiscent of the structures original location as intended by the 1962 Act of Congress.

1

A detailed description of the General Management Plan for the Hamilton Grange was included in Section 2.0 of Part I of this EAS. Potential project impacts were evaluated in Part II of the EAS.

## 1.1 Background and Purpose

The relocation of the Hamilton Grange is proposed as part of the *General Management Plan* for Hamilton Grange National Memorial. The *General Management Plan* was the subject of a detailed and comprehensive environmental review prepared by the NPS in accordance with the National Environmental Policy Act (NEPA). As part of the NEPA Environmental Review, a *Draft General Management Plan/Environmental Impact Statement* (DEIS) was prepared and published in April 1993. That document was subject to a public review period of approximately 11 months. At the close of the comment period agency and public review comments were considered and the draft management plan and DEIS were reviewed in light of the comments received. In January 1995, the *Final General Management Plan Environmental Impact Statement* (FEIS) was published by the National Park Service. The FEIS addressed changes to the proposed management plan developed in consideration of public comments received and included information regarding additional public meetings as well as responses to comments received on the DEIS. Following publication of the FEIS, a NEPA Record of Decision was issued in July 1995. No changes have occurred to the Final General Management Plan since issuance of the NEPA Record of Decision.

This Environmental Assessment Statement (EAS) is submitted in accordance with the New York City Environmental Quality Review (CEQR) to address the grant of a permanent easement to the United States National Park Service and associated city map change, by the City of New York for the proposed relocation of the Hamilton Grange National Memorial. Part I and II of this EAS was filed with the Office of Environmental

Coordination under letters dated October 23, 2000 and December 6, 2000, respectively.
Parts I and II were distributed to the same service list as this Part III.

As provided by the CEQR regulations, materials prepared for other purposes,
specifically, the *Draft General Management Plan/Environmental Impact Statement, Final
General Management Plan Environmental Impact Statement*, and NEPA Record of
Decision, were evaluated to satisfy the expanded analyses portion of this Part II. The
NEPA Record of Decision was attached as Appendix A of Part I of this EAS document.
The *Draft General Management Plan/Environmental Impact Statement* and *Final
General Management Plan Environmental Impact Statement* were incorporated into the
EAS by reference and can be reviewed at the following locations:

> City of New York, Parks and Recreation
> The Arsenal, Central Park
> New York, New York 10021
>
> United States National Park Service
> Northeast Regional Development Office
> 26 Wall Street
> New York, New York 10005
>
> New York City Department of City Planning
> Environmental Assessment and Review Division
> 22 Reade Street, 4F
> New York, New York 10007
>
> Manhattan Community Board 49
> 565 West 125th Street
> New York, New York 10027

No substantive changes have occurred to the Final General Management Plan for the
Hamilton Grange since issuance of the July 1995 NEPA Record of Decision. However,
to ensure the "hard look" at potential impacts required by CEQR, in June 2000 the
National Park Service reassessed the *Final General Management Plan Environmental
Impact Statement* prepared for the proposed Hamilton Grange Relocation, dated January

3

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

1995, and the July 1995 Record of Decision. Where appropriate, text contained within the FEIS has been revised to reflect recent changes in the affected environment or the assessment of potential impacts. These revisions were identified in the FEIS addendum attached as Appendix B to Part I of this EAS document which was filed and distributed under cover letter dated October 23, 2000. The re-evaluation of the FEIS document established that there have been no substantive or significant changes in the affected environment or the assessment of impacts contained within the FEIS and reaffirmed the validity of the Record of Decision for the *Final General Management Plan*.

In addition, in July 2000, the NPS undertook an assessment of alternative moving techniques and associated construction-related impacts for the relocation of the Hamilton Grange. The findings of this analysis were addressed in Part II of this EAS.

This Part III summarizes the environmental findings of the City of New York, Parks and Recreation, the duly authorized lead agency under the New York City Environmental Quality Review, in this proceeding.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## 3.0    CEQR ENVIRONMENTAL ASSESSMENT STATEMENT

The main body of Part III of the CEQR Environmental Assessment Statement is included
on the following pages. Part I and II of this EAS was filed with the Office of
Environmental Coordination under letters dated October 23, 2000 and December 6, 2000,
respectively. Parts I and II were distributed to the same service list as this Part III.

## PART III

## ENVIRONMENTAL ASSESSMENT AND DETERMINATION

The lead agency should complete this Part after Parts I and II have been completed. In completing this Part, the lead agency should consult 6 NYCRR §617.11 (attached), which contains the State Department of Environmental Conservation's criteria for determining significance.

The lead agency should ensure the creation of a record sufficient to support the determinations in this Part. The record may be based upon analyses submitted by the applicant with Part II of the EAS. The EAS Guidebook sets forth methodologies developed by the City to be used in analyses prepared for the listed categories. Alternative or additional methodologies may be utilized by the lead agency.

1.    For each of the impact categories below, consider whether the action may have a significant effect on the environment with respect to that impact category. If it may, answer yes.

Neighborhood character _____

> The proposed relocation of the Hamilton Grange will not adversely impact neighborhood character within the project area.
>
> Temporary construction impacts will be experienced within the directly affected area, including increases in ambient noise levels, excavation within St. Nicholas Park, tree removal, and alterations to existing traffic patterns, during the physical relocation of the Grange. Additionally, some existing street trees and streetscape elements (i.e. fire hydrants, street lights, pedestrian crossing signal, etc.) along the moving route on Convent Avenue and West 141st Street and trees within St. Nicholas Park will need to be removed to facilitate the relocation of the Grange. To address these temporary construction impacts a number of project measures have been developed by the NPS in coordination with the City of New York, Parks and Recreation (see Section C and F of Part II of this EAS and response to question number 3, below). The intent of these measures will be to achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed

improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit to local residents.

## Socioeconomic impacts/displacement _____

Existing socioeconomic characteristics within the Project area will not be affected as a result of the relocation of the Grange. In addition, no displacement will occur as a result of the proposed action.

## Community facilities _____

The proposed action will result in the grant of a permanent easement to the United States National Park Service for a 0.93-acre parcel within St. Nicholas Park to facilitate the relocation of the Hamilton Grange. The proposed grant of easement will not preclude public access to the directly affected area within St Nicholas Park. The 0.93-acre parcel within St. Nicholas Park which comprises the proposed easement, however, will be managed by the National Park Service as the Hamilton Grange National Memorial. In addition, the relocation and restoration of the Hamilton Grange itself can be viewed as a beneficial community impact in as much as the relocation of the Grange will allow for its re-opening to the general public. The existing Hamilton Grange site was open to the public until June of 1992, when it was closed due to the unsafe structural condition of the building.

Additional community benefits will be experienced as a result of the new structure to be constructed at the current Hamilton Grange site at 287 Convent Avenue, which is also proposed as part of the Grange General Management Plan. The new building, to be no more than two stories and built on the 1889 Grange foundation, would emphasize heritage, education and community involvement. A multipurpose meeting room would occupy the main floor, where educational programs and community meetings could be held. Space would also be provided for exhibits to depict the growth, and development of, Harlem; the role of the Grange in the community; the role of St. Luke's parish in preserving the Grange; and broader community preservation efforts. This new structure would be designed to be compatible and enhance the qualities for which the Hamilton Heights Historic District was established.

## Open space _____

The relocation of the Hamilton Grange will have a direct impact on designated open space within the directly affected area as the proposed action will result in the grant of a permanent easement to the United States National Park Service

(NPS) and associated city map change, by the City of New York for a 0.93-acre portion of St. Nicholas Park. This action, however, will not preclude public access to this portion of St. Nicholas Park. Rather, the site will be managed by the National Park Service as the Hamilton Grange National Memorial and open to the general public. Therefore, there will be no net loss of publicly accessible open space as a result of the proposed action.

### Historic and archaeological resources _____

Beneficial cultural and historic impacts will be experienced through the restoration of the Hamilton Grange and the development of enhanced interpretive programs at the structure's new setting. The relocation and restoration of the Grange would recreate the appearance of the Grange during Hamilton's residency in accordance with the approved *Historic Structure Report* and NPS *Management Policies* and any new information learned during the move. Implementation of this plan would accomplish what Congress intended in establishment of the memorial - restoration of the Grange within an appropriate setting while keeping it within the context of its present-day community and on Hamilton's original tract of land.

Additionally, impacts to unidentified archaeological resources that could be present at the proposed relocation site within St. Nicholas Park are not anticipated. Site investigations by the National Park Service's architectural consultant for this project, Beyer Blinder Belle, indicate that due to the close proximity of bedrock to the ground surface at the proposed relocation site, it is unlikely that unidentified archaeological artifacts will be encountered during proposed excavations. Prior to project excavation activities, however, the National Park Service will conduct a more detailed investigation of the proposed relocation site to discover any underlying historical data/artifacts.

### Transportation _____

The proposed action will not result in any significant adverse traffic impacts. This conclusion is supported by project correspondence from the City of New York Department of Transportation, dated January 29, 2001, which states, "we have concluded that the proposed relocation of the Hamilton Grange will not create any significant traffic impacts". Potential transportation impacts as a result of the proposed action are limited to temporary alterations to existing traffic patterns during the physical relocation of the Grange. In addition, damage to the roadway surface of and utilities within Convent Avenue and West 141st Street will not occur as a result of the relocation. The weight of the Grange will be distributed over multiple rubber-tired dollies. The result of this distribution is that the weight of the

8

Grange will exert no more pressure on the roadway surface than that of a typical car or truck.

**Air quality** _____

The proposed action will impact local air quality conditions within the directly affected area.

**Infrastructure and energy** _____

The proposed action will not adversely impact existing infrastructure and energy resources within the directly affected area. Damages to roadway surfaces and utilities within Convent Avenue and West 141st Street will not occur as a result of the relocation. During the proposed relocation, the weight of the Grange will be distributed over multiple rubber-tired dollies. The result of this distribution is that the weight of the Grange will exert no more pressure on the roadway surface than that of a typical car or truck.

**Natural resources** _____

The relocation of the Hamilton Grange will result in an alteration of existing landscape conditions within the directly affected area, which includes the existing Hamilton Grange site, the street rights-of-way of Convent Avenue and West 141st Street, and a 0.93-acre portion of St. Nicholas Park. Impacts to natural resources resulting from the proposed action are limited to the removal of existing street trees along Convent Avenue and West 141st Street and trees within St. Nicholas Park.

The National Park Service, in coordination with the City of New York, Parks and Recreation, has identified a number of project measures to address these impacts and achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit to local residents. These improvements, which are described in greater detail below, include replacement/relocation of street trees required to be moved; replacement of existing missing trees on West 141st Street; inspection and maintenance by a certified arborist of existing street trees unaffected by the relocation; and planting of new trees and landscaping within St. Nicholas Park and the adjacent neighborhood in accordance with the City of New York, Parks and Recreation Basil Area Replacement Formula policy.

9

## Waterfront revitalization _____

The proposed action will not affect coastal resources. The directly affected area is not located within any designated coastal zone.

## Hazardous materials _____

The relocation of the Hamilton Grange will not result in the project impacts related to hazardous materials. A letter was sent to Mr. Ralph Palmer, Chief of Fire Prevention with the New York City Fire Department on June 26, 2000 to determine if any underground tanks exist within the boundaries of the proposed National Park Service easement within St. Nicholas Park. Correspondence received from the New York City Fire Department indicates that no storage tanks are known to be present within the directly affected area. In addition, the City of New York Department of Environmental Protection (NYCDEP) was contacted to confirm the presence/absence of known hazardous materials within the directly affected area. Correspondence received from the NYCDEP, dated July 20, 2000, indicates that there are no known occurrences of hazardous materials within the directly affected area.

## Noise _____

The proposed action will not result in significant noise levels. Temporary increases in ambient noise levels will occur during the physical relocation of the Grange and subsequent restoration activities. These temporary increases, however, will not be more than those associated with typical construction activities within the City of New York.

## Solid waste _____

The proposed action will not result in the generation of unusual or significant amounts of waste.

2.    Are there any aspects of the action relevant to the determination whether the action may have a significant effect on the environment, such as combined or cumulative impacts, that were not fully covered by other responses and supporting materials? If there are such aspects, explain them and state whether, as a result of them, the action may have a significant effect on the environment.

No, potential impacts of the proposed action have been adequately assessed. The relocation of the Hamilton Grange is proposed as part of the *General Management Plan* for Hamilton Grange National Memorial which was the subject of a detailed and comprehensive environmental review prepared by the NPS in accordance with the National Environmental Policy Act (NEPA). As part of the NEPA Environmental Review, a *Draft General Management Plan Environmental Impact Statement* (DEIS) was prepared and published in April 1993. That document was subject to a public review period of approximately 11 months. At the close of the comment period agency and public review comments were considered and the draft management plan and DEIS were reviewed in light of the comments received. In January 1995, the *Final General Management Plan Environmental Impact Statement* (FEIS) was published by the National Park Service. The FEIS addressed changes to the proposed management plan developed in consideration of public comments received and included information regarding additional public meetings as well as responses to comments received on the DEIS. Following publication of the FEIS, a NEPA Record of Decision was issued in July 1995. The Record of Decision is attached as Appendix A of Parts I and II of this EAS

No changes have occurred to the Final General Management Plan since issuance of the NEPA Record of Decision. However, to ensure the "hard look" at potential impacts required by CEQR, in June 2000 the National Park Service reassessed the *Final General Management Plan Environmental Impact Statement* prepared for the proposed Hamilton Grange Relocation, dated January 1995, and the July 1995 Record of Decision. Where appropriate, text contained within the FEIS was revised to reflect recent changes in the affected environment or the assessment of potential impacts. These revisions were identified in the FEIS addendum attached to this EAS as Appendix B of Parts I and II. The re-evaluation of the FEIS document established that there have been no substantive or significant changes in the affected environment or the assessment of impacts contained within the FEIS and reaffirmed the validity of the Record of Decision for the *Final General Management Plan*.

In addition, in July 2000, the NPS undertook an assessment of alternative moving techniques and associated construction-related impacts for the relocation of the Hamilton Grange. The findings of this analysis were disclosed in Part II of this EAS and were used in the preparation of this Part III.

**3.    If the lead agency has determined in its answers to questions 1 and 2 of this Part that the action will have no significant effect on the environment, a negative declaration is appropriate. The lead agency may, in its discretion, further elaborate here upon the reasons for issuance of a negative declaration.**

The City of New York, Parks and Recreation has determined that the proposed action will not have a significant effect on the environment and that a negative declaration is appropriate. The National Park Service has adequately assessed and disclosed the potential environmental effects of the proposed action, and where appropriate, identified project measures to address identified temporary construction impacts associated with the physical relocation of the Grange. The measures, which were developed in coordination with the City of New York, Parks and Recreation, are intended to achieve a "net environmental improvement" within St. Nicholas Park and along the streetscapes of Convent Avenue and West 141st which will serve as an "access corridor" between the existing Grange site and the proposed relocation site. The proposed improvements will result in a "greening" of the Convent Avenue and West 141st streetscapes and be designed to complement the Grange and the Hamilton Heights Historic District; enhance visitor interpretation of the relocated Grange; and provide a benefit to local residents. The specific measures include:

- Replacement/relocation of street trees required to be removed along Convent Avenue and West 141st Street. Significant efforts shall be made to relocate or replant in place as many existing street trees as possible and/or practicable;

- Replacement of missing street trees on West 141st Street;

- Inspection and maintenance of existing street trees along the proposed move route by a certified arborist;

- Transplantation of Hawthorne Tree in St. Nicholas Park;

- Planting of new trees and landscaping within St. Nicholas Park and within the adjacent neighborhood. The placement of new trees will be in accordance with the City of New York, Parks and Recreation Basil Area Replacement Formula policy. The placement of replacement trees will be coordinated with the City of New York, Parks and Recreation.

- Streetlight upgrades along West 141st Street. Fixtures will be period lighting sympathetic to the historic character of the Hamilton Heights Historic District and the Grange itself. The fixtures will not be dissimilar to the traditional "sheperd's crook" fixtures currently in place along Covent Avenue;

- Replacement of existing sidewalks along the move route on Convent Avenue and West 141st Street; and

- Siting considerations for the relocated Grange within St. Nicholas Park to minimize required excavations and tree removals.

- The NPS, in coordination with the City of New York, Parks and Recreation, will develop a community notification program to inform local residents of upcoming significant project activities. This program shall include, but not be limited to, to holding community information meetings and notification via

certified U.S. mail of significant project milestones/construction activity at least six months prior to their commencement.

4.   If the lead agency has determined in its answers to questions 1 and 2 of this Part that the action may have a significant effect on the environment, a conditional negative declaration (CND) may be appropriate if there is a private applicant for the action and the action is not Type I. A CND is only appropriate where the mitigation measures identified will modify the proposed action so that no significant adverse environmental impacts will result. If a CND is appropriate, the lead agency should describe here the conditions to the action that will be undertaken and how they will mitigate potential significant impacts.

Not Applicable. See response to No. 3 above.

5.   If the lead agency has determined that the action may have a significant effect on the environment, and if a conditional negative declaration is not appropriate, then the lead agency should issue a positive declaration. Where appropriate, the lead agency may, in its discretion, further elaborate here upon the reasons for issuance of a positive declaration. In particular, if supporting materials do not make clear the basis for a positive declaration, the lead agency should describe briefly the impacts it has identified that may have a significant effect on the environment.

Not Applicable. See response to No. 3 above.

CEQR Environmental Assessment Statement:
Proposed Relocation of the Hamilton Grange National Memorial

## LEAD AGENCY CERTIFICATION

**Preparer name:**    Kevin J. Maher, AICP

                             TRC Environmental Corporation

**Preparer signature:**

**Date:**

**Name of lead agency representative:**    June P. Cleaver

**Title of lead agency representative:**    Chief of Parklands

**Signature of lead agency representative:**

**Date:**





585 West 125 Street
New York, New York 10027
(212) 864-6200/Fax # 662-7396

**COMMUNITY BOARD #9, MANHATTAN**

C. Virginia Fields
*President, Borough of Manhattan* June 26, 2001

George Goodwill
Chair

Carolyn R. Thompson
First Vice-Chair

Maritta Dunn
Second Vice-Chair

Carolyn Kent
Secretary

Gwendolyn Giles-Madden
Assistant Secretary

Carlotta Damanda
Treasurer

Barbara Marshall
Assistant Treasurer

•

Lawrence T. McClean
District Manager

Mr. Alan M. Moss
First Deputy Commissioner
NYC Department of Parks & Recreation
830 Fifth Avenue, Rm. 308
New York, New York 10021

Dear Mr. Moss:

  At it's General meeting on Thursday June 21, 2001 Community Board No. 9 Manhattan held a Public Hearing on Application Number 010340MM.

  This was the disposition of relocating the Hamilton Grange from 287 Convent Avenue to the proposed site in St. Nicholas Park between West 141st and St. Nicholas Terrace.



  The Board voted 29 in favor, 3 opposed, 3 abstaining to support the application.

  If you have any questions please feel free to contact either myself or District Manager Lawrence McClean at (212) 864-6200.

Sincerely,

*George Goodwill*

George Goodwill
Chair

cc: Hon. Rudolph Giuliani, Mayor
 Hon. C. Virginia Fields, Manhattan Borough President
 Hon. Charles Rangel, Congressman
 Hon. Stanley Michels, City Councilmember
 Hon. Keith Wright, Assemblyman
 Hon. David Paterson, State Senator
 Mr. Joseph Avery, NPS
 Ms. Jane Cleaver, City Planning

SERVING HAMILTON HEIGHTS/MANHATTANVILLE & MORNINGSIDE HEIGHTS



City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Adrian Benepe
Commissioner

Alessandro G. Olivieri
Counsel

(212) 360-1314
alessandro.olivieri@parks.nyc.gov

April 26, 2002

Mr. Joseph T. Avery
Superintendent
National Park Service
Manhattan Sites
26 Wall Street
New York, NY 10005

      Re:    Hamilton Grange Easement

Dear Mr. Avery:

      I am pleased to forward the grant of easement for the relocation of Hamilton
Grange NM to St. Nicholas Park, which grant was signed by Deputy Mayor Patricia
Harris, for execution by the National Park Service. Please execute and forward a copy to
my attention. I believe that you will also be recording the deed. Let me know if you
need me to take further action in this matter.

      If you have any questions I may be contacted at (212) 360-1393.

Sincerely,

Nancy S. Harvey
Assistant Counsel

GRANT
OF
EASEMENT

This Grant of Easement made the 29ᵗʰ day of April, 2002 between the City of New York ("Grantor"), with an address at City Hall, New York, NY 10007, and the United States of America ("Grantee"), with an address at 1849 C Street, N.W., Room 2444, Washington, D.C. 20240.

WHEREAS, the Grantor is the owner in fee of a certain piece of land described as Tax Block 1957, a portion of Lot 140, in New York County known as St. Nicholas Park; and

WHEREAS, the Grantee is desirous of obtaining an easement in a portion of the said above described property to relocate and establish thereon the former dwelling house of Alexander Hamilton, commonly known as The Grange, to restore The Grange to its original appearance, and to permit members of the public to traverse the area, and for such other purposes as may be required in connection with the construction, management, development, use, and maintenance of said Hamilton Grange National Memorial; and

WHEREAS, pursuant to Chapter 551 of the Laws of New York (1999), the Grantor is authorized to grant easements over a portion of St. Nicholas Park, Manhattan, to the Grantee for use as a site for the Hamilton Grange National Memorial;

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration and the payment of one dollar ($1.00) by the Grantee to the grantor herein, the receipt of which is hereby acknowledged by the Grantor, it is mutually agreed as follows:

The grantor hereby grants to the Grantee a permanent and perpetual easement, free and clear of all liens and encumbrances, along, under, over, across, and through a portion of that land described in the metes and bounds description annexed as Exhibit A, with the right of the Grantee at all times, without notice, to enter upon the permanent easement area with men, materials, vehicles, and equipment, for the purposes of relocating and restoring the former dwelling house of Alexander Hamilton, commonly known as the Grange, and for other purposes as may be required in connection with the construction, management, development, use, and maintenance of said Hamilton Grange National Memorial.

Grantee agrees that it shall be bound by the following provisions:

    A. No construction of any kind (except for the initial design, construction and placement of said Hamilton Grange structure and any and all subsequent restoration, maintenance, and repair to said Hamilton Grange structure) shall be conducted by Grantee without the prior written approval of the City of New York/Parks & Recreation,

1

including approval of all designs associated with such construction and the approval of any other City, State or Federal agency with pertinent jurisdiction. Restoration, maintenance, and repair shall include any physical alteration to the said Hamilton Grange structure to maintain the integrity of the said structure consistent with the Secretary of Interior's Standards for Restoration, the Hamilton Grange General Management Plan and as approved by the New York State Historic Preservation Officer that may be accomplished within the limits of the premises described in Exhibit A.;

B. Vehicular access at all times shall be available to the City or its agents, public or private, to perform work within the easement;

C. No trees or shrubs of any kind shall be removed or planted within or over said easement area without prior written approval of the City of New York/Parks & Recreation;

IN WITNESS WHEREOF, the Grantor has signed and subscribed this grant on the date above mentioned.

CITY OF NEW YORK

By: *Patricia Harris*

[Deputy] Mayor

APPROVED AS TO FORM:

*Theodora K. Okun*

Acting Corporation Counsel

2

State of New York    )
                             ss.:
County of New York  )

On the 24th day of _Aprie_, in the year 2002, before me, the undersigned,
personally appeared _Patricia Harris_, personally known to me or proved to me on
the basis of satisfactory evidence to be he individual(s) whose name(s), is (are)
subscribed to the within instrument acknowledged to me that he/she (they) executed the
same in his/her (their) capacities, and that by his/her (their) signature(s) on the
instrument, the individual(s), or the person or entity upon behalf of which the
individual(s) acted, executed the instrument.

_____
(N)otary Public

JEAN A. ROSS
Notary Public, State of New York
No. 31-5007029
Qualified in New York County
Commission Expires May 19, 2002

3

By virtue of the authority granted to me by the Director, National Park Service, as set forth in the Federal Register, Volume 58, Number 176, date Tuesday, September 14, 1993, and titled "Order 77, Amendment 15, Regional Directors; Delegation of Authority," I hereby accept for the United States of America the foregoing easement within the boundary of St. Nicholas Park, this _____ day of _____ A.D. 2001.

<div style="text-align: right">

_____
Boyd L. Sponaugle
Realty Officer

</div>

Commonwealth of Pennsylvania    )
                                ) ss.
City/County of Philadelphia     )

On this _____ day of _____, 2002, before me, personally appeared Boyd L. Sponaugle, Realty Officer, of the Northeast Region, National Park Service, United States Department of the Interior, hereunto duly authorized as the representative of the United States of America, and acknowledged the foregoing instrument to be his free act and deed, and the free act and deed of the United States of America.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

<div style="text-align: right">

_____
Notary Public

</div>

My Commission expires:

4

## EXHIBIT A

### Tract 01-104

All that certain plot, piece or parcel of land, situated, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly streetline of West 141 Street, 349.85 feet northwest of the intersection of the westerly streetline of St. Nicholas Avenue with said southerly streetline of West 141 Street;

Thence running along said southerly streetline of West 141 Street, South 81° 15' 00" East, a distance of 240.58 feet to a point;

Thence South 41° 06' 19" West, a distance of 329.86 feet to a point on St. Nicholas Terrace;

Thence running along the northeasterly streetline of St. Nicholas Terrace, North 36° 15' 49" West, a distance of 45.24 feet to a point;

Thence running along said northeasterly streetline of St. Nicholas Terrace along a curve to the left having a radius of 160.00 feet, a distance of 40.63 feet to a point;

Thence running by land now or formerly of Dormitory Authority of the State of New York (College of the City of New York), North 08° 45' 00" East, a distance of 221.88 feet to the point or place of beginning.

Containing 0.93 of an acre, more or less.

The above Easement parcel is shown on a plan entitled "EASEMENT PLAN OF LAND, HAMILTON GRANGE, ST. NICHOLAS PARK, BOROUGH OF MANHATTAN, NEW YORK CITY, NEW YORK" prepared by Bryant Associates, Inc., dated February 5, 1997.

The above-described parcel, designated as Tract 01-104, Hamilton Grange National Memorial, is intended to be a portion of the same land acquired by the City of New York by Order filed on July 10, 1894 in Condemnation Proceeding No. 36-894, entitled "In the matter of the application of the Mayor, Alderman and Commonalty of The City of New York, by and through the Counsel of the Corporation, to acquire title to certain lands in the Twelfth Ward of The City of New York, as and for a public park to be designated and known as Saint Nicholas Park", under and pursuant to the provisions of Chapter 366 of the Laws of 1894 and recorded in the New York County Registry of Deeds Office in the State of New York.

```
Author:  Joe Avery at NP-MASI
Date:    03/26/2002  04:32 PM
Normal
Receipt Requested
TO: Marie Rust at NPS, Chrysandra Walter at NPS, Mike Adlerstein at NPS, Tom Dyer,
    Bill Sindelar at NPS
Subject:
------------------------------------ Message Contents
```

I am happy to advise you that I have moved the mapping process through
the Manhattan Borough President Office and back to the Department of
City Planning where the process will be completed.  I also have a copy
of the completed map and the transmittal letter from the Borough
President to the Director of Technical Review Unit at the Department of
City Planning.  In addition, I have the name of the person at City
Planning who is responsible for completing the process.

I can now see the easement being granted very soon or working out,
whatever is standing in its way very soon.  The community wants to
know where we are on this project and if we need any assistant from
them. On Wednesday, March 27, 2002 at 6:30 PM, I will be meeting with
Representatives of 10 organizations to give them a Status Report, and
requesting some of them to think about being part of The Friends of
Hamilton Grange non-profit group (501(3) C) which we will help
organize within the year.

We need to move the planning process forward with or without Denver
Service Center.


Joe

JGWA/NAR informal notes from NPS public meeting at Municipal Arts Society
Hamilton Grange National Memorial
December 21, 2006

- ❖ NPS overview of history of building, history of federal funding and process of relocation, involvement of Congressman Rangel to get project approved in 2006
- ❖ NPS summary of archival and physical investigations
  - ➤ Views to the house and from the house important
  - ➤ Little known of original landscape design, outside of 13 gum trees
  - ➤ Some domestic use of basement – unclear, almost no physical evidence
  - ➤ 1970s restoration, NPS Historic Structure Report
  - ➤ Front entrance and main stair evidence intact for restoration
- ❖ NPS approach to house move
  - ➤ Will allow contractor to propose method, may involve partial disassembly of house, possible use of Hamilton Terrace – no decisions made now
  - ➤ Want to balance best preservation of the building with best protection of the community, keep within schedule and budget
- ❖ Discussion of dismantling church loggia (Public Comment: possibly at Church's expense)
  - ➤ Was investigated by NPS, too costly and not feasible, given current condition of entire church – although funding from NY Landmarks Conservancy Sacred Sites could help, maybe a friends' group, private or financial interests that could assist
  - ➤ Further discussion of what was in original deed between church and American Scenic and Historic Preservation Society – details unclear
- ❖ Discussion of recent physical investigations in dining room – mirrored doors – led to discussion of house relocation/orientation
  - ➤ Public Comment – Community Board objects strongly to front entrance on 141st street
    - ■ Facing street that didn't exist
    - ■ 180 degrees turned around
    - ■ Views from and light into room different, will totally compromise the experience of the house
    - ■ ADA accessibility shouldn't be the excuse (Morris Jumel Mansion as an example of historic house provisions/exceptions from ADA?)
    - ■ Understands the need to compromise, but the NPS should be looking to make the building and its relocation more correct
    - ■ If can't, then the building should stay where it is
  - ➤ Further discussion of landscape plan (trees not shown), impact of the move on house and community, current window of opportunity with Rangel in Congress – time is now
  - ➤ Statement that Community Board had already had this fight
    - ■ Ideal relocation – back to original site, with original light and views
    - ■ Should be relocated as close to original as possible
    - ■ Voted in committee of community board re: orientation with front entrance (NAR: *no proof of this offered at meeting*) facing south south-west, entry to park from corner of 141st and St. Nicholas Avenue

JGWA/NAR informal notes from NPS public meeting at Municipal Arts Society
Hamilton Grange National Memorial
December 21, 2006

- Tour buses a big problem, keep them on St. Nicholas Avenue, near entrance down there, or at City College – not on 141st street, which is narrow and has a steep grade – bus staging area unclear
- NPS – two issues – orientation and entrance intertwined
  - NPS philosophically supports original orientation, but realities of project and new site will require interpretation of original experiences, views
- Further discussion of move impact on community
  - 1/3 and 2/3 disassembled move – extreme, may cost more due to unknown conditions, risks
  - Hope for 2007 budget, may be 2008 – close to $8.1M
  - One set of documents – move and restoration, competitive negotiation with pre-qualified contractors a possible procurement method
- Convent Avenue site
  - NPS committed to taking care of what they have
  - No new building planned for Convent Avenue at this time, but NPS still committed to working on this piece
  - NPS can sell the property without restrictions
  - Community Board would like to see restrictions in place – perhaps NPS could negotiate a land transfer?
  - Public Comment: perhaps replicate on Convent Avenue site an interpretation of Hamilton Grange to document/reflect the history of the site
  - Public Comment: Need for an NPS interpretive center at this site
    - NPS: House then isolated from interpretive traffic of visitors
    - Public Comment: don't want exhibits at restored house; want true restoration of kitchen/basement space. NPS ends up putting offices in historic sites – unfortunate
  - Public Comment: how will NPS protect and maintain empty site until building is built? 24 hour guards?
- Discussion of letter from Community Board to Congressman Rangel (NAR: *not sure if had been sent or was to be sent*)
  - Importance of project, key commitments by NPS to Comm. Brd.
  - Public Comment: "We were promised X, Y, and Z – we want whatever it takes to do this"
  - Move of Hamilton Grange important to all New Yorkers, not just local community
  - Public Comment: learned some things from this meeting – orientation not as previously agreed; bus staging on Convent Avenue or St. Nicholas Avenue not acceptable

5/27/2008

2







GRANGE BUILDING ROTATED 180 DEGREES TO FACE SOUTH WEST. HANDICAPPED ACCESS PROVIDED TO THE EAST OF THE BUILDING UNDER THE FRONT PORCH AT THE SOUTH WEST CORNER OF THE BUILDING. FIRST FLOOR ELEVATION OF THE BUILDING REMAINS THE SAME AS DESIGN DWGS.

ST NICHOLAS SITE
CONCEPTUAL LAYOUT
OPTION 3
HAMILTON GRANGE NATIONAL MEMORIAL
ST. NICHOLAS PARK, NEW YORK CITY

**HAMILTON GRANGE MEETING NOTES**
**April 12, 2007**

Location:  Hamilton Grange and St. Nicholas Park

Participants:    (Community) Michael Adams, Jeff Alama, Ron Melichar, Brad Taylor

(Jack Waite Associates) Nancy Rankin

(NPS) Albert Atchison, Maria Burks, Steve Laise, Shirley McKinney, Bill McLaughlin, Stephen Spaulding

**Spaulding** presented three options which would change the orientation of HAGR from the north (facing W. 141st. Street) to the south (facing St. Nicholas Park and CCNY).

Option 1
Handicapped access is provided to back of building only.  Elevation of building is lowered, resulting in fewer steps to front entrance than were historic and more steps added to the rear.

Option 2
Handicapped access is provided to front of building around the west side (toward CCNY).  A retaining wall and 50 feet of railing are required, reaching a total height of approximately 9 feet.  Elevation of the building is raised in order to meet the grade required for handicapped access.

Option 3
Handicapped access is provided around the east side (toward park).  Fill is required to extend the path eastward, along with a 40 foot long railing and a retaining wall of approximately 5 feet in height.

Since this is a new construction, **ADA requirements must be met.**
**Melichar** said that the approach from the rear of the building might be all right, since it doesn't look very different from the front.
**Spaulding** pointed out that the tri-partite windows are on the front only, and are an important feature.
**Adams** observed that NPS could interpret any differences from the original site and orientation.
**Melichar** said that the having visitors enter from the rear would raise challenging questions about why the house was oriented this way, and this might encourage them to become more engaged.
**Adams** suggested CCNY build a stair to provide access from St. Nicholas Terrace to south side of HAGR.
**Melichar and Adams** like the view of the park from the front of the house if it faced south.  They feel it provides a more "rural" setting similar to the original location.
**Spaulding** likes the reflection of the park from the mirrored doors in the dining room if the house faced south.  Otherwise, the mirrors reflect the hillside toward CCNY.
**Laise** mentioned that during the lengthy charette, the north-facing orientation was finally the preferred alternative because it offers visitors a **better view of the house,** not from the house.
**Adams** said that there is no perfect solution, but that the north-facing orientation creates "an even greater fiction."  He also said that "any hale, hearty person" can easily walk up the steps from the park to approach the house from the south; and the number of handicapped visitors is negligible.  He identified himself as "a historian and representative of a consensus of the community."



# United States Department of the Interior

NATIONAL PARK SERVICE

National Parks of New York Harbor
26 Wall Street
New York, New York 10005

IN REPLY REFER TO:

D2217 (NPNH-C)

April 17, 2007

Ms. Carolyn Kent
440 Riverside Drive, Apt. 32
New York, NY 10027

Dear Ms. Kent:

I regret that you were unable to join the recent discussion of the orientation of Hamilton Grange. Enthusiasm was warm, although the weather was frigid! I hope you are feeling much better by now.

We share the concern expressed by Michael Adams that an even greater misunderstanding of the original orientation of the house than at present not be created. It is most unfortunate that nothing like the original site exists in the area today. However, I believe that information about the original site, Convent Avenue site, and the park site can be conveyed through good interpretation.

I could also appreciate the feeling expressed by Michael and Ron that the view of the park toward the southwest creates a most gracious pastoral impression.

However, in the end, several other important considerations had to be weighed. First, as a "new construction," the project must comply with ADA accessibility for wheelchair users. Provision for wheelchair access around the house to the south façade creates a number of undesirable impacts on the landscape, including the addition of extended fill, retaining walls, and railings. Second, after much discussion, our belief is that the view of the house from West 141st street, the closest public access point, must include the handsome front façade. This view of the house front was important to Alexander Hamilton as, for example, it includes the tripartite window. It also must be important to our presentation to visitors today.

I know you care deeply about all issues involving historic preservation, and your participation in the many discussions of this project have been informative and helpful. Thank you for participating in this important process.

Sincerely,

Maria Burks
Superintendent, Manhattan Sites

D2217 (NPNH-C)                                                          Burks

April 19, 2007

Mr. Michael Adams
Community Board #9
565 West 125th Street
New York, NY 10027

Dear Mr. Adams:

I am most grateful to you for joining the recent discussion of the orientation of Hamilton Grange. Enthusiasm was warm, although the weather was frigid!

We share the concern that an even greater misunderstanding of the original orientation of the house than at present not be created. It is most unfortunate that nothing like the original site exists in the area today. However, I believe that information about the original site, Convent Avenue site, and the park site can be conveyed through good interpretation.

I could also appreciate your feeling that the view of the park toward the southwest creates a most gracious pastoral impression.

However, in the end, several other important considerations had to be weighed. First, as a "new construction," the project must comply with ADA accessibility for wheelchair users. Provision for wheelchair access to the south façade creates a number of undesirable impacts on the landscape, including the addition of extended fill, retaining walls, and railings. Second, after much discussion, our belief is that the view of the house from West 141st street, the closest public access point, must include the handsome front façade. This view of the house front was important to Alexander Hamilton as, for example, it includes the tripartite window. It also must be important to our presentation to visitors today.

I know you care deeply about all issues involving historic preservation, and your participation in the many discussions of this project have been informative and helpful. Thank you for participating in this important process.

Sincerely,

Maria Burks
Superintendent, Manhattan Sites

MBurks:jb:04/18/07:a:disk-H:Hamilton Grange 5



**HAMILTON GRANGE**

NATIONAL PARKS OF NEW YORK HARBOR

National Park Service
U.S. Department of the Interior
www.nps.gov/hagr

Hamilton Grange National Memorial Briefing
Thursday, December 13, 2007
Shepherd Hall, City College of New York

## AGENDA

1. Welcome & Introductions

2. Briefing on Move Schedule

3. Discussion: Re-use of Convent Avenue Site

4. Questions & Comments

5. Next Steps

To sign up to receive move updates via email or to send us questions and comments, please visit www.nps.gov/hagr. You may also write to us at the following address:

Hamilton Grange National Memorial
287 Convent Avenue
New York, NY 10031



Hamiltons' 1819 boundry with 1911 survey overlay

original location

existing location

new location

Relocate and Restore Hamilton Grange
St. Nicholas Park, NY, NY
National Park Service



Grange NW Elevation ca.1876

Grange NE Elevation ca. 1876
W

Grange SE Elevation ca. 1884, Sweet Gums to the east.

Grange, existing rear elevation viewed from Hamilton terrace

1997

New Site viewed from Hamilton Terrace

Grange, existing Front Elevation

Relocation and Restoration of Hamilton Grange
St. Nicholas Park, NY, NY
National Park Service

Grange, existing rear elevation

Grange abutting pt Bldg to the North

Narrow alley @ Grange

St Lukes to the South

RELOCATION, STABILIZATION & RESTORATION OF HAMILTON GRANGE



Figure 1

GROUND FLOOR PLAN

FIRST FLOOR PLAN

SECOND FLOOR PLAN

Floor Plans for the Restored Grange

NATIONAL PARK SERVICE

BEORNARE, OWINGS & MERRILL LLP
JOHN G. WAITE ASSOCIATES, ARCHITECTS, PLLC

RELOCATION, STABILIZATION & RESTORATION OF HAMILTON GRANGE

NEW CONVENT AVENUE – ST. NICHOLAS PARK, NEW YORK, NY 10031

FALL 2000

Contextural Map and Site Plan
Original, Existing and New Location

NATIONAL PARK SERVICE

HISTORIC PHOTOS, HAMILTON GRANGE ON ITS ORIGINAL SITE



## Proposed Landscape at New Site

Reloca
St. Nicholas Park, NY, NY
National Park Service


SCALE OF FEET



| ID | Task Name | Dur | Start | Finish |
|----|-----------|-----|-------|--------|
| 1 | ADMINISTRATION | 370 d | 11/19/07 | 5/11/09 |
| 2 | Notice to Proceed | 0 d | 11/19/07 | 11/19/07 |
| 4 | Submittals | 80 d | 11/19/07 | 3/14/08 |
| 5 | Preconstruction Submittals | 1 d | 11/19/07 | 11/19/07 |
| 6 | Building Moving Submittals | 10 d | 11/19/07 | 11/30/07 |
| 7 | Sitework Submittals | 20 d | 11/19/07 | 12/14/07 |
| 8 | Concrete Submittals | 20 d | 11/19/07 | 12/14/07 |
| 9 | Masonry Submittals | 30 d | 11/19/07 | 1/2/08 |
| 10 | HVAC Equipment Submittals | 20 d | 11/19/07 | 12/14/07 |
| 11 | Other Mechanical Submittals | 60 d | 11/19/07 | 2/15/08 |
| 12 | Electrical Submittals | 30 d | 11/19/07 | 1/2/08 |
| 13 | General Construction Submittals | 80 d | 11/19/07 | 3/14/08 |
| 24 | Lead Times | 90 d | 11/19/07 | 3/28/08 |
| 26 | Preconstruction Permitting | 10 d | 11/19/07 | 11/30/07 |
| 27 | Building Moving Permitting | 30 d | 12/26/07 | 2/7/08 |
| 25 | HVAC Equipment | 60 d | 1/3/08 | 3/28/08 |
| 14 | Approvals | 89 d | 11/20/07 | 3/28/08 |
| 15 | Preconstruction Approvals | 1 d | 11/20/07 | 11/20/07 |
| 16 | Building Moving Approvals | 15 d | 12/3/07 | 12/21/07 |
| 17 | Sitework Approvals | 10 d | 12/17/07 | 1/2/08 |
| 18 | Concrete Approvals | 10 d | 12/17/07 | 1/2/08 |
| 20 | HVAC Equipment Approvals | 10 d | 12/17/07 | 1/2/08 |
| 19 | Masonry Approvals | 10 d | 1/3/08 | 1/17/08 |
| 22 | Electrical Approvals | 10 d | 1/3/08 | 1/17/08 |
| 21 | Other Mechanical Approvals | 10 d | 2/18/08 | 2/29/08 |
| 29 | General Construction Approvals | 10 d | 3/17/08 | 3/28/08 |
| 3 | End of Winter Conditions | 0 d | 3/3/08 | 3/3/08 |
| 28 | Substantial Completion | 0 d | 4/13/09 | 4/13/09 |
| 26 | Punchlist | 20 d | 4/14/09 | 5/11/09 |
| 30 | Final Completion | 0 d | 5/11/09 | 5/11/09 |
| 31 | Contract Completion Date | 0 d | 5/11/09 | 5/11/09 |
| 95 | CONSTRUCTION - CONVENT AVE | 222 d | 11/19/07 | 10/3/08 |
| 96 | Mobilization/ Coordination with NYC Parks | 10 d | 11/19/07 | 11/30/07 |
| 98 | Construction Fencing | 5 d | 12/3/07 | 12/7/07 |
| 97 | Setup Offices | 5 d | 12/10/07 | 12/14/07 |
| 99 | Salvage Bldg Exterior | 15 d | 12/17/07 | 1/9/08 |
| 100 | Interior Demolition | 10 d | 1/10/08 | 1/24/08 |
| 101 | Temp Shoring & Cutting of Building | 10 d | 1/25/08 | 2/7/08 |
| 103 | Preparation for Building Moving | 30 d | 2/8/08 | 3/21/08 |

Legend:
- Task
- Critical Task
- Progress
- Milestone ◆
- Summary
- Split
- Group By Summary
- Deadline

RELOCATE HAMILTON GRANGE (HAGR 015985)
Project: Schedule 2007-11-28 Baseline Schedule.mpp
Date: 11/28/07, Page: 1 of 3

| ID | Task Name | Dur | Start | Finish |
|----|-----------|-----|-------|--------|
| 102 | Removal of fences, trees in street | 10 d | 4/7/08 | 4/18/08 |
| 104 | Building relocation | 15 d | 4/14/08 | 5/2/08 |
| 105 | Restoration of fencing, trees in street | 10 d | 6/26/08 | 7/10/08 |
| 106 | Remaining Bldg Demo | 15 d | 7/11/08 | 7/31/08 |
| 107 | Fill & Grading | 15 d | 8/1/08 | 8/21/08 |
| 108 | Site Repairs | 15 d | 8/22/08 | 9/12/08 |
| 109 | Landscaping | 15 d | 9/15/08 | 10/3/08 |
| 110 | Convent Ave Complete | 0 d | 10/3/08 | 10/3/08 |
| 32 | CONSTRUCTION - ST NICHOLAS PARK | 340 d | 12/3/07 | 4/13/09 |
| 33 | Construction Fencing | 5 d | 12/3/07 | 12/7/07 |
| 34 | Site Clearing, Protection, & Erosion Ctr | 10 d | 12/10/07 | 12/21/07 |
| 35 | Excavation | 7 d | 12/26/07 | 1/4/08 |
| 36 | Removal of Ledge | 15 d | 1/7/08 | 1/28/08 |
| 40 | Concrete Footings | 10 d | 1/29/08 | 2/12/08 |
| 41 | Concrete Foundation Walls Sub-Basement | 13 d | 2/13/08 | 2/29/08 |
| 45 | Basement Interior Masonry Walls | 15 d | 3/3/08 | 3/21/08 |
| 46 | Steel, Deck & Concrete | 15 d | 3/24/08 | 4/11/08 |
| 43 | Remove cribbing and jacking | 15 d | 5/5/08 | 5/23/08 |
| 37 | Water & Sewer | 20 d | 5/27/08 | 6/23/08 |
| 44 | Re-Assemble building structure | 15 d | 5/27/08 | 6/16/08 |
| 47 | First Floor Concrete | 16 d | 5/27/08 | 6/16/08 |
| 48 | First Floor Masonry Walls | 15 d | 6/17/08 | 7/8/08 |
| 38 | Electrical Site Utilities | 15 d | 6/24/08 | 7/15/08 |
| 49 | Steel for building | 15 d | 7/9/08 | 7/29/08 |
| 39 | Sidewalk & Paving Repair | 15 d | 7/16/08 | 8/5/08 |
| 50 | Windows | 15 d | 7/30/08 | 8/19/08 |
| 51 | Exterior Stucco | 15 d | 8/20/08 | 9/10/08 |
| 55 | Rough Carpentry, Framing, Stair Framing | 15 d | 8/20/08 | 9/10/08 |
| 42 | Backfill Foundation | 15 d | 9/11/08 | 10/1/08 |
| 52 | Exterior Carpentry | 15 d | 9/11/08 | 10/1/08 |
| 53 | Site Pathways | 15 d | 10/2/08 | 10/23/08 |
| 60 | Lift | 15 d | 10/2/08 | 10/23/08 |
| 54 | Site Landscaping | 15 d | 10/24/08 | 11/13/08 |
| 56 | Gypsum Board | 15 d | 10/31/08 | 11/20/08 |
| 57 | Plaster | 20 d | 11/21/08 | 12/22/08 |
| 58 | Prime Paint | 15 d | 12/23/08 | 1/16/09 |
| 59 | Tile | 15 d | 1/19/09 | 2/6/09 |
| 62 | Millwork & Countertops | 15 d | 1/19/09 | 2/6/09 |
| 63 | Doors & Hardware | 15 d | 2/9/09 | 3/2/09 |

RELOCATE HAMILTON GRANGE (HAGR 015985)
Project Schedule 2007-11-28 Baseline Schedule.mpp
Date: 11/28/07. Page: 2 of 3

| | |
|--|--|
| Task | Summary |
| Critical Task | Split |
| Progress | Group By Summary |
| Milestone | Deadline |

| ID | Task Name | Dur | Start | Finish |
|---|---|---|---|---|
| 61 | Toilet Accessories | 15 d | 3/3/09 | 3/23/09 |
| 64 | Flooring | 15 d | 3/3/09 | 3/23/09 |
| 65 | Final Paint | 15 d | 3/24/09 | 4/13/09 |
| 111 | CONSTRUCTION OPTIONS | 160 d | 6/17/08 | 2/6/09 |
| 112 | Opt A Rear Porch Reconstruction | 15 d | 6/17/08 | 7/8/08 |
| 113 | Opt B East and West Piazza | 15 d | 7/9/08 | 7/29/08 |
| 114 | Opt C Selective Exterior Restoration | 15 d | 7/30/08 | 8/19/08 |
| 115 | Opt E Main Stair Reconstruction | 15 d | 1/19/09 | 2/6/09 |
| 66 | CONSTRUCTION - MEP | 170 d | 7/30/08 | 4/6/09 |
| 67 | HVAC Units Floors B-1 | 15 d | 7/30/08 | 8/19/08 |
| 72 | Plumbing water & sewer connection | 15 d | 7/30/08 | 8/19/08 |
| 85 | Conduit Fl 2-3 | 20 d | 7/30/08 | 8/26/08 |
| 91 | Fire Suppression Valves | 15 d | 7/30/08 | 8/19/08 |
| 68 | HVAC Units Floors 2-3 | 10 d | 8/20/08 | 9/3/08 |
| 76 | Boilers | 15 d | 8/20/08 | 9/10/08 |
| 83 | Panelboards | 15 d | 8/20/08 | 9/10/08 |
| 73 | Plumbing W&V Piping | 15 d | 8/20/08 | 9/10/08 |
| 92 | Fire Suppression Piping | 15 d | 8/20/08 | 9/10/08 |
| 69 | Ductwork Floors 2-3 | 20 d | 9/4/08 | 10/1/08 |
| 77 | Pumps & Mechanical Rm Piping | 15 d | 9/11/08 | 10/1/08 |
| 79 | ATC wiring | 15 d | 9/11/08 | 10/1/08 |
| 84 | Conduit Fl B-1 | 20 d | 9/11/08 | 10/8/08 |
| 74 | Plumbing water connection | 15 d | 9/11/08 | 10/1/08 |
| 70 | Ductwork Floors B-1 | 20 d | 10/2/08 | 10/30/08 |
| 71 | HVAC Piping | 20 d | 10/2/08 | 10/30/08 |
| 86 | Wiring | 15 d | 10/9/08 | 10/30/08 |
| 82 | Terminal Units | 15 d | 10/31/08 | 11/20/08 |
| 78 | Ductwork RGDs | 15 d | 1/19/09 | 1/30/09 |
| 80 | ATC Devices & Programming | 15 d | 1/19/09 | 2/6/09 |
| 87 | Light Fixtures | 15 d | 1/19/09 | 2/6/09 |
| 93 | Fire Suppression Heads | 15 d | 1/19/09 | 2/6/09 |
| 75 | Plumbing Fixtures | 15 d | 2/9/09 | 3/2/09 |
| 88 | Devices | 15 d | 2/9/09 | 3/2/09 |
| 89 | Fire Alarm Devices | 15 d | 2/9/09 | 3/2/09 |
| 81 | Testing, Balancing, & Commissioning | 15 d | 3/3/09 | 3/23/09 |
| 90 | Fire Alarm Program & Test | 10 d | 3/3/09 | 3/16/09 |
| 94 | Fire Suppression Testing | 15 d | 3/17/09 | 4/6/09 |

RELOCATE HAMILTON GRANGE (HAGR 015965)
Project: Schedule 2007-11-28 Baseline Schedule.mpp
Date: 11/28/07, Page: 3 of 3

Critical Task
Progress
Milestone
Split
Group By Summary
Deadline

JUN-05-2008   12:48                                          99%                    P.10

**National Park Service**
**Hamilton Grange NM Community Meeting**
**Thursday, December 13, 2007**
**Shepherd Hall, City College of New York**

| Name | Organization | Address | Contact Information |
|------|-------------|---------|---------------------|
| Anthony Achille | CCNY | 160 Convent Ave NY NY 10031 | 212-650-6400 aachille@ccny.cuny.edu |
| RALPH NEGRON | PBS & T | 29 GARLAND COURT B'KLYN, NY 11229 | 917-939-0669 Ralphie.Buy11229@aol.com |
| Jorge Chevman | Private | 292 Convent Ave #7 10031 | jchrman@hotmail.com |
| ELSA RUTTENBERG | FRIENDS OF ST NICHOLAS PARK | 2611 8th Ave #34 NY NY 10030 | ruttenberg.r@shea.com |
| Jackie Anjiru | St Lukes Church | Mt'a Convent | Jackie@admef.org |
| Brad Taylor | Friends of Morningside Park | | btaylor@morningside-park.org |
| Karleen Wright | HTBA | 5 Hamilton Ter | |
| Albert Atchon | NPS | 287 Convent Ave | albert_atchison@nps.gov |
| Glendon Self | HTBA | 8 Hamilton Terrace NY 10031 | |
| Marlon Jack | 2C Kilukis | 425 W 144th | MJ07.L.R@realwayorg.us |
| Sarah Fort | Partnerships | 24 W 61st St | sarah.fort@parks.nyc.gov |
| Sabina Saragossi | " | | Sabina.Saragossi@parks.nyc.gov |
| Bill Castro | | | |
| MIKE MISCIONE | BORO HISTN. | MUNI BLDG | BOROUGHHISTORIAN@ MANHATTANBP.ORG |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**National Park Service**
**Hamilton Grange NM Community Meeting**
**Thursday, December 13, 2007**
**Shepherd Hall, City College of New York**

| Name | Organization | Address | Contact Information |
|---|---|---|---|
| m Sauvageau | Jungio Const | Wobum Mass | msauvageau @ Lumutinc.com |
| Jason Harper | New York City P.D. | 520 W 126 st NY NY 1007 | Jason.Harper@NYPD.ORG |
| Jeffery Wille | CB #9 | 535 W 113ct nyc | |
| Mark Levine | | 255 Cabrini 1u | MarkDLevineNYC@yahoo.c |
| Matthew Marquart | | 242 Convent Ave #6 | matthewmarquart @ gmail com |
| Michael Holmes | Holland Horizon | 423 W 141 st st. | Mholmes@hollandhouser.com |
| STEVE LAISE | NPS | 26 WILLI St. | steve_laise@nps.gov |
| Ken Melichar | HH NHCPO | 473 W 141 | Ke nmelicher @ att.net |
| DIANE SANK | CCNY Ombudsperson Dept ANTHR | | DSANK OMBUDSPERSON@ |
| BRIAN FRISCHEIN | CCNY ALUMNI | | Januus @ NJ.RR.um NJ.RR.com |
| Alan Wang | Hamilton Terrace Block Associatn | 20 Hamilton Terrace | cogencen@hotmail.com |
| Gregory Generet | '' | 19 '' | |
| Walter Lively | HTBA | 465 W 140th St | |
| Laquita Henry | Heritage Health + Housing | 411 w 127th ST | laquitahenry_1@yahoo.com |
| Sabine Saragoussi | Partnerships for Parks | 830 5th ave. | (212) 360-8190 |
| Kirk... ing Hark L. Egn | | 551 W 141 st+ 1408 + van meyers@vestspad.com | |
| (Greg) Mills MUSEUM of African American Cinema 212-749-5298 | | | |
| 163 W 125th st NYC 10027 email Tamaa@pipeline.com | | | |
| Gregory Generet President Hamilton Terrace Block Assoc | | | |
| ↳ 31 Hamilton Terr - HTBA 141@gmail.com | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

 

THE NEW YORK CITY LANDMARKS PRESERVATION COMMISSION
1 CENTRE STREET 9TH FLOOR NORTH NEW YORK, NY 10007
TEL: 212 669-7700  FAX: 212 669-7780

April 10, 2007

ISSUED TO:

**Maria Burks, Commissioner**
**National Parks of New York**
**Federal Hall**
**26 Wall Street**
**New York, NY 10005**

Re:  **MISCELLANEOUS/AMENDMENTS**
LPC - 076888
MISC 07-7510
287 CONVENT AVENUE
Hamilton Grange National Monument
HAMILTON HEIGHTS
Borough of Manhattan
Block/Lot:  2050 / 4

Pursuant to Sections 3020 and 854 (h) of the New York City Charter and Section 25-318 of the Administrative Code of the City of New York, the Landmarks Preservation Commission issued Commission Report 94-0003 (LPC 93-3374) on August 3, 1993 approving a schematic proposal to move Hamilton Grange from its present non-original site to a new site at St. Nicholas Park and to restore the building to its original condition. However, in voting to grant its approval, the Commission made its determination subject to the condition that the house be sited so that the mansion can read as a free-standing country retreat in the middle of a landscape and contingent upon final documents and drawings.

Subsequently, on April 9, 2007, the staff of the Commission received a draft historic structure report, draft specifications and design development drawings labeled A1.02 through A1.06, A2.01 through A2.04, A3.01 through A3.03, A4.01 through A4.06, A5.04, dated November 3, 2006, A5.01 through A5.05, A7.05 through A7.07, A8.01, R1.01 through R1.06, R2.01 through R2.04, all dated September 15, 2006, C0.01, C1.02, all dated September 6, 2006, C1.03, dated September 26, 2006, C2.01 through C2.03, C11.01, C11.02, all dated September 6, 2006, DT501, DT502, LP503, LP504, all dated March 8, 2007, ES1.01, ES1.02, dated September 15, 2006, LD001, LD002, dated March 8, 2006, LG201, LG202, LP301, LP302, LS101, LS102, LD001, LD002, LS101, LS102, LG201, LG202, LP301, LP302, DT501, DT502, LP503, LP504, all dated March 8, 2007, S1.00 through S1.05, S2.00 S2.01, and SR-1.01 all dated September 15, 2006. The staff reviewed the drawings and specifications and found that the orientation of the house has been revised so that the primary entrance faces West 141st Street. The staff further found that a lift has been incorporated into the design of the portico at the primary elevation.

The Commission reviewed these materials and found that the orientation of the house relates to its original siting as a mansion on a promontory; that the lift has been integrated into the design of the portico so as to remain not visible when not in use; that these revisions are consistent with the intent of the original approval, and that otherwise the approved proposal has been maintained. Therefore Commission Report 93-3374 is hereby appended to include these revisions.

# ART COMMISSION OF THE CITY OF NEW YORK

April 16, 2007

CERTIFICATE    22805

RESOLVED That the Art Commission, having considered designs for the siting of the Hamilton Grange and adjacent landscaping, northwest corner of St. Nicholas Park, near the intersection of 141st Street and Hamilton Terrace, Manhattan, submitted by the Department of Parks & Recreation, represented by exhibits 5490-T, U, V & W of record in this matter, hereby gives to the same unanimous preliminary and final approval and commends the National Parks Service on this project. The Commission strongly recommends that the National Parks Service move the house in one piece.

Final approval is conditioned upon the commencement of work before April 16, 2009 and the submission of three (3) 8" x 10" color archival-quality photographs of the completed project.

A true copy of resolution adopted by
the Art Commission at its meeting
on April 16, 2007.

Jackie Snyder
Executive Director

JUN-25-2007 15:57 FROM:NAT. PARKS NY HARBOR (212) 668-2375    TO:919789705121    P.2



**New York State Office of Parks,**
**Recreation and Historic Preservation**

Historic Preservation Field Services • Peebles Island, PO Box 189, Waterford, New York 12188-0189

518-237-8643

www.nysparks.com

<div align="right">

**Eliot Spitzer**
Governor

**Carol Ash**
Commissioner

</div>

June 21, 2007

Maria Burks
Superintendent, Hamilton Grange National Memorial
National Park Service
26 Wall Street
New York, NY 10005

Re:    NPS
       Hamilton Grange National Memorial
       Manhattan, New York County
       04PR01800

Dear Ms. Burks:

The State Historic Preservation Office (SHPO) has received and reviewed the 100% draft Construction Documents for the proposed plan to Move and Rehabilitation Hamilton Grange National Memorial. We have reviewed the submission in accordance with Section 106 of the National Historic Preservation at of 1966 and the Memorandum of Agreement (MOA) in place for this project.

Based upon our review, we concur that that 100% draft Construction Documents are appropriate. We note that the documents do not detail the full interior and exterior restoration of the building. We request the opportunity to review any additional restoration work outside of these current documents. For example, we would like to review the window restoration plan, which is not in the submitted plans. In addition, we would like to be consulted on any changes to the plans or unexpected impacts to the historic building resulting from the proposed move. Once the move contractor is selected, we would like to review the proposed means and methods as proposed by the contractor.

If you have any questions, or if I can be of any assistance, please call me at (518) 237-8643, ext. 3282.

Sincerely,

Beth A. Cumming BAC
Historic Preservation Specialist – Technical Unit
e-mail: beth.cumming@oprhp.state.ny.us

CC:    David Uschold, NPS

An Equal Opportunity Employer/Affirmative Action Agency

MEMORANDUM OF UNDERSTANDING

BETWEEN

NATIONAL PARK SERVICE

AND

THE FRIENDS OF HAMILTON GRANGE NATIONAL MEMORIAL, INC.

This Memorandum of Understanding between the National Park Service and the Friends of Hamilton Grange National Memorial, Inc., (hereinafter referred to as, "The Friends") is for the purpose of providing a basis for cooperation and assistance between these organizations in the restoration and preservation of Hamilton Grange National Memorial and the operation of the programs and activities mutually agreed upon and entered into.

In consideration of the foregoing and pursuant to the authority contained in the Act of Congress approved August 21, 1935 (45 Stat. 666, 16 U.S.C. 462), entitled, "Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes,"; the Joint Resolution providing for the establishment of the former dwelling house of Alexander Hamilton as a National Memorial approved April 27, 1962 (76 Stat. 57); and the Federal Grange and Cooperative Agreement Act of 1977 (41 U.S.C. 501 et. seq.), the said parties have convenanted and agreed to enter this Memorandum of Agreement.

WHAT THE NATIONAL PARK SERVICE WILL DO

1.  It will administer and develop Hamilton Grange National Memorial according to plans developed through a documented process of public participation, commensurate with available appropriated funds.

2.  It will provide technical and professional staff to preserve, protect, maintain, and operate the Grange in accordance with a Statement for Management and other approved operating plans.

3.  It will support the efforts of the Friends by providing facilities at Hamilton Grange for the meetings of the Friends and for programs sponsored and organized by the Friends insofar as they are consistent with established National Park Service policies, procedures, and guidelines, the carrying capacity of the structure, and the capabilities of staff, budget, and facility to support the proposed functions.

4.  The Superintendent and Deputy Superintendent of Manhattan Sites and the Site Manager of Hamilton Grange and/or their designee(s) will serve as ex-officio members of The Friends of Hamilton Grange Board of Trustees and will cooperate wherever possible to insure the success of mutually agreed upon programs.

- 2 -

5.  The National Park Service will encourage the Friends of HAGR in their
    efforts to raise funds, identify professional support and volunteer
    services, locate and acquire appropriate artifacts and furnishings and
    assist in the development of interpretive and community relations
    programs.

## WHAT THE FRIENDS OF HAGR WILL DO

1.  They will assist the Service to protect, administer, and develop
    Hamilton Grange National Memorial by increasing the budget for the
    management and operation of the site or for special projects, by
    soliciting support from private or public sources for that purpose,
    for example, by means of a gift catalogue.

    Such obligations, however, shall be understood not to bind the
    Friends to expend any sum in excess of revenues received by it or
    designated by it for such purposes.

2.  They will assist the Service in the acquisition of appropriate
    furnishings, museum objects, memorabilia, photographs, and
    related items through an active program of solicitation for
    donation and/or purchase and will seek to provide the restora-
    tion, maintenance, display, and storage, and for professional
    research and documentation of same.

3.  They will assist the Service by supporting the development of
    an education program for the Grange including the preparation of
    professionally produced school previsit kits, audiovisual
    materials, publications, the sponsorship of lectures, symposia,
    artists/writers in "residence," walking tours, etc.

4.  They will assist the Service in reaching a larger and more
    diverse visitor population for Hamilton Grange National
    Memorial by supporitng the development of a public relations
    program which could include the design and production of posters for
    bus and subway, public service announcements, paid listing in various
    newspapers, magazines, guidebooks, etc., and support of increased
    print runs of the Grange brochure for free distribution through
    the New York City Visitor and Convention Bureau, hotels, motels,
    travel agents, and various museums and other attractions and by
    other means as deemed worthwhile.

5.  They will utilize their status as a not-for-profit corporation
    to assist the Service as requested, whenever such legal status
    would facilitate site preservation, development, and management,

- 3 -

as for example, in the acquisition of public or foundation grants
or in the sponsorship of efforts to utilize publicly funded work-
study or employment programs.

To these ends, the Friends will maintain records of their meetings, correspon-
dence, programs, and other activities and affairs and will maintain books of
accounts in accordance with acceptable accounting practices and make these
records and accounts available for inspection during normal business hours by
the official representative(s) of the Service.

They will undertake and subsidize only those programs and acquire only those
historic objects and works of art for the Grange as approved by the Superintendent
of the Manhattan Sites.  These activities shall be conducted without encumbrances
or liabilities to either the U.S. Government or the National Park Service.

During the performance of this Agreement, the participants agree to abide by the
terms of Executive Order 11246 on nondiscrimination and will not discriminate
against any person because of race, color, religion, sex or national origin.   The
participants will take affirmative action to ensure that applicants are employed
without regard to their race, color, religion, sex or national origin.

The Friends will save and hold harmless the United States from all claims for
property and personal injury caused by their actions.

No member or delegate to Congress or resident Commissioner shall be admitted to
any share or part of the Agreement, or to any benefit that may arise therefrom,
but this provision shall not be construed to extend to this Agreement if made
with a corporation for its general benefit.

– 4 –

This Agreement may be terminated by either party upon sixty (60) days prior written notice to the other. This Agreement will germinate three years from the day and year below entered. Provided further, that this Agreement may be renewed at the discretion of the Parties at the end of such period.

This Agreement shall be effective when signed by both parties and may be terminated or modified by mutual agreement.

Dated this _____17th_____ day of _October_ , 1984

NATIONAL PARK SERVICE                    THE FRIENDS OF HAMILTON GRANGE
                                                NATIONAL MEMORIAL

By: _____             By: _____
    Robert F. Mahoney                        President
    Superintendent
    Manhattan Sites

                                         ATTEST: _____
                                                 Secretary

March 18, 1994

Memorandum:

To:       Public Affairs Fil,es

From:     Public Affairs Officer, New York

Subject:  Hamilton Grange Vote by Community Board 19.

Bruce Lambert, reporter for NYTimes, called to inquire about status
of Hamilton Grange now that the Community Board 9 voted in favor of
our alternative plan Thursday night to support our preferred
alternative to relocate the Grange to St.Nicholas Avenue.

After consultation with Michael Adlerstein I called Mr. Lambert
back and explained that the CB vote Thursday night was on a draft
EIS and GMP. The NPS regional office will now review and evaluate
all comments and will make a final decision within 90 days
following consultation with the Congressional delegation.

Q.  CB 9 urged formation of a friends group. How do you feel about
this?
A.  NPS traditionally works with friends groups and in fact, for
years has enjoyed a good relationship with the Hamilton Heights
Homeowners Association and other individuals who have worked with
us at the Grange. There are many friends groups, such as the one at
Gateway NRA.

Q.  So you would not object to a friends group at the Grange?
A.  We would not object but would welcome support.

Q.  How much are you talking about to relocate the Grange?
A.  In the area of $11 million, $10.6 to be exact.

Q.  What happens next in terms of seeking funding?
A.  Premature as the NPS has not made a final decision. If we go
with the relocation we would seek money from the Congress. I don't
know nor could I speculate on a time frame as we would need
additional planning work and we do not know when the funding, if
approved, would come through and for what fiscal year.

Q.  What bearing will the CB vote have on the final decision?
A.  As I explained, it will weigh on the final decision but there
are and have been many comments and we will take them all into
account.  However, we are appreciative of the Community Board
support.

Q.  What is Congressman Rangel's position on this?
A.  You should ask him. I cannot speak for a Congressman.

TOTAL P.02



The City of New York

| **CB9M** | 565 West 125 Street |
| | New York, New York 10027 |
| | (212) 864-6200/Fax # 662-7396 |

**COMMUNITY BOARD #9, MANHATTAN**

Ruth W. Messinger
President, Borough of Manhattan

Theodore P. Kovaleff
Chair

Vernice D. Miller
First Vice-Chair

Thomas Bynum
Second Vice-Chair

Carolyn R. Thompson
Secretary

Carolyn P. Hammond
Assistant Secretary

Victor Victoria
Treasurer

Joseph N. Center
Assistant Treasurer

Lawrence T. McClean
District Manager

March 18, 1994

Mr. Joseph T. Avery, Superintendent
National Park Service, Manhattan Sites
26 Wall Street
New York, NY  10005

Dear Mr. Avery:

At our regularly scheduled General Board meeting
held on Thursday, March 17, 1994, the attached
resolution regarding "National Parks Service
Alternative Proposals for the Relocation/Restoration of
the Hamilton Grange" was passed by a vote of 18 in
favor, 11 opposed, 2 abstentions and 0 abstentions for
cause.

Sincerely,

Theodore P. Kovaleff

Enclosure

cc: Elected Officials

SERVING HAMILTON HEIGHTS/MANHATTANVILLE & MORNINGSIDE HEIGHTS

RESOLUTION RE: RELOCATION AND RESTORATION OF THE HAMILTON GRANGE

Whereas, the National Parks Service has drafted a General Management Plan/Environmental Impact Statement for the renovation of the Hamilton Grange National Memorial; and

Whereas, the NPS preferred alternative/proposed action would

> --re-site the Grange itself within St. Nicholas Park on a level area representing the southerly continuation of Hamilton Terrace across W. 141st St. in order to allow full architectural restoration of the Grange to its interior and exterior appearance during Hamilton's residency and the landscaping of a setting more reflective of its original rural placement at (now) W. 143rd St. and Convent Avenue; and

> --construct upon the present Convent Avenue site a compatible structure housing a Ranger residence, exhibition space, and a reception room for community use; and

Whereas, this proposed action appropriately memorializes Hamilton's contribution as a founder of our government, recognizes and celebrates the achievement of this architect, John McComb, Jr., architect with Joseph F. Mangin of City Hall, extends use of the current NPS site and provides for community presence of NPS Rangers, promises greater security within St. Nicholas Park, promotes national focus upon an enlarged and renewed memorial encouraging to both NYC historic educational efforts and international tourism, and places Hamilton Heights at the center of an emerging Revolution Trail linking nationally significant historic sites and events throughout the length of Manhattan;

Be it resolved that Community Board #9/Man. actively supports the National Park Service in this Memorial renovation, and

Be it further resolved that the Board pledges assistance to Congressman Charles B. Rangel and Senator Daniel P. Moynihan in their efforts toward passage of appropriate Congressional funding legislation, and

Be it further resolved that the Board calls for institution of a community-based organization, Friends of the Hamilton Grange, to be allowed an active support and oversight role toward the Grange -- in guarantee of the community interest in this long-treasured National Memorial, the foremost historic and architectural endowment within our boundaries of responsibility.

SERVING HAMILTON HEIGHTS/MANHATTANVILLE & MORNINGSIDE HEIGHTS



PHILIP VAN BUREN
Attorney at Law
153 West 93rd Street
New York, New York 10025
Tel. (646) 387-8999
Fax (212) 865-7367

**By Registered Mail, RRR**

Ms. Maria Burks
Superintendent, Hamilton Grange National Memorial
National Park Service
Federal Hall National Memorial
26 Wall Street
New York, New York 10005

        Re:    Appeal of agency actions in connection with Hamilton Grange
               National Memorial

                                        May 13, 2008

Dear Ms. Burks:

      On behalf of my client, the Friends of the Hamilton Grange, I hereby appeal the action of
the National Park Service (the "Service") in entering into a Programmatic Agreement in
connection with the Hamilton Grange National Memorial on March 24, 2006 without observance
of procedure required by law. In developing, executing and implementing a Programmatic
Agreement with only City and State public agencies as parties, and excluding prior consulting
parties who have been integral to the Historic Preservation Act § 106 process, the Service
violated its regulations under 36 CFR 800.14. The Service has proceeded under this
programmatic agreement to threaten significant adverse effects upon this national historic
landmark, the house of one of the nation's founding fathers.

      The Friends of the Hamilton Grange is an unincorporated association of community
organizations and individual preservationists resident in, or historically involved with the
Hamilton Grange and the Hamilton Heights Historic District. It's membership includes Dr. John
Cardwell, Chairperson, Michael Hodge, Vice Chair, Louise Lawrence, Secretary-Treasurer, the
Hamilton Heights Homeowners Association, the 141st and 142nd Street Block Association, author
and historian Michael Henry Adams, Thomas Draplin, Barrie Adedeji, Dr. Joseph Fields, Alexa
Donaphin, A.I.A., and Lillian Brown. All have had longstanding involvement with neighborhood
issues including the Hamilton Grange, and many were extensively involved in the development of
the 1995 General Management Plan for the Hamilton Grange.

      The Service entered into a memorandum of agreement with Hamilton Heights

Maria Burks, Superintendent
May 13, 2008
Page 2

Homeowners Association in1990.  In it, the Service committed itself to "administer and develop Hamilton Grange National Memorial according to plans developed through a documented process of public participation"  Memorandum of Agreement at 2, attached as Exhibit A.

The Hamilton Heights Homeowners Association raised money, contributing $8,500 towards the Hamilton Grange.  Most of the member organizations or individual members of Friends the Hamilton Grange were included in the circulation of the draft EIS for the project in 1993.   See 1995 Final General Management Plan and EIS ("GMP/EIS"), at 81, 83-84.  Many, including the Hamilton Heights Homeowners Association submitted comments in response.  Id. The member organizations and individual members of the Friends of Hamilton Grange were instrumental in overcoming contentious community relations surrounding the proposed move of the Hamilton Grange.

The Friends of the Hamilton Grange was convened by the Service in 1994, and met formally at least twice that year.   The organization was identified by the Service in the 1995 Final General Management Plan as having been, by that date, created.  GMP/EIS at v..  In the General Management Plan the Service committed itself to "work with" the Friends of Hamilton Grange, and that the Friends of Hamilton Grange would be "actively involved" in further planning activities.  See GMP/EIS at 26.  The Service distributed Final General Management Plan and EIS to members of Friends of Hamilton Grange under cover addressed to "Friends of Hamilton Grange."  See cover letter attached as Exhibit B.

All the individual members and member organizations of the Friends of Hamilton Grange were satisfied with the proposed plan, "Alternative 4", adopted in the 1995 Final General Management Plan and EIS.   Alternative 4 involved moving the wood framed Hamilton house to nearby St. Nicholas Park, to recreate something closer to the original rural setting, and restoring the building's original orientation towards the southwest.  See Conceptual Site Plan and General Overview from the 1995 General Management Plan (rotated to place North towards top of the page for consistency with other illustrations in this letter), together with text describing preferred Alternative 4, GMP/EIS at 18 - 30, attached as Exhibit C.  Alternative 4 also called for an interpretive center with additional community uses to be built on the site from which the Hamilton house was to be moved. See Id. at 26, 30.  From all points of view, property owners, community leaders, churches, and professional preservationists, the Park Service had successfully negotiated a solid plan that had united community support.

In response to the comment of the New York City Landmarks Preservation Commission to the draft EIS, the Service made an explicit commitment to consult with the Friends of Hamilton Grange in the event of any possible alteration to the location or orientation of the house.  See GMP/EIS at 94.  The Service stated, "...based on site topography, the location of the 141st Street, and the location of Steinman hall, the most appropriate orientation of the house (within the acreage acquired) might be changed during the design process *in consultation with the Friends of the Hamilton Grange group* (emphasis added)."  Id.

Maria Burks, Superintendent
May 13, 2008
Page 3

During the land acquisition process between 1995 and 2001, and the subsequent hiatus while waiting for Federal funding, the Friends of Hamilton Grange did not meet formally. Though members repeatedly inquired of the Service concerning the status of the project, they were told that there was nothing to consult about, as all was proceeding as described in the Final Management Plan. The Park Service made no effort to contact, or reach out to any member organization or to individual member of the Friends of Hamilton Grange until it told Community Board 9 Parks and Landmarks Committee co-chair she could bring some community members to its informational meeting of December 21, 2006.

Moreover, the Friends of the Hamilton Grange relied upon the commitment that the Service made in 1995 in response to the comment of the NYC Landmarks Commission, that any proposed reorientation would be done in consultation with it. "However, based on site topography, the location of the 141st Street, and the location of Steinman Hall, the most appropriate orientation of the house (within the acreage acquired) might be changed during the design process *in consultation with the Friends of the Hamilton Grange group*" (emphasis added). See GMP/EIS at 94.

Members of the Friends Hamilton Grange inquired repeatedly of the Park Service and of U.S. Congressman Charles Rangel concerning the status of the project, and were told they would be contacted as soon as the funding came through.

After concluding negotiations for land acquisition, however, on March 24, 2006, the Service entered a Programmatic Agreement with the New York City Department of Parks, the New York City Landmarks Preservation Commission, and the New York State Office of Historic Preservation. Under 36 CFR 800.14 (a), the Service may develop alternate procedures to implement section 106 of the Historic Preservation Act. The Service may substitute alternative procedures, including a programmatic agreement, for "all or part of subpart B of this part...". Id. Subpart B establishes broad consultative and public participation requirements on project development. 36 CFR 800.2-13. The Programmatic Agreement excluded the Friends of Hamilton Grange, a party with whom the Service, in the 1995 General Management Plan had made explicit commitments to consult. The Programmatic Agreement also excluded other consulting parties from the prior subpart B process, such as Community Board 9. See subpart B, 36 CFR 800.2(c) (5) and (d).

However, even under 36 CFR 800.14, the development, execution, and implementation of a Programmatic Agreement, is subject to other requirements of notice and appropriate consultation that the Service failed to perform.

In developing a programmatic agreement, the Service is required to consult with certain parties. See 36 CFR 800.14 (b) (2) (i) ( "The consultation shall involve, as appropriate, SHPO/THPOs, the National Conference of State Historic Preservation Officers (NCSHPO), Indian tribes and Native Hawaiian organizations, other Federal agencies, *and members of the*

Maria Burks, Superintendent
May 13, 2008
Page 4

*public* (emphasis added).")  The Service's development of a programmatic agreement excluded the community organizations and individual historic preservationists long involved with the Hamilton Grange, raising money for the Hamilton Grange, negotiating and obtaining community support for the proposed move of the Hamilton Grange to St. Nicholas Park, and contributing professional expertise and documentation on Hamilton Grange history.

Under § 800.14 (b) (2) (ii), moreover, "The agency official shall arrange for public participation appropriate to the subject matter and the scope of the program..." The agency official proposing a programmatic agreement furthermore "shall consider the nature of the program and its likely effects on historic properties and take steps to involve the individuals, organizations and entities likely to be interested." *Id.*

The Service made no arrangement for public participation in its development of the Programmatic Agreement. In the implementation of the Programmatic Agreement, the Service's attempts to involve consulting parties or the public was wholly inadequate, with a single meeting called on short notice, and scheduled at a time when many members could not attend. The sacrifice of historic preservation values and community benefits sought to be preserved in the 1995 General Management Plan was a foreseeable impact of the exclusion of the Friends of Hamilton Heights and other consulting parties from the Historic Preservation Act § 106 process by entering into a Programmatic Agreement.

Under the Programmatic Agreement, the Service has proceeded to reorient the house from what was described and illustrated in the 1995 Final Management Plan and EIS. In reorienting the house, the Service acted without regard for the likely effect on the historic property. In turning towards the north a house that was designed to face southwest, the Service committed harm to two distinct historic sets of preservation values as well as to community uses envisaged in the 1995 General Management Plan. First, in turning Hamilton's personal study from its south-western exposure to the north, and in turning the south-easterly facing dining room with its floor to ceiling windows and mirrored interior surfaces to face the looming back of CUNY's Steinman Hall, the Service proposes to destroy the natural lighting scheme of the houses's original design, significantly altering and degrading the ambience of the most important historic and public rooms of the house. Second, in turning these rooms towards the north and west respectively, the Service proposes to destroy their views out onto the more nearly original rural setting of the park. By turning the front of the house onto the urban street scape of 141st Street, the Service destroyed the more historically accurate approach from the more nearly rural setting of the park. This reorientation thus significantly undermines the original rationale for the move to St. Nicholas Park, which was to recreate as much as possible the rural setting of the original house. And third, in turning the house to the north, the Service gave up the front lawn which was intended in the 1995 Final Management Plan for community uses, including festivities and ceremonial events.

Such reorientation indicates either that the Service failed to take the effect upon the historic property into account, or that it placed other, unstated priorities above historic

Maria Burks, Superintendent
May 13, 2008
Page 5

preservation and the community consensus on how the relocation should be effectuated.

The only rationale the Service has offered was that such reorientation and relocation constituted a response to the 1995 comment of the New York City Landmarks Preservation Commission concerning orientation towards the topography. See your letter of April 8th, 2008 to Patricia Jones of Community Board 9. That comment, however, could have been addressed in a number of ways that would not have required sacrificing the historic preservation values and community benefits stated in the 1995 Final Management Plan.

The Park Service also failed to give appropriate notice pursuant to § 800.14 (b) 2 (iv) of its proposal to enter into a Programmatic Agreement, or of the execution of, or implementation of its Programmatic Agreement to either the public, or to prior consulting parties, including the Friends of Hamilton Grange, or to any of its members. The only notice the Service has offered was after the fact, inviting some members of the Friends of Hamilton Grange to a single meeting on December 21, 2006, and then only by word of mouth through the co-chair of the Community Board 9 Parks and Landmarks Committee. That meeting was stated to be merely informational, scheduled on short notice, at a time when community members could not attend, and presented the north oriented Grange as a *fait-accompli*. No details were provided as to the rationale for the northerly orientation, no opportunity was offered to present counter proposals, and considerations that might run contrary to the Service's position were not addressed. A subsequent "site meeting" on April 12, 2007, was similarly held without notice to the Friends of Hamilton Grange, or to the public, with the invitation extended only to a representative of Community Board 9 who could not attend for reasons of health.

The service also failed to make any internal agency procedures implementing the agreement readily available, as required under § 800.14 (b) 2 (iv). Since December 21, 2006 members of the Friends of Hamilton Grange have repeatedly asked the Service for drawings, plans, and rationale for the new orientation. Unable to obtain such material from the Service, they have been forced to resort to a request under the Freedom of Information Act. See Hamilton Heights Homeowners Association letter of March 6, 2008, in final draft, attached as Exhibit D. To date, they have received no disclosure concerning internal agency procedures implementing the Programmatic Agreement. On December 12, 2007, within days of having learned that the Service had proceeded to enter into contract for the relocation, Community Board 9 wrote a letter to Congressman Charles Rangel, with a copy to yourself, objecting to the Service's proceeding without consultation and demanding restoration of the orientation stated in the Final Management Plan. See Letter of December 12, 2007, attached as Exhibit E. To this demand, Community Board 9 was told by the service that it was too late and that the Service's decision was final. On March 20, 2008, Community Board 9 reiterated its concern by formal resolution. See Community Board Resolution of March 20, 2007, attached as Exhibit F.

The drawing that the Service claims it supplied in the application of the Service for the 2001 Uniform Land Use Review Procedure ("ULURP") in connection with its acquisition of land

Maria Burks, Superintendent
May 13, 2008
Page 6

for the site did not constitute notice of the Services's intention to reorient the house to the north. The illustration provided to the Community Board 9 Parks and Landmarks Committee co-chair on June 8, 2007 showed the house facing east, and not north, and was labeled only as a "Preliminary Site Plan" and still showed a building facing essentially into the park. See plan of St Nicholas Park Receiver Site, attached as Exhibit G. The Friends of Hamilton Grange at the time of the ULURP review had every reason to expect that they would be consulted if any actual reorientation was being proposed. The relocation was at that point still under the subpart B process that had resulted the 1995 Final General Management Plan. The Service furthermore gave false and misleading notice in providing neighbors of Hamilton Grange on January 8, 2008 a cursory notice of the impending move using an illustration from the 1995 General Management Plan that showed the house in the southwesterly orientation of the 1995 plan, and not in the northerly orientation it in fact intended. (See notice of impending move, and original rendering of Alternative 4 from the 1995 General Management Plan from which the illustration was taken, attached as Exhibit H)

Finally, the Service was never exempt under § 800.14 (c) (1) (ii) from the provisions of § 800.14 (b). The potential effects on the undertaking upon the historic property were foreseeable as not minimal and, in fact, adverse. Nor did the Service properly seek such exemption. The Service did not arrange for public participation as the proponent of exemption must under subsection (c) (2). It also did not "consider the nature of the exemption and its likely effects on historic properties and take steps to involve individuals, organizations and entities likely to be interested." Id. The Service also did not arrange for public participation in gathering program comments under § 800.14 (e) (2).

In light of this multiple failure to follow procedure required by law, on behalf of the Friends of Hamilton Grange, I respectfully request that this appeal be granted, and that

1.    That the Hamilton Grange be oriented back towards the southwest to replicate the original orientation, to conform again to the 1995 General Management Plan, as demanded also by Community Board 9.

In order to avoid the delay and cost of full review, we offer by way of compromise that the house be simply rotated 180 degrees on the foundation that is currently under construction. Such 180 degree rotation on this foundation was judged by your architect to be both practical and economical. See one of three alternative site plans distributed by your architect at the "site meeting" of May 12, 2008, attached as Exhibit I.

The Friends of Hamilton Grange are acutely aware of the costs that have been incurred by the Service in forging ahead with its plan under the Programmatic Agreement. The Service, however, has had ample notice that it's plan for a northerly orientation was unacceptable, and in fact met with alarm by members of Friends of Hamilton Grange at its first announcement on December 21, 2006, and from the December 12, 2007 letter of Community Board to Charles

Maria Burks, Superintendent
May 13, 2008
Page 7

Rangel, of which you received a copy, and from the Community Board 9 resolution of March 20, 2008. Community and Preservationist opposition has also been evident from the repeated requests for information from the CB9 Parks and Landmarks Committee and the Hamilton Heights Homeowners Association, and from the extensive correspondence from other community members and organizations.

The Friends of Hamilton Grange is willing to work expeditiously towards a workable compromise, within the budget of available funds, taking into account all costs including any penalties for work interruption. However, the Service must respond immediately, or we may reasonably construe its silence as constructive denial of this appeal.

2.      That the Programmatic Agreement be amended to include the Friends of Hamilton Grange as an ongoing consulting party.

3.      That all further work on restoration of the Hamilton Grange National Memorial be undertaken in full consultation and collaboration with the Friends of Hamilton Grange, including landscaping, planting and gardens, and interior finishes, room uses, decisions to restore or replace fabrics, an other matters pertaining to the preservation of historic appearance, materials, artifacts and context, and

4.      That any planning, or decision regarding the disposition of the Convent Avenue site from which the Grange is to be moved be made in full consultation and collaboration with the Friends of Hamilton Grange.

Sincerely,

Philip van Buren, Esq.

for the Friends of Hamilton Grange

cc:    Mary Bomar, National Park Service Director, 1849 C Street NW, Washington, DC 20240

       Dennis Reidenbach, National Park Service NE Regional Director, US Custom House, 200 Chestnut Street, 5th Floor, Philadelphia, Pennsylvania 19106

       Hon. Charles B. Rangel, Adam Clayton Powell, Jr. State Office Building, 163 West 125th Street, New York, New York 10027



**Value Analysis Study**
**May 4 – 6, 2004**

National Park Service
**Hamilton Grange National Memorial**
New York City, NY






# Relocation, Stabilization & Restoration of Hamilton Grange

# Value Analysis Final Report

**June 4, 2004**

*Prepared by:*
***Kirk Associates, LLC***
*1177 Berkshire Road, Suite 100*
*Grosse Pointe Park, MI 48230*
*Phone: 313.823.7330  Fax: 313.823.7332*

*In Association with:*
***Alpha Corporation***
*21351 Ridgetop Circle*
*Dulles, VA 20166*
*Phone: 703.450.0800  Fax: 703.450.0043*



# United States Department of the Interior

NATIONAL PARK SERVICE
DENVER SERVICE CENTER
12795 W. ALAMEDA PARKWAY
P.O. BOX 25287
DENVER, COLORADO   80225-0287



IN REPLY REFER TO:

D18 (DSC-DC)
MASI 015984

AUG 03 2004

Memorandum

To:             Catherine Cook, Federal Hall National Memorial

From:          Mark Alexander, Project Manager, Denver Service Center

Reference:     HAGR 015984, Hamilton Grange Project

Subject:       Value Analysis Report

I am please to provide you with a copy of the final Value Analysis Report.  This report reflects the
discussions and alternatives considered during our Value Analysis workshop at Federal Hall May 4-6, 2004.

Sincerely,

Mark Alexander
Project Manager

Attachment

cc:
Richard Crisson-NER
Peggie Albee-NER
Keith Everett-NER
Jack Dunleavy-NER

**Value Analysis Study**
**Relocation, Stabilization & Restoration of Hamilton Grange**

Hamilton Grange National Memorial
New York City, NY

May 4 – 6, 2004

# TABLE OF CONTENTS

**SECTION A: EXECUTIVE SUMMARY**

- Introduction & Background
- Value Analysis Objectives & Study Areas
- Project Budget & Cost Estimate
- VA Team & Agenda
- Documents Reviewed
- Function Logic Diagram
- Value Models
- Value Analysis Summary
- Next Steps
- Acknowledgements

**SECTION B: VALUE ANALYSIS RECOMMENDATIONS**

- Hamilton Grange VA Proposals
- Convent Avenue VA Proposals
- 90% and 75% Design Alternatives

**SECTION C: RESPONSE TO VALUE ANALYSIS RECOMMENDATIONS**

**SECTION D: VALUE ANALYSIS PROCESS**

- Introduction
- Pre-study Preparation
- Study Workshop
- Post-Study Procedures
- Creative Idea Listing
- Workshop Agenda

**Value Analysis Study**
**Relocation, Stabilization & Restoration of Hamilton Grange**

Hamilton Grange National Memorial
New York City, NY

May 4 – 6, 2004

# SECTION A: EXECUTIVE SUMMARY

*"He has the right to criticize who has the heart to help," A. Lincoln*

## Introduction & Background

This report includes recommendations for value enhancement of the Hamilton Grange Relocation, Stabilization & Restoration project at Hamilton Grange National Memorial in New York City, NY. They stem from a value analysis (VA) workshop initiated by the United States National Park Service and held in Federal Hall, New York City, NY, May 4 - 6, 2004. The VA workshop focused on review of the building relocation, stabilization & restoration. Coordination of this VA was done by Mark Alexander, project manager of the Denver Service Center.

The value analysis workshop provided a rigorous and in-depth examination of the value that will be provided by the relocation, stabilization and restoration of the Hamilton Grange. The workshop found that an extraordinary amount of careful thought and planning on the part of park managers and staff, the park's partners, and the design team has resulted in a project that provides good value in relation to cost. It is appropriately designed to meet the needs of the park and its visitors, and will be a valuable addition to the NPS Manhattan Sites.

## Description

Provide for the relocation, stabilization, and restoration of historic Hamilton Grange from its present location to an approved location in St. Nicholas Park. Provide modern stabilization techniques to strengthen structure. Construct a new masonry and stone subbasement and ground floors for relocated original house floors. Install climate control, security and fire alarm, and suppression systems. Install elevator service for all floors. Construct new building on existing site to provide housing for NPS personnel and to be used as a community use and educational hall

Justifications

This project is needed to avoid further deterioration of this historic landmark and a potential loss of the resource. Parts of the building have already decayed and have been lost. In 1889, to make way for a new city street system, the Grange was moved about 350 feet from its original location. For its new location, the house was severely altered and it is now wedged between a church and apartment building. The 1962 Act of Congress directed that the house be relocated and "preserved in a fitting setting" for its proper administration and interpretation as a National Memorial.

A proposed relocation site at the time of the 1962 Act was too far away and opposed by the local community and the house has remained in this inappropriate location. In addition, limited funding prevented necessary maintenance from being done and subsequent structural problems necessitated closing the site in June of 1992. Limited repairs have been undertaken since 1992 to allow restricted public hours of visitation.

Measurable Results

Project will provide a safe rehabilitated and restored structure in a setting similar to its original location. The proposed relocation and restoration on a secure site is a critical resource capital improvement need. The facility can then be fully open to the public, interpreted, and maintained.

**Value Analysis Objectives**

Following is a summary of the objectives set for this value analysis study:

- Select the preferred alternatives for rehabilitation of the house
- Assure NPS required functions for the Hamilton Grange (goals and objectives) are achieved in a cost effective manner
- Seek best balance of life cycle cost, sustainability, low maintenance, and durability
- Identify cost saving ideas to achieve 90% and 75% design alternatives based on the preferred alternative
- Minimize potential project risks

**Project Budget and Cost Estimate**

The budgeted net construction cost for the project including renovation and exhibits is $8,425,000. The project estimate is broken down as follows:

| | |
|---|---|
| Hamilton Grange | $3,966,000 |
| Site work | 407,000 |
| Move | 1,456,000 |
| Exhibits | 800,000 |
| Convent Ave. | 1,925,000 |
| Total | $8,554,000 (overage of $129,000) |

4

## VA Team & Agenda

The VA team consisted of members from: NPS Manhattan Sites; NPS Northeast Regional Office; NPS Harpers Ferry Center; NPS Denver Service Center; Hamilton Heights Preservation Association; Beyer Blinder Belle, architect; Roberta Washington, architect; Robert Silman Associates, structural engineer; Ambrosino DePinto & Schmieder, mechanical & electrical engineers; EDAW; landscape architect; Hanscomb, cost estimation; and Kirk Associates, value analysis. Stephen J. Kirk, a certified value specialist & architect of Kirk Associates, led the team's deliberations during the workshop.  A list of VA team participants is contained on **Figure 1** that follows.

The team reviewed the design documents and cost estimate and created a function-logic diagram as a part of the workshop. Certain value analysis analytical tools and methods were used during the 3-day workshop to focus the VA team on the issues, problems and opportunities presented by the proposed renovations. The VA agenda, in conformance with the standards of NPS and SAVE International, can be found in **Section D** of this report.






# ATTENDANCE LIST

**Figure 1**

*Value Study*

| | | |
|---|---|---|
| Project: | **Relocation, Stabilization & Restoration of Hamilton Grange** | ( ) Pre-Workshop |
| Location: | **Manhattan Sites, New York City, NY** | ( X ) Workshop |
| Date: | **May 4 - 6, 2004** | ( ) Post Workshop |

## PARTICIPANTS:

| Name/ Title: | Job Function: | Organization/Address: | Phone/ Fax/ e-mail: |
|---|---|---|---|
| **NPS Manhattan Sites** | | | |
| Joseph T. Avery | NPS MASF Superintendent | Federal Hall National Memorial<br>26 Wall Street<br>New York, NY 10005 | 212-825-6990 |
| Catherine A. Cook | NPS MASF Deputy Superintendent | Federal Hall National Memorial<br>26 Wall Street<br>New York, NY 10005 | 212-825-6991 |
| C. Stevens Laise | Chief of Interpretation & Public Affairs | Federal Hall National Memorial<br>26 Wall Street<br>New York, NY 10005 | 212-825-6883<br>212-825-6874 (fax)<br>steve_laise@nps.gov |
| **NPS Northeast Region** | | | |
| Richard C. Crisson | Historical Architect | NPS Northeast Region<br>400 Foot of John St., 4th Floor<br>Lowell, MA 01852-1195 | 978-970-5130<br>978-970-5121 (fax)<br>richard_crisson@nps.gov |
| Stephen Spalding | Chief, Architectural Preservation | NPS Northeast Region<br>400 Foot of John St., 4th Floor<br>Lowell, MA 01852-1195 | 978-970-5127<br>978-970-5121 (fax)<br>stephen_spaulding@nps.gov |
| Tom Dyer | Planner | NPS Northeast Region<br>26 Wall Street<br>New York, NY 10005 | 212-825-8950<br>212-825-6874 (fax)<br>tom_dyer@nps.gov |
| **NPS Harpers Ferry Center** | | | |
| Justin Radford | Interpretative PM | NPS Harpers Ferry Center<br>P.O. Box 50<br>Harpers Ferry, WV 25425 | 304-535-6720<br>304-535-5047 (fax)<br>justin_radford@nps.gov |
| Carol A. Petravage<br>Staff Curator | Historic Furnishings/ HFC | NPS Harpers Ferry Center<br>P.O. Box 50<br>Harpers Ferry, WV 25425 | 304-535-6720<br>304-535-5047 (fax)<br>carol_petravage@nps.gov |
| **NPS Denver Service Center** | | | |
| Al Thornton | Architect | NPS Denver Service Center<br>12795 W. Alameda Parkway<br>Denver, CO 80225-0287 | 303-969-2382<br>303-969-2736 (fax)<br>al_thornton@nps.gov |
| Mark Alexander, ASLA | Project Manager | NPS Denver Service Center<br>12795 W. Alameda Parkway<br>Denver, CO 80225-0287 | 303-969-2294<br>303-969-2238 (fax)<br>mark_alexander@nps.gov |
| **Hamilton Heights Preservation Association, Inc.** | | | |
| Bernice Cummings-Ubiles<br>Executive Director | Community Association | Preservation Association, Inc.<br>429 West 147th St.<br>New York, NY 10031-4802 | 212-862-3133 |
| **Beyer Blinder Belle** | | | |
| Timothy Macy | Project Manager | Beyer Blinder Belle<br>41 East 11 Street<br>New York, NY 10003 | 212-777-7800<br>212-475-7424 (fax)<br>tmacy@bbbarch.com |
| Richard W. Southwick, AIA<br>Partner | Architect | Beyer Blinder Belle<br>41 East 11 Street<br>New York, NY 10003 | 212-777-7800<br>212-475-7424 (fax)<br>rsouthwick@bbbarch.com |

## ATTENDANCE LIST                                                        **Figure 1**
### *Value Study*

| Project: | Relocation, Stabilization & Restoration of Hamilton Grange | ( ) Pre-Workshop |
| Location: | Manhattan Sites, New York City, NY | ( X ) Workshop |
| Date: | May 4 - 6, 2004 | ( ) Post Workshop |

### PARTICIPANTS:

| Name/ Title: | Job Function: | Organization/Address: | Phone/ Fax/ e-mail: |
|---|---|---|---|
| **Roberta Washington Architect** | | | |
| Roberta Washington, AIA | Architect | Roberta Washington Architect | 212-749-9807 |
| | | 271 W. 125th St. | 212-749-9854 (fax) |
| | | New York, NY 10027 | rwash@robertawashington.com |
| **Robert Silman Associates, PC** | | | |
| Nava Abir | Structural Engineer | Robert Silman Associates, PC | 212-620-7970 |
| Project Manager | | 88 University Place | 212-620-8157 (fax) |
| | | New York, NY 10003 | abir@rsapc.com |
| Paul Askham | Structural Engineer | Robert Silman Associates, PC | 212-620-7970 |
| Senior Project Manager | | 88 University Place | 212-620-8157 (fax) |
| | | New York, NY 10003 | askham@rsapc.com |
| Edmund P. Meade, PE | Structural Engineer | Robert Silman Associates, PC | 212-620-7970 |
| Associate | | 88 University Place | 212-620-8157 (fax) |
| | | New York, NY 10003 | meade@rsapc.com |
| **Ambrosino DePinto & Schmieder** | | | |
| Dominick DePinto, PE | Mechanical, Electrical, | Ambrosino DePinto & Schmieder | 212-645-6060 |
| | Plumbing Engineer | 275 Seventh Ave. | 212-645-6533 (fax) |
| | | New York, NY 10001 | ddepinto@adsce.com |
| **EDAW, Inc.** | | | |
| Nathan Imm, RLA, ASLA | Landscape Architect | EDAW, Inc. | 917-339-3300 |
| Associate | | 104 West 27th St. | 917-339-3303 |
| | | New York, NY 10001 | immn@edaw.com |
| **Hanscomb** | | | |
| Don Patterson | Estimator | Hanscomb | 212-252-7070 |
| | | 11 East 26th St. | |
| | | New York, NY 10010 | don.patterson@handscombfgould.com |
| **Kirk Associates (Value Analysis)** | | | |
| Stephen Kirk, PhD, FAIA, CVS | VA Facilitator | Kirk Associates | 313-823-7330 |
| President | Architect | 1177 Berkshire Road, Ste. 100 | 313-823-7332 (fax) |
| | | Grosse Pointe Park, MI 48230 | kirkassociates@aol.com |

**Documents Reviewed:**

The following documents were provided to the VA team as a part of the pre-workshop preparation:

- PMIS Project Description
- Historic Structure Report, 1980
- Hamilton Grange Pre-design Report, April 2004
- Renovation Cost Estimate, April 2004

**Function Logic Diagram**

Function analysis is core to any value study. Identifying functions helps the VA team gain new insight about the project. The diagram is later used to creatively explore alternatives to meet the functions at reduced life cycle cost. For this project, the VA team prepared a function logic diagram to help understand the overall purposes of the Hamilton Grange relocation, stabilization & restoration project. This diagram describes the essential functions of the project that will "enhance the Hamilton legacy." Reading to the right of each function answers "how" the function will be accomplished. Reading to the left of each function answers "why?" This logic diagram also identifies the functions of the Convent Avenue building (shown in blue) as well as Hamilton Grange (shown in green). The function logic diagram (**Figure 2**) can be found in this Executive Summary.

**Value Models**

Cost Model

The net construction cost model for the Hamilton Grange stabilization & restoration portion of the project is shown as **Figure 3**. This graphical "Pareto" diagram helped the team focus on high cost items to identify areas of savings. This model contains the cost for the Hamilton Grange. Largest costs include basement & cellar new construction, interpretative exhibits, design contingency, interior restoration and exterior restoration & exterior work.

Risk Model

The risk model (**Figure 4**) helped the VA team identify high project risks. The model was prepared during the value analysis workshop. It was used by this VA team to help identify ways to mitigate the risks identified earlier. Most significant risks to this project included: building move to new location, security surveillance, design coordination with NPS exhibit requirements, contractor lay down area limitations (small site), traffic congestion, and safety to community residents during move, condition of existing structure, and potential loss of items from period due to restoration.



RELOCATION, STABILIZATION & RESTORATION OF HAMILTON GRANGE
Manhattan Sites, New York, NY                    Figure 2

Function Logic Diagram

9



RELOCATION, STABILIZATION & RESTORATION OF HAMILTON GRANGE
Manhattan Sites, New York, NY

Figure 2

Function Logic Diagram



## Cost Model, Summary
### Hamilton Grange - Alternative A

**Figure 3**

7,500  GSF

| Item | Cost | Cost/ GSF |
|---|---|---|
| Demolition | 75,550 | 10.07 |
| LEED certification allowance | 187,500 | 25.00 |
| Escalation | 287,560 | 38.34 |
| Exterior Restoration & New Exterior V | 427,775 | 57.04 |
| Interior Restoration, high | 451,350 | 60.18 |
| Design Contingency | 684,667 | 91.29 |
| Interpretitive Exhibits | 800,000 | 106.67 |
| Basement & Cellar | 1,481,162 | 197.49 |
| **Total Net Construction Cost** | **4,395,565** | **586.08** |



Pareto Cost Model: Hamilton Grange

11

**RISK MODEL**  Relocation, Stabilization & Restoration of Hamilton Grange   **Figure 4**

| ELEMENTS | RISK AREAS | N/A | LOW | MEDIUM | HIGH |
|---|---|---|---|---|---|
| A. MANAGEMENT, FINANCIAL & ADMINISTRATIVE RISKS | Schedule (Coord. of arch & exhibits, time of year, start & stops re: long schedule) | | | ▓ | |
| | Changing government regulations (codes, funding) | | | | |
| | Public and political perspectives | | | | |
| | Budget amount uncertainty (other projects tied to this funding) | | | | |
| | Site acquisition - Adjacent site elements | | | ▓ | |
| | Permitting delays, regarding the building move | | | | |
| | Agency jurisdictions and conflicts | | | | |
| | Project mgt., organ., decision-making processes, info. flow | | | ▓ | |
| B. ENVIRONMENTAL, GEOTECHNICAL RISKS | Inclement weather, storms, floods (cold climate, flooding) | | ▓ | | |
| | Hazardous waste disposals, asbestos, haz. material testing | | | | |
| | Environ. restrictions (air quality, noise, toxic mat., etc.) | | | | |
| | Contaminated soils remediation | | | | |
| | Groundwater remediation | | | ▓ | |
| | Uncharted underground testing, water deep wells | | | | |
| | Inadequate subgrade testing | | | | |
| | Unanticipated archaeological or historical findings | | ▓ | | |
| | Exhibits: Artifact preservation (risk of deterioration) | | | | |
| | Other: Threat to exhibits, natural light, etc. | | | | |
| C. TECHNICAL RISKS | Systems, processes, and material | | | | |
| | New, unproven systems, processes and materials | | | | |
| | Other: Building move | | | | ▓ |
| D. SECURITY RISKS | Visual surveillance, site (entries, parking, plazas, walks, lighting, etc.) | | | | ▓ |
| | Visual surveillance, building (entry, exits, lighting, other) | | | | ▓ |
| | Separation of people & vehicles | | | | |
| | Fencing appropriateness & adequacy | | | | |
| | Entry signage stating security policies | | | | |
| | Exterior mech./ elect. equipment protection (air intakes, generator) | | | | ▓ |
| | Building accessibility (trees, windows, doors, roof, shafts, etc.) | | | | |
| | Occupant security (toilet areas, public phone area, vending, etc.) | | | ▓ | |
| | Building contents security (furnishings, etc.) | | | | |
| | Building & site panic call buttons | | | | |
| | Integration of phone & alarm system and CCTV | | | | |
| | Occupant badging, metal detectors, etc. | | | | |
| | Interior door security system adequacy | | | | |
| | Other: potential fire under porch (past history of fires) | | | | ▓ |
| | Other: security during construction | | | | |
| E. IMPLEMENTATION RISKS 1. Design | Design approvals and changes (review & approval process) | | | | |
| | Design errors and omissions | | | | |
| | Untested and unproven design features and innovations | | | | |
| | Insufficient design contingencies | | | | |
| | Exhibit fails to engage visitor | | | | |
| | Other: Investigations & recommentations for historic elements (roof, porch, balustrade, mantels, stairs) | | | ▓ | |
| | Design coordination with NPS exhibits reqm'ts (elect, lighting, etc.) | | | | ▓ |
| | Other: Capital Asset Plan & DAB | | | | |

**RISK MODEL**  Relocation, Stabilization & Restoration of Hamilton Grange  **Figure 4**

| ELEMENTS | RISK AREAS | N/A | LOW | MEDIUM | HIGH |
|---|---|---|---|---|---|
| 2.  Contractor | Availability of qualified contractors or skills (geothermal syst & move contractor in the area are very limited) | | | ▓ | |
| | Construction material requirements (steel material costs) not locally available) | | | ▓ | |
| | Allow time to install exhibits (coordinate with const. contractor) | | | ▓ | |
| | Inadequate or unclear specs for mat'ls & workmanship | | | | |
| | Labor negotiations/work stoppages | | | | |
| | Operator training/certification incl. manuals for bldg./ exhibits for sustainability (Obtain manuals in advance to contract for maint.) | | | ▓ | |
| | Low construction contingency | | | | |
| | Other: Commissioning & LEED req'mt (geothermal, controls, etc.) | | | ▓ | |
| 3.  Change Orders | Design Changes | | | | |
| | Field Changes (unseen site and historic bldg. conditions) | | | ▓ | |
| | Other: | | | | |
| 4.  Equipment/Material | Availability: | | | | |
| | Rejects, defects | | | | |
| | Malfunctions or failures | | | | |
| | Other: | | | | |
| 5.  Project Controls | Planning | | | | |
| | Scheduling | | | | |
| | Estimating, knowledge of local costs and general conditions | | | ▓ | |
| | Estimating, exhibits build in controlled environment | | | | |
| | Other: | | | | |
| 6.  Logistics, Transportation | Laydown areas limitations, both sites (cultural landscape plan) | | | | ▓ |
| | Traffic congestion at site or access to site | | | | |
| | Transportation difficulties for construction mat'ls | | | ▓ | |
| | Other: contractor access, if off site | | | | |
| 7.  Interference and Maintenance of Services | Interference with other work (potential other contract work) | | | | |
| | Maintenance of certain essential services during const. (security syst.) | | | | |
| | Tie-ins/cutovers with utilities (with community) | | | ▓ | |
| | Other: | | | | |
| 8.  Condition of Existing (For renovation, rehab. repair projects) | Condition of existing structure and material (for site) | | | | |
| | Tie-ins | | | | |
| | Removals or restoration | | | | |
| | Weight of house impact during move re: existing street utilities | | | ▓ | |
| 9.  Safety and Hazards During Construction | Safety to contractor and subcontractors | | | | |
| | Safety to owner and non-project personnel (move of house) | | | ▓ | ▓ |
| | Other: Existing townhouses along street access during move | | | ▓ | ▓ |
| 10.  Process start-up and Commissioning | Testings and test planning and scheduling (security systems) | | | | |
| | Malfunctions and failures | | | | |
| | Inadequate documentation/training (HVAC, bldg alarm,) | | | | |
| | Other: | | | | |

13

**Value Analysis Summary**

<u>VA Proposals</u>

The following summary (**Figure 5**) identifies each proposal by number, description of the change, benefits and cost impact. Benefits include: initial cost savings, life cycle cost savings, and performance improvements. Some recommendations will generate significant savings for the project while others will add costs. Refer to **Section B**, VA proposals for the complete description of each VA proposal, sketches where necessary and cost estimates used as a basis for initial and life cycle costs.

<u>90% and 75% Alternatives</u>

Alternatives were also developed to reduce the project cost should the budget be further constrained. The "90% alternative" is based on accomplishing the project functions with only 90% of the original budget. The "75% alternative" is based on accomplishing the project functions with only 75% of the original budget. Refer to **Section B**, 90% and 75% Alternatives for a more complete discussion.

**Section C** contains the thoughtful responses of the National Park Service and Design team regarding the VA recommendations. (In final VA report)

**Section D** contains a description of the VA process used in this study, ideas generated, and the VA agenda followed in the workshop.

**Next Steps**

Following are the next steps in the process:

| | |
|---|---|
| May 13, 2004 | Kirk Associates to send VA draft report to NPS |
| May 14, 2004 | BBB to send 90% design package to NPS |
| May 17, 2004 | NPS begins preparation of DAB submittal |
| May 28, 2004 | BBB to send 100% draft SD package to NPS |
| June 21, 2004 | NPS to submit DAB package |
| July 21, 2004 | DAB presentation |
| Oct. 2004 | BBB to begin DD design |

**Acknowledgements**

It would be a serious oversight to end this Executive Summary without acknowledging the significant contribution made by the well-informed, spirited and cooperative staff of the National Park Service, including Manhattan Sites, Northeast Regional Office, Harpers Ferry Center, Denver Service Center; and Hamilton Heights Preservation Association, Beyer Blinder Belle, architect, Roberta Washington, architect, Robert Silman Associates, Ambrosino DePinto & Schmieder, EDAW, Hanscomb, and Kirk Associates.

**VALE ANALYSIS RECOMMENDATIONS**                                    **Figure 5**

Project: **Relocation, Stabilization & Restoration of Hamilton Grange**
Location: **Manhattan Sites, New York, NY**

| No. | Proposal Description<br>ilo = in lieu of; LEED = Leadership in Energy & Environmental Design | Benefits<br>Performance,<br>Quality, etc. | Potential Savings<br>( ) indicates cost increase | |
|---|---|---|---|---|
| | | | Initial | LCC |
| **Hamilton Grange VA Proposals** | | | | |
| CBA-1 | Based on the evaluation of five potential design options using "choosing by advantages" and life cycle cost analysis, the VA team recommends Alternative 5 (E): Elevator is consolidated with stair on all 4 floors, Permanent exhibits are located on basement level. | - Less fabric loss<br>- Best preserves the exterior and interior appearance and best preserves 2nd floor for visitor viewing free of obstructions<br>- Additional 1000 SF for exhibits<br>- Best visitor experience in universal accessibility<br>- Allows disabled visitors to access all floors incl. 2nd floor<br>- Very best operational efficiency by controlling visitor flow, allows access to all floors & has least walking distance, and best operational flow<br>- Best meets goal of providing visitor access to all floors, and best allows the public to experience all floors for interpretive use | $0 | $0 |
| CBA-2 | Based on evaluation of several building move options using "choosing by advantages" and life cycle cost analysis, the VA team recommends Alternative 5 (E): Dismantle St. Luke's loggia and move along streets to new site. | - Significantly less risk of loss of historic structure and much greater opportunity for resource protection<br>- Best visitor experience<br>- Very limited impact to residences | $0 | $0 |

15

**Figure 5**

## VALUE ANALYSIS RECOMMENDATIONS

Project: Relocation, Stabilization & Restoration of Hamilton Grange
Location: Manhattan Sites, New York, NY

| No. | Proposal Description<br>*ilo = in lieu of; LEED = Leadership in Energy & Environmental Design* | Benefits<br>Performance, Quality, etc. | Potential Savings<br>( ) indicates cost increase | |
|---|---|---|---|---|
| | | | Initial | LCC |
| | | | $135,000 | $135,000 |
| HG-1 | VA team recommends the following ideas for HG location in addition to CBA-1 preferred alternative:<br>1. Use Convent Ave. community room to show video when overflow of visitors at HG<br>2. Add cost for removing historic furniture, placing in storage, and relocation to HG after the move<br>3. Sprinkler system should also cover porches including under the porches<br>4. Consider closing shutters at night for added security<br>5. Use title III services to define and specify commissioning requirements<br>6. Incorporate commissioning work into construction contractor responsibilities<br>7. Develop agreement with church to allow use of site for contractor lay-down area<br>8. Coordinate HG move with owners of residences<br>9. Design team to define move issues and costs for NPS review.<br>11. Resolve site issues | - Greater flexibility in operation<br>- Improve interpretative opportunities & flow of visitors<br>- Improved accuracy of estimate<br>- Improved performance and usability | | |
| S-1 | Augment site with low impact interpretive signage. Also consider additional landscape features and paths to expand upon concept. | - Allows for increased casual use of site<br>- Provides ability to add further interpretation or pre-orientation<br>- Offers visitors other enjoyment opportunities during queuing at busy times | Design Suggestion | |
| S-2 | Add additional landscape features per historic interpretation/ data. Also consider integrating landscape features to accommodate casual/ community use. | - Adds to understanding of historic site & use<br>- Add to use of site | Design Suggestion | |
| S-3 | Add ability to queue significant numbers of visitors without impacting (or minimizing impact) of pastoral quality. Approaches could include enlarging circle, widening paths, creating sub-spaces. | - Adds to capability of site/ building<br>- Allows for additional orientation area, if needed<br>- Hardens site to withstand heavy traffic impacts | Design Suggestion | |

# VALUE ANALYSIS RECOMMENDATIONS

**Figure 5**

Project: **Relocation, Stabilization & Restoration of Hamilton Grange**

Location: **Manhattan Sites, New York, NY**

| No. | Proposal Description<br>*ilo = in lieu of; LEED = Leadership in Energy &*<br>*Environmental Design* | Benefits<br>Performance,<br>Quality, etc. | Potential Savings<br>( ) indicates cost increase | |
|---|---|---|---|---|
| | | | Initial | LCC |
| **Convent Avenue VA Proposals** | | | | |
| CBA-3 | Based on the evaluation of four potential layouts using "choosing by advantages" and life cycle cost analysis, the VA team recommends Alternative 4 (D): Three levels plus basement, GSF 5,400 | - Less footprint impacted (570 SF)<br>- Offers best quality of multipurpose space, best adjaciencies, and best functionallity<br>- Best visitor outdoor experience with 425 sf additional space<br>- 10% more space efficient<br>- Moderately more sustainable<br>- Best relationship to community | $475,000 | $675,000 |
| CA-1 | The VA team recommends the following ideas for Convent Avenue project in addition to CBA-3:<br>1. Omit one of the 2 BR apartments to save cost<br>2. Add sign re: moving of HG<br>3. Omit one floor to reduce space & cost<br>4. Reduce size of apartments and retain 3 units<br>5. Check space standards for housing<br>6. Consider "dorm" style housing<br>7. Modify space program for entire building to be 5,000 sf<br>8. Have rear patio with hardscape<br>9. Create site gathering area in front (identify future site seating locations)<br>10. Include cost for removing and storing statue in estimate<br>11. Use Convent Ave. community room to show video about Hamilton<br>12. Confirm need to use housing space calculator for Convent Avenue | - Reduced cost to meet budget<br>- Improve interpretative opportunities<br>- Inproved NPS housing for attracting and retaining Park staff<br>- Improved performance and usability<br>- Improved accuracy of estimate<br>- Meet community & visitor needs<br>- Meet NPS space standards | Design Suggestion | |

| **Summary of VA Recommendations** | | | | |
|---|---|---|---|---|
| *Savings Potential* | | | *$610,000* | *$810,000* |

| **Summary of 90% and 75% Alternatives** | | | | |
|---|---|---|---|---|
| 90% | To achieve a project net construction cost of 90% of the original budget would require a cost reduction of $842,000 or 10%. This would be achieved by reducing the exhibit budget, eliminating the LEED sustainability budget at Convent Ave., and deleting the remaining LEED budget at Hamilton Grange | - Lowers the net construction by 10% | $842,000 | $842,000 |

**VALUE ANALYSIS RECOMMENDATIONS**                                    **Figure 5**

Project: **Relocation, Stabilization & Restoration of Hamilton Grange**
Location: **Manhattan Sites, New York, NY**

| No. | Proposal Description<br>*ilo = in lieu of; LEED = Leadership in Energy &*<br>*Environmental Design* | Benefits<br>Performance,<br>Quality, etc. | Potential Savings<br>( ) indicates cost increase | |
|-----|-----|-----|-----|-----|
| | | | Initial | LCC |
| 75% | To achieve a project net construction cost of 75% of the original budget would require a cost reduction of $2,106,000 or 25%. This would be achieved by eliminating the Convent Avenue building. | - Lowers the net construction by 25% | $2,106,000 | $2,106,000 |

**Value Analysis Study**
**Relocation, Stabilization & Restoration of Hamilton Grange**

Hamilton Grange National Memorial
New York City, NY

May 4 – 6, 2004

# SECTION B: VA RECOMMENDATIONS

- Hamilton Grange VA Proposals
- Convent Avenue VA Proposals
- 90% and 75% Design Alternatives

19

## Value Analysis Recommendation

**Project:**   **Relocation, Stabilization & Restoration of Hamilton Grange, NYC**
**Item:**        **Access and Interpretation**

**VA No.**
**CBA-1**

---

### Original Design

The Park and VA team identified a number of alternatives to improve visitor accessibility and interpretation. These alternatives include:

Alternative 1 (A): Elevator in center of new stairs to all 4 floors. Permanent exhibits are located on 2nd floor
Alternative 2 (B): Back pack with elevator, accessibility to all 4 floors. Permanent exhibits are located on 2nd floor
Alternative 3 (C): Lift from basement to cellar, access to 1st floor by site entry. Permanent exhibits are located on 2nd floor
Alternative 4 (D): Basement lift to cellar, stair rail from basement to 1st, lift from 1st to 2nd flr. Permanent exhibits are located on 2nd floor
Alternative 5 (E): Elevator is consolidated with stair on all 4 floors, Permanent exhibits are located on basement level

---

### Proposed Design

Based on the evaluation of five potential design options using "choosing by advantages" and life cycle cost analysis, the VA team recommends Alternative 5 (E): Elevator is consolidated with stair on all 4 floors, Permanent exhibits are located on basement level.

---

### Advantages and Disadvantages

**Advantages of Alternative 5 (E):**

- Less fabric loss
- Best preserves the exterior and interior appearance and best preserves 2nd floor for visitor viewing free of obstructions
- Additional 1000 SF for exhibits
- Best visitor experience in universal accessibility
- Allows disabled visitors to access all floors including 2nd floor
- Very best operational efficiency by controlling visitor flow, allows access to all floors & has least walking distance, and best operational flow
- Best meets goal of providing visitor access to all floors, and best allows the public to experience all floors for interpretive use

---

### Life Cycle Cost Summary

|  | Initial Cost | Life Cycle Cost |
|---|---|---|
| Original Design |  |  |
| Proposed Design (Preferred Alternative) | 3,966,000 | 3,966,000 |
| Potential Savings |  |  |

20

Choosing By Advantages

Project/Location: Relocation, Stabilization & Restoration of Hamilton Grange, NYC
Component: Access and Interpretation
Function: Maintain access and interpretive opportunities

Reconsideration

| Factors | Alternative 1 (A) | Alternative 2 (B) | Alternative 3 (C) | Alternative 4 (D) | Alternative 5 (E) |
|---|---|---|---|---|---|
| | Elevator in center of new stairs to all 4 floors. Permanent exhibits are located on 2nd floor | Back pack with elevator, accessibility to all 4 floors. Permanent exhibits are located on 2nd floor | Lift from basement to cellar, access to 1st floor by site entry. Permanent exhibits are located on 2nd floor | Basement lift to cellar, stair rail from basement to 1st, lift from 1st to 2nd flr. Permanent exhibits are located on 2nd floor | Elevator is consolidated with stair on all 4 floors. Permanent exhibits are located on basement level |
| **Prevent Loss of Resources** | | | | | |
| Impact on historic fabric | | | | | |
| *Attributes:* - *amount of fabric removed* | Minimal loss of ceiling fabric | Some loss of fabric on exterior of wall | No loss of historic fabric | Minimal loss of ceiling/ floor fabric | Minimal loss of ceiling fabric |
| *Advantages:* | Less fabric loss  80 | ----------  0 | No fabric loss  90 | Less fabric loss  80 | Less fabric loss  80 |
| **Provide for visitor enjoyment** | | | | | |
| Visual impact on historical scene & visitor experience | | | | | |
| *Attributes:* - *Restores building & site to 1802-4 appearance* | Preserves exterior appearance and nearly maintains all interior appearance | Compromises significantly the exterior appearance and minimally impacts interior appearance | Slightly compromises exterior appearance and nearly maintains all interior appearance | Preserves exterior appearance and nearly maintains all interior appearance | Preserves exterior appearance and nearly maintains all interior appearance, allows visitors to view 2nd floor architecture and spaces free of exhibit obstructions |
| *Advantages:* | Better preserves the exterior and interior appearance  90 | ----------  0 | Preserves well the exterior appearance  80 | Best preserves the exterior and interior appearance  100 | Best preserves the exterior and interior appearance and best preserves 2nd floor for visitor viewing free of obstructions  120 |

21

# Choosing By Advantages

Project/Location: Relocation, Stabilization & Restoration of Hamilton Grange, NYC
Component: Access and Interpretation
Function: Maintain access and interpretive opportunities

Reconsideration

| Factors | Alternative 1 (A) | Alternative 2 (B) | Alternative 3 (C) | Alternative 4 (D) | Alternative 5 (E) |
|---|---|---|---|---|---|
| **Exhibit space opportunity for interpretation** | Elevator in center of new stairs to all 4 floors. Permanent exhibits are located on 2nd floor | Back pack with elevator, accessibility to all 4 floors. Permanent exhibits are located on 2nd floor | Lift from basement to cellar, access to 1st floor by site entry. Permanent exhibits are located on 2nd floor | Basement lift to cellar, stair rail from basement to 1st, lift from 1st to 2nd flr. Permanent exhibits are located on 2nd floor | Elevator is consolidated with stair on all 4 floors. Permanent exhibits are located on basement level |
| *Attributes:* - quantity of exhibit space - Quality of space - Quality of location in bldg | 1500 SF of exhibit space, 2nd floor limits number of visitors at a time, limited flexibility of layout, requires visitor to travel 2 levels to see exhibits | 1400 SF of exhibit space, 2nd floor limits number of visitors at a time, limited flexibility of layout, requires visitor to travel 2 levels to see exhibits | 1500 SF of exhibit space, 2nd floor limits number of visitors at a time, limited flexibility of layout, requires visitor to travel 2 levels to see exhibits | 1500 SF of exhibit space, 2nd floor limits number of visitors at a time, limited flexibility of layout, requires visitor to travel 2 levels to see exhibits | 900 SF of permanent exhibit space and 1500 SF of temporary space, 2nd floor limits number of visitors at a time, very flexible layout, permanent exhibits on basement level allows more integrated design |
| *Advantages:* | Additional 100 SF for exhibits [10] | ............ | Additional 100 SF for exhibits [0] | Additional 100 SF for exhibits [10] | Additional 1000 SF for exhibits [160] |
| **Visitor experience regarding means of universal accessibility to floors** | | | | | |
| *Attributes:* - Visitor experience | Good visitor experience (using elevator) | Good visitor experience (using elevator and view to building) | Poor visitor experience (using lift) and requires accessing 1st floor from basement by going outside | Fair visitor experience (using lift) and requires accessing 1st floor from basement by using stair lift | Good visitor experience (using elevator) |
| *Advantages:* | Best visitor experience in universal accessibility [75] | Better visitor experience in universal accessibility [70] | ............ [0] | Good visitor experience in universal accessibility [60] | Best visitor experience in universal accessibility [75] |

22

Choosing By Advantages

Project/Location: Relocation, Stabilization & Restoration of Hamilton Grange, NYC
Component: Access and Interpretation
Function: Maintain access and interpretive opportunities

Reconsideration

| Factors | Alternative 1 (A) | Alternative 2 (B) | Alternative 3 (C) | Alternative 4 (D) | Alternative 5 (E) |
|---|---|---|---|---|---|
| | Elevator in center of new stairs to all 4 floors. Permanent exhibits are located on 2nd floor | Back pack with elevator, accessibility to all 4 floors. Permanent exhibits are located on 2nd floor | Lift from basement to cellar, access to 1st floor by site entry. Permanent exhibits are located on 2nd floor | Basement lift to cellar, stair rail from basement to 1st, lift from 1st to 2nd flr. Permanent exhibits are located on 2nd floor | Elevator is consolidated with stair on all 4 floors, Permanent exhibits are located on basement level |
| **Public & Employee Health, Safety and Welfare** | | | | | |
| **ADA Accessibility** | | | | | |
| *Attributes:* - Accessibility to all floors | All floor accessibility | All floor accessibility | 2nd floor not accessible | All floor accessibility | All floor accessibility |
| *Advantages:* | Allows disabled visitors to access all floors including 2nd floor  30 | Allows disabled visitors to access all floors including 2nd floor  30 | --------  0 | Allows disabled visitors to access all floors including 2nd floor  30 | Allows disabled visitors to access all floors including 2nd floor  30 |
| **Visitor & employee egress sufficiency** | | | | | |
| *Attributes:* - number of means of egress for all floors | One means of egress from 2nd floor | Two means of egress from 2nd floor | One means of egress from 2nd floor | One means of egress from 2nd floor | One means of egress from 2nd floor |
| *Advantages:* | --------  0 | Has an additional means of egress from 2nd floor  10 | --------  0 | --------  0 | --------  0 |

23

# Choosing By Advantages

**Project/Location:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC
**Component:** Access and Interpretation
**Function:** Maintain access and interpretive opportunities

| Factors | Alternative 1 (A) | Alternative 2 (B) | Alternative 3 (C) | Alternative 4 (D) | Alternative 5 (E) |
|---|---|---|---|---|---|
| | Elevator in center of new stairs to all 4 floors. Permanent exhibits are located on 2nd floor | Back pack with elevator, accessibility to all 4 floors. Permanent exhibits are located on 2nd floor | Lift from basement to cellar, access to 1st floor by site entry. Permanent exhibits are located on 2nd floor | Basement lift to cellar, stair rail from basement to 1st, lift from 1st to 2nd flr. Permanent exhibits are located on 2nd floor | Reconsideration: Elevator is consolidated with stair on all 4 floors, Permanent exhibits are located on basement level |
| **Operations and Sustainability** | | | | | |
| **Operational efficiency** | | | | | |
| *Attributes:* - Park staff operational efficiency | Allows easy operational control of visitor flow and access by all, minimal walking distance, short time to get visitors to another floor | Allows some operational control of visitor flow and access by all, extended walking distance | Allows some operational control of visitor flow, limited ADA visitor access to 2nd flr, extended walking distance | Allows some operational control of visitor flow and access by all, modest walking distance, extended time to get visitors to another floor | Allows very easy operational control of visitor flow and access by all, minimal walking distance, short time to get visitors to another floor |
| *Advantages:* | **Best operational efficiency by controlling visitor flow, allows access to all floors & has least walking distance, and best operational flow** — 86 | Better operational efficiency by allowing access to all floors, increased time to get all visitors to another floor — 40 | ---------- — 0 | Better operational efficiency by allowing access to all floors and less walking distance — 40 | **Very best operational efficiency by controlling visitor flow, allows access to all floors & has least walking distance, and best operational flow** — 110 |

24

# Choosing By Advantages

**Project/Location:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC
**Component:** Access and Interpretation
**Function:** Maintain access and interpretive opportunities

Reconsideration

| Factors | Alternative 1 (A) | Alternative 2 (B) | Alternative 3 (C) | Alternative 4 (D) | Alternative 5 (E) |
|---|---|---|---|---|---|
| | Elevator in center of new stairs to all 4 floors. Permanent exhibits are located on 2nd floor | Back pack with elevator, accessibility to all 4 floors. Permanent exhibits are located on 2nd floor | Lift from basement to cellar, access to 1st floor by site entry. Permanent exhibits are located on 2nd floor | Basement lift to cellar, stair rail from basement to 1st, lift from 1st to 2nd flr. Permanent exhibits are located on 2nd floor | Elevator is consolidated with stair on all 4 floors. Permanent exhibits are located on basement level |
| **Strengthen Partnerships with community** | | | | | |
| **Community goals** | | | | | |
| *Attributes:* -Meets goal of all floor accessibility - Meets goal of all floor public interpretative experience | All floor accessibility, mixed interpretative experience | All floor accessibility, mixed interpretative experience | 2nd floor not accessible, mixed interpretative experience | All floor accessibility, mixed interpretative experience | All floor accessibility, Meets goal of all floor public interpretative experience |
| *Advantages:* | Best meets goal of providing accessibility of all visitors to all floors    30 | Best meets goal of providing accessibility to all visitors to all floors    30 | ................    0 | Best meets goal of providing accessibility of all visitors to all floors    30 | **Best meets goal of providing visitor access to all floors, and best allows the public to experience all floors for interpretive use**    80 |
| **Total Importance of Advantages (Benefits)** | 400 | 180 | 180 | 340 | 645 |
| **Total Initial Cost** | $3,966,000 | $4,640,000 | $3,895,000 | $3,949,000 | $3,966,000 |

25

# LIFE CYCLE COST ANALYSIS (LCCA)

Project/Location: Relocation, Stabilization & Restoration of Hamilton Grange, NYC

Subject: Access and Interpretation

Project Life Cycle = 25 Years
Discount Rate = 7.0%

| | | | | | Alternative 1 (A) Elevator in center of new stairs to all 4 floors. Permanent exhibits are located on 2nd floor | | Alternative 2 (B) Back pack with elevator, accessibility to all 4 floors. Permanent exhibits are located on 2nd floor | | Alternative 3 (C) Lift from basement to 1st floor by site entry. Permanent exhibits are located on 2nd floor | | Alternative 4 (D) Basement lift to cellar, stair rail from basement to 1st, lift from 1st to 2nd flr. Permanent exhibits are located on 2nd floor | | Alternative 5 (E) Elevator is consolidated with stair on all 4 floors. Permanent exhibits are located on basement level | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity | UM | Unit Cost | PW Factor | Est. | PW | Est. | PW | Est. | PW | Est. | PW | Est. | PW |
| **INITIAL COSTS** | | | | | | | | | | | | | | |
| A. Alternative 1 (A) | 1 | LS | $3,966,000 | 1.0000 | 3,966,000 | 3,966,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B. Alternative 2 (B) | 1 | LS | $4,640,000 | | 0 | 0 | 4,640,000 | 4,640,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| C. Alternative 3 (C) | 1 | LS | $3,895,000 | | 0 | 0 | 0 | 0 | 3,895,000 | 3,895,000 | 0 | 0 | 0 | 0 |
| D. Alternative 4 (D) | 1 | LS | $3,949,000 | | 0 | 0 | 0 | 0 | 0 | 0 | 3,949,000 | 3,949,000 | 0 | 0 |
| E. Alternative 5 (E) | 1 | LS | $3,966,000 | 1.0000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,966,000 | 3,966,000 |
| F. | | | | | | | | | | | | | | |
| **Total Initial Cost** | | | | | | 3,966,000 | | 4,640,000 | | 3,895,000 | | 3,949,000 | | 3,966,000 |

**REPLACEMENT COST/ SALVAGE VALUE**

| | Year | PW Factor | | | Est. | PW | Est. | PW | Est. | PW | Est. | PW | Est. | PW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. | 0 | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B. | 0 | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Replacement/Salvage Costs | | | | | | 0 | | 0 | | 0 | | 0 | | 0 |

**ANNUAL COSTS**

| Description | Diff. Escl. % | PWA | | | Est. | PW | Est. | PW | Est. | PW | Est. | PW | Est. | PW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. _____ | 0.00% | 11.654 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B. _____ | 0.00% | 11.654 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C. _____ | 0.00% | 11.654 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| D. _____ | 0.00% | 11.654 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| E. _____ | 0.00% | 11.654 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| F. _____ | 0.00% | 11.654 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| G. _____ | 0.00% | | | | | | | | | | | | | |
| H. | | | | | 0 | | 0 | | 0 | | 0 | | 0 | |
| **Total Annual Costs (Present Worth)** | | | | | | 3,966,000 | | 4,640,000 | | 3,895,000 | | 3,949,000 | | 3,966,000 |
| **Total Life Cycle Costs (Present Worth)** | | | | | | 3,966,000 | | 4,640,000 | | 3,895,000 | | 3,949,000 | | 3,966,000 |
| **Total Life Cycle Costs (Annualized)** | | | PF Factor 0.0858 | | 340,325 Per Year | | 398,161 Per Year | | 334,232 Per Year | | 338,866 Per Year | | 340,325 Per Year | |

26

Import-IC$ Graph



CBA Importance to Initial Cost Graph:
Relocation, Stabilization & Restoration of Hamilton Grange ~ Access and Interpretation

27

**Adjacency Diagram – Hamilton Grange**



Hamilton Grange National Memorial
Pre-Design Report
Beyer Blinder Belle Architects & Planners LLP

April 2004
Page 20



## Stacking & Blocking Diagram – Hamilton Grange

ATTIC

EXHIBIT

HISTORIC ROOMS

VISITOR SERVICES
ORIENTATION

MECH/SERVICE

1800 SF

1900 SF

1900 SF

1900 SF

TOTAL
7500 SF

Hamilton Grange National Memorial
Pre-Design Report
Beyer Blinder Belle Architects & Planners LLP

April 2004
Page 21



## BASEMENT
3/16" = 1'-0"

Public Entry

- Women's Toilet 238sf
- Men's Toilet 137sf
- Display/Info/Bookshop 286sf
- Stair 45sf
- Hall 150sf
- Possible Changing Exhibits or Enlarged Orientation 238sf
- Orientation 375sf
- Entry Lobby 150sf
- Foyer 104sf
- Stair Hall 208sf
  - Dn 19R
  - Up 17R

New Wood Stair & Hydraulic Elevator to All Floors

## CELLAR
3/16" = 1'-0"

- Electrical Room 246sf
- Mechanical Room 372sf
- Office 246sf
- Mech 51sf
- Hall 224sf
- Possible Storage 246sf
- Staff Room 175sf
- Locker Room 90sf
- Locker Room 90sf
- Elev Mach Rm 144sf
- Stair Hall 66sf
  - Up 19R

Interpretive & Historic Spaces
Visitor Services
NPS Staff & Support Spaces
Circulation
Mechanical & Storage

A-3

# Hamilton Grange National Memorial
The Grange - Option A Floor Plans ("Internal Elevator & Exhibits on 2nd Floor")

Beyer Blinder Belle

30



**SECOND FLOOR**
3/16" = 1'-0"

Chamber 572sf

Chamber 310sf

Chamber 278sf

Chamber 207sf

Hall 114sf

Stair Hall 65sf

Stair Hall 208sf

DN 22R

Exhibit Space = 1,550sf

**FIRST FLOOR**
3/16" = 1'-0"

Guest Chamber 237sf

Guest Chamber 231sf

Hall 108sf

Dining Room 393sf

Parlor 393sf

Library 208sf

Entry Hall 191sf

Stair Hall 177sf

Stair Hall 208sf

DN 17R

UP 22R

UP

Exhibit Space = 1,927sf

Ceremonial Entry

Interpretive & Historic Spaces

Visitor Services

NPS Staff & Support Spaces

Circulation

Mechanical & Storage

A-4

# Hamilton Grange National Memorial

The Grange - Option A Floor Plans ("Internal Elevator & Exhibits on 2nd Floor")

Beyer Blinder Belle

31



BASEMENT
3/16" = 1'-0"

CELLAR
3/16" = 1'-0"

Hamilton Grange National Memorial

The Grange - Option B Floor Plans ("Backpack")

32



FIRST FLOOR
3/16" = 1'-0"

SECOND FLOOR
3/16" = 1'-0"

Hamilton Grange National Memorial

The Grange - Option B Floor Plans ("Backpack")

| | Interpretive & Historic Spaces |
| | Visitor Services |
| | NPS Staff & Support Spaces |
| | Circulation |
| | Mechanical & Storage |

A-6

33



# Hamilton Grange National Memorial

## The Grange - Option B Sections & Elevations ("Backpack")

A-7



CELLAR
3/16" = 1'-0"

BASEMENT
3/16" = 1'-0"

Hamilton Grange National Memorial

The Grange - Option C Floor Plans ("Two Entrances At Grade")

35

Beyer
Blinder
Belle



SECOND FLOOR
3/16" = 1'-0"

FIRST FLOOR
3/16" = 1'-0"

Hamilton Grange National Memorial

The Grange - Option C Floor Plans ("Two Entrances At Grade")

A-9

Interpretive & Historic Spaces
Visitor Services
NPS Staff & Support Spaces
Circulation
Mechanical & Storage

36



**SECTION** 1/8" = 1'-0"

**ELEVATION** 1/8" = 1'-0"

# Hamilton Grange National Memorial

The Grange - Option C Sections & Elevations ("Two Entrances At Grade")

A-10



**Mechanical Shaft, Typical**

**Women's Toilet** 200sf
**Hall** 45sf
**Men's Toilet** 200sf
**Display/Info/Bookshop** 372sf

**Public Entry**

**Office** 221sf
**Orientation** 375sf
**Hall** 199sf
**Entry Lobby** 135sf
**Foyer** 104sf

**Stair Hall** 140sf

**BASEMENT**
3/16" = 1'-0"

UP

New HC Lift Down To Cellar Level
New Wood Stair in Original Location
ADA Motorized Chair Rail Integrated within Stair Assembly (storage in Basement when not in use)

**Mechanical Shaft, Typical**

**Electrical Room** 166sf
**Mechanical Room** 372sf
**Office** 244sf

**Storage** 196sf
**Staff Room** 175sf
**Locker Room** 90sf
**Locker Room** 90sf
**Hall** 279sf

**Stair Hall** 165sf

**CELLAR**
3/16" = 1'-0"

UP

New HC Lift Up To Basement Level
New Wood Stair in Original Location

# Hamilton Grange National Memorial
## The Grange - Option D Floor Plans ("Two Lifts and a Chair Rail")

Interpretive & Historic Spaces
Visitor Services
NPS Staff & Support Spaces
Circulation
Mechanical & Storage

A-1

Beyer Blinder Belle



**Hamilton Grange National Memorial**

The Grange - Option D Floor Plans ("Two Lifts and a Chair Rail")

FIRST FLOOR
3/16" = 1'-0"

SECOND FLOOR
3/16" = 1'-0"

FIRST FLOOR labels:
- Guest Chamber 236sf
- Dining Room 392sf
- Guest Chamber 236sf
- Hall 107sf
- Parlor 392sf
- Library 207sf
- Hall 39sf
- Stair Hall 138sf
- Entry Hall 193sf
- Exhibit Space = 1,927.5f
- Ceremonial Entry
- UP
- Mechanical Shaft In Existing Flue, Typical
- New Concealed Folding Egress Stair Above
- New HC Lift Up To Second Floor
- New Wood Stair in Original Location

SECOND FLOOR labels:
- Chamber 572sf
- Chamber 377sf
- Chamber 288sf
- Chamber 207sf
- Hall 114sf
- Hall 39sf
- Stair Hall 316sf
- Exhibit Space = 1,550sf
- New Concealed Folding Egress Stair Down to First Floor Porch
- Convert Existing Window Opening to Egress Door
- New HC Lift Down To First Floor
- New Wood Stair in Original Location
- DN

Legend:
- Interpretive & Historic Spaces
- Visitor Services
- NPS Staff & Support Spaces
- Circulation
- Mechanical & Storage

Beyer Blinder Belle

39



Total Exhibit = 1,089sf

Exhibit
25sf

Exhibit
375sf

Security
Office
52sf

Bookstore

Office
52sf

Public Entry

Exhibit
25sf

Hall/
Exhibit
196sf

Entry
Lobby
& Info
106sf

Foyer
106sf

Exhibit
25sf

Introduction
375sf

Stair
Hall
210sf
9R

New Wood Stair &
Hydraulic Elevator
to All Floors

**BASEMENT**
3/16" = 1'-0"

Interpretive &
Historic Spaces

Visitor
Services

NPS Staff &
Support Spaces

Circulation

Mechanical &
Storage

A-13

**CELLAR**
3/16" = 1'-0"

Electrical
Room
196sf

Women's
Toilet
78sf

Men's
Toilet

Mechanical
Room
?sf

Hall
314sf

Locker
Room
106sf

Locker
Room
106sf

Egress Stair
105sf

Staff
Room
206sf

Elev Mach Rm
106sf

Stair
Hall
66sf
9R

UP
19R

**Hamilton Grange National Memorial**

The Grange - Option E Floor Plans ("Internal Elevator & Exhibits in Basement")

Beyer
Blinder
Belle

40



Hamilton Grange National Memorial

The Grange - Option E Floor Plans ("Internal Elevator & Exhibits in Basement")



Hamilton Grange National Memorial

The Grange - Option E Sections & Elevations ("Internal Elevator & Exhibits in Basement")

SECTION
1/8" = 1'-0"

ELEVATION
1/8" = 1'-0"

Typical HVAC Distribution

Attic/Mech
Chamber
Library
Office
Men's Toilet
Stair Hall
Hall
Entry Hall
Lobby & Info
Hall
Stair Hall
Stair Hall
Stair Hall

Elevator Overrun Incorporated into New Roof Assembly

Typical HVAC Distribution

Attic/Mech
Chamber
Chamber
Parlor
Guest Chamber
Exhibit
Mech
Introduction
Lock Rm
Stair Hall
Stair Hall
Stair Hall
Stair Hall
Lock Rm
Lock Rm

SECTION
1/8" = 1'-0"

ELEVATION
1/8" = 1'-0"

Hydraulic Elevator to All Floors

Elevator Overrun Incorporated into New Roof Assembly

Beyer Blinder Belle

42

# Value Analysis Recommendation

**Project:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC      <u>VA No.</u>

**Item:** Hamilton Grange Building Move Options                                           CBA-2

## Original Design (Alternatives considered)

The Park and VA team identified a number of move options for the Hamilton Grange from its present location on Convent Ave. These alternatives include:

<u>Alternative 1 (A)</u>: Divide building into three parts and move along streets to new site

<u>Alternative 2 (B)</u>: Move bldg. East through Hamilton Terrace to new site *(determined not to be feasible)*

<u>Alternative 3 (C)</u>: Lift building & carry using dirigible to new site *(determined not to be feasible)*

<u>Alternative 4 (D)</u>: Raise building over St. Luke's Porch then move along streets to new site

<u>Alternative 5 (E)</u>: Dismantle St. Luke's loggia and move along streets to new site

## Proposed Design

Based on evaluation of several building move options using "choosing by advantages" and life cycle cost analysis, the VA team recommends <u>Alternative 5 (E)</u>: Dismantle St. Luke's loggia and move along streets to new site.

## Advantages and Disadvantages

**Advantages of Alternative 5 (E):**

- Significantly less risk of loss of historic structure and much greater opportunity for resource protection
- Best visitor experience
- Very limited impact to residences
- 

## Life Cycle Cost Summary

|  | <u>Initial Cost</u> | <u>Life Cycle Cost</u> |
|---|---|---|
| Original Design (Budget) |  |  |
| Proposed Design (Preferred Alternative) | 1,300,000 | 1,300,000 |
| Potential Savings |  |  |

43

## Choosing By Advantages

Project/Location: Relocation, Stabilization & Restoration of Hamilton Grange, NYC
Component: Hamilton Grange Building Move
Function: Relocate Building

| Factors | Alternative 1 (A) | Alternative 4 (D) | Alternative 5 (E) |
|---|---|---|---|
| | Divide building into three parts and move along streets to new site | Raise building over St. Luke's Porch then move along streets to new site | Dismantle St. Luke's loggia and move along streets to new site |
| **Prevent Loss of Resources/ Maintain & Improve Resources** | | | |
| *Attributes:* <br> - risk of loss of historic structure <br> - Improved resource protection | High risk of loss of historic structure | Moderate risk of loss of historic structure | Almost no risk of loss of historic structure, potential improved resource protection |
| *Advantages:* | ------------- (0) | Much less risk of loss of historic structure (60) | Significantly less risk of loss of historic structure and much greater opportunity for resource protection (100) |
| **Provide for visitor enjoyment** | | | |
| **Visitor experience** | | | |
| *Attributes:* <br> - Quality of visitor experience | Potentially poor quality visitor experience | Good quality visitor experience | Good quality visitor experience |
| *Advantages:* | ------------- (0) | Best visitor experience (20) | Best visitor experience (20) |
| **Strengthen Partnerships with community** | | | |
| **Impact to Community (Residences & Church)** | | | |
| *Attributes:* <br> - Degree of impact on residence occupants (time of disturbance) <br> - Church temporary arch. impact | One month of disturbance to residences, no church architectural impact, one month functional disturbance | 3 days of disturbance to residences, no church architectural impact, no church functional disturbance | 3 days of disturbance, to residences, significant church architectural impact, minor functional disturbance |
| *Advantages:* | ------------- (0) | Best limits impact to residences and church (40) | Very limited impact to residences (35) |
| **Total Importance of Advantages (Benefits)** | 0 | 120 | 155 |
| **Total Initial Cost** | $1,625,000 | $1,267,500 | $1,300,000 |

44

# LIFE CYCLE COST ANALYSIS (LCCA)

**Project/Location:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC
**Subject:** Hamilton Grange Building Move

Project Life Cycle = 25 Years
Discount Rate = 7.0%

| | | | | Alternative 1 (A) Divide building into three parts and move along streets to new site | | Alternative 4 (D) Raise building over St. Luke's Porch then move along streets to new site | | Alternative 5 (E) Dismantle St. Luke's loggia and move along streets to new site | |
|---|---|---|---|---|---|---|---|---|---|
| **INITIAL COSTS** | Quantity | UM | Unit Cost | Est. | PW | Est. | PW | Est. | PW |
| A. Alternative 1 (A) | 1 | LS | $1,625,000 | 1,625,000 | 1,625,000 | 0 | 0 | 0 | 0 |
| D. Alternative 4 (D) | 1 | LS | $1,267,500 | 0 | 0 | 1,267,500 | 1,267,500 | 0 | 0 |
| E. Alternative 5 (E) | 1 | LS | $1,300,000 | 0 | 0 | 0 | 0 | 1,300,000 | 1,300,000 |
| F. | | | | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Initial Cost** | | | | | 1,625,000 | | 1,267,500 | | 1,300,000 |

**REPLACEMENT COST/ SALVAGE VALUE**

| Description | Year | PW Factor | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A. | 0 | 1.0000 | | 0 | 0 | 0 | 0 | 0 | 0 |
| B. | 0 | 1.0000 | | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Replacement/Salvage Costs** | | | | | 0 | | 0 | | 0 |

**ANNUAL COSTS**

| Description | Diff. Escl. % | PWA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A. | 0.00% | 11.654 | | 0 | 0 | 0 | 0 | 0 | 0 |
| B. | 0.00% | 11.654 | | 0 | 0 | 0 | 0 | 0 | 0 |
| C. | 0.00% | 11.654 | | 0 | 0 | 0 | 0 | 0 | 0 |
| D. | 0.00% | 11.654 | | 0 | 0 | 0 | 0 | 0 | 0 |
| E. | 0.00% | 11.654 | | 0 | 0 | 0 | 0 | 0 | 0 |
| F. | 0.00% | 11.654 | | 0 | 0 | 0 | 0 | 0 | 0 |
| G. | 0.00% | 11.654 | | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Annual Costs (Present Worth)** | | | | | 0 | | 0 | | 0 |

**Total Life Cycle Costs (Present Worth)** | | 1,625,000 | | 1,267,500 | | 1,300,000

PP Factor 0.0858

**Total Life Cycle Costs (Annualized)** | 139,442 Per Year | 108,765 Per Year | 111,554 Per Year

45

Import-IC$ Graph



**CBA Importance to Initial Cost Graph:**
**Hamilton Grange Move Options**

46



Hamilton Grange National Memorial

Building Relocation Plan

BUILDING MOVE PLAN
1/32" = 1'-0"



SECTION THROUGH CONVENT AVENUE
LOOKING SOUTH - DURING MOVE

SECTION THROUGH CONVENT AVENUE
LOOKING SOUTH - POST MOVE

Hamilton Grange National Memorial

Building Relocation Sections

A-2

48

## Value Analysis Recommendation

**Project:** **Relocation, Stabilization & Restoration of Hamilton Grange**    **VA No.**
**Item:**    **List of VA recommendations for Hamilton Grange location**    **HG-1**

### Original Design

As presented in Predesign Report dated April 2004.

### Proposed Design

The VA team recommends for following for the Hamilton Grange location:
1. Use Convent Ave. community room to show video when overflow of visitors at Hamilton Grange
2. Add cost for removing historic furniture, placing in storage, and relocation to Hamilton Grange after the move (cost to be part of MCPP budget not net construction)
3. Sprinkler system should also cover porches including under the porches (historically this is where fires have started at HG)
4. Consider closing shutters at night for added security
5. Use title III services to define and specify commissioning requirements
6. Incorporate commissioning work into construction contractor responsibilities
7. Develop agreement with church to allow use of site for contractor lay-down area during construction
8. Coordinate HG move with owners of residences along street (access and other issues to be addressed)
9. Design team to define move issues for NPS review. Also estimate the potential cost impact (neighbors, utilities, bus rates, etc.)
10. Revise LEED allowance for HG
11 Site issues to be resolved:
    - Create access for emergency vehicles (fire, ambulance) to building
    - Parking spaces (only holding area for 15 minutes)
    - Drop-off to house at rear with walking to front (visitors/staff/service)
    - Bus drop-off location to be identified by NPS (on-site location not possible)
12. Consider using 2nd floor for temporary exhibits and special tours (architectural, family, etc.)

### Advantages and Disadvantages

**Advantages:**
- Greater flexibility in operation
- Improve interpretative opportunities & flow of visitors
- Improved accuracy of estimate
- Improved performance and usability

**Disadvantages:**
- Some loss of performance

### Discussion

The listing of recommendations above provide options for consideration in meeting required functions for the visitors and NPS staff while meeting budget constraints.

### Life Cycle Cost Summary

|  | Initial Cost | Life Cycle Cost |
|---|---|---|
| Original Design |  |  |
| Proposed Design |  |  |
| Potential Savings (Re: LEED allowance) | 135,000 | 135,000 |

49

## Value Analysis Recommendation

**Project:** Relocation, Stabilization & Restoration of Hamilton Grange     <u>VA No.</u>

**Item:** Create independent site interpretation opportunities     S-1

### Original Design

Several distinct landscape features added according to historic information on original Grange landscape.

### Proposed Design

Augment site with low impact interpretive signage. Also consider additional landscape features and paths to expand upon concept.

### Advantages and Disadvantages

**Advantages:**
- Allows for increased casual use of site
- Provides ability to add further interpretation or pre-orientation
- Offers visitors other enjoyment opportunities during queuing at busy times
- 
- 

**Disadvantages:**
- Must be well planned to not detract from intended pastoral quality of landscape
- 
- 

### Discussion

### Life Cycle Cost Summary

|  | <u>Initial Cost</u> | <u>Life Cycle Cost</u> |
|---|---|---|
| **Original Design** |  |  |
| **Proposed Design** | **Design Suggestion** |  |
| **Potential Savings** |  |  |

50

## Value Analysis Recommendation

**Project:** **Relocation, Stabilization & Restoration of Hamilton Grange**          **VA No.**
**Item:**    **Add landscape features (per historic data)**                                        **S-2**

### Original Design

Several distinct landscape features added include:

    13 Sweetgums
    Circle drive
    "Building in the round"

### Proposed Design

Add additional landscape features per historic interpretation/ data. Also consider integrating landscape
features to accommodate casual/ community use.

### Advantages and Disadvantages

**Advantages:**
- Adds to understanding of historic site & use
- Add to use of site
-
-
-

**Disadvantages:**
- Must be well planned to not detract from intended pastoral quality of landscape
-
-

### Discussion

### Life Cycle Cost Summary

|  | Initial Cost | Life Cycle Cost |
|---|---|---|
| Original Design | | |
| Proposed Design | Design Suggestion | |
| Potential Savings | | |

51

## Value Analysis Recommendation

**Project:** **Relocation, Stabilization & Restoration of Hamilton Grange**     VA No.
**Item:** **Offer exterior queuing**                                          S-3

### Original Design

Queuing of visitors is limited to small circle drive.

### Proposed Design

Add ability to queue significant numbers of visitors without impacting (or minimizing impact) of pastoral quality. Approaches could include enlarging circle, widening paths, creating sub-spaces.

### Advantages and Disadvantages

**Advantages:**
- Adds to capability of site/ building
- Allows for additional orientation area, if needed
- Hardens site to withstand heavy traffic impacts
- 
- 

**Disadvantages:**
- Could reduce intended pastoral quality
- 
- 

### Discussion

### Life Cycle Cost Summary

|                    | Initial Cost      | Life Cycle Cost |
|--------------------|-------------------|-----------------|
| **Original Design** |                   |                 |
| **Proposed Design** | Design Suggestion |                 |
| **Potential Savings** |                 |                 |

52

## Sketch Worksheet

**Project:** Relocation, Stabilization & Restoration of Hamilton Grange    **VA No.**
**Item:** Offer exterior queuing    **S-3**

☐ **Original Design**    ■ **Proposed Design**



SITE PLAN
1/16" = 1'-0"

# Value Analysis Recommendation

**Project:**  **Relocation, Stabilization & Restoration of Hamilton Grange, NYC**

**Item:**  **Convent Ave. Building Layout**

VA No.
CBA-3

---

## Original Design

The Park and VA team identified a number of Convent Avenue building layouts to improve the cost effectiveness. These alternatives include:

Alternative 1 (A): Three levels plus basement, GSF 7,656; $2,680,000 *(determined not to be feasible, too large & high cost)*

Alternative 2 (B): Three levels plus basement, GSF 7,700; $2,695,000 *(determined not to be feasible, too large & high cost)*

Alternative 3 (C): Three levels plus basement, GSF 7,307; $2,400,000

Alternative 4 (D): Three levels plus basement, GSF 5,400; $1,925,000

---

## Proposed Design

Based on the evaluation of four potential layouts using "choosing by advantages" and life cycle cost analysis, the VA team recommends Alternative 4 (D): Three levels plus basement, GSF 5,400

---

## Advantages and Disadvantages

**Advantages of Alternative 4 (D):**

- Less footprint impacted (570 SF)
- Offers best quality of multipurpose space, best adjaciencies, and best functionallity
- Best visitor outdoor experience with 425 sf additional space
- 10% more space efficient
- Moderately more sustainable
- Best relationship to community
- 

---

## Life Cycle Cost Summary

|  | Initial Cost | Life Cycle Cost |
|---|---|---|
| Original Design (Alternative 3) | 2,400,000 | 3,166,375 |
| Proposed Design (Alternative 4) | 1,925,000 | 2,491,364 |
| Potential Savings | 475,000 | 675,010 |

54

## Choosing By Advantages

**Project/Location:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC
**Component:** Convent Ave. Building Layout
**Function:** Offer Community Use and Create NPS Housing

| Factors | Alternative 3 (C) | | Alternative 4 (D) | |
|---|---|---|---|---|
| | Three levels plus basement, GSF 7,307 | | Three levels plus basement, GSF 5,400 | |
| **Prevent Loss of Resources** | | | | |
| Impact on footprint | | | | |
| *Attributes:* *- amount of footprint impacted* | 1,828 SF | | 1,258 SF | |
| *Advantages:* | -------- | 0 | Less footprint impacted (570 SF) | 75 |
| **Provide for visitor enjoyment** | | | | |
| Toilet location | | | | |
| *Attributes:* *- Convenience* | First floor direct access | | Basement, less direct access | |
| *Advantages:* | More convenient for visitors to access toilets | 10 | -------- | 0 |
| **Multipurpose location** | | | | |
| *Attributes:* *- quality of space* *- functionallity* | No views, limited natural light, not adjacent to kitchen, minimally functional proportions | | Views, natural light, adjacent to kitchen, very functional proportions | |
| *Advantages:* | -------- | 0 | Offers best quality of multipurpose space, best adjaciencies, and best functionallity | 100 |

55

## Choosing By Advantages

**Project/Location:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC
**Component:** Convent Ave. Building Layout
**Function:** Offer Community Use and Create NPS Housing

| Factors | Alternative 3 (C) | | Alternative 4 (D) | |
|---|---|---|---|---|
| | Three levels plus basement, GSF 7,307 | | Three levels plus basement, GSF 5,400 | |
| **Visitor enjoyment, indoor experience** | | | | |
| *Attributes:* | | | | |
| - Public program space (SF) | 1,276 SF (indoor) | | 1,186 SF (indoor) | |
| *Advantages:* | Best Visitor indoor experience with 90 sf additional public space | 10 | | 0 |
| **Visitor enjoyment, outdoor experience** | | | | |
| *Attributes:* | | | | |
| - Public exterior space (SF) | 0 SF (outdoor, rear patio) | | 425 SF (outdoor, rear patio) | |
| *Advantages:* | | 0 | Best visitor outdoor experience with 425 sf additional space | 40 |
| **Operations and Sustainability** | | | | |
| **Operational efficiency** | | | | |
| *Attributes:* | | | | |
| - Net to gross space efficiency | 70% | | 80% | |
| *Advantages:* | | 0 | 10% more space efficient | 20 |
| **NPS housing accommodation** | | | | |
| *Attributes:* | | | | |
| - Housing total sf | 2560 SF of housing, 7 bedrooms | | 2013 SF of housing, 6 bedrooms | |
| - Number of bedrooms | | | | |
| *Advantages:* | 547 sf of additional housing space and one additional bedroom | 90 | | 0 |

56

## Choosing By Advantages

**Project/Location:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC
**Component:** Convent Ave. Building Layout
**Function:** Offer Community Use and Create NPS Housing

| Factors | Alternative 3 (C) | Alternative 4 (D) |
|---|---|---|
| | Three levels plus basement, GSF 7,307 | Three levels plus basement, GSF 5,400 |
| **Sustainability** | | |
| *Attributes:* - LEED checklist | Some natural lighting, fair natural air circulation | Significant natural lighting, good natural air circulation, efficient use of space and materials to meet program |
| *Advantages:* | 0 | Moderately more sustainable    5 |
| **Strengthen Partnerships with community** | | |
| Community relations | | |
| *Attributes:* - window coverage - daylight to neighbors | Moderate coverage of windows in adjacent apartments, allows some daylight to neighbors | Minimal coverage of windows in adjacent apartments, allows daylight to neighbors |
| *Advantages:* | 0 | Best relationship to community    10 |
| **Total Importance of Advantages (Benefits)** | 110 | 250 |
| **Total Initial Cost** | $2,400,000 | $1,925,000 |

57

# LIFE CYCLE COST ANALYSIS (LCCA)

**Project/Location:** Relocation, Stabilization & Restoration of Hamilton Grange, NYC
**Subject:** Convent Ave. Building Layout

Project Life Cycle = 25 Years
Discount Rate = 7.0%

| | Quantity | UM | Unit Cost | | Alternative 3 (C) Three levels plus basement, GSF 7,307 | | Alternative 4 (D) Three levels plus basement, GSF 5,400 | |
|---|---|---|---|---|---|---|---|---|
| **INITIAL COSTS** | | | | | Est. | PW | Est. | PW |
| A. Alternative 3 (C) | 7,307 | GSF | $328.45 | | 2,400,000 | 2,400,000 | | |
| B. Alternative 4 (D) | 5,400 | GSF | $356.48 | | 0 | 0 | 1,925,000 | 1,925,000 |
| N. | | | | | 0 | 0 | 0 | 0 |
| **Total Initial Cost** | | | | | | 2,400,000 | | 1,925,000 |

| | | Year | PW Factor | | Est. | PW | Est. | PW |
|---|---|---|---|---|---|---|---|---|
| **REPLACEMENT COST/ SALVAGE VALUE** Description | | | | | | | | |
| A. | | 0 | 1.0000 | | 0 | 0 | 0 | 0 |
| B. | | 0 | 1.0000 | | 0 | 0 | 0 | 0 |
| **Total Replacement/Salvage Costs** | | | | | | 0 | | 0 |

| | Cost/ GSF | GSF | Diff. Escl. % | PWA | Est. | PW | Est. | PW |
|---|---|---|---|---|---|---|---|---|
| **ANNUAL COSTS** Description | | | | | | | | |
| A. Alt 3 (C) Maintenance | $6.00 | 7,307 | 0.00% | 11.654 | 43,842 | 510,916 | | |
| B. Alt 4 (D) Maintenance | $6.00 | 5,400 | 0.00% | 11.654 | 0 | 0 | 32,400 | 377,576 |
| C. Alt. 3 (C) Energy | $3.00 | 7,307 | 0.00% | 11.654 | 21,921 | 255,458 | | |
| D. Alt. 4 (D) Energy | $3.00 | 5,400 | 0.00% | 11.654 | 0 | 0 | 16,200 | 188,788 |
| E. | | | | | | | | |
| **Total Annual Costs (Present Worth)** | | | | | | 766,375 | | 566,364 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Total Life Cycle Costs (Present Worth)** | | | | | | 3,186,375 | | 2,491,364 |
| **Total Life Cycle Costs (Annualized)** | | | PP Factor 0.0858 | | | 271,708  Per Year | | 213,785  Per Year |

Import-IC$ Graph



CBA Importance to Initial Cost Graph:
Convent Ave. Building Layout

59

Import-LCC$ Graph



CBA Importance to Life Cycle Cost Graph:
Convent Ave. Building Layout

60



LEGEND

Visitor Services

Visitor Circulation

Residential Circulation

3 Bedroom Apartment

2 Bedroom Apartment

Staff & Services

BASEMENT FLOOR

# Hamilton Grange National Memorial

## Convent Avenue - Option A

Roberta Washington
· architects pc

Beyer
Blinder
Belle

PD-#

61



Hamilton Grange National Memorial

Convent Avenue - Option A

FIRST FLOOR

Beyer Blinder Belle

Roberta Washington
·architects pc

PD-#



Hamilton Grange National Memorial

Convent Avenue - Option A

SECOND FLOOR

Beyer
Blinder
Belle

Roberta Washington
. architects pc

63



THIRD FLOOR

Hamilton Grange National Memorial
Convent Avenue - Option A

Roberta Washington
·architects·pc

64

SECTION

Hamilton Grange National Memorial
Convent Avenue - Option A

Beyer Blinder Belle

Roberta Washington
·architects·pc

PD-#

65

BASEMENT

Hamilton Grange National Memorial
Convent Avenue - Option B

Roberta Washington
·architects.pc

Beyer
Blinder
Belle

PD-#

66



FIRST FLOOR

Hamilton Grange National Memorial

Convent Avenue - Option B

Beyer Blinder Belle

Roberta Washington
·architects pc

PD-#

67



SECOND FLOOR

Hamilton Grange National Memorial

Convent Avenue - Option B

Roberta Washington
·architects p.c.

Beyer
Blinder
Belle

68



THIRD FLOOR

Hamilton Grange National Memorial

Convent Avenue - Option B

Beyer Blinder Belle

Roberta Washington
.architects pc

PD-#



SECTION

Beyer
Blinder
Belle

Roberta Washington
·architects pc

Hamilton Grange National Memorial

Convent Avenue - Option B

PD-#



LEGEND

Visitor Services

Visitor Circulation

Residential Circulation

3 Bedroom Apartment

2 Bedroom Apartment

Staff & Services

PATIO

Staff Workroom / Office 166sf

Community Classroom 280sf

Kitchen 95sf

Toilet w/ Shower

Elev. Mach.

Storage 375sf

Mechanical 216sf

40'-0"

45'-8"

BASEMENT FLOOR

Hamilton Grange National Memorial

Convent Avenue - Option C

Roberta Washington
·architects p c

Beyer
Blinder
Belle

PD-#

71

FIRST FLOOR

Hamilton Grange National Memorial

Convent Avenue - Option C

Roberta Washington
·architects pc

Beyer
Blinder
Belle

PD-#

72



THIRD FLOOR

SECOND FLOOR

Hamilton Grange National Memorial

Convent Avenue - Option C

Roberta Washington
architects p.c.

Boyer
Blinder
Belle

PD-#

73



SECTION

Hamilton Grange National Memorial
Convent Avenue - Option C

Roberta Washington
·architects.pc

Beyer
Blinder
Belle



BASEMENT

Hamilton Grange National Memorial

Convent Avenue – Scheme D



FIRST FLOOR

Hamilton Grange National Memorial
Convent Avenue – Scheme D

A-7



SECOND FLOOR

Hamilton Grange National Memorial
Convent Avenue – Scheme D

A-8

Roberta Washington
architects psc

Beyer
Blinder
Belle



THIRD FLOOR

Hamilton Grange National Memorial
Convent Avenue – Scheme D

A-9



SECTION

Hamilton Grange National Memorial
Convent Avenue – Scheme D

A-10

# Sketch Worksheet

**Project:** **Relocation, Stabilization & Restoration of Hamilton Grange**
**Item:** **Convent Ave. Building Layout**

**VA No.**
**CBA3**

☐ **Original Design**    ■ **Proposed Design**

**Alternative 4 (D)**
Three levels plus basement, GSF 5,400

**Landscape Option 1**



# Sketch Worksheet

**Project:** Relocation, Stabilization & Restoration of Hamilton Grange
**Item:** Convent Ave. Building Layout

**VA No.**
**CBA3**

☐ Original Design          ■ Proposed Design

**Alternative 4 (D)**
Three levels plus basement, GSF 5,400

**Landscape Option 2**



AREA NOT IN CONTRACT
FOR REFERENCE ONLY

## Value Analysis Recommendation

**Project:** **Relocation, Stabilization & Restoration of Hamilton Grange**     <u>VA No.</u>
**Item:**    **List of VA recommendations for Convent Avenue**                    CA-1

---

**Original Design**

As presented in Predesign Report dated April 2004.

**Proposed Design**

The VA team recommends the following ideas in addition to CBA-3 preferred alternative for Convent Avenue project:
1. Omit one of the 2 BR apartments to save cost
2. Add sign re: moving of Hamilton Grange
3. Omit one floor to reduce space & cost
4. Reduce size of apartments and retain 3 units (see CBA-3)
5. Check space standards  (NPS) for housing
6. Consider "dorm" style housing (see CBA-3)
7. Modify space program for entire building to be 5,000 sf (see CBA-3)
8. Have rear patio with hardscape
9. Create site gathering area in front (identify future site seating locations)
10. Include cost for removing and storing statue in estimate
11. Use Convent Ave. community room to show video about Alexander Hamilton when overflow of visitors at Hamilton Grange
12. Confirm need to use housing space calculator for Convent Avenue

**Advantages and Disadvantages**

**Advantages:**
- Reduced cost to meet budget
- Improve interpretative opportunities
- Inproved NPS housing for attracting and retaining Park staff
- Improved performance and usability
- Improved accuracy of estimate
- Meet community & visitor needs
- Meet NPS space standards

**Disadvantages:**
- Some loss of performance
- 

**Discussion**

The listing of recommendations above provide options for consideration in meeting required functions for the community, visitors and NPS staff while meeting budget constraints.

**Life Cycle Cost Summary**

|  | <u>Initial Cost</u> | <u>Life Cycle Cost</u> |
|---|---|---|
| **Original Design** | | |
| **Proposed Design** | **Design Suggestions** | |
| **Potential Savings** | | |

82

# Value Analysis Recommendation

**Project:** **Relocation, Stabilization & Restoration of Hamilton Grange**
**Item:**     **90% design alternative**

<u>VA No.</u>
90

## Original Design

The budgeted project net construction cost is $8,425,000.

## Proposed Design

To achieve a budgeted project net construction cost of 90% of the original cost would require a cost reduction of $842,000 or 10%. This would be achieved by modifying the design as itemized on the cost worksheet which follows.

## Advantages and Disadvantages

**Advantages:**
- Lowers the net construction cost by 10%
- 
- 
- 

**Disadvantages:**
- Performance reductions
- 
- 

## Discussion

## Life Cycle Cost Summary

|  |  | Initial Cost | Life Cycle Cost |
|---|---|---|---|
| Original Design |  | 8,425,000 | 8,425,000 |
| Proposed Design | 90% | 7,582,500 | 7,582,500 |
| Potential Savings | 10% | 842,500 | 842,500 |

83

# Cost Worksheet

**Project:** Relocation, Stabilization & Restoration of Hamilton Grange     <u>VA No.</u>

**Item:** 90% design alternative     **90**

**Proposed Design**

| | | Quantity | Unit | Unit Cost | Total |
|---|---|---|---|---|---|
| | Savings Target | | | | |
| 90% alternative | $842,500 | | | | |
| | Reduce exhibit budget | | | | 532,500 |
| | Eliminate LEED sustainability budget at Convent Ave. | | | | 175,000 |
| | Delete remaining LEED sustainability budget at Hamilton Grange | | | | 135,000 |
| | | | | | |
| | Subtotal | | | | 842,500 |
| | | | | Total Cost | 842,500 |

**Potential Savings**

Potential Savings     (842,500)

84

# Cost Worksheet

**Project:** **Relocation, Stabilization & Restoration of Hamilton Grange**

**Item:** **75% Design Alternative**

VA No.
75

**Proposed Design**

| Savings Target | | Quantity | Unit | Unit Cost | Total |
|---|---|---|---|---|---|
| 75% alternative | $2,106,250 | | | | |
| **Potential Savings:** | | | | | |
| Eliminate Convent Ave. building (employee housing & community functions) | | | | | 1,925,000 |
| Reduce exhibit budget | | | | | 181,250 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Subtotal** | | | | | 2,106,250 |
| | | | | | |
| | | | | **Total Cost** | 2,106,250 |

**Potential Savings**

| | | | | Potential Savings | 2,106,250 |
|---|---|---|---|---|---|

86

**Value Analysis Study**
**Relocation, Stabilization & Restoration of Hamilton Grange**

Hamilton Grange National Memorial
New York City, NY

May 4 – 6, 2004

# SECTION C: RESPONSE TO VALUE ANALYSIS RECOMMENDATIONS

## RESPONSE TO VALUE ANALYSIS RECOMMENDATIONS

Figure 6

Project: Relocation, Stabilization & Restoration of Hamilton Grange

Location: Manhattan Sites, New York, NY

| No. | Proposal Description<br>ilo = in lieu of; LEED = Leadership in Energy & Environmental Design | Benefits<br>Performance,<br>Quality, etc. | Potential Savings<br>( ) indicates cost increase | | Response<br>accepted/<br>not accepted |
|---|---|---|---|---|---|
| | | | Initial | LCC | |
| **Hamilton Grange VA Proposals** | | | | | |
| CBA-1 | Based on the evaluation of five potential design options using "choosing by advantages" and life cycle analysis, the VA team recommends Alternative 5 (E): Elevator is consolidated with stair on all 4 floors, Permanent exhibits are located on basement level. | - Less fabric loss<br>- Best preserves the exterior and interior appearance and best preserves 2nd floor for visitor viewing free of obstructions<br>- Additional 1000 SF for exhibits<br>- Best visitor experience in universal accessibility<br>- Allows disabled visitors to access all floors incl. 2nd floor<br>- Very best operational efficiency by controlling visitor flow, allows access to all floors & has least walking distance, and best operational flow<br>- Best meets goal of providing visitor access to all floors, and best allows the public to experience all floors for interpretive use | $0 | $0 | Accept |
| CBA-2 | Based on evaluation of several building move options using "choosing by advantages" and life cycle cost analysis, the VA team recommends Alternative 5 (E): Dismantle St. Luke's loggia and move along streets to new site. | - Significantly less risk of loss of historic structure and much greater opportunity for resource protection<br>- Best visitor experience<br>- Very limited impact to residences | $0 | $0 | Accept |

88

**RESPONSE TO VALUE ANALYSIS RECOMMENDATIONS**                    Figure 6

Project: __Relocation, Stabilization & Restoration of Hamilton Grange__
Location: __Manhattan Sites, New York, NY__

| No. | Proposal Description<br>*ilo = in lieu of; LEED = Leadership in Energy & Environmental Design* | Benefits<br>Performance, Quality, etc. | Potential Savings<br>( ) indicates cost increase | | Response<br>accepted/<br>not accepted |
|---|---|---|---|---|---|
| | | | Initial | LCC | |
| HG-1 | VA team recommends the following ideas for HG location in addition to CBA-1 preferred alternative:<br>1. Use Convent Ave. community room to show video when overflow of visitors at HG<br>2. Add cost for removing historic furniture, placing in storage, and relocation to HG after the move<br>3. Sprinkler system should also cover porches including under the porches<br>4. Consider closing shutters at night for added security<br>5. Use title III services to define and specify commissioning requirements<br>6. Incorporate commissioning work into construction contractor responsibilities<br>7. Develop agreement with church to allow use of site for contractor lay-down area<br>8. Coordinate HG move with owners of residences<br>9. Design team to define move issues and costs for NPS review.<br>11. Resolve site issues | - Greater flexibility in operation<br>- Improve interpretative opportunities & flow of visitors<br>- Improved accuracy of estimate<br>- Improved performance and usability | $135,000 | $135,000 | Accept |
| S-1 | Augment site with low impact interpretive signage. Also consider additional landscape features and paths to expand upon concept. | - Allows for increased casual use of site<br>- Provides ability to add further interpretation or pre-orientation<br>- Offers visitors other enjoyment opportunities during queuing at busy times | Design Suggestion | | Accept |
| S-2 | Add additional landscape features per historic interpretation/ data. Also consider integrating landscape features to accommodate casual/ community use. | - Adds to understanding of historic site & use<br>- Add to use of site | Design Suggestion | | Accept |

**Figure 6**

# RESPONSE TO VALUE ANALYSIS RECOMMENDATIONS

Project: Relocation, Stabilization & Restoration of Hamilton Grange
Location: Manhattan Sites, New York, NY

| No. | Proposal Description<br>*ilo = in lieu of; LEED = Leadership in Energy & Environmental Design* | Benefits<br>Performance, Quality, etc. | Potential Savings<br>( ) indicates cost increase | | Response<br>accepted/<br>not accepted |
|-----|-----|-----|-----|-----|-----|
| | | | Initial | LCC | |
| | | | | | Accept |
| S-3 | Add ability to queue significant numbers of visitors without impacting (or minimizing impact) of pastoral quality. Approaches could include enlarging circle, widening paths, creating sub-spaces. | - Adds to capability of site/ building<br>- Allows for additional orientation area, if needed<br>- Hardens site to withstand heavy traffic impacts | Design Suggestion | | |
| **Convent Avenue VA Proposals** | | | $475,000 | $675,000 | Accept |
| CBA-3 | Based on evaluation of several building move options using "choosing by advantages" and life cycle cost analysis, the VA team recommends Alternative 5 (E): Dismantle St. Luke's loggia and move along streets to new site. | - Less footprint impacted (570 SF)<br>- Offers best quality of multipurpose space, best adjaciencies, and best functionallity<br>- Best visitor outdoor experience with 425 sf additional space<br>- 10% more space efficient<br>- Moderately more sustainable<br>- Best relationship to community | | | |

**RESPONSE TO VALUE ANALYSIS RECOMMENDATIONS**                    **Figure 6**

Project:   **Relocation, Stabilization & Restoration of Hamilton Grange**
Location:  **Manhattan Sites, New York, NY**

| No. | Proposal Description<br>*ilo = in lieu of; LEED = Leadership in Energy & Environmental Design* | Benefits<br>Performance,<br>Quality, etc. | Potential Savings<br>( ) indicates cost increase | | Response<br>accepted/<br>not accepted |
|-----|----------------------------------------------|--------------------------------------------|-------------------|------|----------|
| | | | Initial | LCC | |
| CA-1 | The VA team recommends the following ideas for Convent Avenue project in addition to CBA-3:<br>1. Omit one of the 2 BR apartments to save cost<br>2. Add sign re: moving of HG<br>3. Omit one floor to reduce space & cost<br>4. Reduce size of apartments and retain 3 units<br>5. Check space standards for housing<br>6. Consider "dorm" style housing<br>7. Modify space program for entire building to be 5,000 sf<br>8. Have rear patio with hardscape<br>9. Create site gathering area in front (identify future site seating locations)<br>10. Include cost for removing and storing statue in estimate<br>11. Use Convent Ave. community room to show video about Hamilton<br>12. Confirm need to use housing space calculator for Convent Avenue | - Reduced cost to meet budget<br>- Improve interpretative opportunities<br>- Inproved NPS housing for attracting and retaining Park staff<br>- Improved performance and usability<br>- Improved accuracy of estimate<br>- Meet community & visitor needs<br>- Meet NPS space standards | Design Suggestion | | See CBA-3 in lieu of items 1, 3, 4, and 7. Accept items 2, 5, 6, 8, 10, 11, 12. Not accept item 9. |

**Summary of VA Recommendations**

| | | | | | |
|-----|----|----|----|----|----|
| | *Savings Potential (Courthouse Location ilo New Building)* | | $610,000 | $810,000 | |

**Summary of 90% and 75% Alternatives**

| | | | | | |
|-----|----|----|----|----|----|
| 90% | To achieve a project net construction cost of 90% of the original budget would require a cost reduction of $842,000 or 10%. This would be achieved by reducing the exhibit budget, eliminating the LEED sustainability budget at Convent Ave., and deleting the remaining LEED budget at Hamilton Grange | - Lowers the net construction by 10% | $842,000 | $842,000 | |

91

**RESPONSE TO VALUE ANALYSIS RECOMMENDATIONS**                    **Figure 6**

Project:  **Relocation, Stabilization & Restoration of Hamilton Grange**
Location: **Manhattan Sites, New York, NY**

| No. | Proposal Description<br>*ilo = in lieu of; LEED = Leadership in Energy & Environmental Design* | Benefits<br>Performance,<br>Quality, etc. | Potential Savings<br>( ) indicates cost increase | | Response<br>accepted/<br>not accepted |
|---|---|---|---|---|---|
| | | | Initial | LCC | |
| 75% | To achieve a project net construction cost of 75% of the original budget would require a cost reduction of $2,106,000 or 25%. This would be achieved by eliminating the Convent Avenue building. | - Lowers the net construction by 25% | $2,106,000 | $2,106,000 | |

92

**Value Analysis Study**
**Relocation, Stabilization & Restoration of Hamilton Grange**

Hamilton Grange National Memorial
New York City, NY

May 4 – 6, 2004

# SECTION D: VALUE ANALYSIS PROCESS

# VALUE ANALYSIS PROCESS

## Introduction

Value Analysis (VA) is an organized, creative process, which focuses attention on the requirements of a project for the purpose of achieving essential functions and attendant benefits at the lowest, total costs for materials, equipment, staffing, energy usage, facilities, professional services, maintenance, etc. over the life of the project. In other words, value analysis is a systematic approach to obtain optimum *value* for each dollar spent. As a result of thorough investigation, using experienced, multi-disciplined teams, value and economy are improved by the study of alternate systems, concepts, materials, methods and procedures.

A Certified Value Specialist (CVS) guides a value analysis study. Experience has shown that project studies performed by a person or team with little or no value engineering leadership will tend to steer in the direction of a superficial review and concentrate on errors made by others. A value analysis study, on the other hand, focuses on both reducing the total cost of ownership and improving overall performance. Application of the VA methodology and coordination of the activities before and after the study also significantly increase the probability the recommendations will be implemented.

This approach has been successfully applied to projects of all types and magnitudes and allows value analysis teams to be responsive to clients by producing practical results. The VA approach also encourages participation of the clients in the study in order to take advantage of their experience and knowledge. Multi-disciplined teams, using a value analysis job plan, analyze the functions of the buildings, products or processes under study, identify high cost areas, ascertain the benefits sought and propose alternatives to those planned or currently being used.

A value analysis job plan is organized into three distinct parts: (1) Pre-Study Preparation, (2) Study Workshop, and (3) Post-Study Implementation.

## Pre-Study Preparation

The success of a value analysis study is largely dependent on proper preparation and coordination. Information and documents are furnished by the client and distributed to the team to enable them to prepare for their role in the study. All participants are briefed on the project and their responsibility prior to the study. The pre-study activities include the following tasks:

- Identification of context of the value analysis study.
- Review of project documentation and distribution of information to team members. The VA team relies on the client for the completeness and organization of the material to be used.
- Finalization of team and team assignments.

94

- Preparation of analytic models, as appropriate.
- Finalization of arrangements for workshop.

Each VA study is designed in response to the goals of the client. The analytic models developed prior to the workshop are consistent with these goals and are based on the information provided to the study team. While not every model is used for every study, it is important the team have sufficient data to develop at least a few of the analytic models to ensure a measure of thoroughness and perspective.


**Study Workshop**

During the workshop portion of a value analysis study, a Study Plan is followed which usually includes specific phases to ensure a thoughtful, professional analysis.

Information Phase

At the beginning of a value analysis study, it is important to understand the background and decisions that have influenced the development of the client's goals. For this reason, the client normally describes the history and scope of the project.

Function Analysis Phase

The functions of the project are the controlling elements in the overall value analysis approach. Explicitly identifying the functions that drive the project is essential to the team because it forces the participants to think in terms of the purposes for the project and the desired results and costs associated with those functions.

Creativity Phase

This step in a value analysis study involves the listing of creative ideas. During this portion of a workshop, the value analysis team thinks of as many ways as possible to provide the necessary functions, keeping in mind the benefits important to the client and, at the same time, the need to reduce costs in a responsible manner. During this creative session, judgement about the ideas is not permitted.

Evaluation Phase

All of the information created up to this point must undergo careful consideration. The value analysis team assesses the ideas stemming from the creativity session to test, first, whether the creativity session addressed the problem areas, opportunities and functions identified earlier and, second, whether the specific strategies generated during the creativity session can be, at least in a preliminary fashion, linked with them.

Development Phase

The development phase includes preparing sketches, engineering calculations, cost estimates and life cycle cost analyses to verify the idea adds value to the project. The results of this effort are then used to prepare a presentation.

Recommendation Phase

The last phase of the value analysis study involves the presentation of recommendations. The team carefully reviews the recommendations before they are formally presented, generally on the last day of the workshop. The recommendations, the rationale that went into the development of each proposal and a summary of the cost savings are presented at this time so that the client can begin an evaluation of the value analysis recommendations prior to the receipt of the report itself.

**Post-Study Implementation**

The post-study portion of a value analysis study includes the preparation of a report describing the activities undertaken during the study and incorporating the recommendations stemming from the workshop. This post-study effort may require follow-up to resolve questions remaining from the study. Either the value analysis team leader or an appropriate team member may work directly with the client to further implementation strategies.

**Creative Idea Listing**

Following is a list of creative ideas generated during the "brainstorming" portion of the VA workshop. These ideas were evaluated using the following ranking criteria. The highest ranked ideas (indicated in bold type) were developed into VA proposals by the team.

Criteria for VA Proposal Development:

- Meets functions
- Ease of implementation, redesign impact
- Benefit - potential
    Improved performance
    Better quality
- Cost savings potential
- LCC: Construction cost
    Energy, maintenance, staffing cost

Hamilton Grange

1. **Improve visitor flow by rearranging space locations within Hamilton Grange (see CBA-1) Location & Space Functions:**
    **Basement for Theater and Exhibits**
    **Cellar for Toilets, Lockers (Public & Private)**
    **1st Floor for Historic Furnished Rooms**
    **2nd Floor for special tours: Arch., Family**
2. Run NPS "space calculator" to verify space need
3. **Use Convent Ave. community room to show video about Alexander Hamilton when overflow of visitors at Hamilton Grange**
4. Consider staff lockers on 2nd floor or in corridor with unisex bathroom
5. **Confirm need to use housing space calculator for Convent Avenue**
6. **Add cost for removing historic furniture, placing in storage, and relocation to Hamilton Grange after the move (cost to be part of MCPP budget not net construction)**
7. **Sprinkler system should also cover porches including under the porch (historically this is where fires have started at HG)**
8. **Consider closing shutters at night for added security**
9. **Use title III services to define and specify commissioning requirements**
10. **Incorporate commissioning work into construction contractor responsibilities**
11. **Develop agreement with church to allow use of site for contractor lay-down area during construction**
12. **Explore alternatives for moving building including removal of site/street elements and replacement (see CBA-2)**
13. **Coordinate HG move with owners of residences along street (access and other issues to be addressed)**
14. **Design team to define move issues for NPS review. Also estimate the potential cost impact (neighbors, utilities, bus rates, etc.)**
15. Consider giving cameras to tenants prior to move to record potential construction/move issues (good PR opportunity)
16. **Revise LEED allowance for HG**
17. **Site issues:**
    - **Create access for emergency vehicles (fire, ambulance) to building**
    - **Parking spaces (only holding area for 15 minutes)**
    - **Drop-off to house at rear with walking to front (visitors/staff/service)**
    - **Bus drop-off location to be identified by NPS (on-site location not possible)**
18. **Consider using 2nd floor for temporary exhibits and special tours (architectural, family, etc.)**

97

<u>Convent Avenue</u>

1. **Omit one of the 2 BR apartments to save cost**
2. **Add sign re: moving of Hamilton Garage**
3. Add 2nd exit for apartments
4. Consider acquiring additional property at rear of site to match with existing use (for employees & community)
5. **Omit one floor to reduce space & cost**
6. **Reduce size of apartments and retain 3 units (see CBA-3)**
7. **Check space standards  (NPS) for housing**
8. **Consider "dorm" style housing (see CBA-3)**
9. **Modify space program for entire building to be 5,000 sf (CBA-3)**
10. **Have rear patio with hardscape**
11. **Create site gathering area in front (identify future site seating locations)**
12. **Include cost for removing and storing statue in estimate**
13. **Use Convent Ave. community room to show video about Alexander Hamilton when overflow of visitors at Hamilton Grange**
14. **Confirm need to use housing space calculator for Convent Avenue**

**RELOCATION, STABILIZATION & RESTORATION OF HAMILTON GRANGE**



**Manhattan Sites, New York, NY**

**VALUE ANALYSIS WORKSHOP**
**May 4 - 6, 2004**

**THREE DAY AGENDA**

---

## Day 1

9:00 a.m.   **INTRODUCTION TO VA WORKSHOP**

Welcome & Opening Remarks
Team Member Introductions
Objectives of Workshop
Workshop Organization & Agenda

9:15   **VALUE ANALYSIS BRIEFING**

9:30   **PROJECT DESIGN PRESENTATION** (By Design Team)

Facility Program and Objectives (including Sustainability)
Site Plan and Site Analysis
Site and Building Layouts, Arch. & Eng. Systems
Restoration Work, Exhibit Design
Results of Various Reports, Studies, Tests, Surveys, etc.
Project Budget and Schedule
"Value Listening" Exercise (by VA Team)

11:00   **COST & OTHER VALUE MODELS** (Hamilton Grange and Convent Ave. Buildings)

Cost Model
Risk, LEED Sustainability Models, as appropriate

12:00   **LUNCH**

1:00p.m.   **FUNCTION ANALYSIS PHASE** (Hamilton Grange and Convent Ave. Buildings)

Prepare Function Logic Diagram
Associate Costs to Functions

99

**VALUE ANALYSIS WORKSHOP**

**THREE DAY AGENDA**

---

2:00       **FORCE FIELD ANALYSIS**
           (Hamilton Grange Building incl. Site Work & Exhibits)

           Best Project Features
           Weakest Features
           Ideas for Value Enhancement

2:30       **SUMMARY OF FORCE FIELD FINDINGS**
           (Hamilton Grange Building incl. Site Work & Exhibits)

3:00       **CREATIVITY PHASE**
           (Hamilton Grange Building incl. Site Work & Exhibits)

           Brainstorm Ideas to Meet Functions (Project Objectives)
           Identify High Cost Elements for Value Enhancement
           90% and 75% Design Alternatives

4:30       **SUMMARIZE IDEAS FOR DEVELOPMENT & CBA**
           (Hamilton Grange Building incl. Site Work & Exhibits)

5:00       **ADJOURN**

**Day 2**

9:00 a.m.    **CHOOSING BY ADVANTAGES - Concurrent w/ VA Proposals**
           (Hamilton Grange Building incl. Site Work & Exhibits)

           Define CBA Alternatives
           Define Evaluation Factors
           Identify Attributes & Advantages
           Score Importance of Advantages
           Determine Total Importance of Each Alternative

10:30      **ECONOMIC ANALYSIS**
           (Hamilton Grange Building incl. Site Work & Exhibits)

           Estimate Construction Costs
           Determine Life Cycle Cost of Each Alternative

100

## VALUE ANALYSIS WORKSHOP

## THREE DAY AGENDA

11:00      **IMPORTANCE TO LCC GRAPHS/ RECONSIDERATION**
(Hamilton Grange Building incl. Site Work & Exhibits)

Importance to Cost Graphs
Reconsideration, Other Alternatives
CBA/ LCC/ Importance to Cost Graph Updates
Consensus of Preferred Alternative

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9:00 a.m.      **VA PROPOSAL DEVELOPMENT - Concurrent with CBA**
(Hamilton Grange Building incl. Site Work & Exhibits)

12:00      **LUNCH**

1:00 p.m.      **CREATIVITY PHASE**
(Convent Ave. Bldg. & Site Work)

Brainstorm Ideas to Meet Functions (Project Objectives)
Identify High Cost Elements for Value Enhancement
90% and 75% Design Alternatives

4:30      **SUMMARIZE IDEAS FOR DEVELOPMENT & CBA**
(Convent Ave. Bldg. & Site Work)

5:00      **ADJOURN**

**Day 3**

9:00 a.m.      **CHOOSING BY ADVANTAGES - Concurrent w/ VA Proposals**
(Convent Ave. Bldg. & Site Work)

Define CBA Alternatives
Define Evaluation Factors
Identify Attributes & Advantages
Score Importance of Advantages
Determine Total Importance of Each Alternative

10:30      **ECONOMIC ANALYSIS**
(Convent Ave. Bldg. & Site Work)
Estimate Construction Costs
Determine Life Cycle Cost of Each Alternative

101

## VALUE ANALYSIS WORKSHOP

## THREE DAY AGENDA

---

11:00     **IMPORTANCE TO LCC GRAPHS/ RECONSIDERATION**
          (Convent Ave. Bldg. & Site Work)

          Importance to Cost Graphs
          Reconsideration, Other Alternatives
          CBA/ LCC/ Importance to Cost Graph Updates
          Consensus of Preferred Alternative

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9:00 a.m.  **VA PROPOSAL DEVELOPMENT - Concurrent with CBA**
           (Convent Ave. Bldg. & Site Work)

           Team Member Proposal Development Assignments
           Document Design Alternatives
           Cost Estimate of Alternatives
           Sketches of Alternatives
           Life Cycle Cost Calculations
           Written Proposals (Original, Proposed, Discussion)

12:00      **LUNCH**

12:30 p.m. **PROPOSAL DEVELOPMENT – Continued**
           (Convent Ave. Bldg. & Site Work)

2:30       **PRESENTATION PHASE**
           (Hamilton Grange and Convent Ave. Buildings)

           Opening Remarks
           Summary of VA Process
           VA Proposals & Performance Improvements/ Cost Savings
           Next Steps (VA Implementation Plan)

3:30       **ADJOURN/CELEBRATION!**

102

Final
General Management Plan
Environmental Impact Statement



Manhattan Sites
# HAMILTON GRANGE
National Memorial • New York

Final
General Management Plan
Environmental Impact Statement
January 1995

# Hamilton Grange

National Memorial
New York County, New York

Four alternatives for future management and use of Hamilton Grange National Memorial are presented and analyzed in this document. The Grange, surrounded by a church and an apartment building, is not on its original site, and its current setting bears no resemblance to the period of Hamilton's residency (1802-04). Access for visitors with disabilities would be provided under all alternatives. Alternative 1, a "no-action" alternative, describes a continuation of existing management trends and provides a basis to evaluate the other alternatives. Under this alternative the existing building would be stabilized and some interior finishes would be partially restored. Access would continue to be to the basement and first floor; the second floor would continue to be closed to the public. Security and fire alarm systems would be upgraded. Historic furnishings and artifacts sensitive to temperature and humidity fluctuations could not be exhibited because no climate control system would be installed. Expanded exhibits and reproductions would be used. About 1,734 square feet of space would be available for visitor use and interpretation and community use. Impacts under this alternative would be minimal. Stabilization would ensure continuation of existing uses. Alternative 2 would entail structural reinforcement and the addition of an exterior elevator, allowing full public use of all three floors. Two rooms would be refurnished to the Hamilton period, conveying a sense of the comfort in which Hamilton lived. More space, about 2,773 square feet, would be available for visitor use and interpretation and community use. Intrusion and fire alarm systems would be upgraded, and fire suppression and climate control systems would be installed. With structural reinforcement, impacts to the cultural resources would be positive, although the architectural significance of this landmark — an important example of a free-standing Federal-style villa — could not be fully understood. Quality of visitor experience would be better than under alternative 1. Alternative 3 would enhance the setting of the site by reorienting the visitor entrance to a more impressive but less historically accurate four-story east facade. The combination of four refurnished rooms, exhibits, theater, and class/meeting rooms would provide space for a full visitor use program. Intrusion and fire alarm systems would be upgraded and fire suppression and climate control systems would be installed. About 3,589 square feet would be available for visitor use and interpretation and community use. Impacts on the building and visitor experience, with restoration of 1802-04 interior architecture, would be significant under this alternative. Construction-related economic effects would be relatively small. Promotion efforts could generate some additional local tourism. Potential cumulative benefits could occur if proposals such as the Harlem pier were developed and promoted in conjunction with the Grange. Alternative 4 would relocate the Grange across 141st Street to St. Nicholas Park and restore the house, to the greatest degree possible, to its interior and exterior appearance during Hamilton's residency. A new subbasement and ground floor constructed at the St. Nicholas Park site would provide space for a theater, lobby, information/book sales area, restrooms, storage, and NPS operations. A compatible structure, no more than two stories, would be built on the 1889 foundation for community use and NPS housing. Implementing this alternative would accomplish what Congress intended — providing an appropriate setting for the Grange but keeping it within the context of its present-day community. Under this alternative, visitors would have the best opportunity to fully understand the house, its architecture, the feel of its original setting, and Hamilton himself. This alternative is, therefore, the preferred alternative/proposed action. Impacts on the Grange would be even more significant than under alternative 3. About 3,827 square feet of would be available for visitor use and interpretation community use. There would be positive and negative effects on St. Nicholas Park, the Hamilton Heights Historic District, and the community because of the relocation. A two-story compatible building would be constructed on the Convent Avenue site, one floor for community meetings, educational programs, and exhibits, and the basement for NPS law enforcement ranger apartments and storage and maintenance operations. The community would benefit from better site security and the presence of law enforcement personnel. Numbers of visitors and visitor spending could increase significantly with proper promotion. Potential cumulative benefits could occur if proposals such as the Harlem pier were developed and promoted with the Grange. The *Draft General Management Plan / Environmental Impact Statement* was distributed in April 1993. This final plan includes changes that came from the review, additional public meetings, and responses to the comments and letters. The plan will become final upon issuance of the record of decision.

For more information about this document, contact the superintendent of Manhattan Sites at the following address:

Superintendent, Manhattan Sites
26 Wall Street
New York, NY 10005

United States Department of the Interior • National Park Service • Denver Service Center

## SUMMARY

### A SUMMARY OF THE PLAN

Hamilton Grange was established as a national memorial in 1962 "to commemorate the historic role played by Alexander Hamilton in the development of this Nation." The Grange, built in 1802-03 in upper Manhattan (now Harlem), New York, was the only home Hamilton ever owned. In 1889 the Grange was moved about 350 feet from its original site. It was used as a temporary chapel for St. Luke's Episcopal Church until a permanent church building was built. Development around the Grange, as Harlem grew, included the permanent church building only a few feet to the south and an apartment building that actually touches the Grange on the north. Designed by architect John McComb Jr., the Grange has architectural significance as a house of the Federal period. While neither grandiose nor imposing, Hamilton Grange is an economically conceived, refined work that is remarkable because of its sophistication despite its modest conception. Certain details, including the transom light over the doorway, presaged the coming of the Greek Revival. However, the real purpose for the memorial is to remember Alexander Hamilton and his accomplishments as a major draftsman and proponent of the federal Constitution and the foremost architect of American financial policy in the Republic's early years.

The 1962 act of Congress that established Hamilton Grange National Memorial directed that the house eventually be relocated and "preserved in a fitting setting" for its proper administration and interpretation as a national memorial. The proposed site at the time was about 10 blocks away from its current site. The house was not moved, and because of limited funds authorized by Congress only various minor rehabilitation projects were undertaken. The existing setting, with the Grange tightly wedged between a church and an apartment building, is not a "fitting setting." Returning the house to its original site is not possible. The house is also in need of major structural repairs. Congress has recently made $1.7 million available for repair and rehabilitation of the Grange.

There are several other issues and concerns. Due to the structural problems and poor security, visitor access to and interpretation of the Grange is limited. The opportunity to convey the full significance of Hamilton to local, national, and international visitors is unrealized. Other problems exist with the security, fire protection, and climate control systems.

This *General Management Plan / Environmental Impact Statement* explores four alternatives for preserving and interpreting the Grange. Alternative 1 would retain the building's current limited visitor capacity. However, the building would be stabilized by reinforcing failed wooden structural members, as necessary, and interior finishes would be partially restored. The basic configuration, which is not the historic configuration, would remain unchanged. About 1,734 square feet would be available for visitor use and interpretation and community use.

Under alternative 2, the existing building and configuration would be the same as in alternative 1, but the building would be structurally reinforced to allow public use of the basement and the first and second floors. This alternative would preserve as much original fabric as possible and would include insertion of a new framing system. An exterior elevator at the back (east) side of the house, either attached to the original building or as a free-

standing column attached only to the porches, and a wheelchair lift at the front (west) would allow full visitor circulation to all floors. Two rooms would be refurnished to the 1802-04 period of Hamilton's residency. With structural reinforcement and use of the second floor, about 2,773 square feet would be available for visitor use and interpretation and community use. NPS interpretation would convey the history of the house and Alexander Hamilton's role in establishing the political and financial foundations of this country.

Alternative 3 would enhance the setting of the site by reorienting the visitor entrance to a more impressive four-story east facade. About 3,589 square feet would be available for visitor use and interpretation and community use. Additional space would be made available by lowering the existing subbasement floor and opening a new entryway into this garden level from the east (Hamilton Terrace) side. The foundations would be underpinned, and the Grange would be structurally reinforced to allow public use of all four floors. The combination of refurnished rooms, exhibits, theater, and class/meeting rooms would provide space for a full visitor use program. Although the historic (1802) configuration — the door and stair placement — would be restored, visitors could not experience entering the house as the Hamilton family did. Once inside, visitors would have a more accurate idea of what Hamilton's home was like. The four-story east façade might create a perception of grandeur, but the building would have little resemblance to the two-story house that Hamilton knew and would not contribute to visitor understanding of the architectural significance of the house.

Alternative 4 would relocate the original first and second floors of the Grange across 141st Street to St. Nicholas Park and restore the Grange, to the greatest degree possible, to its appearance during Hamilton's residency (1802-04). Implementation of this alternative would accomplish what Congress intended — providing an appropriate setting for the Grange but keeping it within the context of its present-day community. This alternative is, therefore, the National Park Service's preferred alternative / proposed action. This relocation would require city and state approval, review and consultation through the section 106 process (the National Historic Preservation Act), and an act of Congress.

In its new location the Grange's exterior would be restored as closely as possible to its historical appearance, with all doors, windows, and porches in their original places. The entry door would be relocated to its original position, and the entrance porch would be reconstructed. The house would be reoriented with the visitor entry door to the north and the original front door of the Grange facing southwest, as it did when it was originally constructed. A new masonry and stone subbasement and ground floor would be constructed at the new site — consistent with the restoration of the upper floors and complementary to the original building in size, scale, and material. About 3,827 square feet of would be available for visitor use and interpretation and community use (including community use space at the Convent Avenue site).

The new subbasement would house mechanical equipment, maintenance, storage, and space for staff use. The main visitor entrance, with a theater, lobby, information desk and book sales area, staff space, and fully accessible public restrooms, would be at ground level through a new door in the northeast corner. Exhibits at the entrance would orient visitors to Hamilton and to the house, the various moves it has undergone, and the role of the church in preserving it. An elevator in the northwest corner would provide access to all floors.

Four rooms on the first floor would be refurnished to reflect the house as it appeared during Hamilton's occupancy. The dining room and parlor would be fully restored, and the mirrored folding doors that once separated them and reflected the sylvan setting of the house would be re-created. The entry hall and library would also be refurnished. The remaining room would have graphic and audiovisual exhibits to help interpret the man.

On the second floor, one room could exhibit the family furniture that is in the park collection but comes from a time after Hamilton's death. Because so little is known about these rooms, they would be developed with contemporary exhibits about the military, political, and professional accomplishments of Hamilton.

The new act needed to relocate the Grange should also authorize funding for preserving and redeveloping the current Convent Avenue site into a community use building on one floor and space for NPS law enforcement staff housing in the basement. The National Park Service and Friends of Hamilton Grange group (described in the "Actions Common to All Alternatives" section) would work with the City College of New York to identify existing parking spaces that would be available for use by Grange visitors.

Alternative 4 would provide the most comprehensive visitor use program. Relocation would enhance the interpretive program's ability to convey to visitors the 18th century historical context and architectural significance and qualities of the Grange as Hamilton's home. This is not possible at the existing site. Visitors would also have the best opportunity to fully understand Hamilton and his contributions to our nation under this alternative. NPS rangers living at the Convent Avenue site would enhance security at the Grange.

## A SUMMARY OF CHANGES FROM THE DRAFT MANAGEMENT PLAN

In response to concerns and suggestions received during the review process on the *Draft Environmental Impact Statement / General Management Plan*, a number of changes have been made to the plan and especially to alternative 4 as presented in the draft document and public meetings. Major changes in the document include additions on past relocation and preservation efforts, Samuel Parsons Jr. and St. Nicholas Park in the "Affected Environment" section, and the following changes to alternative 4:

- A new building would be built at the Convent Avenue site for community use, educational purposes, and NPS housing; public opinion did not favor the option for using this space as a vest-pocket park (see "Alternatives Considered But Rejected" section).
- Interpretation and heritage education programs would be better defined from what was described in the draft.
- No onsite bus pullouts would be provided.
- Full-time security would be provided for both sites.
- A Friends of Hamilton Grange group has been created.
- Land transfer and replacement, future park maintenance, landscaping and other environmental issues, and house orientation issues would be solved through the involvement of the friends group, local organizations, and negotiation with applicable agencies such as the city Department of Parks and Recreation and the state historic preservation office.

SUMMARY

- Environmental mitigation measures would be instituted to protect residents and the Grange from building exhaust and the effects of foundation blasting.
- The National Park Service, in conjunction with the state historic preservation officer and the City Department of Parks and Recreation, has assessed the significance and integrity of St. Nicholas Park through a determination of eligibility for the National Register of Historic Places.

The impacts have been changed, when appropriate, to reflect to these changes.



The Grange — south and east elevations with grove of sweet gum trees (ca. 1884-88). Photo from the Manhattan Sites collection.

# CONTENTS

Purpose of and Need for Action  1
    Purpose of and Need for the Plan  1
    Brief Description of the Grange  1
    Issues and Concerns to be Addressed in the Plan  3
        Manhattan Sites Issues That Apply to Hamilton Grange  3
        Site-Specific Issues  3

Alternatives Including the Proposed Action  5
    Introduction  5
    Interpretive Themes  7
    Actions Common to All Alternatives  7
    Alternative 1 — No Action / Continuation of Existing Trends  8
    Alternative 2 — Preserve and Open Entire Building  11
    Alternative 3 — Entrance Reorientation and Additional Interpretive Space  13
    Alternative 4 — Restoration and Relocation — Proposed Action / General
    Management Plan  18
      A Summary of Changes from the Draft Management Plan  18
      The Proposed Plan  19
      The Shadow Study  30
    Alternatives Considered But Rejected  39

Affected Environment  40
    A Brief History of Hamilton  40
    The Site and Adjacent Resources  41
      The Grange and Its History  41
      An Architectural History of the Grange  43
      The Grange and the Church  45
      The Relationship of the National Park Service and St. Luke's Church  45
      Hamilton Heights Historic District  45
      Traffic and Transportation  45
      City Department of Parks and Recreation  46
    Visitor Use and Interpretation  46
      Existing Facilities  48
      Visitor Use Data  48
    Area Land Use and Resources  49
      Proposed Development  49
      New Developments  50
      St. Nicholas Park  50
    Socioeconomic Environment  52
    Ethnographic Resources  53
    Natural Resources  54
      Air Quality  54
      Geology  54
      Soils  54
      Climate  54
      Vegetation/Wildlife  55
      Federal and State Threatened and Endangered Species  55
      Floodplains and Wetlands  55
      Water Quality  55
      Prime and Unique Farmlands  55

Environmental Consequences  56
    Impacts Common to All Action Alternatives  56
        Impacts on Cultural Resources  56
        Impacts on Natural Resources  56
        Impacts on Community Uses and Facilities  56
        Impacts on Parking  57
    Alternative 1 — No Action / Continuation of Existing Trends  57
        Impacts on Cultural Resources  57
        Impacts on Visitor Use  58
        Impacts on Community Use and Facilities  58
        Impacts on the Local Economy  58
        Impacts on Traffic Flow/Transportation  59
        Impacts on Natural Resources  59
        Impacts on NPS Operations  59
        Cumulative Impacts  59
    Alternative 2 — Preserve and Open Entire Building  59
        Impacts on Cultural Resources  59
        Impacts on Visitor Use  60
        Impacts on Community Use and Facilities  60
        Impacts on the Local Economy  61
        Impacts on Traffic Flow/Transportation  61
        Impacts on Natural Resources  61
        Impacts on NPS Operations  61
        Cumulative Impacts  61
    Alternative 3 — Entrance Reorientation and Additional Interpretive Space  61
        Impacts on Cultural Resources  61
        Impacts on Visitor Use  62
        Impacts on Community Use and Facilities  63
        Impacts on the Local Economy  63
        Impacts on Traffic Flow/Transportation  63
        Impacts on Natural Resources  64
        Impacts on NPS Operations  64
        Cumulative Impacts  64
    Alternative 4 — Restoration and Relocation — Preferred Alternative / Proposed
        Action  64
        Impacts on Cultural Resources  64
        Impacts on Visitor Use  66
        Impacts on Community Use and Facilities  67
        Impacts on the Local Economy  67
        Impacts on Traffic Flow/Transportation  68
        Impacts on Natural Resources  68
        Impacts on NPS Operations  68
        Cumulative Impacts  69
        Unavoidable Adverse Impacts  69
        Relationship between Short-term Uses and Maintenance and Enhancement of
            Long-Term Productivity  69
        Irreversible and Irretrievable Commitments of Resources  69

Compliance with Federal and State Laws, Executive Orders, and Regulations  70

Consultation and Coordination  75

Preparers and Consultants  188

Appendixes
    A: Legislation  191
    B: Administrative History  194
    C: Draft Management Objectives  195
    D: Summary of Feasibility Study  196
    E: Programmatic Accessibility Guidelines  199
    F: Future Plans and Studies  212
    G: Cost Estimates  214
    H: Implementation of Alternative 4  215
    I: Letter from State Office of Parks, Recreation, and Historic Preservation  216
    J: Shadow Study  219
    K: Letter from U.S. Fish and Wildlife Service  221

Bibliography  225

Index  227

## ILLUSTRATIONS

Manhattan Sites and Region  x
Locations  6
Alternative 1 — Cross Section  9
Alternative 1 — Floor Plan  10
Alternative 2 — Cross Section  11
Alternative 2 – Floor Plan  12
Alternative 3 — East Side of the Grange  14
Alternative 3 — Cross Section  14
Alternative 3 — Aerial View  15
Alternative 3 — Floor Plan  17
Alternative 4 — Conceptual Site Plan  20
Alternative 4 — General Overview  21
Alternative 4 — The Grange on the New Site  23
Alternative 4 — Floor Plan  25
New Building on Convent Avenue Site  27
Use of Convent Avenue Building — Floor Plan  29
Regional Developments  47

## TABLES

1. Summary of Space Use in Each Alternative  30
2. Summary Comparison of Alternatives  31
3. Summary Comparison of Impacts  34
4. Number of Visitors Per Year  49
5. General Management Plan Actions and Cultural Compliance Requirements  72



SAINT PAULS CHURCH
MT· VERNON, NEW YORK

# Manhattan Sites and Region

United States Department of the Interior / National Park Service
DSC / Oct. 1992 / 416 / 20020

# PURPOSE OF AND NEED FOR ACTION

## PURPOSE OF AND NEED FOR THE PLAN

Hamilton Grange was established as a national memorial in 1962. Since that time the site, with limited exhibits, has been open to the public except for periods for rehabilitation work. Hamilton Grange National Memorial is one of the six sites in New York City that are known as the Manhattan Sites. Long-range planning for the Manhattan Sites was begun in 1991 — as required by Public Law 95-625 (New Area Studies, Management Plans and Contracts) and, for Hamilton Grange, by Public Law 100-701. At that time, structural problems existed at the Grange. An engineering analysis done as part of the planning process for this *General Management Plan / Environmental Impact Statement* indicated that structural problems are severe and present an imminent threat to the resource and to visitors. For this reason the site was closed in June 1992 for repairs, and the need to establish a direction for preservation, use, and development of the memorial has become more urgent. Planning for Hamilton Grange is consequently proceeding independently of the other five Manhattan sites.

Hamilton Grange was set aside as a public national memorial to "commemorate the historic role played by Alexander Hamilton in the establishment of this Nation" (see appendix A). The ideal experience for visitors would be to go to the Grange and see what it looked like during Hamilton's residency — a country retreat that was away from the city in a rural setting. Here visitors could learn about the Grange and its history and architecture, Hamilton's lifestyle, the society in which he lived, and, more importantly, about Hamilton the man — his accomplishments, his political, military, personal, and professional life, how he created his own political and personal fortune, and his role in establishing the political and financial foundations of our country.

## BRIEF DESCRIPTION OF THE GRANGE

The six National Park Service (NPS) Manhattan Sites, which are in the general vicinity of Manhattan in New York City, New York, are Castle Clinton National Monument, Federal Hall, General Grant, and Hamilton Grange national memorials, and Saint Paul's Church and Theodore Roosevelt Birthplace national historic sites. These sites are under the administration of one NPS superintendent (see appendix B and Region map).

Hamilton Grange is the only home ever owned by Alexander Hamilton, one of our nation's founding fathers, Revolutionary War leader, coauthor of the *Federalist Papers*, signatory of the Constitution, first secretary of the treasury, and founder of the *New York Post* and the Bank of New York. The house, a three-bay, two-story building that was constructed in the symmetrical Federal style of architecture and had elegant porches on all sides, was completed in February 1803 based on a design by John McComb Jr., a prominent architect of the time. Following Hamilton's untimely death in 1804, the house was occupied by his widow and children at least part of each year until 1833.

After 1833 the Grange was used as a summer home by several successive New York families until 1879 when the property and house were acquired by a merchant and real estate investor. The tract of land was divided into 300 building lots, and the rectangular street system was

1

PURPOSE OF AND NEED FOR ACTION

extended north. When the grid for 143rd Street was laid out, it was clear that the street would pass through the Grange and that the Grange would have to be moved to survive.

In 1889, as the population of New York moved northward, the downtown St. Luke's Episcopal Church was looking for a new uptown site. The rector of the church, upon seeing the large, frame dwelling, contacted the developer and the owner who agreed to donate the house and move it about 350 feet to the south to its current site at 287 Convent Avenue. The Grange then functioned as a temporary chapel while the new stone church was built on the adjoining lot. An apartment building was later built on the opposite adjoining lots.



Existing setting ·

In 1924 the Grange was purchased from the church by the American Scenic and Historic Preservation Society to preserve the Grange as a public monument. The society maintained and operated it as a museum until 1964 when it was accepted by the U.S. government for administration by the National Park Service. In 1960 Hamilton Grange was designated as a national historic landmark in commemoration of Alexander Hamilton. In 1962 the Grange was authorized as a national memorial within the National Park Service. It is also a contributing resource to the architecturally significant Hamilton Heights Historic District, which surrounds the house. New legislation in 1988 amended the earlier legislation, established a boundary, provided for acquisition of the land on which the house sits, required this management plan, and authorized the expenditure of up to $2.5 million for development.

2

## ISSUES AND CONCERNS TO BE ADDRESSED IN THE PLAN

The Park Service has identified a number of issues and concerns that impede the realization of the purpose, significance, and management objectives (see appendix C) for Manhattan Sites as a whole and for Hamilton Grange itself. These issues are based, in part, on obstacles that have arisen in managing the sites and have been supplemented by public comment at the open house meetings during which the preliminary alternatives for site development were presented (see "Consultation and Coordination" section). Concerns that pertain to all the sites and to Hamilton Grange are discussed below.

### Manhattan Sites Issues That Apply to Hamilton Grange

**Inadequate Staffing.** Manhattan Sites has a history of rapid turnover of career employees, which is primarily attributable to noncompetitive federal government salaries, the high cost of living, and the difficulty of finding satisfactory affordable housing. The inability to attract and retain qualified career personnel adversely affects all facets of park management and visitor services.

**Inefficient Maintenance Organization.** Most equipment and materials for custodial services are stored at the individual sites. The building maintenance and repair staff is centrally located at Federal Hall in lower Manhattan. The geographic separation between the sites and the resulting travel time are inefficient and may lead to inappropriate maintenance practices.

**Unmet Visitor Needs.** Interpretation is limited, and interpretive opportunities are not fully realized because of inadequate staffing and facilities. Informational/directional signs at most of the sites and on local streets and highways are inadequate. None of the six sites are fully accessible to visitors with disabilities. Special interest groups at times undertake activities that do not directly support management objectives. These activities sometimes place demands on limited resources and impair the Park Service's ability to meet interpretive and operational objectives.

### Site-Specific Issues

The interpretive program at Hamilton Grange is severely restricted by lack of staff, poor security, and poor structural conditions, which limit the number of visitors that can be in the house at one time and which floors are open to the public. The opportunity to convey the full significance of the contributions of Alexander Hamilton to the contemporary visitor is unrealized. The Grange is a focal point of and an educational opportunity for the community; the Grange also has an interpretive message for the national and international public. New strategies for conveying a traditional interpretive message, fulfilling the site's potential as a community focal point, and developing an interpretive message for national and international visitors are needed.

The building has severe structural problems. Major differential settlement has occurred since the 1889 move. Resulting lateral expansion at the sides of the house has caused the floor joists to pull away from the beam pockets, and the two main beams for each floor have split and cracked horizontally. These conditions have created an unstable structure and unsafe

3

conditions for visitors. Because of these conditions, the building was closed to public use in June 1992 for emergency stabilization. When open, the number of visitors at one time is restricted, and the second floor is closed to the public.

The historic integrity of the house was compromised by removing it from its original 1802 built environment and reorienting it in a different location. With the subsequent development and urbanization of the surrounding area, the Grange was irretrievably removed from its original setting. Relocation to its original site is no longer an option. However, the current site is not an appropriate setting. The architectural integrity of the building — the original intent, design, and materials used when constructing a building — was also compromised by removal of porches and other changes. The historic architectural plan cannot be restored at the current location. The Grange, which is a national historic landmark as well as a contributing resource to the Hamilton Heights Historic District, will need to be considered in each of these contexts when assessing the effects of proposed changes.

The security system is inadequate, leaving the building and the artifacts stored or on display vulnerable to burglary and vandalism. The lack of fire suppression and climate control systems also leaves the building and its contents vulnerable to fire, swelling, and cracking. The heating system is old and difficult to control, and there is no ventilation/air-conditioning system to ensure the comfort and safety of the staff and visitors or protect the collections.

The NPS collection is limited; most of the Hamilton collection is owned by the Smithsonian Institution, various museums, and private collectors throughout the country and in New York. In addition, the building does not meet museum standards for safe and proper display of appropriate furnishings. To fully refurnish the Grange, the challenge for the Park Service is to bring the building up to museum standards and then acquire or obtain on loan original furniture and artifacts or make reproductions of known original pieces.

## ALTERNATIVES INCLUDING THE PROPOSED ACTION

### INTRODUCTION

The 1962 act of Congress that established Hamilton Grange National Memorial directed that the house eventually be relocated for its proper administration and interpretation as a national memorial. The Senate committee stated that "the Grange is indeed of national significance and should be preserved in a fitting setting." The site proposed at that time was about 10 blocks from the present location. The house was not moved, and because of a congressional funding ceiling, only minor rehabilitation projects were undertaken over the next decade.

Congress recently passed legislation that allowed the Park Service to acquire the land on which the house is now located and the personal property necessary for interpretation of Hamilton, the Grange, and the United States as a young nation.

Although the Grange, built in 1802, has interest as a fine example of Federal period architectural style, Hamilton Grange National Memorial was established to commemorate the historic role played by Alexander Hamilton in the development of this nation. Therefore, Hamilton's accomplishments as an eloquent advocate of the federal constitution and architect of American financial policy in the Republic's early years comprise the significance of the memorial.

This section describes the four alternatives for the rehabilitation of Hamilton Grange. Alternative 1, a "no-action" alternative, describes a continuation of existing management trends and provides a basis to evaluate the other alternatives. Alternative 2 entails structural reinforcement and the addition of an exterior elevator, allowing full public use of all three floors. Alternative 3 involves excavation of the subbasement, which would allow reorienting visitor access to the opposite (east) facade for a more impressive entrance to the memorial. Use of the subbasement would also allow for more interpretive and community use space. Under this alternative the interior would be restored, as much as possible, to look as it did during Hamilton's residency.

Alternative 4, the Park Service's preferred alternative and the proposed action, relocates the Grange south across 141st Street to St. Nicholas Park (on current New York City Department of Parks and Recreation property), thus providing a setting that is reminiscent of its original site (see Locations map). The house would be restored on the interior and exterior, as much as possible, to appear as it did when Hamilton lived there, thus fulfilling congressional intent. A community use / NPS law enforcement staff housing facility would be built on the existing Grange site. Alternative 4 would provide the most comprehensive visitor use program. Visitors would have the opportunity to fully understand the history of the Grange as Hamilton's home and its 18th century architectural significance, which is not possible at the existing site. Visitors would also have the best opportunity to fully understand Hamilton and his contributions to our nation under this alternative.

An engineering analysis was done at the existing site. Development proposed under any of these alternatives would be feasible (see appendix D).



# Locations

United States Department of the Interior / National Park Service
DSC / May 1994 / 416 / 20030

**INTERPRETIVE THEMES**

To share with visitors the reasons why the memorial was established involves deciding not only how the resources should be protected and presented to the public — restore the interior, restore the exterior, move it to St. Nicholas Park, etc. — but also what visitors should learn about Hamilton. What are the stories to tell, which are the most important, and how will the Park Service tell them? Telling these stories, what the Park Service calls interpretation, is basic to any NPS unit. Interpretation is a process of education that is designed to stimulate curiosity and convey messages to the visiting public. The later description of the alternatives tells more of the where and how; what stories will be told is described in the following interpretive themes. The themes apply to all of the alternatives; the differences among the alternatives would be the degree and means by which the themes would be addressed and interpreted.

- Hamilton was not born into wealth or power, but through his own efforts he became wealthy and powerful. His role as a military officer / field commander led him to his position in Washington's cabinet. Hamilton created himself as a political force.
- His writings and philosophical bent contributed to development of political parties in America and our strong central government.
- The financial foundation of United States was established by Alexander Hamilton. He formed the first national bank, was first secretary of the treasury, and established the financial integrity of the new nation.

Under alternative 1, all themes would be covered, but only in an introductory way. Under alternative 2 all themes would be covered, but in slightly more depth than in alternative 1. Alternative 3 would permit in-depth coverage of all themes plus relating Hamilton's life to contemporary times. Alternative 4 would also permit in-depth coverage of all themes plus more understanding of the Hamiltons' lifestyle and the house's historic setting. Alternatives 3 and 4 also present more opportunities for heritage education and community involvement.

**ACTIONS COMMON TO ALL ALTERNATIVES**

The Grange would be made accessible to visitors with disabilities to the greatest extent possible. In some instances it may be difficult to achieve full access without compromising the architectural integrity of the building. The National Park Service, in consultation with the New York Parks, Recreation, and Historic Preservation Office and the Advisory Council on Historic Preservation, will determine which actions would have a negative effect on the historic property and design for access accordingly. Visitors with sensory and cognitive impairments would be accommodated under all alternatives (see Appendix E: Programmatic Accessibility Guidelines).

The Friends of Hamilton Grange group has been formed and would be actively involved with the National Park Service in the future restoration of Hamilton Grange and in mitigation of any concerns that might arise, especially those that arise from moving the Grange from its current site. The group would also help promote the site and programs related to the Grange for visitors and the local community as well as initiate and encourage cooperation with other groups and attractions in the Greater Harlem area to promote the economic welfare of the community (e.g., working with Community Board #9, the Striver's Center Development

Project, Riverbank State Park, etc. as described in the "Affected Environment"). Specific examples of proposed involvement by this group are identified in alternative 4. Under all alternatives, the National Park Service and the Friends of Hamilton Grange group would work to identify existing parking that could be used for visitors.

In accordance with its affirmative action plan, Manhattan Sites will continue to ensure equal employment opportunity within all six sites, including Hamilton Grange National Memorial. This goal as it relates to Hamilton Grange would be enhanced by the following objectives:

> Under the direction of the superintendent, deputy superintendent, the administrative officer, and the facility manager would conduct outreach recruiting efforts within the Harlem community to increase the consideration of local applicants for positions in maintenance and ranger staffs. Orientation sessions would be held within the Harlem community to make applicants aware of the government employment process, including how to document skills, abilities, and work experiences. Job announcements would be distributed to the friends group and a broad range of community based agencies including Community Boards #9 and #10. The superintendent would provide information on government procurement and contract opportunities to local businesses through the local media, the Chamber of Commerce of Greater Harlem, and other means.

In accord with NPS policies, all discussions of refurnishing are based on current research and contingent on the availability of original furnishings or reproductions of known originals. Much is known about original uses and furnishings of the public rooms of the house. However, a number of the rooms were not designated for any particular use by the architect John McComb. The remaining rooms would be used for other interpretive purposes.

Also following NPS policies, many plans and studies would also be done under any of the alternatives; a list is given in appendix F.

## ALTERNATIVE 1 — NO ACTION / CONTINUATION OF EXISTING TRENDS

Alternative 1 would retain the building's current limited visitor capacity. However, the structure would be stabilized by reinforcing failed wooden structural members, as necessary, and interior finishes would be partially restored. The basic configuration would not be changed (the stair and front door would not be returned to their original locations) (see Alternative 1 — Cross Section and Floor Plan). The subbasement would continue to be used for utility space, storage, and maintenance; the basement would continue as an interpretive area and theater/meeting room, and exhibits would be upgraded. The first floor would also have upgraded exhibits, and the second floor would be for staff/site use and storage. About 1,734 square feet of space would be available for visitor use and interpretation and community use (see table 1 at the end of the description of the alternatives).

The structural capacity of the second floor would remain that of a typical wood-frame house — not meant for visitor use. Public access would be only to the basement and first floor. A wheelchair lift would be installed on the outside of the front (west) of the house to allow wheelchair users access to these two floors.



## Alternative 1 - Cross Section

Security and fire alarm systems would be upgraded. No climate control system would be installed; therefore, historic furnishings and artifacts sensitive to temperature and humidity fluctuations could not be exhibited. Expanded exhibits and reproductions of furniture would be used. Museum collections would be stored offsite.

Exhibits would focus on Hamilton's personal and political life. The history of the house would be covered only as necessary to understand its architectural relevance and current location. Without substantial additional funds, the interpretive program would remain basically unchanged.

Onstreet parking, already crowded, would continue to be first-come/first-served for visitors. Visitation has been about 41,000 visitors annually, and the number of visitors coming to the site would not be expected to increase under this alternative.

The site would be managed as a historic zone; the first and second floors would be managed as a preservation subzone, and the basement and subbasement would be managed as a preservation/adaptive use subzone.

Five staff people would be needed for this alternative. The cost of stabilization would be $1,086,815, and the costs for new and upgraded exhibits would be $624,000 (see appendix G for more details about cost estimates).



**First Floor**



**Second Floor**



**Subbasement**

**Basement**

# Alternative 1 - Floor Plan

United States Department of the Interior / National Park Service
DSC / Oct. 1992 / 416 / 20021

North
E
W
No Scale    S

## ALTERNATIVE 2 — PRESERVE AND OPEN ENTIRE BUILDING

Under alternative 2, the existing building configuration would be the same as in alternative 1, but the house would be structurally reinforced to allow full public use of the basement and the first and second floors (see Alternative 2 — Cross Section). This alternative would preserve as much original fabric as possible. Deteriorated wooden members would be retained, and a new interior steel framing system would be erected; this new framing system would not be hidden behind the existing original interior walls and floors. An exterior elevator at the back (east) side of the house, either attached to the original structure or as a free-standing column attached only to the porches, and a wheelchair lift at the front (west) would allow full visitor circulation to all floors. With structural reinforcement and use of the second floor, about 2,773 square feet would be available for visitor use and interpretation and community use (see table 1 at the end of the description of the alternatives). NPS interpretation would convey the history of the house and Alexander Hamilton's role in establishing the political and financial foundations of this country.

After improving the climate control and security systems, the house interior would be partially restored to the Hamilton period (1802-04), based on the 1986 NPS *Historic Furnishings Report* and subsequent research that may be needed and the availability of furnishings. Efforts would be made to acquire (through purchase, donation, or loan) original Hamilton furniture from public institutions and private sources or to make reproductions. Major changes from the 1889 move (e.g., the current stair and entrance configuration and the second-floor room partitions) would be retained. The parlor and dining room would be refurnished, conveying a sense of the comfort in which Hamilton lived. Exhibits and contemporary media in the remaining rooms on the first floor and three rooms on the second floor would carry the interpretive story and provide the opportunity to more fully interpret the contributions Hamilton made to his adopted country. The remaining rooms on the second floor would be for site/NPS staff use. The lobby, information/sales desk and theater/meeting room, restrooms, and staff office space would remain in the basement. The subbasement would remain in use for utility space, storage, and maintenance (see Alternative 2 — Floor Plan).



# Alternative 2 - Cross Section



First Floor



Second Floor



Sub Basement



Basement

# Alternative 2 - Floor Plan

United States Department of the Interior / National Park Service
DSC / Oct. 1992 / 416 / 20022

Exhibits would focus on Hamilton and his accomplishments in his personal, professional, and political life. The museum-quality climate control system would enhance visitor and staff comfort as well as protect historic fabric and collections. Museum collections not on display would be stored offsite. With upgraded exhibits and two refurnished rooms, guided tours or stationed personnel would be needed for security purposes.

Site security would be enhanced with installation of improved intrusion and fire alarm systems, and a fire suppression system would be installed; a contract security agency could be employed to monitor the site.

St. Luke's Episcopal Church has suggested that the rectory on Hamilton Terrace might be available for NPS use (letter from David Johnson, Rector, St. Luke's Church, to superintendent, Manhattan Sites). The rectory could be developed as a visitor center, which would work well in combination with provisions of alternative 2. If this became reality, the information/sales desk, theater, public restrooms, and staff/storage room could be in the rectory and the Grange basement could be used as a multipurpose space for handling school groups and public meetings. Under this concept, visitors would most likely enter the Grange on the east facade, with ramps and an elevator for visitors with disabilities, retaining walls, and landscaping similar to that described later under alternative 3.

Archeological investigation and evaluation would be done prior to any ground disturbance for the elevator. Trained personnel would also be onsite during construction for archeological monitoring. A brief archeological study, done during the engineering analysis, indicates that finding archeological resources would be unlikely. (Nothing was found but debris from when house was moved.)

Onstreet parking, already crowded, would continue to be first-come/first-served for visitors. Little increase in the number of visitors would be expected.

The site would be managed as a historic zone; the first and second floors would be managed as a preservation subzone, and the basement and subbasement would be managed as a preservation/adaptive use subzone.

A staff of seven would be needed to implement this alternative. Development costs would be $1,914,424, and costs for interpretive exhibits would be $1,702,500 (see appendix G for more details about cost estimates).

## ALTERNATIVE 3 — ENTRANCE REORIENTATION AND ADDITIONAL INTERPRETIVE SPACE

Alternative 3 would alter the setting of the site by reorienting the visitor entrance to a more impressive but less historically accurate four-story east facade (see Alternative 3 — East Side of the Grange and Aerial View). More space would be made available by lowering the existing subbasement/garden level floor and opening a new entryway into this level from the east (Hamilton Terrace) side. The combination of refurnished rooms, exhibits, theater, and class/meeting rooms would provide space for a comprehensive visitor use program. About 3,589 square feet would be available for visitor use, interpretation, and community use (see Alternative 3 — Cross Section and table 1 at the end of the description of the alternatives).

13



## Alternative 3 - East Side of the Grange



## Alternative 3 - Cross Section



Convent Avenue

141st Street

St. Luke's Church

The Grange

Apartment Building

Entrance

Bench

13 Sweetgum Trees

Church Rectory

Gate

Gate

Hamilton Terrace

W North
S    E
No Scale

**Alternative 3 - Aerial View**
United States Department of the Interior / National Park Service
DSC / May 1994 / 416 / 20023

ALTERNATIVES INCLUDING THE PROPOSED ACTION

The foundations would be underpinned, and the differential settlement that has occurred would be stabilized (but no attempt would be made to level the house). New foundations and footings for the chimneys would be built, and a waterproof slab and drainage system would be required. The deteriorated wooden members would be replaced by a steel framing system concealed within the original walls and floors, allowing public use of all four floors.

The garden level (existing subbasement) would be excavated approximately 4 feet; a lobby and information desk, a book sales area, restrooms, space for mechanical equipment and maintenance storage, and a meeting room that would be available for community use would be in this new garden level (see Alternative 3 — Floor Plan). (This location of the meeting room would allow its use for after-hours meetings, etc., without needing to open and provide security staff for the entire building.) A new main entrance would be opened in the eastern stone foundation wall, and an entry court with retaining walls and landscaping would be installed. This would include 13 sweet gum trees that would commemorate those supposedly given to Hamilton by George Washington from his Mount Vernon estate to symbolize the 13 original colonies. Access to this new garden level entrance would be by a series of ramps for visitors with disabilities across the property east of the Grange. To expend federal funds for this development, the Park Service would have to acquire interest in this property (through easements or fee-simple acquisition) from St. Luke's Church.

The basement level would include a small theater and school-group meeting room. Interpretation would focus on the accomplishments of the man. Staff office/lunchroom/ lounge space and storage of site-related museum collections would also be in the basement.

The first floor would be restored and partially refurnished (four rooms), based on research and the availability of furnishings. The historic staircase would be re-created, and the front door would be returned to its pre-1889 position on the south wall. Because the front door now faces St. Luke's Church, the view from the glass in the door and the sidelights would be obscured. An emergency egress staircase would be installed in the northeast corner room through all four floors, and an elevator would be installed in the north center hallway. The second-floor rooms would be developed for exhibits and NPS staff use.

After rehabilitation of the building and installation of necessary climate control and security systems, efforts would be made to acquire (through purchase, donation, or loan) original Hamilton furniture from public institutions and private sources or to make reproductions. The restoration and refurnishing of the rooms would focus the emphasis on how Hamilton created his own political and personal fortune; the comfort of his lifestyle would be reflected but would not be the dominant theme.

With additional and upgraded exhibits/refurnishings, guided tours or stationed personnel would be needed for security purposes.

The National Park Service, the local community, and the friends group would actively promote the site; with these efforts and the additional interpretive and educational space available, visitor use would probably increase. Many visitors would arrive by bus, and the National Park Service would work with the city to mark bus parking spaces on 141st Street and Hamilton Terrace, institute vehicle weight limitations, and enforce parking regulations.

16



First Floor



Second Floor



Garden Level



Basement



**Alternative 3 - Floor Plan**

United States Department of the Interior / National Park Service
DSC / Oct. 1992 / 416 / 20024

ALTERNATIVES INCLUDING THE PROPOSED ACTION

A museum-quality climate control system would be installed to protect cultural resources and enhance visitor and staff comfort. Undisplayed artifacts would be stored on-site.

The improvement of the security and fire alarm systems and the addition of a fire suppression system would be as described in alternative 2; NPS law enforcement rangers would provide additional security.

Archeological investigation and evaluation would be done prior to any construction work or ground-disturbing activities. Trained personnel would also be onsite to monitor construction activities. Thus, any disturbance to archeological artifacts would be fully mitigated.

The garden level would be managed as a park development zone. The basement would be managed as a park development zone and a preservation/adaptive use subzone; the first and second floors would be managed as a historic zone and as a preservation subzone.

It would require a staff of 18 to implement this alternative, and the cost of development, excluding land acquisition, would be about $3,856,622. Costs for interpretive exhibits would be about $2,236,500 (see appendix G for more details about cost estimates).

## ALTERNATIVE 4 — RESTORATION AND RELOCATION — PROPOSED ACTION / GENERAL MANAGEMENT PLAN

### A Summary of Changes from the Draft Management Plan

In response to concerns and suggestions received during the review process on the *Draft Environmental Impact Statement / General Management Plan*, a number of changes have been made to alternative 4 as presented in the draft document and public meetings. Described in detail below, in summary these changes include the following:

- A new building would be built at the Convent Avenue site for community use, educational purposes, and NPS housing; public comment did not favor the option for using this space as a vest-pocket park (see "Alternatives Considered But Rejected" section).
- Interpretation and heritage education programs are more defined than in the draft plan.
- No onsite bus pullouts would be provided.
- Full-time security would be provided for both sites.
- A Friends of Hamilton Grange group has been created.
- Land transfer and replacement, future park maintenance, landscaping and other environmental issues, and house orientation issues would be solved through the involvement of the friends group, local organizations, and negotiation with applicable agencies such as the city Department of Parks and Recreation and the state historic preservation office.
- Environmental mitigating measures would be instituted to protect residents and the Grange from building exhaust and the effects of foundation blasting.
- The National Park Service, in conjunction with the state historic preservation officer, and the City Department of Parks and Recreation has assessed the significance and integrity of St. Nicholas Park through a determination of eligibility for the National Register of Historic Places.

**The Proposed Plan**

The general management plan for Hamilton Grange National Memorial would be to relocate and restore the original woodframe first and second floors and attic of the Grange across 141st Street to St. Nicholas Park (see Alternative 4 — Conceptual Site Plan and General Overview). The restoration would recreate the appearance of the Grange during Hamilton's residency in accordance with the approved *Historic Structure Report* and NPS *Management Policies* and any new information learned during the move (see Alternative 4 — The Grange on the New Site). Implementation of this plan would accomplish what Congress intended — restoration of the Grange within an appropriate setting while keeping it within the context of its present-day community and on Hamilton's original tract of land. This alternative is, therefore, the preferred alternative / proposed action.

To relocate and create an appropriate setting for the Grange and provide security, approximately 0.91 acre on the northern edge of St. Nicholas Park would to be transferred to the National Park Service from the city Department of Parks and Recreation. Discussions with the city Department of Parks and Recreation have begun, and they have stated that it is in the public interest to move the Grange and that they approve of the basic concepts in this proposed plan (see their letter in the " Written Comments from Agencies, Organizations, and Individuals"). However, a number of issues must be addressed between the city Department of Parks and Recreation and the National Park Service in future negotiations. In addition, NPS acquisition of the city park land will require both state and federal legislation. The steps necessary to acquire the property are described in appendix H.

The Grange's status as a national historic landmark would not be affected by relocation. Although the Grange's status as a contributing resource would be lost, removing the Grange from the Hamilton Heights Historic District would not affect or compromise the historical and architectural basis for which the district was established. In consultation with the state historic preservation officer, the National Park Service prepared a determination of eligibility to the National Register of Historic Places for St. Nicholas Park. It was determined that St. Nicholas Park is not eligible for listing on the national register and that the relocation of the Grange would not adversely affect the park (see appendix I, letter dated September 1994). However, the effects of relocating the Grange into the park would be mitigated through documentation and appropriate design.

Based on research, in its new location the Grange's exterior would be restored as closely as possible to its historic appearance, with all doors, windows, and porches in their original places. The main door would be relocated to its original position, and the entrance porch would be reconstructed. The house would be oriented to the southwest, and visitors would approach the house from the northeast as Hamilton's guests would have done. Visitors would enter the house through a new, fully accessible doorway on the northeast to an orientation center on the ground floor level (described below). Here they would be greeted by an NPS ranger and introduced to the Grange and the Alexander Hamilton story. A curving walk would lead from 141st Street around the house to its formal front entrance. Groups who have been oriented at the Convent Avenue site and guests attending ceremonies and special commemorative occasions would enter through the restored front door.

A new masonry and stone subbasement (for housing mechanical equipment, maintenance and space for staff use) and ground floor, which would be developed as a visitor contact area,



City College Building

13 Sweetgum Trees

Light Post

Gate

Entrance

141st Street

Scale 1" = 10'

W / North / S / E

# Alternative 4 -
# Conceptual Site Plan
United States Department of the Interior / National Park Service
DSC / May 1994 / 416 / 20026



**Alternative 4 - General Overview**

United States Department of the Interior / National Park Service
DSC / May 1994 / 416 / 20025

would be constructed at the new site to complement the original building in size, scale, and material. However, these additions would be clearly differentiated from the original Grange so as not to create a false historical appearance. During the design phase, geotechnical factors would be assessed and considered in determining the foundation design. The results of this study would influence the type of foundation and extent of the basement on the new site. Vibrations from excavation of bedrock, as measured by peak particle velocity, would be limited through the use of modern excavation techniques to avoid damage to nearby structures and minimize disturbances to nearby residents and businesses.

A concealed steel framing system would be inserted to stabilize the building and provide adequate load-bearing capacity. An elevator in the northwest corner would provide access to all floors (see Alternative 4 — Floor Plan).

Visitor contact would necessarily be in the ground level floor, which would have a lobby, a theater, an information desk and book sales area, staff space, and fully accessible public restrooms. Exhibits and other interpretive media would orient visitors to all the major themes of Alexander Hamilton and the Grange, as well as the house's historic setting and the various changes it has undergone. Four rooms on the first floor would be refurnished to reflect the house as it appeared during Hamilton's occupancy. Efforts would be made to acquire (through purchase, donation, or loan) original Hamilton furniture from public institutions and private sources or to make reproductions. The front entry hall would be refurnished and would include the bust of Hamilton in the niche opposite the front door. The dining room and parlor would be fully restored, and the mirrored folding doors that once separated them and reflected the sylvan setting of the house would be re-created. The room off the entry hall would be restored as Hamilton's library.

Less is known about the five private rooms on the second floor than about the first floor. Because so little is known about these rooms, they would be developed as interpretive space with exhibits about the military, political, and professional accomplishments of Hamilton. Contemporary exhibits in at least one room could feature the family furniture that is in the park collection but comes from a time after Hamilton's death.

About 3,827 square feet, including the community use space at the Convent Avenue site, would be available for visitor use and interpretation and community use (see table 1 at the end of the description of the alternatives).

A museum-quality climate control system would be installed to protect cultural resources and enhance visitor and staff comfort. Artifacts not on display would be stored onsite. With additional and upgraded exhibits/refurnishings, guided tours or stationed personnel would be needed for security purposes.

The new site in St. Nicholas Park would be fully developed as an appropriate setting for the memorial. Landscaping that is evocative of Hamilton's period would be done. Thirteen sweet gum trees commemorating the original colonies and perhaps propagated from the trees at Mount Vernon, would be planted near the house in a grove as Hamilton had planted them. About six mature trees would have to be removed to allow for the house relocation, but additional trees would be planted to ensure that those trees lost are replaced. During the design process, landscaping plans would be developed to soften the intrusion of Steinman Hall (part of City College of New York), a nine-story structure adjacent to the new Grange

Alternative 4 –
The Grange on the New Site



First Floor



Second Floor



Subbasement



Ground Floor

North E S W

No Scale

# Alternative 4 - Floor Plan

United States Department of the Interior / National Park Service
DSC / May 1994 / 416 / 20027

site. (This would include attention to when the site would be in the shadows; see "The Shadow Study" section below.) Representatives of the City College of New York would work with the National Park Service to ensure that building exhaust does not harm site vegetation. As mentioned previously in the "Actions Common to All Alternatives" section, the Friends of Hamilton Grange group would be actively involved in planning both the existing and new house site, including landscape design.

Parking for visitors would continue to be predominately on the street. The National Park Service would work with the Friends of Hamilton Grange group and the City College of New York to identify existing parking spaces that would be available for visitor use. Promotional efforts for the Grange would also encourage the use of public transit, particularly the subway. (Off-street parking options identified in the draft plan are no longer being considered because of the desire not to convert public park land to paved parking and the steep grade and traffic congestion on 141st Street.)

Security for the site would be provided by NPS rangers. Rangers would be on duty at the Grange 24 hours a day and would live in the housing provided at the new structure on the Convent Avenue site. Security and fire alarm and suppression systems would be installed at both sites. A decorative iron security fence would be installed around the perimeter of the new site, and appropriate walk and security lighting and decorative house lighting would be installed. The historic shutters would be used to secure the house from unauthorized entry when the site is closed.

The National Park Service would work with the city Department of Parks and Recreation to provide information about the outstanding public collection of historic house museums within New York City parks and draw parallels between these houses and Hamilton Grange. With the dramatic restoration and cooperative promotional efforts with the city and the Friends of Hamilton Grange group, it could be expected that the number of visitors would increase significantly. The Park Service would also work with the city Department of Parks and Recreation on upgrading and maintaining St. Nicholas Park to preserve and protect the remaining elements of the park's original design.

Archeological investigations and evaluation would be done before construction work or ground-disturbing activities. Trained personnel would be onsite to monitor construction activities. Thus, any disturbance to archeological resources would be fully mitigated. Actions would also be taken to prevent soil erosion and runoff during construction.

The plan for the Convent Avenue site would be to construct a new structure for public and NPS uses. The new building, no more than two stories, built on the 1889 Grange foundation, would emphasize heritage education and community involvement. A multipurpose meeting room would occupy the main floor, where educational programs and community meetings could be held. Space would also be provided for exhibits to depict the growth and development of Harlem, the role of the Grange in the community, the role of St. Luke's parish in preserving the Grange, and broader community preservation efforts. Large groups could also be oriented to the Grange here before visiting the house. The lower levels of this structure would be developed as apartment(s) for housing NPS law enforcement rangers and for site storage needs and maintenance operations. The new structure proposed for the Convent Avenue site would be designed to be compatible with the qualities for which the Hamilton Heights Historic District was established (see New Building on Convent Avenue Site and Use of Convent Avenue Building — Floor Plan). The Friends of Hamilton Grange group would be actively involved in all aspects of planning the new structure.



New Building on
Convent Avenue Sit





Street Level - Main Floor



Housing Level - Basement

Subbasement

North
E
W
S
No Scale

## Use of Convent Avenue Building - Floor Plan

United States Department of the Interior / National Park Service
DSC / June 1994 / 416 / 20028

ALTERNATIVES INCLUDING THE PROPOSED ACTION

The two original upper levels of the house would be managed as a historic zone and preservation subzone; the two newly built lower levels would be managed as a park development zone, and the Convent Avenue facility as a park development zone.

This alternative would require a total of 23 staff. Excluding land acquisition costs, relocation and restoration of the house on the new site would cost approximately $7,907,372, developing NPS housing / community use space on the 1889 site would cost about $961,540, and interpretive exhibits would cost about $2,109,000 (see appendix G for more details about cost estimates). Completion of the project would be carefully phased. Following the move of the Grange to the new site in St. Nicholas Park, development of the new NPS building on the Convent Avenue site and restoration of the Grange would proceed simultaneously. (The steps necessary to acquire funding are listed in appendix H).

## The Shadow Study

Because of public interest in / request for consideration of the landscape design, a study was done that determined when the Grange would be in shadows from adjacent buildings based on the time of year and day and the location and height of surrounding buildings at the relocation site. For comparative purposes, the shortest and longest days of the year were selected, and the existing site was also included. The study showed that in December (the shortest day) the Grange on the existing site would be in the shadow of adjacent buildings throughout the entire day and on the new site only in the afternoon. In June (the longest day) the southern portion of the Grange, bordering the church, would be shadowed while the northern half would be in natural light throughout the day. The St. Nicholas site would be in the sun in the morning and early afternoon and shadow only in the late afternoon. The results of this study are shown in appendix J.

TABLE 1. SUMMARY OF SPACE USE IN EACH ALTERNATIVE (IN SQUARE FEET)

|  | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | |
|---|---|---|---|---|---|
|  |  |  |  | New Site | Convent Avenue Site |
| **Refurnished Rooms** | 0 | 780 | 1,099 | 1,099 | 0 |
| **Exhibit Area** | 1,080 | 1,339 | 1,082 | 1,056 | 0* |
| **Information/ Orientation** | 318 | 318 | 636 | 288 | 0* |
| **Community Use/ Education** | 336 | 336 | 772 | 0 | 1,384 (incl. restrooms) |
| **TOTAL** | 1,734 | 2,773 | 3,589 | 2,443 | 1,384 |
| **NPS Staff** | 784 | 608 | 336 | 690 | 2,192 (incl. 2,000 for housing) |
| **Maintenance** | 180 | 180 | 180 | 0 | 656 |
| **Mechanical/Storage** | 914 | 914 |  |  |  |
| **Mechanical** |  |  | 356 | 240 | 1,066 |
| **Storage** |  |  | 170 | 416 | 816 |
| **Circulation** | 1,352 | 1,389 | 1,396 | 1,971 | 690 |

* Although exhibits and orientation would be provided at this site, they would be provided in the community use area and are included in the 1,384 figure.

TABLE 2. SUMMARY COMPARISON OF ALTERNATIVES

Note: This table does not include actions/developments that are common to all alternatives.

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| Concept | No action / continuation of existing trends. Retain current limited visitor access to basement and first floor; upgrade exhibits. | Open three floors for public use and interpretation, creating more space to provide enhanced interpretive program. | Open four floors for public use; alter existing setting by using more impressive but less historically accurate four-story east facade as visitor entrance and providing full visitor use program. | Restore Grange exterior and interior to greatest degree possible to appear as it did during Hamilton's residency in a place that is reminiscent of its original setting. Provide most comprehensive visitor use program. |
| The Grange | Stabilize building, reinforce failed structural members, and partially restore interior finishes. Retain existing configuration. | Structural reinforcement and new exposed framing system to allow use of basement, first, and second floors. Retain existing 1889 configuration. | Structural reinforcement, new concealed framing system, and subbasement/garden level excavation to allow public use of all four floors. Restore historic (1802-04) interior configuration as much as possible. | Move first and second floors and attic of Grange to St. Nicholas Park and place on new subbasement and ground floor. Restore interior and exterior to historic (1802-04) configuration. |
| Access | Visitor entrance through existing western basement entrance. Exterior wheelchair lift provides access to basement and first floor from Convent Avenue. | Visitor entrance through existing western basement entrance. Exterior wheelchair lift and east-side exterior elevator provide access to all three floors. | Visitor entrance to eastern garden level from Hamilton Terrace via landscaped entry court with ramps and retaining walls. Full access (interior elevator) to all four floors | Visitor entrance to ground floor. Full access (interior elevator) to all floors. Access through front door for large groups and on special occasions. |

TABLE 2. SUMMARY COMPARISON OF ALTERNATIVES (CONT.)

|  | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| Visitor Use, Interpretation, and Exhibits | Basement: continued use as visitor contact / interpretive area. First Floor: upgraded exhibits focus on Hamilton's personal and political life. House history covered only as necessary to understand its architectural relevance and current location. Continuation of existing interpretive program. Without climate control / fire suppression systems, only exhibits and reproduction furniture would be used. Undisplayed collections stored offsite. Second Floor: Closed to public. | Partially restored interior (based on plans and research and availability of furnishings or reproductions). Basement: information/sales desk, theater/ meeting room, staff space, and restrooms. First and Second Floors: two refurnished rooms which Hamilton lived. Some rooms devoted to interpretive media to more fully interpret Hamilton's contribution to our country; other rooms used for NPS staff/site needs. Undisplayed collections stored ofisite. | Partially restored interior (based on plans and research and availability of furnishings or reproductions). Garden Level: lobby, information desk, book sales area, restrooms, meeting room, and mechanical/ maintenance equipment. Basement: small theater, school-group meeting room, exhibit and staff space, and storage. First Floor: restore and refurnish four rooms to appearance of Hamilton era, and interpret how Hamilton created his own political and personal fortune. Second Floor: Some rooms devoted to interpretive media to more fully interpret Hamilton's contribution to our country; other rooms used for NPS staff/site needs. Undisplayed collections stored onsite. | Fully restored (as possible) exterior; partially restored interior (based on plans and research and availability of furnishings or reproductions). Subbasement: NPS office and storage and mechanical equipment. Ground floor: theater, lobby, book sales, restrooms, staff space, exhibits orienting visitors to house, its history, the church's role in its preservation, and Hamilton himself. First Floor: refurnish parlor, dining room, library, and hall; use other room for exhibits. Second Floor: exhibit other family furniture; use interpretive media and exhibits in other rooms to describe Hamilton's accomplishments. Undisplayed collections stored onsite. Convent Avenue building exhibits would depict the growth and development of Harlem, the Grange's role in the community, the role of St. Luke's parish in preserving the Grange, and the broader community preservation efforts. |

TABLE 2. SUMMARY COMPARISON OF ALTERNATIVES (CONT.)

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| Interpretation/ Education | Introductory coverage of all themes. | Slightly more in-depth coverage of all themes. | In-depth coverage of all themes plus relating Hamilton's life to contemporary times. More opportunities for heritage education and community involvement. | Same as alternative 3 plus more understanding of the Hamiltons' lifestyle and the historic setting of the house. |
| Protection Systems | Upgrade security and fire alarm systems; no climate control or fire suppression systems. | Improve security and fire alarm systems, install fire suppression and climate control systems; security firm would monitor site. | Improve security and fire alarm system; install climate control and fire suppression system. Site security by NPS rangers. | Install museum-quality climate control, security, and fire alarm and suppression systems. Site security by NPS rangers living nearby. |
| Parking | Onstreet visitor parking would still be first-come/first-served. | Same as alternative 1. | Park Service would work with city to mark and enforce designated bus parking areas on Hamilton Terrace and 141st Street. | Visitor parking would continue to be predominately on the street. The Park Service would work with the Friends of Hamilton Grange group and City College to identify existing parking spaces that would be available for visitor use. The use of public transit would be encouraged. |
| Use of St. Luke's Rectory, the Existing Site, and the St. Nicholas Park Site | | If rectory becomes available, develop as a visitor center with information/sales desk, small theater, public restrooms, and staff/storage space. Existing Grange basement then used as multipurpose space for school groups. Visitor entrance would be from Hamilton Terrace and involve the retaining walls, vegetation, and the ramps and elevator for visitors with disabilities described in alternative 3. | | Compatible with the character of the historic district, a two-story community use / NPS ranger apartment would be built on remaining foundation on Convent Avenue site. Heritage education and community uses would be emphasized. St. Nicholas Park site would be appropriately landscaped, with sweet gum trees, paved walks from 141st Street to entrance, perimeter security fence, and lighting. |
| Staffing | staff of 5 | staff of 7 | staff of 18 | staff of 23 |
| Development Costs (including interpretation and refurbishing costs) | $1,710,815 | $3,616,924 | $6,093,122 (excluding land acquisition) | $10,016,372 (excluding land acquisition) for St. Nicholas Park site and $961,540 for Convent Avenue site |

33

TABLE 3. SUMMARY COMPARISON OF IMPACTS

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| **IMPACTS ON CULTURAL RESOURCES** | Overall, impacts would be positive because stabilization procedures would help preserve and maintain building. Collections would be protected through storage offsite. Architectural significance and integrity would be more difficult to interpret. The house would not be reminiscent of its original setting. With the house remaining in its current location and continued existing use, there would not be any impacts on ethnographic resources. | Overall, impacts would be positive because structural reinforcement would help preserve and maintain building. This alternative would be the least disruptive of all action alternatives to surviving historic fabric. Displayed collections would be protected by new climate control and security systems; collections not on display would be protected through offsite storage. Architectural significance and integrity would be more difficult to interpret. The house would not be returned to a setting that is reminiscent of its original setting. Impacts on visual setting from wheelchair lift and elevator would be minimized through design. Exposed steel framing system would intrude on appearance of historic interior. No impacts on potential archeological resources would be expected. With the house remaining in its current location and continued existing use, there would not be any impacts on ethnographic resources or the cultural landscape. | Overall, impacts would be significant but beneficial. Major impacts on 1802 and 1889 historic fabric from rehabilitation, concealed framing system, and construction work to develop new east entry and elevator. The collections would be adequately protected, displayed, and stored intact onsite. Perceived grandeur of four-story building would not contribute to visitor under-standing of architectural significance of house. Framing system would impact building's historic materials but not design intent or interior or exterior appearance. Significant change in visual appearance of house and surrounding neighborhood from entryway changes and from exterior landscaping (trees, retaining walls, ramps, vegetation). Although there would be ground-disturbing activities, no impacts on potential archeological resources would be expected. With the house remaining in its current location and continued existing use, there would not be any impacts on ethnographic resources or the cultural landscape. | Overall, impacts would be sig-nificant and beneficial. Reloca-tion would adversely affect sur-rounding properties in historic district. However, relocation would provide reminiscent set-ting of Hamilton's time. Grange would lose status as contributing resource to historic district. Sensitive design of new Convent Avenue facility would maintain continuity in district. Moving the building would damage some historic fabric. However, resto-ration would more accurately reflect its visual and architectural design characteristics. Collections would be ade-quately protected, displayed, and/or stored intact onsite. Interpreting architectural in-tegrity and history of the Grange would be possible. Visual setting of existing location and St. Nicholas Park would be signifi-cantly changed. Despite ground-disturbing activities, no impacts on potential archeological resources would be expected. Relocation could cause a loss of a cultural and ethnic link to some of the African-American residents of the neighborhood. St. Nicholas Park does not retain its original integrity. The new location of Grange would not affect park's overall character-defining features or design. |

34

TABLE 3. SUMMARY COMPARISON OF IMPACTS (CONT.)

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| IMPACTS ON VISITOR USE | Current visitation could continue without concern for visitor safety. Wheelchair lift and programmatic accessibility would help ensure access for all visitors. Visitors could learn more about Hamilton and his accomplishments. Number of visitors would not be expected to increase. | With partial restoration, two refurnished rooms, additional exhibits and interpretive space, quality of visitor experience would be better than under alternative 1. Exposed steel framing system would intrude on visitor's perception of historic building. Climate control system would increase visitor comfort. Visitors would likely stay longer, although little if any increase in numbers of visitors would be expected. Wheelchair lift, elevator, and programmatic accessibility would help ensure access for all visitors. | With further restoration, four refurnished rooms, added interpretive space, media, and displays, and return of interior architectural integrity, offered visitor experience would be of a higher quality than under alternatives 1 and 2. Visitors would have a more accurate idea of what the interior of Hamilton's house was really like, and they could learn even more about Hamilton and his accomplishments and how he created his political career and financial fortune. Visitors would not have a sense of the house in the setting Hamilton knew. Number of visitors would likely increase significantly, and visitors would likely stay longer. Wheelchair lift, elevator, and programmatic accessibility would help ensure access for all visitors. | Significant increase (over other alternatives) in quality of visitor experience offered because of restoration of interior and exterior of the Grange, new exhibits, four refurnished rooms, and increased space for interpretation and commemorative events. The redeveloped Convent Avenue site would be available for community meetings and educational uses. Portions of St. Nicholas Park site would not be available for its present use. Universal programmatic accessibility would ensure that all visitors could enjoy site. Substantial improvement in NPS ability to convey early 19th century historical context and architectural significance and qualities of Grange as Hamilton's home and Hamilton the man. Number of visitors would likely increase significantly. |

35

TABLE 3. SUMMARY COMPARISON OF IMPACTS (CONT.)

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| **IMPACTS ON COMMUNITY USE AND FACILITIES** | Stabilization would ensure continued community use of and pride in the building. Church/National Park Service relationship would continue as is. Temporary noise and activity from building reinforcement might be bothersome for some neighbors. Continued measure of security to church due to proximity of Grange. | Impacts would be much the same as under alternative 1. Additionally, if rectory is developed as NPS visitor center, church operating budget could be affected. Church/National Park Service relationship would continue as is. Noise from elevator operation and temporary noise and activity from building reinforcement might be bothersome for some neighbors. Community would be less confident with contracted security personnel. | Impacts would be much the same as under alternatives 1 and 2. Church would give up potential use of property east of Grange. Additional community use space would be available. Temporary noise and activity from building reinforcement might be bothersome for some neighbors. Church members' sense of ownership and security would not be disrupted. | Overall positive impact on St. Nicholas Park — attracting investment and visitors and having NPS personnel present on the relocation and Convent Avenue sites. Development of NPS housing on existing site and 24-hour security at the Grange would increase site and overall community security. Proposed project phasing and fund acquisition would help alleviate community concerns that the project would not be completed. Noise levels and activity would temporarily increase during removal/construction and could be bothersome. |
| **IMPACTS ON LOCAL ECONOMY** | No significant change. | No significant change. | Retail sales, additional employment opportunities, and perhaps stimulation of new businesses that result from redevelopment of site would not be economically significant because development under this alternative would be relatively small. Number of visitors would be expected to increase, depending on efforts by community and other tourism-related organizations. | Potential for construction-related economic benefits would be slightly greater than described under alternative 3. Recovery of house's architectural and structural integrity would likely attract many more visitors. Visitor spending could increase, depending on nearby development and efforts of community and other tourism-related organizations. |

TABLE 3. SUMMARY COMPARISON OF IMPACTS (CONT.)

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| **IMPACTS ON TRAFFIC FLOW/ TRANSPORTATION** | No significant change; temporary loss of some parking area for construction contractors. | Same as alternative 1. | Increases in visitors arriving by bus or public transit would not have significant impact on traffic, but the difficulty for residents and visitors to find parking space would increase. | If existing parking area is identified at City College or in some other location, parking options for buses and private vehicles might improve and decrease demand and competition for available onstreet parking. If parking options are not identified, anticipated increases in visitation could create significant parking problems along adjacent streets. |
| **IMPACTS ON NATURAL RESOURCES** | No impacts. | No impacts. | Loss of grass for ramps and retaining walls; temporary disturbance of lot east of the Grange during excavation, construction, and structural reinforcement. After construction, some of this loss/disturbance would be restored because of new landscaping, including sweet gum trees. Current relatively natural scene changed to developed site. | About 0.91 acre of St. Nicholas Park would be irretrievably committed to relocation of the Grange. Some trees and grass would be lost, however, site landscaping would replace these resources. Some granite bedrock would also be impacted. Redevelopment of the existing site for community use and NPS ranger housing would not impact any additional natural resources. |
| **Impacts on Floodplains, Wetlands, Prime and Unique Farmlands, and Threatened and Endangered Species** | No impacts. | No impacts. | No impacts. | No impacts. |
| **IMPACTS ON NPS OPERATIONS** | No change. | No significant changes. More staff would be needed to monitor visitor use and protect and maintain the collections and displays. | Substantial new staff required to monitor visitor use and protect and maintain collections and displays, but no resolution of lack of affordable staff housing. Additional maintenance requirements but reduced space for maintenance activities. | Significant impact on daily operations because of additional staff and resources to interpret, protect, and maintain site and collections. Staffing limitations and maintenance inefficiency resolved in part. |

37

TABLE 3. SUMMARY COMPARISON OF IMPACTS (CONT.)

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|
| CUMULATIVE IMPACTS | None. | None. | No cumulative impacts on cultural resources. Could have positive beneficial cumulative economic effects if opportunities developed in conjunction with sites such as the Grange; however, associated additional costs for services (police protection, graffiti removal, street cleaning, etc). | Same as alternative 3. In addition, city, state, and other tourism-related businesses would be most likely to publicize the relocated Grange as a city visitor attraction. Adding the Grange to St. Nicholas Park would take the park further from its design intent but would enhance maintenance and security of the area. |
| UNAVOIDABLE ADVERSE IMPACTS | | | | Continuum of history represented by adaptive use of the Grange for religious purposes would be lost in the process of regaining its 1802-04 appearance. The Grange would be removed from Hamilton Heights Historic District and moved into St. Nicholas Park. |
| RELATIONSHIP BETWEEN SHORT-TERM USES AND LONG-TERM PRODUCTIVITY | | | | None. |
| IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RESOURCES | | | | Removal of historic fabric for elevator, fire stair, and concealed framing system would be irreversible. Excavation into bedrock in St. Nicholas Park would be irreversible. |

38

## ALTERNATIVES CONSIDERED BUT REJECTED

There has been a long history of efforts to find an appropriate setting for Hamilton Grange National Memorial. Those relocation efforts are described more fully in the "Affected Environment" section under "The Grange and Its History." During these past efforts, many relocation sites were considered, including the southern portion of the City College of New York campus, Riverside Park near Grant's Tomb, and Amsterdam Avenue at Hamilton Place. These sites were rejected because they were too removed from the Grange's present-day community or did not provide a substantially improved site.

At the beginning of the current planning process, a number of broad concepts were considered but rejected. These included relocating the Grange to its original site or reorienting it and restoring on or adjacent to its current site. Both of these alternatives would require the acquisition and demolition of major apartment buildings that are occupied. Besides the extraordinary acquisition and relocation costs, the loss of valuable housing in a community that has a stated need for housing was deemed unacceptable. Therefore, these alternatives did not receive further consideration.

Of the four alternatives that were considered in the draft plan, alternative 4, which relocates the Grange to St. Nicholas Park, had two options for what to do with the Convent Avenue site. The option of a vest-pocket park was considered and rejected because of a community concern that a park open space would leave a void in the neighborhood fabric / streetscape, attract vagrants, and support antisocial behavior. Therefore, the option to build a compatible structure on the site was selected.

AFFECTED ENVIRONMENT

## A BRIEF HISTORY OF HAMILTON

Alexander Hamilton was born in 1755 on the island of Nevis in the West Indies. Immigrating to America in 1773 to attend school at Kings College, currently known as Columbia University, Hamilton settled in New York. Because of the threat of British attack and the subsequent revolution, he deferred his schooling. Through his involvement in the war, he became one of George Washington's closest confidants, and in 1776 he became Washington's aide-de-camp. Hamilton later married Elizabeth Schuyler, daughter of the wealthy New York mayor and general, Philip Schuyler. Though Hamilton had arrived in New York with little money of his own, through his marriage and professional life the Hamilton family led a comfortable life.

In 1784, a year after the end of the war, Hamilton founded the Bank of New York, the first bank chartered in the state following the Revolution and still a powerful financial institution today. Resuming his law career and interest in politics, Hamilton became one of the most brilliant statesmen of early America. A proponent of a strong federal constitution, he published his opinions through articles known as the *Federalist Papers*. Along with coauthors John Jay and James Madison, Hamilton stated that a strong central government was absolutely necessary for the struggling new nation. In 1789 Hamilton was appointed the first secretary of the treasury of the United States. In this powerful position he created and implemented the first successful financial system for the nation. He continued in this position until January 1795 when he returned to his law practice in New York. In 1801 Hamilton founded a newspaper, *The New York Evening Post,* which is still published.

His business dealings were in the city of New York, but Hamilton wanted a haven in the country to escape the congestion and plagues of the city. He and his family bought 32 acres of land in what is now Harlem, outside the city, to build their country estate. Hamilton hired John McComb Jr. to build the house in the Federal architectural style. McComb, one of the first American-born architects professionally trained in Europe, later designed Castle Clinton, Gracie mansion, and the New York City Hall (with J.F. Mangin), as well as many of the most elegant city and country houses of the Knickerbocker elite. Construction on the Grange began in 1801 and was sufficiently completed for the family to move in in 1802. Hamilton decided to name his estate the "Grange," after an ancestral home in Scotland. Hamilton, with his wife and eight children, retreated from city life. Unfortunately, he did not enjoy the Grange for very long. In 1804 Hamilton was killed in a duel by long-time adversary, Aaron Burr in Weehawken, New Jersey. Thus ended the life of one of early America's greatest statesmen and founders of the United States' political and financial systems.

After Hamilton's death, his wife and family lived in the Grange until 1833. It later became the summer home for various affluent Manhattanites who wished to escape from city life to the suburbia of Harlem.

## THE SITE AND ADJACENT RESOURCES

### The Grange and Its History

As described in the above history, the Grange was designed as a country retreat, on a 32-acre tract that was away from the busy city. It was the only home that Hamilton ever owned. According to the NPS *Historic Structure Report* (1980), during the northward population expansion and development of upper Manhattan in the 1880s the Grange was threatened with demolition. The expanding migration of residents and resultant dwelling needs engendered a systematic, rectangular grid pattern of development, the layout of which ignored the boundaries of private landownership. The Grange, situated diagonally, did not conform to the proposed grid system. St. Luke's Episcopal Church, planning to move from lower downtown Manhattan, had decided on the upper Manhattan area near the Grange. The rector of St. Luke's, Reverend Issac Henry Tuttle, noticed the Grange in the area the church was interested in moving to and contacted Amos Cotting, the Wall Street broker who had invested in the development area of 143rd Street and owned much of the property. Cotting, a shrewd investor, recognized Tuttle's interest in the Grange and the benefit of donating the Grange to the church. In 1889, with the stipulation that the Grange be used as the church until the edifice of St. Luke's was constructed, Cotting moved the Grange approximately 350 feet southeast onto a piece of donated property near the future church (to its current site). St. Luke's purchased the five lots adjacent to the donated site, on the corner of Convent Avenue and 141st Street, for the permanent church. In 1889, the Grange was christened as an interim chapel. Services were held in the Grange until St. Luke's Church was completed in 1892.

Although relocated in 1889 to an undeveloped, open area, the subdivided lots were not large enough to have the Grange's original front door face Convent Avenue. The Grange was turned sideways, with the original front door facing south, and the original back facing north. The original front and back porches also had to be removed. To use the Grange as a temporary chapel, the church moved the large original front door to the southwest corner, facing Convent Avenue and closed the old door opening with a blank wall. The front hall and stairway from the first and second stories was also changed for church uses. Steps were added to the west side, along with wooden pillars at the top of the steps and a walk to Convent Avenue. A basement and partial subbasement were built in 1889 as support for the house and to provide more space. After the move, apartment buildings and houses were built up around the Grange.

By 1894, the Grange showed the effects of the move and its age. Repairs for structural damage and deterioration would be costly. Several members of the church believed that the house was no longer needed and was not worth the money required for the repairs. Reverend Tuttle, intent on avoiding the removal of the house, raised the money and made the repairs. After Tuttle died in 1896, several changes were made to the house; a portion of the house was used as a day school until 1909. As the condition of the Grange continued to deteriorate, a movement began to preserve the building and establish it as a memorial to Hamilton.

In 1901, steps were taken to bring attention to the Grange and the need for its preservation. Through the efforts of Alexander Hamilton Post, a bill was introduced to the state legislature for the purchase of the site and the house for it restoration. The bill was not passed, but the feeling remained that the house needed to be preserved. When the issue resurfaced years later, the American Scenic and Historic Preservation Society became involved. The society's

AFFECTED ENVIRONMENT



The Grange in 1888 (Manhattan Sites collection).

executive secretary Dr. Edward Hall, a leader in the early preservation movement, talked with St. Luke's about saving the Grange. Correspondence between the two groups proposed the transfer and care of the property to the society. World War I discontinued negotiations, but by 1924 the property and the house were deeded to the society. Maintenance of the Grange, including efforts to relocate the house for restoration purposes, continued by the society until 1962 when the Grange became part of the national park system.

In 1951, when the Grange was still under ownership by the American Scenic and Historic Preservation Society, relocation of the house to a more appropriate site for restoration was considered. An architectural historian from Columbia University, Talbot Hamlin, corresponded to the American Scenic and Historic Preservation Society about the location of the Grange and possible relocation sites. It was felt that the house needed to be accessible to visitors and that the architectural design and features be visible, not wedged between two buildings. Hamlin felt that the house should be relocated within the vicinity to maintain contextual continuity and that some of the topographical qualities of the new site reflect the original site. Some of the suggested relocation sites included (1) an area just south of the Cloisters, (2) within Riverside Park, north of Grant's Tomb, and (3) the Manhattanville campus of City College. It was also suggested that the apartment buildings directly north of the Grange be removed so the house could have been repositioned away from the church and remain on its current site. None of these options were chosen and the Grange remained adjacent to St. Luke's Church.

Discussions on the relocation of the house subsided, but the issue was never dismissed. When the Grange became a unit of the national park system in 1962, it was legislated that the house should be "preserved in a fitting setting." In the 1960s (1960-67), deliberations about relocation continued. The sites considered were all in the vicinity of the current location, keeping the Grange within the Hamilton Heights neighborhood. These locations afforded more room for restoration of the building, as well as an opportunity for visual clarity and more appropriate surroundings. These sites included (1) the north end of St. Nicholas Park, along 141st Street, (2) the campus of the City College of New York at West 138th Street, and (3) the north side of 141st Street and Edgecombe Avenue, east of St. Luke's Church. None of the proposed sites resulted in the relocation, and in 1980, a feasibility study (Meadows Woll Architects) was prepared to analyze additional locations and the relocation effort itself.

At 287 Convent Avenue, the Grange today is in Hamilton Heights, a part of Harlem in upper Manhattan — one block north of the City College of New York and three blocks east of the Hudson River. The apartment building on the north (erected in 1921) actually touches the Grange, and the permanent St. Luke's Church building (completed December 18, 1892), is just a few feet south of the Grange. The church obstructs the original front of the house. Hamilton Grange has been used by local groups such as the Hamilton Heights Homeowners Association, for meetings.

A commemorative statue of Hamilton was designed by American Beaux Arts sculptor William Orway Partridge and created in France in 1892-93 for the Hamilton Club of Brooklyn. With the 1936 demise of the club, the statue was relocated to the Grange.

The cultural resources of the site are the house itself and the Hamiltonian collection in storage at Federal Hall. The NPS collection is very limited; most of Hamilton's collection is owned by the Smithsonian Institution and various museums throughout the country and in New York, such as the New York Public Library, the Museum of the City of New York, and the New York Historical Society, as well as private collections. The existing location of the Grange is historic as it relates to St. Luke's Church and is an integral element to the Hamilton Heights Historic District.

Hamilton Grange was established as a national historic landmark in 1960 and as a national memorial on April 27, 1962 (76 Stat. 57). (The Grange was also listed on the National Register of Historic Places on October 15, 1966, with historical documentation to follow on March 25, 1977.)

## An Architectural History of the Grange

The three-bay, two-story wooden building was designed in a restrained Federal architectural style, with identical north and south elevations. The house had entry doors on two opposing sides and broad porches on two opposing sides; coupled with the siting, this opened the house to all sides and gave distant views in all directions. Such symmetry and equality between opposite facades downplay the idea of front and back, making it an object to be viewed in the round. The concept of the geometrically perfect villa set in a landscape was an ideal of the Palladian revival in England and was a very popular motif for American designers of the period.

AFFECTED ENVIRONMENT

Hamilton Grange was designed by John McComb Jr., one of the leading New York architects of this period. Although significantly altered, it is one of a very few surviving examples of his domestic architecture. According to Fiske Kimball, the noted American architectural historian, both the octagonal rooms at the Morris-Jumel mansion, at Monticello, and those at the Grange were derived from Morris' *Selected Architecture*, written in 1759. Once completed, Hamilton Grange was on a par with other elegant country homes in the area, such as the Van Cortland and Gracie mansions.

The Grange was a two-story house on a half-raised English basement, which originally contained the family kitchen, family dining room, ironing room, and storage areas. The original basement exterior walls were ashlar sandstone (possibly brownstone). The two upper stories are wood frame, with clapboard siding on the east, north, and west walls and flush siding on the south wall, which was originally the entrance facade. A simple Doric entablature surmounts all four elevations. Photographs from the mid 19th century, supported by correspondence between McComb and Hamilton, show a carved wood balustrade surrounding the perimeter of the main roof, as well as on all the porch roofs. It is not possible to tell whether this balustrade is McComb's design or if it was a later addition. The balustrade was removed from all roofs in the 1930s.

The main floor level, one-half story above ground, contained the formal public rooms of the house — the entertainment and living area. The front door was centered on the south elevation, reached by a half flight of stairs leading to a columned porch. This entrance was lost in 1889 when the house was moved; the entrance hall and stair were altered by the architect Alexander McMillan Welch for use by St. Luke's Church.

The most distinctive features of the house are the connecting octagonal drawing room and dining room at right angles to the (original) entrance hall. The exterior walls of these octagonal rooms form bay windows projecting onto broadside porches or piazzas. Floor-to-ceiling triple-hung windows in the bays were common by the early 19th century for porches and porticoes for providing access to the porches because the small sashes slide up in a compact manner to permit passage to the porch. These long windows also allow maximum daylight to enter the two rooms and would have provided excellent views that, when on the original site, looked to the East River in one direction and the Hudson River palisades in the other. The two octagonal rooms are connected by a doorway originally outfitted with mirrored doors like those at the Nathaniel Russell house at Charleston. These doors, when closed, reflected light and exterior views entering from the bay windows. Fireplaces, which provided heat and light, were in all but two small rooms on each of the first and second floors, and there were hardwood floors and balustrades.

The staircase originally stood where the front door is now, in a separate room adjoining the original entrance hall. It was repositioned in 1889, and the ceiling between the upper hall and the entrance hall was removed to make a two-story stair hall. The second floor of the house contained the private living area, the bedrooms, and the plan of this floor has changed little except that the two small north rooms with a bathroom and hallway between them were originally one long room.

The existing interior millwork, molding, and plasterwork throughout the house are mostly original. Restrained and elegant, this work shows evidence of an Adamesque influence. Most distinctive are the three arched openings, especially the south arch adjacent to the entrance

hall, with its elegant, attenuated garlands and acanthus leaves made of composition material. The fireplaces were originally Italian statuary marble mantels; these were removed by James Hamilton III and installed in "Nevis," his Greek Revival style country home (built in 1835) in Irvington, New York. These mantels were simply carved, in a very restrained but slightly elongated manner. The two marble mantels in the octagonal rooms are not original.

Originally, the front door with its sidelights and half-round transom, and the tripartite window in the second-floor stair hall were part of the same composition, forming an elegant millwork feature to mark the front entry. The front door was moved to the west elevation, but is made up mostly of original parts. Its sidelights were once identical to the delicate, curvilinear mullion pattern that still exists in the tripartite hall window. The center window in the tripartite composition is another triple-hung unit.

### The Grange and the Church

St. Luke's Church and the Grange have had a long and complementary relationship since the house was donated to the church in 1889, and many church members have a sense of ownership in the site. The Grange location and its NPS management have benefitted the church through periodic maintenance and onsite security. Visitors to the Grange often become interested in the church and its history while visiting the Grange.

St. Luke's owns about 5,400 square feet of property, vegetated with grass, directly behind the Grange (east) on Hamilton Terrace. The property is maintained and mowed periodically by the church. The church also owns a rectory in the building that is north of the lot behind the Grange, which the church has suggested they might make available to the National Park Service.

### The Relationship of the National Park Service and St. Luke's Church

The National Park Service and the church have a good relationship, and the National Park Service is often invited to participate with the congregation in programs of mutual interest. The National Park Service lends maintenance support when requested or needed. The church is included in NPS interpretive programs and literature.

### Hamilton Heights Historic District

Much of the area surrounding the Grange has been listed on the NPS National Register of Historic Places as Hamilton Heights Historic District to recognize the various architectural styles and development in the area during the period of 1886-1906, with some examples extending to the 1930s. The district, which has also been designated by the city as a landmark district, includes the area roughly between West 140th and West 145th Streets and Amsterdam and St. Nicholas Avenues. Hamilton Grange is a contributing resource to this district.

AFFECTED ENVIRONMENT

### Traffic and Transportation

There are no traffic counts available from the New York City Department of Transportation for the Hamilton Grange vicinity. Traffic in the area is primarily local, substantially increased by City College students and faculty on weekdays. Traffic on two-lane 141st Street is particularly heavy because it is the first crosstown street north of 125th (see Regional Developments map).

Visitors can access the Grange using private vehicles, although parking is limited. Area parking for local residents is primarily on the street, and demand exceeds the available spaces. The only parking available for visitors to the Grange is also on the street, and visitors compete with residents for parking spaces.

Public transportation is also available by bus or subway. Buses run daily along streets near the Grange, including St. Nicholas and Amsterdam Avenues and 135th and 145th Streets. Stops generally occur every two to three blocks. There is a no-parking zone in front of the Grange/church where tour buses park. Four subway stops are within walking distance of the Grange (see Regional Developments map).

### City Department of Parks and Recreation

The National Park Service has a long-standing cooperative relationship with the city Department of Parks and Recreation due to the presence of two of the historic sites (Castle Clinton and General Grant) in city park areas. Recently the Park Service has assisted the city parks in preparing environmental education information related to St. Nicholas Park.

### VISITOR USE AND INTERPRETATION

The six Manhattan sites offer a unique cultural experience for the visitor. Each site represents and interprets a significant individual or event in the history and formation of the United States, including New York State and New York City. Opportunities for visitors to understand and learn about each site and its significance are available through interpretive displays, heritage education programs, and various cultural activities. These opportunities are currently offered by the National Park Service, as well as by other government and private entities within and adjacent to the different sites.

Manhattan Sites have more than 3.5 million visitors per year. Along with the Statue of Liberty, Ellis Island, the six sites offer tourism opportunities to local, national, and international visitors. Visitors come to see the Grange as well as other tourist attractions in the area such as the famous 125th Street shopping district, Grant's Tomb, the Apollo Theater, the National Black Theater, the Schomburg Library, the Studio Museum, and the Morris-Jumel mansion.

Visitor access to Hamilton Grange has been restricted due to the unsafe structural condition of the building; the building has periodically been closed to visitor use for various repair and



EXISTING LOCATION OF HAMILTON GRANGE NATIONAL MEMORIAL

PROPOSED LOCATION OF HAMILTON GRANGE NATIONAL MEMORIAL

ST. NICHOLAS PARK

STRIVERS CENTER DEVELOPMENT PROJECT

GENERAL GRANT NATIONAL MEMORIAL



No Scale



City College of New York



Metropolitan Transportation Authority

# Regional Developments

United States Department of the Interior / National Park Service
DSC / Aug 1994 / 416 / 20031

AFFECTED ENVIRONMENT

rehabilitation projects. There are no provisions for visitors with disabilities at the Grange. Also, the lack of visitor parking space affects visitation levels

Exhibit space and the quality of exhibits are limited due to poor security, failing house structure, and an inadequate heating/ventilating/air-conditioning system. These conditions also limit the Park Service's ability to provide full interpretation and exhibits about Hamilton and his life and influence on our country's financial and political foundations.

### Existing Facilities

The subbasement houses the heating and hot water systems for the building and is used for storage, a maintenance workshop, and a breakroom for park staff. The basement, with an information desk, a small book sales area, public restrooms and phone, a small theater/meeting room, exhibit space, and staff room is used as the visitor contact area. Basement entry is from the Convent Avenue (west) side of the building by way of steps that descend one-half level. Interior stairs lead from the basement to the first floor where the tour of the house is conducted. The first floor has seven rooms and is used for exhibit space and interpretation of Alexander Hamilton's contribution to the formation of our nation and its monetary system. This floor shows the style of architecture of the period — with high ceilings and floor-to-ceiling windows that allow efficient cooling of the house in the summer.

The second floor is not accessible to the public; the wood-frame structure was built for a family, not to accommodate present-day visitors. This floor is used for staff office space and storage, and there is also much space that could be used to enhance the visitors' experiences if structural reinforcement was done to accommodate visitor loads. The attic is an open space that is not used.

### Visitor Use Data

The number of visitors per year at Hamilton Grange National Memorial is shown below. No analysis of park visitors (hometown, length of stay, age, makeup of group, interests, activities, etc.) has been conducted for the site. Except for participants in specific programs, little is known about the types of visitors using the site. However, Hamilton Grange attracts many visitors because of the importance of Hamilton's writings in Europe. The number of visitors may increase in the future because of special events, community outreach efforts, the Junior Park Ranger program, and bus tours.

The condition of the building and other interior infrastructure problems have affected visitation over the past years. Portions of the house have been closed because of structural problems and the Park Service's inability to ensure a safe and enjoyable visit. The entire house has been closed to the public since June 1992 because of safety factors.

48

TABLE 4. NUMBER OF VISITORS PER YEAR

| Year | Visits/Yr. | Year | Visits/Yr. |
|------|-----------|------|-----------|
| 1983* | 2,653 | 1988 | 46,361 |
| 1984 | 9,163 | 1989 | 38,036 |
| 1985** | 19,840 | 1990 | 28,117 |
| 1986 | 42,798 | 1991 | 41,372 |
| 1987 | 48,107 | 1992 | closed since June |

\* Area was only open part of the year.
\*\* Counting procedure changed.

## AREA LAND USE AND RESOURCES

The area around the Grange is mostly residential, containing townhouses and apartments (see Locations map). The City College campus of City University of New York is just south of the site. Hamilton Heights Historic District, which is irregularly bound by West 140th and 145th Streets and St. Nicholas and Amsterdam Avenues, includes Hamilton Grange and other buildings significant for the various styles of architecture. Revitalization efforts, funded through capital from the city budget and through federal community development block grants, have occurred within the district. Recent capital improvements, including granite curbs, tinted cement, and tree plantings, were made to Convent Avenue (which runs in front of Hamilton Grange) from West 141st to West 145th Street.

The city grid generally accommodated residential properties on streets and commercial activities on the avenues. Convent Avenue is lined with residential townhouses and buildings. Other avenues, such as Amsterdam, are lined with buildings that contain commercial businesses on the ground floor and apartments on upper floors. These avenues are often zoned for mixed uses. Examples of businesses on Amsterdam in the vicinity of Hamilton Grange include bodegas (small grocery stores), printers, a travel agency, a bike store, a pizza store, and a millinery shop (Hamilton Heights Homeowner's Association, Ron Melichar, past president, pers. comm., August 26, 1992).

### Proposed Development

Several development proposals, discussed below, exist in the vicinity of the Grange; these developments could affect or positively interact with NPS sites such as the Grange and Grant's Tomb. Because New York City tourism is a $12 billion industry annually, an important economic objective of these projects is to attract additional visitors to New York City and to encourage visitors already in New York to stay an additional day and visit sites in the Harlem area. Other important objectives include improving the quality of the area and capturing additional local consumer spending.

**Harlem-on-the-Hudson.** A development, known as the Harlem-on-the-Hudson project, has been proposed in western Harlem on the piers at 125th Street and the Hudson River. The proposed development is identified by Community District #9 as the last remaining major

AFFECTED ENVIRONMENT

development opportunity in the community. Both private and public agencies have studied the site and recommended a variety of plans. Among these are a modernized food market that would include meat, fresh fruits and vegetables, and possibly fish and fresh flowers. The market would not only provide jobs, but also healthy food services. The development could also provide open space and recreation by connecting the development with Riverside Park and potentially reestablishing the recreation pier that once served Harlem. Recreational and cultural opportunities could complement the development and existing parks, provide services for residents, and function as an attraction for New York visitors.

**Strivers Center Development Project.** A mixed-use entertainment and cultural complex is in the initial stages of development along 135th Street west of Adam Clayton Powell Jr. Boulevard and St. Nicholas Park in Central Harlem (about six blocks south of the Grange — see Regional Developments map). Three city blocks have been proposed for redevelopment along the street, which in the 1920s and 30s was the entertainment center of Harlem, to provide jazz clubs, restaurants, boutiques, some affordable housing, and the Jazz Hall of Fame Museum.

The first phase of the project, known as Striver's Plaza, is underway and includes the renovation of eight vacant buildings to create residential and retail space. An extension of the commercial zone is also being requested along 135th Avenue to St. Nicholas Avenue to allow for continuous retail space.

A landscape design for the section of St. Nicholas Park at 135th Street is also in process. Design elements being considered include wider sidewalks, trees, and new light fixtures.

### New Developments

**Riverbank State Park.** Dedicated on May 27, 1993, this state park is new to the Harlem community. Built on top of a controversial sewage treatment plant for Manhattan's west side, the park was in various stages of planning for 25 years. The park is unique in several ways: first, it is an urban contemporary park that provides a wide range of recreational experiences for Manhattan residents and visitors, and, second, it is clearly designed for the Harlem neighborhood in which it is situated. Community representatives (e.g., community boards and other organization members) were involved in the planning process and continue to be involved in day-to-day development decisions at the park. In addition, many of the park staff are from the surrounding community, which provides positive local economic benefits. This park appears to provide an excellent role model and foundation for success from which the National Park Service can learn and build on with the planning for and restoration of Hamilton Grange.

### St. Nicholas Park

**The Site.** St. Nicholas Park, owned by the city Department of Parks and Recreation, is a parcel of land that was reserved as park land during the urban development of New York City. Along the west side of St. Nicholas Avenue between 128th and 141st Streets, this narrow linear park is built on a portion of the rugged topography and rock outcroppings that extend

50

from 110th to 155th Streets and was designed in the 1900s by Samuel Parsons Jr., a horticulturist by family tradition and a landscape architect by training.

St. Nicholas Park is part of the same topographical ridge as Central Park and Morningside and Jackie Robinson (Colonial) Parks, which are also narrow linear parks that have been defined by the geological formation of the land. In the early 1900s, with urban expansion into northern Manhattan, areas that could not easily be developed were left vacant. Recognizing the potential of future development, the Department of Parks used some of these areas for park land. In his book *Landscape Gardening Studies* (Parsons 1910), Samuel Parsons Jr. described his work and several designs throughout New York. Parsons felt that St. Nicholas Park, created on a precipitous section of land and forming a natural barrier between two portions of the city, was a "noteworthy" example of the design using this type of topography. Parson's design intent was for it to be a place to stroll and escape from urbanization. Designing in the Picturesque style, Parsons kept the natural topographical basis of the property, blasted some areas, and filled others to provide level areas for the lawns and paths. Using the design philosophy expressed in Central Park, the planting design for St. Nicholas enhanced the natural features of the landscape while providing the borders for a flowing pedestrian circulation pattern.

With time, many elements were introduced to the park that were not part of the original design. In the 1930s playgrounds were added to the east side and north end, and a large playground was added to the southern end at 128th Street at a later time. Ball courts and comfort stations were added along St. Nicholas Avenue, the east border of the park, causing part of the path system to be relocated. In the 1960s the City College of New York constructed the nine-story Steinman Hall on the corner of 141st and Convent Avenue, where a 2½ story stone building existed. Other changes included regrading and replanting several areas throughout the park, the periodic replacement and removal of the paving materials for the paths, and the addition and subsequent removal of some swimming pools. Although most of these additions were made to the peripheral boundaries of the park, they introduced visual intrusions to the park's natural setting as well as to the original design. The additions of the ball courts and playgrounds were not in keeping with Parson's original intent.

A determination of eligibility for the National Register of Historic Places was prepared by the National Park Service in August 1994 to assess the significance and integrity of St. Nicholas Park. Samuel Parsons Jr. was an important figure in the history of American landscape architecture. St. Nicholas Park is a noteworthy example of its style, and it retains some of its character-defining features (such as the circulation pattern). However, only a few specimen trees from the Parson's planting plan remain, and most of the existing vegetation was planted later or grew voluntarily. Considering the loss of Parson's design intent and planting scheme and the substantial intrusions and additions described above, the state historic preservation officer, in consultation with the city Department of Parks and Recreation and the National Park Service, determined that the park does not possess its original integrity and is therefore not eligible for listing on the national register (see appendix I, letter dated September 1994).

The northern section of the park, along 141st Street, is the location being considered for permanent relocation of the Grange (alternative 4). The area of interest slopes sharply from west to east with the ridge occupied by City College on the west side. East of Steinman Hall is a small bench of land, approximately 50 to 60 feet wide at its widest point, on which the Grange could be relocated. From the bench, the land drops off steeply leveling off as it meets

AFFECTED ENVIRONMENT

St. Nicholas Avenue. A path, now unpaved but part of the original circulation system, meanders through the proposed area of relocation, meeting a set of stairs that also survive from Parson's design.

The park land surrounding the potential site contains various natural resources. Outcroppings of granite, although manipulated by man, mark the passage of ancient glaciers. Plants and animals that live in this heavily urbanized area include oak, maple, locust, dogwood, hawthorn, and Japanese cherry trees, grasses, rhubarb, ivy, honeysuckle, squirrels, rats, pigeons, starlings, and a variety of songbirds. Two playgrounds and handball and basketball courts are in the park, and Boy Scout and Police Athletic League activities also take place in the park. These activities occur along the narrow, level portions of the park that adjoin St. Nicholas Avenue. Remnants of illegal drug activities such as crack vials are evident on the park stairs near the proposed relocation site. Homelessness, vandalism, litter, graffiti, and noise are evident throughout the park.

## SOCIOECONOMIC ENVIRONMENT

Hamilton Grange National Memorial is in the Harlem section of New York City. New York City occupies 321.8 square miles and supports a population of 7.3 million. Manhattan, which supports a population of approximately 1.49 million, is an island bordered by the Harlem and East Rivers on the north and east, the Hudson River on the west, and the upper New York Bay on the south. Manhattan is divided into 12 community districts, which are administered by community boards. These boards represent the needs of their community and serve in an advisory capacity to the New York City council and mayor. Hamilton Grange is in district 9.

Because of the neighborhood characteristics and availability of data by district, general socioeconomic information that relates to Hamilton Grange is presented below by district. The following information was abstracted from the *Community District Needs* report for fiscal year 1993.

Community district 9 borders the eastern shore of the Hudson River and the Henry Hudson Parkway between Cathedral Parkway and West 155th Street. The district, commonly known as West Harlem, is 1.5 square miles. The residential population in the area is ethnically and economically diverse and includes many of New York's most affluent African-Americans. Industrial and commercial tax lots account for only 9% of the total lots in the district; the remainder are generally residential.

The area includes Columbia University, the City College campus of City University of New York, Bank Street College, Grant's Tomb, and three distinctive neighborhoods known as Morningside Heights, Manhattanville, and Hamilton Heights. Hamilton Grange is in Hamilton Heights in the northernmost portion of the district. Containing a substantial number of owner-occupied brownstones, particularly in the area surrounding Hamilton Grange and St. Luke's Episcopal Church, this area is known as the Hamilton Heights Historic District. The remaining area outside the historic district contains some vacant city-owned buildings and an increasing number of small businesses.

District 9 shares some concerns with many other districts, including transportation, parks, homelessness, deteriorating infrastructure, and other related concerns. The community is fortunate to have over 75.3 acres of park land, most of which surrounds Grant's Tomb.

A concern unique to district 9, which potentially affects Hamilton Grange and its future management, is local economic development opportunities and the education levels and literacy of the local work force. This area of Harlem may be described as economically isolated and is characterized by high unemployment rates, large numbers of dislocated and discouraged workers outside the labor force, large numbers of working poor, and a high percentage of the community who are dependent upon public assistance for survival. The working population is dominated by individuals who earn less than $10,000 per year and have limited English language skills. The average waiting time for entry into an adult literacy or English as a second language course exceeds one year. Also affecting the working population is the decline in light industrial manufacturing activity in Harlem. Much of the existing industrial space is being converted to industrial storage space, which creates one job per 20,000 square feet versus the average of one job per 200 to 300 square feet for industrial businesses. Because of such economic losses, the community is looking for new development and job opportunities and thus is highly interested in future plans for Hamilton Grange (and Grant's Tomb).

## ETHNOGRAPHIC RESOURCES

Ethnographic resources are those cultural and natural resources of ongoing significance to contemporary groups that have traditional ties to and associations with the resources. The nearly 100 years through which Hamilton Grange has been on its Convent Avenue site has resulted in strong associations with neighborhood residents and in particular the clergy and parishioners of St. Luke's Church. In the minds of many residents, the associations with the Grange give the Hamilton Heights neighborhood its distinctive identity. Furthermore, its presence in the neighborhood is seen as having a stabilizing effect preventing the kind of deterioration that has been seen in other nearby neighborhoods.

Throughout the planning process for this management plan, community residents have expressed a sense of proprietorship of the Grange. Barbara Lund, in *Hamilton Grange and Its Contemporary Harlem Community: A Composite Sketch, 1993*, reports on the community's "sense of having taken special responsibility for that building, of 'looking out' for it, . . . of 'watching over it.'" Many of the residents who have this sense of guardianship are African-Americans for whom Alexander Hamilton's Caribbean roots provide a cultural link between their community and the Grange. It is felt that the Grange symbolizes a piece of the African-American ethnic heritage in the founding fathers' roles in the development of the country.

These traditional associations between the Hamilton Heights neighborhood and Hamilton Grange are of continuing importance to the sense of identity and cohesiveness in the community. A better understanding of the traditional associations and a continuation of those associations will be important to the successful restoration, rehabilitation, and preservation of the Grange, particularly in a new location. The formation of the Friends of Hamilton Grange group will be an important factor in encouraging the continuation of traditional associations.

AFFECTED ENVIRONMENT

## NATURAL RESOURCES

### Air Quality

Hamilton Grange National Memorial is classified as class II area under the Clean Air Act (42 USC 7401). Under this classification, maximum allowable increases (increments) in sulfur dioxide ($SO_2$), particulate matter, and nitrogen oxides ($NO_x$) cannot be exceeded. These increments allow for modest industrial growth in the vicinity of the memorial.

Hamilton Grange is within the New Jersey-New York-Connecticut Interstate Air Quality Control Region. Data from the New York State Department of Environmental Conservation, Division of Air Resources, was collected from 26 air monitoring stations in the borough of Manhattan. Dated June 30, 1992, this data indicates that emissions in Manhattan are within the national ambient air quality standards (NAAQS) for $SO_2$, nitrogen dioxide ($NO_2$), and lead; however, emissions of carbon monoxide and ozone exceed these national standards (New York Department of Environmental Conservation, Bureau of Abatement Planning, Mike Cronin, pers. comm., 1992). Particulate matter (PM-10) is currently unclassified, usually indicating a lack of monitoring data.

### Geology

The geologic grouping known as the New York City Group underlies the island of Manhattan. Members of this grouping include the Manhattan formation, the most common rock in the grouping, which overlies the Inwood marble and the Fordham gneiss. The Manhattan formation, metamorphic gneissic schist, is the bedrock foundation that supports the weight and height of the Manhattan skyscrapers and that is found throughout Manhattan in numerous conspicuous outcrops. These outcrops are seen in places such as Central Park and other natural areas throughout Manhattan. The outcrops in St. Nicholas Park may be one such area.

### Soils

The Soil Conservation Service does not survey Manhattan. It is assumed, since the sites are in a highly urbanized area, that the soils are suitable for development.

### Climate

The New York City metropolitan area is in the vicinity of most storm and frontal systems that move from west to east across the North American continent. Because most storms approach from the west, New York City can have higher temperatures in summer and lower temperatures in winter than would normally be expected in a coastal area.

Although continental influences predominate, oceanic effects are also present. Local sea breezes moderate the afternoon heat in summer and add to the warming effect of the heat generated by the city in the winter. The small average daily variation in temperature attests to the influences of the ocean.

Average yearly temperature varies from a low of 46.9° F to 62.2° F. Highest and lowest average temperatures occur in July (85° F) and January (26° F), respectively. Average relative humidity varies yearly between 56% and 72%, depending on the time of day. Humidity reaches a high of between 75% and 80% in the early morning hours throughout most of the summer and early fall. Precipitation averages 44 inches annually.

### Vegetation/Wildlife

The lot to the rear of the Grange is vegetated with grass and weeds. A variety of plant species exist in St. Nicholas Park, including oak, maple, locust, dogwood, hawthorn, and Japanese cherry trees, grasses, rhubarb, ivy, and honeysuckle. Predominant animal species include squirrels, rats, pigeons, starlings, and a variety of songbirds.

### Federal and State Threatened and Endangered Species

Consultation with the U.S. Fish and Wildlife Service office in New York revealed that, except for occasional transient species, no federally listed or proposed endangered or threatened plant or wildlife species exist within the boundaries of Hamilton Grange or St. Nicholas Park (see appendix K).

Consultation with the New York State Department of Environmental Conservation indicated that historically there may have been habitat for several rare plant species in the area of the Grange. However, because of the urbanization of Harlem over the past 100 years, this habitat has been permanently altered. The State Department of Environmental Conservation says that the possibility of a rare species occurring is highly unlikely; therefore onsite surveys are not required for the Grange (Significant Habitat Unit, Latham, New York, Steve Young, botanist, pers. comm. 1992).

### Floodplains and Wetlands

There are no wetlands or floodplains at Hamilton Grange National Memorial.

### Water Quality

There are no water bodies close to the Grange that would be impacted by any of the proposed alternatives.

### Prime and Unique Farmlands

There are no prime or unique farmlands at Hamilton Grange National Memorial.

## ENVIRONMENTAL CONSEQUENCES

This section presents the environmental impacts of the alternatives. This discussion of impacts provides the scientific and analytic basis for comparison of the alternatives. A summary of the environmental impacts is presented in table 3 in the "Alternatives Including the Proposed Action" section.

## IMPACTS COMMON TO ALL ACTION ALTERNATIVES

### Impacts on Cultural Resources

Because the historic landscapes from the 1802-04 and the 1889 periods of significance no longer exist, the actions of these alternatives would not impact the Grange's historic landscapes.

### Impacts on Natural Resources

Because Hamilton Grange is in a highly urbanized section of Harlem with few significant natural resources, impacts on floodplains, wetlands, prime and unique farmlands, and threatened and endangered species would not occur under any of the four proposed alternatives. The State Department of Environmental Conservation says that the possibility of a rare species occurring is highly unlikely; therefore, onsite surveys are not required for the Grange.

There are no water bodies close to the Grange that would be impacted by any of the proposed alternatives; therefore, water quality is not discussed except in terms of stormwater runoff.

During stabilization and construction work, temporary and minor increases would occur in fugitive dust and vehicle exhaust from construction equipment and activities.

### Impacts on Community Uses and Facilities

Stabilizing, restoring, or moving the existing building would ensure that Hamilton Grange remains as a resource for the adjacent community. Local groups using the facility would be able to safely continue using a multipurpose meeting room under all alternatives. Without stabilization or restoration, the declining integrity of the structure would prevent future visitor and community use.

The Friends of Hamilton Grange group would foster communication between the National Park Service and the local community. The involvement represented by this group in the future planning and restoration of the Grange could help maintain and enhance community pride in Hamilton Grange as a site as well as in Hamilton himself.

**Impacts on Parking**

Parking would continue to be a problem in all alternatives — less so in alternative 1, more so in alternatives 2 and 3, and most in alternative 4, because of visitor use. However, because the National Park Service and the Friends of Hamilton Grange group would work with City College to identify existing parking spaces at the college for Grange visitors, some parking problems might be alleviated. Except in alternative 3, no designated onstreet bus parking would be provided, and buses would have to drop-off visitors and find available parking. However, the no-parking zone in front of the house/church could still be used by tour buses as it is currently.

## ALTERNATIVE 1 — NO ACTION / CONTINUATION OF EXISTING TRENDS

**Impacts on Cultural Resources**

**Impacts on Historic Structures and Properties.**  Under alternative 1 there would be minimal impacts on the building by the addition of stabilization materials and the addition of an exterior wheelchair lift. These improvements would introduce nonhistoric fabric, but they would be designed so that architectural integrity of the building would not be jeopardized. Any historic fabric lost during stabilization would be recorded according to NPS standards; modern construction materials might be needed for stabilization efforts, and visitors might be aware of stabilization measures. Compared to the other alternatives, there would be minimal impacts on the building interior due to stabilization.

All of these changes, along with the double porch that is not original to the house, create a greatly misleading impression of what was a pioneering and noteworthy example of early American Neo-Classicism. The Grange would be virtually unrecognizable to Hamilton or McComb.

**Impacts on Museum Collections.**  Without air-conditioning and temperature/humidity control and fire suppression system, museum artifacts could not be displayed. Objects and artifacts of the collection would be stored offsite, where there would be adequate climate control, security, and fire suppression systems.

**Impacts on Architectural Integrity.**  The house cannot be interpreted or understood as a significant architectural resource in its existing location. The relocation and rearrangement of the house's entry and orientation has resulted in a significant loss of architectural integrity.

**Impacts on the Cultural Landscape.**  There would no impacts on the cultural landscape.

**Impacts on Visual Resources.**  The house would not be restored to a setting that is more reminiscent of its original setting.

**Impacts on Archeological Resources**.  Because no ground-disturbing activities are proposed, the possibility of disturbing any archeological resources would be unlikely.

ENVIRONMENTAL CONSEQUENCES

**Impacts on Ethnographic Resources.** Because the house would remain in its current location and existing uses would continue, there would not be any impacts on ethnographic resources.

### Impacts on Visitor Use

Stabilization of the Grange would enable current visitation levels to continue without concern for visitor safety. The wheelchair lift and programmatically accessible interpretive media (see appendix E) would help ensure universal accessibility. Visitors could learn more about Hamilton's life and time because of upgraded exhibits and reproduction furnishings, which would potentially enhance the quality of the visitors' experiences.

Improvement to the Grange under this alternative would likely not be enough encouragement to city, state, and other tourism-related groups to promote it as a worthwhile visitor attraction. There would be no expected increase in visitation — except perhaps minor increases due to house stabilization and NPS programs.

### Impacts on Community Use and Facilities

Stabilizing the existing building would ensure that Hamilton Grange remains a community resource and a source of community pride. Local groups using the facility would be able to safely continue using the theater/meeting room. Future community use of the building might not be possible without stabilization.

The relationship between the Grange and St. Luke's Church would remain as it currently exists. The proximity of the Grange to the church would continue to provide a measure of security for the church, particularly with the improved security system.

Based on comments received during scoping, the congregation of St. Luke's Church has a sense of ownership of the Grange and perceives a value from its current location. This alternative would not disrupt members' sense of security and ownership.

Temporary noise and activity from building reinforcement might be bothersome for some neighbors.

### Impacts on the Local Economy

Stabilization of the Grange would not result in any significant changes to the local community or community use in the vicinity. Reopening the Grange would ensure that any positive economic effects that currently occur in the community would continue. Purchases of goods and services related to the Grange are unknown but assumed to be relatively small. Visitors usually tour the Grange and leave the neighborhood for other destinations.

### Impacts on Traffic Flow/Transportation

There would be no change in traffic flow under this alternative. There would be temporary impacts on parking space due to the presence of the contractors who would be doing work on the house.

### Impacts on Natural Resources

There would be no additional impacts on natural resources.

### Impacts on NPS Operations

There would be no change in NPS operations.

### Cumulative Impacts

There would be no cumulative impacts.

## ALTERNATIVE 2 — PRESERVE AND OPEN ENTIRE BUILDING

### Impacts on Cultural Resources

**Impacts on Historic Structures and Properties.** Loss of historic fabric during stabilization, and reinforcement and where the wheelchair lift and elevator are attached to the building would be thoroughly documented and minimized through design. Fabric would be replaced in kind whenever possible. The exposed steel framing system would help stabilize the building but minimize the loss of historic fabric. The elevator entrance on each floor, which would mean converting a window to a door, would change use of the space into a vestibule and preclude restoration of that immediate area, including the library on the first floor. All of these changes, along with the double porch that is not original to the house, create a greatly misleading impression of what was a pioneering and noteworthy example of early American Neo-Classicism.

The insertion of air-conditioning duct work and a fire suppression system would destroy some historic fabric and would be a visual intrusion. The climate control system would allow the windows to be fixed shut, further enhancing the security of the site.

**Impacts on Museum Collections.** Under this alternative, the part of the Hamiltonian collection that would be on display would be better protected because of the improved security and fire suppression and climate control systems. The part of the collection that would be stored offsite would also be protected from theft and damage.

**Impacts on Architectural Integrity.** In addition to the impacts described under alternative 1, insertion of an exposed steel framing system would impact the building's architectural integrity and design intent.

ENVIRONMENTAL CONSEQUENCES

**Impacts on the Cultural Landscape.** There would no impacts on the cultural landscape.

**Impacts on Visual Resources.** The wheelchair lift would impact the visual resources; however, proper design could minimize these impacts. The addition of the elevator would intrude on the visual scene and setting of the rear of the house. Proper design of the elevator could minimize these impacts as well. The exposed steel framing system would intrude on restoration and appearance of the historic interior.

**Impacts on Archeological Resources.** Prior archeological investigation and evaluation and on-site personnel would mitigate any potential impacts on archeological resources caused by ground being disturbed to install the elevator. If archeological artifacts are found, they would be catalogued and preserved according to NPS standards, thus mitigating adverse effects to these resources.

**Impacts on Ethnographic Resources.** Because the house would remain in its current location and existing uses would continue, there would not be any impacts on ethnographic resources.

### Impacts on Visitor Use

The quality of the visitor experience would most likely be somewhat greater than under alternative 1 because of the partial restoration of the house, additional exhibits related to Hamilton's role in history, refurnishing two rooms, increased staff, and the programmatic accessibility of all interpretive media as well as the basement, first, and second floors to all visitors. The new climate control system would also enhance the visitor experience, and visitors would likely stay longer; the addition of more space for visitor use and interpretation would allow the Park Service to more fully interpret the life and accomplishments of Alexander Hamilton. The exposed steel framing system would intrude on visitors' perception of the restored rooms.

With minimal improvement of the site, the city, state, and other tourism-related groups would probably not promote the Grange as a visitor attraction, and little if any increase in numbers of visitors over the current levels would be expected.

### Impacts on Community Use and Facilities

Impacts would be much the same as described under alternative 1. Additionally, if the St. Luke's rectory, which adjoins the church property behind the Grange, was developed as a visitor center, the church would give up its use as staff housing. The church operating budget could be affected by loss of the rectory; the effect would depend on how funds from the Park Service for purchase of the property would be used and by the cost of replacing the housing.

Noise from elevator operation and temporary noise and activity from building reinforcement might be bothersome for some neighbors.

Based on comments received during scoping, the congregation of St. Luke's Church has a sense of ownership of the Grange and perceives a value from its current location. This alternative would not disrupt members' sense of security and ownership.

The community would be less confident in security personnel from a contract agency than in NPS law enforcement personnel who would be either working on-site full time or living nearby.

### Impacts on the Local Economy

Impacts would be much the same as described under alternative 1.

### Impacts on Traffic Flow/Transportation

Impacts would be the same as described under alternative 1.

### Impacts on Natural Resources

No additional impacts on natural resources would occur under this alternative.

### Impacts on NPS Operations

There would be no significant changes in NPS operations. Because more historic objects would be displayed, more NPS rangers would be needed to monitor visitor use and protect and maintain the collections and displays.

### Cumulative Impacts

There would be no cumulative impacts under this alternative.

## ALTERNATIVE 3 — ENTRANCE REORIENTATION AND ADDITIONAL INTERPRETIVE SPACE

### Impacts on Cultural Resources

**Impacts on Historic Structures and Properties**. Rehabilitation and major construction under this alternative would have significant effects on the structural components and historic materials of the building. Insertion of a concealed steel framing system would require the removal of some original structural members and finish materials. All finish materials would be replaced in kind. The rear facade and appearance of the house would be substantially altered to accommodate the new entry. Changing the staircase and front door would significantly affect evidence of the building's history (from the relocation period).

The insertion of air-conditioning duct work, a fire suppression system, and an elevator would destroy some historic fabric and would be a visual intrusion. However, the climate control system would allow the windows to be fixed shut, further enhancing the security of the site.

ENVIRONMENTAL CONSEQUENCES

**Impacts on Museum Collections.** The collection would be kept intact at the site, where it would be adequately protected.

**Impacts on Architectural Integrity.** Reorienting the visitor entrance would create a perception of grandeur in a four-story building with a two-story porch, but this building would bear little resemblance to the two-story house that Hamilton knew and would not contribute to visitor understanding of the architectural significance of the house. The concealed steel framing system would impact the building's original materials but not the design intent.

**Impacts on the Cultural Landscape.** There would no impacts on the cultural landscape.

**Impacts on Visual Resources.** There would be a visual effect on the house and on the Hamilton Heights Historic District, which encompasses the Grange, with the entrance reorientation and the addition of landscaping, sweet gum trees, retaining walls, and ramps. The concealed framing system would not impact the building's interior or exterior appearance.

**Impacts on Archeological Resources.** Archeological investigation and evaluation prior to ground disturbance for the elevator, subbasement excavation, and foundation underpinning would mitigate impacts on archeological resources. Preliminary archeological investigation suggests that the only likely archeological resources around the house are associated with the relocation of the house and the construction of the 1889 foundation and the church. If archeological artifacts are found, they would be preserved and catalogued to NPS standards, thus mitigating adverse effects to these resources.

**Impacts on Ethnographic Resources.** Because the house would remain in its current location and existing uses would continue, there would not be any impacts on ethnographic resources.

### Impacts on Visitor Use

The quality of the visitor experience would be expected to increase beyond that of alternatives 1 and 2 because of further restoration, additional interpretive space and displays, the four refurnished rooms, and the return of the historic staircase and front door to their original location (although the door would not be open to visitors). Because of these additions and improvements, visitors would be able to experience much of the comfort of Hamilton's life and better understand how Hamilton created his own political career and financial fortune. Visitors would not experience entering the house as Hamilton's visitors would have, but once inside visitors would have a more accurate idea of what Hamilton's home was like. Visitors would probably stay longer. However, visitors would not have a sense of the house in its original setting as Hamilton knew it. The elevator, ramps into the main entrance, fully accessible interpretive media, and audiovisual components, would help ensure universal programmatic accessibility.

**Impacts on Community Use and Facilities**

The relationship between the Grange and St. Luke's Church would remain as it exists. The proximity of the Grange to the church would continue to provide some security for the church, particularly with the improved security system and the presence of NPS personnel. With NPS purchase or easement on the property east of the Grange, the church would give up any potential use of that site.

Additional community use space would be available. Noise levels and activity would temporarily increase during construction, potentially disturbing the neighborhood surrounding the site.

Based on comments received during scoping, the congregation of St. Luke's Church has a sense of ownership of the Grange and perceives a value from its current location. This alternative would not disrupt members' sense of security and ownership.

**Impacts on the Local Economy**

As described in the "Affected Environment" section, the Harlem community is seeking local economic development opportunities because of declining employment in the area of Community District 9. Local retail sale increases, additional employment opportunities, and perhaps the stimulation of new businesses that result from development or redevelopment of a site are related to construction and visitor activities. The amount of construction dollars for redevelopment under this alternative would not be economically significant because the job would be relatively small.

Material purchases and other retail sales might or might not occur in the area, depending on the availability of goods. Because federal contracting regulations do not allow hiring contractors from specific geographic region, there is no guarantee that the stabilization work would be awarded to a contractor in the Harlem community. Thus, local construction-related employment opportunities would not be ensured. Even if a local firm was awarded the job, the work would be short-term, with few construction-related economic benefits to the community.

As suggested in the alternative, additional NPS and community promotional efforts could increase the number of visitors at the site, which could benefit the local community if visitors remained in the community to visit other sites, enjoy restaurants, or shop. Such activities could contribute in a minor way to the local economic base. Currently, most visitors come to the site and leave for other parts of the city. To encourage spending, visitors must have information on restaurants, shops, and other sites, and such opportunities must be available in the community. Promotion would require concerted community efforts and perhaps funding to launch a promotional campaign to encourage tourism in Harlem.

**Impacts on Traffic Flow/Transportation**

The likely increase in the number of visitors arriving by public transit and bus would not have a significant affect on traffic, but the difficulty for residents and visitors to find parking

space would increase. Designating and enforcing bus parking regulations would depend heavily on the cooperation of local residents and the willingness of the city. City budget limitations could make it difficult to enforce parking rules.

### Impacts on Natural Resources

The small yard behind the Grange and the adjacent church property that abuts Hamilton Terrace would be temporarily disturbed during excavation of the subbasement, underpinning of the foundation, and creation of a new main entrance. Preventing or containing stormwater runoff during construction and removing soil and other excavated material would prevent pollution.

Some grass in the church yard would be permanently lost to ramps for visitors with disabilities and retaining walls. Additional grass would be impacted during construction; however, after construction, a portion of this loss would be restored through new landscaping, including sweet gum trees. The current relatively natural scene would be changed to a developed site.

### Impacts on NPS Operations

This alternative would require substantial additional NPS staff but would not resolve the issue of affordable housing for the staff. Also, this alternative would have additional maintenance requirements while reducing space for maintenance activities. Because more original historic objects would be displayed, more NPS rangers would be needed to monitor visitor use and protect and maintain the collections and displays.

### Cumulative Impacts

There would be no cumulative impacts on cultural resources. Beneficial economic effects could potentially occur for the community if opportunities such as the proposed Strivers Center Development Project were developed in conjunction with sites such as Hamilton Grange. If properly packaged and promoted, these sites could attract visitors and tourism-related spending to the Harlem area. However, additional costs for services such as police protection, graffiti removal, street cleaning, and promotional efforts would also be required.

## ALTERNATIVE 4 — RESTORATION AND RELOCATION — PREFERRED ALTERNATIVE / PROPOSED ACTION

### Impacts on Cultural Resources

**Impacts on Historic Structures and Properties.** Relocation of the building to a different site would have an adverse effect on the historic resource and surrounding properties of the Hamilton Heights Historic District. This relocation would result in a loss of status for the Grange as a contributing resource to the district. Although the Grange would be removed from the district, the historical and architectural reasons for which the district was established

would remain intact. However, relocation would provide a setting reminiscent of Hamilton's residence.

Sensitive design of a new facility at the Convent Avenue site would preserve the 1889 foundation and maintain the continuity in the district.

Moving the building would result in some damage to and loss of exterior and interior fabric, such as plaster or wood that would have to be replaced or repaired. However the original cross-axial floor plan would be recovered and perceptible to visitors, with the front door and stair returned and front porch rebuilt. Restoration of the door and stairway reconstruction would affect historic fabric from the 1889 period but would also reflect the original architectural design of 1802. The elevator would destroy historic fabric and preclude restoration of two rooms. However, restoration would more accurately reflect the building's visual and architectural design characteristics.

Insertion of a concealed steel framing system would require the removal of some original structural members and finish materials. All finish materials would be replaced in kind. The insertion of air-conditioning duct work and a fire suppression system would destroy some historic fabric and would be a visual intrusion. The climate control system would allow the windows to be fixed shut, further enhancing the security of the site.

**Impacts on Museum Collections**. The museum-quality climate control and fire suppression systems would protect displayed and stored artifacts.

**Impacts on Architectural Integrity**. Returning the house to a free-standing position and restoring the original entrance facade would allow interpretation of the house's history as Hamilton's country retreat and its early 19th century architectural significance, which is not possible at the existing site.

The concealed steel framing system would impact original materials but not the building's design intent.

**Impacts on the Cultural Landscape.** A determination of eligibility was prepared to evaluate the historical significance and integrity of St. Nicholas Park, designed by Samuel Parsons Jr. in the early 1900s. Completed by the National Park Service in August 1994, the determination was reviewed by the state historic preservation officer and the city Department of Parks and Recreation. It was determined that the park does not retain sufficient integrity to be listed on the National Register of Historic Places. Locating the Grange at the north end of the park would not adversely affect the park's overall character-defining features or design.

**Impacts on Visual Resources**. With the building's removal, the existing setting of Hamilton Grange would be altered. Vegetation would also be altered by removals and additions. The concealed framing system would not impact the building's interior or exterior appearance.

In St. Nicholas Park, the house would be returned to a site that is reminiscent of its 1802 historic setting. Relocation of the Grange to St. Nicholas Park would be a significant visual impact on the park because a new element would be introduced.

ENVIRONMENTAL CONSEQUENCES

**Impacts on Archeological Resources**. Disturbing ground for the new subbasement at the relocation site could disturb archeological resources. Prior research and evaluation would mitigate potential impacts. It is unlikely that archeological resources would be found because the bedrock is close to the surface. However, if archeological artifacts are found, they would be evaluated and if determined significant they would be preserved and catalogued to NPS standards, thus mitigating adverse effects on these resources. Archeological resources at the existing site could be adversely affected by site rehabilitation and work required to move the building. Removal of the 1889 foundation and development of a park could significantly impact potential archeological resources.

**Impacts on Ethnographic Resources.** With the relocation of the Grange to St. Nicholas Park, some African-American residents could experience a sense of loss of the cultural and possible ethnic link with a founding father of this country's democratic government. Although visitor use of the house would remain the same, its relocation would cause the loss of a symbol in the immediate neighborhood.


**Impacts on Visitor Use**

Relocating the house and returning it to a free-standing setting that is reminiscent of its historic site would substantially improve the interpretive program's ability to convey to visitors the early 19th century historical context and architectural significance and qualities of the Grange as Hamilton's home and in turn Hamilton the man. The relocation of the Grange to an appropriate setting such as the park would most likely attract new visitors, if properly advertised, promoted, and maintained (see "Impacts on the Local Economy" under alternative 3). However, the potential for increase in visitor use is difficult to quantify.

The increase in the quality of the visitor experience would be significant under this alternative. Seeing a restored building with all its doors, windows, and porches in place and the interior with its restored staircase and front door and furnishings would enhance the visitors' experiences. New exhibits and original and reproduction furnishings and objects would allow visitors to interact with the past. Special events and commemorative occasions related to Hamilton and his ideas would be easier and more appropriate to enact because of the increased space and the house restoration. Overall, this would mean a much more complete visitor experience — with a film, exhibit rooms, furnished rooms, and ranger interpretation. Universal programmatic accessibility would ensure that all visitors could enjoy the site.

The landscaping at the relocation site would be aesthetically pleasing to visitors and park users; however, the park land inside the fence surrounding the Grange would only be available for general use during the hours when the site is open.

The exhibits provided at the new Convent Avenue building would provide the visitor and community members with insights into the significance of the Harlem community's and St. Luke's parish's involvement in the preservation of the Grange. The possibility of using the multipurpose community room for large group orientations would further enhance visitors' experiences by giving them important background information and by preparing them for what they will see upon entering the Grange.

*Alternative 4 — Restoration and Relocation — Preferred Alternative/Proposed Action*

**Impacts on Community Use and Facilities**

The overall impact on St. Nicholas Park, in its current state, could be positive — having NPS personnel on the site and attracting investment and visitors. The proposed relocation site in St. Nicholas Park is not used for organized activities. The path that goes through the relocation area would be interrupted by moving the house. The path is used primarily as a shortcut by individuals coming from City College to 141st Street, Hamilton Terrace, the lower section of the park along St. Nicholas Avenue, and the 145th Street subway station. Although unrestricted access to approximately 0.91 acre of park land would be lost to the community, the National Park Service would work with the city Department of Parks and Recreation to mitigate some of this loss by assisting in the maintenance of the park adjacent to the proposed relocation site.

Redevelopment of the 1889 foundation with a building for NPS ranger housing and community uses would result in a continued, if not somewhat heightened sense of security for community residents and visitors. With NPS law enforcement rangers stationed nearby, the full-time security of the two sites, and the security fence around the relocated Grange, greater security would be provided in those areas. Local research indicates some community residents have felt a heightened sense of security from developments such as Riverbank State Park because of the park's security measures and the pervasive presence of park personnel, which discourages negative and/or criminal activity in the park's vicinity.

Other positive benefits of the new building at the Convent Avenue site include the potential for educational programs related to the community and its heritage, as well as space for community meetings and activities. The use and availability of this building, and the programs and exhibits within, would promote community involvement with the National Park Service and the future of the Grange. However, as discussed in alternative 3, St. Luke's Church as well as other community members feel a distinct sense of ownership of the Grange. Moving the building has raised the following concerns in the past and present: fear that insufficient funds would be available to finish moving the building and maintain it in its new location and security issues at the existing and new sites. These concerns should be overcome by the project phasing plan presented in the alternative description.

Noise levels and activity would temporarily increase during the move and construction, potentially disturbing the surrounding neighborhood.

**Impacts on the Local Economy**

The potential for construction-related economic benefits from Grange relocation would be slightly greater than that described in alternative 3. Recovering the house's architectural and structural integrity would likely attract many additional visitors, as do other restored house museums in Harlem and the Bronx, such as the Morris-Jumel and Van Cortland mansions. Visitor use and spending could potentially increase but would require community efforts to promote local sites and keep visitors in the Harlem area, as explained in alternative 3.

Visitors would spend more time at the site, and there would be more to see and learn. With the dramatic restoration and relocation, the city, state, and other tourism-related businesses would be more likely to publicize the Grange as a New York City visitor attraction.

ENVIRONMENTAL CONSEQUENCES

Cooperative efforts between the National Park Service, the Friends of Hamilton Grange group, and developments near the Grange such as the Strivers Center Development Project could also promote additional tourism and tourist-related spending, particularly as restaurants, shops, and other commercial enterprises are developed along 135th Street.

## Impacts on Traffic Flow/Transportation

If existing parking is identified at City College or in some other location by the Friends of Hamilton Grange group, City College, and the National Park Service, parking options for buses and private vehicles might improve and decrease demand and competition for available onstreet parking. If parking options are not identified, anticipated increases in visitation under this alternative could create significant parking problems along adjacent streets.

## Impacts on Natural Resources

Approximately 0.91 acre of open park land would be irretrievably committed to the relocation of the Grange in the northern section of St. Nicholas Park — adjacent to 141st Avenue and on the bench next to City College. Specific resources lost would include six old trees and ground cover. These would be replaced by landscaping that is evocative of Hamilton's time period, including 13 commemorative sweet gum trees. As indicated in the alternative description, landscaping plans would be developed for the site that are appropriate for the shade that envelops the site on spring and summer afternoons (see appendix J) and that would help stabilize soils.

Granite bedrock would be blasted and disturbed to build the foundation for the relocated Grange. Blasting activities would be controlled to prevent damage to surrounding buildings.

Only surface areas of St. Nicholas Park acquired by the National Park Service would be disturbed during construction. Following construction, the National Park Service will work cooperatively with the city Department of Parks and Recreation to preserve and maintain the adjacent sections of St. Nicholas Park, which would enhance its current condition.

Redevelopment of the site on which the Grange now resides for public use and NPS housing would have no additional impacts on natural resources.

Preventing or containing stormwater runoff during removal/construction at both sites would prevent onsite erosion and minimize sediment in local gutters and drains.

## Impacts on NPS Operations

There would be a significant impact on daily operations because of additional staff required to interpret, protect, and maintain the resources. The staffing limitations and maintenance inefficiency issues would be resolved in part by ensuring affordable staff housing at the Convent Avenue site and providing adequate onsite maintenance facilities.

*Alternative 4 — Restoration and Relocation — Preferred Alternative/Proposed Action*

## Cumulative Impacts

Cumulative impacts would be the same as described in alternative 3; in addition, under this alternative, the city, state, and other tourism-related businesses would be most likely to publicize the relocated Grange as a New York City visitor attraction. The addition of the Grange to St. Nicholas Park would take the park further from its original design intent, but it would also enhance maintenance and security of the area.

## Unavoidable Adverse Impacts

The continuum of history represented by the adaptive use of Hamilton Grange for religious purposes would be lost in the process of regaining its 1802-04 appearance. The historic significance of Hamilton Heights Historic District would be not be affected by removing a resource that is a contributing element to the district. Sensitive design of the Convent Avenue facility site would mitigate impacts on the historic district.

## Relationship between Short-term Uses and Maintenance and Enhancement of Long-Term Productivity

None.

## Irreversible and Irretrievable Commitments of Resources

Removal of historic fabric for insertion of a new structural system and an elevator and fire stair would be irreversible. Excavation into bedrock in St. Nicholas Park, which would be necessary for relocation of the Grange, would be irreversible.

## COMPLIANCE WITH FEDERAL AND STATE LAWS,
## EXECUTIVE ORDERS, AND REGULATIONS

In implementing the *General Management Plan* for Hamilton Grange National Memorial, the National Park Service has and would continue to comply with all applicable laws, regulations, and executive orders, including those listed below.

Because there are no floodplains, wetlands, or prime and unique farmlands at Hamilton Grange or in St. Nicholas Park (the relocation site in alternative 4), compliance with Executive Orders 11988, "Floodplain Management" and 11990, "Protection of Wetlands", and analysis of prime and unique farmlands will not be necessary for Hamilton Grange. Informal consultation with appropriate federal, state, and local agencies has been conducted in the preparation of this document. These agencies are listed in the section on scoping and consultation.

The procedures to be followed are described as follows.

### NATIONAL ENVIRONMENTAL POLICY ACT OF 1969 (as amended)

This document provides public disclosure of the planning and decision-making process and the potential environmental consequences of actions and alternatives, as required under this act. The draft environmental impact statement for the general management plan was on public review for about 11 months. Agency and public comments were considered; the draft plan and environmental analysis have been reviewed in light of the comments. A final environmental impact statement has been prepared that responds to or incorporates the public comments on the draft document. After a 30-day no-action period, a record of decision will be prepared and circulated to interested parties. The record of decision documents the final decision and the alternatives considered and identifies the environmentally preferable alternative.

### NATURAL RESOURCE COMPLIANCE

#### Clean Air Act, as Amended (42 USC 7401 et seq.)

Section 118 of the Clean Air Act requires all federal facilities to comply with existing federal, state, and local air pollution control laws and regulations. Hamilton Grange National Memorial would work with state and local agencies to ensure that all in-park activities meet applicable air quality standards.

#### Endangered Species Act of 1973, as Amended
#### (16 USC 1531 et seq.)

Section 7 of the Endangered Species Act requires all federal agencies to consult with the U.S. Fish and Wildlife Service to ensure that any action authorized, funded, or carried out by the agency does not jeopardize the continued existence of listed species or critical habitat.

70

Informal consultation was initiated under section 7 during the summer of 1992. No endangered or threatened species were identified in the area of Hamilton Grange (see appendix K). However, as requested by the Fish and Wildlife Service, specific development plans and associated environmental documentation for Hamilton Grange would be provided for their review before construction to ensure that no new listed species have been found at the site(s) being considered.

## CULTURAL RESOURCE COMPLIANCE

### Architectural Barriers Act of 1968 (42 USC 4151 et seq.); Rehabilitation Act of 1973 (29 USC 701 et seq.)

All facilities and programs developed would be accessible to visitors with disabilities.

### Section 106 of the National Historic Preservation Act

Hamilton Grange, listed on the National Register of Historic Places in 1966, and Hamilton Heights Historic District, listed in 1983, will be evaluated for potential impacts as proposed in the actions of the alternatives. In assessing effects of any of the actions for compliance purposes, Hamilton Grange would be considered as a national historic landmark and as a contributing resource to the locally significant Hamilton Heights Historic District. These actions must be addressed under the provisions for assessing effects outlined in 36 CFR part 800, regulations issued by the Advisory Council on Historic Preservation implementing section 106 of the National Historic Preservation Act, as amended (NHPA, 16 USC 470 et seq.). Federal actions are considered to have an effect when they alter the character, integrity, or use of a cultural resource.

Section 106 applies only to federal or federally funded, licensed, or assisted properties. The National Park Service must adequately evaluate the impacts of each alternative on the cultural resources of the site and Hamilton Heights Historic District. Under alternative 4, which calls for relocation of the Grange, revision of the boundary of Hamilton Heights Historic District to retain the presence of the Grange as a contributing resource was considered. However, based on the significance of the district and the delineation of the current boundaries, the National Register of Historic Places was consulted and does not believe that the revision of the boundary is justified. With the relocation of the Grange, a national historic landmark, proper compliance procedures would be followed. Furthermore, as stipulated under section 110, research on potential cultural resources is required before any proposed actions can be undertaken (see appendix F). Therefore, a determination of eligibility was prepared for St. Nicholas Park, which determined that the park was ineligible for listing on the National Register of Historic Places (see appendix I).

A draft copy of this document was submitted to the state historic preservation office and the Advisory Council on Historic Preservation for review and comment. The National Park Service will continue to consult with the state historic preservation officer and the Advisory Council on Historic Preservation to ensure that NPS administration provides for the management and protection of the site's cultural resources. This will be performed in accordance with the intent of NPS policies and section 106, as provided for in the 1990

COMPLIANCE WITH FEDERAL AND STATE LAWS, EXECUTIVE ORDERS, AND REGULATIONS

programmatic agreement among the National Park Service, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers. Under stipulations C, D, and F of the programmatic agreement, all actions that are not considered programmatic exclusions (these are actions reviewed by the National Park Service and are considered programmatic exclusions only if found to meet conditions specified in the programmatic agreement) or that are were not adequately reviewed for 106 purposes in plans reviewed under former programmatic memoranda of agreement will be reviewed in accordance with 36 CFR part 800. Actions proposed in the alternatives that are programmatic exclusions — installing climate control systems and fire suppression systems — are covered under paragraphs C1c and C1k in the programmatic agreement.

### TABLE 5. GENERAL MANAGEMENT PLAN ACTIONS AND CULTURAL COMPLIANCE REQUIREMENTS

Implementation of these alternatives would require up-to-date research and documentation to fully ascertain the implications of these actions on the resources. The following programmatic exclusions for the actions were determined in consultation with the NPS North Atlantic Regional Office regional historian, with the assessment of effects based on preliminary determinations.

| ACTIONS | COMPLIANCE REQUIREMENTS |
|---|---|
| **ALTERNATIVE 1 — NO ACTION (EXISTING TRENDS)** | |
| 1. Stabilize and reinforce exterior and interior structural components of house | Requires SHPO/ACHP review |
| 2. Modification of building to allow access to visitors with disabilities | Requires SHPO/ACHP review |
| 3. Upgrade existing fire detection and security systems | Programmatic exclusion (C1k)* |
| **ALTERNATIVE 2 — ADDITIONAL INTERPRETIVE SPACE** | |
| 1. Stabilize and reinforce exterior and interior structural components of house | Requires SHPO/ACHP review |
| 2. Modification of building to allow access to visitors with disabilities, including exterior elevator | Requires SHPO/ACHP review |
| 3. Restoration and refurnishing of three rooms and installation of exhibits | Requires SHPO/ACHP review |
| 4. Upgrade fire detection and security alarm systems | Programmatic exclusion (C1k)* |
| 5. Installation of environmental and climate control monitoring units and fire suppression system | Programmatic exclusion (C1c, C1k)* |

TABLE 5. GENERAL MANAGEMENT PLAN ACTIONS AND COMPLIANCE REQUIREMENTS (CONT.)

| ACTIONS | COMPLIANCE REQUIREMENTS |
|---|---|
| **ALTERNATIVE 3 — ENTRANCE REORIENTATION** | |
| 1. Stabilize and reinforce exterior and interior structural components of house | Requires SHPO/ACHP review |
| 2. Addition of interior space with expanded basement area | Requires SHPO/ACHP review |
| 3. Restore doorway and staircase to 1802 configuration | Requires SHPO/ACHP review |
| 4. Restore and refurnish four rooms and install exhibits | Requires SHPO/ACHP review |
| 5. Modification of building to allow access to visitors with disabilities, including interior elevator | Requires SHPO/ACHP review |
| 6. Reorientation of access, with new main entrance and landscaping | Requires SHPO/ACHP review |
| 7. Upgrade fire detection and security alarm systems | Programmatic exclusion (C1k)* |
| 8. Installation of environmental and climate control monitoring units and fire suppression system | Programmatic exclusion (C1c, C1k)* |
| **ALTERNATIVE 4 — RESTORATION AND RELOCATION** | |
| 1. Obtain legislation for boundary change and raising the funding ceiling | Requires congressional action |
| 2. Transfer city park land to National Park Service | Requires state and local legislative action |
| 3. Relocate building — effects on structural and historical components, including Hamilton Heights Historic District | Requires SHPO/ACHP review |
| 4. Stabilize and reinforce exterior and interior structural components of house | Requires SHPO/ACHP review |
| 5. Restore exterior and interior four rooms and install exhibits | Requires SHPO/ACHP review |
| 6. Addition of interior space with expanded basement area | Requires SHPO/ACHP review |
| 7. Modification of building to allow access to visitors with disabilities | Requires SHPO/ACHP review |

COMPLIANCE WITH FEDERAL AND STATE LAWS, EXECUTIVE ORDERS, AND REGULATIONS

### TABLE 5. GENERAL MANAGEMENT PLAN ACTIONS AND COMPLIANCE REQUIREMENTS (CONT.)

| ACTIONS | COMPLIANCE REQUIREMENTS |
|---|---|

ALTERNATIVE 4 — RESTORATION AND RELOCATION (CONT.)

| | | |
|---|---|---|
| 8. | Installation of environmental and climate control monitoring units and fire suppression system | Programmatic exclusion (C1c, C1k)* |
| 9. | Improve fire detection and security alarm systems | Programmatic exclusion (C1c, C1k) |
| 10. | Feasibility evaluation of housing unit design and the effects on the surrounding historic districts | Requires SHPO/ACHP review |

* Must be reviewed by the region and found to meet conditions in the programmatic agreement, stipulation C, before they be finally determined to be programmatic exclusions.

## CONSULTATION AND COORDINATION

### 1992 PUBLIC PRESENTATIONS OF
### PRELIMINARY ALTERNATIVES

Before the release of the draft plan in 1993, public meetings were held to solicit public input into the planning process and the preliminary alternatives. The meetings are listed below.

March    Manhattan Community Board #9, general board meeting. Attendance 50. Superintendent presented preliminary alternatives for Hamilton Grange and Grant's Tomb. Relocation of the Grange was the principal issue discussed.

April    Manhattan Community Board #9, Parks Committee. Attendance 25. Continued above discussion.

Open house at Hamilton Grange, 12:00–5:00 P.M. Attendance 50. General discussion of alternatives and their impact on the immediate neighborhood. Approval expressed by several residents of area for moving the Grange to restore architectural integrity.

Manhattan Community Board #9, Landmarks Committee. Attendance 15. Superintendent discussed preliminary alternatives for Hamilton Grange.

May    St. Mary's Church, 6:30–8:30 P.M. ("town hall" meeting regarding Hamilton Grange and Grant's Tomb). Attendance 75. Principal issue discussed was relocation of the Grange. Representatives of St. Luke's Church expressed strong opposition to move.

June    Fine Arts Federation. Preliminary alternatives for the Manhattan Sites were reviewed.

Municipal Arts Society. Preliminary alternatives for the Manhattan Sites were reviewed.

August    Legislative update at Federal Hall (regarding Hamilton Grange, Grant's Tomb, and Federal Hall). Attendance 12. Superintendent provided information for legislative aides and city and state government representatives. Superintendent reported that the public comments received have identified three controversial issues: relocation of Hamilton Grange, relocation of mosaic benches at Grant's Tomb, and termination of exclusive use of portions of Federal Hall. Suggestions were made that the Park Service explore transfer of part of Riverside Park surrounding Grant's Tomb from the city Department of Parks and Recreation and that the plan for Hamilton Grange include development of the current site after house is moved, as well as additional parking and full-time security at the site. Finally, it was agreed that the preferred alternative for Hamilton Grange should be presented at a general public meeting, to be attended by those public officials represented here.

75

CONSULTATION AND COORDINATION

## SUMMARY OF COMMENTS ON THE DRAFT PLAN

The *Draft General Management Plan / Environmental Impact Statement* for Hamilton Grange was released to the public in April 1993. A 60-day comment period was initially provided but was extended until early 1994 to solicit and respond to the public opinion generated by the draft plan alternatives. Meetings held with community residents, interested parties, organizations, and government agencies are briefly outlined below.

### 1993 Presentations/Comments

May         Individual presentations on the alternatives were made to Community Board #9's Park Commission and Landmarks Commission. Both meetings were open to the public.

July        A public meeting was held at Aaron Davis Hall, City College of New York, by the National Park Service to present the four proposed alternatives for development of Hamilton Grange. Attendance was 250. Vocal opposition to moving the structure to St. Nicholas Park reflected concerns about the absence of security in the park, the resulting "hole" left at the existing location, as well as the loss of playground space in the park to accommodate parking for the new site.

August      Representatives of Community Board #9, the Hamilton Heights Homeowners Association, and others in favor of alternative 4 were invited to a meeting at Federal Hall to discuss a resolution in favor of alternative 4 to be presented to a full meeting of Community Board #9. The construction of a new facility on the existing site, elimination of parking areas from the proposal, and increased NPS security staff were discussed.

            A presentation of alternatives was also made by the National Park Service to the Historic Preservation Committee of the Municipal Arts Society.

September   A presentation of the preferred alternative 4 was made by the National Park Service to a joint public meeting of the Parks and Landmarks Committees of Community Board #9 at Convent Avenue Baptist Church. Attendance was 100. Local clergy expressed strong opposition to this alternative based upon their views that the move would result in a major loss to the neighborhood community. In a vote by those committee members present, 11 voted in favor and 7 opposed the preferred alternative.

            A presentation was also made to Landmarks Harlem. This meeting resulted in a vote that was favorable to alternative 4.

December    Congressman Charles B. Rangel called a meeting in his office, bringing together NPS representatives and five local clergyman opposed to alternative 4 and moving the Grange. Means of accommodating their concerns were discussed. However, their opposition remained firm.

*Summary of Comments on the Draft Plan*

**1994 Presentations/Comments**

January    A presentation was made by the National Park Service to Community Board #10 on the preferred alternative 4. All questions and concerns were solicited and fully addressed.

March      A "town hall" meeting was called by Congressman Charles B. Rangel at the City College of New York. Attendance was 250. A full presentation of the preferred alternative 4 was made by NPS Regional Director Marie Rust and other NPS representatives from Boston and Washington, D.C. Discussion focused on the economic impact of this alternative, proposed new construction on the existing site, increased security in St. Nicholas Park, preservation of playground space, offsite parking, shadows, and many other issues. A comprehensive public discussion followed the presentation, with speakers both opposed to and in favor of this alternative expressing their views. Written statements either agreeing to or opposing the move were also submitted at the meeting: nine were in favor of the move and 12 were opposed. Concerns expressed in these statements were discussed at the meeting and are also addressed through responses to other letters below.

           Subsequent to this meeting, Community Board #9 voted (18 in favor, 11 opposed, 2 abstentions) in favor of a resolution supporting the preferred alternative 4. A copy of this letter is included in the following "Comment and Response" section.

August     On August 10, 1994, an onsite meeting was held with the National Park Service, the city Department of Parks and Recreation, and the state historic preservation office to evaluate the significance and integrity of St. Nicholas Park.

October    On October 24, 1994, a meeting was held with the city Department of Parks and Recreation Commissioner Henry Stern and other department staff, NPS Regional Director Marie Rust, NPS Chief of Urban Projects Michael Adlerstein, and Manhattan Sites Superintendent Joe Avery to discuss a land transfer.

CONSULTATION AND COORDINATION

## LIST OF AGENCIES AND ORGANIZATIONS WHO RECEIVED OR REVIEWED COPIES OF THE DRAFT PLAN / ENVIRONMENTAL IMPACT STATEMENT

This document was prepared in consultation with or was distributed to the following agencies, organizations, and individuals. An * indicates a response was received on the *Draft General Management Plan / Environmental Impact Statement.*

### INTERNATIONAL ORGANIZATIONS

Permanent Mission of the Republic of Vanuatu to the United Nations*
Robert F. Van Lierop, Ambassador
Permanent Representative
416 Convent Avenue
New York, NY 10031

### FEDERAL AGENCIES/OFFICIALS

Advisory Council on Historic Preservation
Washington, D.C.

Environmental Protection Agency*
Region II
Robert W. Hargrove, Chief
Environmental Impacts Branch
Jacob K. Javits Federal Building
New York, NY 10278-0012

Howard Lowe
Office of Congressman Charles Rangel
163 West 125th Street
New York, NY 10027

Office of Policy and Management
Environmental Protection Agency
Region 2
26 Federal Plaza, Room 500
New York, NY 10278

Linda Rosenstadt/Neil Goldstein
Office of Congressman Jerry Nadler
1841 Broadway, Suite 800
New York, NY 10027

Many Ross
Office of Congresswoman Valazquez
815 Broadway, 1st Floor
Brooklyn, NY 11229

Cooper-Hewitt Museum*
The Smithsonian Institution's National Museum of Design
2 East 91st Street
New York, NY 10128

U.S. Fish and Wildlife Service
New York Field Office
Leonard P. Corin, Field Supervisor

John Wade
Office of Congresswoman Maloney
950 Third Avenue, 19th Floor
New York, NY 10022

### STATE AGENCIES/OFFICIALS

Mr. Abert Appleton, Commissioner
Environmental Protection, Room 2358
1 Centre Street
New York, NY 10007

Mr. Carter Avery
Office of Assemblyman Farrell
2341-55 7th Avenue
New York, NY 10030

Hon. Herman D. Farrell Jr.
Assemblymember

The Fine Arts Federation of New York*
Roy Gussow, President
40-40 24th Street
Long Island City, NY 11101

78

Ms. Jannie Green
Office of Assemblyman Edward E. Sullivan

Joseph Haslip
Office of State Senator David Peterson

Richard Harley
Office of Assemblyman Keith Wright

Michael Klein
Manhattan Regional Representative

Hon. Franz S. Leichter, State Senator
656 West 181st Street
New York, NY  10033

New York State Department of
Environmental Conservation
Significant Habitat Unit
Burrell Buffington

New York State Office of Parks, Recreation,
and Historic Preservation*
Historic Preservation Field Services Bureau
Julia S. Stokes, Deputy Commissioner for
Historic Preservation
Peebles Island
P.O. Box 189
Waterford, New York 12188-0189

Ray Saltini
Office of State Senator Leichter
656 West 181st Street
New York, NY  10033

## OTHER ORGANIZATIONS

National Trust for Historic Preservation*
Northeast Regional Office
Vicki Jo Sandstead, Director
Seven Faneuil Hall Marketplace
Fifth Floor
Boston, MA  02109

Catalogue of Landscape Records in the
United States*
Catha Grace Rambusch, Director
Wave Hill
675 West 252nd Street
Bronx, New York 10471

## CITY AND LOCAL ORGANIZATIONS/ AGENCIES/OFFICIALS

Abyssinian Development Corporation
Karen A. Phillips, Executive Director

C. H. Anderson, President
West 149th St. Tenants Assoc.

Antioch Baptist Church
Rev. Al Floyd Alston

Area 143 Day Care Center

Ms. Alto Averatt, Director
HPD Neighborhood Preservation

E. Verda Avila, Community Affairs Officer
School District #6

Audubon Tenants League
Ms. Katie M. Rolle

Bank Street College
Government and Community
Ms. Eileen Mantone, Director

Ms. Elizabeth Barlow
Central Park Administration

Laurie Beckelman, Chairperson
Landmarks Preservation Commission*

Bethune Senior Center

Boscobel Restoration Inc.*
Garrison-on-Hudson, New York

Bowery Saving Bank
Mr. Clarence Petty

CONSULTATION AND COORDINATION

Boys Club of Harlem
Mannie L. Wilson Center

Gail Brewer
Mayor's Office of Legislative Affairs

Broadway Presbyterian

Camara Da Comercio De
Hamilton Heights Inc.

Child Inc. Head Start
Convent Avenue Center

Children's Art Carnival
Ms. Betty Taylor, Director

Church of Annunciation
Sr. Rita Davoli

Church of Christ
Fourteenth

Church of God
Rev. Pierre L. Desrosier

Church of the Intercession
Vicar Fred Williams

Church of the Master

Church of the Resurrection
Rev. Lawrence E. Lucas

Citizens Action for a Safer Harlem
Mr. Joseph Kelly

Citizens for Hudson River
Esplanade, Mr. Lee Lien, Director

City College
Ms. Tony Rogers

City of New York Community Board #9,
Manhattan*
565 West 125 Street
New York, NY 10027

City of New York Department of
Environmental Conservation
Natural Resources Unit —
Chris Nadareski

Bureau of Abatement Planning, Division
of Air Resources — Mike Cronin

City of New York
Department of Transportation

City Tabernacle S.D.A
Rev. Johnathan Thompson

*Columbia Daily Spectator*

Columbia University
Mr. Larry Dais, Asst. V.P.

Community Precinct Council
26th Precinct

Congregation Church of God
Rev. W.M. Aarons

Convent Avenue Baptist Church
Rev. Clarence P. Grant

Convent Avenue Neighborhood Assoc.
Collin Clarke, President
Mr. Larry Butler, President

Cosmopolitan
Rev. L. Mahamaker

Mr. Michael Crohin
Deputy Assistant Chief NYPD

Dept. of Sanitation DST. #9
Mr. Carl Galina

Ms. Angela Dews, Director
Northern Manhattan Office of the
Manhattan Borough President

Hon. David N. Dinkins, Mayor
City of New York

Dunwell Plaza S.S.
Ms. Ann Ratcliffe, Coordinator

Mr. Robert Early
Manhattan District Attorney's
Office of Community Affairs

East Harlem School of Music
Mr. Johnny Colon

*El Diario La Prensa*
Community News
Mr. Reginaldo Atanay

Emanuel Pieterson Historical Society*
Horace Carter, President
P.O. Box 733
Manhattanville Station
New York, NY 10027

Episcopal Diocese of New York
George Hernandez, Archivist

Episcopal Mission Society in
The Diocese of New York
Ms. Nell B. Gibson, Director

Ethiopian Congregation
Rev. Roulos

Mr. Jay Faiertag
Senior Project Manager
Public Development Corporation

Wallace L. Ford, II, Commissioner
Dept. of Ports & Trade

Friends of Cast Iron Architecture*
Margot Gayle, President
235 East 87th Street, 6C
New York, NY 10128

Gardens Nursery Schools

Genesis II
Mr. Andi Owens, Director

Christopher Glaisek
Harbor Park Coordinator, New York City
Department of Parks and Recreation

Betsy Gotbaum
Commissioner, New York City Department
of Parks and Recreation

Grant Houses Day Care Center

Greater File Chapel Baptist Inc.
Rev. Jasper Simmons

Greater Saint Luke AME Church
Rev. Frank Emmanual

Hamilton Grange Community Task Force to
Prevent the Removal of the Grange*
Rev. Johan Johnson, Task Force Coordinator
435 W. 141st Street
New York, NY 10031

Hamilton Grange Day Care Center

Hamilton Grange Library
Ms. Jean Peterson

Hamilton Heights Homeowners Association*
John Cardwell, President
P.O. Box 565
Hamilton Grange Station
New York, NY 10031

Harlem Interfaith Counseling
Mr. Cadric C. Johnson

Harlem Legal Services Inc.
Ms. W. Faye Jackson

Harlem Restoration Project
Ms. Marie Runyon

Healthy Start Program

CONSULTATION AND COORDINATION

Landmarks Harlem, Inc.*
Ms. Sandi Griffin, Chair
Thomas J. Bess, Executive Director
201-A West 138 Street
New York, NY 10030

Elizabeth Holtzman, Comptroller
City of New York

Chief Thomas Kennedy
New York Fire Department

Jack Linn
Assistant Commissioner for Government
Relations, New York City Department of
Parks and Recreation

LUFPA
Mr. Trini Apolinar

Mr. Charles McKinney
Riverside Park Director
Borough of Manhattan

Stanley E. Michaels, City Councilmember

New York City
Department of Mental Health

New York City Department of Parks and
Recreation, Parks Enforcement Unit

New York City Housing Authority
Office of Community Affairs

*New York Observer*
Toby Axelrod

New York Urban League
Mr. Chris Boyd

Our Lady of Lourdes Church R.C.
Father Thomas Fenlon

Macedonia Baptist Church
Rev. Issac Graham
Mr. Joseph B. Edwards

Major Morris Community Center
Willie Dixon, Director

Manhattan Community Center

Manhattan Holy Tabernacle
Rev. Richard Christie

Manhattan Spirit
Mr. Bruce McCandless

Manhattanville Day Care Center

Mt. Zion 7th-Day Advent Church
Mr. Danzel Martin

The Municipal Art Society of New York*
457 Madison Avenue
New York, NY 10022

New York One News
Mr. John Dienst

Office of Black Ministry
Mr. Herbert Johnson

Omega Psi Phi Fraternity
Mr. Benjamin Grant

Our Lady of Lourdes Adult
Leisure Club

PHASE: Piggy Bank Inc.

RENA Coalition Multi-Services
Mr. Donald Jenkins

Riverside Church

Riverside Coalition
Ms. Mary Saunders

Riverside Park Fund
Ms. Debbie King, Executive Director

Ms. Lisa Robinson
Department of City Planning

*List of Agencies and Organizations*

Saint Catherine of Genoa R.C. Church
Father Robert Richie

St. James Presbyterian Church
Rev. Lenton Gunn Jr.

Saint Johns Baptist Church
Rev. John. L. Scott

Saint Luke's Episcopal Church

Saint Lukes Roosevelt Hospital Corp.
Ms. Brenda T. Belfield
Associate Vice President
Community Affairs and Development

Saint Mary's Church
Rev. Robert Castle

St. Nicholas Park Civic Assoc.
Mr. David Kennedy, President

St. Nicholas Place
Neighborhood Association
Euzie Hutchinson

Saint Stephen's African Orthodox Church
Father David Richard

Captain John Seymour
Commanding Officer
30th Precinct

Peggy Shephard
District Leader

Society for the Preservation of WEEKSVILLE
and Bedford-Stuyvesant History*
Joan Maynard, Executive Director
P.O. Box 130120,
St. John's Station
Brooklyn, New York 11213-0002

Mr. Andrew Stein
Office of City Council President

Donna Stovall
Office of City Council Stanley Michels

Upper Manhattan Task Force
on AIDS

Ms. Margaret Walton
Office of the Mayor
Community Assistance Unit

Captain William F. Wanamaker
Commanding Officer
26th Precinct

West Harlem Cluster of Churches
Rev. Robert L. Johnson

West Side Waterfront Panel
Ms. Betsy Haggerty
Executive Director

Zion Baptist Church
Rev. Charles Harvin

### BLOCK ASSOCIATIONS

Broad/AM Block Association
Mr. Mendell Jackson, Business Manager

West 112th Street — 500 Block Association
Mr. John Arbo, President

West 113th Block Association
Mr. George Ewing

West 123rd Block Association
Mr. Herbert Crews

West 135th Street — 500 Block Association
Ms. Dorothy Smith

West 142nd Street — 500 Block Association
Ms. Genevieve Outlaw

West 142nd Street — 500 Block Association
Ms. Bernice Tully

West 143rd Street Block Association
Ms. Dorothy Cherebin

83

CONSULTATION AND COORDINATION

West 144th Street — 500 Block Association
Mr. Nestor Gonzalez

West 146th Street — 500 Block Association
Mr. Eugene T. Morgan

West 147th Street — 600 Block Association
Ms. Patrica Boatner

West 148th Street — 400 Block Association
Ms. Florence Atkins

West 148th Street Block Association
Ms. Irene Beasley, President

West 149th Street — 600 Block Association
Ms. Carol Bergaam

West 149th Street Block Association
Mr. Randy Still

West 151st Street — 500 Block Association
Ms. Margaret Robinson

West 151st Street — 500 Block Association
Ms. Marie Fitts, President

West 152nd Street — 500 Block Association
Ms. Cheryl Kyler

West 154th Street Block Association
Marie Leroy

Hamilton Terrace Block Association
Ms. Frizell Williams

Hamilton Terrace Block Association
Ms. Henrietta Rouse

Hamilton Terrace Block Association
Ms. Elizabeth Mayo

Hamilton Terrace Block Association
Ms. Cecilia Vargas

150-155 Edgecombe Block Association
Ms. Gloria Clark

130-153 Edgecombe Block Association
C.G. Madden, Secretary

## TENANT ASSOCIATIONS

854 St. Nicholas Avenue Tenants Association
Ms. Deborah Henry

596 Riverside Drive Tenants Association
Ms. Marie Lee
Ms. Colister Morrisey

49th St. Nicholas Terrace
Tenants Association
Shampelle Everett, President

Logan Plaza Tenants' Association
Ms. Queenie Thompson
Mr. Robert Buksha

Manhattanville Tenants Assoc.
Ms. Dorothea Chapman

Riverview Apartments Tenants Association
Ms. Liz Stuart

601 West 136th Street Tenants Association
Mr. William Palmer

608-610 Tenants Association
Mr. Louis Aguas

680 Riverside Drive Tenants Association

3569 Broadway Tenants Association
Ms. Gloria Barretto

United Tenants Association

## INDIVIDUALS

Michael Adams
Aileen Avery
John Cardwell
John Clark
Alienza Domenicana
Joseph E. Fields*

84

Donald Hill*
Matthew Huffman*
Marjorie Johnson*
Christopher W. London*
Roderick J. MacGregor*
Robert Mahoney
Ms. Trinidad Martinez
Wendy Mauritzon*
Ronald L. Melichar*
Alvarene Molland*
Mary Mu___ (illegible)*
Boydie Patterson

Robert D. Paulus*
Francis Redhouse*
Dwight Stanley
Herbert W. Thorne
Lana Turner
Ronald F. Wagner*
Caroline Waloski Weinman*
Jim Williams*
Timothy Van Dam*
Dr. D.J. Wellington*
Colette C. Whitlock*

## WRITTEN COMMENTS FROM AGENCIES, ORGANIZATIONS, AND INDIVIDUALS

A total of 37 letters were received on the draft plan. Individuals or groups commenting could be divided into two general groups — those in favor of moving the Grange to a more appropriate location and those supporting the retention of the Grange in its current location on Convent Avenue. The Environmental Protection Agency favored any of the four proposals. Of those favoring the move, 31 groups or individuals supported alternative 4 (but many only under certain conditions) and one suggested another offsite location. The five letters opposing alternative 4 and relocating the Grange were in favor of restoring the Grange within its current site and did not necessarily state a preference for the other alternatives. In addition to letters, the following petitions were received:

- 168 signatures favoring alternative 3 and opposing alternative 4 (petition was sponsored by the Hamilton Terrace Block Association)
- 729 signatures in support of full restoration and relocation of Hamilton Grange National Memorial within the present community and on Hamilton's original tract of land.
- 538 signatures opposing the physical relocation of Hamilton Grange from its existing site to any other location (sponsored by St. Luke's Episcopal Church)
- 74 signatures protesting the move of the Hamilton Grange from its existing location (sponsored by Convent Avenue Baptist Church)

As a result of the comments received in meetings, letters, and petitions, changes were made to the preferred alternative 4 to address public concerns. These changes are described in alternative 4 of the final plan and are referred to in the following "Comment and Response" section.

International Representatives
    Permanent Mission of the Republic of Vanuatu  87
Federal Agencies
    Cooper-Hewitt Museum  89
    U.S. Environmental Protection Agency  91
State Agencies
    New York State Office of Parks, Recreation and Historic Preservation  92

CONSULTATION AND COORDINATION

Local Agencies
    City of New York Landmarks Preservation Commission  93
    City of New York, Parks and Recreation  96
    Community Board #9, September 1993  98
    Community Board #9, March 1994  99
Organizations
    Boscobel Restoration Inc.  101
    Catalog of Landscape Records in the United States  102
    Emanuel Pieterson Historical Society  109
    Fine Arts Federation of New York  115
    Friends of Cast Iron Architecture  116
    Hamilton Grange Community Task Force to Prevent the Removal of the Grange  117
        Hamilton Grange: An Analysis of Alternative 4  119
        Position Paper  143
    Hamilton Heights Homeowners Association  149
    Landmarks Harlem, Inc.  151
    Municipal Art Society of New York  155
    National Trust for Historic Preservation  157
    Society for the Preservation of WEEKSVILLE and Bedford-Stuyvesant History  159
Individuals
    Joseph E. Fields  161
    Margot Gayle  162
    Don Hill  163
    Matthew Huffman  164
    Marjorie Johnson  165
    Christopher W. London  166
    Roderick J. MacGregor  167
    Wendy Mauritzon  168
    Ronald L. Melichar  174
    Alvarene Molland  176
    Mary Mu_____ (illegible)  178
    Robert D. Paulus  180
    Francis Redhouse  181
    Ronald F. Wagner and Timothy Van Dam  182
    Caroline Waloski Weinman  183
    D. J. Wellington, M.D.  184
    Colette C. Whitlock  185
    Jim Williams  187

*International Agencies*

## COMMENTS

PERMANENT MISSION OF THE REPUBLIC OF VANUATU
TO THE UNITED NATIONS

MISSION PERMANENTE DE LA REPUBLIQUE DE VANUATU
AUPRES DES NATIONS UNIES

418 CONVENT AVENUE, NEW YORK, N.Y. 10031

TEL. (212) 926-3311                              TELE/FAX (212) 926-4131

9/19/93

15 July 1993

Georgette Nelms
Superintendent
United States Department of the Interior
National Park Service
Manhattan Sites
26 Wall Street
New York, N.Y. 10005

Re: Proposed Development Plan for Hamilton Grange National Memorial

Dear Ms. Nelms,

Thank you for your letter of June 28, 1993 and the draft General Management Plan and Environment Impact Statement for the Hamilton Grange National Memorial which was enclosed therewith.

I have reviewed that document very carefully because of the great importance of Hamilton Grange to the future of the immediate community. I regret that I was out of town and unable to attend the public meeting held on July 13th at Aaron Davis Hall. I would have been most interested in hearing the views of others in the community.

At the outset, let me state that most proposals of this sort are immediately viewed with considerable trepidation because very few of the premises that have been made to the community in which the Grange is located have been kept. Furthermore, very few changes in this community have been effected with the long-term perspective necessary to assist it in its redevelopment and improvement in its quality of life. The North River Sewage Treatment Plant it, of course, one obvious example. The loss of the Museum of the American Indian is another.

On the surface, Alternative 4 does look appealing. There is no question that the Grange is somewhat dwarfed physically by the two adjoining structures. In its current state, it is also under-utilized and lacks a high quality of visitor experience. The proposed bus pullouts and parking spaces would certainly help to alleviate the often congested traffic conditions on Convent Avenue itself. In short, Alternative 4 appears to have many attractive qualities which would recommend it. The proposed possible use of the Convent Avenue site for the National Park Service also appears to be attractive.

1

## RESPONSES

1. Although a potentially positive method of eliminating congestion, the proposed bus pullouts and parking spaces were eliminated from alternative 4 to preserve park land and play areas within St. Nicholas Park. The National Park Service proposes to work with the Friends of Hamilton Grange and the City College of New York to identify feasible locations for visitor parking. The text describing alternative 4 in the final plan reflects these changes.

COMMENTS AND RESPONSES

## COMMENTS

*page 2*
*Ms. G. Nelms*
*15 July 1993*

However, Alternative 4 also raises many questions which can only be answered by immediate, firm, and long-term commitments of the resources necessary to protect, enhance, and preserve this rare treasure should that alternative be adopted. It also appears to me that considerable effort must be expended for public information and education with respect to the importance of the Grange and its surrounding environment, regardless of which alternative is selected. Without such efforts, it is doubtful that members of the public will demonstrate the necessary pride and community spirit to assure the success of the project.

Should the necessary resources be committed, we would certainly look forward to the results of the restoration and relocation of the Grange. Indeed, we would be pleased to join with others in heralding what could be a very positive and constructive step forward for the community which we are proud to be a part of.

Thank you for asking for my views, and thank you for the effort being put into the consideration of the various proposals.

Sincerely yours,

Robert F. Van Lierop
Ambassador
Permanent Representative

cc: The Honorable Charles Rangel
U.S. House of Representatives
2252 Rayburn House Building
Washington, D.C. 20515

RFVL:mtc

## RESPONSES

2. Following the completion and review of the final plan, the process for resource commitment and/or acquisition would begin. The foreseen steps in this process are identified in appendix H of the final plan. As noted in the alternative 4 description in the final plan, communicating the importance of the Grange and the surrounding community would be a major component of the interpretation and education at the restored Grange and the new Convent Avenue building.

## COMMENTS

### RESPONSES



**Cooper-Hewitt Museum**

The Smithsonian Institution's
National Museum of Design

2 East 91st Street
New York, NY 10128
Telephone 212-860-6868
Fax 212-860-6909

July 12, 1993

The Honorable Charles B. Rangel
United States Congressman
Adam Clayton Powell State Office Building
163 West 125th Street
New York, New York 10027

Dear Congressman Rangel:

My Name is Deirdre Scott and I am Program Coordinator for Audience
Development at Cooper-Hewitt, National Museum of Design, Smithsonian
Institution. In addition to that designation I am also a board member of
the Upper Manhattan Society for Progress Through Preservation and an
active concerned citizen of New York City. As an African American I have
been an ardent follower and supporter of preservation issues especially as
they affect Harlem, Upper Manhattan and the Bronx - areas that have been
historically overlooked and neglected. I am writing to you now to make
you aware of my concerns which are shared by a great many people and to
request that you help secure the full restoration of Hamilton Grange to
its original grandeur by leading the effort to guarantee sufficient funds
from congress.

When erected in 1802 the Hamilton Grange was an architectural masterpiece
of great sophistication by one of the country's first professional
architects, John McCoombs Jr. who also designed New York's City Hall.
Today, and for over 100 years it has been an architectural aberration
wedged between two massive structures totally out of scale and character
with its delicate design.

The Parks Service, happily mindful of the fact that for many years
attempts to restore the Grange were also used as a subterfuge to remove

89


*Federal Agencies*

## COMMENTS

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

REGION II

JACOB K. JAVITS FEDERAL BUILDING

NEW YORK, NEW YORK 10278-0012

Class: LO

Joseph T. Avery
Acting Superintendent
National Park Service
Manhattan Sites
26 Wall Street
New York, New York  10005

Dear Mr. Avery:

The Environmental Protection Agency (EPA) has reviewed the draft
environmental impact statement and general management plan for
the Hamilton Grange National Memorial (the Grange). This review
was conducted in accordance with Section 309 of the Clean Air
Act, as amended (42 U.S.C. 7609, PL 91-604 12(a), 84 Stat. 1709),
and the National Environmental Policy Act.

The proposed project involves the development of alternatives for
future management and use of the Grange. These alternatives have
been developed in an attempt to address the problems of
inadequate staffing, inefficient maintenance organization, unmet
visitor needs, poor security and severe structural conditions
which plague the site. Further, the alternatives consider
Congress's directive to preserve the Grange "in a fitting
setting."

EPA believes that the implementation of any of the project
alternatives will not result in significant adverse environmental
impacts. Therefore, in accordance with EPA policy, we have rated
this project as LO, indicating that we do not object to
implementation of the project.

Should you have any questions concerning our comments, please
contact Joanne Arenwald of my staff at (212) 264-6689.

Sincerely yours,

*[signature]*

Robert W. Hargrove, Chief
Environmental Impacts Branch

PTD ON RECYCLED PAPER

## RESPONSES

COMMENTS AND RESPONSES

## COMMENTS

New York State Office of Parks, Recreation and Historic Preservation
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189, Waterford, New York 12188-0189

518-237-8643

July 1, 1993

Marie Rust
Regional Director
U.S. Department of the Interior
National Park Service
North Atlantic Region
15 State Street
Boston, Mass.  02109-3572

Dear Ms. Rust,

Re: DOI
Hamilton Grange National
Memorial
Manhattan, New York
92PR2184

Thank you for requesting the comments of the State Historic Preservation Office (SHPO). We have reviewed the project in accordance with Section 106 of the National Historic Preservation Act of 1966 and the relevant implementing regulations.

Staff from this office have recently visited this historic property. Therefore, after reading the report submitted by your office, it is the opinion of the SHPO that, while any of the four alternatives would be an acceptable treatment of this property, we concur with your findings that proposal #4 (moving the structure to a new site) is the preferred alternative. This would allow the original orientation of the house to be restored, provide a much more appropriate setting for the house as well as offer more opportunities for public programming. As for the Hamilton Heights Historic District, it appears that the move would have no adverse Effect despite the Grange being considered a contributing building. These comments are given with the proviso that the proper procedures for review of the move of a National Register listed property will be followed.

Please use our project review identification number if additional correspondence is necessary. If you have any questions, please call Jim Warren of our Project Review Unit at (518) 237-8643, Ext. 280.

Sincerely yours,

*[signature]*

Julia S. Stokes
Deputy Commissioner for
Historic Preservation

JSS/JPWtr

An Equal Opportunity/Affirmative Action Agency

## RESPONSES

1. Compliance procedures are outlined in the "Compliance with Federal and State Laws, Executive Orders, and Regulations" section of the *Final General Management Plan/Environmental Impact Statement*. The procedures outlined in the draft plan have been amended to include the findings of the determination of eligibility for St. Nicholas Park.

92

*Local Agencies*

COMMENTS

RESPONSES

---

THE CITY OF NEW YORK LANDMARKS PRESERVATION COMMISSION
225 BROADWAY, NEW YORK, NEW YORK 10007 PHONE (212) 553-1100

# R E P O R T

| DATE | ADDRESS | BOROUGH | BLOCK | LOT | LP |
|---|---|---|---|---|---|
| August 3, 1993 | 287 Convent Avenue | Manhattan | 2050 | 4 | 93-3374 |
| REPORT NUMBER | 94-0003 | HAMILTON GRANGE | | 12-0317 | LP NUMBER |
| | HISTORIC DISTRICT/NAME OF BUILDING | | | | DRAFT |

HAMILTON HEIGHTS HISTORIC DISTRICT

**LANDMARKS PRESERVATION COMMISSION REPORT**

CR 94-0003
August 3, 1993

With respect to docket number 93-3374, a schematic proposal to move Hamilton Grange from its present non-original site at 287 Convent Avenue to St. Nicholas Park and to restore the building to its original condition, 287 Convent Avenue, LP-0317, Borough of Manhattan.

This report is pursuant to Title 25, Chapter 3 of the Administrative Code of the City of New York, which requires such a report by the Landmarks Preservation Commission when plans for the construction, reconstruction, alteration or demolition of any improvement or proposed improvement which is owned by a governmental agency, and is or is to be located on a landmark site or in a historic district or which contains an interior landmark.

At the Public Meeting of July 13, 1993, following the Public Hearing and Public Meeting of June 22, 1993, the Landmarks Preservation Commission reviewed a schematic proposal to move Hamilton Grange from its present non-original site to a new site at St. Nicholas Park, and to restore the building to its original condition, as shown in the photographs, the Draft Environmental Impact Statement and in drawings 1 and 2, dated received May 27, 1993, prepared by the National Park Service, submitted as components of the application, and presented at the Public Hearing and Public Meetings.

In reviewing this proposal, the Commission noted that Hamilton Grange is a three-bay, two-story, wood frame, free-standing symmetrical, Federal style mansion designed by John McComb, Jr., and built in 1802-1803 for Alexander Hamilton as a country retreat; that the mansion originally featured identical north and south elevations, with two entry doors on two opposing sides and broad porches on two opposing sides; that the original siting of the mansion on 32 acres of land opened the house to all

## COMMENTS

August 3, 1993
Hamilton Grange
Page 2

sides, giving distant views in all directions, a concept of the geometrically perfect villa set in an expansive landscape; that in 1879 the property was divided into 200 building lots, and the rectangular street system was extended north with the grid for 143rd Street proposed to pass through the building; that in 1889 the mansion was moved 150 feet to the southeast to its present location at 287 Convent Avenue and acquired by St. Luke's Episcopal Church; and that when the mansion was moved and the adjacent church and apartment buildings were constructed, the building was turned sideways and the original front and back porches and entrance door were removed and relocated on the building. The Commission further noted that the interior of the mansion exhibits mostly original millwork, molding and plasterwork, showing evidence of Adamesque influence; that although the mansion is altered, it is one the few surviving examples of architect John McComb, Jr.'s domestic architecture; and that when the building was designated in 1967, the designation report noted that the National Park Service was considering moving the building to a more appropriate site and stated "as the building is now situated, the Grange cannot be made to reflect either its architect's conception or its condition when it was Alexander Hamilton's residence." The Commission finally noted that the mansion is closed to the public due to severe structural problems including floor joists that have pulled away from beam pockets, and split and horizontally cracked beams.

With regard to this proposal, the Commission found that moving the building from its present non-original site to a new location within St. Nicholas Park would enable the mansion to be restored to its original appearance with all doors, windows and porches restored to their original places; that the new setting of the mansion within the park would more closely recall the building's interrelationship within 32 acres of landscaped grounds; and that the restoration of the building in its new site would allow more comprehensive visitor programs which would enhance interpretation of this important national era and era as the city's tribute to Alexander Hamilton. Based on these findings, the work is found to be appropriate.

1 | However, the Commission also found that the existing site, being within the Hamilton Heights Historic District and associated with the Grange for over 100 years, is very important, and its disposition should be dealt with as part of the proposal.

2 | [continued text about moving and restoring the Grange — orientation of the house should consider not only the historic orientation of the house but also that the historic orientation with the front door facing south on the proposed site, which has a north-facing street frontage; and that any fence placed around]

## RESPONSES

1. Following the relocation of the Grange, a new building that is compatible with the architectural characteristics of the Hamilton Grange Historic District would be constructed. A possible design for the building is depicted in the final plan in the description of alternative 4. The purpose of the building would be for community use, heritage education programs, and NPS housing. In addition, the preservation efforts and the importance of the current location in the Grange's history would be presented through exhibits and interpretive media. (A more detailed description of the building is provided in the alternative 4 description in the final plan.) Restoration of the Grange and construction of the new building would occur simultaneously; the Convent Avenue site would not be left vacant.

2. The proposed orientation for the relocated Grange, as presented in the description of alternative 4 in the final plan, is the historical orientation to the south. However, based on site topography, the location of 141st Street, and the location of Steinman Hall, the most appropriate orientation and location of the house (within the acreage acquired) might be changed during the design process in consultation with the Friends of Hamilton Grange group, the state historic preservation office, the Landmarks Commission, and other state and local organizations. Site elements such as security fencing would be appropriately placed.

94

## COMMENTS

August 3, 1993
Hamilton Grange
Page 3

the site be as far removed from the mansion as possible and that the distance between the house and the high retaining wall at the edge of the park be increased, if possible, so that the mansion can read as a free-standing country retreat in the middle of a landscape.

Please note that the issuance of this report pertains to the schematic stage of this project only and that when final documents and drawings are completed they will need to be submitted to the Commission for review. Direct all inquiries and correspondence relating to this report to Jennifer Field, Landmarks Preservationist.

Very truly yours,

Laurie Beckelman
Chair

LB/JF/vp
cc: National Park Service
    Art Commission
    NYC Department of Parks and Recreation
    SHPO/Advisory Council
    Joan Olshansky
    Alex Herrera
    Laura Aliano
    City Record
    HDC
    Community Board 9
    Files

## RESPONSES

3.  As noted in response #1, the National Park Service would continue to involve the Landmarks Commission in the relocation and restoration of the Grange. Final design drawings would be submitted for the commission's review.

COMMENTS AND RESPONSES

## COMMENTS



City of New York
Parks & Recreation

The Arsenal
Central Park
New York, New York 10021

Henry J. Stern
Commissioner

October 27, 1994

Ms. Marie Rust
Director, North Atlantic Regional Office
National Park Service
15 State Street
Boston, Massachusetts 02109

Dear Ms. Rust:

It was a pleasure to have met with you, Michael Adlerstein and Joseph Avery last Monday to discuss the National Park Service proposal to relocate Hamilton Grange to a site within New York City's St. Nicholas Park.

Subject to future detailed negotiation, Parks & Recreation hereby approves the basic concept of the plan. We believe it is in the public interest to move the Grange to a more attractive and spacious setting. As we discussed, there are a number of issues which a final agreement between the parties must address.

**1**

**Loss of Trees/St. Nicholas Park**

We are particularly concerned about the possible loss of mature trees from St. Nicholas Park. The National Park Service should rely upon siting and construction options which can preserve the existing large trees, including consideration of siting the house to the east (somewhat downhill) from the currently proposed site. When trees must be removed, New York City requires tree replacement based upon a Basal Area Replacement Formula, namely that the cross-sectional area of replacement trees equals the cross-sectional area of trees removed. The Grange relocation must meet or surpass this standard.

**2**

**Land Transfer/Park Mitigation**

We would prefer to limit the land transfer to the immediate grounds of the new Grange location, which should roughly correspond to the property within St. Nicholas Park which formerly was part of Alexander Hamilton's Grange property. In partial exchange for this land transfer, the National Park Service should perform ongoing maintenance and operational support for the upkeep of related areas of St. Nicholas Park. Such ongoing maintenance support will not only improve the public experience of the relocated Grange, but will more importantly provide the greatest compensatory benefit to the surrounding neighborhood which currently uses St. Nicholas Park.

**3**

**Land Replacement**

Our usual practice requires at least acre-for-acre replacement for the loss of City parkland. In this case, Parks & Recreation would expect that our transfer of land within St. Nicholas

## RESPONSES

1.  The National Park Service would work with the city to site the house in such a way as to preserve the maximum number of trees. The cross-sectional area of trees that must be removed would be replaced by the 13 commemorative sweetgum trees along with other trees necessary to achieve the basal area replacement formula.

2.  Final determination of the area and extent of land transfer would be made through negotiations between the city and the National Park Service. Following the definition of the related areas and the area to be transferred, the National Park Service would work with the city Department of Parks and Recreation to provide/ensure ongoing maintenance of those areas.

3.  The National Park Service and the city would address the actual method of land transfer in future negotiations. As part of those negotiations the National Park Service would explore land replacement from federally owned lands. Appendix H outlines the acquisition procedures anticipated by the National Park Service. Any land transfer from the federal government to the city related to this plan might require additional compliance with the National Environmental Policy Act.

## COMMENTS

Henry Stern to Marie Rust, NPS, re: Hamilton Grange          Page 2

Park to the Federal government be accompanied by similar transfer of land from the Federal government to the City. The transfer of the Coast Guard Building located between Battery Park and the Staten Island Ferry Terminal would enhance public waterfront access and provide a valuable addition to Battery Park.

**National Register Eligibility**
My staff concur with the finding of the New York State Office of Parks, Recreation, and Historic Preservation that St. Nicholas Park, originally designed and built by Samuel Parsons but subsequently reconstructed and modified in the 1930's and later, does not retain sufficient historical integrity to merit National Register eligibility.

Should the National Park Service decide to pursue the relocation of Hamilton Grange into St. Nicholas Park, my staff and I would be pleased to meet with you to discuss the terms of the agreement and conditions of the land transfer. Please call me or Stephen Whitehouse, our Chief of Planning at (212)-360-3403, when you are ready to proceed.

All the best,

Henry J. Stern

## RESPONSES

97

COMMENTS AND RESPONSES

**COMMENTS**

| RESPONSES |
| --- |



The City of New York

Ruth W. Messinger
President, Borough of Manhattan

Thomas R. Lerland
Chair

Verna D. Miller
First Vice-Chair

Thomas Bynum
Second Vice-Chair

Curtis A. Thompson
Secretary

Carolyn P. Hammond
Assistant Secretary

Victor Victoria
Treasurer

Joseph H. Carter
Assistant Treasurer

Lawrence T. McClean
District Manager

**CB9M**

565 West 125 Street
New York, New York 10027
(212) 864-6200/Fax # 662-7396

COMMUNITY BOARD #9, MANHATTAN

September 20, 1993

Mr. Joseph Avery
Acting Superintendent
United States Department of the Interior
National Parks Service Manhattan Sites
26 Wall Street,
New York, NY 10005

Dear Mr. Avery:

Both the Parks Committee and the Landmarks and Historic Preservation Committee of Manhattan Community Board No. 9 would like to thank you and your staff for your presentation at the Public Hearing held on Thursday, September 9th, in the matter of the restoration of Hamilton Grange.

To confirm what you already know from that meeting, the meeting resolved that it favors alternative No. 4. The vote was as follows:

Community Board: In Favor: 7    Opposed: 5
Abstaining: 1

Community: In Favor: 14    Opposed: 11
Abstaining: 0

Very truly yours,

Barbara Pietz, Co-Chair
Parks Department

Rosalie Jean Baptiste, Co-Chair, Parks Department

Jonathan Miller, Co-Chair
Landmarks and Historic Preservation



SERVING HAMILTON HEIGHTS/MANHATTANVILLE & MORNINGSIDE HEIGHTS

98

*Local Agencies*

## RESPONSES

## COMMENTS

The City of New York

Ruth W. Messinger
President, Borough of Manhattan

Theodore P. Kovaleff
Chair

Martin D. Miller
First Vice-Chair

Thomas Bynum
Second Vice-Chair

George R. Thompson
Secretary

Cecilia R. Hammond
Assistant Secretary

Victor Villacis
Treasurer

Joseph M. Carter
Assistant Treasurer

Lawrence T. McGhee
District Manager

**CB9M**

**COMMUNITY BOARD #9, MANHATTAN**

565 West 125 Street
New York, New York 10027
(212) 864-6200/Fax # 662-7396

March 18, 1994

Mr. Joseph T. Avery, Superintendent
National Park Service, Manhattan Sites
26 Wall Street
New York, NY 10005

Dear Mr. Avery:

At our regularly scheduled General Board meeting held on Thursday, March 17, 1994, the attached resolution regarding "National Parks Service Alternative Proposals for the Relocation/Restoration of the Hamilton Grange" was passed by a vote of 18 in favor, 11 opposed, 2 abstentions and 0 abstentions for cause.

Sincerely,

Theodore P. Kovaleff

Enclosure

cc: Elected Officials

SERVING HAMILTON HEIGHTS/MANHATTANVILLE & MORNINGSIDE HEIGHTS

99

## COMMENTS

**RESOLUTION RE: RELOCATION AND RESTORATION OF THE HAMILTON GRANGE**

Whereas, the National Parks Service has drafted a General Management Plan/Environmental Impact Statement for the renovation of the Hamilton Grange National Memorial; and

Whereas, the NPS preferred alternative/proposed action would

--re-site the Grange itself within St. Nicholas Park on a level area representing the southerly continuation of Hamilton Terrace across W. 141st St. in order to allow full architectural restoration of the Grange to its interior and exterior appearance during Hamilton's residency and the landscaping of a setting more reflective of its original rural placement at (now) W. 143rd St. and Convent Avenue; and

---

**1**

--construct upon the present Convent Avenue site a compatible structure housing a Ranger residence, exhibition space, and a reception room for community use; and

Whereas, this proposed action appropriately memorializes Hamilton's contribution as a founder of our government, recognizes and celebrates the achievement of this architect, John McComb, Jr., architect with Joseph F. Mangin of City Hall, extends use of the current NPS site and provides for community presence of NPS Rangers, promotes greater security within St. Nicholas Park, promotes national focus upon enlarged and enhanced educational and both NYC historical/educational efforts and international tourism, and places Hamilton Heights at the center of an emerging Revolution Trail linking nationally significant historic sites and events throughout the length of Manhattan;

---

**2**

Be it resolved that Community Board #9/Man. actively supports the National Park Service in this Memorial renovation, and

Be it further resolved that the Board pledges assistance to Congressman Charles B. Rangel and Senator Daniel P. Moynihan in their efforts toward passage of appropriate Congressional funding legislation, and

---

**3**

Be it further resolved that the Board calls for institution of a community-based organization, Friends of the Hamilton Grange, to be allowed an active support and oversight role toward the Grange -- in guarantee of the community's interest in this long-treasured National Memorial, the foremost historic and architectural endowment within our boundaries of responsibility.

## RESPONSES

1. Alternative 4 in the final plan has been amended to identify a new NPS ranger residence and community use facility as the appropriate use for the Convent Avenue site once the Grange has been moved. The vest-pocket park has been eliminated as a viable option.

2. The concept of a Revolution Trail was not specifically identified in the draft plan and is not addressed in the final plan. The trail is part of a larger planning concept that involves Hamilton Grange, the five remaining sites within the Manhattan Sites group (Federal Hall, Grant's Tomb, Theodore Roosevelt's birthplace, St. Paul's Church, and Castle Clinton), and other historic sites within the city. The future of the trail will be discussed in the general management plan/ environmental impact statement for Manhattan Sites, which will be on public review in the future.

3. The Friends of Hamilton Grange group was identified in the draft plan and is also included in the final plan (in the "Actions Common to All Alternatives" section). Formation of the group has been initiated by the National Park Service 2.

*Organizations*

## COMMENTS

## RESPONSES

Ms. Georgette Nelms, Superintendent of Manhattan Sites
The National Park Service, Department of the Interior
26 Wall Street
New York, New York 10005

July 13, 1993

Dear Ms. Nelms:

I send this letter in support of the proposed relocation and restoration of Hamilton Grange, the early 19th century home of Alexander Hamilton. I believe that the plan is a reasonable and responsible solution in regards to both preserving a landmark and assuring a strong future for the surrounding community.

As curator of a Federal-era country residence, I am well aware of the historical significance of Hamilton Grange. Like Boscobel, Hamilton's famous residence represented the best of American architecture and decorative arts. Today, as the house sits overwhelmed by domineering structures, the significance of its original conception is lost. How successful is an historic structure exhibited in so foreign a situation to that which it was built? By relocating Hamilton Grange to the nearby park setting, you will be able to strengthen its presentation, and thus its attractiveness and historical significance for drawing visitors.

The value of this proposed relocation must also be seen as beneficial to the surrounding community. By strengthening Hamilton Grange's presentation and offerings to a public audience, you will be increasing the numbers of visitors to the entire neighborhood – encouraging a rediscovery of one of Manhattan's most interesting areas. This proposed plan would benefit the entire community from the perspectives of both preservation and business.

It is my hope that this plan becomes a reality. I applaud its creation, and I offer my services to help make this relocation happen.

Sincerely,

James Archer Abbott,
Curator of Collections

*Boscobel Restoration, Inc.*

GARRISON-ON-HUDSON, NEW YORK

101

COMMENTS AND RESPONSES

## RESPONSES

1. An evaluation of St. Nicholas Park has been completed in response to public concerns expressed following the release of the draft plan. The National Park Service, working with the state historic preservation officer and the city Department of Parks and Recreation, completed a determination of eligibility for the National Register of Historic Places. The integrity of the park as a whole was analyzed using national register criteria.

2. As noted in response #1, St. Nicholas Park was evaluated to determine its level of significance and integrity. Some of the character-defining elements are discussed in the sections of the final plan. However, it has been determined by the state historic preservation officer and the city Department of Parks and Recreation that the park does not retain sufficient historical integrity to meet national register eligibility (see appendix J).

   A copy of the determination of eligibility can be provided by the National Park Service if requested.

## COMMENTS

CATALOG OF LANDSCAPE RECORDS IN THE UNITED STATES

Wave Hill
675 West 252nd Street
Bronx, New York 10471
212/549-3200

RE: THE GRANGE, ALEXANDER HAMILTON'S HOUSE

In the discussion about the proposed resiting of The Grange, Alexander Hamilton's house from its present location to nearby Saint Nicholas Park, one exceedingly important, indeed critical element, has been overlooked—namely the park itself. It is being treated as a vacant lot. Advocates of the move assert the park will be "improved" by the insertion of The Grange. Saint Nicholas Park is not a vacant lot. Saint Nicholas Park and its history deserve recognition. This recognition must be part of any serious, educated discussion.

Saint Nicholas Park is the work of Samuel Parsons, Jr. (1844-1923). The Parsons family (for whom Parsons Blvd. in Queens is named) was well established and respected in the 19th century horticultural world. It was the Parsons Nursery, remnants of which can still be seen in Kissena Park, that Samuel Parsons, Sr. introduced for the first time Japanese cutleaf maples to the nation. Parsons also was the first in the country to propagate rhododendrons. Much of the plant material supplied for New York's Central Park came from the Parsons Nursery.

Samuel Parsons, Jr. was educated at Haverford and Yale. He was partner to Calvert Vaux until the latter's death in 1895. In addition to continuing private practice, with commissions nationwide, Parsons was in charge of New York City's parks longer than any single person. In 1882, he was appointed Superintendent for Planting; in 1898 Landscape Architect and in 1906 Parks Commissioner. His career bridged the change in taste from the "beautiful and picturesque" to the "reform era" parks.

Saint Nicholas Park is the only existing example of Parsons' work in the picturesque style. Character defining elements, e.g. boundaries, circulation systems, topographical delineation are all intact. Some original plant material is evident though in mature even declining state. Only to remember the decrepitude of Central Park in the 1960s to know that present conditions are not insurmountable to a proper rehabilitation.

1

2

## COMMENTS

Page 2

I must comment on the irony of the present situation. Parsons was often the single dissenting voice against incursions into the green spaces of New York's Central Park. Some of the suggested insertions included expositions and a race-track. Indeed it could be asserted that Central Park, as we know it and treasure it today, is as a result of Parsons' unyielding defense of the original design intent of Olmsted and Vaux.

My personal opinion is that The Grange should stay right where it is. Why? Because it teaches valuable lessons, only two of which I will summarize:

* The power of a single persons' determination in the Preservation Movement. Whether it be Ann Pamela Cunningham and Mount Vernon, or Rev. Isaac Tuttle and The Grange. The houses were saved, by the perseverance of one person.

* The present discussions speak to the growth and philosophical sophistication of the Preservation Movement in the United States. To move is good. To move with contextual integrity is better. We have come a long way.

Will moving The Grange, making changes, drastic, even mutilating changes, in Saint Nicholas Park merely be another form of insensitivity to site? Another form of misplacement?

The point of this letter is to be sure that any discussions about The Grange and its location or proposed relocation should, indeed MUST include Saint Nicholas Park as a cultural resource in its own right.

Toward this end, I enclose a bibliography of the work of Samuel Parsons, Jr. A copy of the Planting Plan for Saint Nicholas Park takes from Parsons book Landscape Gardening published in 1910 by John Lane Company, New York. It should be further noted that one of Parsons' books, The Art of Landscape Architecture is being reprinted in the near future. The New York State Council on the Arts has just awarded a grant for an exhibition on the legacy of Samuel Parsons, Jr.

Yours truly,

Catha Grace Rambusch
Cathe Grace Rambusch
Director/CATALOG

## RESPONSES

3. The Grange has a rich history within preservation efforts. In relocating the house, it would become possible to restore the architectural and structural qualities of the house. The proposed relocation site in St. Nicholas Park is on the peripheral boundary of the northern end. Throughout the history of the park, several additions and structural intrusions have occurred, mostly in the north and east sides of the park. The proposed site of relocation would not compromise the picturesque qualities of the central part of the park, and it would not be a visual intrusion from the northeast staircase and entrance of the park.

4. See responses #1, #2, and #3.



COMMENTS AND RESPONSES

**RESPONSES**

**COMMENTS**



104

*Organizations*

## COMMENTS | RESPONSES

*Architecture*, July 1949; XXXIX(9): 184-186. An early brief assessment of Parmentier as a landscape designer.

Stiles, Henry R. *A History of the City of Brooklyn*, Brooklyn, NY: Published by Subscription, 1869. Vol. II, pp. 173-174, contains an anecdotal quotation from an unidentified source, which describes Parmentier's "prompt, entire comportment" and his "enthusiastic devotion to Pomological art," as well as his abilities as a musician and artist. Refers to many sketches and drawings still in the possession of the family. The source describes Parmentier's horticultural prowess but says nothing about his activities as a landscape designer.

Toole, Robert M. "Wilderness to Landscape Gardens, The Early Development of Hyde Park." *Hudson River Regional Review*, September 1991; 8(2): 1-33. Discusses both the third and fourth ownerships of Hyde Park.

Contributed by Cynthia Zaitzevsky, Ph.D.

No repository has been located that contains original papers and drawings by or relating to André Parmentier. However, the Saint Joseph Convent, Brentwood, NY has Parmentier family records and portraits scattered primarily on André Parmentier Brye and her beneficiaries? Additionally, the Western Historical Manuscript Collection, University of Missouri, Columbia, MO holds the Charles Van Ravensway Collection, which include a draft manuscript on Parmentier by the late Dr. Van Ravensway, including extensive notes collected by him. This material was very useful to the project; notes mentioning the Vanderbilt Mansion National Historic Site Cultural Landscape Report listed above, although Dr. Van Ravensway's research focused more on Parmentier as a horticulturist than a landscape designer.

**[Name]** b. 1844, d. 1923. Samuel Parsons, Jr. was born in New Bedford, MA, the son of Samuel Bowne Parsons, a nurseryman, and Susan (Bowne) Parsons. Founder by two generations of Quaker horticulturists, his family propagated and cultivated nursery stock for nearly two centuries. This nursery prospered until the elder Parsons' death (1907), it brought to the family international notoriety, opportunities for international travel, and the ability to introduce a variety of ornamental trees and shrubs to the U.S.



Parsons, Jr. Samuel, ca 1910s. (Frontispiece, Memories of Samuel Parsons, 1926).

Parsons first studied at Haverford College and later graduated from Yale Scientific School with a Bachelor of Philosophy in 1862. His studies emphasized Agricultural Chemistry, Geology, Botany, Physics and Surveying. After college he studied farming, first for one year on a model farm on Cayuga Lake, and then six on his own farm in southern New Jersey. This was followed by five years in the family nursery, Parsons & Sons Company, Flushing, NY. Here his attention was turned to laying out and planting country places. This period of practical experience prepared Parsons for his association with Calvert Vaux, when he joined his NYC office. Vaux and Company, as a student. In the course of one year he became a partner. During this tenure numerous places were laid out throughout the country. In 1881, Vaux was asked to return to the NYC Parks Department, which he agreed to do on condition that Parsons be able to join him. Thus began a thirty-year tenure for Parsons as a public servant.

Parsons began this career as Superintendent of Planting, which was initially Vaux's assistant. Here he helped Vaux to perfect plans, with an emphasis on planting. Although Vaux later resigned in 1883 for two years, upon

93

COMMENTS AND RESPONSES

| COMMENTS | RESPONSES |
|---|---|

## PIONEERS OF AMERICAN LANDSCAPE DESIGN

his return, the two worked together on every phase of park design within the city. This meant attention to development in various parts of Central Park, and to the redesign, design and/or construction of such parks and open spaces as Union Square, Morningside Green, Union and Abingdon Squares, and Riverside Park. Upon Vaux's Christopher Park. After Vaux's death in 1895, Parsons retained the role of Landscape Architect. He left the department briefly for four years, 1898-1902, and served as Commissioner for a brief period in 1905. During this time he oversaw much of the design and planting in Central, Riverside and Morningside Parks, and the creation, design and construction of St. Nicholas, DeWitt Clinton, Thomas Jefferson, and John Jay Parks and the Broadway Mall. (59-1/256 Street). Through his responsibilities at the Parks Department, as president of the Park Board of Manhattan and Richmond, NY, and as the landscape architect appointed to the City Improvement Commission, he played a pivotal role during a time when New York City's parks evolved from Picturesque to Reform-Era designs.

Parsons' commissions can be found throughout the country in the form of parks, playgrounds, estates, gardens, cemeteries, planned communities (or homestead parks as he referred to them), public grounds, and campus plans. He was the first professional landscape architect hired by the cities of Birmingham, AL (Giles Iris Park) and San Diego, CA (Balboa Park). A sampling of career projects includes: the National Capital Grounds (undertaken under an Act of Congress), Washington DC (unexecuted); League Island Park, Philadelphia, PA; Pine Lawn Cemetery, Syosset, L.I.; Evergreen Park Cemetery, Brooklyn, NY; Albemarle Park, Asheville, NC; the University of Alabama at Tuscaloosa, AL; "Elmendorf" Horse Farm, Lexington, KY; "Berry Hill", Newport, RI and "Linlield", Roslyn, NY.

Concurrent with public service and his own practice, Parsons & Co., the American Society of Landscape Architects (ASLA) was founded in Parsons' NYC office in the St. James Building on January 4, 1899 — due largely to his persistence. He was selected the first Vice President, with John Charles Olmsted as President, and played a role in drafting its first constitution among other tasks. He later served as president in 1902, and again in 1906-7.

Throughout his career, Parsons wrote extensively including numerous articles in Scribner's Magazine, Garden & Field, The American Garden, The Outlook, and The American Architect. He also wrote seven major books. His design philosophy and much of his career

94

sources can be gleaned from these publications and its significant legacy extant in the American landscape today.

. . . .

Parsons, Jr., Samuel. "Italian Villas; Their Place and Function in the Landscape." The American Architect, 24 July 1915; CVIII(2066); 49-55, 59, illus.

Parsons, Jr., Samuel. "Landscape Surrounds for Academic Buildings". The American Architect, 20 October 1915; CVIII(2078); 257-264, Photos.

Parsons, Jr., Samuel. "Lawn and Landscape: Suburban Lawns." The American Garden, April 1881; II(1) 9.

Parsons, Jr., Samuel. "Lawn and Landscape; An Ideal Lawn." The American Garden, October 1881; II(7) 60.

Parsons, Jr., Samuel. "Lawn and Landscape: Nookishness." The American Garden, February 1882; III(2): 24.

Parsons, Jr., Samuel. "Lawn and Landscape: Ornamental Climbing Vines." The American Garden, September 1882; III(9): 116.

Parsons, Jr., Samuel. "Lawn and Landscape: The Hardy Azalea," The American Garden, December 1882; III(12): 184.

Parsons, Jr., Samuel. "Lawn and Landscape: Rhododendrons." The American Garden, June 1883; IV(6): 108.

Parsons, Jr., Samuel. "Lawn and Landscape: Central Park." The American Garden, December 1883; IV(12): 230.

Parsons, Samuel, Jr. "Lawn Planting for Winter Effect." The Atlantic Monthly, May 1881; (XLVII).

Bailey, Liberty Hyde (Ed.). Cyclopedia of American Horticulture. New York: The Macmillan Company; 1910. Includes "Lawn", by Parsons: (pp. 890-893.)

Copies, Harold A.; Pray, James Sturgis; Vaux, Downing (Ed.). Transactions of the American Society of Landscape Architects 1899/1908. Harrisburg, PA: Horace McFarland Co. "Small City Parks" by Parsons. Includes many Reform Era park designs. (pp. 77-80).

Copies, Harold A.; Pray, James Sturgis; Vaux, Downing (Ed.). Transactions of the American Society of Landscape Architects 1899/1908. Harrisburg, PA: Horace McFarland

**RESPONSES**

**COMMENTS**

# AN ANNOTATED BIBLIOGRAPHY

Co. "Interesting Facts in Regard to the Inception and Development of Central Park" by Parsons. Includes early park plan. (pp. 105-110).

Chan, Eugene (Ed.), Parsons, Mabel (Planner), Fowler, Clarence (?) (?). Reginald Henry Grounds. New York: Mabel Parsons, 1924. A rare collection of garden photos from the family trip to England. The book is dedicated to the memory of Samuel Parsons.

Parsons, Jr., Samuel. "Blythbury in the Hyton Grenadic ..." New Sectors the Rural Kimdal", Country Life in America. November 1901; 25-26.

Parsons, Jr., Samuel. "How to Make a Garden — The Lawn: Some of the Principles Explained by a New York Landscape Gardener", Country Life in America. March 1902; 173.

Elwood, P. H. (Ed.), American Landscape Architecture. New York: The Architectural Book Publishing Co., Inc.; 1924. Photos of Ajax, Snuff, Cook, and Sixteen Estates designed by Parsons (pp. 122-124).

Mathews, Jane Giacvino and Mathews, Richard A. (Ed.). The Manor and Cottages: Albemarle Park, Asheville, North Carolina: A Historic Planned Residential Community, Asheville, N.C: The Albemarle Park Manor Grounds Association, Inc.; 1991. Includes the chapter "The Landscape of Albemarle Park: Samuel Parsons' Vision" by Charles Birnbaum (pp. 40-45). Historic and contemporary photos, plans.

Parsons, Mabel (Ed.), Memories of Samuel Parsons. New York and London: G.P. Putnam's Sons, 1926. After her father's death in 1923, Mabel Parsons (1902-1964) completed his detailed biography; how he met Olmsted and Vaux; the Central Park years and the battle to preserve the intent of the "Greensward" plan for the following decades. Personal photos as a frontispiece.

Parsons, Jr., Samuel. "The Parks and the People", The Outlook, 7 May 1904; 32-33.

Parsons, Jr., Samuel and O'Donovan, W.R. "The Art of Landscape Gardening", The Outlook. 22 September 1906; 222-231.

Parsons, Jr., Samuel, The Art of Landscape Architecture. New York and London: The Knickerbocker Press, G. P. Putnam's Sons, 1915. Parsons' study of the development of landscape architecture and "its application to modern landscape gardening." The technician of his work and design philosophies. Many photos of which some are identified.

Parsons, (Jr.), Samuel (Ed.), Hints on Landscape Gardening, Boston and New York: Houghton Mifflin Company, The Riverside Press, 1917. Parsons writes introduction and serves as editor for the reprint of Prince von Puckler-Muskau's classic. Preface by John Nolan. Second in a series of "undertaken" books to be published with the cooperation of the ASLA.

Parsons, Jr., Samuel, How to Plan the Home Grounds. New York: Doubleday & McClure Co; 1899. "Basic principles concerning the selection and design of residential properties." Discussion of plant materials. Engravings, plans, sections.

Parsons, P., Samuel, Landscape Gardening, New York, London: G.P. Putnam's Sons, The Knickerbocker Press; 1891. Emphasis on landscape composition and plant materials. Changes in nomenclature to wall illustrated. Innovative use of photos and engravings for the period.

Parsons, (Jr.), Samuel, Landscape Gardening Studies, New York: John Lane Company; 1910. One of the few books by Parsons to contain his own work with prolific nature and locations. Includes many photos and plans.

Parsons, Jr., Samuel, Report to Park Board New York City of Samuel Parsons, Landscape architect on Visit to European Parks. New York: Martin B. Brown Company Printers, 1906. Short monograph.

Parsons, Jr., Samuel, "Lawn Planting for City and Country", Scribner's Monthly Magazine, 1879; (VIII):649.

Parsons, Jr., Samuel, "The Ornamentation of Ponds and Lakes." Scribner's Monthly Magazine. March 1891; IX(5) May NYC examples including Union Square.

Parsons, Jr., Samuel, "Small Country Places." Scribner's Monthly Magazine. March 1891; XI(5). This is the same article that appears in Homes in City and Country.

Parsons, Jr., Samuel, "The Evolution of A City Square." Scribner's Monthly Magazine. July 1892; XII(3); 107-116. Focus on smaller NYC parks designed with Vaux.

Storrje, Russell; Reed, Edda W.; Price, Bruce, Mitchell, Donald G.; Parsons Jr, Samuel; Lim, W.A. Homes in City and Country. New York: Charles Scribner's Sons; 1893. Includes chapter by Parsons on "Small Country Places." Previously published in Scribner's Monthly.

95

107

COMMENTS AND RESPONSES

| COMMENTS | RESPONSES |
|---|---|

## COMMENTS

PIONEERS OF AMERICAN LANDSCAPE DESIGN

Vaux, Calvert and Parsons, Jr., Samuel. *Concerning Lawn Planting*. New York: Orange Judd Company; 1881. *This 30+ page monograph is a series of short essays in alternating chapters by the authors. Parsons' focuses on plant materials (eg. "My Friend the Andromeda"), while Vaux addresses broader design applications ("The Value of Sky").*

. . . . .

The location of the office papers of Parsons & Co. is not known today. However the NYC Municipal Archives contains the Central Park Collection representing Parsons' public service career. The Archives are being catalogued, and there is also related correspondence which is organized by year, much of which is in Parsons' own hand. Also in NYC, the Arsenal, at the Department of Parks & Recreation, has detailed meeting minutes and a photographic bibliography for all Annual Reports. The Long Island Collection, Queens Public Library contains the Parsons family papers including information on the nursery operations, Quaker society meetings, family tree, etc. There is also a scrapbook of newspaper articles highlighting personal controversies and achievements. The NY Historical Society has a limited collection and a small family file. Other archives are usually job specific and can be found locally. Examples include the photographic archives of the Birmingham Historical Society with historic images of Parsons-designed residential communities. The Birmingham Public Library, Dept. of Archives and Manuscripts includes the family papers of Robert Jemison, Sr. The San Diego Historical Society holds one of the few collections of known correspondence from Parsons & Co related to Balboa Park found in the George Marston family papers. Also the California Room, San Diego Public Library has over 100 related drawings. The Frances Loeb Library at Harvard, Cambridge, MA has ten original plans by Parsons.

Contributed by Charles A. Birnbaum

◆

Peets, Elbert, b. 1886, d. 1968. Elbert Peets was born in Hudson, OH on May 5, 1886. Educated in the Cleveland public school system, Peets worked as a teenager for H. U. Horvath, a landscape architect and nurseryman who served as a consultant forester to the City of Cleveland. After graduating, magna cum laude, Phi Beta Kappa, and with First Scholarship Honors from Cleveland's Western Reserve University (1912), Peets enrolled in the graduate program in landscape architecture at Harvard University, earning an MLA (1915).

96

## RESPONSES



Elbert Peets. *(Photo courtesy of Cornell University Libraries, Department of Manuscript and University Archives.)*

Because of his early training, Peets taught horticulture at Harvard and also published a book, *Practical Tree Repair* (1916). He then worked for the Cambridge, MA firm of Frey, Hubbard and White. Around 1915 or 1916, he met Werner Hegemann, a well-known planner from Germany who worked as a consultant to many American cities. This association resulted in the preparation of numerous plans for communities in Wisconsin, including the company town of Kohler. Peets served as a civilian planning engineer for the U.S. Army during WWI (1917-1918), followed by a return to Wisconsin, where he again worked with Hegemann until late 1919. In 1920, he spent a year in Europe, using funds from the Charles Eliot Travelling Fellowship that Harvard had awarded him in 1917. Following his return to the United States, Peets immediately rejoined Hegemann and began to collaborate on their profusely illustrated volume, *The American Vitruvius: An Architects' Handbook of Civic Art* (1922).

After returning to Cleveland and developing a private planning office that he maintained throughout the 1920s and into the 1930s, Peets established a reputation as one of America's leading critics in landscape architecture, publishing a series of especially insightful articles in

*Organizations*

## RESPONSES

1. All development and rehabilitation activities by the National Park Service at Hamilton Grange within St. Nicholas Park and at new facilities on Convent Avenue would conform to the requirements of the Americans with Disabilities Act. The grade is steep on 141st Street between St. Nicholas Avenue and Convent Avenue. Diligent maintenance would be necessary to keep it passible in winter icy conditions. The entrance walk to the site would fall within federal accessibility standards.

## COMMENTS

*EMANUEL PIETERSON HISTORICAL SOCIETY*

**COMMENTS ON THE NATIONAL PARK SERVICE
DRAFT PLAN FOR RESTORATION OF THE
HAMILTON GRANGE NATIONAL MEMORIAL**

With the assistance of our architectural and engineering consultants, whose statement of qualifications is attached, we inspected the existing site and reviewed the Alternatives in the April 1993 Draft Plan prepared by the National Park Service. With respect to Alternative 4, we find that the proposed relocation of the Grange to St. Nicholas Park would create tremendous accessibility problems for disabled visitors planning to arrive on their own by foot or in a wheelchair. The grade along 141st Street between Convent Avenue and St. Nicholas Avenue is extremely steep, the slope of which we estimate at 1:8 or approximately 12.5%. Guidelines for mobility-impaired persons recommend that the grade on sloped surfaces be as gradual as possible and not exceed a 1" rise in a 12" run or approximately 8%. Clearly, the slope of the hill providing access to the proposed entrance in Alternative 4 would exceed Federal accessibility standards for public buildings as required by the Americans with Disabilities Act. Ascending or descending this hill during the winter when icy conditions may exist is extremely dangerous, whether a person is disabled or not.

1

109

## COMMENTS

2

*For the same reason, we do not feel Alternative 3 in the Draft Plan would be feasible either. Reaching the south gate by foot or in a wheelchair from St. Nicholas Avenue, as depicted on the proposed site plan contained in the Draft Plan report, would be extremely difficult in good weather and most probably impossible when icy conditions exist on the ground. The slope of grade from the proposed Hamilton Terrace gate to the proposed new building entrance would likewise be extremely steep.*

3

*Therefore, in consideration of the likely accessibility problems with the preferred relocation site proposed in the Draft Plan, we have developed an alternative proposal for relocating the Grange in St. Nicholas Park (see the attached site plan). The site we propose is only one and a half blocks south of the existing site and would have panoramic views of the Harlem Valley below. It would also provide easy access to mobility-impaired visitors because the street grade along St. Nicholas Terrace is relatively flat. The site would also be accessible to charter buses and is only one block west of public bus transportation that runs along Convent Avenue.*

## RESPONSES

2. It is anticipated that the Grange would be moved, as described in alternative 4, following the approval of the final plan and record of decision. Therefore, alternative 3 would not be implemented.

3. The proposed location of Hamilton Grange at the foot of Hamilton Terrace is intended to continue the direct connection the Grange has shared with its historical community of Hamilton Heights. Although the National Park Service would work with City College to address issues of mutual concern, it is not the intent of this plan to integrate Hamilton Grange into the City College of New York campus.

110

## RESPONSES

## COMMENTS

In addition, siting the building along St. Nicholas Terrace would provide a more secure location for the Grange, as opposed to the other Alternatives in the Draft Plan, because this area is regularly patrolled by the City College of New York's security force. We feel that locating the Grange at this site would provide a further benefit by integrating this national historic monument into the life and fabric of City College, which is located adjacent to the proposed site, thus acting as a resource to students studying early American history and architecture.

Respectfully submitted,

Horace Carter, President

EMANUEL PIETERSON HISTORICAL SOCIETY

November 17, 1993

Post Office Box 733, Manhattanville Station

New York, New York 10027

(212) 283-5300   or (718) 937-3124

111

COMMENTS AND RESPONSES

RESPONSES

COMMENTS



PROPOSED SITE PLAN

HAMILTON GRANGE NATIONAL MEMORIAL
NEW YORK, NY

© 1993 - THE EMANUEL PIETERSON HISTORICAL SOCIETY - NEW YORK, NY

112

## COMMENTS

### ARCHITECTURAL AND ENGINEERING CONSULTANTS
### TO THE EMMANUEL PIETERSON HISTORICAL SOCIETY

#### MARK G. BARKSDALE, R.A. - ARCHITECT

Mr. Barksdale is a registered architect in the states of New York and New Jersey, as well as a licensed professional planner in the state of New Jersey. He is also a certified construction inspector and a certified environmental inspector. He has had over 15 years experience in the fields of architecture and urban planning.

As an architect he has been primarily involved with the design and renovation of healthcare facilities, hotels and residential buildings. During the course of his career he has performed site surveys and building inspections, has been involved in all phases of the design process and has provided construction administration services on numerous projects. He is treasurer of the New York chapter of the National Organization of Minority Architects (NOMA) and has also been actively involved with landmarks preservation activities, having been a member of the Emanuel Pieterson Historical Society since 1983.

Mr. Barksdale earned a Bachelor of Science degree in Architecture from the City College of the City University of New York, Master of Science degrees in Urban Planning and Health Facility Design from Columbia University, and a Juris Doctor degree from Yale University Law School.

#### BYRON FROWNER, P.E. - CONSULTING ENGINEER

Mr. Frowner is a licensed Professional Engineer in the state of New York and has over 30 years experience as an engineer, specializing in electrical and electronic engineering. He has been involved with the design, testing and maintenance of complex electro-mechanical and electronic equipment, as well as management of large-scale projects and staff for such governmental agencies as the United States Navy, the New York City Transit Authority and the Bureau of Water Pollution Control in New York City. He has also acted as a construction manager and designed mechanical and electrical systems for several large-scale renovation projects at Metropolitan Hospital in New York City. In addition, he has also acted as a consultant on various other engineering projects throughout New York City and the nation.

Mr. Frowner earned a Bachelor of Electrical Engineering degree from the City College of the City University of New York.

## RESPONSES

113

# COMMENTS

## FRANK KENNEDY, R.A. - ARCHITECT

Mr. Kennedy is a registered architect in the state of New York and has over 26 years experience in the construction industry, consisting of 10 years of civil engineering activities and 16 years of work providing architectural design and construction administration services to clients throughout the metropolitan New York area.

As an architect he has been involved in various aspects of architectural program planning and building design, including preparation of documents for all phases of the design and construction process. He is also highly experienced in the application and analysis of building codes and zoning regulations, gained through many years of practice in New York City. In addition, he has a strong planning background, which he has applied in dealing with a number of urban design problems.

Mr. Kennedy holds a Bachelor of Science degree in Architecture and a Bachelor of Architecture degree from the City College of the City University of New York.

## ANTHONY O. SOMEFUN, ENG.SC.D., P.E. - CONSULTING ENGINEER

Mr. Somefun is a licensed Professional Engineer in the state of New York and has 16 years of experience in engineering and architecture, specializing in the area of structural design. He has acted as a consultant on a number of projects including hospitals, churches, high-rise commercial buildings and residential buildings. He has also performed construction inspections and building investigations.

Mr. Somefun holds a Bachelor of Science degree in Civil Engineering, a Master of Science degree from Columbia University and a Doctor of Engineering Science degree from Columbia University, as well as a Bachelor of Science degree in Architecture from the City College of the City University of New York.

# RESPONSES

114

## COMMENTS

## RESPONSES

1. Alternative 4 in the final plan has been amended to identify a new NPS ranger residence and community use facility as the appropriate use for the Convent Avenue site once the Grange has been moved. The vest-pocket park has been eliminated as a viable option.

---

THE FINE ARTS FEDERATION OF NEW YORK

NATIONAL ACADEMY OF DESIGN
NEW YORK CHAPTER OF THE
AMERICAN INSTITUTE OF ARCHITECTS
THE ARCHITECTURAL LEAGUE OF NEW YORK
NATIONAL INSTITUTE FOR ARCHITECTURAL EDUCATION
NATIONAL SCULPTURE SOCIETY
NATIONAL SOCIETY OF MURAL PAINTERS
BROOKLYN CHAPTER OF THE
AMERICAN INSTITUTE OF ARCHITECTS
THE ASSOCIATES OF THE ART COMMISSION
NEW YORK CHAPTER OF THE
AMERICAN SOCIETY OF LANDSCAPE ARCHITECTS
THE DECORATORS CLUB

Bart Gorman, President
Blu Barone, 1st Vice President
Jan H. Pokorni, 2nd Vice President
Cornell Co-Adult, Honorary Vice President
Maxwell Cox II, Honorary Vice President
Sherman Goventor, Honorary Vice President
F. Donald Winston, Honorary Vice President
Herbert S. Wolfram, Honorary Vice President
Barbara Lawrence, Secretary
Morris L. Bason, Treasurer

THE DRAWING SOCIETY
NEW YORK METROPOLITAN CHAPTER OF THE
AMERICAN SOCIETY OF INTERIOR DESIGNERS
AMERICAN ABSTRACT ARTISTS
THE SCULPTORS GUILD
ELMLEN CULTURAL COUNCIL, INC.
NEW YORK METROPOLITAN CHAPTER OF THE
AMERICAN PLANNING ASSOCIATION
THE PARKS COUNCIL
NEW YORK ARTISTS EQUITY ASSOCIATION, INC.
NEW YORK SOCIETY OF ARCHITECTS
NEW YORK STATE COUNCIL ON THE ARTS
PUBLIC ART FUND, INC.
HISTORIC DISTRICTS COUNCIL

Carlton Calburth, Director
Jean Bivona, Director
Michael Francola, Director
Fran Leinmaier, Director
Hannett Kristen, Director
Otto Praskauli, Director
Eleanor Forrest, Director
Lee Raden, Director
Morris Sulzer, Director
Hope Richards, Director
Alexander Jost, Titman, Director

FOUNDED 1895
40-48 34th Street
Long Island City, N.Y. 11101
(718) 361-7215

October 2, 1993

RE: The Grange

Mr. Theodore Kovaleff, Chairman
Community Board #9
565 West 125 Street
New York, N.Y. 10027

Dear Mr. Kovaleff,

As an organization representing the major architectural professional societies of New York City, we recommend the restoration and relocation of the Alexander Hamilton house, The Grange, across 141st Street to St. Nicholas Park, as proposed by the National Park Service.

The 1802 house is one of the last remaining Federal style villas built in early New York City, and because it is a part of Hamilton's original estate, it deserves a park setting that would more closely reflect its original environment.

| We understand the community is reluctant to have an empty lot created next to St. Lukes Church to which it presently adjoins, but we are told the Park Service includes in its proposal erection of a public facility in that space determined with community approval. Considered under these conditions, the Fine Arts Federation strongly urges community support for the relocation of this historic treasure. |

In our interest in the preservation of your community, as well as its goals, we offer our help in any way it can be of value.

Sincerely,

Roy Gussow, President

RG/rf

1

---

115

116

## COMMENTS

Friends of **GAST IRON** architecture

255 East 49th Street, 6C
New York, N.Y. 10024
(212) 260-5000

Henry-Russell Hitchcock
Sir Nikolaus Pevsner
Honorary Co-Chairmen

Established 1970

Mr. Joe Avery, Supervisor                          October 31,1993
Five Manhattan Sites
National Park Service
26 Wall Street                     RE: Alexander Hamilton's,
N. Y., N.Y. 10005                       Historic home, The Grange

Dear Mr. Avery:

    Our organization, which was established in 1970 to help save
all we could of New York City's 19th century heritage of iron-
front buildings, such as those in the SOHO Historic District, and
others outside the district which are still in their original
concern that the condition of the historic Hamilton Grange in
the Hamilton Heights Historic District in Manhattan.

    It is widely recognized that The Grange was "stored" on its
present site for some years from demolition. A civic minded few
forker made possible the moving of Alexander's Hamilton's
historic home when it stood in the way of "progress", as streets
were being cut through for development of its site in 1889.The
Grange to an appropriate site, after all these years. And how
fortunate that the site is nearby so that this significant
national monument can still be an enrichment to its traditional
neighborhood.

    It is quite so inspiring to visualize how this stately
landscaping. We do hope that Park Service planning includes the
planting of thirteen new sweet gum trees from George Washington's
Mount Vernon estate. Maybe these could be located in positions
so so that they will be ready for rededication following
its relocation and restoration.

    The rescue of this rare architecture went to encourage and
support the National Park Service, and you personally, as you
press forward with this project as fast as possible.

                                         *(signature)*
                                         Margot Gayle
                                         President

*President: Margot Gayle   Treasurer: Alfred Koenig   ... Directors...*
*Vice-President: Peter Blake FAIA   Alan Burnham FAIA   George McCue   Charles E. Peterson, FAIA   Edmund V. Gillon, Jr.*
*William John Kirschner III   ...*
*Working Team Co-Chairmen: ...   Public Information: Nelson Lehner ...*

## RESPONSES

1.  The feasibility of placing the sweet gum trees on the new site
    would be thoroughly evaluated during the design process.
    Conclusive research would be completed in an attempt to
    substantiate the origins of the sweet gum trees.

## COMMENTS

# HAMILTON GRANGE COMMUNITY TASK FORCE
# TO PREVENT THE REMOVAL OF THE GRANGE

435 West 141 Street, New York, New York 10031
(212) 926-2713

March 8, 1994

The Honorable Albert A. Gore, Jr.
Vice President of the United States
Washington, D.C.

Re: The Hamilton Grange National Memorial

Dear Sir:

As a concerned group of the West Harlem-Hamilton Heights community, we are in opposition to the National Park Service's proposed removal of Alexander Hamilton's House, The Grange, to a city park. This national memorial has been at its present site for approximately 104 years and we oppose its removal to St. Nicholas Park where it will destroy and disrupt the needed open spaces of the Park.

We are writing to you to enlist your support in our efforts in preventing the removal of Hamilton Grange from its present location as is being proposed by the National Park Service.

**1** | We are opposed to the Grange's removal for many reasons, a copy of our position paper is enclosed as well as a copy of An Analysis of N.P.S. Alternative 4. We firmly believe that the Grange can be restored and used as a historic museum for the use of the entire City and the Nation at its present location.

**2** | We would also like to add that we are opposed to the site that is proposed by the National Park Service because it will further scar and disfigure a vital green space of this area, St. Nicholas Park. The historic significance and worth of this vital resource continues to be ignored. St. Nicholas Park is the work of Samuel Parsons, Jr., and stands as the only remaining example of his landscaping work in the picturesque style.

*(left margin — signatories list:)*

Rev. Clarence F. Grant
Pastor
Mount Nebo Baptist Church

Rev. David Lemmon
St. Paul's Episcopal Church

Rev. James Johnson
Pastor
St. Luke's Episcopal Church

Rev. John Kent
St. John's Baptist Church

Mr. Sam A. Ward
Director
Community Affairs Office
Covenant Avenue Baptist Church

STEERING COMMITTEE
Hon. Adam Avery
Mildred Barlow
Will Bunkey
Steven Carter
Deborah Cummings-Mabe
Barbara J. Hatten
Park Chaplain Martinez
Clinton A. Lindsey
Elizabeth Mayo
Joyce Miller
Sylbert Franklin
Ira Kenter
Joseph B. Turner
Erik Williamly
Danek H. Thirsty

## RESPONSES

1. See responses to "Hamilton Grange: An Analysis of Alternative 4" and the "Position Paper" below.

2. See response #1 to the Catalog of Landscape Records in the United States.

117

COMMENTS AND RESPONSES

## COMMENTS

**RESPONSES**

Page 2
March 8, 1994
The Honorable Albert A. Gore, Jr.

We are simply asking that a new and different evaluation of the National Park Service's General Management Plan should be undertaken with the object of restoring the Grange at its present location.

Any assistance or information that you may be able to provide us will be appreciated to help us keep the Grange at its present location.

Cordially yours,

Rep. Joseph Johnson
Task Force Coordinator

118

*Organizations*

COMMENTS

# HAMILTON GRANGE:

## AN ANALYSIS OF ALTERNATIVE

## 4

Report to the

Hamilton Grange Community Task Force To Prevent The Removal Of The Grange.

Prepared by the

City College Architectural Center (CCAC)

Ghislaine Hermanuz, Director
City College of New York
School of Architecture and Environmental Studies

November 1993

## COMMENTS

### INTRODUCTION

Hamilton Grange National Memorial, originally a home built for Alexander Hamilton, the first Secretary of State, is a national monument located in Harlem, at 287 Convent Avenue (Block 2050; Lot -4). Originally located near what is now 143rd Street and Amsterdam Avenue, the house was donated to St. Luke's congregation and moved to its present location, on Convent Avenue and 141st Street. The house was used as a temporary chapel until the stone church was built, next to it. The Grange was purchased from St. Luke's by the American Scenic and Historic Preservation Society and was maintained by them until 1964, when it was accepted by the U.S. Government for administration by the National Park Service. The National Park Service, who owns the property has developed four (4) alternate proposals for the upgrading and refurbishing of the Grange, which has been closed to the public since June 1992, as the building is unsafe for visitors.

( See illustration 1)

The first option proposes to stabilize the structure *in situ*, with partial interior restoration. The second option would add an elevator and stair on the exterior of the building. The third option reorients the entrance to Hamilton Terrace, lower the subbasement floor, add elevator and stair inside the building, and reestablish the historical landscape around the entry. The fourth alternative proposes to move the Grange to St. Nicholas Park, after stabilizing and restoring the existing structure, and rebuild the Grange in the Park to its original configuration.

The NPS proposal analyzed here (Alternative 4) shows the Grange relocated along the Northern edge of St. Nicholas Park, opposite West 141st. Street 's intersection with Hamilton Terrace. These are some of the issues with the proposed relocation.

## RESPONSES

3

120

*Organizations*

**RESPONSES**

**COMMENTS**



Illustration 1:  Historical Site Plan

1.  Original Location
2.  Present Location
3.  Proposed Relocation

## COMMENTS

**1.0    Choice of Relocation Site:**

*"In St Nicholas Park, the house would be returned to a site that is reminiscent of its 1802 historic setting. Relocation of the Grange to St. Nicholas Park would be a significant visual impact because a new element would be introduced." (p.52)*

1.1    Proposed site is not the physical equivalent of the original site. It is not a hill top but the flank of a steep hill, or combe.

1.2    Site's orientation is different from original; it does not face or allows views toward the Hudson River. Nor does it have comparable views to the Harlem River.

1.3    There is little light access to the site. It is shaded by trees, a steep slope from St. Nicholas Terrace and the CCNY Steinman Hall (Engineering Building). The site feels gloomy the year round. (See Illustration 2)

1.4    Site is not acceptable simply because it falls within the boundaries of Hamilton's former property. All available properties within the limits of the former Grange should be analyzed and compared.

## RESPONSES

1.    Although the St. Nicholas Park site is not the physical equivalent to the original location of Hamilton Grange, the proposed site would offer a natural setting that is more compatible with the original design intent of the house than the current location. The new site would also provide a more open and natural feeling than the current location. The urbanization and development of the city affords few locations to place the house from which to view the Hudson or Harlem Rivers and still remain within Hamilton's original landholdings and the Hamilton Heights neighborhood.

2.    A shadow study of the proposed relocation site in St. Nicholas Park was performed by the National Park Service in response to public concern. The results were presented at the March 11, 1994, public meeting and are documented in the final plan in appendix I. The study demonstrated that the relocation site is in the shadows of existing buildings (e.g., Steinman Hall) only in mid to late afternoon in the winter and late afternoon in the summer. The site has light more than half the day. In contrast, the current site is in the shadow of adjacent buildings all day throughout the winter and in partial shadows all day throughout the summer.

Landscaping plans, developed during the later design process, would promote use of the natural light of the site rather than create further obstructions.

3.    Numerous locations for the Grange have been evaluated by the National Park Service through the years. Some of the alternatives considered are discussed in the "Affected Environment" under "The Grange and Its History" and under the "Alternatives Considered But Rejected" sections of the final plan. Many of the past plans are available to the public through the park or through the Technical Information Center at the NPS Denver Service Center in Denver, Colorado.

122

1

2

3

5

**RESPONSES**

**COMMENTS**



**Illustration 2: Perspective**

Perspectival View of the reconstructed Grange in the context of Steinman Hall and St. Nicholas Terrace.

6

## COMMENTS

**2.0**   **Site Accessibility:**

*"Additional visitors arriving by car and bus would not create significant additional demands on local roads if the option to develop bus parking in St Nicholas Park is chosen."* (p.54)

**2.1**   Access to the proposed site is uneasy for both buses and pedestrians, because of the steep slope of 141st Street, from either Convent Ave. or St. Nicholas Ave.

**2.2**   141st Street is heavily trafficked, as it is the first available crosstown street, with river to river access, north of 125th Street. It is used by emergency vehicles (fire trucks, ambulances, etc.) continuously. It is two-way although narrow, and cannot allow for buses to stop along the Park. Buses will continue to stop on Convent or Hamilton Terrace.

(See Illustration 3)

**2.3**   If bus parking is developed at the foot of the hill (St. Nicholas Ave), access to relocated mansion involves a very steep hike. It also means displacement of the only playground within a 6-block radius, and the displacement of a public bus stop (M-3).

**2.4**   The site cannot be adequately secured from the rest of the park and St. Nicholas Terrace unless a very high fence is erected around it.

**2.5**   Playground at St. Nicholas Avenue would be jeopardized. It cannot be easily replaced as the topography of most of the parkland precludes the development of accessible recreation space.

(See Illustration 4)

**2.6**   The development of bus parking to service the mansion would emphasize the privatization of the north edge of St. Nicholas Park.

**2.7**   Valuable public land would be lost.

## RESPONSES

**4.**   Access to the site is steep and would be considered when designing the visitor approach to the restored Grange (see response #1 to Emanuel Pieterson Historical Society). Security fencing would also be included in the design.

Bus parking and dropoffs have been removed from the proposed alternative 4 (see Alternative 4 description in the final plan) so that the public park land, the playground on St. Nicholas Avenue, and the bus stop would not be lost or displaced. The National Park Service would work with the Friends of Hamilton Grange group and the City College of New York to identify existing parking spaces for private vehicle and bus parking (as noted in the description of alternative 4 in the final plan). Buses dropping off visitors would create additional traffic congestion on 141st, Convent Avenue, and Hamilton Terrace unless other suitable locations are found nearby within easy walking distance.

7

124

*Organizations*

**RESPONSES**

**COMMENTS**



Illustration 3: Traffic

141st Street as the only crosstown, river-to-river connector in the neighborhood of the Grange.

8

**RESPONSES**

**COMMENTS**



**Illustration 4:   Bus Parking Issue**

Parking of buses in St. Nicholas Park would preempt the playground. Parking of buses along 141st Street would affect circulation on the street.

9

126

## COMMENTS

**3.0   Impact on Natural Resources**

*"Specific resources but include several trees and grass... These would be replaced by landscaping... including 18 commemorative sweet gum trees. The remainder of the park would remain in its current state." (p. 54 )*

**3.1**   5 very old trees ( 6, if bus pull-out/handicapped parking is created along 141st Street) would be destroyed. These trees are part of the ecosystem which contributes to fight the soil erosion of the slope.

(See Illustration 5 )

**3.2**   The commemorative grove of trees is to be planted at the darkest spot of the site, wedged between the relocated mansion and the exhaust pipes of the engineering building. It does not seem to reflect the intention to recreate a landscape evocative of Hamilton's period.

**3.3**   Sweet gum trees require lots of light and direct sun. They should not be planted as a dense grove. They are not appropriate for slopes.

**3.4**   Exhaust pipes from the Engineering Building send clouds of smoke and possible chemical pollution to the site.

**3.5**   So as to create foundations for the mansion, blasting through the granite bedrock of the Park will be necessary. The neighboring houses are still recovering from the blasting due to Steinman Hall's construction. The slope of the remainder of the site will be increased.

**3.6**   The relocation of the Grange in the Park is not seen by NPS as the catalyst for the rehabilitation of the St. Nicholas Park.

## RESPONSES

**5.**   The number of trees to be removed to allow the restoration (six) has been noted in the alternative 4 description in the final plan. It has also been noted that a landscaping plan, with vegetation appropriate for the site topography, light conditions, the design of St. Nicholas Park, and proposed historic character of the Grange, would be developed by the National Park Service in cooperation with the Friends of Hamilton Grange group during the design process. As noted in response #1 to the Friends of Cast Iron Architecture, the feasibility of placing the sweet gum trees onsite and their proposed location would be also be evaluated. Additionally, representatives of the City College of New York have offered to work with the National Park Service to control the exhaust being emitted from Steinman Hall.

**6.**   Bedrock would have to be removed from the St. Nicholas Park site to allow for construction of a new basement/subbasement for the restored Grange. As now noted in the alternative 4 description in the final plan, damage to nearby buildings and annoyance to humans would be avoided by limiting vibrations from the excavation. This would be accomplished using modern excavation techniques that limit peak particle velocity, which is the phenomenon that causes blasting damage.

**7.**   The National Park Service intends to work cooperatively with the city Department of Parks and Recreation to rehabilitate and maintain St. Nicholas Park. The misleading statement in the draft plan (i.e., the remainder of the park would remain in its current state) has been corrected.

10

127

RESPONSES

COMMENTS



Illustration 5:  Proposed Relocation: Plan

Impact on natural resources

128

## COMMENTS

**4.0    Architectural Issues:**

*"In purely architectural terms, there is no doubt that the Grange should be moved to a new site. In order to experience the spatial qualities and orientation of the building, it is important that it be situated and constructed as it was in 1802." (p. 75 )*

**4.1**    The Grange was designed for a hilltop. The same design does not make architectural sense in the middle of a slope. ( See Illustration 6 )

**4.2**    Porches (piazzas) were designed to relate to uninterrupted views: with relocation, one of the porches faces the wall of Steinman Hall. ( See Illustration 7 )

**4.3**    Requirements such as handicapped accessibility demand serious modifications of the historical design: the visitors' entrance still occurs at basement level and not up the front stoop, although it is now relocated on the "correct" side of the house.

## RESPONSES

**8.**    As discussed in response #1 above, restoration of the Grange on a hilltop and with uninterrupted views would not be possible given the urbanization and development of the surrounding city. Efforts through design and placement would best use the topographical features of the proposed site and attempt to mitigate the intrusions of Steinman Hall.

**9.**    See response #1 to the Emanuel Pieterson Society. Conformance with the Americans with Disabilities Act and federal accessibility standards would occur at the new Grange site. However, serious modifications to the historical design to accommodate these federal requirements are not anticipated. Cultural resource compliance procedures outlined in the "Compliance with Federal and State Laws, Executive Orders, and Regulations" section of the final plan have been followed and would continue to be followed throughout the design process. Additionally, as described in alternative 4 of the final plan, prearranged groups and guests attending commemorative occasions would enter through the restored front door.

12

129

COMMENTS AND RESPONSES

RESPONSES

COMMENTS



**Illustration 6: Section**

Cross-section through entrance facade and St. Nicholas Terrace.

13

**RESPONSES**

**COMMENTS**



**Illustration 7: Section**

Cross-section through porches (*piazzas*) and Steinman Hall.

14

## COMMENTS

**5.0    Historical Preservation Issues:**

*"In order to avoid a lengthy discussion of "period" history versus "living" history, let it suffice it to say that he [the Grange] met significance is as a memorial to Alexander Hamilton and that can only be realized by restoring the architectural integrity which expresses the lifestyle and issue of a very influential person in our history" (p. 75)*

**5.1    The proposed historical "reconstruction" of the Grange in the Park violates the preservation of the historical fabric of the community.**

**5.2    The question of filling the gap left by the removal of the Grange has not been adequately answered, except by proposing a "period" structure the use of which is totally unrelated to its neighbors, St Luke's Church in particular.**

**5.3    Presently, the site that includes St Luke and the Grange clearly defines and anchors the southern portion of Hamilton Heights district. The presence of the Hamilton's statue on the sidewalk further identifies the intersection of 141st and Convent Ave. as a history marker for New York City as a whole, as well as for the immediate community.**
**(See Illustration 8)**

15

## RESPONSES

10.    The proposed relocation would remove the Grange from the Hamilton Heights Historic District as well as from its historic context at the current location. However, the relocation would not impede the preservation of the remaining resources within the district, and the overall architectural context and significance of the district would not be negated.

11.    A new building that is not a "period" structure but that is compatible with the qualities for which the historic district was established would be built on the site. It would provide interpretation and education of the Grange and the local community to visitors and residents as described in alternative 4 of the final plan. A possible building design is also shown in the alternative description.

12.    The impact of removing the Grange, a contributing resource, from the Hamilton Heights Historic District was discussed in the draft plan (page 51). Although relocation of the Grange would cause the house to be removed from the district, St. Luke's Church would remain, defining the southern boundary of the district.

RESPONSES

COMMENTS



Illustration 8:   Plan

The Grange in its present location.

16

COMMENTS AND RESPONSES

## COMMENTS

**6.0 Impact on Local Economy**

*"Community promotional effort could increase the number of visitors to the site, which could benefit the local community if visitors remained in the community to visit other sites, enjoy restaurants or shop." (p.50)*

6.1 The immediate surroundings of the Grange are exclusively residential: zoning regulations do not allow for the insertion of commercial facilities. The nearest commercial zone is Amsterdam Avenue. Its economic base: auto-repair shops, taxi dispatching, bodegas, etc. are hardly attractive to tourists. (See Illustration 9)

6.2 City College and its 25,000 commuter students has not succeeded in promoting the development of commercial establishments, such as restaurants, bookstores, etc. It is doubtful that the Grange will.

6.3 The isolation of the Grange in the Park will favor bus access, and therefore, little or no time spent by tourists in the community.

6.4 Thus, the only economic activities directly generated by the Grange in the Park would be concessions in the Park, which would further erode the notion of public land.

17

## RESPONSES

13. Information surfaced by the community in response to the draft plan identified several proposed or existing developments in the vicinity of the Grange that might draw new tourism into the area. These are discussed in the final plan in the "Affected Environment" under "Area Land Use and Resources." One such project is the Strivers Center Development Project. As part of this project, zoning changes to allow commercial establishments such as restaurants and boutiques are being proposed along 135th Street. The proposed Jazz Hall of Fame, in conjunction with commercial establishments and other sites such as a restored Hamilton Grange, could be the catalyst to attract new tourism, particularly if cooperative promotional efforts occur as discussed on pages 53 and 54 in the draft plan. Bus and private vehicle parking is another issue that would be cooperatively addressed.

14. Concessions would not be provided at the new Convent Avenue building, at the restored Grange, or within the boundaries of the property to be acquired by the National Park Service for the relocation.

134

RESPONSES

COMMENTS



Illustration 9:  Land Use

Residential neighborhood, with limited commercial outlets along Amsterdam Ave., St. Nicholas Ave. and 145th Street.

18

135

**COMMENTS**

**RESPONSES**

## CONCLUSION

The relocation of Hamilton Grange in St. Nicholas Park is an issue that has been raised not because of any intrinsic problem with its present site, but because the legislation allowing the financing of its upgrading is tied to its relocation ( site unspecified). The first attempt to remove the Grange from Harlem (in the 60's) was aborted. Unfortunately, the enabling legislation was not modified and thus, today, we have to consider a proposal by the National Parks Services to relocate Hamilton Grange in St. Nicholas Park.

The removal of the Grange from it s present site means the destruction of the "genius loci" of Hamilton Heights in favor a a free-standing object that will have little relationship to the topography and the ecosystem in which it happens to be relocated, and will estrange it from historical ties with the Harlem community. The opportunity to explore the theme of aging and transformation in the life of a building will be missed.

This Task Force of individuals and organizations are asking the community to confront the fact that an essential aspect of the poetic of architectural artifacts is linked to the passing of time, and how the passing of time has transformed them. The specialness of the history of the Grange in Harlem should not be obliterated by a rash relocation. Indeed, it should be celebrated by upgrading it in its present location.

19

136

*Organizations*

RESPONSES

COMMENTS



Hamilton Grange is jammed against St. Luke's on Convent Avenue.

When the National Park Service announced a plan to move Hamilton Grange, the former home of Alexander Hamilton, from 287 Convent Avenue to St. Nicholas Park, it was seen with dismay — not only because the park is only a block away, and a full restoration of the house would push it out of the way.

But so many of its neighbors, the stately yellow-and-white building wedged against St. Luke's Episcopal Church belongs just where it is, lodged, a scene of grace and beauty to the choiceness of lower Convent Avenue and make up Hamilton Heights, ... but many of them protested the Park Service plan as a demolition or frontward of the Grange.

"There are people who very much want to see the house restored as it was built when it was built," said the Rev. John Johnson of St. Luke's, whose is actively fighting the move. "But I don't think if any are looking, as much as the preservation of the neighborhood. To move the house would be to tear the fabric of this community."

The Grange, which was designed by John McComb Jr., the architect who helped design City Hall, was originally 700 feet to the north. When the city decided to extend an street grid uptown, the building was in the path of 143d Street. The owners donated it to St. Luke's in 1889 and moved it to its current location.

The house was so well loved and its porch and back entrance ripped off. Three years later, St. Luke's built a new stone church, which stands to the Grange's southern side. On its northern side is a row of brick apartment buildings. For the past year, the Grange has been closed to visitors because it is structurally unsound.

There have been drives to move the building by preservationists who say it cannot be

fully restored where it is. On Nov. 18 Community Board 9, which represents the area, will take an advisory vote on the plan by the Park Service, which acquired the building in 1962, to move the Grange and construct on its current site a new building with exhibit space and an apartment for a park ranger.

"If you ask me how I am going to vote, I don't know yet, and I am a perfectionist," said Theodore P. Kovaleff, chairman of the community board. "I feel torn in two ways, I see the merits to moving to represent the community, but one of my problems is deciding that
But many of the homeowners and apart-

ment dwellers in the small Hamilton Heights historic district believe they know what community wants. They are trying to keep the neighborhood safe and clean, and they are worried that the Park Service will be able to get enough money, an estimated $11 million, both to construct the house and to construct a new building, and that the new site will become a vacant lot.

And they see the house, and the statue of Alexander Hamilton, as a cherished part of their community, one they do not want to lose, even if a park across the street. A group of them has obtained more than 1,300 signatures on a petition.
— J.H.B.

137

COMMENTS AND RESPONSES

| COMMENTS | RESPONSES |
| --- | --- |

THE NEW YORK AMSTERDAM NEWS                    Saturday, November 13, 1993  23

# Why move the Hamilton Grange?

**By SAMUEL WHITE, JR.**
*Special to the AmNews*

The Alexander Hamilton Grange, the house of Alexander Hamilton between 1802 and 1804, has stood 191 years on the corner of 141st St. and Convent Ave., but is scheduled for relocation to a site inside St. Nicholas Park, behind nearby City College, by the National Park Services of the U.S. Department of the Interior. Harlem residents, in a placard-waving demonstration in front of the building last Thursday morning, let the National Park Service know it had a fight on its hands.

General Alexander Hamilton, one of the framers of the Constitution, was the first Secretary of the Treasury, born in 1757 and spent his last days in the Grange, was of African heritage.

With signs declaring "The Grange Shall Not Move" and "Stop the Removal of the Grange," demonstrators rallied their determination to save their landmark from being

relocated and marched in a circle, then up to the porch of the Grange, officially known as the Hamilton Grange National Museum. Architecturally, the yellow frame house stands in stunning sharp contrast to the surrounding apartment house and brownstone structures of much later vintage. A sign on the Museum's front door announces that it is now "temporarily closed."

Rev. Adams, the coordinator of the protest from the adjacent St. Luke's Episcopal Church, found out about the move, which he said "had been in the works for the last few years," when he approached the National Park Service to do something with the area on a tract, an adjacent lot, shared by the Hamilton Grange and St. Luke's Church.

The high regard in which Hamilton was held notes the front largeness exceeding that front rendered to Hamilton Grange, for unusually Hamilton was notable from the lands along the first militarizing product of America

[illegible small paragraph — photo/document reference]

The National Park Service will seek approval for the relocation of the Grange at a hearing general meeting of Community Board 9, 565 W. 125th St., call (212) 666-7213.

| COMMENTS | RESPONSES |
| --- | --- |

The New York Times
Sunday, November 14, 1993
**Real Estate**
Section 10

Should It Be Moved?

## Discussing the Future Of Hamilton Grange

Earlier this year, the National Park Service decided to lift up Hamilton Grange, the rural home of Alexander Hamilton from 1802 to 1804, and carry it from 287 Convent Avenue in Hamilton Heights across West 141st Street to St. Nicholas Park, which is a block away.

The plan, however, has met with opposition from some Harlem community members, who say that the Grange should remain where it is, next to St. Luke's Episcopal Church and among the brownstones of Hamilton Heights, and that to move it would put a rift in the fabric of the community.

On Wednesday at 8 P.M., Community Board 9 will sponsor a panel discussion on the plan, as well as on three alternatives the Park Service had considered, all of which involved minimal changes and leaving the grange on Convent Avenue. "The forum is designed to increase interest and knowledge about the subject among area residents," said Carolyn Kent, a board member.

The Park Service plan involves restoring the house as much as possible to the way it was in Hamilton's final years. The current site would become home to a new building with a park ranger's apartment and exhibition space. Many preservationists support the move, saying it would not be possible to restore the building fully if it remained where it is.

The discussion, the last of five public forums on the plan, is to be held in the World Room of the Journalism Building at Columbia University, 116th Street and Broadway. Set to take part are Ene Sirvet, editor of "The Papers of John Jay"; Hollee Haswell, curator of Columbiana at the university; Michael Devonshire, senior architectural conservator with Jan Hird Pokorny Architects; Michael Henry Adams of the Upper Manhattan Society for Progress Through Preservation; Horace Carter of the Emanuel Pieterson Historical Society, and James Marston Fitch, emeritus professor of architecture at Columbia.

The moderator is to be Robert Van Lierop, permanent representative of the Republic of Vanuatu (formerly the New Hebrides) to the United Nations and a former chairman of Community Board 9. Vanuatu's Mission to the United Nations was established by Mr. Van Lierop in Hamilton Heights.

COMMENTS AND RESPONSES

## COMMENTS

## RESPONSES

THE NEW YORK AMSTERDAM NEWS   Saturday, November 22, 1980, 5

# Community protests removal of Hamilton Grange



PROTEST AT THE GRANGE — Residents of the Hamilton Grange area in Harlem are up in arms over the National Park Service's plan to move the home of Alexander Hamilton to another area. Used as a museum and a point of contact probably by the neighborhood, the house is being restored and refurbished in the colonial style.

Hamilton Heights residents recently protested in front of the Alexander Hamilton Grange on Convent Avenue. Demonstrators support the position that the Hamilton Grange should remain in its present location where it has been for more than 100 years and should not be moved.

They reject the National Park Service (NPS) proposal to move the Grange to another site. Instead, four groups support retaining the Grange on its present location. The protestors represent the liberal faction group Community Task Force to Prevent the Removal of the Grange.

They have collected more than 1,200 signatures of neighborhood residents who want the Grange to stay. These petitions were presented at the last neighborhood meeting of Manhattan Sites at a meeting held at City College of New York in Aaron Davis Hall in late July.

Protestors are outraged that the petition to have moved been referred to any of the documents that the National Parks Service has issued about disruption. They believe that the NPS is seeking to move the Grange from the community to support itself and participate in decisions that affect them who live and reside in the immediate neighborhood.

The protesters say the removal of the Grange to another site would signal the beginning of a decay and transformation of the neighborhood and deteriorate into a dangerous location. The neighbors feel that the Grange should be moved. The task force position paper contends that the proposed site bears no resemblance to the original site and that the community for alternatives presented by the NPS fails to address critical ecological and environmental issues.

What's planned is an ill-conceived alternative; they say, which would justify the Grange to CCNY's Hamilton Hall, where in buildings) a location which is in perpetual shadow and receives natural lighting already on the site from this facility.

Moreover, the removal of the Grange represents more than aesthetic considerations and preservation of artifacts, they said. It represents a whole attempt to deteriorate the city of a neighborhood.

The Grange has long been a symbol of the Hamilton Heights community and cannot be considered in isolation from the neighborhood around it, critics say.

Thursday evening, Nov. 18, Planning Board 9 is holding a special meeting to decide what its recommendation will be to the National Parks Service. Community residents are urged to attend.

*Organizations*

## COMMENTS

## RESPONSES

# Neighborhood Report

*THE NEW YORK TIMES, SUNDAY, NOVEMBER 21, 1993*

## HAMILTON GRANGE UPDATE

### A Short Move, an Angry Dispute

At the center of the emotional neighborhood battle over Hamilton Grange, the 1802 home of Alexander Hamilton on Convent Avenue just north of 141st Street, is a larger issue: how best to preserve and honor the heritage of Harlem.

One side, backed by committees of Community Board 9, supports the National Park Service, which owns the building, in its plan to move the grange to St. Nicholas Park. The other side wants to restore the home where it now stands.

The community board committees have pressed their case at several forums on the issue, and at a meeting at the Convent Avenue Baptist Church, people from the community argued passionately for and against the move. The community board put off its advisory vote until December, amid continuing disputes and questions about the plan.

Here, in the words of some key players, is a look at some of the issues at stake.

#### FOR

"Harlem absolutely deserves to have a landmark of this caliber restored in this manner. We have the opportunity to restore the sophisticated and intricate features of the building that have been removed, and to recapture a house which embodies the person who commissioned it and the person who built it."

*Michael Henry Adams, president of the Upper Manhattan Society for Progress through Preservation*

"We have a hidden gem that has been forgotten for all of these years. The Grange will attract people to Harlem, and we need people to come to Harlem. People drive through, but this will give them a reason to stop and spend some time and, even more crucial, some money. This is a symbol for something much greater."

*Ronald Melichar, former president, Hamilton Heights Homeowners' Assn.*



The New York Times

#### AGAINST

"I know old Harlem. I want to bring Harlem back. They can sit and talk endlessly about the restoration of the house in light of how it was in 1802, but that's not realistic in an urban area in an urban setting. We're saying, let's take the best of this world and make it acceptable with some changes. It can be restored, visitors can come and go, they can buy their souvenirs, but we can hold on, too."

*Jerome Turner, a member of St. Luke's Episcopal Church*

"I am very, very deeply appalled at the way in which the majority sentiment of this community has been ignored and overridden. I do not think we should allow the Federal Government to destroy culturally the identity of a neighborhood. I do not think we should allow the Federal government to destroy a neighborhood park. I do not think we should allow the Federal government to decide what the character of a neighborhood should be."

*The Rev. Clarence P. Grant, pastor of Convent Avenue Baptist Church*

141

# Neighborhood Report

*THE NEW YORK TIMES, SUNDAY, NOVEMBER 21, 1993*

## HAMILTON GRANGE UPDATE

### A Short Move, an Angry Dispute

At the center of the emotional neighborhood battle over Hamilton Grange, the 1802 home of Alexander Hamilton on Convent Avenue just north of 141st Street, is a larger issue: how best to preserve and honor the heritage of Harlem.

One side, backed by committees of Community Board 9, supports the National Park Service, which owns the building, in its plan to move the grange to St. Nicholas Park. The other side wants to restore the home where it now stands.

The community board committees have pressed their case at several forums on the issue, and at a meeting at the Convent Avenue Baptist Church, people from the community argued passionately for and against the move. The community board put off its advisory vote until December, amid continuing disputes and questions about the plan.

Here, in the words of some key players, is a look at some of the issues at stake:

### FOR

"Harlem absolutely deserves to have a landmark of this caliber restored in this manner. We have the opportunity to restore the sophisticated and intricate features of the building that have been run down, and to recapture a house which embodies the person who commissioned it and the person who built it."

*Michael Henry Adams, president of the Upper Manhattan Society for Progress through Preservation*

"We have a hidden gem that has been forgotten for all of these years. The Grange will attract people to Harlem, and we need people to come to Harlem. People drive through, but this will give them a reason to stop and spend some time and, even more crucial, some money. This is a symbol for something much greater."

*Ronald Melichar, former president, Hamilton Heights Homeowners' Assn.*



### AGAINST

"I know old Harlem. I want to bring Harlem back. They can sit and talk endlessly about the restoration of the house in light of how it was in 1802, but that's not realistic in an urban area in an urban setting. We're saying, let's take the best of this world and make it acceptable with some changes. It can be restored, visitors can come and go, they can buy their souvenirs, but we can hold on, too."

*Jerome Turner, a member of St. Luke's Episcopal Church*

"I am very, very deeply appalled at the way in which the majority sentiment of this community has been ignored and overridden. I do not think we should allow the Federal Government to destroy culturally the identity of a neighborhood. I do not think we should allow the Federal government to destroy a neighborhood park. I do not think we should allow the Federal government .to decide what the character of a neighborhood should be."

*The Rev. Clarence P. Grant, pastor of Convent Avenue Baptist Church*

COMMENTS AND RESPONSES

142

## COMMENTS

Acknowledgements:

This report has been prepared by the City College Architectural Center ( CCAC), with the help of the Hamilton Grange Community Task Force to Prevent the Removal of the Grange Steering Committee. All quotations have been extracted from the document entitled: <u>Manhattan Sites: Hamilton Grange National Memorial, New York</u>, a draft management plan and environmental impact statement prepared by the National Park Service.

The following members of the CCAC Staff have contributed to this study:

Benjamin Hernandez
Haila Hamar
Nancy Liesade

Marilyn Gallagher, Landscape Consultant

Michael Koehler, Assistant Director
Ghislaine Hermanuz, Director

© The City College Architectural Center ( CCAC)

20

## RESPONSES

*Organizations*

| COMMENTS | RESPONSES |
|---|---|
| **HAMILTON GRANGE COMMUNITY TASK FORCE TO PREVENT THE REMOVAL OF THE GRANGE**<br>435 West 1st Street, New York, New York 10031<br>(212) 926-2713<br><br>**POSITION PAPER**<br><br>It is our position that the Hamilton Grange should remain in its present location and not be moved. We soundly reject the National Park Service's (NPS) preferred Alternative Four. It is our view that the Grange should be improved and upgraded to meet the necessary programmatic requirements, and in so doing reflect certain aspects illustrated in NPS' Alternative Three. The following are some of the reason for our rejection of Alternative Four.<br><br>• PRESERVATION CANNOT BE VIEWED AS SOLELY THE RESTORATION OF OBJECTS TO A SINGLE MOMENT IN TIME THAT IS DIVORCED FROM THE FLUX AND CHANGE SURROUNDING IT AND WHICH ULTIMATELY IS INTRINSIC TO THE EVOLUTIONARY PROCESS OF THE URBAN LANDSCAPE;<br><br>**1** THE PROPOSED SITE BEARS NO RESEMBLANCE TO/OR IS COMMENSURATE TO THE ORIGINAL SITE;<br><br>**2** HISTORICALLY THE GRANGE IS A SYMBOL OF THE HAMILTON HEIGHTS COMMUNITY AND CANNOT BE CONSIDERED IN ISOLATION FROM THE NEIGHBORHOOD AROUND IT;<br><br>**3** THE CONCEPTS PRESENTED BY NPS IN ALTERNATIVE FOUR HAVE BEEN UNREALISTICALLY ADDRESSED IN TERMS OF GEOLOGICAL AND ENVIRONMENTAL ISSUES;<br><br>**4** THE REMOVAL OF THE GRANGE WILL DESTROY THE HISTORICAL FABRIC OF THIS NEIGHBORHOOD FOR THERE IS MORE AT RISK HERE THAN ESTHETIC SENSITIVITIES AND ARTIFACT PRESERVATION.<br><br>**5** The proposed preferred alternative of NPS which calls for the removal of the Grange from its present site to the northern boundary of St. Nicholas Park, opposite West 141st Street's intersection with Hamilton Terrace, would signal the beginning of the decomposition of our neighborhood.<br><br>The underlying issue which is at the basis of NPS' preferred alternative is the technicality that mandates that the functions of the Grange is linked to legislation which dictates that the Grange must first be relocated before it can take place. Thus, what is being foisted upon this community is an ill-conceived alternative which would juxtapose the Grange to CCNY's Shetman Hall (Engineering Building), a location which is in perpetual shadow and receives exhaust fumes directly on the site from this facility.<br><br>**6** Such a relocation does not take into account this community's historical ties to the Grange per the significant disruption to the neighborhood which would ensue. It appears that NPS has gravely ignored the wishes of the residents of this community. This is clearly evidenced by the negation and subsequent disregard of petitions bearing the signatures of 1,200 individuals who reside in the neighborhood and are not in favor of the removal of the Grange from its present site. These petitions were protested to the then superintendent of Manhattan Sites at a meeting held at City College of New York in Aaron Davis Hall on July 13, 1993. These petitions have never been referred to in any of the documents that NPS has issued since that meeting. This clearly negates the right of our community to empower itself and participate in decisions that affect us. | 1. See response #8 to the "Hamilton Grange: An Analysis of Alternative 4."<br><br>2. A connection between the Grange and the neighborhood would be maintained through the use of interpretive media and exhibits in the new building.<br><br>3. A section on local geology has been included in the final plan in the "Affected Environment" under "Natural Resources." It has also been noted in the alternative 4 description that bedrock would be disturbed and mitigation measures would be employed during construction on the new site. (See response #6 to above "Hamilton Grange: An Analysis of Alternative 4.") A geotechnical survey would be performed before design work to determine the type and extent of the foundation possible on the site. Other environmental issues of concern have been appropriately analyzed.<br><br>4. The relocation of the Grange would affect the cultural association with the immediate Hamilton Heights neighborhood.<br><br>5. The purpose of this plan is to fulfill the intent of Congress to provide an appropriate setting for the Grange and to fulfill the desire to keep it on Hamilton's original tract of land within the context of its present-day community. See also responses #2 and #5 to the "Hamilton Grange: An Analysis of Alternative 4."<br><br>6. The National Park Service has received many comments on restoration of the Grange from community and city residents and organizations, comments that were solicited through public meetings, individual meetings with local and city organizations such as Community Board #9, and the draft plan. Decisions have been made based on input from these meetings and comments, recognizing that consensus might not be possible. Alternative 4 was selected because it allowed for restoration of the Grange and for a high-quality visitor experience and because it received significant support from |

## RESPONSES

community members and organizations throughout the New York City area.

As evidenced in the comment letters, the Harlem and New York City communities are both in favor of and against moving the Grange. The petitions received by the National Park Service following the release of the draft plan showed a similar trend. The "Summary of Public Involvement" section indicates approximately 1,500 signatures were received — approximately 780 in favor of the move and 730 opposed. This final plan is the first document to be released to summarize public comment since the draft plan and the public meeting of July 1993. All comments and petitions are represented and addressed in this document.

## COMMENTS

```
**  FACSIMILE  COVER  NOTE  **
                              MAR 24.1994    03:58 PM
                                             UBILES

TO : ROGER KENNEDY

BITH: ME KENNEDY

PAGE: 4 (including cover note)
                              PHONE NO:
FROM: SERVICE UBILES
                              FAX NO :

FROM UBILES     FAX NO                         MAR 24.1994    03:58
```

### HAMILTON GRANGE COMMUNITY TASK FORCE
### TO PREVENT THE REMOVAL OF THE GRANGE

435 West 141 Street, New York, New York 10031
(212) 926-2713

March 24, 1994

Mr. Roger Kennedy
Director
National Park Service
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20013

Re: The Hamilton Grange National Memorial

Dear Mr. Kennedy:

Community Board #9 at its General Board Meeting on Thursday, March 17, 1994, in its capacity as an advisory body, voted on the Draft Management Plan concerning the relocation of Hamilton Grange. Please note that there were two votes, the first was for a resolution in favor of Alternative 3 (see copy attached) and the second was for Alternative 4 (this resolution was previously forwarded to you in the Community Board's letter of October 7, 1993). The results of the vote were as follows:

Alternative 3:

Community Board Members:
    14 in favor
    13 opposed
     3 abstaining

Members of the Community:
    24 in favor
     8 opposed

Alternative 4:

Community Board Members:
    18 in favor
    11 opposed

144

**RESPONSES**

**COMMENTS**

*Alternative 4:*

Community Board Members:
  18 in favor
  11 opposed
  2 abstaining

Members of the Community:
  14 in favor
  19 opposed

## COMMENTS

Page 2
March 24, 1994
Mr. Kennedy

In view of the fact that there was such a clear majority voting in favor of Alternative 3, that resolution was defeated by members of the community Board and as indicated above, the resolution advocating Alternative 4 prevailed.

We find the political chicanery and slight of hand that is being employed in this issue to be appalling and shameful.

**1**
The former Superintendent of Manhattan Sites gathered about her several individuals who were members of Community Board #9 for the sole purpose of "brainstorming" and promoting Alternative 4 of the Draft Management Plan. One of the members of this group at the Board's General meeting on Thursday, March 17, 1994, stated for the record, that the Draft Management Plan consisted of only one Alternative, four; and that the others, one through three, were merely cited as window dressing to lead to four. If this statement is true and represents the position of the National Park Service, it will be yet another example of the gross injustice and insensitivity that can be placed directly on the doorstep of your agency.

We would like to bring to your attention, however, after the Board voted the residents of this neighborhood were asked to vote. In both instances, the community, voted that the Grange should remain at its present site and be renovated and refurbished there.

**2**
In view of the fact that the above-referenced board vote is purely advisory we are writing to request that you inform us in detail of the various layers of governmental approval that must be obtained on the local, state and federal levels before this project sees fruition.

**3**
From the time that this project was first presented by the then Superintendent of Manhattan Sites, no current information has been given about the true costs of this project.

We, as members of the task force, and residents of this neighborhood are requesting:

1. A detailed cost analysis of the total cost of this project;

2. A detailed engineer's report describing the manner

## RESPONSES

1. The four alternatives presented in the draft plan were developed to represent a "range of feasible alternatives" for achieving the rehabilitation and restoration of Hamilton Grange as required by the National Environmental Policy Act and the planning process for national park system sites. Community members had input into the range and scope of these alternatives during preliminary alternative meetings in April of 1992. A full analysis of each alternative was presented in the draft plan, and comments on each alternative were invited by letter and solicited in public meetings. These comments have been used to further evaluate the proposed alternatives and make modifications, which are evident in the alternative 4 description of the final plan. Alternative 4 was selected as the proposed plan because it allowed for full restoration of the Grange and for a high-quality visitor experience and because it received significant support from community members and organizations throughout the New York area.

2. The steps necessary to implement alternative 4 are presented in appendix H of the final plan.

3. An evaluation and cost analysis of the four alternatives was presented in appendix G of the draft plan. More detailed design and cost information (e.g., site plans, soils reports, etc.) would be initiated following completion and approval of the final plan. The detailed information requested is not generated during the general management planning process but rather during the design process after a plan has been approved.

## COMMENTS

## RESPONSES

FROM BRULEY        FAX NO 0035133                    MAR 24,1994  08:09 PM  P 3

Page 3

and plans of the completed reward (detailed drawings and other analysis are to be included) along with a cost analysis for every stage of this procedure;

3. A detailed report which describes the actual amount of land that is required for the project;

4. A detailed cost analysis of the true acquisition cost of the land (kindly include all other land that would be "swapped" in kind);

5. A detailed description of the work necessary to prepare the new site (please include site plans, soil reports, etc.) as well as a detailed cost analysis; and

6. A detailed, line by line, cost assessment of the monies that have been expended to date on this project.

7. As pursuant to the presentation made by your staff at City College on March 11, 1994, there was presented a one dimensional drawing of the proposed building that is contemplated to replace the Gingko on Convent Avenue.

We are, therefore, requesting that copies of these drawings, including the floor plans be made available to The Task Force for its analysis and comment. We are also requesting that all materials contemplated for the aforesaid issues outlined herein above as well as a detailed cost analysis.

Should you have any questions or wish clarification concerning the above, I can be reached at (212) 926-2713.

Your assistance and cooperation in this matter is appreciated.

Cordially yours,

Rev. John Johnson
Task Force Coordinator

COMMENTS AND RESPONSES

| COMMENTS | RESPONSES |
|---|---|

**RESOLUTION IN FAVOR OF ALTERNATIVE NUMBER 3**

WHEREAS, Alexander Hamilton's house (referred to as "the Hamilton Grange") has been an integral part of the Hamilton Heights neighborhood for almost 200 years and the house of Alexander Hamilton from 1802 to 1804; and

WHEREAS, the Hamilton Grange has been at its present location for 100 years, and in this location it has become a vital part of the immediate area; and

WHEREAS, Convent Avenue and some of the nearby east-west blocks of Hamilton Heights have developed their physical and social characteristics in part because of the presence of the Hamilton Grange in its current location; and

WHEREAS, the Hamilton Grange is an important symbol and a source of pride to the neighborhood surrounding it, and at its current location on Convent Avenue it is an inspiration to the entire community, particularly the young people and seniors living in the neighborhood; and

WHEREAS, the significance and the importance of the Hamilton Grange to the neighborhood surrounding it can also be illustrated by the fact that the New York City Landmarks Commission in its Designation Report of November 26, 1974, which designated the Hamilton Heights Historic District, stated that the Hamilton Grange gave its name to the newly established District, and therefore the removal of this building to another location would diminish the stature and significance of the Hamilton Grange area and the Historic District; and

WHEREAS, the National Parks Service's Alternative Number Three is a good and viable cost effective alternative, which will restore, improve, and upgrade the existing building and permit its use as an historic resource; and

WHEREAS, the National Parks Service's Alternative Number Three is reflective of the wishes of the residents of the neighborhood, who have expressed their wishes that the Hamilton Grange not be removed from its current location by their submission of petitions bearing 1,200 signatures;

NOW, THEREFORE BE IT RESOLVED, that Community Board #9 supports the National Parks Service's Alternative Number Three.

## COMMENTS

*hamilton heights
homeowners association*

September 20, 1993

Mr. Joseph Avery
Superintendent, Manhattan Sites
National Park Services
U.S. Department of the Interior
26 Wall Street
New York, N.Y. 10005

Dear Mr. Avery:

The Hamilton Heights Homeowners Association is a group of
concerned home and co-op owners in NYC's historic Hamilton
Heights district, the area of Manhattan from 104th to 155th
Streets and from Riverside Drive to St. Nicholas Avenue. The
organization was founded in 1980 and has an active membership
of concerned individuals.

HHHA seeks to make its Historic Landmark District a better
place to live through providing property owners with useful in-
formation to support their properties and through seeking to
solve community problems.

For example, with influence from Congressman Charles B.
Rangel, we played a supportive role in getting Congress to
approve $750,000 for initiating the most recent Hamilton Grange
renovation. We pressed this issue by establishing a Hamilton
Grange Fund and contributing $10,000 toward restoration work.

Our membership is concerned, despite the several opportun-
ities you've provided for public comment, that our position is
not clear to your office; hence, this letter.

> The Hamilton Heights Homeowners Association's position has
> three facets. The Grange should remain in its current site until
> there are sufficient resources to (1) maintain proper security
> at the proposed new site in the St. Nicholas Park, (2) replace
> the Grange building with a suitable structure and security at the
> vacated site, and (3) continue community liaison with and support

1

*post office box 565 • hamilton grange station • new york, ny 10031*

## RESPONSES

1.  In reference to point (1), NPS personnel would be stationed at
    the relocation site 24 hours a day once the Grange is moved.
    Security alarms would be installed and security fencing would
    also surround the new site. This information is included in the
    alternative 4 description of the final plan. In reference to points
    (2) and (3), see response #1 to the City of New York,
    Landmarks Preservation Commission and response #1 to the
    National Trust for Historic Preservation, respectively.

149

## COMMENTS

2

of the facility as a Harlem institution.

We would like to be represented on any group established
to monitor the Grange developement.

Cordially,

John Cardwell
President

cc: Theodore Kovaleff

JC/bh

## RESPONSES

2. See response #1 to the National Trust for Historic Preservation.

*Organizations*

## RESPONSES

1.  See response #1 to the National Trust for Historic Preservation.

## COMMENTS

### LANDMARKS HARLEM, INC.

201-A West 138 Street
New York, NY 10030
(212) 862-9552/9554
Fax (212) 862-9189

October 26, 1993

Mr. Michael Adlerstein
Chief of Urban Projects
North Atlantic Region
National Park Service
26 Wall Street
New York, NY 10005

Dear Mr. Adlerstein:

Thank you for meeting with the Board of Directors of
Landmarks Harlem on September 21, 1993.

This letter is to inform you that the Board, by a majority
vote, approved NPS Alternative Plan 4, to move Hamilton
Grange to St. Nicholas Park.

1 | It is the consensus of the Board that your office continue
working with residents of Hamilton Heights to effect an
amicable relocation of the property.

Again, I thank you and your staff for your presentation.

Yours truly,

Thomas J. Jess
Executive Director

cc: Community Board #9

151

**RESPONSES**

**COMMENTS**

**LANDMARKS HARLEM, INC.**

201-A West 138 Street
New York, NY 10030
(212) 862-9552/9554
Fax (212) 862-9189

**MINUTES**
**BOARD OF DIRECTORS**
**MEETING**
**July 21, 1993**

Present:    Sandi Griffin, Chair
            Thomas J. Bess, Executive Director
            Karen Taborn, Recorder
            William Seraile
            Colette Whitlock
            BettiJean Miller
            Allyson Williams
            Josephine Jones
            Hilda Vazquez-Barrow

CALL TO ORDER

The meeting was called to order at 6:30 P.M.

ADOPTION OF MINUTES

There was not a quorum of the Board present; adoption of
minutes was tabled until the next Board meeting.

SAVE HARLEM COMMITTEE

TB informed the Board that he spoke to Don Nelson, president
of Metro North; that Metro North is preparing to renovate
the viaduct at 125 Street and Park Avenue, along with track
work from @114 Street up to 134 Street and Park Avenue.
Metro North has expressed a desire to hire minority contractors.
However, according to federal guidelines, it is difficult
to insist on the contractor who wins the bid to force them
into minority hiring. TB asked A. Williams to check to
see if there's any loophole in the federal statute whereby
we can insure that the community gets a fair share of the
top level contracts.

Metro North indicated that because of timing it would not
be possible to do anything with the Corn Exchange Bank Building
because their project would start in early fall and the
building could not be ready in time.

152

*Organizations*

## RESPONSES

## COMMENTS

Minutes
July 21, 1993                                                    Page 2

**FUNDRAISING COMMITTEE**

TB announced that the $360,000 year-long program that Landmarks
Harlem will co-sponsor with the NYC Landmarks Conservancy
is almost definite. The monies are expected in the fall
of this year.

2nd Birthday Party. TB informed the Board that $5,248.00
was spent and the income was only $1,980. This left a $3,268
deficit. However, the primary goal of publicity was met.
The costs were incurred because of mailing 5,000 that were
professionally printed; advertisements in African American
newspapers. TB was interviewed on radio station WBAI where
he announced the party in Marcus Garvey Park.

**HERITAGE EDUCATION**

TB announced that the Cultural Diversity Conference, co-
sponsored by the Historic Districts Council and the Municipal
Arts Society is still being planned. At the conference
TB will emphasize the importance of Harlem culture and the
need to include culture in landmarking properties and districts.

**HAMILTON GRANGE**

At the May 26 LMH board meeting, Carolyn Denerstein reported
on her research of the available options given by the Interior
Park Service to renovate and/or move Hamilton Grange. There
was a consensus taken in favor of supporting plan/option
#3 which would (1) leave a landscaped area in back of the
Grange at the present site, (2) make room for exhibits,
and (3) a theater on the slope. Since at that meeting,
Colette Whitlock reviewed the four available options further
and recommended plan #4. C. Whitlock reasoned that plan
#4 would move the building across the street to St. Nicholas
Park and give it more space on its sides. Right now, the
Grange is literally sandwiched inbetween a church and an
apartment building. S Griffin announced her continued
support for plan #3 and included that members of the Hamilton
Heights Historic District, who have been the "guardians"
of the Grange for years, have strongly been opposed to moving
the Grange for years because that would remove the Grange
from the immediate vicinity of the historic district.
Griffin's concern was that the Grange would not be protected
adequately if it is moved. C. Whitlock added that part
of plan #4 included a 24-hour, live-in guard for the Grange.
W. Serale expressed concern that if the Grange is moved
across the street, where a playground presently exists,
that the Park Service should promise to replace any playground
or park facility that may be taken over the movement of
the Grange. C. Whitlock stated that the report alread makes
the promise to replace any misplaced park facilities at
another location in the park.

153

## RESPONSES

## COMMENTS

Page 3

Minutes
July 21, 1993

A vote was taken with Plan #4 receiving the majority. However,
since there was not a quorum present, T. Bess suggested the
discussion be tabled until the next board meeting and that
a letter be sent to the National Park Service stating that
a consensus was taken in support of Plan #3, with a minority
vote to support Plan #4. Furthermore, T. Bess suggested that
consideration be given to requesting an extension of the Hamilton
Heights Historic District to include the area that will house
the Grange.

ADJOURNMENT

The meeting was adjourned at 8:00 P.M.

154

## COMMENTS

THE MUNICIPAL ART SOCIETY OF NEW YORK
CENTENNIAL

October 14, 1993

Joseph Avery, Acting Superintendant
National Park Service
Federal Hall
26 Wall Street
New York, N.Y. 10004

Dear Mr. Avery:

The Municipal Art Society, whose Preservation Committee has seen and discussed the Park Service's alternatives for Hamilton Grange, strongly supports the proposal to relocate and restore it. Hamilton Grange is at once a cherished local monument and a landmark of national stature: this proposal promises to restore it to its true grandeur and reveal its full significance. Hamilton Grange deserves no less.

Recognizing that plans to move and restore the house have not yet been fully worked out, we would like to comment on a few elements of key importance.

**1** § Hamilton Grange has long been an important part of a streetscape, a neighborhood, and a New York City Historic District. We applaud the Park Service's commitment to replace it, following its relocation with a compatible new building on the existing foundations. It is of the utmost important that the existing site and its context be treated with respect. Indeed, we regard the commitment to build an appropriate community-oriented building on the current site is an essential component of the plan to relocate Hamilton Grange.

**2** § Concerns have been raised about the security of a Hamilton Grange relocated within the park. Though we are aware of National Park Service policies against resident custodians, we are also aware of many instances where this arrangement has worked well, providing far better security than could otherwise be obtained. We therefore urge the Park Service to study this issue further and to make every attempt to develop the best possible security plan for Hamilton Grange.

E MUNICIPAL ART SOCIETY  457 MADISON AVENUE  NEW YORK NY 10022  TEL: (212) 935.3960  FAX: (212) 753.1816

## RESPONSES

1. See response #1 to the City of New York, Landmarks Preservation Commission

2. See response #1 to the Hamilton Heights Homeowners Association.

## COMMENTS

§ In restoring Hamilton Grange on its new site, every effort should be made to restore its original orientation and to allow visitors to enter through its original front door. Orientation, both with regard to topography and to the sun, has always been an important aspect of architecture, and nowhere more so than in the design of classical villas. Plans currently available of the proposed restoration show the house reversed from its original orientation, and this should be rethought. Furthermore, it is of great importance that visitors be able to approach and enter the house through the front door - as Hamilton himself did. To slip into the house through a basement entrance gives a false idea of its architecture. We understand the difficulty of complying with regulations regarding access for the physically challenged, and the importance of doing so with dignity. We are not convinced, however, that these regulations would completely preclude the use of the original front door. We would urge the National Park Service to continue seeking a solution that would allow visitors to use the front door in its original orientation. The opportunity to restore Hamilton Grange to its full architectural and scenic splendor will not come again. It is well worth doing right.

We would like to commend the National Park Service for its excellent planning and design work in bringing the proposal to relocate and restore Hamilton Grange to this point. We understand that there remain many hurdles before this excellent idea becomes a reality. We offer our full and active support in working out remaining issues and surmounting those hurdles.

Yours sincerely,

Edward Kaufman
Associate Director of Issues

cc: Hon. Charles B. Rangel

## RESPONSES

3. See response #2 to the City of New York, Landmarks Preservation Commission. In addition, as noted in the alternative 4 description in the final plan, the daily visitor would enter the Grange from a welcoming entrance on the house's lower level, which would most likely face 141st Street. This entrance would lead into the information/orientation center for the Grange. Entering through the front doors of the house would preclude adequate visitor orientation because the first floor would be refurnished to reflect the house as it was in Hamilton's time. However, entering through the front door would be possible for large groups who have made advance arrangements and for visitors attending commemorative events. Orientation would be accomplished at the Convent Avenue site on these occasions.

*Organizations*

## COMMENTS



National Trust for Historic Preservation

August 11, 1993

Ms. Georgette Neims, Superintendent
Manhattan Sites
National Park Service
26 Wall Street
New York, NY 10005

RE: <u>Hamilton Grange/Manhattan Sites</u>

Dear Ms. Neims:

Thank you very much for having forwarded the Development Plan for the Hamilton Grange National Memorial to our office for review. We appreciate your affording us the opportunity to comment on the proposed plans for this important historic resource.

We concur with the National Park Service's preference to pursue "Alternative Four," the restoration and relocation of the Hamilton Grange to St. Nicholas Park. Although the National Trust does not usually support the relocation of historic sites, in this case it appears that the relocation will provide an opportunity for the National Park Service to fully restore the mansion and develop a more comprehensive interpretation plan for the site. The plan to relocate the Grange from its non-original location on Convent Avenue to a park which is believed to have been part of the original Hamilton property is an appropriate way to make the mansion fully accessible to the public and provide a better setting for this important site.

1 | We are aware that there are issues related to the siting of the structure in St. Nicholas Park and that there are decisions to be made related to the use of the site on Convent Avenue which will become vacant if "Alternative Four" is adopted. We trust that the National Park Service will involve local organizations, neighborhood groups and the New York Landmarks Preservation Commission in these decisions so that this national site will again be one in which the citizens of New York can take great pride.

I am pleased that the suggestions of significant organizations and individuals involved in preservation in New York I forwarded was

Northeast Regional Office
Seven Faneuil Hall Marketplace
Fifth Floor
Boston, Mass. 02109
(617) 523-0885 / FAX (617) 523-1199

National Office:
1785 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(202) 673-4000

## RESPONSES

1. The National Park Service has involved and would continue to involve all interested parties in the development and implementation of alternative 4. The input received from a variety of organizations (including the New York Landmarks Preservation Commission) and community groups during public meetings and in letters received on the *Draft General Management Plan/Environmental Impact Statement* has influenced the final alternative description in the *Final General Management Plan/Environmental Impact Statement*. Please note that a Friends of Hamilton Grange group, as described in the "Actions Common to All Alternatives" section of the final plan, has been formed and would be involved with the National Park Service in relocating and restoring the Grange and in planning and designing the Convent Avenue building. Representatives of the different groups and interests in the community would be invited to join the group.

COMMENTS AND RESPONSES

## RESPONSES

## COMMENTS

helpful to you. If we can be of further assistance with respect to the Hamilton Grange or other projects, please do not hesitate to contact me at (617) 523-0885. Best of luck with your preservation efforts.

Sincerely,

Vicki-Jo Sandstead
Director

cc: Myra Harrison, NPS
New York Landmarks Preservation Commission

## RESPONSES

1.  Following restoration of the Grange under alternative 4, the park would reinstate an interpretive outreach program on Hamilton's life, heritage, and accomplishments in the local schools. (The program could be part of the local history curriculum required in grades 4 through 9). Additionally, Alexander Hamilton would be fully interpreted in the restored Grange as explained on page 6 of the draft plan.

## COMMENTS

Society for the Preservation of
**WEEKSVILLE and Bedford-Stuyvesant History**
P.O. BOX 130158, ST. JOHN'S STATION, BROOKLYN, NEW YORK 11213-0800 TEL. 718-756-5250

*Save the Memories of Self*

July 10, 1993

Georgette Melms
Superintendent
U.S. Department of the Interior
National Park Service
Manhattan Sites
26 Wall Street
New York, New York 10005

Dear Ms. Melms:

Thank you for the invitation to review and comment on the
GENERAL MANAGEMENT PLAN ENVIRONMENTAL IMPACT STATEMENT for
the Hamilton Grange National Memorial.

The document itself reflects the thorough and thoughtful work
of the preparers and consultants charged with preserving this
rich national resource in a fitting setting for its proper
administration and interpretation as a national memorial.

After reviewing the four alternatives presented in the plan,
I believe that the most favorable choice is ATERNATIVE #4.

So many people/institutions are to be thanked for their constant
concern and efforts in behalf of the well being of the historic
property over the years. I believe all will be comfortable with
a plan that provides the very best security plan for the property
and allows it to offer the finest state of the art interpretation
to the public in an appropriate and spacious setting.

Because many of visitors to the relocated, fully restored
property, are still very young or not yet born, is there any
plans to institute a large "Grange Curriculum" to be introduced
into nearby elementary, intermediate and highschools? Perhaps
a colorful book with a ten dollar "HAMILTON" bill on the cover!

Because Hamilton was born in Nevis, in the Caribbean, he may
be seen as an attractive, successful "immigrant", for several
of the today's area inhabitants. If that idea has feasibility,
then the envelope of caring and security for the historic
property may be enlarged.

- MORE -

CHARTERED UNDER NEW YORK STATE EDUCATION DEPARTMENT

1

## COMMENTS

The Honorable Bertram Baker, the first Black elected to the New York State Legislature, 1948, who came from Brooklyn, was born in Nevis.   Mr. Baker, a history buff, was the first Life Member of the Weeksville Society.  His writings include Alexander Hamilton, who he admired greatly.  Mr. Baker's archives are with his grandson, Ronald Howell, a journalist with NEWSDAY.

I believe it may be valuable to your interpretation to include Hamilton's activities, along with John Jay and others, concerning the African Manumission Society and the African Free School. Examinations of those themes generally illuminate little known American history and are relevant to today's issues.

Is'nt it wonderful that historic places have such great power to help citizens understand their place in time and their potential to positively effect future generations!

Very sincerely,

John Maynard
Executive Director

cc: Honorable Howard Golden, President Borough of Brooklyn
    Curtis Lyles, MSW, CSW, President Weeksville Society

## RESPONSES

2.  An objective of NPS interpretation is to make the lessons of history relevant to contemporary life. The relationship of Hamilton to the African-American community of his day and the present day would be explored in the site's interpretive program.

160

*Individuals*

## COMMENTS

## RESPONSES

Dr. Joseph E. Fields

July 9, 1993

Ms. Georgette Neilms
Superintendent, Manhattan Sites
United States Department of the Interior
National Park Service
26 Wall Street
New York, NY 10005

Dear Ms. Neilms,

I am writing in support of the plan to move the Hamilton Grange to St. Nicholas Park. We are very proud to have such an important part of our country's history in our neighborhood, but have long bewailed the inappropriateness of its site, wedged between a large apartment building and a church.

This plan would put the Grange in its natural setting (it was, after all, a free-standing country house); it would allow the rebuilding of porches that were chopped off or altered to fit it into its present location; and it would make the Grange a more visually successful and accessible site, both for neighborhood residents and the public at large.

Also, it should be mentioned that the Grange is no longer on its original site, having been moved at least once to accomodate the Manhattan street grid.

Thank you for your interest and I hope we are successful with this project to move the Grange to St. Nicholas Park.

Sincerely yours,

Joseph E. Fields

Joseph E. Fields

cc: Hon. Charles B. Rangel



COMMENTS AND RESPONSES

| COMMENTS | RESPONSES |
|---|---|

MARGOT GAYLE

Mr. Thom Bess

August 21, 1993

Dear Thom,

It was very good to talk to you yesterday about the thorny problem concerning the proposed moving of Alexander Hamilton's home to a setting where it can be fully appreciated. I honestly feel that why they are opposed to it now would be completely convinced of the appropriateness of this move after a short lapse of time during which the grounds around it could be planted with the 13 trees, and the interior of the house made to look like the Hamilton family's home. These very opponents would find themselves feeling proud and happy, especially if they had played a deciding role in the project.

The challenge to all of us who want to see the change is to seize the moment while the federal government is poised to take this step and find it impractical. It behooves us to reach out to everyone we know and help them see the vision. I wonder if you agree with me that the lowly 1887 photograph can play a key role in the campaign. It can make the goal visible. The picture was taken not long before the house was moved to its present location, and for me it is truly evocative. The trees at the left of the photograph are the 13 trees which were given by Gen. Washington as saplings from his Mt. Vernon plantation. The spokesman for the National Park Service who talked to us at the Municipal Art Society this week said it is their plan to secure seedlings from Mt. Vernon and have these put in the hands of the Arboretum so that they could start now growing 13 new trees for planting if and when the move takes place.

My 8 X 10 glossy print can be borrowed if you or someone else wants to make a large scale enlargement of it. Meanwhile, I made a trip today to the only place in our part of town that I know to have a Cannon color copier and had the print reproduced for you. A commercial photographer has told me that this kind of reproduction can be used for most purposes, though the glossy print would be best for a blow-up for mural size. Along with the special print, I am enclosing some run-of-the-mill Xeroxes.

Also, I am sending a photocopy of the article which I wrote for the Sunday Magazine of the New York Daily News a couple of years ago. You are welcome to reproduce any or all of it anytime it would be useful. I sold only first rights. When the old photograph is used it should be credited Courtesy of the New-York Historical Society. The photographer is Charles Gilbert Hine.

Sincerely,

Margot (Gayle)

162

*Individuals*

**RESPONSES**

**COMMENTS**

Don Hill

15 July 1993

Ms. Georgette Nelms
Superintendent, Manhattan Sites
United States Department of the Interior
National Parks Service
26 Wall Street
New York, NY 10005

Dear Ms. Nelms:

Please accept this letter in support of Alternative 4 for the full restoration and relocation of Hamilton Grange to St. Nicholas Park.

Hamilton Grange is an important landmark of Harlem and of our nation and deserves no less than the full commitment of our energies and resources to establish Hamilton Grange as a national memorial on par with those in other areas of our country.

The only possible reason for not relocating this historic building would be that it was on its original site — which it is not. It should have the grace of a site fitting its beauty and its history.

Sincerely,

Don Hill

cc:    Hon. Charles B. Rangel

163

| COMMENTS | RESPONSES |
|---|---|

## MATTHEW HUFFMAN

15 July 1993

Ms. Georgette Neims
Superintendent, Manhattan Sites
United States Department of the Interior
National Parks Service
26 Wall Street
New York, NY 10005

Dear Ms. Neims:

Please accept this letter in support of Alternative 4 for the full restoration and relocation of Hamilton Grange to St. Nicholas Park.

Hamilton Grange is an important landmark of Harlem and of our nation and deserves no less than the full commitment of our energies and resources to establish Hamilton Grange as a national memorial on par with those in other areas of our country.

The only possible reason for not relocating this historic building would be that it was on its original site -- which it is not. It should have the grace of a site fitting its beauty and its history.

Sincerely,

Matthew Huffman

cc:    Hon. Charles B. Rangel

## COMMENTS

Marjorie Johnson

July 8, 1993

Ms. Georgette Nelms
Superintendent, Manhattan Sites
United States Department of the Interior
National Park Service
26 Wall Street
New York, NY 10005

Dear Ms. Nelms:

Please accept this letter in support of Alternative 4 for the full restoration and relocation of Hamilton Grange to St. Nicholas Park. Hamilton Grange is an important landmark of Harlem and our nation and deserves no less than the full commitment of our energies and resources to establish Hamilton Grange as a national memorial on par with those in other areas of our country.

Sincerely,

Marjorie Johnson

c:  Hon. Charles B. Rangel

## RESPONSES

165

COMMENTS AND RESPONSES

## COMMENTS

Christopher W. London

Georgette Nelms
Superintendent Manhattan Sites
National Park Service
26 Wall Street
New York, N.Y.  10005

July 19th 1993

Dear Ms. Nelms,
    I write to urge you to choose "Alternative 4" in your decision regarding the fate of Hamilton Grange.
    The grange should be fully restored and relocated to St. Nicholas Park, as outlined in this proposal.
    The National Park Service and your local office should choose this method of preservation, as it is the only sure way to safeguard the building for the future.
    I hope that is the arrangements you have started planning for after the compelling arguments offered at the public meeting last week.

Sincerely yours,

Christopher W. London

CC: The Hon. Charles B Rangell, 163 W. 125th Street, NYC
        10027
    Michael H. Adams, Chairman, The Upper Manhattan Society
        for Progress through Preservation, 63 Hamilton
        Terrace, NYC 10031

## RESPONSES

166

*Individuals*

## COMMENTS

## RESPONSES

### Roderick J. MacGregor

July 12, 1993

Ms. Georgette Nelms
Superintendent, Manhattan Sites
U.S. Dept. of the Interior
National Park Service
26 Wall Street
New York, NY 10005

Dear Ms. Nelms:

My wife, Joan, and I wholeheartedly support Alternative #4
for the full restoration of and relocation of the Hamilton
Grange to St. Nicholas Park.

At its present location and in its present condition, the
Grange is not shown in the light it deserves either
architecturally nor as a most important historical landmark
of Harlem.

We feel that it is important that our federal government as
well as the National Park Service take the same interest in
landmarks in this neglected area of New York City as it would
in those located in a more fashionable areas.

Sincerely

Roderick J. MacGregor

cc: Hon Charles B. Rangel

167

## COMMENTS

.WALLER.INC. [redacted] Jun 30.93 15:58 No.004 P.01

June 29, 1993

Superintendent, Georgette Helms
Manhattan Sites
26 Wall Street
New York, New York 10005

Faxed: 264 3186

Pursuant to the invitation for commentary extended during the may meeting of Community Board Nine during which the proposal for moving the Hamilton House was presented, I wish to offer the following response. I was initially impressed with the motivation expressed by NPS to accord the landmark the respect due a national treasure, to preserve our heritage in a manner most approximating the vision of its architect and owner and to favorably impact on the economy and quality of life of the surrounding community. After the meeting, in studying the draft distributed that evening and conducting a personal investigation, I must strongly protest proceeding with favored alternative #5.

1 "Implied in the Park's Service positioning itself on #5 from among the options presented is the assumption that a full range of possibilities were studied. Yet, no alternative which would involve using the land most proximate to its present site were presented in the draft and apparently never studied by the absence of this alternative, as well as the history of ~~attempts to relocate it to Riverside Park and the failure of~~

2 NPS to provide a permanent foundation to protect the house from structural deterioration in the 29 years it has held the national interest to preserve this structure. The house currently sits on its temporary support dating from the 1889 move.

3 I propose the following compromise to address some of the real problems which are posed by alternative #5 detailed below. This option would focus on moving the structure further back on the adjacent lot which abuts on Hamilton Terrace and involve a partial restoration of the house. The empty space left behind could then be incorporated into creating a sweeping, beautifully landscaped entrance accessible from Convent Avenue. Given the current heavy tourist Traffic any increase, which at this point is speculation, according to the draft, would be better absorbed on an avenue,

## RESPONSES

General Note: Alternative 5 is identified in this letter as the preferred alternative. Because there is no alternative 5, the National Park Service is assuming the respondent was referring to alternative 4, the preferred alternative in the draft plan.

1. The National Park Service has examined a full range of feasible alternatives in this planning effort, as well as in past planning efforts focused on Hamilton Grange. An evaluation of alternatives considered but rejected during the preparation of the draft plan is presented in the "Alternatives Considered But Rejected" section of the final plan. A summary of past planning efforts and relocation attempts is also discussed in the "Affected Environment" section under "The Grange and Its History." Use of the land surrounding the Grange was evaluated and dismissed because without demolishing adjacent housing units there is not sufficient land to reorient the front of the house to the street.

2. The Grange currently sits on a stone foundation built in 1889 for use by St. Luke's Church. The deterioration of the Grange over the years is attributable to the forces of gravity, which have caused major wooden beams to split, the exterior walls to bow out, and mortise and tenon joints to separate. Relocation to a less restrictive site would greatly facilitate the structural rehabilitation of the Grange.

3. This alternative was discussed at a Community Board #9 meeting and has been analyzed and dismissed. See response #1 above.

## COMMENTS

WALLER, INC.                        Jun 30,93  16:00 NO.004 P.02

- 2 -

**4** *[handwritten comment, partially legible]*

**5** *[handwritten comment, partially legible]*

**6** *[handwritten comment, partially legible]*

## RESPONSES

4. The optimum site for the Grange would be its original site; however, relocation there is impossible. By definition, any other site would be less than optimum. See also responses #2 and #5 to the "Hamilton Grange: Analysis of Alternative 4" submitted by the Hamilton Grange Task Force to Prevent the Removal of the Grange (March 8, 1994).

5. As described in alternative 4 of the final plan, the National Park Service proposes to work with the city Department of Parks and Recreation to rehabilitate and maintain St. Nicholas Park. The extent of the these activities would be determined in future discussions and negotiations between the city and the National Park Service regarding the proposed land transfer. Only a portion of the existing St. Nicholas Park was part of Hamilton's original landholdings. It is unclear as to how much of St. Nicholas Park was a working farm because its topography may have inhibited such activities.

6. Additional information has been added to the "Traffic and Transportation" section in the "Affected Environment" and the "Impacts on Traffic Flow/Transportation" sections of the final plan. Because of the narrowness of 141st Street and its importance as a cross-town connector route and because of the importance of maintaining park land, all parking options have been removed from the preferred alternative. Parking would not be developed on 141st Street or on St. Nicholas Avenue. The National Park Service would work with City College of New York and the Friends of Hamilton Grange group to identify existing parking options (potentially on City College property) for Grange visitors. Bus and subway stops are within walking distance. These are identified on the Regional Developments map and in the "Traffic and Transportation" section of the final plan.

## COMMENTS

- 3 -

may be created in Hamilton Station, a one-way street.

7  The economic benefit to the community stressed during the presentation by the Parks Service and supporters of the proposal is non-existent. The draft proposal clearly states that any employment or business opportunities will be guaranteed from the removal. The conditions of implementation of any alternative must include provisions for preference hiring of the qualified construction workers, potential Park Ranger, and joint ventures with community entrepreneurs in this area.

## RESPONSES

7.  NPS local hiring policies are outlined in "Actions Common to all Alternatives" section of the final plan. Within federal regulations, efforts would be made to hire locally and provide procurement and contracting opportunities for local businesses. Potential economic benefits to the community are outlined in the "Area Land Use and Resources" section of "Affected Environment" and in the "Impacts on the Local Economy" sections of the various alternatives in the final plan, and they are discussed in response #12 to the "Hamilton Grange: Analysis of Alternative 4" submitted by the Hamilton Grange Community Task Force to Prevent the Removal of the Grange (March 8, 1994).

170

*Individuals*

## COMMENTS

8. Increasingly of disturbing the community with an ill-conceived plan to work on the Hamilton house is only made more tragic by the astronomical cost which the National Park Service proposes to perform from sum will be set aside to complete the Grange not only welcome plans enduring guidelines to ensure what would be built in place of the house once it is removed, but the choice to build a community center is hardcased in our area that regularly makes use of the church aud/—Tourisme and private audiences for public meetings. If any type of public access space is contemplated in alternative this, perhaps it might be better suited to the performing arts to permit cultural events to be planned in keeping with that period of history. This would introduce another element of cultural enrichment and economic development in a community that supports the Arts.

9. One who is sophisticated, I view this entire issue in the broader perspective. The Parks Service is attempting to sanitize and/or erase the history of the house; one

## RESPONSES

8. The estimated costs for alternative 4 were presented in the draft plan and are presented again in appendix G of the final plan. The capital costs for this project are reasonable relative to other projects in the metropolitan area and nationwide. Regarding the new building on Convent Avenue, the primary functions of this building would be heritage education, community use, and law enforcement ranger housing. These uses do not preclude appropriate cultural events.

9. The relocation and restoration of the Grange is an unfulfilled opportunity to reach a much broader and larger audience than at present.

171

COMMENTS AND RESPONSES

| COMMENTS | RESPONSES |
|---|---|

WALLER.INC.                    Jun 30.93   16:00 No.004 P.03

- 4 -

I feel, in another sense, the country. The most authentic representation of history in this instance, is shown by the fact that a part of wilderness was alarmed by Hamilton for the development and growth that reads even with the construction of his house and this country. It is the fact that structure is continuing because even in less than ideal surroundings, this is the strongest testimony to those who consciously seek it out or find it as an unexpected treasure. Hamilton house stands as a monument to the optimism, foresight, and technical skill used by Hamilton as someone to design intensely a residential structure, but a new republic that endures.

False characterization of history, no matter how noble the intent of its proponents, is a disservice to future generations. The amount of exhibits or audiovisual environments, especially those which imply recent scholarship concerning Hamilton's disputes regarding character will not be paid homage, can compare with the legacy left by the real home of the house.

I strongly urge the National Parks Service to reconsider this proposal. Let this house be restored on-site in partnership with a not-back-from Grange Avenue and monument to these who founded, preserved, and participated the American dream of freedom, growth and wealth. Often neither this destroy the people whose personal history is reflected in this house, to wit, St. Luke's which served it from demolition, the American Scenic and Historic Preservation Society which sought to protect it as a monument and the Harlem community who have fought to keep it in its original area and are part of the building of the Parks Service employees as you are. You are pioneers with a unique

172

*Individuals*

**RESPONSES**

**COMMENTS**

- 5 -

opportunity to examine the dichotomies of
whether to foster growth on allow stagnation,
to preserve or destroy, or deal in truth rather
than denial. I challenge you and the poli-
tical leaders involved to make the right
choice, which is not Alternative #5.

Sincerely,

Andy Mauritzen

cc: Congressman Charles Rangel
Senator Alfonse D'Amato
Senator Patrick Moynihan

174

| COMMENTS | RESPONSES |
|---|---|

July 9, 1993

Ronald L. Melichar

Ms. Georgette Neims
Superintendent, Manhattan Sites
United States Department of the Interior
National Park Service
26 Wall Street
New York, NY 10005

Dear Ms. Neims:

I am writing to support of Alternative 4 of the National Park Service Draft General Management Plan, Environmental Impact Statement, April 1993 calling for the full restoration and relocation of Hamilton Grange to St. Nicholas Park. Hamilton Grange is an important landmark of Harlem and our nation and deserves no less than the full commitment of our energies and resources to bring this long neglected national memorial to a level equal with those in other areas of our country.

The relocation of the Grange to St. Nicholas Park is the most appropriate alternative for several reasons. First, while retaining the Grange in the community and near its original site, it would permit the Grange to be seen and enjoyed in a location that resembles its original setting. In its current location hemmed in between St. Luke's Church and an apartment building, the property is diminished and loses its significance as a free standing country home. In the park, the house will be seen as Hamilton knew it, surrounded by trees and gardens.

Second, the relocation will permit the house to be fully restored so that it can be understood as an important historic home of one of the founding fathers of our nation. The main door and entrance porch, rather than abutting St. Luke's Church, can be replicated and the side porches returned to their original configurations. These restorations are important to an understanding of how the house worked and how one entered, moved and lived in the house. None of the other alternatives can address this correction of the current situation.

Third, the relocation will permit the construction of a new building on the present site which would serve as both an orientation center for the Grange as well as much needed public meeting space.

## COMMENTS

## RESPONSES

Page Two, Hamilton Grange

Last, the fourth alternative raises the Grange to the level of other important landmarks of our country and will serve as one important location, among others, to attract visitors to our community. New York City attracts so many visitors: we need to attract them to Harlem by supporting projects which are properly carried out and not compromised by narrow or provincial interests. Restoring the house on its present site will turn the current third rate situation into a second rate one. This is not good enough for an historic monument of the first caliber. It should be treated accordingly by giving it the attention and resources that are routinely given similar sites of this importance throughout the country.

Sincerely,

Ronald L. Melichar

Ronald L. Melichar

cc: Hon. Charles B. Rangel

COMMENTS AND RESPONSES

| COMMENTS | RESPONSES |
|---|---|

## COMMENTS

**Alvarene Molland**

Georgette Nelms
Superintendent of Manhattan Sites
US Department of Parks
26 Wall Street
New York, NY 10005

June 14, 1993

Dear Ms. Nelms:

Re: Restoration of Hamilton Grange

As I heard in the last meeting regarding the Hamilton Grange Restoration, the battle regarding the "resting place" has been going on for decades! It seems to me that some people are unclear in their minds about what they really want.

The sentiments seem to run high that Convent Avenue is the best location. If The Grange is to be truly a National Monument, it cannot remain squeezed between two structures. People must be prepared to give something to get something! The building needs to be centered with space around it. You most probably should obtain the apartment building next to it and take it out.

I know this is a hard decision and people will scream and shout about this but that will be the only solution, to keeping the Grange on Convent Avenue. The apartment building is old anyway and there are many like buildings in the neighborhood in which people can be relocated. We must have parking to accommodate the tours that are anticipated.

Failing that, Hamilton Grange should be moved around on the parcel of land that is donated by the church. The entrance should be on Hamilton Place since it would be more spacious.

## RESPONSES

1. This alternative was considered early in the planning process but rejected because of extraordinary costs of acquisition and relocation and the shortage of housing (identified in the *Community District Needs, Fiscal Year 1993* (City of New York, Department of City Planning 1991). See the "Alternatives Considered But Rejected" section of the final plan for additional information.



176

## COMMENTS

It seems that the Department of Parks will be the ultimate decision maker, since the building and the land belong to that department. However, we do not wish the building to be removed from the neighborhood.

2. If the building is moved to the park, then something like a cultural center should be built on that land on Convent. Probably a museum or Art Gallery, which will be multicultural in presentation.

3. To be fair, since the church has been "protector/caretaker" of the Hamilton Grange over the years, you most probably should involve them more fully in the decision making process, and include them in your plans, whatever the outcome. This is a very emotional situation and should be handled with tact - we love the Grange and would like to see the restoration started as soon as possible.

This is my humble suggestion

Very truly yours,

## RESPONSES

2. See response #8 to Wendy Mauritzon.

3. See response #1 to the National Trust for Historic Preservation.

177

## COMMENTS

July 8, 1993

Ms. Georgette Nelms
Superintendent, Manhattan Sites
United States Department of the Interior
National Park Service
26 Wall Street
New York, NY 10005

Dear Ms. Nelms:

Please accept this letter in support of Alternative 4 for the full restoration and relocation of Hamilton Grange to St. Nicholas Park. Hamilton Grange is an important landmark of Harlem and our nation and deserves no less than the full commitment of our energies and resources to establish Hamilton Grange as a national memorial on par with those in other areas of our country.

The relocation of the Grange to St. Nicholas Park is the most appropriate alternative for several reasons. First, while retaining the Grange in the community and near its original site, it would permit the Grange to be seen and enjoyed in a location that resembles its original setting. In its current location hemmed in between St. Luke's Church and an apartment building, the property is diminished and loses its significance as a free standing country home. In the park, the house will be seen as Hamilton knew it, surrounded by trees and gardens.

Second, the relocation will permit the house to be fully restored so that it can be understood as an important historic home of one of the founding fathers of our nation. The main door and entrance porch, rather than abutting St. Luke's Church, can be restored/replicated and the side porches returned to their original configurations. These restorations are important to an understanding of how the house worked and how one entered, moved and lived in the house. None of the other alternatives can address this correction of the current situation.

Third, the relocation will permit the construction of a new building on the present site which would serve as both an orientation center for the Grange as well as much needed public meeting space.

## RESPONSES

178

## COMMENTS

## RESPONSES

Page Two, Hamilton Grange

Last, the fourth alternative raises the Grange to the level of other important landmarks of our country and will serve as one important location, among others, which will attract visitors to our community. New York City attracts as many visitors: we need to attract them to Harlem by supporting projects which are properly carried out and which are given the attention and resources that are given similar sites throughout our country.

Sincerely,

Mary Webb

c:   Hon. Charles B. Rangel

COMMENTS AND RESPONSES

## COMMENTS

October 7, 1993

Superintendent, Manhattan Sites
26 Wall Street
New York, New York 10005

Dear Superintendent:

I appreciate the opportunity to comment on the draft management plan and environmental impact statement for Hamilton Grange National Memorial. I strongly recommend that the National Park Service adopt alternative 4, relocating the Grange to St. Nicholas Park. Relocation will obviously provide a better and more appropriate setting for the house and allow for more visitation and a fuller interpretation of the life and times of Alexander Hamilton.

On my first visit to the Grange a number of years ago, I fully anticipated that I would see the country house of Hamilton's day in a much-altered setting, surrounded by a heavily developed urban neighborhood. But it was nonetheless startling to find the house shoehorned into a narrow space next to a church. While we all can appreciate the contributions of St. Luke's Church in preserving the house, I think it is self-evident that the Grange cannot be the shrine to Hamilton that the Congress intended in designating it as a national park unless it is moved to a more suitable site. Nor can it be the visitor attraction that it should be unless it is moved.

I also strongly endorse the plans for the interior of the house. I am particularly delighted by the plan to use much of the interior as a "museum" about Hamilton and his era. This is not only appropriate given the availability of historic furnishings and lack of knowledge about the second floor rooms, but also desirable. The life and contributions of Alexander Hamilton deserve to be fully explained.

I look forward to learning of your final decision and the progress of your plans. If possible, I would like to be informed of what happens next. Thank you for your consideration.

Sincerely yours,

Robert D. Paulus

Robert D. Paulus

## RESPONSES

180

**COMMENTS**

**RESPONSES**

July 8, 1993

Ms. Georgette Neims
Superintendent, Manhattan Sites
United States Department of the Interior
National Park Service
26 Wall Street
New York, NY 10005

Dear Ms. Neims:

Please accept this letter in support of Alternative 4 for the full restoration and relocation of Hamilton Grange to St. Nicholas Park. Hamilton Grange is an important landmark of Harlem and our nation and deserves no less than the full commitment of our energies and resources to establish Hamilton Grange as a national memorial on par with those in other areas of our country.

Sincerely,



c: Hon. Charles B. Rangel

COMMENTS AND RESPONSES

## COMMENTS

## RESPONSES

Ronald F. Wagner
Timothy Van Dam

3 July 1993

Ms. Georgette Nelms
Superintendent of Manhattan Sites
National Park Service
26 Wall Street
New York, New York

Dear Ms. Nelms:

As eight year residents of Hamilton Heights and former co-secretaries of the Hamilton Heights Homeowners Association, we do fully endorse the proposal under consideration to move Hamilton Grange to the park below City College. This plan would allow this historic building to be restored most fully because the surroundings would provide the space to re-orient the entrance to its previous placement, and restore the missing two porches. Also, these surroundings would more closely resemble those in which the Grange once stood.

Sincerely yours,

Ronald F. Wagner
Timothy Van Dam

182

*Individuals*

**RESPONSES**

**COMMENTS**



July 17, 1993

Mr. George Dilis Nelson
Superintendent/Manhattan Sites
U.S. Dept. of Interior
National Park Service
26 Wall Street
New York, N.Y. 11005

Dear Mr. Nelson:

Please accept this letter in support of Alternative 4 for full park restoration and relocation of Hamilton Grange to East Nicholas Park. Hamilton Grange is an important landmark of Harlem and our nation and deserves no less than our full commitment to establish it as a national memorial.

Sincerely,
Caroline Walruth Wasserman

C. Hon. Charles B. Rangel

183

**COMMENTS**

**RESPONSES**

O.J when 16/Tal MD

July 8, 1993

Ms. Georgette Nelms
Superintendent, Manhattan Sites
United States Department of the Interior
National Park Service
26 Wall Street
New York, NY 10005

Dear Ms. Nelms:

Please accept this letter in support of Alternative 4 for the full
restoration and relocation of Hamilton Grange to St. Nicholas Park.
Hamilton Grange is an important landmark of Harlem and our nation
and deserves no less than the full commitment of our energies and
resources to establish Hamilton Grange as a national memorial on
par with those in other areas of our country.

Sincerely,

c:  Hon. Charles B. Rangel

184

## COMMENTS

**Colette C. Whitlock**

June 14, 1993

Ms. Carolyn Denerstein
Landmarks Harlem, Inc.
201-A West 138th Street
New York, NY 10030

Re:    Hamilton Grange National Memorial
       U.S. Dept. of Interior/National Parks Service
       Proposed Management Plan

Dear Carolyn,

I am, at last, returning the Draft/General Management Plan/Environmental Impact Statement for Hamilton Grange National Memorial developed by the U.S. Department of Interior. Thank you very much for lending the publication to me.

At the meeting held May 26, 1993, I told you that my initial reaction was in disagreement with your position that the group should recommend the alternative that calls for extensive renovations to the building but leaves it at its present site. As you suggested, I have read the draft and am writing to explain my feelings.

My position is unchanged. I believe that the fourth and most drastic alternative is the only plan worth proceeding with. Should the fourth alternative not prevail then I would prefer to see alternative 1, the no action plan, adopted. The remaining two alternatives do nothing to either restore the building or enhance the public's knowledge of the Grange and how Hamilton and his family lived. Plan 1 provides minimal stabilization to the structure without inflicting the indignity of creating a deceptive and historically incorrect four storey facade. Alternatives 2 and 3 are renovations of a historical structure the equivalent of the all to common practice in Harlem and Upper Manhattan of the penitentiary style gutted rehabs.

You had expressed concern that the new site for Hamilton Grange would necessitate the elimination of a much used children's playground. The house itself would not be placed at the playground. It would occupy a trail used as a shortcut between City University and the IND subway. If no accommodations for bus parking were made, the existing playground would remain intact. The Plan also states that should a bus parking area be created and the playground altered, it would be replaced at another site within the park.

continued on page 2

1

## RESPONSES

1.  Bus parking and dropoff areas have been eliminated from alternative 4 in the final plan (see description of alternative 4). Valuable park land and the children's playground would not be eliminated or displaced by the Grange relocation or associated parking. The Park Service would work with the Friends of Hamilton Grange group and City College to identify parking opportunities nearby.

## COMMENTS

## RESPONSES

Letter to Carolyn Denerstein
Date: June 14, 1993
Page 2

I was told that St. Luke's opposition to moving the building is based on their congregation having maintained the building at a time when no one else cared about it. They believe that St. Luke's has a proprietary claim as to its location. Indeed St. Luke's has played the role of caretaker, but the congregation cannot take delight in the Grange's situation. For years its front and rear doors have been invisible, its porches truncated as it stands sandwiched between a church, remarkable in its own right, and an apartment building.

It is the only home ever owned by the man responsible for the financial structure of this country. After having been moved and sheared over the past 190 years to accommodate other people and other structures, it merits being appropriately presented to the nation and to the world as a national landmark. If funds have been appropriated, they should be spent to historically restore the building architecturally. The only way to appreciate the architecture of the building is to reinstate the doors and replace the two tiered porches that originally surrounded the building. Although it's not possible to return Hamilton Grange to its original 300 acre estate, it is possible to move the Grange so that all four sides of the structure are visible. It is possible to furnish the public rooms in period furniture and it is possible to give the public a sense of how Hamilton and his family lived at the Grange.

As a group dedicated to the preservation of Harlem's architectural treasures, I think Landmarks Harlem has to ask itself two questions: Why should Harlem accept another renovation? Why shouldn't Harlem be the beneficiary of the tourism attracted by a fully restored national landmark.

Sincerely,

Colette C. Whitlock

Colette C. Whitlock

cc: Thom Bess

186

*Individuals*

| COMMENTS | RESPONSES |
|---|---|

## JIM WILLIAMS

15 July 1993

Ms. Georgette Nelms
Superintendent, Manhattan Sites
United States Department of the Interior
National Parks Service
26 Wall Street
New York, NY 10005

Dear Ms. Nelms:

Please accept this letter in support of Alternative 4 for the full restoration and relocation of Hamilton Grange to St. Nicholas Park.

Hamilton Grange is an important landmark of Harlem and of our nation and deserves no less than the full commitment of our energies and resources to establish Hamilton Grange as a national memorial on par with those in other areas of our country.

The only possible reason for not relocating this historic building would be that it was on its original site — which it is not. It should have the grace of a site fitting its beauty and its history.

Sincerely,

Jim Williams

cc:   Hon. Charles B. Rangel

187

# PREPARERS AND CONSULTANTS

## PREPARERS

Joe Avery, Superintendent, Manhattan Sites
Karen Andrews, Co-Team Captain and Natural Resource Specialist/Economist, NPS Denver
    Service Center
Dave Dame, former Interpretive Planner, NPS Harpers Ferry Center/Denver Service Center
Eunice Fedors, Historian, Denver Service Center
Jeff Garrett, former Landscape Architect, Denver Service Center
Chandler McCoy, former Architect, Building Conservation Branch, Cultural Resources Center,
    NPS North Atlantic Regional Office
Georgette Nelms, former Superintendent, Manhattan Sites
Chris Schillizzi, Interpretive Planner, NPS Harpers Ferry Center / Denver Service Center
Richard Wells, Co-Team Captain, Office of Urban Projects, NPS North Atlantic
    Regional Office

## CONSULTANTS

Michael Adlerstein, Chief of Urban Projects, NPS North Atlantic Regional Office
Craig Cellar, Cultural Resource Specialist, Denver Service Center
Steve Laise, Interpretive Specialist, Manhattan Sites
Gary Warshefski, former Deputy Superintendent, Manhattan Sites

## PRODUCTION SERVICES

Beverly Boecher, Visual Information Specialist, Denver Service Center
Christy Fischer, Writer/Editor, Denver Service Center
Larry Morrison, Supervisory Information Specialist, Denver Service Center

188

Appendixes
and Bibliography
Hamilton Grange

## APPENDIX A: LEGISLATION

### 8. Hamilton Grange National Memorial Project

Establishment authorized_____Joint Resolution of April 27, 1962    Page 382

---

**Joint Resolution Providing for the establishing of the former dwelling house of Alexander Hamilton as a national memorial, approved April 27, 1962 (76 Stat. 57)**

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior is authorized and directed to take such action as may be necessary to provide for the establishment of the former dwelling house of Alexander Hamilton (commonly known as The Grange), situated in New York, New York, as a national memorial. However, the Secretary shall not establish the national memorial until he has satisfied himself that the lands which have been donated are sufficient to assure the relocation of The Grange and administration and interpretation of the national memorial.

Alexander Hamilton national memorial. Establishment.

SEC. 2. (a) The national memorial established by the Secretary of the Interior pursuant to this joint resolution shall be designated as the Hamilton Grange National Memorial and shall be set aside as a public national memorial to commemorate the historic role played by Alexander Hamilton in the establishment of this Nation.

Designation as Hamilton Grange National Memorial.

(b) The National Park Service, under the direction of the Secretary of the Interior, shall administer, protect, and develop such memorial, subject to the provisions of the Act entitled "An Act to establish a National Park Service, and for other purposes", approved August 25, 1916, as amended and supplemented, and the Act entitled "An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes", approved August 21, 1935, as amended.

39 Stat. 535. 16 U.S.C. 1–4.

49 Stat. 666. 16 U.S.C. 461–467.

SEC. 3. There are hereby authorized to be appropriated such sums, but not more than $460,000, as may be necessary to carry out the provisions of section 1 of this joint resolution.

Appropriation.

APPENDIXES

102 STAT. 4640      PUBLIC LAW 100-701—NOV. 19, 1988

Public Law 100–701
100th Congress

## An Act

Nov. 19, 1988
[H.R. 4212]

To amend the Joint resolution of April 27, 1962, to permit the Secretary of the Interior to establish the former home of Alexander Hamilton as a national memorial at its present location in New York, New York.

Historic
preservation.
Conservation.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Joint resolution of April 27, 1962 (76 Stat. 57), is amended by striking all after the resolving clause and inserting the following:

"SECTION 1. HAMILTON GRANGE NATIONAL MEMORIAL.

16 USC 431 note.

"(a) ESTABLISHMENT.—In order to provide for the benefit, inspiration, and education of the American people, there is hereby established the Hamilton Grange National Memorial (hereinafter in this Act referred to as the 'memorial') in the State of New York.

"(b) MAP.—The memorial shall consist of the lands and interests in lands and improvements as generally depicted on the map entitled 'Hamilton Grange National Memorial Boundary Map' numbered 416/80,002 and dated June 1988.

"SEC. 2. ACQUISITION OF PROPERTY.

"The Secretary of the Interior (hereinafter in this Act referred to as the 'Secretary') is authorized to acquire lands, interests in lands, and improvements thereon within the boundaries of the memorial by donation. The Secretary is authorized to reimburse the owner not more than $15,000 for administrative costs directly related to the transfer of ownership of this property. The Secretary may also acquire by the donation, purchase with donated or appropriated funds or by exchange, personal property associated with and appropriate for interpretation of the memorial.

"SEC. 3. ADMINISTRATION OF MEMORIAL.

"The Secretary shall administer the memorial in accordance with the provisions of law generally applicable to units of the National Park System, including the Act of August 21, 1916 (39 Stat. 535; 16 U.S.C. 1, 2-4) and the Act of August 21, 1935 (49 Stat. 666; 16 U.S.C. 461). In administering the memorial, the Secretary shall—

"(1) provide for the interpretation of the life of Alexander Hamilton;

"(2) preserve and interpret the history of The Grange, home of Alexander Hamilton; and

"(3) present the history of the United States as a young Nation.

"SEC. 4. GENERAL MANAGEMENT PLAN.

"Within 3 complete fiscal years after the enactment of this section, the Secretary shall submit to the Committee on Interior and Insular Affairs of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate a general management plan for the memorial. The

PUBLIC LAW 100–701—NOV. 19, 1988        102 STAT. 4641

plan shall be prepared in accordance with section 12(b) of the Act of
August 18, 1970 (84 Stat. 825; 16 U.S.C. la–1—la–7). Such plan shall
identify appropriate facilities for proper interpretation of the site
for visitors.

"SEC. 5. AUTHORIZATION OF APPROPRIATIONS.

"There are authorized to be appropriated such sums as may be
necessary to carry out this Act, but not to exceed $2,500,000 for
development.".

SEC. 2. Notwithstanding any other provision of law or any order of
land classification based thereon, the Secretary of the Interior is
authorized to consider an application for desert land entry covering
approximately 280 acres of public lands, 105 of which constitute a
part of a scenic easement area of the Dinosaur National Monument,
Utah, as identified on a map entitled "Desert Land Entry—Dino-
saur National Monument—October 1, 1987". If the applicant meets
the requirements of section 3 of this Act, the Secretary shall issue a
patent to the applicant in accordance with the Desert Land Entry
Act (43 U.S.C. 321 et seq.). Such patent shall reserve to the United
States a right-of-way 200 feet in width for the Dinosaur National
Monument entrance road.

*Public lands.*
*Patents and*
*trademarks.*
*Utah.*
*16 USC 431 note.*

SEC. 3. The Secretary shall not issue a patent to the lands de-
scribed in section 2 until the applicant has: (a) complied with the
requirements of the Desert Land Entry Act; and (b) conveyed to the
United States, at no cost, title to scenic easements for purposes of
Dinosaur National Monument on lands identified by the National
Park Service as tracts 07–114, south half; 07–115, the complete tract.

SEC. 4. The scenic easements acquired by the Secretary and any
patents issued by him under this Act shall be subject to the restric-
tions set forth in the scenic easement deed dated March 16, 1967,
and filed in the records of Moffat County, Colorado, at pages 2 and 3
of book 341 of the deed of records of the county.

*Patents and*
*trademarks.*

Approved November 19, 1988.

LEGISLATIVE HISTORY—H.R. 4212:

HOUSE REPORTS: No. 100–699 (Comm. on Interior and Insular Affairs).
SENATE REPORTS: No. 100–536 (Comm. on Energy and Natural Resources).
CONGRESSIONAL RECORD, Vol. 134 (1988):
    June 20, considered and passed House.
    Oct. 21, considered and passed Senate, amended. House concurred in Senate
    amendments.

## APPENDIX B: ADMINISTRATIVE HISTORY

Manhattan Sites is comprised of six National Park Service properties in New York City and Westchester County that are under the jurisdiction of one superintendent. Castle Clinton National Monument is on the southern tip of Manhattan, within 1 mile south of the first United States Capitol, Federal Hall; both are in the 17th Congressional District. On East 20th Street in the 18th Congressional District is the birthplace and boyhood home of Theodore Roosevelt. General Grant is memorialized in a tomb in the 8th Congressional District of Upper Manhattan, on a bluff overlooking the Hudson River, within Riverside Park. Approximately 2½ miles northeast from Grant's Tomb, in the 16th Congressional District, is Hamilton Grange, the only home that Alexander Hamilton, forefather to the United States' financial system, owned. St. Paul's Church National Historic Site is in Westchester County, within the 20th Congressional District. Authorization dates are as follows:

- Castle Clinton National Monument — authorized 8/12/46
- Federal Hall National Memorial — designated as Federal Hall Memorial National Historic Site 5/26/39; approved and changed to Federal Hall National Memorial 8/11/55
- General Grant National Memorial — dedicated 4/27/1897; legislature in 1956 approved transfer by Grant Monument Association and the city of New York to federal ownership; accepted by Congress 8/14/58; placed under National Park Service 5/1/59
- Hamilton Grange National Memorial — authorized 4/27/62
- Saint Paul's Church National Historic Site — designated 7/5/43, authorized 11/10/78
- Theodore Roosevelt Birthplace National Historic Site — authorized 7/25/62

The Manhattan Sites were formerly part of the New York Group, which was formed in the 1960s and included Statue of Liberty National Monument and Ellis Island, Fire Island National Seashore, Sagamore Hill National Historic Site, as well as the five properties (prior to St. Paul's authorization as an NPS unit) of Manhattan Sites. Each of these properties had a site supervisor and a curatorial employee. The headquarters of this group was in various locations, as dictated by spacial needs and the preference of the superintendent.

During 1969-1972 the New York Group evolved into the New York Park District by the addition of more sites — Edison National Historic Site, Morristown National Historical Park, and Gateway National Recreation Area in New Jersey and Fort Stanwix National Monument in New York. This new assembly was operated as a small district or "region" until 1974, when the NPS Northeast Regional Office was created. During this time, in response to site needs, staff at each of the sites increased. For instance, curatorial staff was added to those sites where collections management was needed. Law enforcement officers for each site were also added for security. (Later, NPS law enforcement at the sites would be eradicated in favor of the New York City Police Department.)

At this time, the New York Park District dismantled (Fire Island, Fort Stanwix, Morristown, and Edison were removed) and returned to the original properties that formed the New York Group. In 1974 a study was conducted on managing grouped properties, examining the good and the bad aspects as well as the financial benefits (for example, saving overhead by having group offices). One of the motives for dissolving the concept of a group office was that individual units of these sizes would be ideal training ground for new superintendents. At that time, Gateway became its own park (1973-74), managed by its own superintendent; the Statue of Liberty and Ellis Island also became one unit, as did Sagamore Hill (1974-75). In 1978 Saint Paul's was authorized as a park unit and included within the Manhattan Sites, thus completing the group as it exists today. Manhattan Sites is currently administered by one superintendent, with site managers at each of the sites, except for the combined management of General Grant and Hamilton Grange national memorials.

## APPENDIX C: DRAFT MANAGEMENT OBJECTIVES

### Preservation and Protection of Cultural Resources

To preserve the site's cultural resources in compliance with legislative and executive mandates and NPS policies and historic preservation guidelines.

To provide adequate collections storage and maximum security for the site's curatorial collections.

To lead, by example, in efforts to preserve cultural resources and to make NPS expertise available.

### Interpretation and Visitor Use

To use all available historical information as well as materials and artifacts for interpreting the Manhattan Sites in a manner consistent with NPS policy.

To ensure appropriate consideration for visitors with special needs in the planning, development, and management of the site.

To develop and implement an educational curriculum for site interpretation that is consistent with state standards.

To develop and implement a comprehensive visitor and resource protection program to ensure the preservation of resources and that visitors have a safe, secure, and educational visit.

### Administration

To increase the site's allotted operational budget and number of full-time equivalent employees to adequately preserve site resources and provide for visitation.

To increase the professionalism of the site staff through various strategies, including increased training, details, and other work assignments.

To promote effective public relations, cooperation, and partnerships with local, state, and federal agencies, nonprofit organizations, and private groups and individuals.

195

## APPENDIX D: SUMMARY OF FEASIBILITY STUDY

The following is an excerpt from the 1992 *Evaluation and Cost Analysis for the Restoration of Hamilton Grange National Memorial* by Grieves, Worrall, Wright & O'Hatnick Inc.

Hamilton Grange National Memorial has been an important structure in the United States since it was built in 1802. This significant structure was originally built and owned by Alexander Hamilton. Serving as Washington's Secretary of the Treasury, among other roles, Hamilton was instrumental to the development and early growth of this great nation. The Grange is also significant in that it is one of the last remaining residences designed by John McComb Jr. Although Mr. McComb was best known for his work on churches and public buildings, including the New York City Hall, his residential designs represent the beginnings of a very influential career in architecture. The structure of the Grange itself is also important as it is one of the last remaining examples of the Federal Style Villas built in New York. Aside from the historical issues, Hamilton Grange plays an important role in the surrounding community, providing both focus and identity.

Hamilton Grange has been recognized for its historical significance since the early 1900s when it was purchased by the American Scenic and Historic Preservation Society. The Grange has undergone several renovations, both prior to, and subsequent to its purchase by the American Scenic and Historic Society, including a move to its present site in 1889. The structure was purchased by the National Park Service in 1962.

In 1980 the firm of Meadows/Woll Architects prepared a feasibility study and cost estimate based on a scenario which involved moving the Grange to a new site. The 1980 study was never implemented, and the current study prepared by Grieves Worrall Wright & O'Hatnick was commissioned to update the Meadows/Woll study as well as look at three additional options for restoration of the Grange.

The four options for restoration of Hamilton Grange are as follows:

OPTION I    Stabilize the existing structure in its present location, and partial interior restoration.

OPTION II   Stabilize and restore the existing structure, add an elevator and stair on the exterior of the building.

OPTION III  Reorient the main entrance to the east side of the house, lower the sub-basement floor, stabilize and restore the existing structure add an elevator and stair on the interior of the building, reestablish the historical entryway and stair, and landscape around the main entry.

OPTION IV   Stabilize and restore the existing structure and move it across 141st Street to the foot of Hamilton Terrace where it can be restored to its original 1802 configuration.

In addition to the above options, the project team was to make recommendations for temporary shoring of the existing structure and provide a cost estimate as well as a final recommendation concerning the four options. To fully analyze these options, they were looked at with regard to structural as well as architectural and historical issues.

Structural Issues

There are several problems with the existing structure of Hamilton Grange which directly affect the safety of the staff and visitors to the National Memorial. Several of the existing structural members are in the process of failing and should be immediately shored to prevent system failure and possible life threatening injury. As soon as temporary shoring is in place, permanent repairs should be undertaken immediately to restore the structural integrity of the Grange.

It should be noted that, even if the existing structural members are completely restored, the floor loading capacities are inadequate in terms of modern museum requirements. There are two possible solutions to this problem. Either the number of visitors allowed in various areas must be restricted, or the capacities of the floors increased to meet current standards. Either of these options is acceptable; however, upgrading the structure is probably more desirable in the long run and will ultimately provide more freedom for the public. Other than the issues noted above, none of the options pose any significant structural difficulties.

Architectural Issues

In purely architectural terms, there is no doubt that the Grange should be moved to a new site. In order to experience the spatial qualities and orientation of the building it is important that it be situated and constructed as it was in 1802. Since Hamilton Grange is one of the only remaining examples of the federal style villas extant in New York, it should reflect the design values of that period. For this to be fully realized the entry configuration and piazzas should be restored, as they are distinctive elements of this style of architecture. Given the four options, it is very apparent that the only way to fully restore the Grange is to move the structure to a new site as outlined in option IV.

Historical Issues

The historical impact of the four options is not as straightforward as the architectural issues. In order to avoid a lengthy discussion of "period" history versus "living" history, let it suffice to say that any of the four options could be accomplished in a historically acceptable manner. The historical analysis focused on the overall advantages and disadvantages of each option as well as the real historical value of Hamilton Grange. The entire 200 year history of the Grange can be considered significant. Its real significance is as a memorial to Alexander Hamilton and that can only be realized by restoring the architectural integrity which expresses the lifestyle and tastes of a very influential person in our history. Although each of the options address these issues to some degree, the most desirable option would be to move and restore the Grange.

Conclusion

The final recommendation is predicated on the feeling that moving the Grange would not detract from the historical significance of the structure as stated above. The only real drawback to this scenario is the fact that it has been a focal point of the community for several years. However, with the building moving less than one block, this should not be a major concern. In fact, with Hamilton Grange fully restored to its original splendor it should become even more of a focus and identifying element within the same neighborhood as well as adjoining areas.

The restoration of the Hamilton Grange National Memorial is a very important project and should be pursued as soon as possible. As previously noted, all of the options for restoration of the

197

APPENDIXES

Grange are both feasible and acceptable in terms of historic guidelines. However, when all of the variables such as architectural significance, and the impact on the users and surrounding community are considered, the most desirable solution is to relocate the Grange. By doing so, Hamilton Grange can be understood and appreciated in much the same way that it was in 1802 by Alexander Hamilton and his contemporaries, as well as continue to function as a focal point in the community.

APPENDIX E: PROGRAMMATIC ACCESSIBILITY GUIDELINES

SPECIAL POPULATIONS PROGRAMMATIC
ACCESSIBILITY GUIDELINES
FOR INTERPRETIVE MEDIA

All new interpretive media will conform with the September 1991
*Special Populations: Programmatic Accessibility Guidelines for
Interpretive Media*, which is as follows:

## Special Populations:
## Programmatic Accessibility
## Guidelines for Interpretive Media

National Park Service
Harpers Ferry Center

September 1991
[Version 2.1]

Prepared by
Harpers Ferry Center Accessibility Task Force

## Contents

Statement of Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Audiovisual Programs . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Historic Furnishings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Publications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
Wayside Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## Statement of Purpose

This document is a guide for promoting full access to interpretive
media to ensure that people with physical and mental disabilities
have access to the same information necessary for safe and
meaningful visits to national parks. Just as the needs and abilities
of individuals cannot be reduced to simple statements, it is

34

impossible to construct guidelines for interpretive media that can apply to every situation in the national park system.

These guidelines define a high level of programmatic access which can be met in most situations. They articulate key areas of concern and note generally accepted solutions. Due to the diversity of park resources and the variety of interpretive situations, flexibility and versatility are important.

Each interpretive medium contributes to the total park program. All media have inherent strengths and weaknesses, and it is our intent to capitalize on their strengths and provide alternatives where they are deficient. It should also be understood that any interpretive medium is just one component of the overall park experience. In some instances, especially with regard to learning disabilities, personal services, that is one-on-one interaction, may be the most appropriate and versatile interpretive approach.

In the final analysis, interpretive design is subjective, and dependent on both aesthetic considerations as well as the particular characteristics and resources available for a specific program. Success or failure should be evaluated by examining all interpretive offerings of a park. Due to the unique characteristics of each situation, parks should be evaluated on a case by case basis. Nonetheless, the goal is to fully comply with NPS policy:

> "...To provide the highest level of accessibility possible and feasible for persons with visual, hearing, mobility, and mental impairments, consistent with the obligation to conserve park resources and preserve the quality of the park experience for everyone."

NPS Special Directive 83-3, Accessibility for Disabled Persons

35

## Audiovisual Programs

Audiovisual programs include motion pictures, sound/slide programs, video programs, and oral history programs. As a matter of policy, all audiovisual programs produced by the Harpers Ferry Center will include some method of captioning. The approach used will vary according to the conditions of the installation area and the media format used, and will be selected in consultation with the parks and regions.

The captioning method will be identified as early as possible in the planning process and will be presented in an integrated setting where possible. To the extent possible, visitors will be offered a choice in viewing captioned or uncaptioned versions, but in situations where a choice is not possible or feasible, a captioned version of all programs will be made available. Park management will decide on the most appropriate operational approach for the particular site.

### Guidelines Affecting Mobility Impaired Visitors

1.  The theater, auditorium, or viewing area should be accessible and free of architectural barriers, or alternative accommodations will be provided.  UFAS 4.1.

2.  Wheelchair locations will be provided according to ratios outlined in UFAS 4.1.2(18a).

3.  Viewing heights and angles will be favorable for those in designated wheelchair locations.

4.  In designing video or interactive components, control mechanisms will be placed in an accessible location, usually between 9" and 48" from the ground and no more than 24" deep.

### Guidelines Affecting Visually Impaired Visitors

1.  Simultaneous audio description will be considered for installations where the equipment can be properly installed and maintained.

36

### Guidelines Affecting Hearing Impaired Visitors

1.  All audiovisual programs will be produced with appropriate captions.

2.  Copies of scripts will be provided to the parks as a standard procedure.

3.  Audio amplification and listening systems will be provided in accordance with UFAS 4.1.2(18b).

### Guidelines Affecting Learning Impaired Visitors

1.  Unnecessarily complex and confusing concepts will be avoided.

2.  Graphic elements will be chosen to communicate without reliance on the verbal component.

3.  Narration will be concise and free of unnecessary jargon and technical information.

## Exhibits

Numerous factors affect the design of exhibits, reflecting the unique circumstances of the specific space and the nature of the materials to be interpreted. It is clear that thoughtful, sensitive design can go a long way in producing exhibits that can be enjoyed by a broad range of people. Yet, due to the diversity of situations encountered, it is impossible to articulate guidelines that can be applied universally.

In some situations, the exhibit designer has little or no control over the space. Often exhibits are placed in areas ill-suited for that purpose, they may incorporate large or unyielding specimens, may incorporate sensitive artifacts which require special environmental controls, and room decor or architectural features may dictate certain solutions. All in all, exhibit design is an art which defies simple description. However, one central concern is

37

to communicate the message to the largest audience possible. Every reasonable effort will be made to eliminate any factors limiting communication through physical modification or by providing an alternate means of communication.

### Guidelines Affecting Mobility Impaired Visitors

1.  Exhibit space will be free of physical barriers or a method of alternate accommodation shall be provided.

2.  All pathways, aisles, and clearances will meet standards set forth in UFAS 4.3. Generally a minimum width of 36" will be provided.

3.  Ramps will be as gradual as possible and will not exceed a slope of 1" rise in 20" run, and otherwise conform with UFAS 4.8.

4.  Important artifacts, labels, and graphics, will be placed at a comfortable viewing level relative to their size. Important text will be viewable to all visitors. Display cases will allow short or seated people to view the contents and the labels. Video monitors associated with exhibits will be positioned to be comfortably viewed by all visitors.

5.  Lighting will be designed to reduce glare or reflections, especially when viewed from a wheelchair.

6.  Ground and floor surfaces near the exhibit area will be stable, level, firm, and slip-resistant. (UFAS 4.5).

7.  Operating controls or objects to be handled by visitors will be located in an area between 9" and 48" from the ground and no more than 24" deep. (UFAS 4.3)

8.  Horizontal exhibits (e.g. terrain model) will be located at a comfortable viewing height.

38

9.    Information desks and sales counters will be designed for use by visitors and employees using wheelchairs, and will include a section with a desk height no greater than 32 to 34 inches, with at least a 30-inch clearance underneath. The width should be a minimum of 32 inches vertical, with additional space provided for cash registers or other equipment, as applicable.

10.    Accessibility information about the specific park should be available at the information desk and the International Symbol of Access will be displayed where access information is disseminated.

11.    Railings and barriers will be positioned in such a way as to provide unobstructed viewing by persons in wheelchairs.

**Guidelines Affecting Visually Impaired Visitors**

1.    Exhibit typography will be selected with readability and legibility in mind.

2.    Characters and symbols shall contrast with their backgrounds, either light characters on a dark background or dark characters on a light background. (UFAS 4.30.3)

3.    Tactile and participatory elements will be included where possible.

4.    Audio description will be provided where applicable.

5.    Signage will be provided to indicate accessible restrooms, telephones, and elevators. (UFAS 4.30)

**Guidelines Affecting Hearing Impaired Visitors**

1.    Information presented via audio formats will be duplicated in a visual medium, either in the exhibit copy or by printed material.

39

2.  Amplification systems and volume controls will be incorporated to make programs accessible to the hard of hearing.

3.  Written text of all audio narrations will be provided.

4.  All narrated AV programs will be captioned.

5.  Allowance for Telecommunication Devices for the Deaf (TDD) will be included in information desk designs.

**Guidelines Affecting Learning Impaired Visitors**

1.  Exhibits will avoid unnecessarily complex and confusing topics.

2.  Graphic elements will be developed to communicate nonverbally.

3.  Unfamiliar expressions and technical terms will be avoided and pronunciation aids will be provided where appropriate.

4.  To the extent possible, information will be provided in a manner suitable to a diversity of abilities and interests.

5.  Where possible, exhibits will be multisensory. Techniques to maximize the number of senses utilized in an exhibit will be encouraged.

6.  Exhibit design will be cognizant of directional handicaps and will utilize color and other creative approaches to facilitate comprehension of maps.

## Historic Furnishings

Historically refurnished rooms offer the public a unique interpretive experience by placing visitors within historic spaces. Surrounded by historic artifacts, visitors can feel the spaces "come

40

alive" and relate more directly to the historic events or
personalities commemorated by the park.

Accessibility is problematical in many National Park Service
furnished sites because of the very nature of historic architecture.
Buildings were erected with a functional point of view that is
many times at odds with our modern views of accessibility.

The approach used to convey the experience of historically
furnished spaces will vary from site to site. The goals, however,
will remain the same, to give the public as rich an interpretive
experience as possible given the nature of the structure.

### Guidelines Affecting Mobility Impaired Visitors

1. The exhibit space should be free of architectural barriers
   or a method of alternate accommodation should be
   provided, such as slide programs, videotaped tours, visual
   aids, dioramas, etc.

2. All pathways, aisles, and clearances shall (when possible)
   meet standards set forth in UFAS 4.3 to provide adequate
   clearance for wheelchair routes.

3. Ramps shall be as gradual as possible and not exceed a 1"
   rise in 20" run, and conform with UFAS 4.8.

4. Railings and room barriers will be constructed in such a
   way as to provide unobstructed viewing by persons in
   wheelchairs.

5. In the planning and design process, furnishing inaccessible
   areas, such as upper floors of historic buildings, will be
   discouraged unless essential for interpretation.

6. Lighting will be designed to reduce glare or reflections
   when viewed from a wheelchair.

41

7.    Alternative methods of interpretation, such as audiovisual programs, audio description, photo albums, and personal services will be used in areas which present difficulty for the physically impaired.

**Guidelines Affecting Visually Impaired Visitors**

1.    Exhibit typefaces will be selected for readability and legibility, and conform with good industry practice.

2.    Audio description will be used to describe furnished rooms, where appropriate.

3.    Windows will be treated with film to provide balanced light levels and minimize glare.

4.    Where appropriate, visitor-controlled rheostat-type lighting will be provided to augment general room lighting.

5.    Where appropriate and when proper clearance has been approved, surplus artifacts or reproductions will be utilized as "hands-on" tactile interpretive devices.

**Guidelines Affecting Hearing Impaired Visitors**

1.    Information about room interiors will be presented in a visual medium such as exhibit copy, text, pamphlets, etc.

2.    Captions will be provided for all AV programs relating to historic furnishings.

**Guidelines Affecting the Learning Impaired**

1.    Where appropriate, hands-on participatory elements geared to the level of visitor capabilities will be used.

2.    Living history activities and demonstrations which utilize the physical space as a method of providing multisensory experiences will be encouraged.

42

## Publications

A variety of publications are offered to visitors, ranging from park folders which provide an overview and orientation to a park to more comprehensive handbooks. Each park folder should give a brief description of services available to the disabled, list significant barriers, and note the existence of TDD phone numbers, if available.

In addition, informal site bulletins are often produced to provide more specialized information about a specific site or topic. It is recommended that each park produce an easily updatable "Accessibility Site Bulletin" which could include detailed information about the specific programs, services, and opportunities available for the disabled and to describe barriers which are present in the park. These bulletins should be in reasonably large type, 18 points or larger.

### Guidelines Affecting Mobility Impaired Visitors

1.  Park folders, site bulletins, and sales literature will be distributed from accessible locations and heights.

2.  Park folders and Accessibility Site Bulletins should endeavor to carry information on the accessibility of buildings, trails, and programs by the disabled.

### Guidelines Affecting Visually Impaired Visitors

1.  Publications will be designed with the largest type size appropriate for the format.

2.  Special publications designed for use by the visually impaired should be printed in 18-point type.

3.  The information contained in the park folder should also be available on audio cassette. Handbooks, accessibility guides, and other publications should be similarly recorded where possible.

43

### Guidelines Affecting Hearing Impaired Visitors

1.    Park site bulletins will note the availability of such special services as sign language interpretation and captioned programs.

### Guidelines Affecting Learning Impaired Visitors

1.    The park site bulletin should list any special services available to this group.

## Wayside Exhibits

Wayside exhibits, which include outdoor interpretive exhibits and signs, orientation shelter exhibits, trailhead exhibits, and bulletin boards, offer special advantages to disabled visitors. The liberal use of photographs, artwork, diagrams, and maps, combined with highly readable type, make wayside exhibits an excellent medium for visitors with hearing and learning impairments. For visitors with sight impairments, waysides offer large type and high legibility.

Although a limited number of NPS wayside exhibits will always be inaccessible to visitors with mobility impairments, the great majority are placed at accessible pullouts, viewpoints, parking areas, and trailheads.

The NPS accessibility guidelines for wayside exhibits help ensure a standard of quality that will be appreciated by all visitors. Nearly everyone benefits from high quality graphics, readable type, comfortable base designs, accessible locations, hard-surfaced exhibit pads, and well-designed exhibit sites.

While waysides are valuable on-site "interpreters," it should be remembered that the park resources themselves are the primary things visitors come to experience. Good waysides focus attention on the features they interpret, and not on themselves. A wayside exhibit is only one of the many interpretive tools which visitors can use to enhance their appreciation of a park.

44

**Guidelines Affecting Mobility Impaired Visitors**

1.    Wayside exhibits will be installed at accessible locations whenever possible.

2.    Wayside exhibits will be installed at heights and angles favorable for viewing by most visitors including those in wheelchairs.  For standard NPS low-profile units the recommended height is 34 inches from the bottom edge of the exhibit panel to the finished grade; for vertical exhibits the height of 24-28 inches,  depending on panel size.

3.    Trailhead exhibits will include an accessibility advisory.

4.    Wayside exhibits sites will have level, hard surfaced exhibit pads.

5.    Exhibit sites will offer clear, unrestricted views of park features described in exhibits.

**Guidelines Affecting Visually Impaired Visitors**

1.    Exhibit type will be as legible and readable as possible.

2.    Panel colors will be selected to reduce eye strain and glare, and to provide excellent readability under field conditions.  White should not be used as a background color.

3.    Selected wayside exhibits may incorporate audiostations or tactile elements such as models, texture blocks, and relief maps.

4.    For all major features interpreted by graphic wayside exhibits, the park should offer nonvisual interpretation covering the same subject matter.   Examples include cassette tape tours, radio messages, and ranger talks.

5.    Appropriate tactile cues should be provided to help visually impaired visitors locate exhibits.

45

**Guidelines Affecting Hearing Impaired Visitors**

1.    Wayside exhibits will communicate visually, and will rely heavily on graphics to interpret park resources.

2.    Essential information included in audiostation messages will be duplicated in written form, either as part of the exhibit text or with printed material.

**Guidelines Affecting Learning Impaired Visitors**

1.    Topics for wayside exhibits will be specific and of general interest. Unnecessary complexity will be avoided.

2.    Whenever possible, easy to understand graphics will be used to convey ideas, rather than text alone.

3.    Unfamiliar expressions, technical terms, and jargon will be avoided.    Pronunciation aids and definitions will be provided where needed.

4.    Text will be concise and free of long paragraphs and wordy language.

46

## APPENDIX F: FUTURE PLANS AND STUDIES

The following is a discussion of standard NPS plans and studies that would be done under any of the alternatives.

### For Cultural Resource Management

This section addresses the studies and plans that would be required for protecting, preserving, and managing the cultural resources at Hamilton Grange. These studies and plans assist managers in making even better decisions about managing these resources in the future. The information contained in these reports and studies would be an adequate data base for the preservation and maintenance of the cultural resources within historic districts, landscapes, and settings. Some of these studies and plans listed in the *Resource Management Plan* (NPS 1989a) for Hamilton Grange, which is currently in draft form.

Administrative history for Manhattan Sites
Archeological inventory
Collection condition survey
Collection management plan *
Collection storage plan *
Cultural landscape assessment
Updated cultural resources management plan
Exhibit plan
Updated historic furnishing report
Revised national register nomination and historic landmark information for the Grange
Revised national register nomination for Hamilton Heights Historic District
Updated historic structure report
Scope of collection statement
Special history study on Alexander Hamilton and the Grange

   * May be done as part of a document that includes all Manhattan Sites

The site is listed on the National Register of Historic Places; documentation forms will need to be revised and finalized to better document the significance of the cultural resources. Should the Grange be moved (as in alternative 4), the forms would be updated to reflect that move.

Collections and archives would be managed under standards and guidelines for protecting the resources and historic data. The collection would be exhibited or stored in appropriately controlled environments with adequate protection against theft, atmospheric elements, pest infestations, and vandalism. Furthermore, consistent monitoring would be applied to ensure preservation and protection.

Additional research must be undertaken to further document provenance and status of the collections, both NPS and non-NPS collections, that might become available for the National Park Service to display.

**For Natural Resource Management**

The limited natural resources at Hamilton Grange are an integral part of the historic scene. Any resources around the Grange would be managed to support interpretation of themes and historic structures. Overall, natural resource management at the site supports cultural resource management objectives. These objectives would be determined in more detail in the proposed cultural landscape report.

According to the NPS *Natural Resource Management Guidelines* (NPS-77), the development of an up-to-date inventory of natural resources in each park is important, including historical sites. Only when a manager has an accurate picture of the type and condition of the natural resources at a site can effective management decisions be made. Natural resources are constantly changing; thus, a program of long-term monitoring is also essential. Monitoring can help detect changes in resource conditions before unacceptable changes occur.

Studies and/or actions that would assist in the management of the site include the following:

- integrated pest management program (this is more of a cultural resource need)
- natural resource inventory
- landscaping and site maintenance plan
- maintain current information on air quality from state, local, and federal monitoring stations and document effects on building
- photodocumentation program that would establish photographic records of viewsheds and adjacent land use patterns for future reference.

## APPENDIX G: COST ESTIMATES

### TABLE G-1. CONSTRUCTION / DEVELOPMENT COSTS

|  | Gross Construction Costs | Construction Planning | Total Construction Costs |
|---|---|---|---|
| Alternative 1 | $869,452 | $217,363 | $1,086,815 |
| Alternative 2 | $1,531,539 | $382,885 | $1,914,424 |
| Alternative 3 | $3,085,298 | $771,324 | $3,856,622 |
| Alternative 4 Relocation Site | $6,325,898 | $1,581,474 | $7,907,372 |
| Alternative 4 Convent Avenue Site | $769,232 | $192,308 | $961,540 |

### TABLE G-1. INTERPRETIVE / REFURNISHING COSTS

|  | Gross Production Cost | Media Planning and Design | Total Interpretive Cost |
|---|---|---|---|
| Alternative 1 | $535,000 | $107,000 | $624,000 |
| Alternative 2 | $1,418,750 | $283,750 | $1,702,500 |
| Alternative 3 | $1,863,750 | $372,750 | $2,236,500 |
| Alternative 4 | $1,757,500 | $351,500 | $2,109,000 |

## APPENDIX H: IMPLEMENTATION OF ALTERNATIVE 4

To implement alternative 4, an interest acceptable to the National Park Service must be acquired in the designated portion of St. Nicholas Park. The type of interest, whether it be fee simple or less-than-fee simple, will be determined in discussions with the city and the state. If the discussions lead to a plan that involves a fee simple land transfer, the city must secure approval through the Uniform Land Use Review Process (ULURP), a complex public review process that requires about nine months. At the conclusion of the ULURP review, legislation on the state and city level is needed for the transfer of park land to the National Park Service.

If a less-than-fee-simple transfer is found to be acceptable to the National Park Service and the city, a less lengthy and complicated public review by the city is possible.

On a parallel track, the National Park Service would initiate discussions with Congress seeking boundary adjustment legislation that would permit expansion of the boundary to include the St. Nicholas park site.

Funding for the actual design and restoration of the house in St. Nicholas Park and the new facility on the Convent Avenue site would follow the passage of the legislative authorities.

## APPENDIX I: LETTERS FROM STATE OFFICE OF PARKS, RECREATION, AND HISTORIC PRESERVATION



**New York State Office of Parks, Recreation and Historic Preservation**
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189, Waterford, New York 12188-0189                518-237-8643

Orin Lehman
*Commissioner*

July 1, 1993

Marie Rust
Regional Director
U.S. Department of the Interior
National Park Service
North Atlantic Region
15 State Street
Boston, Mass.  02109-3572

Dear Ms. Rust,

Re: DOI
Hamilton Grange National
Memorial
Manhattan, New York Co.
92PR2184

Thank you for requesting the comments of the State Historic Preservation Office (SHPO).  We have reviewed the project in accordance with Section 106 of the National Historic Preservation Act of 1966 and the relevant implementing regulations.

Staff from this office have recently visited this historic property. Therefore, after reading the report submitted by your office, it is the opinion of the SHPO that, while any of the four alternatives would be an acceptable treatment of this property, we concur with your findings that proposal #4 (moving the structure to a new site) is the preferred alternative.  This would allow the original orientation of the house to be restored, provide a much more appropriate setting for the house as well as offer more opportunities for public programming.  As for the Hamilton Heights Historic District, it appears that the move would have No Adverse Effect despite the Grange being considered a contributing buiding.  These comments are given with the proviso that the proper procedures for review of the move of a National Register listed property will be followed.

Please use our project review identification number if additional correspondance is necessary.  If you have any questions, please call Jim Warren of our Project Review Unit at (518) 237-8643, Ext. 280.

Sincerely yours,

Julia S. Stokes
Deputy Commissioner for
Historic Preservation

JSS/JPW:tr

*Appendix I: Letters from State Office of Parks, Recreation, and Historic Preservation*



**New York State Office of Parks, Recreation and Historic Preservation**
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189, Waterford, New York 12188-0189          518-237-8643

Joan K. Davidson
Commissioner

September 21, 1994

Ms. Marie Rust
Regional Director
National Park Service
North Atlantic Regional Office
15 State Street
Boston, MA 02109-3572

                              Re: St. Nicholas Park,
                                  New York Co., NY

Dear Ms. Rust:

Thank you for requesting the comments of the State Historic Preservation Officer (SHPO) on the National Register eligibility of St. Nicholas Park in New York City. Based on the materials provided to us by your office and a site visit by staff, it is our opinion that the park does not possess integrity and therefore is not eligible for listing on the National Register of Historic Places.

St. Nicholas Park, designed by Samuel Parsons, Jr., at the turn of the twentieth century, was a landscape that exhibited Parson's design philosophy and architectural expertise. Subsequent developments along the edges of the park, as well as the loss of some of the features within the park has caused the overall denigration of the park. Few major elements and features of the original design remain intact and the integrity of the original design intent of Parsons is questionable because of the numerous additions to the park. Therefore we conclude that the overall integrity of the park is so marginal that the property is not eligible for National Register listing.

While the park may not be eligible for listing, it is nonetheless an important amenity to the Harlem community, and we would encourage careful attention be paid to the remaining important features of the park in planning the move of the Hamilton Grange.

                              Sincerely,

                              David S. Gillespie
                              Director
                              Field Services Bureau

cc: P. Weinbaum

An Equal Opportunity/Affirmative Action Agency
printed on recycled paper

APPENDIX J: SHADOW STUDY



**Shadow Study**
Shortest Day and Longest Day of the Year
United States Department of the Interior / National Park Service
DSC / May 1994 / 416 / 20029

## APPENDIX K: LETTER FROM U.S. FISH AND WILDLIFE SERVICE



## United States Department of the Interior    JUN 2 9 1992

FISH AND WILDLIFE SERVICE
3817 Luker Road
Cortland, New York 13045

Mark: MA51
Pkg. # 101  P.T. 22A
Area _____
Subject _____

June 24, 1992

| Manager | |
|---|---|
| Management A____ | |
| Assistant Ma____ | |
| ____ | |
| ____ | |
| ____ | |
| ____ | |
| Park Re____ | |
| EAF | |
| EAA | |
| WPP | |
| NRSO | |

Mr. Robert J. Shelley, Manager, Eastern Team
National Park Service
Denver Service Center
12795 Alameda Parkway
P.O. Box 25287
Denver, CO  80225-0287

Dear Mr. Shelley:

This responds to your letter of June 4, 1992, requesting information on the presence of
Federally listed or proposed endangered or threatened species in the vicinity of the
following sites:

1.  Castle Clinton National Monument located in Battery Park in lower Manhattan,
    New York City.

2.  Federal Hall National Memorial at 26 Wall Street in lower Manhattan, New York
    City.

3.  Theodore Roosevelt Birthplace National Historic Site at 28 East 20th Street in mid-
    town Manhattan, New York City.

4.  General Grant National Memorial in Riverside Park near West 122nd Street and
    Riverside Drive in Harlem, New York City.

5.  Hamilton Grange National Memorial at Convent Avenue and 141st Street in
    Harlem, New York City.

6.  St. Paul's Church National Historic Site at 897 South Columbus Avenue in Mount
    Vernon, New York.

The following applies to Sites 3, 5, and 6 only.  Except for occasional transient
individuals, no Federally listed or proposed endangered or threatened species under our
jurisdiction are known to exist in the project areas.  Therefore, no Biological Assessment
or further Section 7 consultation under the Endangered Species Act (87 Stat. 884, as
amended; 16 U.S.C. 1531 et seq.) is required with the U.S. Fish and Wildlife Service
(Service).  Should project plans change, or if additional information on listed or
proposed species becomes available, this determination may be reconsidered.  A
compilation of Federally listed and proposed endangered and threatened species in
New York is enclosed for your information.

However, the peregrine falcon (*Falco peregrinus*) is a Federally listed endangered
species known to breed in close proximity to Sites 1, 2, and 4 and may be found in the
surrounding area.  The general management plan for these sites should, therefore,
include an evaluation of the potential direct, indirect, and cumulative effects of specific

221

project related activities on this species. When specific plans are identified, the plans and the results of the evaluation should be provided to this office to determine the need for further consultation pursuant to Section 7 of the Endangered Species Act of 1973 (87 Stat. 884, as amended; 16 U.S.C. 1531 et seq.).

Except for the peregrine falcon and occasional transient individuals, no other Federally listed or proposed endangered or threatened species under our jurisdiction are known to exist at Sites 1, 2, and 4. Should project plans change, or if additional information on listed or proposed species becomes available, this determination may be reconsidered.

The above comments pertaining to endangered species under our jurisdiction are provided pursuant to the Endangered Species Act. This response does not preclude additional Service comments under the Fish and Wildlife Coordination Act or other legislation.

For additional information on fish and wildlife resources or State-listed species, we suggest you contact:

New York State Department
   of Environmental Conservation
Region 2
47-40 21st Street
Long Island City, NY  11101
(718) 482-4900

New York State Department
   of Environmental Conservation
Significant Habitat Unit
Information Services
700 Troy-Schenectady Road
Latham, NY  12110-2400
(518) 783-3932

If you have any questions regarding this letter, contact Tom McCartney at (607) 753-9334.

Sincerely,

Leonard P. Corin
Field Supervisor

Enclosure

cc:  NYSDEC, Albany & Long Island City, NY (Regulatory Affairs)
     NYSDEC, Latham, NY

2

*Appendix K: Letter from U.S. Fish and Wildlife Service*

## FEDERALLY LISTED AND PROPOSED ENDANGERED AND THREATENED SPECIES IN NEW YORK

| Common Name | Scientific Name | Status | Distribution |
|---|---|---|---|
| **FISHES** | | | |
| Sturgeon, shortnose* | *Acipenser brevirostrum* | E | Hudson River & other Atlantic coastal rivers |
| **REPTILES** | | | |
| Turtle, green* | *Chelonia mydas* | T | Oceanic summer visitor coastal waters |
| Turtle, hawksbill* | *Eretmochelys imbricata* | E | Oceanic summer visitor coastal waters |
| Turtle, leatherback* | *Dermochelys coriacea* | E | Oceanic summer resident coastal waters |
| Turtle, loggerhead* | *Caretta caretta* | T | Oceanic summer resident coastal waters |
| Turtle, Atlantic ridley* | *Lepidochelys kempii* | E | Oceanic summer resident coastal waters |
| **BIRDS** | | | |
| Eagle, bald | *Haliaeetus leucocephalus* | E | Entire state |
| Falcon, peregrine | *Falco peregrinus* | E | Entire state - re-establishment to former breeding range in progress |
| Plover, piping | *Charadrius melodus* | E | Great Lakes Watershed |
| | | T | Remainder of coastal New York |
| Tern, roseate | *Sterna dougallii dougallii* | E | Southeastern coastal portions of state |
| **MAMMALS** | | | |
| Bat, Indiana | *Myotis sodalis* | E | Entire state |
| Cougar, eastern | *Felis concolor cougar* | E | Entire state - probably extinct |
| Whale, blue* | *Balaenoptera musculus* | E | Oceanic |
| Whale, finback* | *Balaenoptera physalus* | E | Oceanic |
| Whale, humpback* | *Megaptera novaeangliae* | E | Oceanic |
| Whale, right* | *Eubalaena glacialis* | E | Oceanic |
| Whale, sei* | *Balaenoptera borealis* | E | Oceanic |
| Whale, sperm* | *Physeter catodon* | E | Oceanic |
| **MOLLUSKS** | | | |
| Snail, Chittenango ovate amber | *Succinea chittenangoensis* | T | Madison County |
| Mussel, dwarf wedge | *Alasmidonta heterodon* | E | Orange County - lower Neversink River |

\* Except for sea turtle nesting habitat, principal responsibility for these species is vested with the National Marine Fisheries Service.

Region 5 - 06/16/92 - 2 pp.

APPENDIXES

### FEDERALLY LISTED AND PROPOSED ENDANGERED AND THREATENED SPECIES IN NEW YORK (Cont'd)

| Common Name | Scientific Name | Status | Distribution |
|---|---|---|---|
| **BUTTERFLIES** | | | |
| Butterfly, Karner blue | *Lycaeides melissa samuelis* | PE | Albany, Saratoga, Warren, and Schenectady Counties |
| **PLANTS** | | | |
| Monkshood, northern wild | *Aconitum noveboracense* | T | Ulster County |
| Pogonia, small whorled | *Isotria medeoloides* | E | Entire state |
| Swamp pink | *Helonias bullata* | T | Staten Island - presumed extirpated |
| Gerardia, sandplain | *Agalinis acuta* | E | Nassau and Suffolk Counties |
| Fern, American hart's-tongue | *Phyllitis scolopendrium* var. *americana* | T | Onondaga and Madison Counties |
| Orchid, eastern prairie fringed | *Platanthera leucophea* | T | Not relocated in New York |
| Bulrush, northeastern | *Scirpus ancistrochaetus* | E | Not relocated in New York |
| Roseroot, Leedy's | *Sedum integrifolium* ssp. *Leedyi* | PT | West shore of Seneca Lake |
| Amaranth, seabeach | *Amaranthus pumilus* | PT | Atlantic coastal plain beaches |

E=endangered    T=threatened    P=proposed

Region 5 - 06/16/92 - 2 pp.

224

# BIBLIOGRAPHY

Alden, John Richard
   1954     *The American Revolution 1775-1783*. Harper & Row Publishers, Inc., New York, NY.

Bullock, Orin M. Jr.
   1969     *The Pastures: The Home of General Philip Schuyler, Albany, New York — A Master Plan Study for the Development of the Historic Site of National Importance for the New York State Historic Trust.* Baltimore, MD.

Burcan, G. Ellis
   1983     *Introduction to Museum Work*. 2nd ed. revised and expanded. American Association for State and Local History, Nashville, TN.

City of New York, Department of City Planning
   1991     *Community District Needs, Fiscal Year 1993*. Office of Management and Budget, New York, NY.

_____, Division of Air Resources
   1992     Air Quality Data.

Grieves, Worrall, Wright & O'Hatnick, Inc./Architects, with Robert Silman Associates, P.C. and Jenkins Professionals, Inc.
   1992     *Evaluation and Cost Analysis for the Restoration of Hamilton Grange National Memorial.* Prepared for the National Park Service. Baltimore, MD.

Hamilton, Alexander, James Madison, and John Jay
   1787-88     *The Federalist Papers*. 1982 printing. Bantam Books, New York, NY.

Lund, Barbara
   1993     *Hamilton Grange and Its Contemporary Harlem Community: A Composite Sketch, 1993.* Museum Studies, New York University. Prepared for the National Park Service.

McDonald, Forest
   1979     *Alexander Hamilton: A Bibliography*. W.W. Norton & Company, New York, NY.

Meadows Woll Architects
   1980     *Feasibility Study for Moving and Restoring Hamilton Grange National Memorial*. Prepared for U.S. Department of the Interior, National Park Service.

Miller, John C.
   1964     *Alexander Hamilton and the Growth of the New Nation*. Harper & Row Publishers Inc., New York, NY.

National Oceanic and Atmospheric Administration
   1991     *Local Climatological Data. Annual Summary with Comparative Data, New York, Central Park, New York*. National Climatic Data Center, Asheville, NC.

APPENDIXES

National Park Service, Department of the Interior
- 1964    *Furnishing Plan for Hamilton Grange, New York City.* National Park Service Group, New York, NY.

- 1977    *Historic Structure Report, Architectural Data Section, Hamilton Grange,* by Anne Derry Whidden. North Atlantic Region.

- 1980    *Historic Structure Report, Hamilton Grange National Memorial, Manhattan Sites, New York City,* by Alfred Mongin and Anne D. Whidden. North Atlantic Historic Preservation Center, North Atlantic Region, Boston, MA.

- 1985    *Interpretive Prospectus, Hamilton Grange National Memorial.*

- 1987    *History and Prehistory in the National Park System and the National Historic Landmarks Program.* History Division, Washington, D.C. Government Printing Office: Washington, D.C.

- 1989a    *Resource Management Plan Update.* Manhattan Sites Park, New York, NY.

- 1989b    *Statement for Management, Manhattan Sites, New York, New York.*

- 1990    *Draft Manhattan Sites Collections Storage Plan,* by Martha Bernholz, Neil Abelsma, and John Maounis. Cultural Resources Center, North Atlantic Region.

Newton, Norman T.
- 1971    *Design on the Land: The Development of Landscape Architecture.* Belknap Press of Harvard University Press, Cambridge, MA.

Parsons, Samuel Jr.
- 1910    *Landscape Gardening Studies.* John Lane Company, New York, NY.

- 1915    *The Art of Landscape Architecture: Its Development and Its Application to Modern Landscape Gardening.* G.P. Putnam's Sons, New York, The Knickerbocker Press.

- 1926    *Memories of Samuel Parsons.* Edited by Mabel Parsons. G.P. Putnam's Sons, New York, The Knickerbocker Press.

Smith, Thomas E. V.
- 1972    *The City of New York in the Year of Washington's Inauguration 1789.* The Chatham Press, Inc. Riverside, CT.

226

**INDEX**

access  5, 7, 8, 16, 22, 31, 35, 44, 46, 67, 72, 73 (see also visitors with disabilities)
air quality  54, 70
archeological resources  13, 26, 34, 57, 60, 62, 66
City College  22, 26, 33, 37, 39, 42, 43, 46, 49, 51, 52, 57, 67, 68, 76, 77
community use  5, 8, 11, 13, 16, 18, 22, 30, 33, 36, 37, 56, 58, 60, 63, 67
compliance  70-74
cultural resources  18, 22, 34, 43, 56, 57, 59, 61, 64, 71
Department of Parks and Recreation  5, 18, 19, 26, 46, 50, 51, 65, 67, 68, 75, 77
economy  36, 52, 58, 61, 63, 66, 67 (see also socioeconomic environment)
environmental consequences  56-69 (see also impacts)
floodplains and wetlands  55
Hamilton, Alexander  1-5, 7, 9, 11, 13, 16, 19, 22, 31-35, 40, 41, 43, 44, 48, 53, 56-59, 60, 62, 65, 66
Hamilton Grange  1-5, 7, 8, 13, 14, 16, 18, 19, 22, 23, 26, 30-46, 48-55, 56-58, 60, 62-71, 75, 76
Hamilton Grange National Memorial  1, 5, 8, 19, 39, 48, 52, 54, 55, 70
Hamilton Heights Historic District  2, 4, 19, 26, 38, 43, 45, 49, 52, 45, 52, 62, 64, 69, 71
impacts  34-38, 56-69, 71
interpretation  3, 5, 7, 8, 11, 13, 16, 18, 22, 30, 31, 32, 33, 34, 35, 45, 46, 48, 58, 60, 61, 62, 66, 72
land acquisition  18, 30, 33
land use  49
Manhattan Sites  1, 3, 8, 13, 42, 46, 75, 77
McComb Jr., John  1, 8, 40, 44, 57
natural resources  37, 52-54, 56, 59, 61, 64, 68
prime and unique farmlands  37, 55, 56, 70
socioeconomic environment  52
soils  26, 54, 64, 68
St. Luke's Church  13, 16, 41-45, 53, 58, 60, 63, 67, 75
St. Nicholas Park  5, 7, 18, 19, 22, 26, 30, 31, 33-39, 43, 46, 50, 51, 54, 55, 65-71, 76, 77
threatened and endangered species  37, 55, 56
vegetation  26, 33, 34, 51, 55, 65
visitors with disabilities  3, 7, 13, 16, 33, 48, 64, 71-73
water quality/resources  55, 56, 64, 68
wildlife  55, 70, 71, 78

☆ U.S. GOVERNMENT PRINTING OFFICE: 1995 - JACKET 674-167 / M 7782 REGION NO. 8

 

As the nation's principal conservation agency, the Department of the Interior has responsibility for most of our nationally owned public lands and natural and cultural resources. This includes fostering wise use of our land and water resources, protecting our fish and wildlife, preserving the environmental and cultural values of our national parks and historical places, and providing for the enjoyment of life through outdoor recreation. The department assesses our energy and mineral resources and works to ensure that their development is in the best interests of all our people. The department also promotes the goals of the Take Pride in America campaign by encouraging stewardship and citizen responsibility for the public lands and promoting citizen participation in their care. The department also has a major responsibility for American Indian reservation communities and for people who live in island territories under U.S. administration.

NPS D-12A  January 1995