UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

FRIENDS OF HAMILTON GRANGE and
DR. JOHN CARDWELL,

                           Plaintiffs,                      08 Civ. 5220 (DLC) (FM)

     -against-

DIRK KEMPTHORNE, Secretary of the Interior;
U.S. DEPARTMENT OF THE INTERIOR,
MARY A. BOMAR, Director of the National Park
Service; NATIONAL PARK SERVICE; and
MARIA BURKS, Commissioner of National Parks
of New York Harbor and Superintendent of Manhattan
Sites,

                           Defendants.

----------------------------------------------------------------x


**REPLY MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**




EMERY CELLI BRINCKERHOFF & ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019

*Attorneys for Plaintiffs*

Plaintiffs Friends of Hamilton Grange ("Friends") and Dr. John Cardwell submit this reply memorandum of law in further support of their motion for a preliminary order pursuant to Fed. R. Civ. P. 65.

## ARGUMENT

### I. Preliminary Injunction Standard

Defendants argue that plaintiffs must meet the "more rigorous likelihood-of-success standard" because the relief plaintiffs seek "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme." Def.s' Br. at 20. Defendants have it backwards. Defendants are taking action *against* the public interest and in *derogation* of the NHPA and its implementing regulations. Under the circumstances, plaintiffs are not required to meet the more rigorous standard.

That said, the argument over the proper standard is of no moment because, when it comes to the merits, plaintiffs are not merely likely to succeed, they *will* succeed.

### II. Plaintiffs Will Succeed

There is no room for doubt. Defendants violated the NHPA and its regulations. They did so repeatedly. Indeed, the limited self-serving record reveals an abject failure to even recognize that Section 110 of the NHPA was even implicated. It was certainly not followed.

#### A. Standard of Review

Plaintiffs assert claims directly under sections 106 and 110(f) of the NHPA (codified at 16 U.S.C. §§ 470f & 470h-2(f)) and indirectly via the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"). Ignoring plaintiffs' claims directly under the NHPA, defendants contend that in order to succeed, plaintiffs must show that defendants' failure to comply with the NHPA were arbitrary and capricious. Not so.

First, even under the APA, the "reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).  Thus, under the APA, all plaintiffs need demonstrate is that defendants' various undertakings concerning Hamilton Grange – *e.g.,* to reorient the house one-hundred and eighty degrees, to abandon the Convent Avenue community center, to jettison the elevator providing access to all floors – were made in violation of the procedure mandated by the NHPA.  This, plaintiffs can handily do.

Second, because plaintiffs assert claims "directly under the NHPA, [defendants are] not entitled to the more deferential arbitrary and capricious standard of review provided by the [APA]." *Committee to Save Cleveland's Huletts v. U.S. Army Corps of Engineers*, 163 F.Supp.2d 776, 789 (N.D. Ohio 2001).  Plaintiffs' claims are brought directly under Sections 106 and 110(f) of the NHPA.[1]  Thus, the APA standard of review does not apply.  *See id.*

B.    **Section 110(f)**

Section 110(f) provides that: "Prior to approval for any federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible federal agency shall, to the maximum extent possible, undertake such planning and actions as may

---

[1] While the Second Circuit has acknowledged the issue, it has thus far declined to address whether there is a private right of action under NHPA. *Business and Residents Alliance of East Harlem v. Jackson*, 430 F.3d 584, 590 (2d Cir. 2005) (adjudicating claims brought directly under Section 106 of the NHPA without deciding existence of private right of action).  The weight of authority supports a private right of action. *See Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1016-17 (3d Cir. 1991) (recognizing private right of action under the NHPA based in part upon NHPA's provision for attorneys' fees to any "interested person" who successfully enforces the NHPA,16 U.S.C. § 470w-4); *Vieux Carre Property Owners, Residents & Assocs. v. Brown*, 875 F.2d 453, 458 (5th Cir. 1989) (holding that private right of action exists under the NHPA); *Committee to Save Cleveland's Huletts,* 163 F.Supp.2d at 789 (same); *Brewery Dist. Soc'y v. Fed. Highway Admin.*, 996 F. Supp. 750, 756 (S.D. Ohio 1998) (same); *but see San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1098-99 (9th Cir. 2005) (holding that Section 106 does not give rise to a private right of action).

be necessary to minimize harm to such landmark and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking." NHPA § 110(f) (codified at 16 U.S.C. § 470h-2(f)).

The language of Section 110(f) is plain and unambiguous. It commands that the head of a federal agency shall "minimize harm" to National Historic Landmarks, "to the maximum extent possible," in both "planning" and "actions." *Id.*

**1.    Planning.** Section 110(f)'s "planning" requirement is plainly procedural. It mandates planning that minimizes harm to the maximum extent possible and commands that the Advisory Council be "afforded a reasonable opportunity" to comment.[2]

To this end, the implementing regulations contain: "Special Requirements for protecting National Historic Landmarks." 36 C.F.R. § 800.10. The special requirements direct that the agency official:

> (1) "shall notify the Secretary [of the Interior] of any consultation involving a National Historic Landmark and invite the Secretary to participate in the consultation where there may be an adverse effect"; and
>
> (2) "shall request the Council to participate in any consultation to resolve adverse effects on National Historic Landmarks conducted under § 800.6."

36 C.F.R. § 800.10.

**a.    Notice and Invitation to the Secretary.** Here, the sum total of defendants' compliance with the "special requirement" to provide notice and an invitation to the Secretary is an alleged June 22, 2005 conversation "regarding the consultation needs of the

---

[2] Although the language is plain and unambiguous, its meaning is also reinforced by the legislative history. The House Report on Section 110, explains that "110(f) establishes a higher standard of care to be exercised by Federal agencies when considering undertakings that may directly and adversely affect National Historic Landmarks. . . . This section does not supersede Section 106, but complements it by setting a higher standard for agency planning." *See* H.R. Rep. No. 1457, 96th Cong., 2d Sess. 36, 38 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6399.

Secretary for this project" between David Uschold, a Park Service manager, and Caroline Hall, who works in the office of the Associate Director of Cultural Resources, in which Mr. Uschold was told "that the Secretary did not wish to participate in consultations." Declaration of David Uschold, dated June 12, 2008 ("Uschold Decl.") ¶¶ 1, 8-9.

Mr. Uschold's cryptic description does not reveal whether he communicated the nature of the adverse affects to the office worker or explained how they would be minimized to the maximum extent possible. What we do know, is that not a single document was provided, not even a summary letter. Notwithstanding the unambiguous record of non-compliance, defendants disingenuously assert that: "In fact, NPS consulted with both the [Council] and the Secretary." Def.s' Br. at 31 n.7. This is false.

**b. Notice and Request to the Council.** In addition to the express command of Council involvement contained in Section 110(f), the regulations provided that defendants "shall request the Council to participate," 36 C.F.R. § 800.10, and "shall notify the Council of the adverse affect finding by providing the documentation specified in § 800.11(e)," *id.* § 800.6(a)(1). In turn, the Council, after receiving the request, including the documentation required by § 800.11(e), "shall advise the agency official and all consulting parties whether it will participate within 15 days." *Id.* § 800.6(a)(1)(iii). The documentation required by § 800.11(e) is detailed and comprehensive.

Here, according to Mr. Uschold, the Council: (1) was provided with a copy of the Draft GMP in 1993, but did not comment; (2) was invited to participate as a signatory to the Programmatic Agreement, but declined; (3) was copied on a December 12, 2006 letter to the State Historic Preservation Officer ("SHPO"); (4) was provided with a set of construction documents on May 21, 2007; and (5) reviewed defendants' compliance with Section 106 on May 28, 2008 after

-4-

receiving requests from community groups concerned about defendants' misconduct. Uschold Decl. ¶¶ 3-7, Exs. 1-6.

An examination of defendants' selective record reveals otherwise. In fact: (1) it appears that the Council received a copy the Draft GMP in 1993, but did not comment; (2) there is no indication that the Council was notified of the Programmatic Agreement before it was executed, Uschold Ex. 1, but it appears to have been provided to the Council thereafter, Uschold Ex. 2; (3) it appears that the Council was copied on a Dec. 12, 2006 letter to the SHPO that included design development drawings and an amended historic structures report, however, those documents were omitted from Mr. Uschold's Declaration and to this day have never been seen by plaintiffs; (4) Mr. Uschold's claim that the Council was provided a set of construction documents on May 21, 2007, is simply false, *see* Uschold Ex. 4 at 2 ("cc: all w/o enclosure"); and (5) the Council's "review" occurred only in response to recent requests by community groups, including Friends member, HHHA, and even then was limited to a pre-determined, *post hoc*, review of compliance with Section 106, not Section 110.

Defendants actions violated Section 110(f) and the regulations insofar as they mandate detailed notice to the Council, a request for consultation and a response within fifteen days.

           **c. The Programmatic Agreement**. Through their silence, defendants concede that the regulations do not permit agency officials to utilize a program alternative such as a Programmatic Agreement under Subpart C of regulations, 36 C.F.R. § 800.14, when the action is governed by Section 110(f) of the NHPA and 36 C.F.R. § 800.10. Accordingly, defendants' utilization of a Programmatic Agreement violated Section 110(f) and the regulations.

**2.    Actions**.  A plain reading of the "actions" requirement in Section 110(f) confirms that it is substantive.  It directs that defendants "shall, to the maximum extent possible, undertake such . . . actions as may be necessary to minimize harm" to Hamilton Grange.  NHPA § 110(f) (codified at 16 U.S.C. § 470h-2(f)).  Section 110(f) commands agencies to take "action" to minimize harm to the maximum extent possible.  By contrast, Section 106 directs that defendants shall "take into account the effect of the undertaking."  NHPA § 106(f) (codified at 16 U.S.C. § 470f).  Section 106 directs that agencies "take into account" effects, but does not limit an agency's discretion, provided it has considered possible adverse impacts.  As defendants argue, Section 106 is a stop, look and listen provision, Def.s' Br. at 28.  Section 110(f), however, is not.

After quoting the unique language of Section 110(f), defendants contend that courts "have repeatedly held that Section 110 does not impose any substantive requirements on a federal agency."  Def.s' Br. at 16; *see also id.* at 31-33.  This Court should not be fooled by defendants' misleading construction.  Defendants fail to disclose that none of the cases they cite have anything to do with Section 110(f).  Instead, each of *three* district courts that "have repeatedly held that Section 110 does not impose any substantive requirements" addressed other subsections of Section 110, *not* subsection (f), which is unique to undertakings involving National Historic Landmarks.

For example, in *Nat'l Trust for Historic Preservation v. Blanck*, 938 F. Supp. 908, 917 (D.D.C. 1996), the court considered whether Section 110(a)(1), which applies generally to historic properties, not landmarks, that are "owned or controlled" by a federal agency, creates "an independent substantive requirement."  The court concluded that it did not.  The plaintiffs in *Blanck* did not invoke Section 110(f).  Indeed, *Blanck* did not involve a National Historic Landmark.  The same is true for defendants' other two cases.  *See New Mexico ex rel. Richardson v. Bureau of Land Management*, 459 F.Supp.2d 1102, 1128 (D. N.M. 2006) (relying on *Blanck*, no

-6-

National Historic Landmark, no claim under Section 110(f)); *Coalition of 9/11 Families, Inc. V. Rampe*, No. 04 Civ. 6941, 2005 WL 323747 (S.D.N.Y. Feb. 8, 2005) (relying on *Blanck*, no National Historic Landmark, claim under Section 110(b), *not* 110(f)); *see also Oglala Sioux Tribe v. U.S. Army Corps of Engineers*, 537 F.Supp.2d 161, 173 (D.D.C. 2008) (same) (cited in Def.s' Br. at 32).

Stripped of their disingenuous Section 110 argument, all that remains is defendants attempt to minimize *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 225 (5th Cir. 2006) and *Okinawa Dugong v. Gates*, 543 F.Supp.2d 1082, 1095 n.4 (N.D. Ca. 2008). To be sure, as defendants note, the statement by the court in *Okinawa Dugong* is *dicta* as it did not involve a National Historic Landmark, but it *did* involve the pertinent Section 110 subsection, subsection (f). The holding by the Fifth Circuit in *Coliseum Square*, however, is not *dicta* as defendants claim. The plaintiffs in *Coliseum Square* appropriately invoked Section 110(f) because the proposed undertaking potentially involved four National Historic Landmarks. 465 F.3d at 241. In *Coliseum Square*, the court held that actions involving National Historic Landmarks "are subject to more stringent requirements." *Id.* at 242. "When an agency action will cause a direct adverse effect to a National Historic Landmark, the agency has an affirmative duty under NHPA § 110f to minimize the harm done." *Id.* While the court in *Coliseum Square* ultimately ruled in favor of the government, it did so by finding that the undertaking would have no adverse effect and thus the minimizing/maximizing duty did not attach. *Id.* at 243-44.

**III.    Plaintiffs Will Suffer Irreparable Harm**

Defendants contend that plaintiffs' delay in bringing this action belies any claim of irreparable harm. Def.s' Br. at 22-25 (citing primarily intellectual property infringement cases, *e.g. Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995), *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)). Defendants are wrong. They fail to consider, as this

-7-

court must, whether plaintiffs' delay was reasonable under the circumstances. *See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (doctrine that delay rebuts presumption of irreparable harm applies primarily in "copyright and trademark cases" and turns upon reasonableness of delay).

Delay in moving for a preliminary injunction has been considered reasonable when plaintiffs pursued alternatives to litigation and then delayed for weeks after the defendant "unmistakably closed the door" on plaintiffs efforts to pursue non-litigation alternatives. *Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334, 340 (S.D.N.Y. 1998); *see also Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989) (excusing delay in seeking preliminary injunction because plaintiff "was unaware of the true and pervasive extent" of his claims and "the intervening period" was consumed by efforts to resolve the matter without litigation), *aff'd*, 883 F.2d 1022 (2d Cir. 1989). Consideration of plaintiffs "small size and financial resources" as compared to defendants is also a factor in determining whether the delay here was reasonable. *Alacritech, Inc. v. Microsoft, Corp.*, No. 04-03284, 2005 WL 850729 at *7 (N.D. Cal. Apr. 12, 2005).

Plaintiffs delay was reasonable for two reasons. First, plaintiffs did not know that defendants decision to reorient the grange was final until they received a copy of defendant Burks' letter to Community Board 9 ("CB9") on or about April 8, 2008. Cardwell Decl. Ex. 11 (refusing CB9's request for a meeting and stating that, as of April 8, 2008, the "Park Service has considered the matter carefully over the last year on several occasions" and at the end "our decision remains the same"). Thus, plaintiffs' claim challenging the reorientation decision did not accrue until April 8, 2008, less than two moths prior to the commencement of this action on June 6, 2008. This is hardly an unreasonable delay for a group consisting of individuals, and block and homeowners

associations with extremely limited resources to mount a legal challenge to the actions of the United States government.

Second, although plaintiffs learned that defendants were considering reorienting the Grange to face Northeast on December 21, 2006, they spent the next many months diligently attempting: (1) to persuade defendants that reorienting the Grange would adversely effect the historical authenticity of the Grange; and (2) to obtain information about what plans had been or were being considered that pertained to relocation of the Grange.

Plaintiffs wrote scores of letters to defendants and to public officials throughout 2007 and 2008.  At times, they believed that their efforts to resolve the conflict without resort to litigation were making headway.  For example, when some members of Friends met with Mr. Spaulding and defendant Burks at the site in April 2007, or when defendants handed out fliers in January 2008 containing the rendering of the Grange from the 1995 GMP facing Southwest (a rendering that to this day is confusingly displayed on defendants' website).

At other times, plaintiffs were more pessimistic.  For example, when defendant Burks wrote a letter to Friends members in April 2007 indicating she still believed the Grange should face Northeast.  Or, when plaintiffs discovered in late March 2008 (two years after the fact), that defendants had surreptitiously bypassed standard Section 106 procedures by entering into a Programmatic Agreement.  Defendants should not be heard to complain about equity when their hands are unclean.

### III.     Balancing the Equities

Defendants argue that plaintiffs' motion should be denied because they allege that the Grange will be irreparably harmed unless it is placed on a permanent foundation immediately. Plaintiffs are at a tremendous disadvantage when it comes to rebutting this allegation.

First, given the time constraints, although defendants have discussed and shared the materials filed by defendants with consultants/potential experts and even fact witnesses, plaintiffs have been unable thus far to secure a rebuttal affidavit for filing today at noon. Plaintiffs can represent that homes as old as Hamilton Grange that have been moved have rested on temporary supports for between six months and a year before being placed on a permanent foundation without any significant harm. Because defendants refuse to disclose the actual date they will move the Grange onto the foundation, or even the amount of time on the temporary foundation that they themselves allotted as acceptable (and most likely set forth in a contract with the house moving company), plaintiffs request an additional two to three days to submit declaration(s) on this issue.

Second, given the controlled and limited nature of the information filed by defendants, it is extremely difficult to meaningfully contest defendants' allegations unless plaintiffs are afforded limited, expedited discovery on this issue. The standard for obtaining expedited discovery in advance of a hearing on a preliminary injunction motion is easily met here for the same reasons that this Court should grant plaintiffs' motion for preliminary relief.

Finally, plaintiffs propose that the Court appoint a neutral expert as a special master to evaluate the harm to the Grange should its move to a permanent foundation be delayed for a number of months. Plaintiffs are confident that a such a neutral party, beholden only to the Court, will confirm that defendants' claims concerning the alleged imminent threat to the Grange are far fetched.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be granted.  Alternatively, plaintiffs request that the Court grant additional time to submit rebuttal declaration(s), or to conduct expedited discovery, or appoint a special master to report to the Court on whether the Grange would be in any serious danger should it remain on its temporary foundation for a number of months.

Dated: June 16, 2008
      New York, New York

                           EMERY CELLI BRINCKERHOFF
                              & ABADY LLP

By: _____/s/_____
     Matthew D. Brinckerhoff (MB-3552)

75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212)763-5000

*Attorneys for Plaintiffs*