UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

FRIENDS OF HAMILTON GRANGE and
DR. JOHN CARDWELL,

                        Plaintiffs,                08 Civ. 5220 (DLC)

     -against-

DIRK KEMPTHORNE, Secretary of the Interior;       **AMENDED COMPLAINT**
U.S. DEPARTMENT OF THE INTERIOR,                **FOR DECLARATORY**
MARY A. BOMAR, Director of the National Park      **AND INJUNCTIVE RELIEF**
Service; NATIONAL PARK SERVICE; and
MARIA BURKS, Commissioner of National Parks
of New York Harbor and Superintendent of Manhattan
Sites,

                         Defendants.

-------------------------------------------------------------x

       Plaintiffs, Friends of Hamilton Grange ("Friends") and Dr. John Cardwell, by

their attorneys Emery Celli Brinckerhoff & Abady LLP, for their complaint, alleges as follows:

## INTRODUCTION

       1.     This case is about the relocation and restoration of the home of Alexander

Hamilton, a founder of our Nation.  Hamilton's home, the Hamilton Grange, located in the

Hamilton Heights neighborhood in northern Manhattan, is a National Memorial and a National

Historic Monument under the care and control of defendant National Park Service.

       2.     Pursuant to the Park Service's own Final General Management Plan and

Environmental Impact Statement (the "Final GMP"), it was decided, after a long and arduous

process, that the Hamilton Grange would be moved from Convent Avenue to St. Nicholas Park

and – "simultaneously" – a new, two-story interpretive and community center designed to be

compatible with the Hamilton Heights Historic District would be constructed (the "Grange Interpretive Center").

3.      Without input from the parties to the Final GMP – including plaintiff Friends of Hamilton Grange (the entity the Parks Service itself designated for consulting on such matters), or the community or public at large – the Park Service made numerous substantive changes to the Final GMP, including among other things, abandoning altogether (or postponing indefinitely) the Grange Interpretive Center, re-orienting the Grange itself, and completely revamping the interior and landscaping plans for the Grange.

4.      These changes are in direct conflict with the commitments that plaintiffs, the community at large and many other interested parties worked tirelessly (and successfully) to secure from the Park Service during the process that culminated with the Final GMP.  Having secured crucial community support for the project by committing to historical authenticity and the construction of the Grange Interpretive Center on Convent Avenue, the Park Service has now reneged on those promises.

5.      The Park Service's decision to abrogate the Final GMP was without consultation with plaintiffs and others as mandated by the National Historic Preservation Act (the "NHPA" or the "Act").  Had defendants complied with their obligations, plaintiffs would have been afforded a meaningful opportunity to be heard concerning the decision.  Moreover, the decision itself directly violates the Act's command that defendants must "minimize harm" to the historical authenticity of the Hamilton Grange "to the maximum extent possible."

## JURISDICTION AND VENUE

6.    This action arises under the National Historic Preservation Act, 16 U.S.C.

§ 470 *et seq.*, and its implementing regulations, the Administrative Procedure Act, 5 U.S.C. §

701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

7.    The jurisdiction of this Court is predicated upon 28 U.S.C. § 1331.

8.    The acts complained of occurred in the Southern District of New York.

Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(e).

## PARTIES

*Plaintiffs*

9.    Plaintiff Friends of Hamilton Grange ("Friends") is an unincorporated

association created in 1994 at the behest of defendant National Park Service (the "Park Service"

or "NPS"), as an umbrella organization for the community groups, property owners, professional

preservationists and other interested parties who consulted extensively with the Park Service

throughout the process that led to the 1995 Final General Management Plan and Environmental

Impact Statement (the "Final GMP").

10.    The Final GMP provided for the physical relocation and restoration of the

house of Alexander Hamilton and the building of an interpretive and community center at its

current location.  During the period leading to the Final GMP, Friends consulted with the Park

Service, raised funds, provided historical expertise and documentation, and mediated community

controversy over the proposed moving of the house.  As set forth in the Final GMP, the Park

Service committed that Friends "would be actively involved . . . in the future restoration of

Hamilton Grange and in the mitigation of any concers that might arise, especially those that arise

from moving the Grange from its current site." Final GMP at 7.

11.    Friends' membership includes, among others, Dr. John Cardwell

(Chairperson), Michael Hodge (Vice-Chairperson), Louise Lawrence (Secretary-Treasurer), the

Hamilton Heights Homeowners Association, the 141st and 142nd Street Block Association,

Michael Henry Adams, Thomas Draplin, Barrie Adedeji, Dr. Joseph Fields, Alexa Donaphin,

Lilian Brown and Carolyn Kent. All Friends members have a long-standing commitment to the

Grange, have been involved in the community surrounding the Grange, have visited and utilized

the Grange and will do so in the future when it is opened again for public use, and have a keen

interest in historic preservation. All Friends members have suffered as the result of defendants

failure to comply with sections 106 and 110 of the National Historic Preservation Act (the "Act"

or "NHPA" (codified at 16 U.S.C. § 470 *et seq.*)) and will continue to suffer absent the

declaratory and injunctive relief sought by this action.

12.    Plaintiff Dr. John Cardwell is chairperson of the Friends of Hamilton

Grange. He has lived in the Hamilton Heights neighborhood since 1980. He served as President

of the Hamilton Heights Homeowner's Association ("HHHA") from 1991 to 2001, which is also

a member of Friends. As the then-President of Friends member HHHA, Dr. Cardwell signed the

letter of support from HHHA that was included in the final GMP. In that letter, Dr. Cardwell and

HHHA maintained that the "Grange should remain in its current site until there are sufficient

resources to . . . replace the Grange building with a suitable structure at the vacated site, . . .

continue community liaison with and support of the facility as a Harlem institution." In the same

letter, Dr. Cardwell and HHHA also asked that they "would like to be represented on any group established to monitor the Grange development."

      13.    In response to the letter from Dr. Cardwell and HHHA and many others like them, the Park Service responded that "a Friends of Hamilton Grange group, . . . has been formed and would be involved with the National Park Service in relocating and restoring the Grange and in planning and designing the Convent Avenue building."

      14.    As Chairperson of Friends, and in his individual capacity as a long time resident of the community tied to Hamilton Grange with strong interest in historical preservation issues, Dr. Cardwell has a long-standing commitment to the Grange, has been involved in the community surrounding the Grange, has visited and utilized the Grange and will do so in the future when it is opened again for public use. Dr. Cardwell has suffered from defendants failure to comply with sections 106 and 110 of the National Historic Preservation Act (the "Act" or "NHPA" (codified at 16 U.S.C. § 470 *et seq.*)) and will continue to suffer absent the declaratory and injunctive relief sought by this action.

***Defendants***

      15.    Defendant Department of the Interior ("Interior") is a department of the United States. The Mission of Interior is to protect and provide access to our Nation's natural and cultural heritage. Interior is responsible for implementing the NHPA and overseeing the National Park Service.

      16.    Defendant Dirk Kempthorne is Secretary of the Interior. As Secretary, defendant Kempthorne has primary responsibility for implementing the National Historic

Preservation Act and ultimate authority over the National Park Service.  Defendant Kempthorne

is sued in his official capacity.

17.    Defendant National Park Service ("NPS" or "Park Service") is an agency

within the Department of the Interior.  The mission of the Park Service is to preserve unimpaired

the natural and cultural resources and values of the national park system and in cooperation with

partners to extend the benefits of natural and cultural resource conservation throughout this

country and the world.  The Park Service administers the Hamilton Grange National Memorial,

which is a National Historic Landmark and the subject of this action.

18.    Defendant Mary A. Bomar is Director of the Park Service, an agency

within the Department of the Interior.  As Director, defendant Bomar is responsible for ensuring

that the Park Service complies with the mandate of the National Historic Preservation Act.

Defendant Bomar is sued in her official capacity.

19.    Defendant Maria Burks is the Commissioner of National Parks of New

York Harbor and Superintendent of Manhattan Sites.  As Commissioner, and as Superintendent,

defendant Burks is responsible for all aspects of Hamilton Grange, one of the Manhattan sites.

Defendant Burks is sued in her official capacity.

## FACTS

**A.    History of Hamilton Grange**

20.    The Hamilton Grange was built in 1802 by Alexander Hamilton, one of

our nation's founders.  It was originally located on a 32 acre estate in the then rural northern end

of Manhattan.  The Hamilton Grange was designed by John McComb, Jr., who, together with

Joseph Mangin, also designed New York's City Hall.

-6-

21.    This Federal style wood framed house was located on the ridge of Harlem Heights on a site offering wide views to the Hudson Palisades and east over the Harlem Plains to the East River.

22.    The Hamilton Grange was moved from its original location in 1887 when Hamilton's estate was subdivided into city lots to form the neighborhood that is now Convent Avenue between approximately 140th street and 148th street.  The Grange was moved onto one of the subdivided row house lots.  It was stripped of its front and back porches and sandwiched sideways between a church and an apartment building.  There it remained, obscured, underutilized, and largely neglected, until now.

23.    The Hamilton Grange was declared a National Historic Landmark in 1960.

24.    As a National Historic Landmark, Hamilton Grange is also automatically listed on the National Register of Historic Places.

25.    In 1962, Congress designated the Hamilton Grange as a National Memorial.  It is currently one of only forty-four national memorials in the United States.

26.    The area in which the Hamilton Grange is located, the Hamilton Heights Historic District, also known as "Sugar Hill", has played an important role at the pinnacle of Harlem society, culture, economy and politics.  The Hamilton Heights Historic District ("HH Historic District") is also listed on the National Register of Historic Places.

**B.    Hamilton Grange Restoration**

27.    Hamilton Heights features a vigorous community leadership active in many block associations, prestigious churches, civic associations and Community Board 9 ("CB9").

28.     Beginning in the mid-1980s, the Hamilton Heights Homeowners Association ("HHHA"), a not-for-profit corporation and member of plaintiff Friends of Hamilton Grange, undertook to persuade the Park Service to fully restore the Hamilton Grange.

29.     In 1987, as part of the bi-centennial celebration of the U. S. Constitution, the HHHA planted a sweet gum tree in front of the Grange, and others around the neighborhood, reminiscent of the thirteen sweet gum trees planted by Hamilton to symbolize the original thirteen colonies.

30.     The HHHA then commenced a campaign to win the Park Service's agreement to a restoration. Through its annual Hamilton Heights House and Garden tours, the HHHA raised $8,500 to contribute to the restoration of the Hamilton Grange. The HHHA conducted outreach with local schools and involved school children in caring for the sweet gum trees, as part of an effort to educate the community about the Hamilton Grange.

31.     On November 8, 1990, defendant Park Service entered into a Memorandum of Agreement with the HHHA, in which the HHHA agreed to raise funds, and contribute historic materials, and the Park Service agreed to "administer and develop the Hamilton Grange National Memorial according to plans developed through a documented process of public participation, commensurate with available funds." The Park Service also committed itself to support the efforts of HHHA to provide facilities for its meetings at the Grange, as well as for other community programs.

32.     On or about December, 1990, the HHHA made a donation of $8,500 to the Park Service.

C.    **Legitimate Hamilton Grange Restoration Review Process**

33.    In the early 1990s, the Park Service commenced a process of consultation and public participation in evaluating the adverse effects of various restoration proposals.

34.    This process resulted in a draft General Management Plan and Environmental Impact Statement "Draft GMP" in 1993. The 1993 Draft GMP proposed the removal of Hamilton Grange from its current location to near by St. Nicholas Park. The Draft GMP proposed two alternative possibilities for the Convent Avenue location in the event that the Grange was moved to St. Nicholas Park. One option was to remove the Grange foundation and create a "vest-pocket park." The other option was to "preserve and redevelop the current Convent Avenue site" with a "new building" that "could be constructed on the existing 1889 foundation, [and would] include space for heritage education programs and community meetings."

35.    Initial proposals to move the Grange to the more open St. Nicholas Park were met with significant community opposition. The Hamilton Grange Community Taskforce to Prevent the Removal of the Grange led by St. Luke's Episcopal Church gathered 538 signatures on a petition opposing relocation of the Grange. Convent Avenue Baptist Church obtained another 74 signatures.

36.    One concern articulated by community opponents of the move was that the proposed pocket park on the lot vacated by a relocated Grange would attract crime. Concerns were also expressed that the Park Service would not follow through on commitments to adequately secure, maintain and operate the Grange.

37.     More important, however, was an underlying distrust of the National Park Service in the Hamilton Heights community.  The community regarded the Park Service as outsiders threatening to deprive the community of control over and access to its own historical resources. · The Hamilton Heights community felt a strong sense of ownership over the Grange. Members of the surrounding community volunteered their time to support the Grange.  The community used the Grange for meetings and events, and actively promoted and supported the restoration of the Grange for years when the Park Service appeared to be neglecting it.

38.     The community concerns that the Grange would be taken away were not unfounded.  On information and belief, in the early 1980s, when it was assumed white tourists would not venture into Harlem to see the Grange, the Park Service proposed removing the Hamilton Grange from Harlem altogether and placing it next to Grant's Tomb on Morningside Heights, a largely white neighborhood.   This proposal was defeated by vocal Hamilton Heights community opposition.

39.     From 1992 to 1995, preservationists interested in the Hamilton Grange, including Friends' member and author Michael Henry Adams, and the HHHA led an effort in which members of the community, as well as Community Board 9 worked with the Park Service to address community concerns about a proposed move to St. Nicholas Park.  These organizations and individuals, together with other block associations and preservationists were convened in 1994 by the Park Service into a single consulting party, the Friends of the Hamilton Grange.  They met formally as a group on two occasions in 1994.

40.     As a result of the outreach and mediation performed by members of the Friends of Hamilton Grange, a consensus was reached to support a plan for moving the Grange to

St. Nicholas park because that option would maximize historic the authenticity of setting and appearance, and because it would also include the building of a brand new interpretive and community center on the Convent Avenue site from which the Grange was to be removed.

   41.  In 1994, Community Board 9 approved the plan to move the Grange to St. Nicholas Park, specifying a "full architectural restoration of the Grange in its interior and exterior appearance during Hamilton's residency and landscaping of a setting more reflective of its original rural placement" and to "construct upon the present Convent Avenue site a compatible structure housing a Ranger residence, exhibition space, and a reception room for community use."

**D.  The 1995 Final General Management Plan**

   42.  The twin aims of (1) restoring Hamilton Grange in an historically authentic setting and (2) enhancing community use by building an interpretive and community center at the Convent Avenue site were incorporated into the 1995 Final General Management Plan and Environmental Impact Statement (the "Final GMP").

   43.  In the Final GMP, the Park Service represented that it had "and would continue to comply with all applicable laws, regulations, and executive orders, including . . . Section 106 of the National Historic Preservation Act."

   44.  The Final GMP cited historic authenticity as the rationale for the move to St. Nicholas Park.  The Park Service proposed to recreate a setting most nearly like the original. The review process had brought about a number of changes and modifications.  For plaintiffs, the most significant changes won in the review process was the restoration of the house to its

original southerly orientation and the commitment to simultaneously build the interpretive and community center at the Convent Avenue site.

45.     The Final GMP provided that: "Completion of the project would be carefully phased. Following the move of the Grange to the new site in St. Nicholas Park, development of the new NPS building on the Convent Avenue site and restoration of the Grange would proceed simultaneously."

46.     The Final GMP described the interpretive and community center as follows:

> The plan for the Convent Avenue site would be to construct a new structure for public and NPS uses. The new building, no more than two stories, built on the 1889 Grange foundation, would emphasize heritage education and community involvement. A multipurpose meeting room would occupy the main floor, where educational programs and community meetings could be held. Space would also be provided for exhibits to depict the growth and development of Harlem, the role of the Grange in the community, the role of St. Luke's parish in preserving the Grange, and broader community preservation efforts. The lower levers of this structure would be developed as apartment(s) for housing NPS law enforcement rangers and for site storage needs and maintenance operations. The new structure proposed for the Convent Avenue site would be designed to be compatible with the qualities for which the Hamilton Heights Historic District was established (see New Building on Convent Avenue Site and Use of Convent Avenue Building – Floor Plan). The Friends of Hamilton Grange group would be actively involved in all aspects of planning the new structure.

## E.     Friends of Hamilton Grange – A Consulting Party

47.     The Friends of the Hamilton Grange was identified by the Park Service in the Final GMP as a present and future stakeholder and consultant in all issues concerning the restoration of the Grange. Most of the member organizations or individual members of Friends of the Hamilton Grange had been included in the circulation of the 1993 Draft GMP, and many,

including the Hamilton Heights Homeowners Association and Michael Henry Adams, submitted comments in response.

48.     In the 1995 Final General Management Plan, the Park Service committed itself to "work with" the Friends of Hamilton Grange, and that the Friends of Hamilton Grange would be "actively involved" in "the future restoration of Hamilton Grange and in mitigation of any concerns that might arise, especially those that arise from moving the Grange from its current site."  The Service distributed the Final GMP to members of Friends of Hamilton Grange under cover addressed to "Friends of Hamilton Grange."

49.     Included in the Final GMP were the communications received from various individuals, organizations and government agencies with interest in the project and responses from the Park Service.

50.     The National Trust for Historic Preservation explained that it was "aware that there are issues related to the siting of the structure in St. Nicholas Park" and commented that it trusted "that the National Park Service will involve local organizations, neighborhood groups and the New York Landmarks Preservation Commission in these decisions."  In response the Park Service asserted that it had "involved and would continue to involve all interested parties in the development and implementation" of the move to St. Nicholas Park.  The Park service agreed that the "Friends of Hamilton Grange group . . . would be involved with the National Park Service in relocating the Grange" and that "[r]epresentatives of the different groups and interests in the community would be invited to join the group."

51.     The comments of Community Board included a resolution that called "for the institution of a community-based organization, Friends of the Hamilton Grange, to be

allowed an active support and oversight role toward the Grange – in guarantee of the community

interest in this long-treasured National Memorial, the foremost historic and architectural

endowment within our boundaries of responsibility." In response, the Parks Service reiterated

that the "Friends of Hamilton Grange" would serve that role.

**F.      Delay**

52.     From 1995 to 2001, while the Park Service obtained an easement to the

land in St. Nicholas Park, and from 2001 to 2006, while waiting for funding to be secured, the

Friends of Hamilton Grange did not meet formally, but its members, all active in local

community affairs, kept in contact and frequently discussed the Hamilton Grange.

53.     On information and belief, Members of Friends of the Hamilton Grange

inquired of the Park Service by phone with then Superintendent of Manhattan Sites Joseph

Avery, concerning the status of the project. Superintendent Avery repeatedly told them there was

nothing to consult about until the easement to the St. Nicholas receiving site was secured, and

then that there was nothing to consult about until funding was secured.

54.     In 2000, the Hamilton Heights West Harlem Community Preservation

Organization, concerned at the lack of progress, wrote to the Park Service Northeast Regional

Director protesting the lack of movement on the project, and asking for information regarding the

project status. Superintendent Avery wrote back explaining that the transfer of an easement

would require review under New York City's Uniform Land Use Review Procedure ("ULURP"),

but that "planning related to the project, including for the facility which will replace the Grange

on Convent Avenue, will begin soon." However, when the Hamilton Heights West Harlem

Community Preservation Organization called to follow up that year, and on at least two

occasions between 2001 and 2004, they were told each time that no further planning was under

way, and that there would be nothing to consult about, until funding was obtained.

55.    In 2001 the Park Service applied for review of the land easement transfer

in St. Nicholas Park, as provided under New York City's Uniform Land Use Review Process.

The Park Service's application was approved by Community Board 9 on June 21, 2001.

56.    The Park Service obtained partial funding for the GMP for fiscal year

2007.  On information and belief, funding for the Convent Avenue interpretive and community

center was not included.

F.    **The Sham/Non-Existent Hamilton Grange Restoration Review Process**

57.    On March 24, 2006, but only discovered by plaintiffs in March of 2008,

more than eleven years after the Final GMP and five years after negotiations with New York City

for an easement on the site in St. Nicholas were concluded, the Park Service entered into a secret

Programmatic Agreement, ostensibly pursuant to 36 C.F.R. § 100.14.  The other parties to the

agreement were the New York State Office of Historic Preservation, the New York City

Department of Parks and Recreation, and the New York City Landmarks Preservation

Commission.

58.    The Programmatic Agreement did not include the Friends of Hamilton

Grange, a party with whom the Service, in the 1995 General Management Plan, had made

explicit commitments to consult.  The Programmatic Agreement also excluded other consulting

parties from the pre-1995 process, such as Community Planning Board 9.

59.    The Programmatic Agreement provided that "in place of the relocated

Grange at the Convent Avenue site, the NPS will initiate and actively support a public/private

-15-

partnership to plan and develop a new multi-use facility that will achieve the original goals of
providing educational and community space, and . . . will pursue the replacement facility in a
separate action and . . . as a separate Section 106 action."

60.    Neither the Friends of Hamilton Grange and its members, nor Community
Board 9, nor the public, was given notice of the Park Service's proposal of such a Programmatic
Agreement.

61.    Neither the Friends of Hamilton Grange and its members, nor Community
Board 9, nor any member of the public, was consulted in the development of the Programmatic
Agreement.

62.    Neither the Friends of Hamilton Grange and its members, nor Community
Board 9, nor the public, was given notice of the Park Service's execution of a Programmatic
Agreement.

63.    Indeed, the existence of the Programmatic Agreement was not discovered
by Community Board 9 until late March, 2008 and even then it was not obtained from the Parks
Service.

64.    The Park Service made no effort to contact the Friends of Hamilton
Grange and/or its members, or Community Board 9, or the public, until late 2006.

65.    On April 30, 2007, Carolyn Kent, co-chair of the CB9 Committee met
with defendant Burks. On information and belief, when presented with a copy of the 1995 GMP,
defendant Burks expressed surprise, explaining that she "never seen this before."

66.    On December 13, 2007, the Park Service held a public meeting
announcing the move of the Grange. At the meeting, members of the Friends of the Hamilton

Grange and others contested the cancellation of the interpretive and community center and the reorientation of the Grange in its new location.  The Park Service did not respond.

      67.    Since the beginning of the year, various community based organizations have engaged in a letter writing campaign to Congressman Charles Rangel with the hope that he could mediate the dispute between the community and defendant Burks.  Letters were sent to Congressman Rangel by:  Community Board 9 Chair Reyez-Montblanc; the Hamilton Heights West Harlem Community Preservation Organization; Friends of Hamilton Grange members, the 141st Street and 142nd Street Block Associations; the Hamilton Terrace Block Association; Friends of the Hamilton Grange member the Hamilton Heights Homeowners Association; the West 144th Street Land Mark Block Association; and the Morningside Heights Historic District Committee.  All of the letters protested the damaging and historically inaccurate orientation of the Grange facing northeast onto a city street and many protested the decision by the Parks Service to abandon the interpretive and community center for the Convent Avenue site.

      68.    On March 6, 2008, Friends member, HHHA, wrote the Park Service seeking information under the Freedom of Information Act.  HHHA expressly raised two issues of primary concern:  "First, in direct contradiction to the GMP, a new design would reverse the orientation given the Grange."  "Second, we are informed that the plans for an expanded historic preservation information and community meeting site on Convent Avenue, plans arising from broad community discussion prior to GMP approval, have been summarily cancelled."  The letter went on to point out that the decision to abandon the interpretive and community center violated the GMP which provided that:

> The purpose of the building would be for community use, heritage education
> programs, and NPS housing.  In addition, the preservation efforts and the

importance of the current location in the Grange's history would be presented
through exhibits and interpretive media. Restoration of the Grange and
construction of the new building would occur simultaneously; the Convent Ave
site would not be left vacant.

69.    On information and belief, in late March, 2008, CB9 Committee co-chair
Kent managed to obtain a copy of the March 24, 2006 Programmatic Agreement between the
Park Service, the New York State Office of Historic Preservation, the New York City Parks
Department, and the New York City Landmarks Commission. Defendants had concealed the
existence of the Programmatic Agreement from anyone connected with Community Board 9 or
the Friends of Hamilton Grange or the Hamilton Heights community for over two years.

70.    On March 20, 2008, Community Board 9 voted 27 to 3 to protest the Park
service's wilful violation of its commitments to the community in the 1995 GMP.

71.    On information and belief, in late April 2008 the Park Service produced
records in response to HHHA's Freedom of Information Law request. The documents provided
did not disclose when, by whom, and on what basis, or by what process the decision was made to
reorient the grange towards the northeast or to abandon the Convent Avenue interpretive and
community center.

72.    The Park Service's disclosures revealed that the approval of the New York
State Historic Preservation Office, the New York City Department of Parks and New York City
Land Marks Preservation Commission under the Programmatic Agreement had each been made
by staff, without public notice or proceedings.

73.    On May 13, 2008, Friends sent a letter of appeal to the Park Service
alleging that its use of a Programmatic Agreement violated NHPA and its implementing

regulations, and that the further undertaking of reorienting the Hamilton Grange to the northeast

was not in accordance with law.

## FIRST CAUSE OF ACTION
(National Historic Preservation Act § 110)

74.    Plaintiffs repeat and reallege the allegations set forth in the preceding

paragraphs.

75.    Section 110(f) of the National Historic Preservation Act ("NHPA" or the

"Act") (codified at 16 U.S.C. § 470h-2) provides that: "Prior to approval for any federal

undertaking which may directly and adversely affect any National Historic Landmark, the head of

the responsible federal agency shall, to the maximum extent possible, undertake such planning

and actions as may be necessary to minimize harm to such landmark and shall afford the

Advisory Council on Historic Preservation a reasonable opportunity to comment on the

undertaking." NHPA § 110(f) (codified at 16 U.S.C. § 470h-29f)).

76.    Plaintiffs assert this claim directly under Section 110 of the Act and its

implementing regulations and also via the Administrative Procedure Act, codified at 5 U.S.C. §

701, *et seq.*

77.    Hamilton Grange was designated as a National Historic Landmark in 1960

and a National Memorial in 1962.

78.    The relocation and restoration of the Grange is an undertaking within the

meaning of the Act which will directly and adversely affect the Grange.

79.    Defendants did not implement the planning and actions necessary to

minimize harm to the Grange.  Indeed, defendants bypassed the normal section 106 planning and

actions required even for historic properties that are listed on the National Register, but not designated as National Historic Landmarks, as the Grange is.

80.    Defendants' decision to make wholesale changes to the Final GMP, including, without limitation, the decision to abandon the community and interpretive center, thus leaving the Convent Avenue site fallow, the decision to substantially alter the plans for the interior of the Grange and the landscaping, and the decision to jettison the plan for elevator access to all floors within the Grange, will cause harm to important historical and architectural elements of the Grange, thus degrading its status as a National Historic Landmark.

81.    Defendants' decisions as detailed above do not "minimize harm" to the Grange "to the maximum extent possible" in violation of the NHPA.

82.    The regulations promulgated by the Advisory Council on Historic Preservation (the "Council") pursuant to the Act provide: "Special Requirements for protecting National Historic Landmarks."  36 C.F.R. § 800.10.

83.    The special requirements direct that: (1) "the agency official shall notify the Secretary [of the Interior] of any consultation involving a National Historic Landmark and invite the Secretary to participate in the consultation where there may be an adverse effect"; (2) "the agency official shall request the Council to participate in any consultation to resolve adverse effects on National Historic Landmarks conducted under § 800.6'" (3) "When the Council participates in consultation under this section, it shall report the outcome of the section 106 process, providing its written comments or any memoranda of agreement to which it is a signatory, to the Secretary" and agency head; and (4) "the Council shall use the process set forth

in §§ 800.6 through 800.7 and give special consideration to protecting National Historic

Landmarks as specified in this section." 36 C.F.R. § 800.10.

84.     On information and belief, no notice was ever provided to Secretary

Kempthorne pursuant to 36 C.F.R. § 800.10©).

85.     On information and belief, defendants never invited the Council to

participate in the consultation, notwithstanding the regulation that requires an invitation when

either (1) the "undertaking has an adverse effect upon a National Historic Landmark," or (2)

when a "programmatic agreement under § 800.14 will be prepared." 800.6(a)(1).

86.     While the regulations allow agency officials to bypass the Section 106

Process provided for in Subpart B of 36 C.F.R. Part 800 and instead utilize a program alternative

such as a Programmatic Agreement under Subpart C of 36 C.F.R. Part 800, the bypass procedure

is not permitted in actions governed, as this one, by Section 110 of the Act.

87.     In bypassing the normal Section 106 procedures that are mandatory under

36 C.F.R. § 800.10, defendants violated Section 110 of the Act and its implementing regulations.

88.     Defendants' actions were contrary to law, unreasonable, arbitrary and

capricious.

89.     Plaintiffs have suffered and will continue to suffer absent an order

directing defendants to comply with their obligations under Section 110 of the Act.

## SECOND CAUSE OF ACTION
(National Historic Preservation Act § 106)

90.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

91.    Section 106 of the National Historic Preservation Act (codified at 16 U.S.C. § 470f) provides that the "head of any Federal agency having direct or indirect jurisdiction over a proposed . . . undertaking shall . . . take into account the effect of the undertaking on any district, site, building or structure that is included . . . in the National Register."

92.    Plaintiffs assert this claim directly under Section 106 of the Act and its implementing regulations and also via the Administrative Procedure Act, codified at 5 U.S.C. § 701, *et seq.*

93.    As a National Historic Landmark, Hamilton Grange is automatically included in the National Register.  The Hamilton Heights Historic District is also included in the National Register.  The Grange has been located in the Hamilton Heights Historic District for many years.

94.    Defendants violated Section 106 of the Act by failing to meet the consultation and public participation requirements of 36 C.F.R. §800.3-12, and by implementing an alternative procedure without notice of intent to enter into such agreement, of entry into such agreement, or of implementation of such agreement, or provision for public participation pursuant to 36 C.F.R. § 800.14.

95.    Defendants violated the regulations by entering an undertaking in violation of its obligation to consult under 36 C.F.R. 800.2  § (a) (4).  Members of the Friends of the

-22-

Hamilton Grange demonstrated interest, including financial participation and neighboring property rights, as well as demonstrated concern for the undertaking's effect on historic properties. The Park Service represented in the 1995 GMP that the Friends of the Hamilton Grange was a consulting party pursuant to § 800.2 ©)(5). The Friends of Hamilton Grange was designated by the Park Service to represent member organizations, including the Hamilton Heights Homeowner's Association.

96.     Defendants violated the regulations by entering an undertaking without seeking and considering the views of the public, pursuant to § 800.2(d)(1). Defendants failed to give notice to provide the public with information about an undertaking and its effects on historic properties, pursuant to § 800.2(d)(2).

97.     Defendants' decision to make wholesale changes to the Final GMP, including, without limitation, the decision to abandon the community and interpretive center, thus leaving the Convent Avenue site fallow, the decision to substantially alter the plans for the interior of the Grange and the landscaping, and the decision to jettison the plan for elevator access to all floors within the Grange, have caused and will continue to cause harm to important historical and architectural elements of the Grange.

98.     Defendants entered a new undertaking without assessing its adverse effects, altering the characteristics of a historic property as enumerated in § 800.5, including changing the character of the property's setting that contribute to its historic significance, pursuant to 36 C.F.R. 800. 5 (a) (2) (iv) and introducing visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features, pursuant to § 800. 5 (a) (2) (iv).

99.     Defendants failed to consult with consulting parties to develop and evaluate alternatives to the new undertaking pursuant to § 800.6 and § 800.6 (2).

100.     Defendants failed to involve the public by making information available pursuant to § 800.6 (4). Friends' member, the Hamilton Heights Homeowners Association had to resort to the lengthy and cumbersome process of a Freedom of Information Act request just to find the basis for the Park Services's decision to orient the house towards the northeast, or disclosing the agency's procedures in reaching such a position, and its request remains unanswered to date.

101.     Defendants also failed to provide opportunity to members of the public to express their views on resolving adverse effects of the undertaking, pursuant to 36 C.F.R. 800.6 (4).

102.     Alternatively, insofar as defendants' decision as set forth above represent a further modification of an unfinished Section 106 Process, pursuant to Sub Part B of the regulations, defendants failed to either terminate its consultation with the Friends of Hamilton Grange pursuant to 36 C.F.R. 800.7 (a), resolve adverse effects pursuant to § 800.7 (b), or produce a modified memorandum of agreement pursuant to § 800.7 ©).

103.     Defendants failed to ensure that the determination, finding or agreement challenged in this action is supported by sufficient documentation to enable reviewing parties to understand its basis, as required by § 800.11.

104.     Defendants failed to give notice of its development of an alternative procedure in connection with the Hamilton Grange National Memorial pursuant to § 800.14 (a)(1). Defendants did not give notice of the availability of alternative procedures in connection

-24-

with the Hamilton Grange to the Friends of Hamilton Grange, to any member of the Friends of

Hamilton Grange, to Community Board 9, or to any member of Community Board 9, or to the

public at large. Defendants did not publish such notice in the Federal Register, pursuant to §

800.14 (a) 3. Defendants thereby denied the Friends of Hamilton Grange an opportunity to

comment, or request inclusion in such Programmatic Agreement.

105.    Defendants acted without legal authority in entering into a Programmatic

Agreement. The land transfer had been accomplished in 2001, five years prior to the

Programmatic Agreement. The project therefore no longer represented a complex project

situation or multiple undertaking. There were no non-federal parties delegated major decision

making responsibilities, and no other circumstance has been offered by the Park Service to

warrant departure from the normal section 106 process under 36 C. F. R. 800.14 (b) (1).

106.    Defendants failed to consult with members of the public concerning the

development of a Programmatic Agreement for the Hamilton Grange National Memorial

pursuant to § 800.14 (b) (2) (I).

107.    Defendants failed to arrange for public participation appropriate to the

subject matter and scope of the program pursuant to § 800.14 (b) (2) (ii). Defendants also did

not provide adequate opportunities for public involvement consistent with Subpart B of the

regulations, in violation of § 800.2 (d) (3).

108.    Defendants failed to give notice of the execution of a Programmatic

Agreement, or to give notice before it takes effect pursuant to § 800.14 (b) 2 (iv). Defendants

did not give notice to the Friends of Hamilton Grange, to any member of the Friends of Hamilton

Grange, to Community Board 9, or to any member of Community Board 9, or to the public at

large, and it did not publish such notice in the Federal Register. Defendants thereby denied and delayed the Friends of Hamilton Grange the opportunity to pursue administrative or judicial processes for review of defendants' unlawful conduct until this late date.

109.    Defendants also failed to make any internal agency procedures implementing the agreement readily available, as required under § 800.14 (b) 2 (iv).

110.    Defendants' actions were contrary to law, unreasonable, arbitrary and capricious.

111.    Plaintiffs have suffered and will continue to suffer absent an order directing defendants to comply with their obligations under Section 110 of the Act.

## RELIEF

WHEREFORE, plaintiffs request the following relief:

1.    A judgment declaring that defendants have committed the violations of law alleged in this action;

2.    A judgment declaring the Programmatic Agreement null and void;

3.    A permanent injunction directing defendants to comply with their obligations under the National Historic Preservation Act, including their obligation to consult with Friends of Hamilton Grange prior to any further undertakings in connection with the relocation, orientation, restoration, landscaping, or operation of the Hamilton Grange National Monument;

4.    A permanent injunction directing defendants to construct the interpretive and community center on the Convent Avenue site as described in the Final GMP;

5.      An order awarding disbursements, costs, and attorneys' fees pursuant to 16 U.S.C.

§ 470w–4; and

6.      Such other and further relief that may be just and proper.

Dated: August 8, 2008
      New York, New York

                              EMERY CELLI BRINCKERHOFF
                                 & ABADY LLP

                              By: _____
                                  Matthew D. Brinckerhoff (3552)

                              75 Rockefeller Plaza - 20th Floor
                              New York, New York 10019
                              (212) 763-5000

                              *Attorneys for Plaintiffs*

### Certificate of Service

       I, Matthew D. Brinckerhoff, a member of the bar of this Court, certify that on August 8, 2008, I served a true and accurate copy of the Amended Complaint For Declaratory And Injunctive Relief in *Friends of Hamilton Grange, et al. v. Kempthorne, et al.*, 08 Civ. 5220 (DLC) via email on the persons or entities listed:

    Lawrence Fogelman, Esq.
    Sarah Light, Esq.
    United States Attorneys Office
    86 Chambers Street, 3rd Floor
    New York, NY 10007
    Lawrence.Fogelman@usdoj.gov
    Sarah.Light@usdoj.gov

Dated:  August 8, 2008
       New York, New York

                                          Matthew D. Brinckerhoff