UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRIENDS OF HAMILTON GRANGE and          :
DR. JOHN CARDWELL,                       :
                                         :
                    Plaintiffs,          :          08 Civ. 5220 (DLC) (FM)
                                         :
        v.                               :
                                         :
DIRK KEMPTHORNE, Secretary of the Interior;   :
U.S. DEPARTMENT OF THE INTERIOR;         :
MARY A. BOMAR, Director of the National       :
Park Service; NATIONAL PARK SERVICE; and     :
MARIA BURKS, Commissioner of National Parks   :
of New York Harbor and Superintendent of      :
Manhattan Sites,                         :
                                         :
                    Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF THE
## GOVERNMENT'S MOTION TO DISMISS THE AMENDED COMPLAINT


                        MICHAEL J. GARCIA
                        United States Attorney for the
                        Southern District of New York
                        Attorney for the Defendants
                        86 Chambers Street, 3rd Floor
                        New York, New York 10007


LAWRENCE H. FOGELMAN
Assistant United States Attorney
    Of Counsel

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Background on the Grange Relocation Project and Convent Avenue Site . . . . . . 3

    B.    Landscaping, Interiors and Elevators in the Grange at St. Nicholas Park . . . . . . . 4

            1.    Landscape . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            2.    Interiors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            3.    Elevator Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    Developments to the Convent Avenue Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    Ongoing Efforts to Inform the Community of Developments to the Grange . . . 10

    E.    Overview of Statutory and Regulatory
            Requirements of the National Historic Preservation Act . . . . . . . . . . . . . . . . . . . 11

            1.    Statutory Background of the NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            2.    NPS Compliance with NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE AMENDED
    COMPLAINT BECAUSE PLAINTIFFS HAVE NOT SATISFIED THE ELEMENTS
    FOR STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Plaintiffs Lack Standing To Challenge The Landscaping, Interiors or Elevator
            Access of the Grange . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.    Plaintiffs Failed to Articulate Any Harm to Themselves As a Result of the
                Landscaping, Interiors or Elevator Access of the Grange . . . . . . . . . . . . 18

            2.    The Government Has Provided Full Opportunity for Public Participation
                by Plaintiffs In Its Decisions Regarding the Landscaping, Interiors and
                Elevator Access to the Grange . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            3.    Plaintiffs' Allegations Regarding Landscaping, Interiors and Elevator
                Access are Not Redressible by the Court . . . . . . . . . . . . . . . . . . . . . . . . . 24

|   | B. | Plaintiffs Lack Standing to Challenge NPS' Plans Regarding the Convent Avenue Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 |
|---|---|---|
|   | C. | Plaintiffs Lack Standing to Sue Based on Alleged Procedural Deficiencies . . . . 26 |

| II. | | PLAINTIFFS' CLAIMS REGARDING THE CONVENT AVENUE SITE ARE NOT RIPE AND MUST BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 |
|---|---|---|

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## PRELIMINARY STATEMENT

Defendants Dirk Kempthorne, Secretary of the Department of the Interior, the United States Department of the Interior, Mary Bomar, Director of the National Parks Service ("NPS"), the National Parks Service, and Maria Burks, Commissioner of National Parks of New York Harbor and Superintendent of Manhattan Sites (collectively, the "Government" or "NPS"), by their attorney Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of the Government's motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

Having withdrawn their initial complaint and preliminary injunction motion seeking to prevent the Government from affixing Alexander Hamilton's home, the Hamilton Grange National Memorial (the "Grange") to its new foundation in St. Nicholas Park in a northeast orientation, Plaintiffs filed an amended complaint that now challenges the Government's efforts to complete the rehabilitation and restoration of the Grange. Plaintiffs claim that the Government improperly abandoned its determination to build a community center with park ranger housing on the location on Convent Avenue where the Grange had been located until its move in June (the "Convent Avenue site"), and also raise vague allegations about the proposed landscaping and the interior restoration of the Grange.

Plaintiffs' amended complaint should be dismissed because plaintiffs lack standing to assert these claims. Plaintiffs claim that the Government failed to comply with the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq., but cannot demonstrate that they have been injured by the Government's actions, or that the Court can provide a remedy. Plaintiffs cannot demonstrate how any change to the "interior of the Grange and the

landscaping," as well as the determination to not to include an elevator in the Grange have harmed the Grange or plaintiffs. Moreover, NPS has conferred with the community on several occasions regarding the developments in the plans regarding landscaping, the interior of the Grange and changes in access to the Grange for individuals with disabilities, and, accordingly, plaintiffs had ample opportunity to express their views on these subjects. The NHPA does not require any substantive result in how NPS ultimately concludes the Grange should be rehabilitated, but rather requires only that the Government stop, look, and listen to concerns raised by the public, as it has done consistently throughout this project. Nor can plaintiffs demonstrate standing by pointing to alleged procedural defects without tying such defects to any concrete harm to plaintiffs.

With regard to plaintiffs' claims concerning the development of the Convent Avenue site, plaintiffs' claims are simply not ripe. Without any factual basis, plaintiffs incorrectly assert that the Government has abandoned the development of the site. The plan for the development of the Convent Avenue site, prepared in 1995 as part of the General Management Plan/Environmental Impact Statement ("GMP/EIS"), contemplated that NPS would construct a building for park ranger housing that would also provide space for the community's use. Since 1995, however, NPS' policies and priorities had changed in a manner that made it infeasible to build housing for park rangers. Moreover, the discovery of a deed restriction that limited the permissible uses on the Convent Avenue site further complicated the plans initially contemplated in 1995. Accordingly, NPS decided to amend the GMP/EIS in a process that will include significant community involvement in order to determine how to address the Convent Avenue site. Thus, plaintiffs will have an opportunity to participate in the public process and NPS has made no final

2

determinations regarding use of the Convent Avenue site. Accordingly, this Court should dismiss Plaintiffs' amended complaint for lack of subject matter jurisdiction.

## STATEMENT OF FACTS

### A. Background on the Grange Relocation Project and Convent Avenue Site

Built in 1802, the Grange is the only home ever owned by Alexander Hamilton, one of our nation's founding fathers. See Declaration of Maria Burks, dated June 12, 2008 ( "Burks June Decl.") ¶ 2.[1] In 1962, the United States Congress designated the Grange as a National Memorial with the requirement that the house be relocated from its previous location on Convent Avenue between 141st Street and 142nd Street ("Convent Avenue site").[2] Id. ¶ 2-3; id. Exh. 1. NPS engaged in the planning process for the relocation and renovation of the Grange beginning in the early 1990s. See Burks June Decl. ¶¶ 4, 6, 9, 14.

In 1995, NPS issued the General Management Plan/Environmental Impact Statement regarding the relocation of the Grange to St. Nicholas Park. See Burks Decl. ¶ 4, Exh. 1. The GMP/EIS does not provide, however, a detailed set of project plans that describe exactly how the contractor should implement the project design. See Declaration of Stephen Spaulding, dated October 21, 2008 ("Spaulding Decl."), ¶ 5. Rather, the GMP/EIS is a "General" plan requiring subsequent refinement of project plans and design details in order to translate the intended design into reality. See id. It is customary that design details change during the process of translating

---

[1]     The Declaration of Maria Burks submitted on June 12, 2008 will be referred to as the "Burks June Decl.," and her declaration submitted herewith dated October 21, 2008, will be referred to as the "Burks Decl."

[2]     The Grange had been moved from its original location to Convent Avenue in 1889. See Burks June Decl. ¶ 2.

3

the preferred alternative in the GMP/EIS into the more detailed and specific architectural and engineering plans, and this is true in the design of the Grange.  See id.

In 1995, NPS issued a record of decision regarding the relocation of the Grange.  See Burks Decl., ¶ 5, Exh. 2.  The preferred alternative to relocate the house to nearby Saint Nicholas Park, a park run by New York City Department of Parks and Recreation ("NYCDPR"), was adopted.  Id.  The intention of the relocation project was to recapture, to the greatest extent possible, the appearance and general characteristics of the house within the landscape.  See id. This alternative also contemplated the construction of a new building at the Convent Avenue site that would contain a community center to be used as a public meeting space and for programs related to the Grange, as well as apartments to house NPS employees.  See Burks Decl. Exh. 2 at 3.

**B.      Landscaping, Interiors and Elevators in the Grange at St. Nicholas Park**

NPS has had substantial consultations with the public regarding developments in the design of the Grange's landscaping, interiors and accessibility plan for individuals with disabilities.

**1.      Landscape**

The GMP/EIS did not set forth specific details for the landscaping of the Grange but instead contained a broader conceptual plan to evoke the landscape of Hamilton's period. See Spaulding Decl. ¶ 7.  NPS faced several challenges in this regard, including a lack of documentation demonstrating Hamilton's landscape plan and the very different topography of St. Nicholas Park as compared to the setting in Hamilton's day of the Grange on a promontory overlooking both the Hudson and East rivers.  See id.

4

In developing a landscape plan, NPS examined Hamilton's letters to his wife that described certain plantings around the Grange, and provided this information to the landscape architect. See Spaulding Decl. ¶ 8. NPS also knew that Hamilton had thirteen sweet gum trees prominently planted on the property to reflect and honor the thirteen original states, and incorporated this detail into the landscape plan. See id..

NPS held a number of public meetings presenting the current landscape plans for the Grange that provided the public an opportunity to comment on the plans. For example, on December 21, 2006, NPS presented information regarding the current plans to landscape the Grange, including an explanation of the intent to evoke the Grange's appearance in 1802 and the limitations in that approach. See Spaulding Decl. ¶ 9. NPS also demonstrated the path through the park to the Grange, the grading (slope) of the site, and explained where the plantings and thirteen sweet gum trees would be placed. See id.

NPS also made a presentation to Community Board 9 ("CB 9") on April 9, 2007, attended by purported members of the "Friends of Hamilton Grange" Carolyn Kent and Michael Henry Adams, that referenced, in addition to the orientation of the Grange, plans for site grading and landscaping of the Grange. See Spaulding Decl. ¶10. The drawings presented demonstrated the path to the Grange, the grading of the land, and the location of trees. See id., Exh. 4. During a subsequent site visit on April 12, 2007, NPS presented documents demonstrating three possible designs for the reorientation of the Grange to the southwest, as well as documentation reflecting the northeast orientation of the Grange. See id. ¶ 11. Each of these plans included landscaping details such as the site grading/slope, location of retaining walls, and fencing. See id. Exh. 5. The group discussed in detail the site impacts from each alternative on the landscape, including

5

the need for retaining walls, fence and railings, and the placement of the thirteen sweet gum trees. See id. ¶ 11.

NPS attended a public hearing before the New York City Arts Commission on April 16, 2007. See Spaulding Decl. ¶ 12. NPS displayed the latest version of the landscape plans, a picture of what the site would look like, and presented information on the types of plants that would be planted at the Grange with a picture of each plant. See id., Exh. 6. NPS presented the same information at a CB 9 meeting on December 10, 2007. See Spaulding Decl. ¶ 13, Exh. 7.

At a public meeting held at City College on December 13, 2007, NPS presented the current status of the Grange project and handed out information reflecting the types of plants that would be used at the Grange. See Spaulding Decl. ¶ 14, Exh. 7. NPS discussed landscaping details including grading/sloping, path, retaining walls, shrubbery, perennials and trees. See id. ¶ 14. NPS also held a meeting on May 15, 2008 with the purported "Friends of Hamilton Grange" where, in addition to discussions about the orientation of the Grange, the landscape of the northeast orientation of the Grange was discussed. See Spaulding Decl. ¶ 15.

### 2.    Interiors

Although it is unclear from the amended complaint which alleged changes to the "plans for the interior of the Grange" plaintiffs are claiming violate the NHPA,  see Amended Complaint ¶ 97, the changes since the GMP/EIS regarding the use of the interior of the Grange have been discussed at multiple public meetings. See Spaulding Decl. ¶ 17. NPS discussed the use and function of each of the four floors of the Grange – from bottom to top, the sub-basement, ground floor, first floor and second floor – at the meetings discussed in Section B.1 held on December 21, 2006, April 9, 2007, April 12, 2007, April 16, 2007, December 10, 2007 and

6

December 13, 2007. See id. NPS presented a floor plan of the Grange supplemented with discussion about the intended use of each floor at the December 21, 2007, April 9, 2007, April 16, 2007, December 10, 2007 and December 13, 2007 meetings. See id., Exs. 1, 4, 6, 7. The public had the opportunity to discuss any concerns regarding the interior of the Grange at these meetings. See id. ¶ 17.

### 3. Elevator Access

While NPS originally intended to provide elevator access between each of the floors of the Grange at the time of the GMP/EIS, NPS changed the plans to incorporate a lift in the front porch rather than an elevator. See Spaulding Decl. ¶ 18. NPS discussed with the public on several occasions the changes in access to the Grange for individuals with disabilities, see id., including at the meetings held on December 21, 2006, April 9, 2007, April 12, 2007, April 16, 2007, December 10, 2007 and December 13, 2007. See id. ¶ 25.

The removal of the elevator and substitution of a lift stemmed from the investigative and pre-design process from 2004 to 2005, during which NPS determined that installing an elevator would result in the loss of historic fabric in the backrooms of the Grange on the first and second floors. See Spaulding Decl. ¶ 19. The plan to include an elevator was also removed because in order to have elevator access to the second floor with the attendant pedestrian traffic resulting from maintaining exhibits on the second floor would require the installation of structural supports for the second floor with the concomitant loss of a substantial amount of historic fabric. See id. ¶ 20. NPS thus decided not to include exhibits on the second floor of the Grange, obviating the need for an elevator to the second floor and the structural reinforcements that would result in the loss of historic fabric in the Grange. See id. ¶¶ 20- 22.

7

NPS has taken great care to ensure that individuals with disabilities will be able to access and enjoy the Grange, and developed a lift located in the front porch of the Grange in lieu of an elevator that will provide access to individuals with disabilities between the ground floor and first floor. See Spaulding Decl. ¶¶ 23-24. The lift design allows individuals with disabilities to enter the ground floor and first floor in the same location as all visitors. See id. ¶ 24. The front porch contains no historic materials from 1802, and the lift would not be visible except when in use, such that the lift would not affect the historic appearance of the Grange nor cause the loss of any historic materials. See id. ¶ 24.

## C.    Developments to the Convent Avenue Site

NPS is presently preparing to commence a formal amendment process to the GMP/EIS to address the use of the Convent Avenue site. See Burks Decl. ¶ 7. NPS is proceeding with the amendment process because it cannot build a structure that provides for park ranger housing and a community center with federal funds as had been contemplated in 1995. See id. While NPS policy in 1995 allowed for the provision of employee housing, NPS changed its policy in 1998. The new policy provides: "It is the policy of the NPS to rely upon the private sector to provide housing for NPS employees." See Burks Decl. ¶ 8, Exh. 3. NPS thus cannot provide employee housing at the Convent Avenue site. See id. ¶ 8. NPS had anticipated using the rents through employee housing to fund the management of the structure, and cannot afford to manage the proposed Convent Avenue structure without this income. See id. ¶ 9. NPS has also prioritized the preservation and repair of existing structures over the construction of new buildings. See id. ¶ 10.

8

In late December 2007, the Government also learned of a deed restriction on the Convent Avenue site that limits what can be built on the site. See Burks Decl. ¶ 11. Specifically, the deed provides that in the event the Grange is moved from the site, "...no building will be erected upon the aforesaid rectangle other than a private dwelling not exceeding three stories above the basement." See id. ¶ 11. NPS learned of this deed restriction while reviewing easements over the neighboring church's property while preparing to move the Grange. See id.

The preparation of an amendment to the GMP/EIS will allow NPS to consider alternative means of accomplishing the objectives of NPS with the constraints imposed by NPS policies and priorities. See id. ¶ 12. The process will involve the public and provide ample opportunity for the public to consult with NPS and provide suggestions on how to use the property. See id. ¶ 7.

Although the formal amendment process has not yet commenced, NPS has already started to explore how to use the Convent Avenue site, keeping in mind NPS policies and priorities as well as the community's desire for a community center as expressed in 1995. See id. ¶ 13. NPS invited the community to provide comments on how to pursue the project and explored alternatives. See id. ¶ 14. For example, NPS held a public meeting on December 21, 2006, and discussed that no building was planned at that time for the Convent Avenue site, but that NPS remained committed to working on the project. See id. ¶ 13. NPS continued to discuss the status of the Convent Avenue site at meetings with the Greater Harlem Chamber of Commerce on March 23, 2007, and May 11, 2007; meetings with Community Board 9 on April 9, 2007, and December 10, 2007; meetings with officials from City College of New York ("CCNY") on August 16, 2007, and January 31, 2008; the meeting of the St. Nicholas Park Operations Committee attended by a number of interested neighbors on November 29, 2007; the public

9

meeting NPS held at CCNY on December 13, 2007; and a meeting with Carolyn Kent on April 30, 2007. See Burks Decl. ¶ 14. NPS continued its consultation with the community after learning of the deed restriction on the Convent Avenue site. See Burks Decl. ¶ 15.

During the course of these meetings, NPS received multiple suggestions regarding the development of the Convent Avenue site, but no consensus emerged. See Burks Decl. ¶¶ 16-17. The amendment process will allow NPS to bring all the parties to the table in fully transparent and formalized process that will allow all interested parties to express their views, while considering the changed reality in NPS policies and priorities since the issuance of the GMP/EIS in 1995 and the complications posed by the deed restriction on the Convent Avenue site. See id. ¶ 17.

## D.     Ongoing Efforts to Inform the Community of Developments to the Grange

NPS has and continues to keep the public informed regarding developments pertaining to the Grange and invites and welcomes input and comments from the public. See Burks Decl. ¶ 18. As an example, NPS is in the process of determining the exhibits that will be on display in the Grange, and has hired a contractor with instructions to identify community participants to assist with the preparation and review of materials, and to conduct a public meeting to solicit input from the community. Id. ¶ 19. NPS also has a representative attend all St. Nicholas Park Operations committee meetings to provide the latest updates on the Grange's restoration. Id. ¶ 20. NPS has also commenced an aggressive public interpretive outreach program including the presentation by a park ranger of a powerpoint presentation regarding the Grange, the move of the Grange, and Hamilton's history. See id. ¶ 21. NPS maintains a publicly accessible website with detailed information and photographs regarding the move and subsequent rehabilitation of the

10

Grange. See

Http://www.nps.gov/hagr/parkmgmt/hamilton-grange-national-memorial-move-updates.htm.

See also Declaration of Darren Boch, dated October 21, 2008. NPS also provides updates via

email to individuals who have expressed an interest in the Grange, including several individuals

whom plaintiffs identify as members of the Friends of Hamilton Grange. See id.; Burks Decl. ¶

22.

## E.     Overview of Statutory and Regulatory
##        Requirements of the National Historic Preservation Act

### 1.     Statutory Background of the NHPA

The NHPA was enacted in 1966, and reflected the Congressional determination that "the

historical and cultural foundations of the Nation should be preserved as a living part of our

community life and development in order to give a sense of orientation to the American people."

16 U.S.C. § 470(b)(2). The NHPA authorized the Secretary of the Interior to "expand and

maintain a National Register of Historic Places, composed of districts, sites, buildings, structures,

and objects significant in American history, architecture, archeology, engineering, and culture."

16 U.S.C. § 470a(a)(1)(A). By enacting the NHPA, Congress directed federal agencies to: (1)

consider the impact of federal undertakings on historic resources of national significance; and (2)

assume responsibility for the preservation of historic resources that they own or control.

The core of a federal agency's responsibilities under the NHPA with regard to federal

agency actions can be found in Section 106 of the NHPA, 16 U.S.C. § 470f, which sets forth the

responsibilities of a federal agency having direct or indirect jurisdiction over a proposed federal

or federally assisted "undertaking:"

11

> The head of any Federal agency having direct or indirect jurisdiction over a
> proposed Federal or federally assisted undertaking in any State . . . shall, prior to
> the approval of the expenditure of any Federal funds on the undertaking . . . take
> into account the effect of the undertaking on any district, site, building, structure,
> or object that is included in or eligible for inclusion in the National Register.

Further, the Advisory Council on Historic Preservation ("ACHP") shall have "a reasonable

opportunity to comment with regard to such undertaking." Id.

The Second Circuit has explained that the NHPA is "primarily procedural . . . . It does not

itself require a particular outcome, but rather ensures that the relevant federal agency will [before

an undertaking], consider the potential impact of that undertaking on surrounding historical

places. As such, courts have sometimes referred to Section 106 as a 'stop, look, and listen'

provision." Business and Residents Alliance of East Harlem v. Jackson, 430 F.3d 584, 591 (2d

Cir. 2005); Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 164, 166 (1st Cir. 2003)

(same). "NHPA imposes purely procedural requirements. It requires an agency to 'take into

account' the effect of any 'undertaking' on historical sites. 16 U.S.C. § 470f." City of Oxford v.

FAA, 428 F.3d 1346, 1356 (11th Cir. 2005) (rejecting claimed NHPA violation based on alleged

failure to properly involve consulting parties). See also National Mining Ass'n v. Fowler, 324

F.3d 752, 755 (D.C. Cir. 2003) (stating that the NHPA is an essentially procedural statute and

that Section 106 of the NHPA "imposes no substantive standards on agencies").

The express goal of the NHPA is for the agency to pause to consider the possible

historical consequences of its undertakings before acting. It does not create any substantive

rights requiring that any specific historic quality or historic place is preserved. See City of

Alexandria v. Slater, 198 F.3d 862, 871 (D.C. Cir. 1999) (explaining that to comply with the

NHPA, the agency is only required to "consult with state historic preservation officers to ensure

12

that historic properties in the project area are thoroughly identified and the effects that the project will have on them fully assessed.").

As no particular outcome is mandated by the NHPA, as long as the spirit of law is honored by pausing to make an informed decision concerning an historic place, procedural "agency missteps" may be "disregarded where it is clear that a remand would accomplish nothing beyond further expense and delay." Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61-62 (1st Cir. 2001); see also Abenaki Nation v. Hughes, 805 F. Supp. 234, 250-51 (D. Vt. 1992) (technical violation of NHPA by Army Corps' failure to prepare memorandum of agreement was "not fatal" and did not warrant injunctive relief).

Section 110(f) of the NHPA also governs National Historic Landmarks. That section provides:

> Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal Agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

16 U.S.C. §470h-2(f). Courts have repeatedly held that Section 110 does not impose any substantive requirements on a federal agency. See, e.g., Nat'l Trust for Historic Preservation v. Blanck, 938 F. Supp. 908 (D.D.C. 1996) (legislative history clarifies that Section 110 is merely intended to flesh out requirements of Section 106), aff'd, 203 F.3d 53 (D.C. Cir. 1999) (table); see also New Mexico ex rel. Richardson v. BLM, 459 F. Supp. 2d 1102, 1128-29 (D. N.M. 2006) (same); Coalition of 9/11 Families, Inc. v. Rampe, 2005 WL 323747, at *3 (S.D.N.Y. Feb. 8, 2005) (noting that Section 110 of the NHPA did not add new substantive requirements).

13

## 2.    NPS Compliance with NHPA

NPS complied with the statutory and regulatory requirements of the NHPA throughout

the relocation of the Grange from Convent Avenue to St. Nicholas Park. Specifically, NPS

appropriately (1) prepared a GMP/EIS in 1995 regarding the relocation project as a whole; (2)

entered into a Programmatic Agreement with the New York State Historic Preservation Office

("SHPO"), New York City Department of Parks and Recreation ("NYCDPR"), and the New

York City Landmarks Preservation Commission ("Landmarks Commission"), and consulted with

these entities regarding the project; (3) offered the ACHP the opportunity to consult on the

project; (4) reached out to the Secretary of the Interior; and (5) repeatedly provided information

to the public regarding the development of the Grange and the Convent Avenue site with

opportunities for the community to provide comments.

Pursuant to 36 C.F.R. § 800.14(b), NPS entered into a Programmatic Agreement in 2006

with the SHPO, NYCDPR and the Landmarks Commission. See Declaration of David Uschold,

dated June 12, 2007 ("Uschold Decl."), Exh. 1. Such programmatic agreements are authorized

under numerous circumstances, including, for example, "[w]hen effects on historic properties

cannot be fully determined prior to approval of an undertaking" or "[w]here other circumstances

warrant a departure from the normal section 106 process." 36 C.F.R. § 800.14(b).

Throughout the historical and environmental review process, beginning in 1993, NPS

repeatedly reached out to the ACHP. See Uschold Decl., ¶¶ 1-7. NPS provided ACHP with all

relevant design and construction documents regarding the relocation project, including after the

orientation had changed. Id. ¶¶ 5-6. By letter dated May 28, 2008, ACHP declined to ask NPS

to revisit the formation of the Programmatic Agreement notwithstanding plaintiffs procedural

14

objections to the formation of the Programmatic Agreement. Id. ¶ 7, Exh. 6. In addition, on or about June 22, 2005, NPS consulted with the designee of the Secretary of the Interior, who stated that the Secretary did not wish to participate in consultations for the project. Id. ¶ 9.

## ARGUMENT

The Court should dismiss plaintiffs' amended complaint for lack of subject matter jurisdiction. "The burden of proving jurisdiction is on the party asserting it." Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996) (citation omitted); see also Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (party claiming jurisdiction must allege facts supporting assertion) (citing cases). Here, plaintiffs cannot establish standing for two reasons. First, plaintiffs' amended complaint fails to demonstrate any injury caused by the Government that can be redressed by the Court and, accordingly, plaintiffs' lack standing to pursue this action.[3] Second, plaintiffs' claims regarding the Convent Avenue site are not ripe for judicial review because the agency is planning to amend the GMP/EIS and has not made a final decision regarding the use of the Convent Avenue site.

I.    **THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE AMENDED COMPLAINT BECAUSE PLAINTIFFS HAVE NOT SATISFIED THE ELEMENTS FOR STANDING**

Any party bringing suit in federal court must first establish standing to prosecute the action. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). "Standing cannot

---

[3] In considering a challenge to subject matter jurisdiction under Rule 12(b)(1), the court may refer to evidence extrinsic to the pleadings. See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); Kamen v. Am. Tele. & Telegraph Co., 791 F.2d 1006, 1011 (2d Cir. 1986); see also Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998). Consideration of extrinsic evidence does not convert the motion to one for summary judgment under Fed. R. Civ. P. 56. See United States v. Vazquez, 145 F.3d 74, 80 (2d Cir. 1998).

be inferred, but 'must affirmatively appear in the record.'" Gully v. National Credit Union

Admin. Bd., 341 F.3d 155, 161 (2d Cir. 2003) (citation omitted).  This threshold inquiry of

constitutional standing derives from Article III's limitation of judicial power to actual cases and

controversies, and thus defines "the power of the court to entertain the suit." Warth v. Seldin,

422 U.S. 490, 498 (1975); accord Valley Forge Christian Coll. v. Americans United for

Separation of Church & State, Inc., 454 U.S. 464, 475–76 (1982); Leibovitz v. New York City

Transit Auth., 252 F.3d 179, 184 (2d Cir. 2001); see U.S. Const. Art. III § 2.  The Constitution's

"case or controversy" requirement "obligates the federal courts to hear only suits in which the

plaintiff has alleged some actual or threatened harm to him or herself, as a result of 'a putatively

illegal action.'" Leibovitz, 252 F.3d at 185 (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617

(1973)).  The essence of this constitutional standing inquiry is whether a plaintiff has alleged a

sufficient personal stake in the outcome of the controversy "to ensure the presence of 'that

concrete adverseness which sharpens the presentation of issues upon which the court so largely

depends.'" Lee v. Bd. of Governors of Fed. Reserve Sys., 118 F.3d 905, 910 (2d Cir. 1997)

(quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

 The Supreme Court has identified three elements necessary for "the irreducible

constitutional minimum" of Article III standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555,

560 (1992); see Heldman v. Sobol, 962 F.2d 148, 154 (2d Cir. 1992).  First, a plaintiff must

"suffer[] an injury in fact — an invasion of a legally protected interest which is (a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at

560 (internal citations and quotation marks omitted).  With regard to a threatened injury, as

opposed to actual injury, the injury must be "imminent." Lujan, 504 U.S. at 564.  In particular,

16

"[a]llegations of possible future injury do not satisfy the requirements of Article III." Whitmore

v. Arkansas, 495 U.S. 149, 158 (1980). "A threatened injury must be 'certainly impending' to

constitute injury in fact." Id. Second, a plaintiff must allege, and ultimately prove, a causal

connection by showing that the injury "is fairly traceable to the challenged action of the

defendant." Lujan, 504 U.S. at 560; Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003); New

York Coastal P'ship, Inc. v. United States Dep't of Interior, 341 F.3d 112, 116 (2d Cir. 2003).

Finally, the requested relief must be likely to redress the injury. See Lujan, 504 U.S. at 561;

Baur, 352 F.3d at 632; Fulani v. League of Women Voters Educ., 882 F.2d 621, 624 (2d Cir.

1989).

Plaintiffs raise three categories of allegations in their amended complaint, none of which

confer standing on plaintiffs.  First, plaintiffs raise vague allegations that NPS' decisions

regarding the landscaping, interior use and removal of an elevator from the plans for the Grange

somehow violate the NHPA, without ever specifying the harm to the Grange itself or to the

plaintiffs arising from these determinations.  Second, plaintiffs claim NPS' allegedly

"abandon[ed]" the development of the Convent Avenue site – an allegation that is factually

inaccurate and likewise cannot confer standing.  Third, plaintiffs allege procedural violations –

without tying any such procedural violations to concrete harms to the Grange or the plaintiffs –

that cannot confer standing on plaintiffs.[4]

---

[4] To the extent that plaintiffs are attempting to raise claims based on the orientation of
the Grange, see Amended Complaint ¶ 3, 44, and to the extent that plaintiffs claim that the
Convent Avenue site had to be constructed "simultaneously" with the move of the Grange,
Amended Complaint ¶ 44, these claims are moot and barred by laches as the Grange has already
been affixed to its foundation and plaintiffs had knowledge in advance of the move of the
orientation of the Grange and the current infeasibility of developing the Convent Avenue site.
See Burks June Decl. (orientation of Grange); Burks Decl. ¶¶ 13-14 (Convent Avenue site);

A.    **Plaintiffs Lack Standing To Challenge The Landscaping, Interiors or Elevator Access of the Grange**

1.    **Plaintiffs Failed to Articulate Any Harm to Themselves As a Result of the Landscaping, Interiors or Elevator Access of the Grange**

Plaintiffs' amended complaint fails to demonstrate how the actions taken by NPS

regarding the landscaping, interior or elevator access to the Grange adversely impact the Grange,

much less plaintiffs. The purpose the NHPA is to ensure that an agency "shall, prior to the

approval of the expenditure of any federal funds on the undertaking . . . take into account the

effect of the undertaking on any district, site, building, structure, or object that is included in or

eligible for inclusion in the National Register." 16 U.S.C. § 470f. The NHPA does not require

any specific substantive outcome but rather requires the agency to consider the impact on historic

properties. See Business and Residents Alliance, 430 F.3d at 591. Plaintiffs' amended

complaint contains only conclusory allegations that NPS "will cause harm to important historical

and architectural elements of the Grange" including "the decision to substantially alter the plans

for the interior of the Grange and the landscaping, and the decision to jettison the plan for

elevator access to all floors within the Grange." See Amended Complaint ¶ 80. Absent from

plaintiffs' amended complaint is any explanation as to what plans for the interior of the Grange

and the landscaping have been altered, much less how these alleged alterations negatively impact

plaintiffs. Similarly, plaintiffs fail to explain how not including elevator access to all floors of

Mount Graham Coalition v. McGee, 52 Fed. Appx. 354, 355 (9th Cir. 2002) (finding NHPA claim moot where "the harm that the [plaintiffs] seek to prevent has already occurred and no effective relief for the alleged NHPA violation can be given."); Committee to Save Fox Bldg. v. Birmingham Branch of Federal Reserve Bank, 497 F. Supp. 504, 511-13 (N.D. Ala. 1980) (barring NHPA claim based on laches). Plaintiffs had initially filed a preliminary injunction motion in this action before the Grange had been moved to St. Nicholas Park and ultimately withdrew their motion.

the Grange injures them, especially given the fact that no elevator access existed during Hamilton's lifetime.

Nor could plaintiffs demonstrate any harm that NPS allegedly caused to the Grange by its plans regarding landscaping, interiors of the Grange and the elevator. With regard to landscaping, NPS has made efforts to incorporate historical landscaping elements into the landscape plan for the Grange, notwithstanding challenges, including the different topography of St. Nicholas Park as compared to the original setting of the Grange on a promontory overlooking the Hudson and East rivers, and the lack of documents demonstrating the landscaping plan that existed during Hamilton's lifetime. See Spaulding Decl. ¶ 7. In order to incorporate historical landscaping elements into the present design for the Grange, NPS examined letters from Alexander Hamilton to his wife describing certain plantings around the Grange and provided this information to the landscape architect development a treatment for the Grange. See id. ¶ 8. NPS also included in the plans for the Grange the planting of thirteen sweet gum trees as a memorial to the trees on Hamilton's property during his lifetime. See id.

With regard to plaintiffs' claim regarding altering the "plans for the interior" of the Grange, it is unclear from the amended complaint what actions plaintiffs claim allegedly harmed them. See Amended Complaint ¶ 80. To the extent that plaintiffs are referring to the manner in which the rooms of the Grange will be used by the public after the Grange has been rehabilitated and opened to the public, plaintiffs have failed to allege any damage to the historic structure of the Grange, much less plaintiffs themselves.

Plaintiffs likewise fail to allege that NPS injured them by not including elevator access to all floors of the Grange. To the contrary, the determination not to include an elevator within the

19

interior of the Grange will in fact preserve historic fabric of the Grange.  Specifically, NPS

determined during the pre-design process from 2004 to 2005 that installing the elevator

contemplated in the GMP/EIS would result in the loss of historic fabric in the Grange to the

backrooms on the first and second floors.  See Spaulding Decl. ¶ 19.

       In addition, NPS reevaluated the need for elevator access to the second floor because of

the loss of historic fabric that would be necessary to provide public access to the second floor.

See Spaulding Decl. ¶ 20.  Specifically, in order to provide for elevator access to the second floor

and accommodate the anticipated volume of pedestrian traffic from maintaining exhibits on the

second floor, NPS would need to open the Grange's walls, ceiling and floors to provide structural

reinforcements to the second floor with the concomitant substantial loss of historic fabric.  See

id.  Accordingly, removing the elevator from the plans for the Grange does not cause any harm to

the historic Grange, and in fact helps to preserve the historic fabric of the Grange.

       Nor have plaintiffs alleged how the determination not to include an elevator causes any

harm to plaintiffs themselves, or how omitting an elevator from the plans for the Grange violates

the NHPA.  The current plans for the Grange ensure that all public areas of the Grange will be

fully accessible to individuals with disabilities.  See Spaulding Decl. ¶ 23.  NPS developed a lift

that allows individuals with disabilities to enter the Grange along with the general public –

through the ground floor entrance in front of the house.  See id. ¶ 24.  The lift will be installed in

the front porch of the Grange, and will provide access to the first floor via the same route that all

visitors would access the first floor – from the basement at the front façade.  See id.  No historic

materials of the porch remaining from the 1802 construction exist.  Accordingly, installing the

lift in the front porch will allow NPS to provide full access to individuals with disabilities

20

without impacting historic fabric. See id. The lift is not visible except when it is in use, and thus would not affect the historic appearance of the Grange. See id. Thus, neither the Grange nor the plaintiffs are adversely affected by the decision not to include an elevator in the Grange.

## 2. The Government Has Provided Full Opportunity for Public Participation by Plaintiffs In Its Decisions Regarding the Landscaping, Interiors and Elevator Access to the Grange

Plaintiffs failed to allege and cannot demonstrate that NPS caused plaintiffs any injury because NPS has publicly discussed its plans for the landscaping, interiors and elevator access to the Grange, and plaintiffs have had an opportunity to express their views on these subjects.

The Second Circuit has explained that the NHPA is "primarily procedural . . . . It does not itself require a particular outcome, but rather ensures that the relevant federal agency will [before an undertaking], consider the potential impact of that undertaking on surrounding historical places. As such, courts have sometimes referred to Section 106 as a 'stop, look, and listen' provision." Business and Residents Alliance of East Harlem v. Jackson, 430 F.3d 584, 591 (2d Cir. 2005); Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 164, 166 (1st Cir. 2003) (same). "NHPA imposes purely procedural requirements. It requires an agency to 'take into account' the effect of any 'undertaking' on historical sites. 16 U.S.C. § 470f." City of Oxford v. FAA, 428 F.3d 1346 (11th Cir. 2005) (rejecting claimed NHPA violation based on alleged failure to properly involve consulting parties). See also National Mining Ass'n, 324 F.3d at 755 (stating that the NHPA is an essentially procedural statute and that Section 106 of the NHPA "imposes no substantive standards on agencies").

The express goal of the NHPA is for the agency to pause to consider the possible historical consequences before acting. It does not create any substantive rights requiring that any

21

specific historic quality or historic place is preserved. See City of Alexandria v. Slater, 198 F.3d

862, 871 (D.C. Cir. 1999) (to comply with the NHPA, the agency is only required to "consult

with state historic preservation officers to ensure that historic properties in the project area are

thoroughly identified and the effects that the project will have on them fully assessed").

With regard to each of the specific allegations in plaintiffs' amended complaint regarding

landscaping, interiors and elevator access, plaintiffs cannot demonstrate that they lacked an

opportunity to be heard on these issues, even if plaintiffs ultimately disagree with the

determinations made by NPS. Accordingly, plaintiffs cannot demonstrate that NPS caused any

harm to plaintiffs. Specifically, with regard to landscaping, NPS has made multiple presentations

to the public during which landscaping was discussed, and plaintiffs had an opportunity to

express their views regarding the landscaping of the Grange. For example, during public

meetings on December 21, 2006, NPS described its intent to provide a setting for the Grange as it

would have appeared in 1802, but also explained the limitations in the knowledge the

Government had regarding the appearance of the Grange in 1802. See Spaulding Decl. ¶ 9. NPS

described the path through St. Nicholas Park approaching the Grange, the grading (slope) of the

site, and the areas where plantings would be placed, and the approximate location of the thirteen

sweet gum trees. See id., id. at Exh. 1. NPS made a presentation to Community Board 9 on

April 9, 2007, that addressed the grading and landscaping of the Grange, and held a site visit on

April 12, 2007, during which NPS presented various possible orientations of the Grange,

including a discussion of the need for retaining walls, fences, and railings, as well as the

placement of thirteen sweet gum trees. See id. ¶¶ 10-11. NPS further attended a public hearing

on April 16, 2007, before the New York City Arts Commission where NPS displayed the latest

22

version of the landscape plans for the Grange and a picture of what the site would look like. See id. ¶ 12. NPS also presented information about the plants that would be planted at the Grange. See Spaulding Decl. ¶12, Exh. 6. At a meeting before Community Board 9 on December 10, 2007, NPS presented similar information about the landscape of the Grange. See id. ¶ 13, Exh. 7. During the public meeting held at CCNY on December 13, 2007, NPS updated the community about the current status of the Grange project including landscaping details such as grading/sloping, path, retaining walls, perennials and trees among other information about the Grange. See id. ¶ 14. At a meeting requested by plaintiffs held on May 15, 2008, NPS discussed landscaping of the northeast orientation of the Grange. See id. ¶ 15.

With regard to the interior of the Grange, NPS discussed the use and function of the subbasement, the ground floor, the first floor and the second floor of the Grange with the public at the meetings described above on December 21, 2006, April 9, 2007, April 12, 2007, April 16, 2007, December 10, 2007, and December 13, 2007. See Spaulding Decl. ¶ 17. NPS presented a floor plan supplemented by NPS' explanations about the intended use of each floor. See id., Exs. 1, 4, 6 and 7. NPS thus provided the public an opportunity to raise any concerns regarding the plans for the interior of the Grange, but did not receive any objections or expressions of concern in this regard. See id. ¶ 17.

The public likewise had ample notice and opportunity to comment regarding the determination to remove the elevator form the Grange that had been contemplated in the GMP/EIS. NPS discussed with the public the determination to install a lift that would not damage the historic fabric or historic appearance of the Grange in place of an elevator at the meetings held on December 21, 2006, April 9, 2007, April 12, 2007, April 16, 207, December

23

10, 2007 and December 13, 2007.  <u>See</u> Spaulding Decl. ¶ 25.  NPS presented floor plans at

several meetings that omitted the interior elevator displayed in the GMP/EIS, and NPS explained

that a lift would be provided through the front porch of the Grange in lieu of an elevator.

<u>See</u> Exhibits 1, 4, 6.

### 3.      Plaintiffs' Allegations Regarding Landscaping, Interiors and Elevator Access are Not Redressible by the Court

To the extent that the Government had an obligation to consult with plaintiffs regarding

the landscaping, interiors and elevator access in the Grange, NPS has discharged its duties in this

regard.  There is no other remedy the Court can fashion that has not already been provided to

plaintiffs by NPS.  NHPA is "primarily procedural;" it "does not itself require a particular

outcome," and essentially functions as a "'stop, look, and listen' provision." <u>Business and</u>

<u>Residents Alliance</u>, 430 F.3d at 591; <u>see also</u> <u>National Mining Ass'n</u>, 324 F.3d at 755 (finding

Section 106 of NHPA "imposes no substantive standards on agencies").  NHPA does not dictate

the form that consultations with the public must take.  <u>See</u> <u>City of Oxford</u>, 428 F.3d at 1357 (the

NHPA regulations "do not speak to the form and content of written invitations to meetings with

consulting parties.").  Nor does the remedy plaintiffs seek – an order that NPS "consult" in

connection with the "restoration" and "landscaping" of the Grange, <u>see</u> Amended Complaint at

26, ¶ 3 – request anything other than the consultations NPS has already conducted.  For these

reasons, plaintiffs lack standing to challenge the landscaping, interior design or elevator issues

raised in their amended complaint.

**B.      Plaintiffs Lack Standing to Challenge NPS' Plans Regarding the Convent Avenue Site**

Plaintiffs also assert claims allegedly stemming from NPS' "abandoning altogether (or postponing indefinitely) the Grange Interpretive center." Amended Complaint ¶ 3. Plaintiffs cannot demonstrate any injury-in-fact caused by NPS from this alleged abandonment because there has been no final decision as to the use of the Convent Avenue site. To the contrary, NPS is preparing to amend the GMP/EIS to address how to best use the Convent Avenue site in a manner consistent with the policies and priorities of NPS. See Burks Decl. ¶ 7. Moreover, prior to instituting this process formally, NPS has been consulting with the community to develop suggestions as to how to best to meet the community's needs within the confines of NPS priorities and policies. See Burks Decl. ¶¶ 8-16. During the amendment process, the public, including plaintiffs, will have ample opportunity to consult with NPS and provide suggestions on how to achieve the community's desired used of the property. See Burks Decl. ¶ 7.

The Court cannot redress plaintiffs' grievances by issuing an "injunction directing defendants to construct the interpretive and community center on the Convent Avenue site as described in the Final GMP." Amended Complaint p. 26, ¶ 4 (requests for relief). NHPA simply "does not itself require a particular outcome." See Business and Residents Alliance, 430 F.3d at 591; see also National Mining Ass'n, 324 F.3d at 755. Rather, it ensures that the agency will "stop, look and listen." See Business and Residents Alliance, 430 F.3d at 591; see also Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 (1st Cir. 2003) ("Section 106 is characterized aptly as a requirement that agency decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes."). NPS is complying with the express goal of

25

the NHPA by pausing to consider the possible historical consequences on the Convent Avenue site before proceeding with any particular plan, while at the same time providing a procedural mechanism for all interested parties to address their concerns with the plans for the Convent Avenue site. See, e.g., Coliseum Square Ass'n v. Jackson, 465 F.3d 215, 225 (5th Cir. 2006) ("[S]ection 106 upholds the NHPA's objectives 'neither by forbidding the destruction of historic sites nor by commanding their preservation, but instead by ordering the government to take into account the effect any federal undertaking might have on them.'").

## C. Plaintiffs Lack Standing to Sue Based on Alleged Procedural Deficiencies

Having failed to point to any specific action of NPS that has caused harm to plaintiffs that the Court could redress, plaintiffs point to various alleged procedural irregularities, including, for example, the alleged failure of NPS to consult with the Advisory Council on Historic Preservation, see Amended Complaint ¶ 85, the alleged failure to provide notice to the Secretary of the Interior, id. ¶ 84, and the alleged impropriety of entering into a Programmatic Agreement. See id. ¶ 86. These allegations, however, are insufficient to confer standing as they are generalized grievances that fail to allege any concrete harm to plaintiffs. As noted above, plaintiffs have had ample opportunity to express their concerns at public meetings. "The [Supreme] Court has expressly disavowed the argument that a procedural deficiency can satisfy the concrete-injury requirement 'without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed.)'" Lee v. Bd. of Governors of the Fed. Res. Sys., 118 F.3d 905, 911 (2d Cir. 1997) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 573 n.8 (1992)). Plaintiffs allegations of procedural violations fail to specify any concrete harm that NPS caused them. Plaintiffs' allegations that

26

NPS failed to properly consult with the ACHP and the Secretary of the Department of the Interior

are alleged "on information and belief" and without any personal knowledge. See Amended

Complaint ¶¶ 84-85. Contrary to their assertions, NPS consulted with both ACHP and the

Secretary. See Uschold Decl. ¶¶ 1-9.

Plaintiffs' allegations regarding the allegedly improper Programmatic Agreement

likewise fail to confer standing because the existence of the Programmatic Agreement has not

diminished NPS' consultation with the public, including plaintiffs, on the issues raised in

plaintiffs' amended complaint, including landscaping, interiors and elevator access within the

Grange. See supra section I.A.2. Nor do plaintiffs have any right to be a party to a

Programmatic Agreement even if they were a "consulting group" – which they are not.[5] See

Coalition of 9/11 Families, Inc. v. Rampe, 2005 WL 323747, at *1-2 (S.D.N.Y. Feb. 8 2005)

(finding that consulting party that was not a party to a programmatic agreement had no standing

---

[5]  Although Plaintiff "Friends of Hamilton Grange" claims it is a consulting party, this is
false. Indeed, notwithstanding plaintiffs' assertions, it is not at all clear that "Friends of
Hamilton Grange" even existed from 1995 through the present, much less acted as a "consulting
party" as defined by 36 C.F.R. 800.2(c). First, there is no reference to the "Friends of the
Grange" in the NPS database of Friends groups, see Burks June Decl. ¶ 25. Second, the 1995
GMP/EIS contains a list of agencies and organizations who received or reviewed the draft plan or
submitted written comments, and the "Friends" group is entirely absent from this listing. See
Burks Decl. Exh. 1, at 78-86. Third, the only letter submitted to NPS from the "Friends of the
Grange" was a letter raising the same issues in this complaint in May 2008. See Burks Decl. ¶
24, Exh. 8. Fourth, plaintiffs admit that the "Friends" group did not meet from 1995 through
2006. See Original Complaint ¶ 57. Accordingly, although the GMP/EIS itself mentions the
"Friends of Hamilton Grange," and plaintiffs have introduced a letter from NPS to the "Friends
of Hamilton Grange" from 1995 (albeit without any address on the letter), see Declaration of
John Cardwell, dated June 5, 2008, Exh. 5, there is no evidence that the "Friends of Hamilton
Grange" existed after the GMP/EIS process concluded in 1995 until just before the institution of
this lawsuit.

27

to enforce the programmatic agreement).[6] Moreover, contrary to plaintiffs' assertion, see Amended Complaint ¶ 86, federal agencies have entered into programmatic agreements in cases in which Section 110 is at issue. See, e.g., Coalition of 9/11 Families, Inc, 2005 WL 323747, at *1 (noting that the LMDC entered into a programmatic agreement and finding that "[i]f defendants have complied with their obligations under Section 106 through the Programmatic Agreement, they have also complied with Section 110(b)").

Even if plaintiffs could demonstrate a procedural error regarding the Programmatic Agreement, there has been no injury to plaintiffs in light of NPS' repeated efforts to reach out to the public on each of the issues raised in plaintiffs' amended complaint – landscaping, interiors of the Grange, elevator access and the future of the Convent Avenue site. Courts have found no basis to remand to the agency for technical procedural defects where the agency has already considered historic impacts and the views of the public. See Save Our Heritage, Inc. v. Federal Aviation Administration, 269 F.3d 49, 62 (1st Cir. 2001) (remand to agency not appropriate for additional review that "might look somewhat different in form and follow somewhat more complicated procedures" where the "project's negative consequences have already been analyzed and found to be absent and the findings have been disclosed to interested parties"); see also Abenaki Nation v. Hughes, 805 F. Supp. 234, 250-51 (D. Vt. 1992) (technical violation of NHPA by Army Corps' failure to prepare memorandum of agreement was "not fatal" and did not warrant injunctive relief). Accordingly, because NPS adequately considered all issues and

---

⁶        The ACHP has rejected Community Board 9 and the Hamilton Heights Homeowners Association's complaints regarding the formation of a Programmatic Agreement, and explicitly "decided not to ask the NPS to revisit the 2006 [Programmatic Agreement] for this undertaking." Uschold Decl. Exh. 6; see also Uschold Decl. Exh. 5.

historic impacts, and afforded plaintiffs ample opportunity for public comment, they lack

standing and the Amended Complaint should be dismissed.

## II.   PLAINTIFFS' CLAIMS REGARDING THE CONVENT AVENUE SITE ARE NOT RIPE AND MUST BE DISMISSED

Plaintiffs have not established that there is a case or controversy regarding the Convent

Avenue site that is ripe for review.  The jurisdictional principle of ripeness "prevents a federal

court from entangling itself in abstract disagreements over matters that are premature for review

because the injury is merely speculative and may never occur, depending on the final

administrative resolution."  Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282

F.3d 83, 90 (2d Cir. 2002) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)); accord

Nutritional Health Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir. 1998).  The doctrine "requires

a two-fold inquiry evaluating the hardship to the parties of withholding judicial determination

and evaluating whether the issues are fit for judicial determination."  Seafarers Int'l Union v.

United States Coast Guard, 736 F.2d 19, 26 (2d Cir. 1984) (citing Abbot Labs., 387 U.S. at 149).

The "central concern" of the ripeness doctrine "is whether the case involves uncertain or

contingent future events that may not occur as anticipated, or indeed may not occur at all."  13A

Wright & Miller, Federal Practice & Procedure Juris. 2d § 3532 (2004); accord AMSAT Cable

Ltd. v. Cablevision of Conn. Ltd. P'ship, 6 F.3d 867, 872 (2d Cir. 1993).  The jurisdictional

principle of ripeness "prevents a federal court from entangling itself in abstract disagreements

over matters that are premature for review because the injury is merely speculative and may

never occur, depending on the final administrative resolution."  Dougherty v. Town of N.

Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002) (citing Abbott Labs. v.

29

Gardner, 387 U.S. 136, 148-49 (1967)); accord Nutritional Health Alliance v. Shalala, 144 F.3d

220, 225 (2d Cir. 1998); see also Alabama State Federation of Labor, Local Union No. 103,

United Bhd. of Carpenters & Joiners of Am. v. McAdory, 325 U.S. 450, 461 (1945) ("It has long

been [the Supreme Court's] considered practice not to decide abstract, hypothetical or contingent

questions, or to decide any constitutional question in advance of the necessity for its decision.")

(citations omitted). The doctrine "requires a two-fold inquiry evaluating the hardship to the

parties of withholding judicial determination and evaluating whether the issues are fit for judicial

determination." Seafarers Int'l Union v. United States Coast Guard, 736 F.2d 19, 26 (2d Cir.

1984) (citing Abbot Labs., 387 U.S. at 149).

Plaintiffs have not presented an issue fit for judicial review at this time regarding the

Convent Avenue site.  "This fitness inquiry is concerned with whether the issues sought to be

adjudicated are contingent on future events or may never occur." Isaacs v. Bowen, 865 F.2d 468,

478 (2d Cir. 1989).  Here, plaintiffs incorrectly claim that NPS "abandon[ed] altogether (or

postpon[ed] indefinitely) the building of a" community center on the Convent Avenue site.

Amended Complaint ¶ 3.  This claim is false.  Rather, in light of practical considerations

including the change in NPS policy regarding the construction of park ranger housing, the

inability of NPS to maintain a community center without the income that would be generated

through park ranger housing in the building, and the presence of a deed restriction, NPS has

decided to amend its GMP/EIS in order to develop a new plan for the use of the Convent Avenue

site.  See Burks Decl. ¶¶ 7-17.  Accordingly, no final determination has been made by NPS

regarding how the site will be used.  Plaintiffs will have a full opportunity to express their views

regarding the future use of the Convent Avenue site during the GMP/EIS amendment process.

The second ripeness consideration – the hardship inquiry – also demonstrates that
plaintiffs' preliminary injunction application is unripe for review. This test requires assessment
of whether the plaintiffs would suffer an impact that "is sufficiently direct and immediate as to
render the issue appropriate for judicial review at this stage," Abbott Laboratories, 387 U.S. at
152, or "whether the challenged action creates a direct and immediate dilemma for the parties."
Marchi v. Bd. of Coop. Educ. Servs., 173 F.3d 469, 478 (2d Cir. 1999). Plaintiffs will suffer no
"direct and immediate" impact absent immediate judicial relief, because plaintiffs will have
every opportunity to consult with NPS regarding the future use of the Convent Avenue site. The
NHPA requires nothing further. See National Mining Ass'n, 324 F.3d at 755 (stating that the
NHPA is an essentially procedural statute and that Section 106 of the NHPA imposes no
substantive standards on agencies). Therefore, plaintiffs' claims are not ripe and the Amended
Complaint should be dismissed for lack of jurisdiction.

31

## CONCLUSION

For the reasons stated above, plaintiffs' amended complaint should be dismissed.

Dated: New York, New York
October 21, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the Government

By: _____
LAWRENCE H. FOGELMAN
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2719
Fax: (212) 637-2730
Email: lawrence.fogelman@usdoj.gov

32