UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
:
FRIENDS OF HAMILTON GRANGE and DR. JOHN :
CARDWELL,                                :
                        Plaintiffs,      :
                                         :
            -v-                          :
                                         :
KEN L. SALAZAR, Secretary of the         :    08 Civ. 5220 (DLC)
Interior; U.S. DEPARTMENT OF THE         :
INTERIOR; MARY A. BOMAR, Director of     :    OPINION & ORDER
the National Park Service; NATIONAL      :
PARK SERVICE; and MARIA BURKS,           :
Commissioner of National Parks of New    :
York Harbor and Superintendent of        :
Manhattan sites,                         :
                        Defendants.[1]   :
----------------------------------------X

For Plaintiffs:
Matthew D. Brinckerhoff
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019

For Defendants:
Lawrence H. Fogelman
Assistant United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007

DENISE COTE, District Judge:

     This lawsuit concerns the relocation of the historic home

of Alexander Hamilton, a National Memorial and National Historic

Monument.  Built in 1802, Hamilton's home was initially

relocated to make way for Manhattan's current grid layout, and

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Secretary Salazar is substituted as defendant for his
predecessor in office, Dirk Kempthorne.

found its way to the neighborhood now known as Hamilton Heights in northern Manhattan.  In June 2008, the National Park Service ("NPS") moved Hamilton's home to a more pastoral setting in St. Nicholas Park and began its restoration.  That relocation and restoration process, as well as the redevelopment of the land formerly occupied by Hamilton's home, have given rise to this lawsuit.  The plaintiffs represent community members involved in the effort to restore Hamilton's home.  Aggrieved by the government's efforts, they claim that the government has betrayed promises made to the Hamilton Heights community, made decisions regarding Hamilton's home that degrade its historical and architectural character, and failed to engage in consultations with the public and various governmental bodies as required by law.

Having withdrawn an earlier application for a preliminary injunction to enjoin defendants from situating Hamilton's home on its new foundation in St. Nicholas Park, plaintiffs filed an amended complaint on August 8, 2008.  In contrast to the pleading that began this litigation with a complaint about the orientation of Hamilton's home on its new foundation, the revised pleading largely concerns the state of the lot from which his home was moved.  Defendants have moved to dismiss plaintiffs' amended complaint in its entirety for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), Fed. R.

Civ. P.  They argue that plaintiffs lack constitutional standing, that some of their claims are not ripe or are barred by mootness and laches, and that there is no final agency action that would permit suit under the only statute which confers standing on the plaintiffs, the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").

BACKGROUND

The following facts are taken from the amended complaint, and, where undisputed, from affidavits submitted by defendants with their motion to dismiss and in preparation for the preliminary injunction hearing.[2]  Along with their motion papers, defendants submitted affidavits from defendant Maria Burks, Commissioner of National Parks of New York Harbor and Superintendent of Manhattan sites; Stephen Spaulding, Chief of the Preservation, Architecture, Engineering and Maintenance Division of the Northeast Region of the NPS; and Darren Boch, Public Affairs Officer for the National Parks of New York Harbor since August 2006.  Plaintiffs did not submit any evidence in opposition.

The chronology of events is undisputed, although plaintiffs' allegations reflect an inference that the public

---

[2] Defendants refer to these affidavits in their memoranda supporting their motion to dismiss, and plaintiffs do not object.

consultation that has occurred has been inadequate[3] or that defendants failed to consult with required government bodies. The parties also disagree regarding whether or not plaintiff The Friends of Hamilton Grange exists as a formal entity.

A.  History of the Grange

Alexander Hamilton -- a founder of the United States, first Secretary of the Treasury, and coauthor of the <u>Federalist Papers</u> -- built Hamilton Grange (or the "Grange") circa 1802.  Designed by John McComb Jr., who also contributed to the design of New York's City Hall, it was the only home Hamilton ever owned.  The Federal-style, wood-framed Grange was originally located on the rural north end of the island of Manhattan, on the ridge of Harlem Heights.  This location offered wide views of the Hudson Palisades to the west, and the Harlem Plains and East River to the east.

The Grange was moved from its original location in 1887, when the newly constructed Manhattan street grid reached the northern part of Manhattan, to a subdivided row house lot on Convent Avenue in the Hamilton Heights neighborhood of Harlem, wedged between a church and an apartment building and stripped of its front and back porches.  This neighborhood is represented by Community Board 9 ("CB 9").  Also known as "Sugar Hill," the

---

[3] Plaintiffs do not, however, dispute the accuracy of defendants' evidence of the occurrence of the consultations.

neighborhood is listed on the National Register of Historic Places and is known as well for its role in Harlem culture and politics.  In 1960, the Grange was declared a National Historic Landmark and was consequently listed on the National Register of Historic Places.  Two years later, Congress designated the Grange one of the nation's forty-four National Memorials.

B.  The Decision to Restore the Grange

In 1987, as part of the bicentennial celebration for the United States Constitution, a neighborhood civic association planted a sweet gum tree in front of the house.  The association, known as the Hamilton Heights Homeowners Association ("HHHA"), then commenced a campaign to persuade the NPS to restore the Grange, ultimately raising $8,500 for the restoration effort by offering neighborhood tours.  Community members volunteered their time to support the Grange, and used the building for meetings and events.

In 1990, the HHHA and the NPS entered into a Memorandum of Agreement.  The HHHA agreed to raise funds and contribute historic materials, and the NPS agreed to "administer and develop the Hamilton Grange National Memorial according to plans developed through a documented process of public participation, commensurate with available funds."  The HHHA donated the $8,500 it had raised to the NPS.

In the early 1990s, the NPS commenced a process of consultation and public participation regarding various restoration proposals for the Grange, culminating in a draft General Management Plan and Environmental Impact Statement ("Draft GMP") issued pursuant to the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., in 1993.  The Draft GMP proposed moving the Grange to nearby St. Nicholas Park.  In the lot where the Grange currently stood, the Draft GMP proposed either a park or a community center constructed on the existing foundation.  612 community members signed petitions opposing the move, for reasons including fears that the lot vacated by the Grange would attract crime and that the NPS threatened community control over the Grange.

C. Formation and Early Activities of The Friends of Hamilton
   Grange

The amended complaint alleges that, in 1994, the NPS convened an umbrella group of concerned individuals and organizations, including preservationists, members of CB 9, and property owners, including the HHHA, to form The Friends of Hamilton Grange ("The Friends"), a plaintiff in this lawsuit. The amended complaint classifies The Friends as an "unincorporated association."  In addition to members of the

HHHA, it asserts that The Friends' members include, among others, the 141st and 142nd Street Block Associations, historian Michael Henry Adams, and CB 9 member Carolyn Kent.  Its chairperson is plaintiff Dr. John Cardwell, a resident of the Hamilton Heights neighborhood since 1980 and president of the HHHA from 1991 to 2001.

According to the amended complaint, The Friends performed outreach and mediation that generated support for a plan to move the Grange to St. Nicholas Park.  Some members of The Friends are listed in their individual or organizational capacities as parties with whom the NPS consulted when preparing the Draft GMP, but The Friends organization does not appear on the list. Nonetheless, the amended complaint alleges that the NPS identified The Friends as a "present and future stakeholder and consultant in all issues concerning the restoration of the Grange," and committed itself to collaborate with The Friends on the restoration effort.

D.  The Draft GMP

The Draft GMP presented four alternative proposals for the Grange.  Alternative 4 proposed restoring and relocating the Grange to nearby St. Nicholas Park, orienting the house to the northeast in its new location, whereas it had been oriented to the southwest in its historic location.  Such an orientation would have situated the Grange with the entrance to the house

facing onto the street, rather than out onto the park.  The
proposed orientation of the house was an issue of concern.  For
example, the New York City Landmarks Preservation Commission, in
its official comment to the NPS on the Draft GMP, stated that

> the decision on the proper orientation of
> the house should consider not only the
> historic orientation, with the front door
> facing south, but also that the orientation
> must make sense on the proposed site, which
> has a north-facing street frontage; and that
> any fence placed around the site be as far
> removed from the mansion as possible and
> that the distance between the house and the
> high retaining wall at the edge of the park
> be increased, if possible, so that the
> mansion can read as a free-standing country
> retreat in the middle of a landscape.

The NPS, in its official response, replied that the proposed
southerly orientation of the house "might be changed during the
design process in consultation with The Friends of the Hamilton
Grange group, the state historic preservation office, the
Landmarks Commission, and other state and local organizations."

On May 25, 1993, the Draft GMP was distributed to the
Advisory Council on Historic Preservation ("ACHP"), an
independent federal agency established by Section 201 of the
NHPA, 16 U.S.C. 460(i)(a) that, among other duties, consults
with federal agencies whose undertakings may affect properties
included in or eligible for inclusion in the National Register
of Historic Places.  16 U.S.C. § 470f.  The ACHP declined to
comment.

E.  The Final GMP

CB 9 approved the plan to move the Grange in 1994, stating that the relocation would allow 1) a full restoration of the Grange that better reflected its original rural setting, and 2) construction of an NPS ranger residence, exhibition space, and community reception room on the Convent Avenue site.  In 1995, the NPS issued its Final General Management Plan and Environmental Impact Statement (the "Final GMP"), as required by the NHPA.  It included the four alternative proposals presented in the draft version.  Alternative 4 had changed in one notable respect, however: the Grange, upon moving to St. Nicholas Park, would be oriented towards the southwest.  The Final GMP cited historic authenticity as the rationale for the relocation, and the NPS proposed to attempt to recapture the Grange's original appearance and characteristics.  The Final GMP provided that, following the move of the Grange to its new site, development of the Convent Avenue site would proceed simultaneously with restoration of the Grange.  Circulating the GMP in its final form did not, however, mean that the details of the project could not change as the general plan was translated into specific architectural and engineering plans for the Grange. The Final GMP did not set forth specific details for the landscaping of the Grange, but instead described a conceptual plan.

F.  The Friends' Role During and Following Completion of the
    Final GMP

     The amended complaint asserts that at some unspecified

time, CB 9 called for the NPS to allow The Friends an active

support and oversight role toward the Grange.  It adds that NPS

responded that The Friends would serve that role.  The NPS

distributed the Final GMP to members of The Friends and

committed to work with the organization, stating in the Final

GMP that The Friends of Hamilton Grange "would be actively

involved with the National Park Service in the future

restoration of Hamilton Grange and in mitigation of any concerns

that might arise, especially those that arise from moving the

Grange from its current site."  With regard to the development

of an interpretive and community center on the Convent Avenue

cite, the Final GMP provided that "The Friends of Hamilton

Grange group would be actively involved in all aspects of

planning the new structure."

     As explained by Burks, however, to become an official

"Friends Group" of the NPS, a group must have an agreement

detailing the nature of the relationship.  NPS has no record

that The Friends ever submitted a letter or other request to

become a consulting party on the relocation of the Grange.

Neither The Friends nor any other group referencing Hamilton

Grange National Memorial is listed on the NPS Friends Group

Directory.  Plaintiffs acknowledge that The Friends did not meet
formally from 1995 until 2006.  Aside from an unaddressed 1995
letter from NPS to The Friends, NPS is unaware of any
communications from or with the group aside from a letter
received in May 2008, shortly before the instigation of this
lawsuit.

G.  Restoration Commences

     From 1995 until 2001, the NPS worked to acquire an easement
on St. Nicholas Park so that the Grange could be situated there.
Members of the Hamilton Heights community grew frustrated with
the slow pace of the process, and wrote letters to the NPS
expressing their concern.  In response to a July 13, 2000 letter
from the Hamilton Heights West Community Preservation
Organization ("HHWCPO"), NPS Superintendent of Manhattan sites
Joseph Avery wrote that the transfer of an easement to the NPS
required review under New York City's Uniform Land Use Review
Procedure ("ULURP").  During the ULURP review, the planned
orientation of the Grange was changed again: upon relocation,
Hamilton Grange would face northeast.  The documents prepared
for the ULURP review reflected this change, both in their text
and graphically, in the form of maps of the move route and the
receiving site in St. Nicholas Park.  These graphics also
represent that the rear wall of the Grange -- onto which the
windows of the originally sunlit dining room and study open --

would face Steinman Hall of the City College of New York, a large, solid building.  CB 9 approved NPS's ULURP application on June 21, 2001.  The easement was conveyed to the NPS by the City of New York on April 24, 2002.

In its 2000 letter, the HHWCPO had also inquired about the Convent Avenue project that would replace the Grange. Superintendent Avery responded that planning would "begin soon." The HHWCPO made multiple follow-up calls, and was informed in 2001 and 2004 that no further planning was under way.  When the NPS obtained partial funding for the Final GMP for fiscal year 2007, plaintiffs believe that no funds for the Convent Avenue site were included.

H.  The Programmatic Agreement

On March 24, 2006, NPS entered into a Programmatic Agreement with the New York State Office of Historic Preservation, the New York City Department of Parks and Recreation, and the New York City Landmarks Preservation Committee pursuant to the regulations implementing the NHPA. See 36 C.F.R. § 800 et seq.  NPS invited the ACHP to participate as a signatory to the Programmatic Agreement, but ACHP declined to do so, requesting instead that NPS provide it with an executed copy of the agreement.  NPS also provided ACHP with design development drawings for the Grange on December 12, 2006. According to its terms, the agreement "evidences that the NPS

12

has afforded the NY [State Historical Preservation Officer], NYC Parks, and NYC [Landmarks Preservation Commission] an opportunity to comment on the relocation/rehabilitation of the Grange."  This agreement was not publicized, and neither The Friends nor CB 9 was included in its development.  It provided for "a public-private partnership to plan and develop a new multi-use facility" on the Convent Avenue site, and planned to "pursue the replacement facility in a separate action and  . . . as a separate [NHPA] Section 106 action."[4]  Plaintiffs aver that they did not discover the Programmatic Agreement until March 2008, when the co-chair of CB 9 obtained a copy.

I.  Changes to the Plans for the Convent Avenue site

On December 21, 2006, after Congress approved funding in 2006 (for its 2007 budget) to move the Grange, NPS conducted one of three public informational meetings to provide details regarding the Grange project.  At the meeting, NPS explained that no construction was currently scheduled for Convent Avenue but that NPS was "still committed to working on the project." Between the issuance of the Final GMP and the relocation of the Grange in 2008, external events disrupted plans for simultaneous construction on the Convent Avenue site.  In 1998, NPS policy changed such that it delegated the provision of park ranger housing to the private sector, conflicting with the Final GMP's

---

[4] NHPA Section 106, 16 U.S.C. § 470f, is desribed below.

provision for the construction of park ranger housing on the
Convent Avenue site.  Without the ability to provide and collect
rent from employee housing on the site, the NPS would be
deprived of the funds it had planned to use to manage the
Convent Avenue structure.  NPS consequently decided to amend the
Final GMP.  Later, in December 2007, the Government learned of a
1924 deed restriction on the Convent Avenue site limiting the
height of any non-private dwelling erected on the site to three
stories.  The formal GMP amendment process has not yet
commenced.  NPS continued to discuss the status of the Convent
Avenue site during meetings held in 2007 and 2008 with
organizations and individuals including the Greater Harlem
Chamber of Commerce, CB 9, officials from City College of New
York, The Friends' member Carolyn Kent, and the St. Nicolas Park
Operations Committee.

J.  Debate Regarding the Orientation of the Grange

Members of CB 9, HHHA, and HHWHCO attended the December 21
meeting.  The minutes of the meeting reflect extensive
discussion of the proposed reorientation of the Grange, in
addition to the discussion of the Convent Avenue site described
above.  Community residents expressed concern that the Grange,
if oriented as proposed by the NPS, would face onto a street
rather than the park, and that that orientation would affect the
views from and the light entering the dining room,

14

"compromis[ing] the experience of the house."  As evidenced by the minutes, these individuals perceived the proposed reorientation of the Grange as a breach of trust by the NPS, which had promised the community that the relocated Grange would be situated in an historically authentic manner.

CB 9's Parks and Landmarks subcommittee held a meeting on April 9, 2007 to address the Grange project.  In attendance were Spaulding and defendant Burks, who had assumed responsibility for the Grange in February 2007.  The Friends members Carolyn Kent and Michael Henry Adams also attended.  At the meeting, several community members again expressed dissatisfaction with the NPS's decision to reorient the Grange, contending that the reorientation would compromise historical authenticity and would destroy views and lighting important to the Grange's dining room.  Moreover, with the Grange oriented towards the northeast, the dining room would face the wall of a building rather than a sylvan setting.  Burks indicated to those present at the meeting that she would revisit the issue of the Grange's orientation. She instructed her staff to prepare scale drawings for three possible designs for the reorientation of the Grange to the southwest, a table-top scale model of the site, and to stake out the footprint of the house on the St. Nicholas Park site.

By memorandum dated April 10, 2007, the New York City Landmarks Preservation Commission granted its approval to the

proposed plans for the Grange.  The Commission had granted its approval to the Draft GMP in 1993 "subject to the condition that the house be sited so that the mansion can read as a free-standing country retreat in the middle of a landscape and contingent upon final documents and drawings."  The Commission approved the final plans for the Grange's relocation and reorientation, finding that the proposed northeast orientation of the Grange satisfactorily "relates to its original siting as a mansion on a promontory."  Revisions to the Grange plans made between 1993 and 2007 were "consistent with the intent of the original approval."  The Commission further endorsed the location of a wheelchair lift on the Grange's front porch, finding that the "lift has been integrated into the design of the portico so as to remain not visible when not in use."  This represented a change from the Final GMP, in which, as described below, the NPS had intended to provide access to the Grange through an elevator inside the Grange.

A site visit was conducted on April 12, and was attended by Burks, Spaulding, and several community representatives, including members of The Friends.  NPS presented three possible designs for the reorientation of the Grange, and attendees "actively discussed the pros and cons" of the various alternatives available, according to Burks.  Specifically, attendees discussed the proposed northeast orientation of the

Grange as well as three possible southwest orientations.  Also discussed was the requirement that the relocation of the Grange comply with the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12101 et seq., and the ways that the various orientations would affect the ease and cost of compliance.  At the end of the site visit, Burks indicated that she would review the matter and respond to the community members' concerns as quickly as possible.  When members of The Friends inquired whether the house could be rotated on the foundation that had already been designed for the relocated Grange because of the symmetry of the house's form, Spaulding replied that such a solution was feasible, with only small changes and minor expense and delay.

The Art Commission of The City of New York, a regulatory group charged with monitoring and approving any changes to statues or other structures in city public spaces, held a public hearing on the Grange on April 16.  City rules require the Commission to notify the affected Community Board in advance of such hearings.  No member of CB 9 attended the hearing.  Burks and Spaulding presented the plan for the Grange, and the Commission unanimously approved it.

Burks made her decision on April 16, determining that the northeast orientation was the best option for the Grange.  According to Burks, she based this decision on consideration of

17

(1) the views of community members who were dissatisfied with
the proposed northeast orientation; (2) the scale drawings and
models prepared for the April 12 site visit; (3) a consideration
of the advantages and disadvantages of the four alternative
orientations discussed during the site visit; (4) discussions
with NPS staff who had worked on the Grange project; and (5) her
observations at the site visit.  Substantively, Burks
considered, inter alia, the appearance of the Grange in its
proposed northeast and southwest orientations, and the resultant
historical authenticity of the Grange's appearance; alterations
to the Grange's façade and foundation necessitated by a
southwesterly orientation; and ease of compliance with the ADA,
as well its aesthetic repercussions.  She determined that
visitors approaching the Grange in its northeast orientation
would apprehend it in the most historically accurate manner,
approaching it from below as Hamilton's guests did and viewing
the historically unique decorated front door and tripartite
window design.  Moreover, the northeast orientation did not
require any retaining walls or railings and allowed the Grange
to be viewed as a freestanding country retreat in the middle of
a landscape, better approximating its historic setting and
satisfying the explicit condition the New York City Landmarks
Preservation Committee had placed on its assent to the 1993
Draft GMP.

Any of the three southwest orientations, by contrast, would obscure this façade by having it face the wall of Steinman Hall, and would force a visitor to approach the rear of the Grange and walk around the building to approach the front.  Each of these orientations also would have forced NPS to remove three of the historic front steps of the Grange, altering the façade, and more deeply carving into the nearby hill to create space for the foundation.  Two of the three southwest orientations would have required the construction of a retaining wall and fence approximately five feet from the front door to retain the nearby hill, in derogation of the City Landmarks Preservation Commission's recommendation that any retaining fence "be as far removed from the mansion as possible."  The third orientation would have required the addition of a four-foot-tall railing across a portion of the front façade.

Finally, Burks recognized that the northeast orientation would provide a less sylvan setting for reflection in the dining room mirrors.  To compensate, NPS planned to plant thirteen sweet gum trees between the house and Steinman Hall.  The trees would be reflected in the mirrored doors and "would, as closely as possible, replicate the original view, given all other constraints."

Burks notified at least some of the community members who had attended the site visit of her decision by letters dated

April 17 and April 19.  She explained that the Grange project was required to comply with the ADA, and that, in a southwesterly orientation, provision of wheelchair access "creates a number of undesirable impacts on the landscape, including the addition of extended fill, retaining walls, and railings."  Further, Burks explained, the NPS believed that "the view of the house from West 141st street, the closest public access point, must include the handsome front façade.  This view of the house front was important to Alexander Hamilton as, for example, it includes the tripartite window.  It must also be important to our presentation to visitors today."  On June 21, 2007, the New York State Preservation Office reviewed and approved the draft construction documents for the Grange Project, in accordance with NHPA Section 106.

K.  Alterations to Plans for the Interior of the Grange

    Although it is unclear from the amended complaint which changes to the interior of the Grange plaintiffs claim violate the NHPA, NPS discussed the interior of the Grange at public meetings on December 21, 2006, April 9, 2007, April 16, 2007, December 10, 2007, and December 13, 2007.  While determining which exhibits will be displayed in the Grange, NPS has instructed its contractor to solicit community participation in the preparation, selection, and review of materials.

NPS also made changes to the elevator access between the Final GMP and the development of final construction plans.[5] NPS originally intended to provide elevator access between each floor of the Grange, but later changed the plans to incorporate a lift within the front porch instead.  Defendants explain that this decision stemmed from the 2004-2005 pre-design process, which revealed that installing an elevator would result in the loss of historic fabric within the Grange and require structural supports to be installed for the second floor.  Instead, NPS decided not to include exhibits on the second floor of the Grange, obviating the need for an elevator.  While allowing individuals with disabilities to enter the ground floor and first floor from the same entrance as all visitors, the lift would not be visible except when in use, and its installation in the front porch would not disturb any historic materials because the front porch contains none.  NPS discussed its decision to substitute a lift for an elevator stopping inside the Grange on every floor at public meetings held on December 21, 2006, April 9, 2007, April 12, 2007, April 16, 2007, December 10, 2007, December 13, 2007.  It provided construction documents to ACHP on May 21, 2007.

---

[5] Plaintiffs raise claims related to the jettisoning of elevator access to all floors to the Grange but do not explain what happened.  The information in this paragraph is drawn from defendants' submissions.

L.  Community Discontent

     The NPS held a public meeting on December 13, 2007 to
address the relocation of the Grange.  Several members of The
Friends attended and protested the orientation of the Grange in
its new location and the cancellation of the community center.
The NPS did not respond.  Community members, including
plaintiffs, commenced a letter writing campaign to
Representative Charles Rangel in the beginning of 2008,
protesting the northeastern orientation of the Grange and the
alleged abandonment of the community center project for the
Convent Avenue site and seeking Representative Rangel's
mediation of the dispute between the community and Burks.  In
March 2008, CB 9 voted twenty-seven to three to protest the
NPS's "willful violations" of commitments made to the community
in the Final GMP.  The HHHA also wrote NPS with a Freedom of
Information Act ("FOIA") request, expressing concern about the
orientation of the Grange and the development of the Convent
Avenue site.  The NPS's April response to the FOIA request did
not disclose the process by which the decisions regarding the
two issues occurred.  The response did reveal the myriad
approvals the project had received.  Plaintiffs allege that
these approvals, procured from the New York State Historic
Preservation Office, the New York City Department of Parks, and
New York City Landmarks Preservation Commission pursuant to the

Programmatic Agreement, occurred without public notice or proceedings.  The Friends sent a letter of appeal to the NPS on May 13, 2008, alleging that its use of a Programmatic Agreement violated the NHPA and its implementing regulations, and that further action to reorient the Grange to the northeast violated the law.

Spaulding met with members of The Friends on May 15, 2008. He again presented the justification for the northeasterly orientation and explained the design alternatives previously discussed during the April 12 site visit, at which certain members of The Friends were present.  An architect, Paul Sheehan, speaking on behalf of Cardwell and others, argued that NPS could achieve compliance with the ADA in a manner other than the three alternative drawings prepared a year earlier in anticipation of the April 2007 site visit.  The objections voiced at the meetings concerned the overall appearance of the landscaping surrounding the Grange, rather than specific aspects of its grading, plantings, or other landscaping details.  In response to requests from community groups, including CB 9 and the HHHA, the ACHP reviewed NPS' compliance with the NHPA in late May 2008.  After reviewing the information provided by NPS and CB 9, ACHP sent a letter to the chairwoman of CB 9 stating that it would not ask NPS to revisit the Programmatic Agreement.

NPS has conducted additional forms of public outreach and consultation during the restoration project.  It maintains a publicly accessible website with information and photographs regarding the restoration of the Grange.  It also provides email updates to individuals who have expressed an interest in the Grange, including several members of The Friends.

M.  Relocation of the Grange and Commencement of the Instant Lawsuit

During the last week in May and the first week in June 2008, Hamilton Grange was lifted off its foundation at the Convent Avenue site and raised onto a moving platform for conveyance to St. Nicholas Park.  The platform was moved from the Convent Avenue site into St. Nicholas Park on June 7.  The Grange was briefly placed on a bed of dirt, before being set on a permanent foundation.  The transfer to the foundation was made as swiftly as possible to limit the cracks and other damage to the fabric of the building that was occurring without the support of a stable foundation.  As of that time, a reorientation of the Grange to the southwest would have been nearly impossible.  The foundation would have had to be completely demolished and reconstructed, and the Grange would have had to remain in the interim on the dirt bed, suffering immeasurable damage to its structure.  Moreover, the reconstruction would have had to await more permits and funding.

24

Plaintiffs commenced this action on June 6, by which time the Grange was fully separated from its foundation and situated on the moving platform.  Plaintiffs sought a temporary restraining order and preliminary injunction enjoining defendants from situating the Grange on its new foundation in St. Nicholas Park facing any direction other than southwest. Pursuant to a schedule set on June 9, defendants submitted their opposition to plaintiffs' motion on June 13, and plaintiffs replied on June 16.  A hearing was held on June 17, at which time plaintiffs withdrew their motion and stated that they wished to amend their complaint.

At a telephone conference held with both parties on the record on July 10, plaintiffs reiterated their desire to amend the complaint.  They were advised that their original complaint had not clearly shown that the named plaintiffs had constitutional standing to bring the lawsuit.  Plaintiffs were also warned that a plaintiff must have a concrete injury, not simply be left out of consultation, to have standing to bring a claim.

Plaintiffs filed their amended complaint on August 8, 2008. They bring causes of action for violations of NHPA Sections 106 and 110, 16 U.S.C. §§ 470f and 470h-2 ("Sections 106 and 110"), the Act's accompanying regulations, 36 C.F.R. § 800 et seq., and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et

seq.  Their claims fall into roughly three categories: that
defendants' decisions regarding the design of the Grange will
harm the Grange, that defendants' abandonment of the
simultaneous development of the Convent Avenue site will also
harm the Grange and/or the Hamilton Heights neighborhood,[6] and
that defendants failed to follow required procedures in
developing plans for the Grange and the Convent Avenue site.
The gravamen of the amended complaint is that defendants
violated two sections of the NHPA and their implementing
regulations: Section 106, which requires that a federal agency,
prior to initiating any "undertaking" involving an historic
property, "take into account the effect of the undertaking on
any district, site, building, structure, or object that is
included in or eligible for inclusion in the National Register,"
16 U.S.C. § 470f, and Section 110, which requires that, for
undertakings involving National Historical Landmarks, the
agency, "to the maximum extent possible, undertake such planning
and actions as may be necessary to minimize harm to such
landmark," id. § 470h-2(f).  Plaintiffs also seek relief under

---

[6] In the "Facts" section of their Complaint, plaintiffs appear to
frame the issue of the Convent Avenue site development as an
allegation that defendants improperly "abandon[ed]" the
simultaneous development of the site, rendering the lot a vacant
blight on the neighborhood, attractive to crime.  Plaintiffs'
recitation of their claims, however, states only that the
failure to develop the Convent Avenue site degrades the
historical and architectural elements of the Grange.

the APA, 5 U.S.C. § 706, which permits a court to set aside agency action undertaken "without observance of procedure required by law," id. § 706(2)(D).

In their First Count, which includes claims under Section 110, its implementing regulations, and the APA, plaintiffs allege that the changes made to the Final GMP, including "the decision to abandon the community and interpretive center . . . the decision to substantially alter the plans for the interior of the Grange and the landscaping, and the decision to jettison the plan for elevator access to all floors within the Grange" will harm the Grange.  They argue that defendants, acting arbitrarily and capriciously, violated the law by bypassing required planning procedures and failing to consult with the Secretary of the Interior and the ACHP.

Plaintiffs' Second Count alleges violations of the APA and of several implementing regulations of Section 106.  Their claims include a broad range of procedural violations. Specifically, plaintiffs allege that defendants failed to 1) provide information regarding either the relocation and its effects on historic properties or the Programmatic Agreement; 2) seek public participation (including participation from The Friends, who plaintiffs assert should be classified as a

"consultant" under 36 C.F.R. § 800.2(c)[7]); 3) assess the adverse effects of the development; 4) document their decision-making regarding the Grange; and 5) give notice of the Programmatic Agreement and make available agency procedures implementing the Agreement.  Plaintiffs assert that they "have suffered and will continue to suffer" absent an order directing defendants to comply with their obligations under the NHPA.  Plaintiffs seek declaratory and injunctive relief, including a declaration voiding the Programmatic Agreement, an injunction directing defendants to comply with the NHPA by consulting The Friends before any further undertakings related to the Grange and ordering the construction of the community center as described in the Final GMP.

On October 21, 2008, defendants moved to dismiss the entirety of plaintiffs' amended complaint for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Fed. R. Civ. P. Defendants assert that plaintiffs lack constitutional standing to challenge the design of the Grange, the Convent Avenue site,

---

[7] 36 C.F.R. § 800.2(c) provides that individuals or organizations interested in an undertaking occurring pursuant to the NHPA "may participate as consulting parties due to the nature of their legal or economic relation to the undertaking ... or their concern with the undertaking's effects on historic properties." See Mid States Coalition for Progress v. Surface Transp. Bd., 345 F.3d 520, 553 (8th Cir. 2003).  To become a consultant, the party must request participation in writing and be granted consulting party status by the agency overseeing the undertaking.  36 C.F.R. § 800.3(f)(3).

or the process used to develop the designs.  Further, they assert that the NHPA provides no private right of action.  They also invoke mootness and laches in an attempt to bar claims based on the orientation of the Grange and the requirement that Convent Avenue construction coincide with the relocation of the Grange.  In the footnote presenting these defenses, defendants assert that plaintiffs should be barred from bringing these claims now that the Grange has been affixed to its new foundation and offer evidence that plaintiffs knew before the Grange was moved what its new orientation would be and that development of the Convent Avenue site was not yet feasible. Defendants also argue that claims regarding the Convent Avenue site are not ripe because defendants continue to develop the site, and that a claim under the APA is not yet ripe because no final agency action has occurred.  Plaintiffs filed their opposition on December 9, and the motion was fully submitted on December 19.


                           DISCUSSION

     Defendants' motion to dismiss principally asserts that there is no subject matter jurisdiction over this action. "Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the

district court lacks the statutory or constitutional power to adjudicate it." Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008) (citation omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Morrison v. National Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted).

A district court may consider evidence outside the pleadings when resolving a motion to dismiss for lack of subject matter jurisdiction.  Id. (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).  In general, on a motion to dismiss, "the court must take all facts alleged in the complaint as true."  Id. (citation omitted).  A plaintiff must affirmatively demonstrate jurisdiction, however, and "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  Id. (citation omitted).  "Where jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment."  London v. Polishook, 189 F.3d 196, 198 (2d Cir. 1999) (citation omitted).

Plaintiffs acknowledge that they bear a burden to demonstrate standing, but they assert that, at the pleading stage, general factual allegations of injury are sufficient, and courts should "presume that general allegations embrace the

specific facts that are necessary to support the claim." Lujan
v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citation
omitted).  While this statement remains good law, the Second
Circuit has clarified since Lujan that the plaintiffs may not
carry their burden based on "inference." Makarova, 201 F.3d at
110.  Neither are courts required to accept conclusory
allegations when considering whether plaintiffs have met their
burden.  Sharkey v. Quantillo, 541 F.3d 75, 83 (2d Cir. 2008).
"[E]ven on a motion to dismiss, courts are not bound to accept
as true a legal conclusion couched as a factual allegation."
Conyers v. Rossides, --- F.3d ----, 2009 WL 513734, at *4 (2d
Cir. Mar. 3, 2009) (citation omitted).  While the threshold may
be low, plaintiffs must still "clearly allege facts
demonstrating standing." Ross v. Bank of America, N.A. (USA),
524 F.3d 217, 222 (2d Cir. 2008).

A. Constitutional Standing

Defendants mount a three-fold attack on plaintiffs' claims
under the umbrella of constitutional standing.  First, they
argue that the allegations of harm to the Grange are not the
kind of concrete injury that confers standing and that those
claims are not redressable under the NHPA.  Second, they explain
that they have not abandoned development of Convent Avenue, so
plaintiffs can neither claim any injury nor show the
redressability of an alleged injury.  Finally, they assert that

plaintiffs' procedural violations are not tied to any concrete harm that either the Grange or the plaintiffs incurred, and cannot meet the injury requirement for standing either.[8]  Woven throughout all of defendants' standing arguments (in support of the argument that plaintiffs' claims are not redressable) is evidence that the consultations required under the NHPA have occurred and continue to occur, and that ordering further consultation would be futile.

A party bringing suit in federal court must first establish standing under Article III of the Constitution to prosecute the action.  See Elk Grove Unified Sch. District v. Newdow, 542 U.S. 1, 11 (2004).  As "constitutional standing is a jurisdictional prerequisite to suit," before considering the merits of a lawsuit, federal courts must ensure that they have jurisdiction under Article III.  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 126 (2d Cir. 2003).[9]  Less clear is whether non-merits questions,

---

[8] Defendants collapse arguments related to the merits of plaintiffs' case into the standing attack.  These include factual disputes regarding whether defendants involved the public sufficiently and whether defendants have in fact abandoned the development of the Convent Avenue site.

[9] The Second Circuit described the recent evolution of the primacy of the Article III inquiry as follows:
> Before 1998, federal courts, including the Second Circuit, occasionally assumed the existence of jurisdiction and proceeded directly to the merits of a case in circumstances where the jurisdictional issue was close or complicated and the plaintiff's claim on the merits could be easily

such as statutory standing, may also be resolved only after a
court establishes that it has Article III jurisdiction.
Alliance for Environmental Renewal, 436 F.3d at 85.  Statutory
standing questions intertwined with the merits may not be
decided before Article III standing is established.  Id. at 87.

     The Constitution's "case or controversy" requirement
"obligates the federal courts to hear only suits in which the
plaintiff has alleged some actual or threatened harm to him or
herself."  Leibovitz v. New York City Transit Auth., 252 F.3d
179, 184 (2d Cir. 2001); U.S. Const. Art. III § 2.
The Supreme Court developed a three-part test for constitutional
standing in Lujan, 504 U.S. at 560.  See also Ross, 524 F.3d at
222.  To establish constitutional standing under Article III, "a
plaintiff must have suffered an injury in fact that is distinct
and palpable; the injury must be fairly traceable to the
challenged action; and the injury must be likely redressable by
a favorable decision."  Ross, 524 F.3d at 222 (citation
omitted).  When presented in satisfaction of the injury-in-fact

---

                    rejected.  However, the Supreme Court has
                    substantially ended that practice, ruling
                    that a district court must generally resolve
                    material factual disputes and establish that
                    it has federal constitutional jurisdiction,
                    including a determination that the plaintiff
                    has Article III standing, before deciding a
                    case on the merits.
Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates
Co., 436 F.3d 82, 85 (2d Cir. 2006) (citation omitted).

requirement, any threatened injury must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." Coalition of Watershed Towns v. United States Environmental Protection Agency, 552 F.3d 216, 217 (2d Cir. 2008) (per curiam). The second requirement ("fairly traceable") is also commonly termed a causation requirement. See, e.g., id. Elaborating on the redressability requirement, the Coalition court explained that

> [r]edressability is the non-speculative likelihood that the injury can be remedied by the requested relief. It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.

Id. at 218.

The Second Circuit has not opined on constitutional standing in the context of claims asserted under the NHPA, but it has done so for an analogous statute, NEPA. NEPA, like the NHPA, is primarily procedural in nature, setting out procedures to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). In Fund for Animals v. Babbitt, 89 F.3d 128 (2d Cir. 1996), the Second Circuit considered an organization's claim that the Department of the Interior had failed to conduct

the required NEPA review, and the defendant Secretary of the
Interior challenged plaintiff's standing.  The Second Circuit
wrote that in order to "satisfy the causation and redressability
requirements" of the constitutional standing inquiry, plaintiff
was required to "show that their injuries are fairly traceable
to [defendant's] failure to conduct NEPA review of its funding
of the [p]roject, and that these injuries are likely to be
ameliorated by a judicial ruling directing the agency to
prepare" the statements required by NEPA.  Id. at 134.

When asserting a procedural right, a party need not
definitively establish that further review or consultation would
result in the outcome it desires in order to demonstrate
redressability.  "When a litigant is vested with a procedural
right, that litigant has standing if there is some possibility
that the requested relief will prompt the injury-causing party
to reconsider the decision that allegedly harmed the litigant."
Massachusetts v. E.P.A., 549 U.S. 497, 518 (2007).

1. Allegations of Harm to the Grange

Defendants argue that plaintiffs fail to make a
sufficiently concrete allegation of harm in their claim
addressed to the Grange.  Plaintiffs formulate their claim in
two ways: that defendants "introduce[ed] visual, atmospheric or
audible elements that diminish the integrity of the property's
significant historic features," and that

> defendants' decision to make wholesale changes to
> the Final GMP, including . . . the decision to
> substantially alter the plans for the interior of
> the Grange and the landscaping, and the decision
> to jettison the plan for elevator access to all
> floors within the Grange, have caused and will
> continue to cause harm to important historical
> and architectural elements of the Grange.

Except for the jettisoning of elevator access to all floors,
plaintiffs do not specify what alterations to plans for the
Grange have occurred.  Nor do plaintiffs specify how any of the
alterations adversely impact either themselves or the Grange.
As a result, they fail to demonstrate that they have incurred an
injury in fact.  See Bronx Household of Faith v. Board of Educ.
of City of New York, 492 F.3d 89, 110-11 (2d Cir. 2007)
(concreteness requirement).  "[T]he requirement of concrete
injury recognizes that if an injury is too abstract, the
plaintiff's claim may not be capable of, or otherwise suitable
for, judicial resolution."  Baur v. Veneman, 352 F.3d 625,
632 (2d Cir. 2003) (citation omitted).

While the elevator decision is sufficiently identified, the
complaint again fails to explain how this decision adversely
impacts the Grange or the plaintiffs.  Plaintiffs' vague
allegation that unspecified alterations cause some sort of harm
to unnamed "historical or architectural elements" represents the
kind of vague allegations that fail to meet the injury-in-fact
standard.

Plaintiffs attempt to establish injury in fact by pointing to a series of cases demonstrating that, when the rights violated are procedural, a "lesser showing of immediacy and redressability is required." New York Public Interest Group v. Whitman, 321 F.3d 316, 326 (2d Cir. 2003).  Even if plaintiffs may benefit from relaxed immediacy and redressability requirements, however, they still have not demonstrated that their injury is concrete:

> [D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.  Only a person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.

Summers v. Earth Island Institute, --- S.Ct. ----, 2009 WL 509325, at *6 (Mar. 3, 2009) (citation omitted).

As defendants point out, the plaintiffs in the cases that plaintiffs cite for the proposition that proximity to an historical site confers standing were able to demonstrate concrete injuries to those historic sites, unlike plaintiffs here.  In Lemon v. Geren, 514 F.3d 1312, 1314 (D.C. Cir. 2008), plaintiffs protested when an historic property faced redevelopment, including commercial and construction "activity on historic grounds." Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 28 (1st Cir. 2007), involved the construction of a

liquified natural gas terminal allegedly endangering protected
species and the preservation of tribal land.  Similarly,
approval of construction of a geothermal plant on land used for
cultural and religious ceremonies by the Pit River Nation
constituted sufficient injury-in-fact in Pit River Tribe v. U.S.
Forest Service, 469 F.3d 768, 779 (9th Cir. 2006).  In Pye v.
United States, 269 F.3d 459, 468 (4th Cir. 2001), construction
of a road running through two places eligible for listing on the
National Register of Historic Places would bisect a historical
area, disrupting its cohesiveness and resulting in the presence
of more looters.  And in Society Hill Towers Owners' Assoc. v.
Rendell, 210 F.3d 168, 176-77 (3d Cir. 2000), the plaintiffs
alleged an injury-in-fact when they argued that construction of
a hotel and parking garage in their neighborhood would increase
traffic and pollution and impair their property values.  These
cases do not allow plaintiffs to evade the requirement that they
allege a concrete injury, which they have failed to do with
regard to the design of the Grange and its site.

2. Procedural Harms

     Neither are plaintiffs' allegations of procedural harms
sufficient on their own to confer standing.  The Supreme Court
"expressly has disavowed the argument that a procedural
deficiency can satisfy the concrete-injury requirement without
any showing that the procedural violation endangers a concrete

interest of the plaintiff (apart from his interest in having the procedure observed)." <u>Lee v. Board of Governors of the Federal Reserve System</u>, 118 F.3d 905, 911 (2d Cir. 1997) (citation omitted). Procedural violations, at best, relax the redressability and immediacy requirements. <u>New York Public Interest Group</u>, 321 F.3d at 326. As described above, plaintiffs have not shown that decisions regarding the Grange created a concrete injury, so the procedural violations they allege related to the design decisions made during the restoration do not confer standing here.

3. Development of the Convent Avenue site

Having failed to show injury to the Grange or make out a claim of procedural injuries alone, plaintiffs' only remaining claim is that NPS "abandon[ed] altogether (or postpon[ed] indefinitely) the building" of the Convent Avenue community center. The essence of the plaintiffs' claim is that the Programmatic Agreement -- adopted without consultation with The Friends -- approved the development of a community center in a separate Section 106 action, in contrast to the Final GMP, which contemplated that the community center would be developed simultaneously with the restoration of the relocated Grange.

Defendants attack this claim on standing, ripeness, mootness, and laches grounds, supported by the assertion that no final decision regarding the site has occurred, so there is

arguably neither injury-in-fact nor a ripe case or controversy. Defendants also argue that plaintiffs' claim is not redressable because the Court cannot enter an injunction directing the immediate construction on Convent Avenue they seek because such relief is not authorized under the NHPA.

a. Injury In Fact

Plaintiffs allege that they were promised that the development would occur simultaneously with the restoration of the Grange, and that the community has suffered as the site has remained fallow during the period that has thus far transpired since the relocation occurred.  They express concern that the site, left empty, attracts crime and blights the neighborhood. This is a concrete and particularized injury affecting the residents' interest in the safety of their community, and it is an ongoing harm.  See, e.g., Pye v. United States, 269 F.3d at 468 (finding injury where the government's actions increased the risk of looting near historic sites).

b. Causation

Defendants do not assert that plaintiffs' alleged injuries are not fairly traceable to defendants' conduct.  Lujan, 504 U.S. at 560.  This requirement is no obstacle with regard to the Convent Avenue site: the government moved Hamilton Grange, left the lot vacant, and controls its future development.  Injuries

stemming from the failure to develop the site are therefore traceable to the government's actions.

c. Redressability

Defendants' attack on the redressability of plaintiffs' Convent Avenue site claim focuses on deficiencies in two possible remedies for the delay in developing the site: a court order that construction on the site begin immediately, or a remand for further procedures in compliance with the NHPA.  With regard to an injunction requiring construction to begin, defendants argue that the NHPA requires particular procedures, not particular outcomes, so a court may not order construction to begin, only further consultations.  Further consultation, defendants argue, would not redress plaintiffs' injury, because full consultation with the public has already occurred and will continue to occur as development of the site progresses.

Defendants have made a fulsome showing of the public consultations in which they engaged.  These consultations occurred over many years, and addressed a variety of topics related to the restoration of the Grange.  But the fact that extensive talks have occurred in the past does not mean that the fate of the empty site is so beyond redress that the plaintiffs lack standing to request further talks.

While the Second Circuit has not addressed the appropriateness of assessing the viability of further

41

consultation, especially at the motion to dismiss stage, the Ninth Circuit addressed a similar situation in Tyler v. Cuomo, 236 F.3d 1124 (9th Cir. 2000).  Plaintiffs, a group of homeowners residing near the site of a low-income housing development project, sued the developers, the City of San Francisco, and the Department of Housing and Urban Development, among others, contending that defendants failed to comply with a consultation requirement in a Memorandum of Agreement entered into pursuant to the NHPA.  Id. at 1128-29, 1131.  After the project had been completed, the district court dismissed the case for lack of Article III standing.  Id. at 1133. Overturning the district court's ruling, the Ninth Circuit concluded that the plaintiffs did have standing because there was a possibility that further consultations could lead to a different outcome and that the "district court should not pre-judge the result of the NHPA process by concluding that no relief is possible."  Id. at 1134 (citation omitted). Plaintiffs have therefore demonstrated standing to press their claims regarding the empty site where the Grange once stood, given the relaxed redressability standard for procedural rights and the possible redress that future consultation could provide.[10]

---

[10] Defendants' argument that they have already fully complied

B. Ripeness

For many of the same reasons that they attack the plaintiffs' standing to bring a claim regarding the Convent Avenue development, defendants assert that the claim is unripe. As there has been no final decision regarding the Convent Avenue site, and NPS is currently deciding how to proceed with the development, defendants claim that a challenge to their decision-making concerning the site is premature.

Ripeness "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." Ross, 524 F.2d at 226 (citation omitted). Ripeness is both a constitutional and a prudential doctrine. See N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 131 (2d Cir. 2008) (comparing constitutional and prudential ripeness). The constitutional doctrine "overlaps in some respects with standing, most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." Ross, 524 F.2d at 226 (citation omitted). Nonetheless, a plaintiff's standing may be enough to satisfy constitutional requirements, but a case "rendered sufficiently abstract by its prematurity" could fail Article III on ripeness

---

with their statutory obligations is a question going to the merits inappropriate for resolution at this stage of the litigation.

grounds separate from standing.  Simmonds v. I.N.S., 326 F.3d

351, 358 (2d Cir. 2003).

Defendants contend that prudential ripeness is lacking

here.  This second form of ripeness is "a more flexible doctrine

of judicial prudence, and constitutes an important exception to

the usual rule that where jurisdiction exists a federal court

must exercise it."  American Savings Bank, FSB v. UBS Financial

Svcs., Inc., 347 F.3d 436, 439 (2d Cir. 2003) (citation

omitted).  As the Second Circuit explained,

> [w]hen a court declares that a case is not
> prudentially ripe, it means that the case
> will be better decided later and that the
> parties will not have constitutional rights
> undermined by the delay.  It does not mean
> that the case is not a real or concrete
> dispute affecting cognizable current
> concerns of the parties within the meaning
> of Article III.

Id.  The prudential ripeness inquiry requires evaluating the

"fitness of the issues for judicial decision and the hardship to

the parties of withholding court consideration."  Clearing House

Ass'n v. Cuomo, 510 F.3d 105, 123 (2d Cir. 2007) (quoting Abbott

Labs. v. Gardner, 387 U.S. 136, 149, (1967)).  "[T]he 'fitness'

analysis is concerned with whether the issues sought to be

adjudicated are contingent on future events or may never occur."

Isaacs v. Bowen, 865 F.2d 468, 478 (2d Cir. 1989).  A challenge

to an agency's proposed policy change has been deemed unripe

where the challenge was "directed at possibilities and proposals

only, not at a concrete plan which has been formally promulgated and brought into operation." Id. at 477.  The Isaacs court "drew a distinction between pre-enforcement judicial review of specific regulations promulgated by the agency and judicial review of a nonfinal proposed policy." Grandeau, 528 F.3d at 132 (citation omitted).  Courts assessing fitness have also considered whether the disputed questions are purely legal, or whether they would benefit from greater factual development. Clearing House Ass'n, 510 F.3d at 123.  "Issues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." Grandeau, 528 F.3d at 132.

The second prong of ripeness analysis is "the hardship to the parties of withholding court consideration." Clearing House Ass'n, 510 F.3d at 123 (citation omitted).  "In assessing this possibility of hardship, we ask whether the challenged action creates a direct and immediate dilemma for the parties.  The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." Grandeau, 528 F.3d at 134 (citation omitted).

Plaintiffs challenge the process by which defendants allegedly abandoned the simultaneous development of the Convent Avenue site and restoration of the Grange.  That the lot is

currently vacant creates an injury that affords plaintiffs standing.  Whether the issue of its vacancy is ripe for judicial intervention, however, implicates a discussion of the types of intervention possible in the current situation.  If none of the interventions that plaintiffs seek is permissible at the present time or if they all demand further factual development, then the development of the Convent Avenue site is an unripe issue. Ripeness here is thus intertwined with consideration of the types of relief authorized by the NHPA and APA, particularly, the APA's directive that agency action is not ripe for adjudication until it is final.  See Sharkey, 541 F.3d at 89 ("The APA requirement of final agency action relates closely to the prudential doctrine of ripeness").

Plaintiffs make three demands for intervention with regard to the Convent Avenue site: an order that construction commence immediately, a declaration that defendants have violated the law and that the Programmatic Agreement is null and void, and an order that consultation with The Friends occur prior to any further undertakings connected to the Grange.  All of these demands rest on the assertion that the defendants have violated and continue to violate Sections 106 and 110.  As explained below, Sections 106 and 110 of the NHPA are procedural requirements imposed on agencies.  See Business and Residents Alliance of East Harlem v. Jackson, 430 F.3d 584, 591 (2d Cir.

2005) (referring to Section 106 as a "stop, look, and listen"
provision); Lee v. Thornburgh, 877 F.2d 1053, 1057 (D.C. Cir.
1989) (Section 110 does not impose substantive requirements on a
federal agency).  The issue potentially fit for adjudication is
thus whether defendants complied with their procedural
obligations under the NHPA.  Because, as explained below, the
NHPA does not create a private right of action, plaintiffs'
claims require a final decision by the government that could
trigger review under the APA.  If no final decision has yet been
made regarding the Convent Avenue site, it is not yet
appropriate to determine whether the consultations required by
the NHPA have occurred.

Until there is some final agency action, review is
"directed at possibilities and proposals only," and partially
complete consultations.  Isaacs, 865 F.2d at 477.  Were
intervention in an ongoing development process to occur,
"decisions properly made by the administrative agency might be
foreclosed or limited."  Id. at 478.  The question of adequate
consultation is a fact-intensive inquiry, not an already
"crystallized" legal issue unaffected by further factual
development.  Id.  To the extent that plaintiffs can identify a
final decision with regard to the vacant lot and plead that it
was undertaken in defiance of consultation requirements under
the NHPA, the issues regarding the site's development would be

ripe.  The adequacy of plaintiffs' allegations of final agency action is addressed below.

C.  Mootness

Defendants' final challenge to the justiciability of plaintiffs' claims under Article III comes on mootness grounds. Defendants assert that plaintiffs' grievances arising from the failure to develop the Convent Avenue site at the time the Grange was relocated are moot because the relocation has occurred.

"The mootness doctrine provides that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Conn. Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ., 464 F.3d 229, 237 (2d Cir. 2006) (citation omitted).  "Under Article III, section 2 of the Constitution, federal courts lack jurisdiction to decide questions that cannot affect the rights of litigants in the case before them." Davis v. N.Y., 316 F.3d 93, 99 (2d Cir. 2002).  Such situations arise when "there is no reasonable expectation that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Id. (citation omitted).

To the extent plaintiffs' claims relate to NPS's failure to develop the Convent Avenue site at the same time that it reclocated the Grange, those claims are now moot.  Plaintiffs'

claims, however, derive not just from the failure to construct the community center on the site at that moment, but from the continuing lack of development of the now-vacant lot, which they claim causes ongoing harm.  A live controversy exists regarding the future of the Convent Avenue site and the role The Friends will play in that development.

D.  Private Right of Action Under the NHPA

Having confirmed that plaintiffs' claim for failures to consult regarding the development, or lack thereof, of the Convent Avenue site is justiciable under Article III, the next stage in the inquiry concerns whether plaintiffs have stated a claim for relief under the relevant statutes.  While defendants state that they move to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P., they also argue that the relevant sections of the NHPA do not confer a private right of action, which is grounds for dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P.  See, e.g., Olmsted v. Pruco Life Ins. Co. of New Jersey, 283 F.3d 429, 430-31 (2d Cir. 2002) (affirming district court's dismissal of action pursuant to Rule 12(b)(6) because relevant statute did not provide for a private right of action).

Recognizing that the Second Circuit has not addressed the issue of whether the NHPA affords a private right of action, East Harlem, 430 F.3d at 590, defendants argue that authority from other circuits nonetheless supports a finding that none

exists.  Plaintiffs respond that the weight of authority is in
their favor, citing other out-of-circuit authority.

As the Second Circuit recently noted,

> [c]ongressional intent is the keystone as to
> whether a federal private right of action
> exists for a federal statute.  Without a
> showing of congressional intent, a cause of
> action does not exist and courts may not
> create one, no matter how desirable that
> might be as a policy matter, or how
> compatible with the statute.  This Court
> must begin its search for Congress's intent
> with the text and structure of the statute,
> and cannot ordinarily conclude that Congress
> intended to create a right of action when
> none was explicitly provided.

Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 116 (2d Cir. 2007)
(citing Alexander v. Sandoval, 532 U.S. 275, 286-88 (2001)).
See also Colavito v. New York Organ Donor Network, 438 F.3d 214,
230 (2d Cir. 2006).  An implied cause of action exists "only if
the underlying statute can be interpreted to disclose the intent
to create one."  Stoneridge Inv. Partners, LLC v. Scientific-
Atlanta, 128 S.Ct. 761, 772 (2008).

Determining the existence of a private right of action will
thus require reference to relevant provisions of the NHPA.
Plaintiffs bring their claims under Sections 106 and Section 110
of the statute.  Section 106 requires a federal agency, prior to
initiating any "undertaking" involving an historic property, to
"take into account the effect of the undertaking on any
district, site, building, structure, or object that is included

50

in or eligible for inclusion in the National Register," 16

U.S.C. § 470f.[11]   Section 106 of the NHPA is

> primarily procedural in nature.  It does not
> itself require a particular outcome, but
> rather ensures that the relevant federal
> agency will, before approving funds or
> granting a license to the undertaking at
> issue, consider the potential impact of that
> undertaking on surrounding historic places.
> As such, courts have sometimes referred to
> Section 106 as a 'stop, look, and listen'
> provision.

East Harlem, 430 F.3d at 590-91 (2d Cir. 2005).

Section 110(f) is also procedural in nature, and

complements Section 106 by setting a higher standard for agency

planning regarding the effects on National Historic Landmarks.

Nat'l Trust for Historic Pres. v. Blanck, 938 F. Supp. 908, 921

---

[11] The full text of Section 106 is as follows:
> The head of any Federal agency having direct
> or indirect jurisdiction over a proposed
> Federal or federally assisted undertaking in
> any State and the head of any Federal
> department or independent agency having
> authority to license any undertaking shall,
> prior to the approval of the expenditure of
> any Federal funds on the undertaking or
> prior to the issuance of any license, as the
> case may be, take into account the effect of
> the undertaking on any district, site,
> building, structure, or object that is
> included in or eligible for inclusion in the
> National Register.  The head of any such
> Federal agency shall afford the Advisory
> Council on Historic Preservation established
> under title II of this Act [16 U.S.C. §§
> 470i et seq.] a reasonable opportunity to
> comment with regard to such undertaking.
16 U.S.C. § 470f.

(D.D.C. 1996) (citing House Report at 36-38, reprinted in 1980 U.S.C.C.A.N. at 6399-6401), aff'd, 203 F.3d 53 (D.C. Cir. 1999). Section 110 requires that, for undertakings involving National Historical Landmarks, the agency, "to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark," 16 U.S.C. § 470h-2(f). Although the Second Circuit has never opined on Section 110, other courts considering the statute have ruled that it does not impose any independent, substantive requirement on a federal agency. See, e.g., Thornburgh, 877 F.2d at 1057; Blanck, 938 F. Supp. at 922.

Absent from Sections 106 and 100 is any suggestion of congressional intent to confer a private right of action. Sections 106 and 110 govern agency conduct. They are addressed to the agencies being regulated, not the classes of individuals who may be protected by the NHPA. They therefore do not bestow on those individuals implied rights to bring a lawsuit. See San Carlos Apache Tribe v. United States, 417 F.3d 1091, 1098 (9th Cir. 2005) ("San Carlos").[12]  Several circuit courts have

---

[12] Moreover, implying a private right of action under the NHPA is problematic because there is no evidence that Congress intended to waive sovereign immunity with respect to the statute. San Carlos, 417 F.3d at 1099. "[W]aivers of sovereign immunity must be unequivocally expressed in statutory text, and cannot simply be implied." Adelke v. United States, 355 F.3d 144, 150 (2d Cir. 2004) (citation omitted). The APA, meanwhile, provides such a waiver. 5 U.S.C. § 702; Sharkey, 541 F.3d at 91.

similarly held that NEPA, which contains an analogous section requiring agencies to consider the impact of major federal actions on the environment, <u>see</u> 42 U.S.C. § 4332(c), contains no private right of action, and that challenges to compliance with NEPA must be brought under the APA.  <u>See</u>, <u>e.g.</u>, <u>Karst Environmental Education and Protection, Inc. v. United States Environmental Protection Agency</u>, 475 F.3d 1291, 1295 (D.C. Cir. 2007); <u>Ouachita Watch League v. Jacobs</u>, 463 F.3d 1163, 1173 (11th Cir. 2006).

Plaintiffs contend that NHPA contemplates that at least some of its provisions will give rise to a private right of action, as it contains an attorneys' fee section allowing for private recovery in an action brought under the NHPA.  16 U.S.C. § 470w-4 ("in any civil action brought in any United States district court by any interested person to enforce the provisions of this subchapter . . . the court may award attorneys' fees"); <u>Preservation Coalition of Erie County v. Federal Transit Admin.</u>, 356 F.3d 444, 450 (2d Cir. 2004) (discussing NHPA's attorneys' fees provision).  The cases plaintiffs cite for the proposition that a private right of action exists rely on this section to support their holding. <u>See</u>, <u>e.g.</u>, <u>Boarhead Corp. v. Erickson</u>, 923 F.2d 1011, 1017 (3d Cir. 1991); <u>Vieux Carre Property Owners, Residents & Assocs. v. Brown</u>, 875 F.2d 453, 458 (5th Cir. 1989).

The attorneys' fee provision is insufficient to infer a
private right of action for either Section 106 or Section 110.
This provision should be read to authorize a fee award in cases
brought under the APA to enforce NHPA obligations, and should
not be construed to authorize a private lawsuit under the NHPA
itself.  Without an explicit private right of action emerging
from the text and structure of the statute, courts should be
cautious to infer that such a right exists.  Bellikoff, 481 F.3d
at 116.

Moreover, the cases plaintiffs cite that relied on the
presence of an attorneys' fees provision to find a private right
of action under the NHPA all pre-date Sandoval, the source of
the current private-right-of-action standard.  Sandoval involved
a section of a statute, Section 602 of Title VI of the Civil
Rights Act of 1964, which elsewhere contains both an attorneys'
fee provision and other sections under which private rights of
action were permitted.  42 U.S.C. § 1988(b).  The availability
of this fee award elsewhere in the statute did not preclude the
Court from finding that no private right of action existed under
Section 602, which, like Sections 110 and 106, focuses "on the
agencies that will do the regulating," not "the individuals
protected" by the statute.  Sandoval, 532 U.S. at 289.  While
the situation is not a precise equivalent -- there were other
provisions of Title VI to which the fee award could apply, and

the fee award under the NHPA can apply to suits brought under the APA -- the basic proposition that the presence of a fee award provision is not dispositive of the issue of a private right of action for each provision of a statute is still relevant.  Having found that the text of Sections 106 and 110, wholly directed at agencies, does not provide a private right of action, plaintiffs' claims arising directly under the NHPA are therefore dismissed.

E. Claims Under the APA

Plaintiffs' remaining claims arise under the APA, which unquestionably affords a private right of action: "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; Sharkey, 541 F.3d at 83.  Plaintiffs, however, face an additional problem under the APA: it requires that final agency action occur before courts may step in and adjudicate a challenge to agency compliance with the statute.  5 U.S.C. § 704; Sharkey, 541 F.3d at 88.  Defendants contend that no final decision has yet been made concerning development of Convent Avenue, so there is no final agency action ripe for review under the APA.

The APA's finality requirement provides that "[a]gency action made reviewable by statute and final agency action for

which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. This requirement looks to "whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." Top Choice Distributors, Inc. v. U.S. Postal Service, 138 F.3d 463, 466 (2d Cir. 1998) (citation omitted). The most recent Supreme Court test for finality appears in Bennett v. Spear, 520 U.S. 154 (1997), where the Court had this to say:

> As a general matter, two conditions must be satisfied for agency action to be considered "final": First, the action must mark the consummation of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

Id. at 177-78 (citation omitted); Sharkey, 541 F.3d at 88.

The Second Circuit has not defined what constitutes "final agency action" under NHPA. The D.C. Circuit has noted that, under the NHPA, that final action must be a "federal undertaking." Karst, 475 F.3d at 1296. The Second Circuit has described final agency action generally as the point when "the process of administrative decision-making has reached a stage where judicial review will not be disruptive of the agency process," or when "legal consequences will flow from the action." Seafarers Int'l Union of North America, AFL-CIO v. Coast Guard, 736 F.2d 19, 26 (2d Cir. 1984) (citation omitted).

"Under the APA, an action is 'final' insofar as it is not a preliminary, procedural, or intermediate agency action or ruling."  Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003) (citing 5 U.S.C. § 704).

In order to state a claim under Rule 12(b)(6), plaintiffs must plead enough facts to make a "plausible" allegation of final agency action.  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (plausibility standard).  In the amended complaint, plaintiffs recite the Programmatic Agreement's statement that the NPS will "initiate and actively support a public/private partnership to plan and develop a new multi-use facility" in the Convent Avenue site "as a separate Section 106 action."  Based on this action, which disconnected the development of the site from the renovation of the Grange, the plaintiffs allege that defendants made a decision to abandon or postpone indefinitely the community and interpretive center, thus leaving the Convent Avenue site fallow.[13]

---

[13] While defendants assert that no final agency action regarding the Convent Avenue site has occurred, all inferences must be made in plaintiff's favor at the motion to dismiss stage. Conyers, 2009 WL 513734, at *4.  It is inappropriate to consider defendants' evidence that review of the Convent Avenue site is ongoing for the purpose of determining whether plaintiffs have stated a claim sufficient to describe dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P.  Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (courts should consider only the complaint, exhibits attached to the complaint, and documents integral to the

The allegation that defendants made a decision "to abandon" the development of the Convent Avenue site, which is frequently repeated in the amended complaint, is insufficient to plead a final agency action.  First, a conclusory allegation is not sufficient to satisfy even the permissive standards with which pleadings are scrutinized as the motion to dismiss stage. Conyers, 2009 WL 513734, at *4.  As significantly, the pleading recognized that the NPS made a commitment to develop the Convent Avenue site in the Programmatic Agreement.  Thus, read as a whole, and considering the Programmatic Agreement which the pleading incorporates, the amended complaint contradicts the assertion that the NPS has made a final decision to abandon the site's development.  Plaintiffs have therefore failed to sufficiently allege a final agency decision permitting review of the Convent Avenue site development under the APA.[14]

---

complaint may be considered when deciding a motion to dismiss under Rule 12(b)(6).

[14] Perhaps in recognition of the hurdle created by the NPS commitment in the Programmatic Agreement, plaintiffs have not requested leave to amend or presented any argument in their opposition brief that could be construed either as a request for leave to amend or a sufficient allegation that the failure to immediately commence construction on or development of the Convent Avenue site was a final agency action.

CONCLUSION

Defendants' motion to dismiss is granted with respect to all claims, and the amended complaint is dismissed. The Clerk of Court is directed to enter judgment for the defendants and to close the case.

SO ORDERED:

Dated:    New York, New York
          March 12, 2009

DENISE COTE
United States District Judge